C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Matthew D. Cubeiro – SBN 291519
mcubeiro@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| STEVEN RUPP, et al., | Case No.: 8:17-cv-00746-JLS-JDE |
|---|---|
| Plaintiffs, | **THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

Plaintiffs, Steven Rupp, Steven Dember, Cheryl Johnson, Michael Jones, Christopher Seifert, Alfonso Valencia, Troy Willis, Dennis Martin, and the California Rifle & Pistol Association, Incorporated, ("Plaintiffs") through their counsel, bring this action against Defendant Attorney General Xavier Becerra, in his official capacity, and make the following allegations:

**INTRODUCTION**

1.     Plaintiffs are law-abiding California residents who seek to protect themselves and their families with rifles owned and in common use by millions of Americans for self-defense. The Second Amendment squarely protects Plaintiffs' right to keep and bear arms "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008). And California plainly infringes that right by completely barring Plaintiffs from acquiring, transferring, or possessing commonly owned rifles that it pejoratively labels "assault weapons"—a non-technical, political term of ever-changing definition and scope with no connection to the public safety interests that the law purports to serve.[1]

2.     California's sweeping Assault Weapon Control Act ("the AWCA")[2] prohibits the most popular rifle models in the country, which are lawfully owned and safely operated by millions of Americans in all but a few states. To achieve such a broad ban, California classifies as "assault weapons" dozens of specific, popular rifles by their make and model along with any other rifle having certain common

---

[1] " 'Prior to 1989, the term "assault weapon" did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of "assault rifles" so as to allow an attack on as many additional firearms as possible on the basis of undefined "evil" appearance.' " *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quoting Bruce H. Kobayashi & Joseph E. Olson, *In Re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons"*, 8 Stan. L. & Pol'y Rev. 41, 43 (1997)).

[2] Part 6, Title 4, Division 10, Chapter 2 of the California Penal Code, commencing with section 30500.

2

THIRD AMENDED COMPLAINT

features that are the hallmarks of the most popular rifle models. None of these features that qualify a rifle for the State's prohibition have anything to do with rate of fire, ammunition capacity, power, or anything else linked to the rifle's potential to be exploited for crime. To the contrary, their purpose is to promote ergonomic comfort, accuracy, and safe handling—that is, to make the rifles safer and more effective for the core lawful purpose of self-defense. In sum, California's prohibition of rifles "in common use . . . for lawful purposes like self-defense" is based on distinctions that have nothing to do with public safety or any other valid government objective. *Id.* at 624. That is a policy choice the Second Amendment takes "off the table." *Id.* at 636.

3.    The Second Amendment is not the only constitutional provision implicated by the State's ban. By retroactively criminalizing firearms that were lawful when purchased based on arbitrarily selected features—many of which actually make firearms that are commonly owned and used *safer* and more effective for self-defense—the AWCA violates the Due Process Clause. *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 541 (2005); *id.* at 548-49 (Kennedy, J., concurring). And by severely constraining the right of firearm owners to transfer lawfully acquired firearms, and eliminating entirely the right of firearms owners "to pass on" their lawfully acquired property to their family members or heirs— "one of the most essential sticks in the bundle of" property rights, which has "been part of the Anglo-American legal system since feudal times"—without compensation, the AWCA violates the Takings Clause. *Hodel v. Irving*, 481 U.S. 704, 716 (1987); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425, 2427 (2015).

4.    Desiring to acquire, possess, use, and/or transfer these constitutionally protected firearms for lawful purposes including self-defense, but justifiably fearing prosecution if they do, Plaintiffs respectfully request this Court: (1) declare that California Penal Code sections 30510(a), 30515(a)(1)(A-C), 30515(a)(1)(E-F), 30515(a)(3), 30520, 30600, 30605, , 30925, and 30945, along with California Code

of Regulations, title 11, section 5499 ("11 C.C.R. 5499"), infringe Plaintiffs' constitutional rights; and (2) permanently enjoin Defendants from enforcing each of those sections to the extent they prevent law-abiding Californians, like Plaintiffs, from acquiring, possessing, using or transferring constitutionally protected arms.

## FACTUAL BACKGROUND

5.     This case involves California's ban on certain commonly owned semiautomatic, centerfire rifles with detachable magazines. "Semiautomatic" means the rifle discharges a single projectile with each pull of the trigger, no matter how long the trigger is depressed.[3] "Centerfire" means the rifle uses "centerfire" (as opposed to "rimfire") ammunition.[4] And having a "detachable magazine" means that the rifle is fed ammunition via a magazine that is not fixed to the rifle.

6.     There is nothing new or unusually dangerous about semiautomatic, centerfire rifles with detachable magazines. Such rifles have been in safe and effective use by civilians in this country—including in California—for over a century. As a general matter, they remain lawful in all states today.

7.     Many semiautomatic, centerfire rifles with detachable magazines come standard with—or can be modified with widely available aftermarket products to include—particular features designed to promote comfort, safe handling, and accuracy. As relevant to this case, those features include a "pistol grip" (including a

---

[3] By contrast, fully automatic weapons—otherwise known as a "machine guns"—are capable of discharging rounds as long as the trigger is depressed. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Fully automatic "machine guns" are generally banned in California by Penal Code section 32625, a section Plaintiffs do not challenge here.

[4] Ammunition consists of loaded cartridges that have four parts: a primer, case, propellant (gun powder) and a projectile (bullet or shot). *See* Cal. Penal Code § 16150. When a firing pin strikes the priming compound of a cartridge placed in a gun's chamber, the resulting spark ignites the powder charge and the resulting gas drives the bullet out of the case and then out of the barrel. In a "centerfire" cartridge, the priming compound is contained in a cup mechanically positioned in a 'pocket' in the center of the back end of the cartridge case. In a "rimfire cartridge," the priming compound has been placed on the outside rim of the cartridge case by centrifugal force. The clear majority of cartridge types are centerfire; rimfire ammunition generally consists of smaller cartridges, *e.g.*, .22LR.

4

"forward pistol grip"), a "thumbhole stock," a "flash suppressor," and an adjustable ("telescoping") stock. *See* Cal. Penal Code § 30515.

8.      A "pistol grip" allows for a "grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing." Cal. Code Regs. tit. 11, § 5469(d). In other words, a pistol grip allows for a more comfortable and stable grip, which in turn promotes accuracy when shooting. "By holding the pistol grip, the shooter keeps the barrel from rising after the first shot, and thereby stays on target for a follow-up shot. The defensive application is obvious, as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting) (citing David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994)). A pistol grip also lessens recoil and, by allowing a user to grip the rifle from below rather than from above, minimizes the chance that a rifle will slip out of the user's hand while firing, further increasing safety, improving accuracy, and preventing stray shots.[5]

9.      A "thumbhole stock" allows the thumb of the user's "trigger hand to penetrate into or through the stock while firing." Cal. Code Regs. tit. 11, § 5469(e). Like a pistol grip, a thumbhole stock makes it easier for a user to have a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the weapon or firing stray shots.

10.     A "flash suppressor" is a device designed to "reduce or redirect muzzle flash"— the sudden flash of light caused by the explosion of gunpowder when a rifle user fires a shot—"from the shooter's field of vision." Cal. Code Regs. tit. 11, § 5469(b). A "flash suppressor" prevents a rifle user from being blinded in low lighting conditions, such as at dusk or dawn or during the nighttime. Another function of a "flash suppressor" is to reduce recoil and muzzle (tip of the barrel)

---

[5] A "forward pistol grip" serves the same function for the user's forward hand. *See* Cal. Code Regs. tit. 11, § 5469(c).

THIRD AMENDED COMPLAINT

movement, making the rifle less painful for the user to operate and increasing accuracy.

11.     An adjustable ("telescoping") stock permits the rifle's user to adjust the stock forward or backward, making it shorter or longer, according to his or her specific physical size so that the rifle can be held comfortably.[6] In other words, its purpose is to fit the particular user's arm length, making it easier, thus safer, to shoot; particularly if there are multiple users of different sizes using the same rifle. And, "there is essentially no difference between a short standard stock and a shortened retractable stock." *Murphy v. Guerrero*, No. 14-00026, 2016 WL 5508998, at *19 (D. N. Mar. I. Sept. 28, 2016). As long as the rifle does not have an illegally short overall length[7] when the adjustable stock is at its most compact setting, a non-adjustable stock can lawfully be just as short.

12.     In sum, a pistol grip, thumbhole stock, flash suppressor, and adjustable ("telescoping") stock (as those terms are defined by California regulations) are each designed to make a rifle more comfortable or easier for a user to accurately operate, thereby facilitating the rifle's safe and effective operation when used for a lawful purpose such as self-defense.

13.     None of these features increases a rifle's "rate of fire and capacity for firepower." Cal. Penal Code § 30505(a). To the contrary, they "actually tend to make rifles easier to control and more accurate—making them safer to use." *Murphy v. Guerrero*, No. 14-00026, 2016 WL 5508998, at *18 (D. N. Mar. I. Sept. 28, 2016).

14.     Rifles with these features are extremely popular with the American public. Between 1990 and 2014, more than 11 million rifles having at least some of these features were manufactured in or imported into the United States. *See Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016), *vacated* 849 F.3d 114 (2017). In 2012,

---

[6] California provides no definition for "telescoping stock."
[7] *See* Penal Code §§ 33210-33290, 17170 and 18 U.S.C.A. §§ 921(a)(8), 922(a)(4), 922(b)(4) (heavily restricting any "short-barreled" rifle having an overall length of less than 26 inches).

such rifles accounted for approximately 20 percent of all retail firearm sales. And in 2014 alone, approximately 1,228,000 such rifles were manufactured or sold in the United States.[8]

15.     Purchasers consistently report that one of the most important reasons for their purchase of this class of rifle is self-defense. Other lawful and constitutionally protected purposes for these rifles include hunting, competitive shooting, and target shooting.

16.     Rifles equipped with the banned features are no more dangerous or susceptible to use for criminal purposes than those without them. In recognition of that fact, the vast majority of States place no special restrictions on semiautomatic, centerfire rifles with a detachable magazine for having a pistol grip, thumbhole stock, flash suppressor, or adjustable stock. Indeed, only five States other than California (plus the District of Columbia) place restrictions on such rifles, and all those restrictions are of recent vintage.[9]

### CALIFORNIA'S ASSAULT WEAPONS CONTROL ACT

**A.     General Principles**

17.     This case concerns what is known, in relevant part, as the Roberti-Roos Assault Weapons Control Act of 1989, or the AWCA, found at Part 6, Title 4, Division 10, Chapter 2 of the California Penal Code, commencing with section 30500.[10]

---

[8] To put that in perspective, less than 570,000 Ford F-150 trucks—the best-selling vehicle in the United States—were sold in 2014. Warren Clarke, *Top 10 Best-Selling Vehicles for 2014*, Edmunds (Jan. 15, 2015), https://www.edmunds.com/car-reviews/top-10/top-10-best-selling-vehicles-for-2014.html.

[9] Connecticut (Conn. Gen. Stat. Ann. §§ 53-202a - 53-2020); Washington D.C. (D.C. Code Ann. § 7-2501.01); Maryland (Md. Code Ann., Crim. Law § 4-301); Massachusetts (Mass. Gen. Laws Ann. ch. 140, § 121); New Jersey (N.J. Stat. Ann. § 2C:39-1(w)); and New York (N.Y. Penal Law § 265.00(22)).

[10] These statutes are also known as the ".50 Caliber BMG Regulation Act of 2004." The firearms impacted by the provisions of that Act, although appearing in the same statutes as "assault weapons," are not at issue in this litigation.

7

18.     The AWCA generally makes it illegal to manufacture or cause to be manufactured, distribute, transport, import into the state for sale, keep for sale, offer or expose for sale, or give, or lend any "assault weapon." A violation is punishable as a felony by imprisonment for four, six, or eight years. Cal. Penal Code § 30600(a).

19.     The AWCA also generally prohibits the possession of any "assault weapon." A violation is punishable as either a misdemeanor or felony with potential imprisonment in county jail or state prison. *Id.* § 30605(a); *id.* § 1170(h).

20.     The AWCA includes a few limited exceptions that apply to specific groups like peace officers, special "dangerous weapons permit" holders,[11] executors of estates, and those specifically licensed to engage in the business of firearms restricted under the AWCA. *See id.* §§ 30625-30630, 30645-30655, 31000-31005. The exceptions do not, however, permit possession of an "assault weapon" by a member of the general public.

21.     As discussed further below, there is an exception to the general restriction on "possessing" an "assault weapon" for anyone who lawfully acquired a firearm prior to the legislature classifying that firearm as an "assault weapon," provided the firearm was registered with the California Department of Justice ("the California DOJ") as an "assault weapon" during the statutorily mandated registration period. *Id.* § 30900. Firearms exempted from the ban by these "grandfathering" provisions, however, generally cannot be transferred to ordinary private citizens in California, including members of the owner's family upon the death of the owner. They can only be transferred to specified law enforcement agencies and personnel, certain "dangerous weapon" permit holders, or those who reside out of state. *Id.* §§ 30625, 30645, 30650, 31055, 31100. Thus, lawful possession of timely registered

---

[11] This permit is generally issued only to those in the business of selling or transferring such firearms, and only upon demonstrating a bona fide market or public necessity for the issuance of such a permit in their application to the Department of Justice. *See* Cal. Code Regs, tit. 11, §§ 4132-4137.

THIRD AMENDED COMPLAINT

grandfathered "assault weapons" is effectively confined to the lifetime of the current owner, after which the executor of the estate must dispose of them as described in the preceding sentence or law enforcement will confiscate them.

### B. Definition of "Assault Weapon"

22.    The class of firearms that California defines as "assault weapons" has evolved (and expanded) several times since the AWCA was first enacted in 1989.

23.    As originally written, the AWCA expressly declared over 55 firearms, listed by make and model, to be "assault weapons." Those firearms include the "Avtomat Kalashnikovs (AK) series," the "Colt AR-15 and AR-15 series" rifles, the "SKS with detachable magazine," and any firearm declared an "assault weapon" by a court under Penal Code section 30520 (former Penal Code section 12276.5).[12] *See* Assemb. B. 357, 1989-1990 Reg. Sess. (Cal. 1989), 1989 Cal. Stat. 64-65.

### *Category 1 Assault Weapons*

24.    In 1991, the Legislature amended the AWCA to add several new firearms to the list of restricted "assault weapons," including "Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S." *See* Cal. Penal Code § 30510 (former Cal. Penal Code § 12276 (1992)) (added by Sen. B. 263, 1991-1992 Reg. Sess. (Cal. 1991), 1991 Cal. Stat. 4440-41). The "Avtomat Kalashnikovs (AK) series" and "CAR-15 series" were removed, while the provision banning the "Colt AR-15 series" remained. *See id.* And "[a]ll AK series" were added to the list. *See id.* This list of firearms commonly became known as "Category 1" "assault weapons."

25.    Category 1 "assault weapons" were required to be registered on or before March 31, 1992, following an extension after the 1991 amendment. *See* Cal. Penal Code § 30960(a) (former Cal. Penal Code § 12285(f) (1992)). It is no longer possible to register a Category 1 "assault weapon" and, therefore, no longer possible

---

[12] In 2010, the legislature reorganized without substantive change all the Penal Code sections relating to "deadly weapons," including those relating to "assault weapons." *See* Sen. B. 1080, 2009-2010 Reg. Sess. (Cal. 2010).

THIRD AMENDED COMPLAINT

for the public to acquire one. Individuals who still possess a Category 1 "assault weapon" can only legally do so if the firearm was properly registered by the applicable deadline. And as explained above, registered owners of Category 1 "assault weapons" cannot transfer them to ordinary private citizens within California, even their own family members upon their death.

### Category 2 Assault Weapons

26.     In 2000, the California Supreme Court explained the legal requirements for adding a firearm to the list of "assault weapons." *Kasler v. Lockyer*, 23 Cal. 4th 472 (2000). Immediately following this decision, the California DOJ added more than 60 AR-15 and AK "series" firearms to that list. These firearms are commonly referred to as "Category 2 assault weapons."

27.     The list of rifles that the California DOJ deemed "assault weapons" as "series" makes and models, or Category 2 "assault weapons" can be found at 11 C.C.R. § 5499. In 2006, the legislature repealed the California DOJ's authority to add firearms to the list of "assault weapons" identified in 11 C.C.R. § 5499. *See* Cal. Penal Code § 30520 (former Cal. Penal Code § 12276.5) (added by Assemb. B. 2718, 2005-2006 Reg. Sess. (Cal. 2006), 2006 Cal. Stat. 6342-43). Thus, the list of firearms deemed "assault weapons" by make and model in Penal Code section 30510 or 11 C.C.R. § 5499 (Category 1 or Category 2 "assault weapons") is now static.[13]

28.     Category 2 "assault weapons" were required to be registered on or before January 23, 2001. It is no longer possible to register a Category 2 "assault weapon" and, therefore, no longer possible for the public to acquire one. Individuals who still possess a Category 2 "assault weapon" can only legally do so if it was properly registered by the applicable deadline. And as explained above, registered

---

[13] *See* Assault Weapons Identification Guide, California Attorney General, https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/awguide.pdf (3d Ed., Nov. 2001).

10

THIRD AMENDED COMPLAINT

owners of Category 2 assault weapons cannot transfer them to ordinary private citizens within California, even their own family members upon their death.

### Category 3 Assault Weapons

29.     In 1999, the legislature again amended the AWCA to further expand the definition of "assault weapon." Unlike Category 1 and Category 2 "assault weapons," which are expressly listed by make and model, this time the legislature classified a firearm as an "assault weapon" based on its features and configuration. *See* Cal. Penal Code § 30515 (former Cal. Penal Code § 12276.1) (added by Sen. B. 123, 1999-2000 Reg. Sess. (Cal. 1999), 1999 Cal. Stat. 1805-06). Firearms meeting this definition are commonly referred to as "Category 3" "assault weapons."

30.     Category 3 "assault weapons" include:

(a)     (1)     A semiautomatic, centerfire rifle *that has the capacity to accept a detachable magazine and any one of the following*:

(A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

(B) A thumbhole stock.

(C) A folding or telescoping stock.

(D) A grenade launcher or flare launcher.

(E) A flash suppressor.

(F) A forward pistol grip.

(2)     A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

(3)     A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

(4)     A semiautomatic pistol *that has the capacity to accept a detachable magazine and any one of the following*:

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.

(B) A second handgrip.

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5)     A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

(6)     A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

(7)     A semiautomatic shotgun that has the ability to accept a detachable magazine.

(8)     Any shotgun with a revolving cylinder.

Cal. Penal Code § 30515.

31.     In 2000, the California DOJ promulgated regulations, defining the following key terms for Category 3 "assault weapons": (a) "Detachable magazine;" (b) "Flash suppressor;" (c) "Forward pistol grip;" (d) "Pistol grip that protrudes conspicuously beneath the action of the weapon;" and (e) "Thumbhole stock." Cal. Code Regs. tit. 11, § 5469.

32.     Category 3 "assault weapons" were required to be registered on or before December 31, 2000. It is no longer possible to register a Category 3 "assault weapon" and, therefore, no longer possible for the public to acquire one. Individuals who still possess a Category 3 "assault weapon" can only legally do so if it was

properly registered by the applicable deadline. And as explained above, registered owners of Category 3 "assault weapons" cannot transfer them to ordinary private citizens within California, even their own family members upon their death.

### *Category 4 Assault Weapons*

33.     Because Category 3 assault weapons must have "the capacity to accept a detachable magazine," Cal. Penal Code § 30505, rifle owners who preferred to keep safety and accuracy-enhancing features like a pistol grip, thumbhole stock, flash suppressor, or adjustable stock (which would otherwise be banned under the Category 3 definition) could avoid categorization as a Category 3 "assault weapon" by disabling their rifle's capacity to accept a detachable magazine. To do so, they typically retrofitted their firearms with an aftermarket product generally referred to as a "magazine lock."

34.     Whereas the standard magazine release for a "detachable magazine" operates with the push of a finger, the typical "magazine lock" replaces the standard one-piece magazine release button with a two-piece assembly that cannot be operated with just the push of a finger; rather, a tool is needed to reach the button to release the magazine so it can be removed. The most common "tool" used to remove the magazine is the tip of a bullet, and a bullet is expressly considered a "tool" under California Code of Regulations, title 11, section 5469(a). Because a tool is needed to release the magazine, and because California considers a magazine not to be "detachable" if a "tool" is required to remove it from the firearm, a firearm with a "magazine lock" does not qualify as having "the capacity to accept a detachable magazine." Therefore, prior to 2017, firearms with a "magazine lock" did not fall within the "assault weapon" definition, and could accordingly be equipped with safety- and accuracy-enhancing features like a pistol grip, thumbhole stock, flash suppressor, or adjustable stock.

35.     In 2016, the Legislature introduced Assembly Bill 1135 and Senate Bill 880, which once again changed the "assault weapon" definitions for rifles and

THIRD AMENDED COMPLAINT

pistols (but not shotguns). The purpose of these bills was to make equipping a pistol or rifle with a "magazine lock" an insufficient alteration to take that firearm outside the definition of an "assault weapon." *See* Assemb. B. 1135, 2015-2016 Reg. Sess. (Cal. 2016); Sen. B. 880, 2015-2016 Reg. Sess. (Cal. 2016).

36.     Specifically, the Legislature amended the definition of "assault weapon" in Penal Code section 30515 as follows:

> (a)     (1)     A semiautomatic, centerfire rifle ***that does not have a fixed magazine but has any one of the following***:
>
>> (A) A pistol grip that protrudes conspicuously beneath the action of the weapon.
>>
>> (B) A thumbhole stock.
>>
>> (C) A folding or telescoping stock.
>>
>> (D) A grenade launcher or flare launcher.
>>
>> (E) A flash suppressor.
>>
>> (F) A forward pistol grip.
>
> . . . .
>
> (4)     A semiautomatic pistol ***that does not have a fixed magazine but has any one of the following***:
>
>> (A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.
>>
>> (B) A second handgrip.
>>
>> (C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel.
>>
>> (D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

> **(b)** *For purposes of this section, "fixed magazine" means an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action.*

Cal. Penal Code § 30515 (subdivisions (a)(1), (a)(4), and (b) are emphasized to underscore the only changes made to the definition of "assault weapon" from 2016 to 2017).

37.    Firearms now classified as "assault weapons" as a result of Assembly Bill 1135 and Senate Bill 880 are being referred to as "Category 4" "assault weapons." The sale or transfer of a Category 4 "assault weapon" is prohibited as of January 1, 2017. Thus, it is no longer possible to acquire a Category 4 (or any) "assault weapon" in California.

38.    Individuals who currently possess a Category 4 "assault weapon" can only legally do so if they lawfully acquired and possessed it before January 1, 2017, and they must register such firearms by June 30, 2018. It will be illegal to possess an unregistered Category 4 "assault weapon" on July 31, 2018, even if that firearm was lawfully acquired. Like registered owners of earlier-designated "assault weapons," registered owners of Category 4 "assault weapons" cannot transfer them to ordinary private citizens within California, even their own family members upon their death.

### Options for Possessing or Transferring Category 4 Assault Weapons

39.    The only option available to Plaintiffs who currently own "assault weapons" other than registration or removing their firearms from California prior to July 1, 2018, should they wish to keep or transfer them is to modify them so they no longer meet the "assault weapon" definition by that same date. That can be achieved, at least in theory, several ways. For semiautomatic, centerfire rifles lacking a fixed magazine, rifles can be modified to: (1) no longer be semi-automatic; (2) utilize rimfire instead of centerfire ammunition; (3) be equipped with a "fixed magazine" as defined in California Penal Code section 30515, subd. (b); or (4) no longer possess any of the features listed in California Penal Code section 30515, subd. (a)(1) (which

15

includes "pistol grips that protrude conspicuously beneath the action of the weapon," a "thumbhole stock," a "folding or telescoping stock," a "grenade or flare launcher," a "flash suppressor," or a "forward pistol grip"). *Id.*

40.    Modifying a rifle so that it no longer can shoot semi-automatically (where a bullet discharges with each pull of the trigger) is virtually impossible for some firearm models without extensive gunsmithing. Most firearm owners are not capable of making on their own because it requires technical knowledge of firearms. Doing it incorrectly could be dangerous.

41.    Similar modifications for an AR-15 platform rifle are less difficult because the entire upper assembly of the firearm can be replaced with a purpose-built non-semiautomatic assembly; essentially, it converts the rifle to no longer function as a semiautomatic and instead some other type of action (such as a bolt-action). But these types of upper assemblies are exceedingly rare, can cost well over $1,000, and completely replace the existing assembly which could also cost just as much, if not more.[14]

42.    Modifying a centerfire rifle to shoot rimfire cartridges is likewise virtually impossible for some rifle models but is possible for an AR-15 platform rifle. This is also a modification that most firearm owners are not capable of making because it requires technical knowledge of firearms, as it completely replaces the firearm's bolt-carrier group, magazines, and ammunition, which also makes it relatively expensive.[15] Conversion kits typically cost around $189.

---

[14] See, e.g., Uintah Precision complete bolt action upper assembly, available for purchase on www.readygunner.com for $1,279.99, https://www.readygunner.com/product/uintah-precision-complete-bolt-action-upper-assembly/ (last visited May 30, 2018).

[15] See, e.g., CMMG Rimfire Conversion Kit AR-15 with Magazine 22 Long Rifle Stainless Steel, https://www.midwayusa.com/product/2546133311/cmmg-rimfire-conversion-kit-ar-15-with-magazine-22-long-rifle-stainless-steel, Midway USA (last visited May 30, 2018). Typical AR-15 magazines owned by law abiding California citizens can cost anywhere between $13-$20. See, e.g., PMAG 10 AR/M4 Gen M3, https://www.magpul.com/products/pmag-10-ar-m4-gen-m3, Magpul (last visited May 30, 2018). Many gun owners have more than one such magazine for their

16

43.    To meet California's definition of "fixed magazine," the magazine must be contained in or permanently attached to the firearm "in such a manner that the device cannot be removed without disassembly of the firearm action." Cal. Penal Code § 30515(b). DOJ has generally defined the term "disassembly of the firearm action" to mean that "the fire control assembly is detached form the action in such a way that the action has been interrupted and will not function." 11 C.C.R. § 5471(n).

44.    While there are products on the market purporting to make firearms with non-fixed magazines meet this definition, it remains unclear whether law enforcement will consider these aftermarket modifications sufficient. Even if they do, these products are not designed or tested by the manufacturer of the firearm. And, complete kits can cost over $100 prior to any required services of a gunsmith.[16]

45.    Removing features from a rifle, such as a pistol grip or adjustable stock, will result not only in significant expense to the owner but will also deprive the owner of the value of those components, monetarily and utility.[17] Aftermarket products to replace or remove these features, thereby making the rifle in a legal configuration, exist for at least some rifle models. However, it is unclear whether they exist for all models. DOJ, has thus far failed to provide California gun owners with any guidance regarding specific ones. Failure to use an appropriate aftermarket product carries with it the serious risk of felony prosecution should law enforcement

_____

firearm, all of which could no longer be used in a firearm equipped with such a conversion kit.

[16] See AR MAGLOCK AR-15 (.223/5.56) – Gen 2 with KingPin, https://www.armaglock2.com/product/ar-maglock-ar-15-223-5-56-gen-2-with-kingpin/, AR Maglock (last visited May 30, 2018).

[17] For example, replacing a stock and pistol grip with a Thordsen Customs FRS-15 replacement kit can cost around $130 for the parts alone. See AR-15 Gen III Stock Kits, https://www.thordsencustoms.com/frs-15-gen-iii-rifle-stock/frs-15-gen-iii-stock-kit/ Thordsen Customs (last visited May 30, 2018). Muzzle brakes, which should not be classified as a "flash suppressor," can likewise cost as much as $60. See, e.g., ProComp Muzzle Brakes, https://www.surefire.com/tactical-equipment/suppressor-adapters/procomp-muzzle-brakes.html, Surefire (last visited May 30, 2018). All of these products may require the services of a professional gunsmith to install, further increasing their associated cost.

view the product as a prohibited feature.

46.     What's more, every modification option would result in a fundamental change to the nature of the firearm. A bolt-action rifle is vastly different from a semiautomatic one, as is a centerfire rifle from a rimfire one. The are both, in fact, completely separate classes of firearms.[18] And, converting a firearm designed to be equipped with a detachable magazine to have a "fixed" magazine can result in dangerous situations should the firearm suffer a malfunction during operation. Making it impossible to remove the magazine (now "fixed") increases the difficulty of removing any unspent ammunition before clearing a malfunction, increasing the risk of removing it.[19] Likewise, removing a pistol grip, for example, prevents a user from holding the firearm in a manner originally intended by the manufacturer. And removal of a telescoping stock can prevent a user of the firearm from adjusting the length of pull to fit their body structure, which allows them to effectively control the firearm while in use. Additionally, any of these changes could potentially void any of the owners' warranties for the modified firearms.

### C.     Summary of Assault Weapons Regulation

47.     As a result of the Category 4 "assault weapon" definition, a rifle that does *not* have a fixed magazine is an "assault weapon" if it has any of the statutorily enumerated features (pistol grip, thumbhole stock, flash suppressor, or adjustable stock), but a rifle that *does* have a fixed magazine is *not* an assault weapon even if it has all of those features.

48.     A Category 3 or Category 4 "assault weapon" can be modified so that it no longer meets the "assault weapon" definition by removing the features that qualify it as one. These modified firearms would not need to be registered and may

---

[18] See, e.g., *New Shooter Seminar*, Actions for Long Guns, National Rifle Association of America.

[19] Some manufacturers of these aftermarket products warn customers of the dangers associated with a double-feed malfunction when using a fixed magazine locking device on an AR-15 style firearm. See, e.g., https://www.armaglock2.com/ (last visited May 30, 2018).

THIRD AMENDED COMPLAINT

be lawfully possessed, used, or transferred, subject only to California's general firearm laws. For example, the owner of a generic AR-15 platform rifle could remove the "pistol grip" and "flash suppressor" and permanently affix the stock so it is not adjustable; the firearm would then be considered a standard rifle under California law and not an "assault weapon."

49. That is not the case, however, with Category 1 or Category 2 "assault weapons" (those expressly listed by make and model in Penal Code section 30510 or 11 C.C.R. § 5499). They remain "assault weapons" forever, regardless of their features, must be registered, and cannot generally be transferred.

50. There are two noteworthy practical effects of this distinction between Category 1 and 2 "assault weapons" and Category 3 and 4 "assault weapons." First, rifles that are essentially identical in function, configuration, features, design, caliber, rate of fire, and ammunition capacity, can have drastically different treatment under the law, solely because of what maker's marks the rifles have etched onto their surface. For example, a rifle with "Colt AR-15" engraved on it that does not have a "pistol grip" or "flash suppressor" and has a fixed (non-adjustable) stock is still an "assault weapon," while a rifle in the same configuration with "Illegal Assault Weapon" engraved on it is not. Second, the rifle marked "Illegal Assault Weapon" could legally have a "detachable magazine" and not be an "assault weapon," as long as it does not have other restricted features, while the rifle marked "Colt AR-15" could have a fixed magazine and would still be an "assault weapon."

51. As long as their overall length is at least 30 inches, California does not place any additional restrictions on semiautomatic, centerfire rifles with detachable magazines that do not have the restricted "assault weapon" features (pistol grip, thumbhole stock, flash suppressor, or adjustable stock). This means that an eighteen-year-old who is not otherwise disqualified from firearm ownership in California may lawfully purchase and use such a rifle, subject only to California's general firearm restrictions that are not at issue here.

19
THIRD AMENDED COMPLAINT

52.     It also means that California is the only state other than Connecticut[20] to treat as an "assault weapon" any semiautomatic, centerfire rifle—regardless of its magazine system or ammunition capacity—that is under 30 inches in overall length.

53.     Outside of registration or dispossession, the only other option available to Plaintiffs to continue to lawfully possess their firearms in the state of California is to perform costly modifications to their firearms, some of which have not been tested by the manufacturer and otherwise pose significant dangers should the firearm suffer a malfunction during normal operation. Such modifications are also the only option for Plaintiffs should they wish to transfer their firearms. Likewise, the only option for those Plaintiffs who wish to acquire semiautomatic, centerfire rifles in the future, is to acquire ones already having these modifications.

**PARTIES**

**Plaintiffs**

54.     Plaintiff Steven Rupp is a resident of Orange County, California, and a law-abiding citizen of the United States. Plaintiff Rupp lawfully owns a semi-automatic, centerfire rifle with a non-fixed magazine and a pistol grip, flash suppressor, and adjustable stock, making it an "assault weapon" under the latest amendment to the AWCA (Category 4). He keeps it in his home for self-defense and other lawful purposes, like training and recreation. As a result of the AWCA, Plaintiff Rupp is prohibited from transferring his rifle to his offspring, which he would do but for this restriction and fear of prosecution for violating the AWCA. Mr. Rupp also owns a firearm frame or "lower receiver" that he wishes to assemble into a fully functioning semiautomatic, centerfire rifle with a detachable magazine that has a pistol grip, flash suppressor, and adjustable stock. As a result of the AWCA, he is prohibited from assembling his firearm frame into a semiautomatic, centerfire rifle that has a non-fixed magazine and a pistol grip, flash suppressor, or

---

[20] Conn. Gen. Stat. Ann. § 53-202a(1)(E)(iii).

adjustable stock. But for this restriction and fear of prosecution for violating the AWCA, Mr. Rupp would assemble his firearm frame into such a configuration, which rifle he would use for self-defense and for other lawful purposes.

55.     Plaintiff Steven Dember is a resident of Orange County, California, and a law-abiding citizen of the United States. Plaintiff Dember seeks to acquire a rifle that is prohibited by the AWCA to keep in his home for self-defense and other lawful purposes, like hunting, training, and recreation. But for the AWCA and his fear of prosecution for violating it, Plaintiff Dember would acquire a semiautomatic, centerfire rifle with a detachable magazine, having one or more of the features that would make it a prohibited "assault weapon" under California law.

56.     Plaintiff Cheryl Johnson is a resident of Orange County, California, and a law-abiding citizen of the United States. Plaintiff Johnson seeks to acquire a rifle that is prohibited by the AWCA to keep in her home for self-defense and other lawful purposes, like hunting, training, and recreation. But for the AWCA and her fear of prosecution for violating it, Plaintiff Johnson would acquire a semiautomatic, centerfire rifle with a detachable magazine, having one or more of the features that would make it a prohibited "assault weapon" under California law.

57.     Plaintiff Michael Jones is a resident of Orange County, California and a law-abiding citizen of the United States. Mr. Jones lawfully owns a semiautomatic, centerfire rifle which he keeps in his home for self-defense and for other lawful purposes, such as hunting and recreation. Mr. Jones' rifle is deemed an "assault weapon" based on the rifle's features under the latest amendment to the AWCA (it is a Category 4 "assault weapon"). As such, he must register the firearm as an "assault weapon" before July 1, 2018, for his possession of it in that configuration to continue to be lawful, which he intends to do. Upon so registering it, Plaintiff Jones will not be able to devise or transfer his rifle in that configuration to his offspring or otherwise devise or transfer his property to law-abiding Californians. But for this restriction and fear of prosecution for violating the AWCA, Plaintiff Jones would

1   devise or transfer his rifle to his offspring.

2       58.    Plaintiff Christopher Seifert is a resident of Orange County, California

3   and a law-abiding citizen of the United States. Mr. Seifert lawfully owns a registered

4   semi-automatic centerfire rifle with a detachable magazine, which he keeps in his

5   home for self-defense and for other lawful purposes, such as hunting and recreation.

6   Mr. Seifert's rifle is deemed an "assault weapon" under California law because it has

7   a detachable magazine and at least one prohibited feature (it is a Category 3 "assault

8   weapon"). As such, Plaintiff Seifert cannot devise or transfer his rifle to offspring or

9   otherwise devise or transfer his property to law-abiding Californians. But for this

10  restriction and fear of prosecution for violating the AWCA, Plaintiff Seifert would

11  devise or transfer his rifle to his offspring. Mr. Seifert also owns a firearm frame or

12  "lower receiver" that he wishes to assemble into a fully functioning semiautomatic,

13  centerfire rifle with a detachable magazine that has a pistol grip, flash suppressor,

14  and adjustable stock. As a result of the AWCA, he is prohibited from assembling his

15  firearm frame into a semiautomatic, centerfire rifle that has a non-fixed magazine

16  and a pistol grip, flash suppressor, or adjustable stock. But for this restriction and

17  fear of prosecution for violating the AWCA, Mr. Seifert would assemble his firearm

18  frame into such a configuration, which rifle he would use for self-defense and for

19  other lawful purposes.

20      59.    Plaintiff Alfonso Valencia is a resident of Orange County, California, a

21  law-abiding citizen of the United States, and former Los Angeles Deputy Sheriff.

22  Plaintiff Valencia seeks to acquire a rifle that is prohibited by the AWCA to keep in

23  his home for self-defense and other lawful purposes, like hunting, training, and

24  recreation. But for the AWCA and his fear of prosecution for violating it, Plaintiff

25  Valencia would acquire a semiautomatic, centerfire rifle with a detachable

26  magazine, having one or more of the features that would make it a prohibited

27  "assault weapon" under California law.

28      60.    Plaintiff Troy Willis is a resident of Riverside County, California and a

law-abiding citizen of the United States, and a retired reserve officer for the Indio Police Department. Mr. Willis lawfully owns a registered semiautomatic centerfire rifle with a detachable magazine, which he keeps in his home for self-defense and for other lawful purposes, such as hunting and recreation. Mr. Willis' rifle is deemed an "assault weapon" under California law because it has a detachable magazine and at least one prohibited feature (it is a Category 3 "assault weapon"). As such, Plaintiff Willis cannot devise or transfer his rifle to his offspring or otherwise devise or transfer his property to law-abiding Californians. But for this restriction and fear of prosecution for violating the AWCA, Plaintiff Willis would devise or transfer his rifle to his offspring.

61.     Plaintiff Dennis Martin is a resident of Kern County, California and a law-abiding citizen of the United States. Mr. Martin lawfully owns two rifles that are deemed "assault weapons" under the AWCA's new definition because they are semi-automatic, center-fire that do not have a fixed magazine and have, at least, a pistol grip, making them "assault weapons" under California Penal Code section 30515, subd. (a)(1) (i.e., they are Category 4 "assault weapons"). Martin keeps it in his home for self-defense and for other lawful purposes, such as hunting and recreation. Mr. Martin's rifle is deemed an "assault weapon" under California law because it has a detachable magazine and at least one prohibited feature (it is a Category 3 "assault weapon"). As such, Plaintiff Martin cannot devise or transfer his rifle to his offspring or otherwise devise or transfer his property to law-abiding Californians. But for this restriction and fear of prosecution for violating the AWCA, Plaintiff Martin would devise or transfer his rifle to his offspring.

62.     Each of the individual Plaintiffs identified above is eligible under the laws of the United States and of the State of California to receive and possess firearms.

63.     Plaintiff California Rifle & Pistol Association, Inc. ("CRPA"), is a nonprofit membership and donor-supported organization qualified as tax-exempt

under 26 U.S.C. § 501(c)(4) with its headquarters in Fullerton, California. Founded in 1875, CRPA seeks to defend the civil rights protected under the Second Amendment of all law-abiding individuals, including the fundamental right to acquire, possess, use, and transfer firearms.

64.     CRPA also provides guidance to California gun owners regarding their legal rights and responsibilities. In addition, CRPA is dedicated to promoting the shooting sports and providing education, training, and organized competition for adult and junior shooters. CRPA members come from virtually all walks of life, including law enforcement officers, professionals, firearm experts, and many others.

65.     In this suit, CRPA represents the interests of the tens of thousands of its members who reside in the State of California, including Orange County, who are too numerous to conveniently bring this action individually, and who are impacted by California's "assault weapon" laws. CRPA members wish to exercise their constitutionally protected Second Amendment right to keep and bear arms without being subjected to criminal prosecution. There are countless CRPA members who are, or will be, eligible for lawful firearm ownership in California who, but for the AWCA and fear of prosecution for violating it, would acquire, assemble, or import to possess in their homes for self-defense and other lawful purposes, a semiautomatic, centerfire rifle with a detachable magazine and a "pistol grip," "flash suppressor," "thumbhole stock," or adjustable stock. There are also CRPA members who already lawfully possess such firearms and would, but for the AWCA and fear of prosecution for violating it, transfer them to offspring or other law-abiding Californians.

**Defendants**

66.     Defendant Xavier Becerra is the Attorney General of California. He is the chief law enforcement officer of California. Defendant Becerra is charged by Article V, Section 13 of the California Constitution with the duty to see that the laws of California are uniformly and adequately enforced. Defendant Becerra also has

direct supervision over every district attorney and sheriff in all matters pertaining to the duties of their respective officers. Defendant Becerra's duties also include informing the public, local prosecutors, and law enforcement regarding the meaning of the laws of the State, including restrictions on certain firearms classified as "assault weapons." He is sued in his official capacity.

67.     The true names or capacities, whether individual, corporate, associate or otherwise of the Defendants named herein as Does 1-10, are presently unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs pray for leave to amend this Complaint to show the true names or capacities of these Defendants if and when the same have been determined.

68.     Defendants Becerra and Does 1-10 are responsible for formulating, executing, and administering California's "assault weapons" laws at issue in this lawsuit and are in fact presently enforcing them.

69.     Defendants enforce California's "assault weapon" laws against Plaintiffs and other California citizens under color of state law within the meaning of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

70.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

71.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized under 42 U.S.C. § 1988.

72.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

### [Right to Keep and Bear Arms]

73.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II.

74.     The United States Supreme Court has concluded (thrice) that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and . . . individual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599, 628); *see also Caetano v. Massachusetts*, -- U.S. --, 136 S. Ct. 1027 (2016). The Court has held that "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" is unconstitutional, especially when that prohibition extends "to the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628.

75.     The "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today. *Id.* at 624-25*; see also, e.g.*, *Caetano*, 136 S. Ct. at 1027-28. The Court has specifically explained that semiautomatic rifles, including ones prohibited by California, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612.

76.     The Supreme Court has also held that the Second Amendment right to keep and bear arms is incorporated into the Due Process Clause of the Fourteenth Amendment and so may not be infringed by state and local governments. *McDonald*, 561 U.S. at 750.

### [Due Process Clause]

77.     The Due Process Clause of the Fourteenth Amendment provides that "No state shall … deprive any person of life, liberty, or property, without due

26

process of law." U.S. Const. amend. XIV.

78.    "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see, e.g.*, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (collecting cases). Thus, a statute that deprives an individual of life, liberty, or property arbitrarily or irrationally—that is, without serving "any legitimate governmental objective"— violates the Due Process Clause. *Lingle*, 544 U.S. at 542.

79.    Legislation that changes the law retroactively—making illegal conduct that was legal when undertaken—is especially likely to run afoul of the Due Process Clause. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976); *E. Enterprs. v. Apfel*, 524 U.S. 498, 547-550 (1998) (Kennedy, J., concurring in part and dissenting in part). "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership. As a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity." *Id.* at 548-49.

80.    A law that deprives an owner of private property without a legitimate justification violates the Due Process Clause regardless of whether it also violates the Takings Clause. *See Lingle*, 544 U.S. at 541-42; id. at 548-49 (Kennedy, J., concurring).

**[Takings Clause]**

81.    The Takings Clause of the Fifth Amendment provides "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies against the States through the Fourteenth Amendment. *See Lingle*, 544 U.S. at 536.

82.    The Takings Clause protects against two kinds of governmental takings: a direct "physical appropriation" of "an interest in property," and "a restriction on the use of property," which is known as a "regulatory taking." *Horne*, 135 S. Ct. at

27

2425, 2427 (2015). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). Likewise, a regulation that "goes too far"—for example, by depriving a landowner of economically beneficial use or otherwise "interfer[ing] with legitimate property interests"—requires just compensation. *Lingle*, 544 U.S. at 537-39.

83.     Among the many protected "interest[s] in property" is "the right to pass on property—to one's family in particular" after death. *Hodel*, 481 U.S. at 716. The right to devise property is "one of the most essential sticks in the bundle of" property rights and cannot be "completely abolished" by the government without compensation. *Id.* at 716-17.

### [Violation of Plaintiffs' Right to Keep and Bear Arms]

84.     Semiautomatic, centerfire rifles with a detachable magazine, including those that the AWCA expressly prohibits by make and model, are arms "typically possessed by law-abiding citizens for lawful purposes" throughout the United States. *Heller*, 554 U.S. at 624-25.

85.     Most of the features prohibited on semiautomatic, centerfire rifles with a detachable magazine by Penal Code section 30515(a)(1)—a "pistol grip," a "flash suppressor," and a "thumbhole stock" or adjustable stock, or any combination of these features (as those terms are defined in California Code of Regulations, title 11, section 5469)—are standard on rifles that are "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 624-25, throughout the United States.[21]

---

[21] Plaintiffs do not assert that "grenade launchers," listed as a prohibited feature under California's definition of an "assault weapon," are in common use or otherwise protected under the Second Amendment. Such devices are restricted as "destructive devices" under California law, the possession of which is generally prohibited irrespective of California's "assault weapon" restrictions. *See* Cal. Penal Code §§ 16460(a)(2), 18710. Those laws are not challenged here.

86.     No public interest is furthered by prohibiting these common rifle features, or by prohibiting any of the commonly possessed rifles that California expressly lists as "assault weapons" by make and model on the ground that they have such features. None of these features makes the rifles more dangerous, raises their likelihood of use in crimes, or increases the power, rate of fire, or ammunition capacity of a semiautomatic, centerfire rifle with a detachable magazine. To the contrary, these features enhance public safety by making rifles safer, more accurate, and more effective for use in self-defense.

87.     Semiautomatic, centerfire rifles with an overall length of 26 inches or more are arms "typically possessed by law-abiding citizens for lawful purposes" throughout the United States. *Heller*, 554 U.S. at 624-25. The AWCA uniquely (with the sole exception of Connecticut) bars any such rifles under 30 inches, regardless of their magazine system, ammunition capacity, or features. In doing so, it bans countless rifles of lengths that are common and generally accepted for lawful purposes throughout the country.[22]

### [Violation of Plaintiffs' Right to Due Process]

88.     The AWCA violates Plaintiffs' rights under the Due Process Clause because it deprives them of protected property interests—namely, the possession and transfer of otherwise-lawful rifles—without due process of law. The due process concerns are heightened here because the ban applies retroactively to eliminate property rights (including the right to transfer or devise the rifles to a family member in California) that existed at the time the rifles were purchased. *See E. Enterps.*, 524 U.S. at 547-550 (Kennedy, J., concurring in part and dissenting in part).

89.     The ban violates Plaintiffs' due process rights because it imposes

---

[22] Penal Code § 30515(a)(3); *see* Penal Code §§ 33210-33290, 17170 and 18 U.S.C.A. §§ 921(a)(8), 922(a)(4), 922(b)(4) (heavily restricting any "short-barreled" rifle having an overall length of less than 26 inches). Plaintiffs do not challenge these "short-barreled" rifle restrictions, but only California's prohibition on semiautomatic centerfire rifles with an overall length of under 30 inches and over 26 inches.

prohibitions and restrictions that have nothing to do with furthering any permissible governmental objective. *Lingle*, 544 U.S. at 542. Moreover, the ban draws arbitrary distinctions, prohibiting rifles that have the statutorily enumerated features in combination with a non-fixed magazine while permitting rifles that have the exact same statutorily enumerated features in combination with a fixed magazine, and prohibiting rifles with a fixed magazine due to their maker's marks, regardless of their features, while permitting effectively identical rifles with non-fixed magazines, as long as they do not have the prohibited features.

### [Violation of the Plaintiffs' Rights Under the Takings Clause]

90.     The AWCA violates Plaintiffs' rights under the Takings Clause. Not only does the law severely constrain Plaintiffs' rights to transfer their lawfully acquired rifles property during their lifetimes; it requires them upon their death to physically surrender to the government (or a tiny category of people permitted by the government to possess dangerous weapons) lawfully acquired rifles that they would otherwise devise to their children or heirs. The law thus deprives Plaintiffs of their property rights—indeed, destroys "one of the most essential sticks in the bundle of" property rights—without compensation. *Hodel*, 481 U.S. at 716; *see Horne*, 135 S. Ct. at 2427; *Lingle*, 544 U.S. at 537-39.

### DECLARATORY JUDGMENT ALLEGATIONS

91.     There is an actual and present controversy between the parties. Plaintiffs contend that the AWCA infringes on Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, by generally prohibiting commonly-possessed firearms it deems "assault weapons." Plaintiffs also contend that the AWCA violates the Due Process Clause by banning lawfully acquired firearms based on features that have nothing to do with enhancing public safety or any other valid governmental objective. And Plaintiffs contend that the AWCA violates the Takings Clause by depriving them of protected property interests in their lawfully acquired firearms without

compensation. Defendants deny these contentions. Plaintiffs desire a judicial declaration that California Penal Code sections 30510(a), 30515(a)(1)(A-C), 30515(a)(1)(E-F), 30515(a)(3), 30520, 30600, 30605, , 30925, and 30945, as well as California Code of Regulations, title 11, section 5499, violate Plaintiffs' constitutional rights. Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights to keep and bear common arms for self-defense and other lawful purposes, and to devise their lawfully acquired property to their heirs.

## INJUNCTIVE RELIEF ALLEGATIONS

92.     Plaintiffs are presently and continuously injured by Defendants' enforcement of California Penal Code 30510(a), 30515(a)(1)(A-C), 30515(a)(1)(E-F), 30515(a)(3), 30520, 30600, 30605, , 30925, and 30945, as well as California Code of Regulations, title 11, section 5499, insofar as those provisions violate Plaintiffs' rights under the Second Amendment, the Due Process Clause, and the Takings Clause by precluding (without compensation) the acquisition, possession, use, and transfer of rifles that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.

93.     If not enjoined by this Court, Defendants will continue to enforce the Act in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs due to their inability to engage in constitutionally protected activity because of California's ongoing enforcement of the AWCA.

## CLAIMS FOR RELIEF

### Right to Keep and Bear Arms

#### (U.S. Const. amends. II and XIV)

94.     Paragraphs 1-93 are realleged and incorporated herein by reference.

95.     The AWCA's definition of "assault weapon"—whether by express

listing of make and model or by prohibited feature combinations—includes the most popular class of rifles in the nation. The AWCA, therefore, generally prohibits Californians or those visiting California from the acquisition, importation, use, possession, and transfer of such rifles, subject to severe criminal penalties, including up to years in prison.

96.     These prohibitions and restrictions on rifles that are commonly possessed throughout the United States by law-abiding, responsible citizens for lawful purposes infringe on the right of the People of California, including Plaintiffs, to keep and bear protected arms as guaranteed by the Second Amendment of the United States Constitution, and as made applicable to California by the Fourteenth Amendment.

97.     In violation of the Second Amendment, the AWCA prohibits law-abiding, responsible adults, including Plaintiffs Rupp, Dember, Johnson, and Valencia, as well as members of CRPA, who would otherwise do so, from acquiring a rifle listed in Penal Code section 30510 or 11 C.C.R. § 5499 (Category 1 or 2 "assault weapons") or that has features listed in Penal Code section 30515(a) (Category 3 "assault weapons") that are standard on rifles that are in common use by law-abiding citizens for lawful purposes throughout the United States.

98.     In violation of the Second Amendment, the AWCA prohibits law-abiding, responsible adults, including Plaintiffs Rupp, Dember, Johnson, Valencia, and Seifert, as well as members of CRPA, who would otherwise do so, from possessing a rifle that is listed in Penal Code section 30510 or 11 C.C.R. § 5499 (Category 1 or 2 "assault weapons") or that has features listed in Penal Code section 30515(a) (Category 3 "assault weapons") that are standard on rifles in common use by law-abiding citizens for lawful purposes throughout the United States.

99.     In violation of the Second Amendment, the AWCA prohibits law-abiding, responsible adults, including Plaintiffs Rupp and Seifert, as well as members of CRPA, who would otherwise do so, from adding features listed in Penal

Code section 30515(a) that are standard on rifles in common use by law-abiding citizens for lawful purposes throughout the United States to their semiautomatic, centerfire rifles.

100.   In violation of the Second Amendment, the AWCA prohibits law-abiding, responsible adults, including Plaintiffs Seifert, Willis, and Martin, as well as members of CRPA, who would otherwise do so, from transferring to their offspring or to other law-abiding Californian residents a rifle that is listed in Penal Code section 30510 or 11 C.C.R. § 5499 (Category 1 or 2 "assault weapons"), which belongs to the most popular class of rifles among law-abiding citizens for lawful purposes throughout the United States.

101.   In violation of the Second Amendment, the AWCA prohibits law-abiding, responsible adults, including Plaintiff Jones, as well as members of CRPA, who would otherwise do so, from transferring to their offspring or to other law-abiding Californian residents a rifle that is deemed an "assault weapons" by virtue of its features, which belongs to the most popular class of rifles among law-abiding citizens for lawful purposes throughout the United States.

102.   In violation of the Second Amendment, the AWCA prohibits law-abiding, responsible adults, including members of CRPA who would otherwise do so, from obtaining or possessing semiautomatic, centerfire rifles, regardless of their magazine system or ammunition capacity, with an overall length of less than 30 but more than 26 inches, as the general consensus in the country for decades has been that rifles with an overall length of more than 26 inches are acceptable for use, and typically used by, law-abiding people for lawful purposes.[23] In doing so, it bans countless rifles of lengths that are common and generally accepted throughout the country for lawful purposes.

---

[23] *See* Penal Code §§ 33210-33290, 17170 and 18 U.S.C.A. §§ 921(a)(8), 922(a)(4), 922(b)(4) (heavily restricting any "short-barreled" rifle having an overall length of less than 26 inches).

THIRD AMENDED COMPLAINT

103.   The AWCA's prohibitions extend into Plaintiffs' homes, where the Second Amendment protections are at their zenith, but also affects lawful and constitutionally protected conduct such as hunting, recreational shooting, and competitive marksmanship participation.

104.   Defendants cannot satisfy their burden of justifying the AWCA's restrictions on the Second Amendment right of the People, including Plaintiffs, to acquire, possess, transfer, transport, and use rifles that are in common use by law-abiding adults throughout the United States for the core right of defense of self and home and other lawful purposes.

**Due Process Clause**

(U.S. Const. amend. XIV)

105.   Paragraphs 1 through 104 are realleged and incorporated herein by reference.

106.   The AWCA's definition of "assault weapon"—whether by express listing of make and model or by prohibited feature combinations—violates the Due Process Clause because prohibiting the rifles and/or features targeted by the law does not advance the State's asserted justification of public safety. If anything, prohibiting the features enumerated by the AWCA undermines public safety by making rifles less safe and more difficult for law-abiding citizens to use for the purpose of self-defense.

107.   For example, as noted, a semiautomatic, centerfire rifle with a detachable magazine with "Colt AR-15" engraved on it that does not have a "pistol grip" or "flash suppressor" and has a fixed (non-adjustable) stock is still an "assault weapon," while a rifle in the same configuration with "Illegal Assault Weapon" engraved on it is not. And a rifle marked "Illegal Assault Weapon" could legally have a "detachable magazine" and not be an "assault weapon," as long as it does not have other restricted features, while the rifle marked "Colt AR-15" could have a fixed magazine and would still be an "assault weapon."

THIRD AMENDED COMPLAINT

108.   Likewise, there is no legitimate basis for banning rifles that have the statutorily enumerated features in combination with a non-fixed magazine while permitting rifles that have the very same statutorily enumerated features in combination with a fixed magazine rifle.

109.   These distinctions do not advance any legitimate government objective, let alone do so in a sufficiently meaningful manner. And they are particularly offensive under the Due Process Clause because they apply retroactively to eliminate property rights that existed at the time the rifles were lawfully purchased.

**Takings Clause**

(U.S. Const. amends. V and XIV)

110.   Paragraphs 1 through 109 are realleged and incorporated herein by reference.

111.   The AWCA severely constrains the right of owners of rifles covered by the law to transfer their lawfully acquired property during their lifetimes, and completely abrogates their right to devise their property to their children or heirs. Rifle owners who wish to keep their property in-state and within their family instead must physically surrender the rifles to the government without compensation, or to a very small category of people to whom the government has issued permits to own dangerous weapons.

112.   By severely constraining Plaintiffs' property rights in their rifles during their lifetimes, and completely destroying an essential and long-lasting property right by requiring surrender of those rifles without government compensation upon their death, the AWCA effects both a regulatory and a physical appropriation of private property without just compensation, in violation of the Takings Clause.

**PRAYER**

Plaintiffs pray that the Court:

1.   Enter a declaratory judgment under 28 U.S.C. § 2201 that California Penal Code sections 30510(a), 30515(a)(1)(A-C), 30515(a)(1)(E-F), 30515(a)(3),

35

THIRD AMENDED COMPLAINT

30520, 30600, 30605, , 30925, and 30945, as well as California Code of Regulations, title 11, section 5499, are each unconstitutional facially and to the extent they apply to "assault weapons" or, alternatively, to the extent they prohibit any semi-automatic, centerfire rifle with a detachable magazine having a "pistol grip," "flash suppressor," "thumbhole stock," or "telescoping" stock, or any semi-automatic, centerfire rifle that is over 26 inches in overall length, because such provisions unlawfully infringe on the right of the People to keep and bear arms that are in common use contemporarily, in violation of the Second and Fourteenth Amendments to the United States Constitution; arbitrarily deprive Plaintiffs of protected property interests und the Due Process Clause; and unconstitutionally take property without compensation in violation of the Takings Clause;

2.     Issue an injunction enjoining Defendants and their officers, agents, and employees from enforcing any provisions of California Penal Code sections 30510(a), 30515(a)(1)(A-C), 30515(a)(1)(E-F), 30515(a)(3), 30520, 30600, 30605, 30925, 30945, and California Code of Regulations, title 11, section 5499, prohibiting "assault weapons" or, alternatively, to the extent they prohibit the acquisition, possession, or transfer of any semi-automatic, centerfire rifle with a detachable magazine having a "pistol grip," "flash suppressor," "thumbhole stock," or "telescoping" stock, or any semi-automatic, centerfire rifle that is over 26 inches in overall length;

3.     Award remedies available pursuant to 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law; and

4.     Grant any such other and further relief as the Court may deem proper.

Dated: June 27, 2018                    **MICHEL & ASSOCIATES, P.C.**

/s/Sean A. Brady
Sean A. Brady
Attorneys for Plaintiffs

36

THIRD AMENDED COMPLAINT