XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
PETER H. CHANG
Deputy Attorney General
State Bar No. 241467
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3776
 Fax:  (415) 703-1234
 E-mail:  Peter.Chang@doj.ca.gov
*Attorneys for Defendant Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **STEVEN RUPP, et al.,,**<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,**<br><br>Defendants. | 8:17-cv-00746-JLS-JDE<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:           May 31, 2019<br>Time:          10:30 a.m.<br>Courtroom:   10A<br>Judge:         Hon. Josephine L. Staton<br>Trial Date:   N/A<br>Action Filed:  April 24, 2017 |

1    **TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

2        **PLEASE TAKE NOTICE** that, on May 31, 2019, at 10:30 a.m., or as soon

3    thereafter as the matter may be heard, in Courtroom 10a of the above-titled court,

4    located at 411 W. Fourth St., Santa Ana, California 92701, defendant Xavier

5    Becerra, in his capacity as the Attorney General of the State of California

6    ("Defendant"), shall move, and hereby does move, this Court for summary

7    judgment under Federal Rule of Civil Procedure 56(a).  Defendant brings this

8    motion because California's restrictions on civilian access to rifles that qualify as

9    "assault weapons," *see* Cal. Penal Code §§ 30510(a), 30515(a)(1)(A)-(C),

10   30515(a)(1)(E)-(F), 30515(a)(3), 30520, 30600, 30605, 30925, 30945; Cal. Code

11   Regs. tit. 11, § 5499, is constitutional under the Second Amendment to the United

12   States Constitution.

13       This motion is based on this notice of motion and motion, the accompanying

14   memorandum of points and authorities, the concurrently filed Declaration of Peter

15   H. Chang, including the exhibits thereto, the concurrently filed Statement of

16   Uncontroverted Facts and Conclusions of Law, the pleadings and papers on file,

17   and upon such further evidence, both oral and documentary, as may be offered at

18   the time of the hearing on the motion.

19   Dated:  March 25, 2019                         Respectfully submitted,

20                                                  XAVIER BECERRA
                                                    Attorney General of California
21                                                  MARK R. BECKINGTON
                                                    Supervising Deputy Attorney General
22                                                  JOHN D. ECHEVERRIA
                                                    Deputy Attorney General
23
                                                    /s/ Peter H. Chang
24
                                                    PETER H. CHANG
25                                                  Deputy Attorney General
                                                    *Attorneys for Defendant Xavier*
26                                                  *Becerra*

27

28

# TABLE OF CONTENTS

**Page**

Memorandum of Points and Authorities.................................................................1

Introduction .........................................................................................................1

Background............................................................................................................2

    I.     The Roberti-Roos Assault Weapons Control Act of 1989 ..................2

    II.    The AWCA's Restrictions on Rifles Based on Their Features ...........4

Procedural History ...............................................................................................6

Legal Standard .....................................................................................................6

Argument..............................................................................................................7

    I.     The Second Amendment's Legal Framework ....................................7

    II.    California's Restrictions on Assault Rifles Do Not Burden the
        Second Amendment...........................................................................7

        A.    Assault Rifles Are "Like" the M-16 and Other "Weapons
            That Are Most Useful in Military Service" .............................8

            1.    Assault Rifles Are Functionally Similar to Military
                 Rifles .............................................................................8

            2.    The Prohibited Features, Individually and in
                 Combination, Serve Specific Combat Functions ...........10

                a.     Ability to Accept Detachable Magazines ............10

                b.     Pistol Grips and Thumbhole Stocks ...................11

                c.     Folding or Telescoping Stocks............................12

                d.     Flash Suppressors ...............................................12

             3.    Gun Manufacturers Market Assault Rifles to
                 Civilians Based on Their Militaristic Features .............13

        B.    Assault Rifles Are Not Commonly Owned or Used for
            Purposes Protected by the Second Amendment......................14

            1.    Assault Rifles Are Not Commonly Owned ...................14

             2.    Assault Rifles Are Not Commonly Used for Self-
                 Defense..........................................................................15

    III.   Even if the Second Amendment Is Implicated, California's
        Restrictions on Assault Rifles Are Constitutional ............................16

        A.    Intermediate Scrutiny Is the Appropriate Standard of
            Review.....................................................................................16

         B.    The Assault-Rifle Restrictions Are Reasonably Fitted to
            Important Public-Safety Interests...........................................18

             1.    Assault Rifles Are Favored by Criminals and Used
                 Disproportionally in Crime ...........................................19

             2.    Assault Rifles Are Used Disproportionately in
                 Mass Murders ................................................................20

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3
       3.    Assault Rifles Are Used Disproportionately
           Against Law Enforcement Officers ...............................21

4
       4.    Assault Rifles Are More Lethal and Cause More

5
           Serious Injuries Than Handguns ...................................21

    C.    The AWCA's Assault Rifle Restrictions Reasonably

6
         Further California's Public-Safety Interests ............................23

7
Conclusion ..........................................................................................................24

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

CASES

*Bauer v. Becerra*
   858 F.3d 1216 (9th Cir. 2017)....................................................15, 17

*City of Renton v. Playtime Theatres, Inc.*
   475 U.S. 41 (1986).......................................................................18

*Daggett v. Comm'n on Governmental Ethics & Election Practices*
   172 F.3d 104 (1st Cir. 1999) .......................................................6

*Daggett v. Comm'n on Governmental Ethics & Election Practices*
   205 F.3d 445 (1st Cir. 2000) .......................................................6

*District of Columbia v. Heller*
   554 U.S. 570 (2008).............................................................*passim*

*Friedman v. City of Highland Park*
   784 F.3d 406 (7th Cir. 2015).....................................................2, 16

*Fyock v. Sunnyvale*
   779 F.3d 991 (9th Cir. 2015)....................................7, 14, 18, 19

*Heller v. District of Columbia* (*Heller II*)
   670 F.3d 1244 (D.C. Cir. 2011) ...........................................*passim*

*Jackson v. City & Cty. of San Francisco*
   746 F.3d 953 (9th Cir. 2014).....................................................16, 17

*Kachalsky v. Cnty. of Westchester*
   701 F.3d 81 (2d Cir. 2012)..........................................................18

*Kasler v. Lockyer*
   2 P.3d 581 (Cal. 2000) ..........................................................2, 3, 19

*Kolbe v. Hogan*
   849 F.3d 114 (4th Cir. 2017)..................................................*passim*

*Kolbe v. O'Malley*
   42 F. Supp. 3d 768 (D. Md. 2014) ...............................................20

# TABLE OF AUTHORITIES
## (continued)

Page

*Korematsu v. United States*
    584 F. Supp. 1406 (N.D. Cal. 1984)....................................................................6

*N.Y.S. Rifle & Pistol Ass'n v. Cuomo*
    990 F. Supp. 2d 349 (W.D.N.Y. 2013)............................................................20

*N.Y. State Rifle & Pistol Ass'n v. Cuomo* (*NYSRPA*)
    804 F.3d 242 (2d Cir. 2015).................................................................2, 16, 17

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018)...........................................................................19

*People v. James*
    94 Cal. Rptr. 3d 576 (Cal. App. 2009) ...........................................................8

*Silveira v. Lockyer*
    312 F.3d 1052 (9th Cir. 2002)................................................................2, 3, 4

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016)......................................................................7, 17

*Staples v. United States*
    511 U.S. 600 (1994).............................................................................8, 9, 10

*Turner Broad. Sys., Inc. v. FCC* (*Turner I*)
    520 U.S. 180 (1997)........................................................................................18

*United States v. Miller*
    307 U.S. 174 (1939)........................................................................................14

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013).........................................................................19

*Wollard v. Gallagher*
    712 F.3d 865 (4th Cir. 2014)...........................................................................18

*Worman v. Healey*
    293 F. Supp. 3d 251 (D. Mass. 2018).........................................................8, 13

# TABLE OF AUTHORITIES
## (continued)

**Page**

### STATUTES

Assault Weapons Control Act ...........................................................................*passim*

California Penal Code
  § 12275.5 ......................................................................................................3
  § 12276.5(a)(1) ............................................................................................3
  § 12276.5(a)(2) ............................................................................................3
  § 30505 ......................................................................................................1, 3
  § 30510(a) ....................................................................................................5
  § 30515(a)(1) ..........................................................................................5, 11
  § 30515(a)(3) ................................................................................................5
  § 30515(b) ....................................................................................................5
  § 30520 ........................................................................................................4
  § 30600(a) ....................................................................................................1

Public Safety and Recreational Firearms Use Protection Act ...................................4

### CONSTITUTIONAL PROVISIONS

United States Constitution
  Second Amendment ..............................................................................*passim*
  Fifth Amendment, Takings Clause ...................................................................6
  Fourteenth Amendment, Due Process Clause ...................................................6

### COURT RULES

Federal Rule of Civil Procedure 56(a) ......................................................................6

Federal Rule of Evidence 201 ...................................................................................6

Local Rule 11-5.2 ......................................................................................................3

# TABLE OF AUTHORITIES
## (continued)

Page

**OTHER AUTHORITIES**

California Code of Regulations, Title 11
  § 5471(nn) ...................................................................................................12
  § 5471(oo) ...................................................................................................12
  § 5471(qq) ...................................................................................................11
  § 5471(r) .....................................................................................................12
  § 5471(t) ......................................................................................................11
  § 5471(z) ......................................................................................................11
  § 5499 ........................................................................................................3, 5

Code of Federal Regulations, Title 27
  § 447.11 .......................................................................................................10
  § 478.11 .......................................................................................................10
  § 4798.11 .....................................................................................................10

Senate Bill
  23 ..............................................................................................................4, 5
  23, § 3 .............................................................................................................4
  23, § 7 .............................................................................................................4
  880 ..................................................................................................................5

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

In 1989, an individual armed with an AK-47 semiautomatic rifle opened fire at the schoolyard of Cleveland Elementary School in Stockton, California, where over 300 children were playing.  The shooter killed five children and wounded 29 others, expending over 100 rounds in four minutes.  In response to this mass shooting, the California Legislature enacted the Roberti-Roos Assault Weapons Control Act (the "AWCA").  In enacting the AWCA, the Legislature found that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  Cal. Penal Code § 30505.  The AWCA prohibits, among other things, the manufacture, possession, transport, sale, offer for sale, and importation of assault weapons, *id.* § 30600(a), including as relevant here, assault rifles, as defined by either make and model of the weapon, or by the presence of one or more of certain militaristic features.

Plaintiffs bring a facial Second Amendment challenge to the AWCA's restrictions on assault rifles—a category of military-style weapons that are unusually dangerous and unsuitable for civilian self-defense.  Plaintiffs' claim must fail.  Assault rifles are "dangerous and unusual" weapons not protected by the Second Amendment for two reasons: they are, "like" the M-16, "most useful in military service"; and they are not commonly used for lawful self-defense.  Even assuming the AWCA's restrictions on assault rifles implicate the Second Amendment, they pass the appropriate level of scrutiny—intermediate scrutiny—because they reasonably fit the State's important public-safety interests.  Assault rifles have been used in some of the nation's most notorious mass shootings, resulting in more deaths and more injuries, and used frequently in the murder of law enforcement officers.  In restricting civilian access to a subset of dangerous,

military-grade rifles, California seeks to reduce the number of gun deaths and injuries in the state.

On this record, there is no triable issue of fact going to the facial constitutionality of AWCA's assault rifle restrictions. Indeed, four federal circuit courts have addressed the issue and all have upheld bans on assault weapons under the Second Amendment by affirming the respective district court's grant of summary judgment. *See Kolbe v. Hogan*, 849 F.3d 114, 140-41 (4th Cir. 2017) (en banc); *N.Y. State Rifle & Pistol Ass'n v. Cuomo* (*NYSRPA*), 804 F.3d 242, 262-64 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 411-12 (7th Cir. 2015); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1264 (D.C. Cir. 2011). Consistent with these decisions, California's regulation of assault rifles is constitutional. Plaintiffs' lawsuit should be dismissed, and summary judgment entered in favor of defendant.

## BACKGROUND

### I.   THE ROBERTI-ROOS ASSAULT WEAPONS CONTROL ACT OF 1989

The AWCA was the first legislative restriction on assault weapons in the nation. *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008). The California Legislature passed the AWCA in 1989 in response to a proliferation of shootings that involved semiautomatic weapons, including the Stockton schoolyard shooting. *See id.* at 1057; *Kasler v. Lockyer*, 2 P.3d 581, 587 (Cal. 2000), *abrogated on other grounds by Heller*, 554 U.S. 570.

At the legislative committee hearing, the California Attorney General testified that "semi-automatic military assault rifles" were the "weapons of choice" for gang shootings. *Kasler*, 2 P.3d at 587 (citation omitted). And a Los Angeles police officer "familiar with gangs and the increasing use of assault weapons" also testified that there is "only one reason [gang members] use [military assault rifles], and that is to kill people. They are weapons of war." *Id.* (citation omitted). The

Legislature found that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state." Cal. Penal Code § 30505 (formerly Cal. Penal Code § 12275.5). The Legislature further found that each of the restricted firearms "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." *Id.*

The AWCA restricted the manufacture, possession, sale, transfer, or importation of 21 enumerated assault-rifle models. The weapons listed included "'civilian' models of military weapons that feature slightly less firepower than the military-issue versions, such as the Uzi, an Israeli-made military rifle; the AR-15, a semi-automatic version of the United States military's standard-issue machine gun, the M-16; and the AK-47, a Russian-designed and Chinese-produced military rifle." *Silveira*, 312 F.3d at 1058. These rifles appear like their military counterparts, possess many of the same military-style features, and commonly use the same ammunition as their military counterparts. *See* Def. Stmt. 8.[1] These rifles are sometimes called "Category 1" rifles.

The AWCA, as originally enacted, also included a mechanism for the California Attorney General to seek a judicial declaration in superior court that certain weapons identical to the listed firearms are also deemed "assault weapons" subject to the restrictions of the AWCA. Former Cal. Penal Code § 12276.5(a)(1)-(2). Following judicial confirmation of the legal requirements to add firearms to the prohibited list, the Attorney General added additional semiautomatic rifles to the prohibited assault weapons list. Cal. Code Regs. tit. 11, § 5499; *see also*

---

[1] Citations to "Def. Stmt." are to the concurrently filed Defendant's Statement of Uncontroverted Facts and Conclusions of Law. Citations to "Def. Exh." are to the exhibits submitted by the accompanying Declaration of Peter H. Chang. In accordance with Local Rule 11-5.2, and for the Court's convenience, the pages of Defendant's exhibits have been numbered consecutively.

1  *Kasler*, 2 P.3d at 587.  These rifles are sometimes called "Category 2" rifles.  The

2  Attorney General's ability to add weapons to the assault weapons list ended in

3  2006.  *See* Cal. Penal Code § 30520.

4      The original AWCA "was the model for a similar federal statute enacted in

5  1994," *Silveira*, 312 F.3d at 1057, the "Public Safety and Recreational Firearms

6  Use Protection Act," which banned assault weapons by make and model, and also

7  by feature, Pub. L. no. 103-322; 108 Stat. 1796 (1994).  The federal assault

8  weapons ban expired in 2004.

9  **II.   THE AWCA'S RESTRICTIONS ON RIFLES BASED ON THEIR FEATURES**

10      After the AWCA was enacted, gun manufacturers began to produce "copycat"

11  weapons that were "substantially similar to weapons on the prohibited list but

12  differed in some insignificant way, perhaps only the name of the weapon, defeating

13  the intent of the ban."  Def. Exh. 29 (S.B. 880 Rpt.) at 1131; *Silveira*, 312 F.3d at

14  1058 n.5.  To address the proliferation of these "copycat" weapons, the Legislature

15  enacted Senate Bill 23, amending the AWCA "to broaden its coverage and to

16  render it more flexible in response to technological developments in the

17  manufacture of semi-automatic weapons."  *Silveira*, 312 F.3d at 1058; *see* Def.

18  Exh. 34 (S.B. 23) at 1343.  The Legislature added an alternative definition of

19  assault weapon to include any "semiautomatic, centerfire rifle that has the capacity

20  to accept a detachable magazine" and any one of a list of prohibited features,

21  including a pistol grip beneath the action of the rifle, a thumbhole stock, an

22  adjustable stock, a flash suppressor, or a forward pistol grip, or any semiautomatic,

23  centerfire rifle that is less than 30 inches in length regardless of features.  Def. Exh.

24  34 at 1369-70 (S.B. 23, § 7).  These assault rifles defined by feature are sometimes

25  called "Category 3" rifles.  By S.B. 23, the Legislature also amended the AWCA to

26  prohibit the manufacture, importation, and sale of large-capacity magazines

27  ("LCMs") capable of holding more than 10 rounds of ammunition.  *Id.* at 1343,

28  1369-70.

After enactment of S.B. 23, gun manufacturers began producing "bullet button" rifles to circumvent S.B. 23's detachable-magazine requirement.  Def. Exh. 29 (S.B. 880 Rpt.) at 1132.  The "bullet button" was a minor design change made by gun manufacturers that allows shooters to use the tip of a bullet as a "tool" to push a button to release the ammunition magazine.  *Id.*  With the "bullet button," a rifle no longer met the technical definition of a "detachable" magazine, and yet allowed a magazine to be removed and replaced in seconds, rendering meaningless the distinction between a magazine that is not "detachable" within the meaning of California law and a magazine that can be readily detached without the use of a tool.  *Id.*  The Legislature found that such "bullet button" rifles were used in the 2015 San Bernardino shooting and that the rifles were "nearly indistinguishable from illegal assault weapons."  *Id.* at 1135; Def. Exh. 41 at 1521-22.  In 2016, the Legislature enacted Senate Bill 880 ("S.B. 880"), 2016 Stat. ch. 48, to address this "bullet button" loophole by focusing on the absence of a "fixed magazine," rather than on the "capacity to accept a detachable magazine."  *See* Cal. Penal Code § 30515(a)(1); *id.* § 30515(b) (defining "fixed magazine").

As it currently stands, the AWCA restricts any rifle listed by make and model, Cal. Penal Code § 30510(a); Cal. Code Regs. tit. 11, § 5499, as well as any centerfire, semiautomatic rifle that lacks a fixed magazine and has one or more enumerated militaristic features, such as a conspicuously protruding pistol grip beneath the action, a forward pistol grip, an adjustable stock, or a flash suppressor, or if the rifle is less than 30 inches in length, Cal. Penal Code §§ 30515(a)(1)(A)-(C), (E)-(F), 30515(a)(3).  By such definition, the AWCA restricts only a subset of semiautomatic rifles.  For example, it does not restrict any rimfire, semiautomatic rifles, nor does it restrict any centerfire, semiautomatic rifle that has none of the militaristic features or a fixed magazine of 10 rounds or less.

**PROCEDURAL HISTORY**

Plaintiffs' Original and First Amended Complaints challenged certain of the AWCA's restrictions concerning assault rifles and the assault rifle registration requirements under the Second Amendment, Due Process Clause, and the Takings Clause.  In 2017, Defendant moved to dismiss Plaintiffs' Takings Clause and Due Process Clause claims, ECF No. 17, and Plaintiffs moved for a preliminary injunction against the enforcement of certain registration requirements, ECF No. 41.  The Court denied Plaintiffs' motion for a preliminary injunction, granted Defendant's motion to dismiss, and dismissed Plaintiffs' Due Process and Takings Clause claims.  ECF No. 49.  The current operative Third Amended Complaint asserts the same claims, including the already dismissed Due Process and Takings Clause claims.  Since the Court's earlier order determined that Plaintiffs cannot proceed with the dismissed claims, *id.* at 19, only the Second Amendment claim remains at issue in this case.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When the constitutionality of a statute is at issue, a court's decision "must be based largely on legislative, as opposed to adjudicative, facts."  *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 455-56 (1st Cir. 2000).  Legislative facts, "which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts." *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) (citing Fed. R. Evid. 201 advisory committee's note); *see Korematsu v. United States*, 584 F. Supp. 1406, 1414 (N.D. Cal. 1984)

1   ("Legislative facts are facts of which courts take particular notice when interpreting

2   a statute or considering whether [a legislative body] has acted within its

3   constitutional authority.").

4                                    **ARGUMENT**

5   **I.   THE SECOND AMENDMENT'S LEGAL FRAMEWORK**

6        The Ninth Circuit uses a two-step inquiry for Second Amendment claims:

7   "first, the court asks whether the challenged law burdens conduct protected by the

8   Second Amendment; and if so, the court must then apply the appropriate level of

9   scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016).  The first step

10  considers whether the challenged law burdens conduct protected by the Second

11  Amendment, based on a "historical understanding of the scope of the right." *Id.* at

12  820 (quoting *Heller*, 554 U.S. at 625).  If the challenged law falls outside the

13  historical scope of the Second Amendment, then that law "may be upheld without

14  further analysis." *Id.* at 821 (citation omitted).  If the Court determines that the

15  challenged law is subject to Second Amendment protection, it then proceeds to the

16  second step of the inquiry to determine the appropriate level of scrutiny to apply,

17  and then to apply that level of scrutiny.  *Id.* (citation omitted).

18

19  **II.   CALIFORNIA'S RESTRICTIONS ON ASSAULT RIFLES DO NOT BURDEN THE SECOND AMENDMENT**

20       The AWCA does not violate the Second Amendment because assault rifles are

21  not protected by the Second Amendment.  In *Heller*, the Supreme Court made clear

22  that Second Amendment protection "extends only to certain types of weapons" and

23  does not encompass a "right to keep and carry any weapon whatsoever in any

24  manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 623; *see id.* at

25  626-27 & n.26.  Importantly, it does not protect weapons that are "most useful in

26  military service," such as the "M-16 and the like." *Heller*, 554 U.S. at 627; *see*

27  *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015); *Kolbe*, 849 F.3d at 136.

28  The Second Amendment also does not protect weapons not "in common use" for

lawful purposes like self-defense. *Heller*, 554 U.S. at 625. The challenged assault-rifle restrictions fall into both of these categories that *Heller* established as outside the scope of the Second Amendment.

### A. Assault Rifles Are "Like" the M-16 and Other "Weapons That Are Most Useful in Military Service"

Assault rifles regulated under the AWCA fall outside the scope of the Second Amendment because they are, "like" the M16, "most useful in military service." *See Kolbe*, 849 F.3d at 137 ("Whatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines . . . are unquestionably most useful in military service."); *accord Worman v. Healey*, 293 F. Supp. 3d 251, 265-66 (D. Mass. 2018) (holding that AR-15s are beyond the scope of the Second Amendment), *appeal docketed*, No. 18-1454 (1st Cir. June 19, 2018); *People v. James*, 94 Cal. Rptr. 3d 576, 585-86 (Cal. App. 2009) ("*Heller* does not extend Second Amendment protection to assault weapons."). Assault rifles were originally developed for military use and are equipped with military-style features designed to serve specific combat needs and enhance the usefulness (and lethality) of the weapons. *See* Def. Stmt. 5-6.

### 1. Assault Rifles Are Functionally Similar to Military Rifles

The Supreme Court has highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the protection of the Second Amendment. *Heller*, 554 U.S. at 627. [2] The AR-15 and other assault rifles restricted by the AWCA have a military pedigree and are nearly identical to the M-16. *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle . . . "); Def. Stmt. 5-10. The AR-15 incorporates the functional design features that make military assault rifles effective in combat. Def.

---

[2] To be precise, "'[a]lthough the *Heller* Court invoked Blackstone for the proposition that 'dangerous and unusual' weapons have historically been prohibited, Blackstone referred to the crime of carrying 'dangerous *or* unusual weapons.'" *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148-49 (1769)).

Stmt. 5-6.  The primary difference between the M-16 and the AR-15 is that the M-16 is a select-fire rifle that allows the shooter to fire in either automatic or semiautomatic mode, while the AR-15 fires only in semiautomatic mode.  Def. Stmt. 10.  This is not a material difference.  While semiautomatic rifles fire only one shot with each pull of the trigger, they can "still fire almost as rapidly as automatics."  *See Heller II*, 670 F.3d at 1263.  In enacting the federal ban on assault weapons, including assault rifles, Congress found that semiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them "virtually indistinguishable in practical effect from machineguns."  Def. Stmt. 11; *see Heller II*, 670 F.3d at 1263; *see also* Def. Stmt. 12 (a 30-second round magazine empties in less than second seconds on automatic, while the same magazine empties in just five seconds on semiautomatic).

That semiautomatic rifles are not materially distinct from their automatic counterparts is also evidenced by the fact that military personnel are trained to use their select-fire weapons in *semiautomatic* mode for improved accuracy and control.  Indeed, the U.S. Army considers the M-16 to be more dangerous and effective as an instrument of war when it is fired on semiautomatic mode than when it is fired on automatic mode.  According to the Army, automatic fire "is inherently less accurate than semiautomatic fire."  Def. Exh. 19 at 911; *see* Def. Exh. 14 (Boone Dep.) at 485:6-16.  Beyond certain distances, "rapid semiautomatic fire is superior to automatic fire in all measures."  Def. Exh. 19 at 908.  For this reason, the Army instructs its solders that their M-16 rifles should "normally be employed in the semiautomatic fire mode."  *Id.* at 912; *see also Kolbe*, 849 F.3d at 125 ("[S]oldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations.").

Furthermore, semiautomatic assault rifles, such as the AR-15, are easily converted to fire in automatic mode.  In enacting the federal ban, Congress found

that "it is a relatively simple task to convert a semiautomatic weapon to automatic fire." Def. Exh. 27 (H.R. Rpt. No. 103-489) at 1095. As the Supreme Court also observed, "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon." *Staples*, 511 U.S. at 603. A metal stop on the AR-15 that prevents an M-16 selector switch to be installed can be easily filed away, as the plaintiff had done in *Staples* to create an automatic AR-15 machinegun. *Id.* Assault rifles can also be converted to automatic machineguns by adding a few parts or by drilling additional holes in the receiver of the rifle or by installing accessories, such as "bump stocks" or "multiburst trigger activators." Def. Exh. 3 (Mersereau Rpt.) at 140, ¶ 20; Def. Exh. 15 (Kleck Dep.) at 642:8-10.[3]

### 2. The Prohibited Features, Individually and in Combination, Serve Specific Combat Functions

"[T]he features that characterize a semiautomatic weapon as an assault weapon are not merely cosmetic, but do serve specific, combat-functional ends." Def. Exh. 27 (H.R. Rpt. No. 103-489) at 1095; *see Kolbe*, 849 F.3d at 132. The "net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." Def. Exh. 27 at 1096-97; *see* Def. Exh. 5 at 198-99, ¶¶ 12-13; *see also id.* at 199-200, ¶¶ 14-17.

### a. Ability to Accept Detachable Magazines

An assault rifle without a fixed magazine enables the shooter to "rapidly reload" one magazine after another. Def. Exh. 22 (ATF Rpt.) at 1048. That feature renders a semiautomatic rifle "capable of killing or wounding more people in a shorter amount of time." Def. Exh. 29 (S.B. 880 Rpt.) at 1133. Such a rifle is also capable of accepting LCMs, which "allow a shooter to fire more than ten rounds

---

[3] As of March 26, 2019, bump stocks will be banned, *see* 27 C.F.R. §§ 447.11, 478.11, 4798.11, but that ban is currently being challenged in several lawsuits. Even if upheld, assault rifles could still be equipped with illegal bump stocks or other similar devices to mimic automatic fire.

without having to pause to reload." *Kolbe*, 849 F.3d at 125.  LCMs "are particularly designed and most suitable for military and law enforcement applications" and "are a feature common, but not unique, to the banned assault weapons, many of which are capable of accepting magazines of thirty, fifty, or even 100 rounds." *Id.*  LCMs "are indicative of military firearms," and the fact "[t]hat a firearm is designed and sold with a large capacity magazine, *e.g.*, 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle."  Def. Exh. 22 (ATF Rpt.) at 1048.  In fact, in 109 domestic public mass shootings from 1982 through September 2018, the use of LCMs resulted in an average of 27 fatalities and injuries compared to 9 fatalities and injuries when no LCMs were used.  Def. Exh. 6 at 232.

### b.   Pistol Grips and Thumbhole Stocks

A pistol grip or thumbhole stock enables a shooter to maintain accuracy during repeated firing.  A pistol grip "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing."  Cal. Code Regs. tit. 11, § 5471(z); *see* Cal. Penal Code § 30515(a)(1)(A).  A thumbhole stock "allows for a grip similar to that offered by a pistol grip."  Def. Exh. 2 (Graham Rpt.) at 123, ¶ 20; *see* Cal. Code Regs. tit. 11, § 5471(qq).  A forward pistol grip "allows for a pistol style grasp forward of the trigger," Cal. Code Regs. tit. 11, § 5471(t), which can help insulate the non-trigger hand from heat during rapid fire. Def. Stmt. 19.  A forward pistol grip is also a feature of early machineguns.  *Id.*

A pistol grip or thumbhole stock is a ubiquitous feature of modern military rifles.  Def. Exh. 3 (Mersereau Rpt.) at 137, ¶ 9; Def. Exh. 2 at 123, ¶ 19 & 5, ¶ 23. A pistol grip or thumbhole stock enables a shooter to maintain accuracy during rapid fire in combat situations.  Def. Stmt. 16; Def. Exh. 22 (ATF Rpt.) at 1048 ("[Pistol] grips were designed to assist in controlling machineguns during automatic fire."); Def. Exh. 3 at 137-38, ¶ 9 ("Pistol grips and thumbhole stocks provide the

combatant with more control of the rifle and thus more accuracy during rapid fire.").

### c.    Folding or Telescoping Stocks

A folding or telescoping stock enhances the portability and concealability of a rifle.  A telescoping stock is "a stock which is shortened or lengthened by allowing one section to telescope into another portion."  Cal. Code Regs. tit. 11, § 5471(oo).  A folding stock, by contrast, is a "stock which is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm."  *Id.* § 5471(nn).  As described by a federal study, the "predominant advantage" of a folding or telescoping stock "is for military purposes, and it is not normally found on the traditional sporting rifle."  Def. Exh. 22 (ATF Rpt.) at 1048.  A folding or telescoping stock also renders the rifle more concealable, as would a semiautomatic centerfire rifle that is under 30 inches in length, and allows a shooter to potentially carry a rifle undetected in public.  Def. Exh. 3 (Mersereau Rpt.) at 138, ¶ 10 ("By collapsing the stock, the rifle becomes more concealable potentially allowing a suspect to introduce the firearm into a vulnerable location."); Def. Exh. 2 (Graham Rpt.) at 124, ¶ 21 (adjustable stocks could "permit the shooter to smuggle the weapon undetected (by, for example, hiding the weapon in a backpack or bag) or to hide in a crowd without telegraphing the shooter's location").

### d.    Flash Suppressors

A flash suppressor is a device attached to the muzzle of a rifle to reduce the flash emitted upon firing.  Cal. Code Regs. tit. 11, § 5471(r).  It is a standard feature of the M-16 that can aid a shooter to maintain accurate, rapid fire in low-light conditions.  Def. Stmt. 22-23; Def. Exh. 22 (ATF Rpt.) at 7 ("[T]he mere removal of the flash suppressor may have an adverse impact on the accuracy of the

firearm.").  A flash suppressor can also help conceal the shooter's position, especially at night.  Def. Stmt. 24; Def. Exh. 22 (ATF Rpt.) at 1049.

### 3.    Gun Manufacturers Market Assault Rifles to Civilians Based on Their Militaristic Features

Manufacturers of assault rifles have advertised them to civilians as military-grade weapons, emphasizing their military history and similarity to military rifles. *See Kolbe*, 849 F.3d at 125 ("Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess."); Def. Exh. 1 (Donohue Rpt.) at 25, ¶¶ 58-59; *see, e.g.*, Def. Exhs. 24-25. Beginning in the 1980s, the gun industry began to market heavily military-style rifles to the civilian gun market, Def. Exh. 32 at 1277, using the term "assault rifles" to describe these military-style weapons.  *See* Def. Exh. 35 at 1457, 1459, 1465 (July 1981 Guns & Ammo) (variously describing a "new breed of assault rifles" as "[s]pawned in the crucible of war," "military-type," "military-style," and "military autoloaders").

In light of the similarities between restricted assault weapons and military weapons "like" the M-16, both the Fourth Circuit and the Massachusetts District Court have held that assault weapons are not protected by the Second Amendment under *Heller*.  *Kolbe*, 849 F.3d at 137 (affirming the district court's award of summary judgment in favor of the State; "Because the banned assault weapons and large-capacity magazines are clearly most useful in military service, we are compelled by *Heller* to recognize that those weapons and magazines are not constitutionally protected"); *Worman*, 293 F. Supp. 3d at 266 (granting summary judgment in favor of the state; "because the undisputed facts convincingly demonstrate that AR-15s and LCMs are most useful in military service, they are beyond the scope of the Second Amendment").  The Court should similarly find

1   that assault rifles restricted under the AWCA are "like" the M-16, most useful in

2   military service, and beyond the scope of Second Amendment protection.

### B.   Assault Rifles Are Not Commonly Owned or Used for Purposes Protected by the Second Amendment

5       Another important limitation on the scope of the Second Amendment is that it

6   protects only the types of weapons "'in common use at the time' for lawful

7   purposes like self-defense." *Heller*, 554 U.S. at 627 (quoting *U.S. v. Miller*, 307

8   U.S. 174, 179 (1939)); *see Fyock*, 779 F.3d at 997.  To establish a cognizable claim

9   under the Second Amendment, Plaintiffs must show that assault rifles are both

10  commonly owned and used for the core Second Amendment purpose of self-

11  defense.  They cannot do so.

### 1.   Assault Rifles Are Not Commonly Owned

13      The assault rifles restricted by the AWCA comprise only a small fraction of all

14  firearms.  The AWCA does not restrict handguns—the "quintessential self-defense

15  weapon"—shotguns, or even all semiautomatic rifles.  Rather, like the assault

16  weapons bans upheld in other judicial circuits, the AWCA restricts only a small

17  subset of rifles that "are designed to enhance their capacity to shoot multiple human

18  targets very rapidly." *Heller II*, 670 F.3d at 1262.

19      California has accurate data on lawful assault-rifle ownership because the state

20  had required owners of assault rifles to register those firearms to maintain lawful

21  possession before the rifles become restricted.  As of November 2, 2018, there were

22  approximately 166,640 assault rifles registered in California. Def. Exh. 18 at 895.[4]

23  In a state with approximately 30.84 million adults, even assuming that each of the

24  approximately 166,000 assault rifles is owned by a separate adult, it would mean

25  that approximately 0.5 % of adult Californians own an assault rifle, an ownership

26  _____

27      [4] Only approximately 174,180 assault rifles have *ever* been registered in California, a higher number than currently registered because some registered owners may have become prohibited from possessing a firearm, deceased, or

28  dispossessed themselves of the rifles.  Def. Exh. 18 at 895.

rate far from what may be considered "common."  Def. Exh. 7 at 252, ¶ 18; *see* Def. Exh. 39 at 1511 (Census data).  The actual ownership rate is likely less than half of one percent because gun ownership is highly concentrated and growing more so.  Def. Exh. 7 at 252, ¶ 18; *see* Def. Stmt. 29.  Evidence shows that approximately 20 percent of gun owners own 60 percent of the nation's firearms.  Def. Exh. 1 (Donohue Rpt.) at 8, ¶ 22.  66 percent of owners of AR- or AK-platform rifles own two or more such rifles; over 30 percent of them report owning three or more such rifles; and over 25 percent of them own four or more such rifles.  Def. Stmt. 30-31.

## 2.    Assault Rifles Are Not Commonly Used for Self-Defense

The core of the Second Amendment, as described in *Heller*, is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *See Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Heller*, 554 U.S. at 635).  There is no evidence that assault rifles are commonly used for self-defense either inside or outside the home.  Instead, in the extreme rare instances when individuals in the United States fire a gun in self-defense, only 4.6 percent of the time did the defender use a rifle of any type (whether assault or non-assault).  Def. Exh. 33 at 1341.[5]

The rarity with which assault rifles have been used in self-defense is to be expected.  As one circuit court held, assault weapons do not have "any legitimate use as self-defense weapons" and they "in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations."  *Heller II,* 698 F.Supp.2d at 193-94; *see also* Def. Exh. 20 at 949 ("In addition to utilizing military features useful in combat, but which have no

---

[5] When confronted with potential violence, the victim used a gun in self-defense in less than one percent of these incidents.  Def. Exh. 1 (Donohue Rpt.) at 35, ¶ 86.  In those rare instances when a gun is used, 98 percent of the time it involves merely brandishing, rather than firing, the gun, which is enough to cause the criminal to stop the attack.  *Id.* at 35-36, ¶¶ 87-88.  And brandishing an assault rifle is no more effective in stopping an attack than brandishing a handgun.  Def. Exh. 10 (Graham Dep.) at 305:20-306:8.

legitimate civilian purpose, assault weapons are exceedingly dangerous if used in self defense, because the bullets many of the weapons fire are designed to penetrate humans and will penetrate structures, and therefore pose a heightened risk of hitting innocent bystanders.").  Assault rifles, in particular, are not well suited for defense use in the home.  Def. Exh. 1 (Donohue Rpt.) at 38-39, ¶ 96; Def. Exh 3 (Mersereau Rpt.) at 141-42, ¶ 23.  They are less effective in home-defense situations than handguns in part because they are less maneuverable in confined areas such as a home.  Def. Exh. 1 at 43-44, ¶ 107; Def. Exh. 3 (Mersereau Rpt.) at 141-42, ¶ 23. In defensive gun uses, handguns are the preferred weapon.  *See Heller*, 554 U.S. at 629; Def. Exh. 15 (Kleck Dep.) at 672:5-21.  For that reason, law enforcement officers recommend handguns and not rifles—let alone assault rifles—for home defense.  Def. Exh. 1 at 44, ¶ 107.

**III.   EVEN IF THE SECOND AMENDMENT IS IMPLICATED, CALIFORNIA'S RESTRICTIONS ON ASSAULT RIFLES ARE CONSTITUTIONAL**

Should the Court reach the second step of the Second Amendment analysis, the Court must uphold the restrictions under intermediate scrutiny, consistent with every circuit court to have selected and applied a level of scrutiny to assault-weapon restrictions.  *See Kolbe*, 849 F.3d at 140-41; *NYSRPA*, 804 F.3d at 269; *Heller II*, 670 F.3d at 1263. *But see Friedman*, 784 F.3d at 410 (upholding assault weapons ban without selecting a level of scrutiny).

**A.   Intermediate Scrutiny Is the Appropriate Standard of Review**

In determining the appropriate level of scrutiny to apply to a Second Amendment challenge, the Court must consider "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014).  Intermediate scrutiny applies unless the challenged law destroys the right of self-defense of the home or severely burdens the core of the Second

Amendment right.  *Bauer*, 858 F.3d at 1222 (internal quotation marks and citations omitted).

The AWCA does not burden Californians' "inherent right of self-defense" that the Second Amendment protects.  *See Heller*, 554 U.S. at 628.  At most, the AWCA regulates the *manner* in which persons may exercise their Second Amendment rights—Californians may select from a range of firearms to engage in lawful self-defense, except for a small subset of firearms comprising assault weapons.  *See Jackson*, 746 F.3d at 961.  The AWCA's restriction on assault rifles "leave[s] open alternative channels for self-defense."  *Id.*  It does not restrict the ability of Californians to possess or use for self-defense handguns and shotguns— weapons more commonly used, better suited, and more effective for self-defense purposes.[6]  The AWCA does not even ban an entire category of rifles or semiautomatic rifles.  In fact, Californians may lawfully acquire for lawful purposes, like self-defense, an array of semiautomatic rifles: a centerfire semiautomatic rifle without a fixed magazine, provided it is not a prohibited make and model and does not have any of the prohibited features (*i.e.*, is "featureless"); a centerfire semiautomatic rifle with any of the militaristic features and with a fixed magazine of 10 rounds or less; or a rimfire semiautomatic rifle with any features.[7]

As this Court held in denying Plaintiffs' motion for a preliminary injunction, "intermediate scrutiny is appropriate" where individuals "remain free to choose any weapon that is *not* restricted by the AWCA or another state law."  ECF No. 49 at 23.  In contrast to the ordinance at issue in *Heller*, the AWCA restricts only a particularly dangerous subset of military-style weapons.  The AWCA, therefore, does not "prevent a person from keeping a suitable and commonly used weapon for

---

[6] Indeed, 90% of all owners of AR- or AK-platform rifles own a handgun prior to owning a rifle.  Def. Exh. 42 at 1531.

[7] A rimfire rifle fires rimfire cartridges, which are lower pressure than centerfire cartridges, resulting in lower bullet travel speed and generally lower power.  Def. Exh. 14 (Boone Dep.) at 482:12-483:24; Def. Exh. 16 (Helsley Dep.) at 753:6-23.

protection in the home or for hunting, whether a handgun or a non-automatic long gun." *Heller II*, 670 F.3d at 1262.  For these reasons, the AWCA's restrictions on assault rifles do not rise to the level of a "substantial burden" and should be analyzed under intermediate scrutiny.  *See Kolbe*, 849 F.3d at 140-41; *NYSRPA*, 804 F.3d at 269; *Heller II*, 670 F.3d at 1263.

### B.   The Assault-Rifle Restrictions Are Reasonably Fitted to Important Public-Safety Interests

A regulation satisfies intermediate scrutiny if (1) the government's stated objective is "significant, substantial, or important"; and (2) there is a "'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821-22 (citation omitted).  Intermediate scrutiny does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest. *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

In determining whether a law survives intermediate scrutiny, courts "afford substantial deference to the predictive judgments of the legislature." *Turner Broad. Sys., Inc. v. FCC* (*Turner I*), 520 U.S. 180, 195 (1997).  Even when the record contains conflicting evidence, "[i]t is the legislature's job, not [the courts'], to weigh conflicting evidence and make policy judgments." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012); *accord Wollard v. Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2014).  Deferential review is particularly appropriate "[i]n the context of firearm regulation" because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97 (quoting *Turner*, 512 U.S. at 665 (plurality)).  Under intermediate scrutiny, the government may "rely on any

18

evidence 'reasonably believed to be relevant' to substantiate its important interests," and the Court "may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'" *Fyock*, 779 F.3d at 1000 (quotation omitted). Such "evidence need only 'fairly support[]' [the government's] conclusions." *Pena v. Lindley*, 898 F.3d 969, 982 (9th Cir. 2018) (quotation omitted). The AWCA easily passes scrutiny under this framework.

"[I]t is beyond question that the government's interest in promoting public safety and reducing gun violence is important or substantial." ECF No. 49 at 11; *see, e.g.*, *Fyock*, 779 F.3d at 1000; *United States v. Chovan*, 735 F.3d 1127, 1135 (9th Cir. 2013). The AWCA furthers that interest directly by restricting a particularly dangerous subclass of firearms that pose an acute danger to the public and law enforcement. Assault weapons are used disproportionately in gun crime, particularly mass shootings, and the killing of law enforcement personnel, resulting in increased casualties.

### 1. Assault Rifles Are Favored by Criminals and Used Disproportionally in Crime

In passing the federal assault weapons ban, Congress found that "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder." Def. Exh. 27 (H.R. Rpt. No. 103-489) at 1090. It further found that "[t]he carnage inflicted on the American people [by] criminals and mentally deranged people armed with . . . semi-automatic assault weapons has been overwhelming and continuing," and the use of those weapons by "criminal gangs, drug-traffickers, and mentally deranged persons continues to grow." *Id.* at 1089-90. Similar findings were made by the California Legislature when it enacted the AWCA. *See Kasler*, 2 P.3d at 587.

Assault weapons and assault rifles are also used disproportionately in crime relative to their market presence. According to the Director of the Bureau of

Alcohol, Tobacco, Firearms in testimony to Congress, firearms tracing statistics showed that assault weapons were proportionally more often used in crimes compared to handguns. Def. Exh. 27 at 1090.[8] Congress found this statistical evidence to be supported by law enforcement officials' observations on the streets. *Id.* These Congressional findings are supported by recent studies that show assault weapons, primarily assault rifles, are used in up to 8% of all crimes involving firearms. Def. Exh. 23 (Koper Article) at 1063. More generally, assault weapons and other high-capacity semiautomatic weapons account for 22 to 36 percent of crime guns, and "appear to be used in a higher share of firearm mass murders (up to 57% in total)." *Id.*

### 2. Assault Rifles Are Used Disproportionately in Mass Murders

Assault rifles are also disproportionately used in mass murders. One researcher found that approximately one-third of firearm mass murders involved an assault rifle. Def. Exh. 23 (Koper Article) at 1066. Another researcher who examined 109 public mass shootings found that an assault rifle was used in 26 of those incidents. Def. Exh. 6 at 232.[9] These tragedies are increasing: public mass shootings have been increasing from an average of 2.7 events per year in the 1980s to an average of 4.5 events per year from 2010 to 2013. Def. Exh. 1 (Donohue Rpt.) at 12, ¶ 34.

---

[8] While many statistics cite only assault weapons without breaking down the ratio of pistols, rifles, and shotguns, data suggests that most assault weapons used in crime are assault rifles. That assault weapons are primarily assault rifles can be seen by the assault weapon registration numbers in California. As of November 2, 2018, over 90 percent of registered assault weapons are assault rifles. Def. Stmt. 26 (166,640 assault rifles out of a total assault weapons registration of 184,552).

[9] This analysis is based on the *Mother Jones* survey of public mass shootings, which is arguably the most comprehensive compilation of public mass shootings in the country. Def. Exh. 5 at 197-98, ¶¶ 8-9 & n.9. The *Mother Jones* survey has been cited favorably in numerous cases. *See N.Y.S. Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 369 (W.D.N.Y. 2013), *aff'd in part and rev'd in part by NYSRPA*, 804 F.3d 242; *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 780 & n.17 (D. Md. 2014), *aff'd by Kolbe*, 849 F.3d 114.

When such weapons are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than other gun attacks.'" Def. Exh. 1 at 44, ¶ 108.  Mass shootings involving assault weapons and LCMs resulted in more than twice as many people shot on average compared to other incidents. Def. Exh. 23 (Koper Article) at 1067; *see* Def. Exh. 1 at 45, ¶ 109; *see also* Def. Stmt. 32.  In 109 public mass shootings, when an assault rifle was used, the average number of fatalities or injuries was 41 per shooting, compared to 11 per shooting in which an assault weapon was not used.  Def. Exh. 6 at 232.

### 3.   Assault Rifles Are Used Disproportionately Against Law Enforcement Officers

Assault rifles pose particular danger against law enforcement officers and have been used disproportionally against them.  Assault rifle rounds are capable of penetrating the soft armor worn by police officers that would otherwise stop handgun rounds.  Def. Stmt. 33; Def. Exh. 11 at 370:5-18; *see* Def. Exh. 30 at 1161-62.  Evidence shows that 13 to 16 percent of guns used in the murders of police are assault weapons, virtually all assault rifles.  Def. Exh. 23 (Koper Article) at 1062, 1068.  Between 1998 and 2001, at least one in five law enforcement officers killed in the line of duty was killed with an assault weapon.  Def. Exh. 31 at 1249.  Assault weapons and high-capacity weapons account for upwards of 40 percent of cases involving serious violence, including murders of police.  Def. Exh. 23 (Koper Article) at 1062, 1068.

### 4.   Assault Rifles Are More Lethal and Cause More Serious Injuries Than Handguns

Assault rifles inflict more numerous and more extensive injuries in gunshot victims than wounds from handguns.  According to the surgeon who treated victims of two of the country's deadliest mass shootings—Columbine and Aurora, Colorado—"[g]unshot wounds from assault rifles, such as AR-15s and AK-47s, tend to be higher in complexity with higher complication rates than such injuries

1   from non-assault weapons, increasing the likelihood of morbidity in patients that

2   present injuries from assault rifles."  Def. Exh. 4 (Colwell Rpt.) at 146.  Victims of

3   assault rifles are also "at far greater risk of both immediate and long-term

4   complications," including "higher amputation rates and higher infection rates."  *Id.*

5   at 147.

6       The "effects of rifle bullets can be far more destructive compared to handguns

7   because of their higher energy," and the "explosive" effects on gunshot victims.

8   Def. Exh. 38 (Stephanopolous Article) at 1505.  When a bullet enters a victim's

9   body, it could create two types of cavities: a permanent cavity where the bullet

10  passes through the tissue, and a temporary cavity where the energy of the bullet

11  causes tissue displacement inside the body.  Def. Stmt. 35; Def. Exh. 38 at 1507.

12      A handgun bullet typically creates only a permanent cavity in its victims

13  where the bullet passes through the tissue.  Def. Exh. 44 at 1548; Def. Stmt. at 35.

14  An assault rifle bullet, by contrast, creates a larger permanent cavity in the victim's

15  body than the diameter of the bullet because it rotates vertically after it enters the

16  body.  Def. Stmt. 36.  A common assault rifle bullet also causes a temporary cavity

17  inside the victim's body in a phenomenon called "cavitation."  Cavitation is

18  "considered the most important feature in wound ballistics of high-velocity

19  projectiles."  Def. Exh. 38 (Stephanopolous Article) at 1505.  Cavitation occurs

20  when tissue is displaced behind a bullet, causing a temporary cavity that is larger

21  than the permanent cavity of the bullet's path, after which "the energy stored in any

22  displaced tissue without enough elasticity cause[s] the cavity walls to collapse, with

23  a few cycles of expansion and contraction ('pulsations') following in a waning

24  fashion, until tissue settles in the form of the residual wound track."  *Id.* at 1507.

25  This process strains, compresses, and shears the affected tissue.  *Id.*  Handguns

26  typically do not cause temporary cavities, and when they do, the temporary cavities

27  they create are typically not as injurious to the issue and can be more easily treated

28  by a physician.  Def. Stmt. 37; *see* Def. Exh. 44 at 1541.

22

Public mass shootings with assault rifles also cause harm to those beyond the direct shooting victims.  Social science studies consistently show that mass shootings can lead to increased levels of post-traumatic stress symptoms, anxiety, and depression in survivors long after the shootings, particularly in children.  Def. Exh. 1 (Donohue Rpt.) at 15-17, ¶¶ 38-41; *see also* Def. Exh. 37 at 1491-93.

## C.   The AWCA's Assault Rifle Restrictions Reasonably Further California's Public-Safety Interests

Restricting the possession of assault rifles has had and will continue to have a significant impact on public safety.  Evidence shows that assault weapons restrictions are effective in reducing gun violence, particularly violence associated with mass shootings.[10]  Prior to its expiration, for example, the federal assault weapons ban was effective in reducing the prevalence of the banned assault weapons in gun crime, as Plaintiffs' own expert acknowledges.  Def. Stmt. 38. Criminal use of assault weapons declined during the years of the federal ban and increased after the ban expired.  Def. Exh. 1 (Donohue Rpt.) at 4, ¶ 12, 23-24, ¶¶ 55-56; *see* Def. Exh. 23 (Koper Article) at 1068.  One study comparing data during the ten-year period of the federal ban with preceding ten-year period shows that the number mass shootings (in which at least six people were killed) dropped by 37 percent (from 19 to 12) and the number of fatalities dropped by 43 percent (from 155 to 89).  Def. Exh. 1 at 23-24, ¶¶ 55-56.  In the ten-year period after the federal assault weapons ban expired, however, the use of assault weapons in crime and the number of mass shootings both increased in relation to the ten-year period of the federal ban.  *Id.*; *see* Def. Exh. 23 (Koper Article) at 1062, 1068.  Mass shootings jumped by 183 percent (from 12 to 34) and the number of fatalities jumped by 239 percent (from 89 to 302).  Def. Exh. 1 at 23-24, ¶ 56.  The sharp

---

[10] *See* Def. Ex. 40 at 1519 (California's gun-death rate was reduced by 56% in the 20 years after the AWCA was enacted).

1    increase in mass shootings is in contrast to the general downward trend in overall

2    crime over the same period of time.  *Id.*

3           Assault weapons bans have also been effective in other countries.  For

4    example, Australia implemented an assault weapons ban in 1996, following a

5    public mass shooting in Port Arthur Tamania.  Def. Exh. 1 (Donohue Rpt.) at 39-

6    40, ¶ 98.  In the 17-year period before the ban, there were seven public mass

7    shootings in Australia, but none in the 22 years after.  *Id.*  After New Zealand

8    suffered the recent devastating public mass shooting in two Christchurch mosques

9    on March 15, 2019, in which 50 worshippers were killed, it has since implemented

10   a ban on military-style semiautomatic weapons.  Def. Exh. 36 at 1470.

11          As this evidence shows, the AWCA, like the federal assault weapons ban,

12   advances important interests in protecting citizens and law enforcement from gun

13   violence, promoting public safety and preventing crime.  Indeed, the AWCA's

14   restrictions on assault rifles is likely to be more effective in reducing gun crimes

15   than the federal ban because, unlike the federal ban's two-feature test, the AWCA

16   restricts centerfire rifles capable of accepting a detachable magazine if it has one of

17   the military-style features.  Def. Stmt. 39.  The AWCA, therefore, has reduced and

18   can be expected to further reduce the overall death and injury from the criminal use

19   of guns.  *See* Def. Exh. 1 at 31, ¶ 77.

20
21                                  **CONCLUSION**

22          For the reasons provided above, Defendant respectfully requests that the Court

23   enter summary judgment in his favor.

24
25
26
27
28

Dated:  March 25, 2019

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General

/s/ Peter H. Chang

PETER H. CHANG
Deputy Attorney General
*Attorneys for Defendant Xavier Becerra*

SA2017106868
21397265.docx

25