# Exhibit 14

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

STEVEN RUPP, et al.,
Plaintiff

v. CASE NUMBER:
8:17-cv-00746-JLS-JDE

XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,
Defendants

DEPOSITION OF:

J. BUFORD BOONE, III

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

J. BUFORD BOONE, III

may be taken before Lisa Bailey, Notary Public, State at Large, at Bradley, Arant, Boult & Cummings, 1819 5th Avenue North, One Federal Place, Birmingham, Alabama 35203 on December 10, 2018 commencing at approximately 10:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is not waived, the deposition to have same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

* * * * *

A P P E A R A N C E S

FOR THE PLAINTIFF:

JOHN PARKER SWEENEY
Attorney at Law
Bradley, Arant, Boult & Cummings
1615 L Street N.W.
Suite 1350
Washington, D.C. 20036
jsweeney@bradley.com

FOR THE DEFENDANT:

PETER H. CHANG
Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94102-7004
peter.chang@doj.ca.gov

EXAMINATION INDEX

J. BUFORD BOONE, III
BY MR. CHANG 5

EXHIBIT INDEX


| Deposition | | MAR |
|---|---|---|
| 20 | Boone's rebuttal report | 8 |
| 21 | California Penal Code section 30510 | 13 |
| 22 | Expert Witness Report | 16 |
| 23 | May 6, 2014 Executive Summary of Justification for Law Enforcement Partners | 48 |
| 24 | Attorney General October 17, 1995 Memorandum on Resolution 14 (Attachment) | 95 |
| 25 | Attorney General October 17, 1995 Memorandum on Resolution 14 (Attachment) - Policy Statement | 95 |
| 26 | Attorney General October 17, 1995 Memorandum on Resolution 14 (Attachment) - Commentary Regarding the Use of Deadly Force in Non-Custodial Situations | 95 |
| 27 | Photo | 112 |
| 28 | Guns & Ammo copy | 168 |

I, Lisa Bailey, a court reporter of Birmingham, Alabama, acting as commissioner, certify that on December 10, 2018 pursuant to Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me in Birmingham, Alabama, J. BUFORD BOONE, III, witness in the above cause, for oral examination, whereupon the following proceedings were had:

J. BUFORD BOONE, III

Being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CHANG:

Q. Good morning, Mr. Boone. My name is Peter Chang from the California Attorney General's Office. And do you understand you're here testifying as an expert witness in the case Rupp versus Becerra?

A. Yes, sir.

Q. Have you been deposed before?

A. Yes, sir.

Q. Let's say in the last four years how many times have you been deposed?

A. I believe four. This may be four. This may make number four.

caliber you're talking about or what individual cartridge would be loaded in that caliber.
Q. Let's ask a more general question. The -- so the same -- so a rifle, say the AR-15, can you load different cartridges into it?
A. Yes, sir.
Q. Cartridges of different caliber?
A. Yes, sir.
Q. How is it you can load cartridges of different caliber into the same rifle -- you know, with a barrel of some diameter --
A. I may have misunderstood you. But I thought you meant the family of AR-15s. Were you speaking individually, of an individual rifle?
Q. I'm speaking, right, of one individual rifle, one individual AR-15.
A. It would typically only load cartridges of one caliber of an individual rifle but the rifle is available in multiple loadings.
Q. I get you. So for a rifle -- for a rifle that is designed to load a .223 cartridge, you can't load a different size cartridge into that rifle; is that correct?
A. Almost.
Q. Okay. What am I missing?

A. You can load 5.56 cartridges in a .223 rifle, although it's not recommended.

Q. So to load a different -- say, a 9 millimeter into that rifle you would need to switch out the barrel; is that correct?

A. You would need to switch out a number of components.

Q. What would you need to switch out?

A. Typically you would need to replace most of the upper receiver which does include the barrel but also includes the bolt group and the 9 millimeter version of that type rifle typically are blowback operated as opposed to gas operated. So the upper receiver would be quite different, and the magazine is configured differently than a 5.56 or .223 magazine. So you would either need a magazine that was modified to fit the magazine well or you would need a block in the magazine well to modify the magazine well to fit the 9 millimeter magazine.

Q. I see.

A. May I add to that a moment?

Q. Please.

A. You could do all that without changing the serial number of the firearm.

Q. Right. What is a centerfire rifle?
A. It uses a cartridge whose priming compound is contained in what we call a primer, which consists of three parts. It has a metal cup. It has the priming compound. It typically has a piece of foil over the top of that and most of what we use in this country will have an anvil contained in the primer. That is loaded into the brass cartridge case. And there is a flash hole in the cartridge case such that when the firing pin contacts the cup of the primer, it crushes the compound between the cup and the anvil creating a flash. And that flash travels through the hole and into the powder and ignites the powder. It's called centerfire because that's located in the center of the cartridge case as opposed to rimfire.
Q. What is the difference between a centerfire and a rimfire?
A. Rimfire cartridges have the priming compound internal to the brass cartridge case around the outside rim of the head of the cartridge case.
Q. What is the functional difference?
A. I'm not sure I understand.
Q. What is the difference in -- beyond the

physical characteristics, what's the difference between the effect of firing a centerfire cartridge versus a rimfire cartridge?

MR. SWEENEY: Objection. You may answer.

Q. Do you understand the question?

A. I'm trying.

Q. I'll rephrase that. Why would someone -- would you choose a centerfire cartridge in certain circumstances and a rimfire cartridge in a different circumstance?

A. Yes.

Q. Could you explain that?

A. Typically rimfire cartridges are not loaded to as high pressure as centerfire cartridges. Rimfire was the earliest self-contained priming method that I'm aware of. And because the priming compound is contained in the rim of the cartridge in an area where the brass necessarily is not as strong as it is in the center of the cartridge, as technology improved and smokeless powder became more used the pressures were able to go up. And rimfire cartridge cases cannot handle the pressures that centerfire cartridge cases can. Typically what we find in

rimfire is 22 rimfire or 17 HMR.

Q. Are there .223 rimfires?

A. None that are called .223, no, sir.

Q. What are they called?

A. .22 rimfire or .22 Magnum. The projectile diameter is the same or almost the same as that of a .223.

Q. Can you fit the .22 rimfire cartridge into a rifle that's designed to use .223?

A. It will travel down into the bore and probably lodge. It can be fit in, but it's not something you should try.

Q. So when you say the rimfire is not capable or packed as high pressure as the centerfire, what's the -- what's the difference when you fire it? I'm trying -- if you could help me, I'm trying to see what is the effect of firing a centerfire cartridge versus a rimfire? Is it -- does it travel at a slower velocity? Does it penetrate less? What is the real world difference when you fire the two different cartridges?

MR. SWEENEY: Objection. Do you want him to answer the last question you just posed?

MR. CHANG: I'm trying to see if he can

decipher what I'm trying to ask.

A. I'm not having any luck deciphering what you're trying to ask. I'm sorry, sir.

Q. So you would say the -- you know, there's a pressure difference in how much pressure the cartridges can handle between rimfire and centerfire, correct?

A. Correct.

Q. So with the rimfire being a lower pressure cartridge, you know -- let me rephrase that.

Why would someone choose a centerfire cartridge over a rimfire cartridge when they want to go shooting?

A. Why would they choose centerfire over rimfire?

Q. Correct.

A. Aside from it fitting the firearm they want to shoot that day, I'm not certain. Although, typically you can find rifles that are capable of shooting much further in centerfire. For example, I was shooting at 400 yards recently with a rimfire rifle because of the challenge, which it would have been less challenging with a centerfire.

Q. That's because centerfire cartridges can

be shot further than a rimfire cartridge?

MR. SWEENEY: Objection. You can answer.

A. I wouldn't phrase it like that because there are so many different centerfire cartridges and so many different rimfire cartridges that there is some overlap. It would not be accurate to make a blanket statement like that about rimfire versus centerfire.

Q. So what other differences are there? If there are -- you know, there are some rimfires that can be shot just as far as a centerfire cartridge, then what other differences are there? Are there any other differences?

A. Typically rimfire cartridges are lower pressure than centerfire cartridges, and that translates into time of flight. One of the reasons I was shooting at long distance with the rimfire was I had a slow cartridge and I was playing around with the ability of a projectile to make the transition from supersonic to subsonic flight.

Q. So when you say slow cartridge, what do you mean by that?

A. Slower cartridges, I believe I said.

Q. Rimfire cartridge is a slower cartridge

than centerfire cartridge; is that correct?
A. Typically. Some of them are but not necessarily. For example, I've shot a number of centerfire cartridges that are loaded to be what we call subsonic or lower than the speed of sound.
Q. So we'll come back to this in a little bit.
A. If you could give me specific cartridge loadings, I could answer much better.
Q. Well, we're talking about, you know, because the -- like you said, there are a lot of variations between the different cartridges. If you need more specificity, please feel free to ask.
A. Yes, sir.
Q. So going back to what we were talking about, the third sentence in the second paragraph, that in your opinion -- it's not your opinion that only actual AR-15 rifles are the only semi-automatic centerfire rifle with the detachable magazines that are useful for self-defense, correct?
A. Yes, sir.
Q. Are semi-automatic centerfire rifles with fixed magazines useful for self-defense?
A. They can be.

Q. How can they can useful for self-defense?

A. The same way any firearm is useful for self-defense. You can shoot a violent attacker and physiologically cause him to stop.

Q. Are automatic centerfire rifles with detachable magazines useful for self-defense?

A. They can be. I would not choose one personally.

Q. Why not?

A. Because I have shot some -- or shot full -- we are talking full automatic, correct?

Q. Correct.

A. I have shot full automatic enough that I understand I can more precisely place shots on semi-automatic than I can on full automatic.

Q. Even with a single?

A. Well, if a full automatic rifle is set to single shot there's virtually no difference. But on full automatic it's difficult for many people to fire a single shot with a trigger pull. Well-trained people have. I've done it. We only use fully automatic for demonstration type purposes. I don't recall operating on full automatic once I learned its limitations.

Q. Are semi-automatic handguns useful for self-defense?
A. They can be, yes, sir.
Q. And when you say "they can be," what do you mean by that?
A. Any weapon you have can be useful for self-defense, arguably more useful than no weapon. Handguns are useful primarily because they're convenient and concealable.
Q. Is there any reason a homeowner would need to conceal his or her handgun in his or her home?
A. I prefer to conceal mine.
Q. Let me be more clear. In a home intruder situation, is there any reason the homeowner would want to conceal his or her handgun when confronting a home intruder?
A. I wouldn't think a rational person would.
Q. Me either. Are shotguns useful for self-defense?
A. They can be if the proper ammunition is selected.
Q. What kind of ammunition would be selected for a shotgun that would be useful for

self-defense?
A. I would recommend looking at test data and determining what level of penetration you're willing -- or you desire. It would depend on the situation as well. Shotgun shells come in a variety of loadings. Some of which may penetrate further than you desire. Some of which may not penetrate as far as you desire.
Q. Do you know what the most common type of shotgun shell is or commonly sold?
A. I would not say there's one that is most commonly sold, but I don't look at sales statistics. Shotguns are used for skeet shooting. And for that you would use small shot sizes. They're used by turkey hunters which would use larger shot sizes or goose hunters that use larger shot sizes. And deer hunters use buckshot and slugs. So it's not the shotgun itself that makes it useful. It's the projectiles and how they perform.
Q. And the same could be said for AR-15s, correct?
A. Yes, sir.
Q. Could you turn to page eight of your report. If you could look at -- you see the

heading Handguns Versus Long Arms?

A. Yes.

Q. If you could look at the second paragraph below that, the third line, the end of the third line starting with "If the" -- I'll read that to you. Tell me if I'm reading it correctly. "If the optimum choices are used in ammunition selection, handguns are typically far less terminally effective than rifles or shotguns." Did I read that correctly?

A. Yes, sir.

Q. What do you mean by that?

A. If not for the bullet no one would be afraid of the gun. And, therefore, you need to look at the choice of ammunition as opposed to the type of firearm being used. And if you choose the best ammunition, then handguns are typically far less terminally effective. They cannot be counted on to create the physical trauma of the tissue to rapidly physiologically incapacitate an individual as well as rifles and shotguns.

Q. Is that true in all circumstances?

A. If you choose the best ammunition for all of them, I have never seen a situation where it was not true.

disingenuous to say fired from all semi-automatic handguns. Because we would -- I would say within reason, within standard service type weapons. We tested our ammunition in test barrels that were designed to mimic a standard service pistol. We also would then shoot the ammunition in a standard service pistol to ensure that the velocity of the projectile was similar.

Q. Sure. And let's say a very standard semi-automatic handgun, a Glock, for example, Glock 17. Are you familiar with that?

A. Yes, sir.

Q. It's a 9 millimeter?

A. Yes, sir.

Q. Well, strike that.

What's a common -- what's a common hand -- semi-automatic handgun that can accept a Winchester 180 grain .40 Smith and Wesson cartridge?

A. A Glock 22.

Q. Glock 22. Okay. And you said that there are other -- there are -- let's talk in the Glock line of semi-automatic handguns. Are there other types of handgun cartridges that could be loaded into other standard Glock handguns that

would allow the projectile to reach the optimum 12 to 18-inch depth?

A. I would assume there are. And by allowed, you mean could be expected to?

Q. Could be expected, yes.

A. Because "allow" would encompass "anything could."

Q. Right.

A. But we tested for consistency.

Q. Correct, that you would expect to reach the optimum depth.

A. Yes, sir, I believe there are other cartridges.

Q. But you can't recall offhand what those are?

A. I'm trying to remember what we went to, the Speer 165 grain Gold Dot I believe 53967. I'm hesitant to call out specific numbers like that just from memory because I want to testify truthfully. There are other cartridges.

Q. There are other .40 Smith and Wesson cartridges?

A. Yes, sir.

Q. There are other .45 cartridges?

A. Yes, sir.

Q. Are there any 9 millimeter cartridges?
A. Yes, sir.
Q. And are those cartridges -- to be clear, there are variance -- strike that.
There are 9 millimeter, .40 Smith and Wesson, and .45 cartridges when shot out of a semi-automatic handgun would allow the projectile to reach the optimum 12 to 18 inch depth. Is that correct?
A. Reasonable belief, yes, sir.
Q. You mean that's your reasonable belief?
A. Yes, sir.
Q. If you could go to page six, and I think you referenced several points already. The bottom of page six, the paragraph starting with "Overpenetration." Fifth line down starting with, "For example." You discuss a test that you participated in in the -- at the BRF, correct?
A. Yes, sir.
Q. When was that test conducted?
A. I believe we conducted it about '99. I don't recall. I believe we were in the older facility when that one happened.
Q. What was the purpose of the test?
A. We had been asked by another government

or law enforcement entity to conduct terminal ballistics testing on some ammunition that they desired to use in their facility, and they had chosen a lightweight jacketed hollow point that was traveling at fast for its caliber speed. And when they contacted me, they said we're using this -- we want to use this because we're afraid that our guys may miss a lot and we want a projectile that when they hit a wall, it will disintegrate and not be dangerous to anyone beyond the wall.

Q. Other than the specific bullet that you mentioned at the bottom of page six, the 115 grain Plus P, Plus 9 millimeter?

A. Yes, sir.

Q. Is that how you say it?

A. Yes, sir.

Q. Other than that bullet what other projectiles did you test?

A. During my career?

Q. In that test.

A. Just that one?

Q. Just that one. Okay. When you conduct tests, these kind of projectile tests, are the -- do you test the shots -- do you fire the shots at different distances between the barrel -- the end

of the barrel and the target?
A. In this test we did.
Q. What were the distances you tested?
A. 10 feet and 20 yards.
Q. Why did you test at two different distances?
A. Our protocol at the time was to conduct six events at ten feet and two events at 20 yards. That was the protocol that was set up before I took over the research facility.
Q. Do you have any understanding as to why those two distances were chosen?
A. Yes, sir, because -- and this is -- I don't have facts on this, but I believe it to be because when the facility was set up there was the realization that most gunfights occur at close distance. And, therefore, the majority of the testing was done at 10 feet. But recognizing the projectiles lose velocity as they travel down range, there was a desire to determine whether there was a difference in projectile performance at 20 yards versus 10 feet.
Q. So this particular test --
A. I'm sorry. I said 20 feet. 20 yards, ma'am. 10 feet versus 20 yards.

Q. You were correct the first time.
A. Okay.
Q. Even when you didn't think you were correct, you were correct.
A. I strive for accuracy, sir.
Q. In this particular test that you discuss at the bottom of page six, where you mention this 9 millimeter bullet averaging 11 inches of bare tissue simulate, was that -- in reaching that depth, was that fired at 10 feet or 20 yards?
A. That was at 10 feet, sir.
Q. Did you test other 9 millimeter bullets -- I think you have mentioned that at this particular test you tested only this bullet, correct?
A. Yes, sir. It was our plan when we did a test, a test was of a particular loading. And if we tested another loading it would be a separate test.
Q. Did the -- after this test did the FBI decide to make any changes in their firearms, their standard issue firearms?
A. After this test?
Q. Correct.
A. No, sir.

Q. Let me step back a little bit. What is your understanding as to what -- what are the standard issue FBI firearms?

A. Right now I believe it is a Glock 19 or a Glock 17 for handguns. A rifle which I will call a Colt pattern rifle for lack of a better term which could be AR-15 similar. Last I heard they were actually Rock River government models. But they also have, I believe, other types. 870 Remington shotgun is probably still issued. There are still firearms in the field that were previously issued. But when the FBI transitions to something, they don't typically recall everything that's in the field. So it's quite common to have previous weapons still in the hands of older agents.

Q. When you say standard issue, does that mean the FBI issues these weapons, these firearms, to all agents?

A. They issue the handguns to all agents. All agents don't necessarily get issued a rifle or shotgun.

Q. Who gets issued a rifle or -- who gets issued a rifle?

A. It would be operational agents. The

objections downloaded the ammunition reducing the pressure, therefore, reducing the recoil but also reducing the velocity.

What they in effect did was created a situation where the .40 Smith and Wesson was no more effective than the 9 millimeter we issued at the time. That meant that you gave the agents the same size pistol with less cartridges. No one who goes into a bad situation would choose to go with less cartridges unless the more cartridges would make it impossible to function. In other words, if you have a choice between 15 or 16 you're a fool if you choose 15. So I pressed hard that we either issue a .40 caliber that is loaded to full potential or we go back to issuing 9 millimeters which had the same effectiveness as the .40 we issued at the time.

The man that took over for me, in my training of him -- we had 18 months roughly together to train. When I explained it all to him and how I had been trying to get us into the most effective system, he said -- well, he was first to find out the way things were, but he said he was going to change it. I helped him in looking at this also because the FBI test protocol projectile

performance has improved drastically over the last 20 years. And 9 millimeter, if you choose the best cartridge, 9 millimeter and .40 are very close together. The 9 offered a better package as long as the best ammunition was chosen. All of this is dependent on the ammunition you choose and not necessarily the caliber of the gun.

But Supervisory Special Agent Patterson wrote this and put it out to law enforcement. I do not believe he intended for it to get out. My counsel to him was write it as if you know it's going to get out. And of course it got out. I'm okay with that too.

So that's what this is. It's describing why the FBI went back to the 9 millimeter.

Q. So this executive summary or this document talks about the 9 millimeter Luger. So under -- do you know whether a 9 millimeter Luger shot out of a semi-automatic handgun shot at ten feet, whether that would allow the projectile to reach the 12 to 18-inch penetration depth?

A. It would be more dependent on the projectile, the actual projectile than the fact that it's a 9 millimeter Luger. There are some that will and some won't.

Q. What kind of -- do you know what kind of projectile the FBI uses?
A. I have read that they're using a Hornady Critical Defense, and I believe they're also using a Speer Gold Dot G2. But I'm not positive of that.
Q. And for both of those projectiles in a 9 millimeter cartridge shot out of a semi-automatic handgun, would the projectile reach the 12 to 18 inch depth?
A. If they're the specific loadings that the FBI uses, I have great confidence that they would.
Q. And those loadings, are they available for purchase by anyone?
A. I hope so but I don't know.
Q. Do you know if they have cartridges specifically made or specially made for the FBI?
A. The FBI solicits ammunition through contracts. And so it's my understanding when a contract is entered into the manufacturer makes that ammunition specifically for that contract. In my time they were not prohibited from selling the same or similar ammunition to others. They were only prohibited from selling what we called contract ammunition at contract price to entities

that were not listed on the contract.
Q. But the manufacturers are free to sell the same ammunition to anyone?
A. I don't know of any reason they couldn't.
Q. So in your report you also talk about the issue of -- is it true that you talked about how a projectile's penetration performance could actually increase by going through an intermediate barrier; is that correct?
A. Yes, sir.
Q. Now, why would a projectile's penetration of a target increase due to striking an intermediate barrier?
A. To go back to the case that I reference there, the 9 millimeter, that particular projectile relied on the construction of its nose to cause it to upset or expand in tissue. When it upsets or expands, the frontal area increases, thereby increasing the resistance to the tissue and slowing the projectile down. However, when it impacted the plywood, the plywood acted as a plug to plug up the hollow cavity of that projectile preventing it from expanding. And because it was loaded to higher pressure than normal and had a higher velocity than

normal, it there became a faster than normal projectile which failed to expand and increased its penetration depth. Exactly the opposite of what requester wanted it to do.

Q. And that's the result of a particular construction of the nose of the bullet; is that correct?

A. I would say it's a result of the bullet construction. I was in the mode of telling manufacturers what performance we wanted as opposed to how to make the bullet.

Q. Okay. Are there handgun cartridges? Strike that.

Are there bullets loaded on handgun cartridges that -- which penetration level would not increase because it hit an intermediate barrier?

A. There are some that probably won't and that are less susceptible than others.

Q. And for those bullets and cartridges can you say that, you know, if they strike an intermediate barrier whether they would still over penetrate a -- the target?

A. I would test them to determine that.

Q. So without testing specific

bullet/cartridge combinations you can't really say whether -- how that bullet/cartridge combination would perform in any situation; is that true?

A. Correct. That's the reason we tested.

MR. SWEENEY: We've been going an hour. Would this be a good time to take a break?

MR. CHANG: Absolutely.

(Off the record.)

BY MR. CHANG:

Q. So, Mr. Boone, do you understand the term "tumbling" as it relates to projectiles?

A. I understand the term that many people use, tumbling, and believe it is an incorrect term as used.

Q. What do you believe many people -- how do you believe people use that term incorrectly?

A. I believe people are under the impression that bullets tumble when they hit tissue. And tumbling would be full rotations through the tissue, which I have rarely, if ever, seen personally.

Q. So what happens when a bullet hits tissue?

A. Depends upon which bullet.

Q. What are the different major types of

bullets?
A. Projectile interaction with tissue really revolves around the designer's intent. And there are bullets that hit tissue and travel quite a distance before yawing. The term that I use "yaw" is probably what most people think of when tumbling. It's common for a projectile, particularly one that is pointed and long and skinny and does not deform or does not deform much, to go into the tissue and travel for a distance depending upon the projectile itself and the characteristics of the rifle before it yaws and turns around and travels backwards.
Q. The projectile will enter the target and do a full rotation -- or do a half rotation and travel backwards?
A. Correct. And that would be a projectile, typically a long skinny projectile, which does not deform or does not deform much. There are, however, projectiles which are designed not to do that. And there are projectiles which are designed to expand when they hit tissue. So there are projectiles designed for all the purposes actually. The market hunters, fur hunters, want projectiles that don't expand so they make a small

hole in and out so that the pelt is in better shape.

Q. What is an example of the long and skinny projectile that yaws?

A. M855. The projectile loaded in that cartridge. I'm sorry. I think the projectile itself is called SS109.

Q. No one is here to contradict you one way or another.

A. And it will -- it may or may not do that. It depends on its angle of impact.

Q. What about a .223 Remington? Does that have a long and skinny projectile?

A. Sir, you described a cartridge which could have any number of projectiles including the one I just mentioned.

Q. Okay. So a .223 Remington cartridge could have an M855 projectile?

A. It could have the same projectile as an M855, yes, sir.

Q. Do you know if that's a common configuration?

A. I don't know of anyone that loads that in the factory, but I suspect there are people that hand load them.

Q. Are there any .223 Remington cartridges that are loaded with the type of long and skinny projectile that yaws that you mentioned?

A. The projectile I mentioned, the SS109.

Q. No, just any kind of projectile that is long and skinny and does the yawing.

A. I'm sure there are.

Q. And that's loaded into a .223 Remington in the factory?

A. I would believe so. Yes, sir.

Q. What is the effect on the target when a projectile yaws inside the target?

A. The maximum tissue damage of a projectile which fails to expand, a long skinny projectile which fails to expand or doesn't expand much, as it yaws it will create the greatest permanent wound cavity at the point of yaw, at the point of maximum rotation. So if you were to look at a wound profile, you would see the entrance. You would see what is called the neck, which is the distance it travels prior to initiating the yaw, and then you would have the maximum cavity at the maximum point of the projectile being vertical. And at that point it would create not only the largest permanent cavity, but likely the largest

temporary cavity if the temporary cavity had any effect on tissue with that particular projectile. And then it would turn over and go out and base forward. And it's quite common for those to fully penetrate mammals the size of humans.

Q. The projectile that does the yawing?

A. The projectile which goes in and fails to expand yaws and travels base forward typically will penetrate more tissue than a common 150 to 200 pound mammal. It would exit.

Q. It would exit?

A. Typically.

Q. Typically. So it would go beyond the 12 to 18 inch?

A. Yes, sir.

Q. Does that mean it's less effective at stopping someone than a projectile that reaches the 12 to 18 inch depth?

A. I believe so, yes, sir.

Q. Why would a projectile that yaws and -- inside a body and creates this permanent cavity that you described and then exits cause -- but less terminal -- be less terminally effective than a projectile that enters a target and stops at somewhere between 12 and 18 inches?

A. It would depend on the size of the target of course. We chose the 12 to 18 inches based on the average population. And 12 to 18 inches we believe is a good range for the average population. But if you were to go to a place with very small or skinny people, that would likely be too much. If you were to go to a place with extremely large people, it might not be enough because we don't know what we're going to encounter.

And when you ask me about a projectile that could be expected to go in and yaw, if you had a subject who was ten inches thick facing you and you fired one of those projectile at him and you just found one that had, say, an 8 inch neck length it would pass completely through that subject's body fully before it yawed completely. And you want the terminal performance to occur where the vital organs are. For example, 12 inches may sound deep to you for a human heart but if you're having to shoot sideways as Agent Doug did on Michael Platt in Miami, 12 inches may not be quite enough.

Q. So it depends on shot placement, correct?

A. Shot placement is paramount with any

firearm.

Q. You mentioned a subject with an eight inch neck. Depth, width?

A. No, sir. Eight inch neck on the projectile. The neck is where the projectile begins to yaw.

Q. I'm sorry. Could you explain that?

A. Sure. As the projectile enters the tissue, if the projectile is going -- sorry if I'm pointing -- as the projectile enters in, where it travels before it begins to yaw is called the neck. And so you measure where it begins to yaw and that's the neck length. And I have seen projectiles with a neck length of zero, but I've also seen projectiles with an expected neck length of eight to ten inches. So if you're counting on the yawing of the projectile to create your wound mechanism but you have chosen a projectile with a neck length longer than your subject's body, then your wounding mechanism is occurring outside the subject's body.

Q. I mean, the optimal penetration as you described earlier was 12 to 18 inches, right?

A. Right.

Q. So you're assuming the projectile -- for

a projectile to reach that depth of 12 to 18 inches, the projectile has to get to 12 to 18 inches, correct?
A. Correct.
Q. So a projectile that yaws at eight to ten inches begins the yawing before you reach that optimum depth, correct?
A. Correct.
Q. And so at this point it's already inside the target's body because you're eight to ten inches inside the body?
A. Correct.
Q. And then it continues through?
A. Correct.
Q. You mentioned the permanent cavity. What is a permanent cavity?
A. That is the tissue that is actually crushed or destroyed by the projectile's interaction with it.
Q. And you mentioned the different body size. So 12 to 18 inches, that's really just a -- how is that chosen? Because you mentioned it really depends on -- the optimal penetration level depends on how large the target is or how thick the target is?

A. Yes, sir.
Q. How did you choose -- how did the FBI choose 18 to 12 inches as the optimum depth?
A. Research I have done and training I have conducted. I was not at Ballistics Research when that was settled. They held consultations with medical experts and they held a wound ballistics seminar. I believe they may have actually had two. And they researched and investigated exactly physiologically how you can stop an aggressive human attacker. And it was a consensus of those present that in the average population you needed 12 to 18 inches.
There are others who have different metrics. For example, I believe Customs and Border Patrol says nine to 15. The most important thing is that because the FBI had a standard or a desired level the ammunition manufacturers could then take that information and engineer their projectiles to perform the way that we wanted. And because we created the scientifically repeatable test method, those engineers could get the same results that we did. Meaning we got better bullets.
Q. So the Customs and Border patrol has a different -- has chosen a different optimum depth?

A. They had at one time. I'm not sure what they have now.

Q. And do you recall when the 12 to 18 inches optimal depth -- or when -- strike that.

Do you recall when the FBI decided that the 18 to 12 inches penetration depth was optimal?

A. I believe it was the same time they selected the other metrics which would have been 1988.

Q. And if the general American population has gotten larger since 1988, would that change the optimal depth penetration level?

A. I would think it would have to. But I don't know if they've gotten larger.

Q. So now let's go back to permanent cavity. If a projectile enters the body is there -- why would you prefer a projectile to stop -- to penetrate -- excuse me.

Why would you prefer a projectile to stop in the 12 to 18-inch penetration depth as opposed to continuing through the body?

A. It is --

Q. Beyond 18 inches?

A. It is my opinion and it is the opinion of the FBI that once you have achieved 18 inches of

penetration you were unlikely to encounter more vital organs deeper than that in the general population. And although we would prefer overpenetration to underpenetration, we recognize that we're responsible for every projectile that we launch. And I'm very comfortable with the 12 to 18-inch standard.

Q. So as far as the terminal effectiveness to the target, it doesn't matter if it continues beyond the 18 inches. It's the same terminal effectiveness in your opinion?

A. Not necessarily. It would depend on other metrics such as expansion. And the temporary cavity can have an effect, though it's difficult to quantify.

Q. What is the temporary cavity?

A. That is the tissue that is strengthened by the passage of the projectile. And if the tissue is stretched beyond its capacity it can be damaged. Typically with handguns you don't have temporary cavity damage. But with larger or faster projectiles you can have temporary cavity damage that's effective in physiologically incapacitating a subject.

Q. So would rifle rounds typically cause

temporary cavities?
A. If they are of sufficient velocity and construction, yes.
Q. What would you consider to be of sufficient velocity?
A. For example, in, say, 300 blackout.
Q. Is that a firearm?
A. That's a chambering that's common in AR-15 type rifles. It would be considered a centerfire rifle cartridge. If you purchase a box of subsonic .300 Blackout and you purchase another box of supersonic .300 Blackout, it's reasonable to believe that the supersonic ammunition will have a higher temporary cavity than the subsonic ammunition, but they're both .300 Blackout.
Q. Do you know what velocity a -- at what velocity does a projectile reach supersonic?
A. The speed of sound constantly changes with the atmosphere. But a good layman's term is to look at temperature in Fahrenheit. Add that to 1060 feet per second -- and that's a rough estimation of the speed of sound, what we call Mach.
Q. You'll have to make it even more layman for me. At the average temperature --

A. On a hundred degree day call it 1160.
Q. Feet per second?
A. Right. 1060 plus 100 is 1160. That is roughly Mach.
Q. Okay.
A. It's not precise, but it's what we use in the external ballistics community typically.
Q. So 1160 feet per second when you have a cartridge, let's say a 9 millimeter, shot out of a semi-automatic handgun, what is the velocity of that cartridge being fired after it's fired?
A. It would be a wide range depending on which cartridge you selected.
Q. Average. Do you have an average velocity?
A. I don't. I could give you a range.
Q. Could you give a range?
A. It might be from 980 feet per second to, say, 1250.
Q. So right around the supersonic -- some could reach supersonic velocity and some might not?
A. Some do and some don't, yes, sir.
Q. And if a handgun round reaches that supersonic velocity or speed, would it create a temporary cavity in the target?

A. They all create a temporary cavity. It's whether or not the temporary cavity is injurious to the tissue.

Q. I see. So generally speaking would a projectile fired out of a rifle be more likely to create a temporary cavity than a projectile fired out of a handgun round?

A. It would depend on the actual cartridge.

Q. Let's say a .223 Remington fired out of a rifle versus a 9 millimeter fired out of a semi-automatic handgun?

A. In general terms -- and you can make this untrue by the selection of certain cartridges -- but in general terms rifles are more effective than handguns. And a large portion of that is because they have a more effective temporary cavity than the handgun. It's one of the reasons that handguns are not as effective -- the temporary cavity typically from a handgun wound is not as injurious to the tissue. In other words, according to the doctors if the projectile has not hit anything vital, then they'll plug it with two Band-Aids and some acetaminophen, or pain reliever.

If we translate that into the reason that the FBI advocates the use of shoulder weapons,

that means a more reliable quick incapacitation of the aggressor.

Q. You just said that the FBI advocates the use of shoulder fire weapons. What do you mean by that?

A. I would think that any agent headed into a situation where he had knowledge that he would or might need a firearm and chose anything other than a shoulder weapon would have been either doing it because of operational need or because he was foolish. The idea is to stop the aggression as quickly as possible, and the rifle or shotgun has the best chance of doing that over the handgun.

Q. Right. Assume the agent would prefer a shoulder mounted rifle over a handgun in a dangerous --

A. Any reasonable person should.

Q. Okay. The FBI doesn't advocate a certain firearm over another, right?

A. In our training we recommend to the agents and we give them terminal ballistics training to show them that the rifle is the better choice terminally. If all things are equal, they rarely are, but if all things are equal the rifle is the better choice than the handgun.

Q. You mentioned that projectiles will expand when it impacts a target; is that correct?
A. Some will. Most will, yes, sir.
Q. What is the effect of that expansion when it impacts the target?
A. Larger projectiles crush more tissue so it results in a larger permanent wound cavity.
Q. And the larger projectiles, do they tend to be on larger caliber cartridges?
A. Do you mean pre-expansion or post-expansion?
Q. Pre-expansion.
A. Pre-expansion, larger projectiles typically are handgun projectiles, I believe. But there is quite a bit of overlap.
Q. So these larger projectiles that are typically in handguns, in handgun cartridges, they tend to -- they tend to expand when they hit a target; is that correct?
A. Depends on which projectile. Some do and some don't.
Q. Would you say most do?
A. I would not, no.
Q. Is it -- is it a correct statement to say that most projectiles will expand when it

yards instead of three?
A. It begins at 50 actually. You start at 50 and shoot in on the rifle.
Q. Why does it end at seven and not three?
A. I'm just guessing because it would be ridiculous to go any closer. It would be no easier at three than it is at seven with a rifle.
Q. With a handgun, the test, do they start at three and go to 25?
A. That's my understanding now. My time we started and went the other way.
Q. But currently they start at three and go the other way?
A. I believe so.
Q. Do you know why in the rifle test they go from the greater distance to the lesser distance?
A. I don't know why. In my time we always started the greater distance and worked our way in. Only towards my retirement was it discussed to start at the closer distance and work your way out.
Q. For rifle tests?
A. For handguns.
Q. What about for a shotgun? To qualify for a shotgun, what distances are the shots taken?

A. Maximum of 50 yards and minimum of seven.

Q. Same as the rifle?

A. Same as the rifle, yes, sir.

Q. You mentioned the Rock River rifle earlier as an FBI issued rifle?

A. Yes, sir.

Q. Is that an AR-15?

A. AR-15 type.

Q. Type. And this Rock River rifle, what is the barrel length of this Rock River rifle?

A. I believe it's 14 and a half.

Q. Is that shorter than the -- than your typical AR-15 rifle, AR-15 type rifle?

MR. SWEENEY: Objection.

A. It would depend on who owned the rifle. There are laws that prohibit citizens from owning rifles with barrel lengths less than 16 inches I think. So it's not common for a civilian to have a 14 and a half inch barrel rifle unless he has a muzzle device that is permanently affixed to it to make it comply with the law or he has registered it as a short barrel rifle.

Q. So the rifles that the FBI issues to its agents are shorter than the rifles that civilians

will purchase on the open market?
A. Typically an inch and a half shorter, yes, sir.
Q. And why do -- do you know why the FBI issued rifles are shorter than the civilian AR-15?
A. The FBI chose the barrel length based on operational needs and not having a barrel length restriction.
Q. What is the operational need of the FBI that they might prefer a shorter barrel length?
A. Operation inside homes or in close quarter battle type situations and in vehicles, maneuvering around with a firearm.
Q. So the civilian versions of AR-15 type weapons have longer barrels. And would you say they're less maneuverable inside a home?
A. Yes, sir.
Q. Correct me if I'm wrong. I think somewhere in your report you mentioned that the AR-15 rifles are the most commonly used rifles in American law enforcement; is that correct?
MR. SWEENEY: Objection.
A. I believe they are.
THE WITNESS: Sorry.
MR. SWEENEY: I said objection. You may

answer.
A. I believe they are.
Q. Do you know whether that's the version with the shorter barrel or the version with the longer barrel that's available to the public?
A. I would not classify them as two versions. There are multiple different barrel lengths.
Q. So do you know the barrel length used by law enforcement -- American law enforcement agencies, are they of the shorter length that the FBI has chosen, or are they of the length that's longer that's available to the general public?
A. Both.
Q. Are the rifles used by the FBI or issued by the FBI, are they select fire rifles?
A. Some are. Some are not.
Q. And the ones that are not select fire, does that mean they are just semi-automatic?
A. Yes, sir.
Q. Okay. And that means one shot per trigger pull, correct?
A. Correct. And in the AR-15 pattern we're still speaking?
Q. Yes.

A. Yes, sir.
Q. What other patterns are there?
A. We had MP5 10 millimeters which are centerfire shoulder weapons that had a two round burst position on the selector.
Q. But that's not a rifle, right?
A. In the context of our discussion it is. Shoulder fire -- shoulder mounted centerfire.
Q. Shoulder mounted centerfire MP5?
A. Yes, sir.
Q. The qualifications that the FBI agents have to undertake, the firearm qualification test that we were discussing earlier, how frequently must the agents take this qualification test to maintain their certification?
A. It depends upon the weapon.
Q. Okay. Let's say for a handgun.
A. Quarterly.
Q. Four times a year?
A. Yes, sir.
Q. What about for a rifle?
A. I believe it's twice a year.
Q. And the shotgun?
A. I believe that's also twice a year.
Q. Why are there different recertification

MR. SWEENEY: Objection.
A. Yes, sir.
Q. And what is the basis of that position?
A. That what it takes to stop an aggressive human being is a physiological metric and that the same humans that attack law enforcement would be expected to attack civilians. In other words, there would be -- aside from individual differences there's no way to say a certain type of person attacks law enforcement but doesn't attack civilians. In other words, humans are humans.
Q. But would you agree that law enforcement officers use their firearms not only for self-defense purposes but for offensive purposes?
A. Could you clarify what you mean by "use." In other words, are we speaking of firing the weapon?
Q. Correct, or potentially firing the weapon.
A. No, sir. The firing the weapon is the same.
Q. Would you agree that law enforcement personnel may use their firearms in a broader range of circumstances than a civilian would be permitted to use their firearm lawfully?

MR. SWEENEY: Objection.
A. No, sir.
Q. For example, law enforcement personnel are authorized to apprehend criminals, correct?
A. Yes, sir.
Q. And civilians are not authorized to apprehend criminals, correct?
A. I'm not aware of that. I believe they are.
Q. Civilians are authorized to apprehend criminals?
A. I believe so, yes, sir.
Q. In what circumstances?
A. If an individual breaks into your house and you hold him at gunpoint until the police arrive, you have apprehended a criminal.
Q. Outside of the home invasion context, are civilians authorized to apprehend criminals?
A. I believe so.
Q. In what context?
A. If someone attacks you and you are forced to defend yourself and you incapacitate them, you have necessarily seized them. And I believe that's lawful.
Q. Let's talk about some specific

scenarios. Law enforcement personnel, they serve warrants, correct?
A. Yes.
Q. And in serving warrants they often serve warrants at the residence of the suspect, correct?
A. Yes, sir.
Q. And to do that they have to often enter the residence of the suspect to serve the warrant, correct?
A. Yes, sir.
Q. Can you think of a scenario in which a civilian would enter the home of a -- of someone that they think might pose a threat to their personal safety?
A. Not a lawful scenario.
Q. But that's a scenario that law enforcement officers face, correct?
A. If they have the appropriate authorities.
Q. A warrant, for example?
A. Right, yes, sir.
Q. Would a law enforcement officer be permitted to use their firearms in active pursuit of a criminal suspect?
A. Depends on the situation.

Q. In which situations would a law enforcement officer be authorized to engage in the active pursuit of a criminal suspect?
A. Authorized to engage in the active pursuit of the suspect if the suspect is fleeing.
Q. Would a civilian be lawfully authorized to engage in the pursuit of a criminal suspect if the suspect is fleeing?
A. I don't know anything that would prohibit him from chasing the suspect.
Q. Let's say a law enforcement officer that's authorized to engage in pursuit of a suspect if a suspect is fleeing. Is that officer authorized to use deadly force on that escaping suspect?
A. It would depend on the situation of the suspect attempting to flee.
Q. In what situations would the law enforcement officer be authorized to use deadly force against a fleeing suspect?
A. If that subject had inflicted or attempted to inflict death or grievous bodily harm in a violent confrontation, the officer, I believe, is authorized to use deadly force to prevent his escape. I believe that's Tennessee versus Garner.

Q. Would the same be true for a civilian -- for example, would a civilian be authorized to use deadly force against a fleeing criminal suspect?
A. It would depend on the situation.
Q. In what situation would a civilian be lawfully authorized to use deadly force against someone who's fleeing the situation?
A. If the fleeing individual continued to be a threat to the civilian or potentially others.
Q. What if the fleeing civilian {(sic) is no longer a threat to the civilian, him or herself?
A. The fleeing subject?
Q. Right. What if the fleeing subject is no longer a threat to the civilian and those immediately around the civilian?
A. I don't think --
Q. Would the civilian still be authorized to use deadly force against the fleeing suspect?
A. I don't believe so.
Q. For a law enforcement officer in the same situation where there's a fleeing suspect and the suspect is no longer an immediate threat to the officer or those immediately around the officer, would the officer still be authorized to use deadly force against a fleeing suspect?

A. My understanding is no.
Q. Let me show you Exhibit --
MR. SWEENEY: The next number is 24.
Q. -- 24, 25, and 26. Let me try to organize them.
(Deposition Exhibit Numbers 24-26 were marked for identification.)
Q. Mr. Boone, you have before you Exhibit 24?
A. Yes, sir.
Q. Can you read the top line of that document?
A. Beginning --
Q. After the box.
A. Attorney General, October 17, 1995 Memorandum On Resolution 14. Parens, attachment, closed parens.
Q. What's below that? What's the bold letters below that?
A. U.S. Department of Justice Office Of Investigative Agency Policies.
Q. Do you recognize this document?
A. I do not.
Q. Okay. Have you seen this document before?

A. I don't know if I've seen this actual document, but it appears to be a deadly force policy so I probably had training on it before.
Q. Take a quick look at the document. And when you're ready, just tell me what the document is about.
MR. SWEENEY: Objection. The document speaks for itself. You can ask him specific questions about the document.
MR. CHANG: Sure.
Q. Let me know when you have had a chance to review.
A. I've had a chance.
Q. And under the background section, the second paragraph it says, "Attachment to this resolution is a uniform deadly force policy and accompanying commentaries. Attachment A sets forth the uniform deadly force policy. Attachment B sets forth the commentaries governing the use of deadly force in noncustodial and custodial situations," correct?
A. Yes, sir.
Q. And this is a memorandum issued by the United States Attorney General?
A. I believe it says Louis J. Freeh,

Director of Investigative Agency Policy, so yes, sir. I'm sorry, that threw me. He became our director.
Q. I meant in a general sense, not a specific attorney general but the U.S. Attorney General's Office?
A. Yes, sir.
Q. Let's turn to Exhibit 25.
A. Yes, sir.
Q. What is the first kind of the bold heading there?
A. Policy Statement, Use of Deadly Force.
Q. Is it your understanding that this is the exhibit referenced in the Attorney General October 17, 1995 memorandum on Resolution 14?
A. I have no reason to believe otherwise.
Q. Well, I -- if you could refer to page seven of your opening report.
A. Yes, sir.
Q. You see there the top of the page under the heading Law Enforcement, you quoted a paragraph from an October 17, 1995 memorandum issued by the U.S. Department of Justice, correct?
A. Yes, sir.
Q. Is Exhibit 25 the memorandum that you

quoted in your opening report?

A. It -- give me a moment to look at it.

Q. Sure. I just direct your attention to Roman numeral I, directly below the bolded --

A. Yes, sir, that appears to be.

Q. Okay. So under that Roman numeral I which you quote in your report, it provides that "Law enforcement officers and correctional officers of the Department of Justice may use deadly force only when necessary; that is, when an officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person." Is that correct?

A. Yes, sir.

Q. Now, the next section, section A, is titled Fleeing Felons, correct?

A. Yes.

Q. "Deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe, one, the subject has committed a felony involving the infliction or threat of infliction of serious physical injury or death, and, two, the escape of the subject would pose an imminent danger of death or serious physical injury

to the officer or to another person." Correct?
A. Yes, sir.
Q. So under this policy described in this subheading a law enforcement officer could use deadly force when against the escape of a fleeing suspect if the officer believes that the subject had committed a felony involving serious bodily injury or death and escape would pose an imminent danger or death to the officer or to another person, correct?
A. Yes.
Q. So in this scenario if the fleeing subject has committed a felony involving serious bodily injury or death but is fleeing and no longer a direct threat to the officer or to another person near the officer but the officer believes the fleeing suspect may escape and pose a danger to someone else in a different location, would the officer be authorized to use deadly force against that escaping subject?
A. Only if the danger was imminent.
Q. Correct. But if the officer believes that the escaping suspect would pose an imminent danger of death to someone at a different location?
A. Yes.

Q. Under the same situation would a civilian be lawfully authorized to use deadly force against that fleeing suspect?

MR. SWEENEY: Objection.

A. I'm not an attorney and have not studied civilian. I would hope that the civilian would do what he could to stop the individual from an imminent threat to others. But unfortunately not all people are concerned about others' safety.

Q. Here we're talking about a -- this is no longer a home invasion, home defense scenario here, correct?

A. Yes, sir. And this is I believe administrative policy as opposed to law.

Q. Correct. Correct.

A. It is my belief that administrative policies typically are more restrictive than what the law allows.

Q. And looking at subsection B titled, Escaping Prisoners, number one below that it says, Unless force other than deadly force appears to be sufficient, deadly force may be used to prevent escaping of a prisoner committed to the custody of the Attorney General or the Bureau of Prisons, correct?

A. Yes.
Q. So a law enforcement officer may use deadly force to prevent the escape of a prisoner committed to federal custody?
A. Yes, sir.
Q. Would a civilian be lawfully authorized to use deadly force to prevent the escape of a prisoner?
MR. SWEENEY: Objection.
A. I doubt it. But I don't know.
Q. That's outside -- outside of a home defense situation?
A. And outside of my area of expertise.
Q. Based on what -- let's go to Exhibit 26. What is Exhibit 26?
A. Attorney General, October 17 memorandum, appears to be a commentary regarding the use of deadly force in noncustodial situations.
Q. Did you review Exhibit 26 in preparing your report?
A. I do not believe that I did. It's possible that this was contained in the cite and I just -- I don't remember how much of the cite I read. It appears to me you printed out much of what I had cited there so I probably had seen that

before but not in this format before.
Q. Sure.
A. So it didn't click with me.
Q. And look at the -- under the introduction section, the second paragraph, the last sentence there. It says, "In addition, as a matter of principle, the department deliberately did not formulate this policy to authorize force up to constitutional or other legal limits." And that's consistent with what you said earlier, the policy is below what's lawfully legally permitted?
A. More restrictive, yes, sir.
Q. More restrictive. And this policy only applies to federal law enforcement personnel, correct?
A. I believe so, yes, sir.
Q. It doesn't apply to civilians, for example?
A. I believe that's correct.
Q. I want you to look at -- direct your attention to section III, Roman numeral III, Principles on use of deadly force. Third line down last word there, "Yet." Could you read that sentence beginning with the word "Yet"?
A. "Yet even the best prevention policies

are on occasion insufficient, as when an officer is serving a warrant or conducting surveillance is confronted with a threat to his or her life."

Q. Is there something about serving a warrant or conducting surveillance which a law enforcement officer may be faced with more threat or danger to his or her life than in other situations?

A. I don't understand the correlation there. To me serving a warrant is significantly different than conducting surveillance.

Q. Here the policy or commentary listed those two situations as examples when the best prevention policies may be insufficient, correct?

A. Do you mind if I read the whole paragraph?

Q. Absolutely. Take your time.

A. My reading of that still makes me question why they only mention warrants or conducting surveillance. In reading the whole context what this portion speaks to is the necessity to use deadly force. That necessity revolves around whether or not your life is in danger, not revolves around what you are doing at the time your life is placed in danger. Therefore,

I think that serving a warrant or surveillance can't necessarily be considered putting your life at greater danger than another instance.

For example, if I serve a warrant on an unoccupied building, I'm probably not in much danger but I'm still serving a warrant. This speaks to the necessity to use deadly force in my opinion.

Q. That's an interesting point. Would you say an officer serving a warrant is more likely to face a threat to his or her life than a civilian watching TV at home?

MR. SWEENEY: Objection.

A. Of course.

Q. Would you say an officer conducting surveillance is more likely to face a threat to his or her life than a civilian who is at his or her home?

MR. SWEENEY: Objection.

A. Depending on where the surveillance is occurring but it's not unreasonable to believe that.

Q. And, you know, as a general matter, you know police officers and law enforcement personnel are more likely to insert themselves in situations

in which there's greater threat to his or her life than a civilian might face; is that correct?

MR. SWEENEY: Objection.

A. I would not disagree with that, yes, sir.

Q. For example, if there's a bank robbery down the street, law enforcement officers would have to go and resolve the situation and perhaps confront the robbers, correct?

A. They're expected to.

Q. They're expected to. A civilian would not be expected to go and apprehend the robbers, correct?

A. Correct.

Q. In fact, do you know whether it would be lawful for a civilian to go and confront the robbers with a firearm or possibly use deadly force against the robbers?

A. Depends on the actual circumstances. There would be an amalgamation of things, but I certainly can imagine situations where it would be appropriate.

Q. Or a civilian who's not in the bank when the robbery takes place, for the civilian to go into the bank and use deadly force against the

robber?
A. It would depend on the situation.
Q. In what situation would a civilian be authorized to do that?
A. If the civilian saw the bank robber murdering people and chose to stop that situation, I think it would be perfectly lawful.
Q. So in an active shooter situation, in a situation where there's a shooter who is shooting at people in the area, let's say, a bank, for example, or a -- let's say a school, for example, -- just strike that.
Let's build on your prior scenario you gave before. If there's a hostage situation in a bank and the law enforcement officers are expected to go and resolve the situation, correct, one way or another?
A. Yes, sir.
Q. And it's your opinion that, you know, in that situation where a bank robber is actually shooting the hostages in the bank that it's lawful for a civilian to go and use deadly force against that bank robber?
A. It is my opinion, that is correct, that it's lawful. You've got two crimes there. You've

the detectives chided him for not fighting which I thought was unprofessional. But they chided him about why didn't you fight, I thought you were going to fire us up. He said, bro, don't nobody mess with the gauge.

Q. That's a good line. They should put that on a cop show. That's a good line.

In your experience are criminals less fearful -- or are criminal suspects less fearful of being shot by a semi-automatic handgun than an AR-15, for example?

MR. SWEENEY: Objection.

A. In my experience criminals are fearful of being shot, A, and they attribute power not the way I would attribute performance. They attribute power to the size of the weapon that's pointed at them. In other words, they seem to always be more afraid of the bigger guns.

Q. In your opinion is it reasonable to believe that a criminal would be more intimidated by a homeowner with an AR-15 than a homeowner with a semi-automatic handgun?

A. Yes.

Q. In your opinion is it reasonable to believe that a criminal would be more intimidated

by a homeowner with an AR-15 than a shotgun?
A. I believe most criminals would not make a handgun differentiation other than it's a big gun.
Q. Right. In your opinion is it reasonable -- in your opinion which might be more intimidating to a criminal, a -- strike that.
Are you familiar with what a featureless AR-15 is?
A. I think so. But I would appreciate an explanation.
Q. When I say featureless AR-15 -- if you'll refer to Exhibit 21, California Penal Code 30515. You'll see that it lists a set of features.
A. Yes, sir.
Q. For example, a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, a folding or telescoping stock, a flash suppressor and a forward pistol grip. So when I say a featureless AR-15, it means it's an AR-15 that does not have any of these features. Do you understand?
A. Yes, sir.
Q. Including a detachable magazine?
A. Yes, sir.

Q. So in your opinion would a criminal be intimidated by a homeowner with a featureless AR-15?
A. Would it be intimidated by it? It would be intimidated by any firearm, I believe.
Q. Would he be more or less intimidated by a homeowner with a AR-15 with a forward pistol grip, for example, than one without?
A. I doubt it.
Q. About the same level of intimidation?
A. Just solely speaking of a forward pistol grip.
Q. Sure.
A. That could be roughly the same.
Q. What about a flash suppressor, what about faced with an AR-15 with all the features described and one -- let's take that back.
Faced with an AR-15 with a -- faced with a featureless AR-15 and an AR-15 -- the same AR-15 but with a flash suppressor, would you say it's reasonable to believe that a criminal would be equally intimidated by the two firearms?
A. For clarification, the only difference between the two firearms is a flash suppressor?
Q. Correct.

A. I don't think he would notice.
Q. Is the same true for a folding or telescoping stock?
A. If that's the only feature, yes, sir.
Q. And a detachable magazine?
A. I don't know that he would notice whether the magazine was permanent or attached.
Q. We're up to Exhibit 27 now.
(Deposition Exhibit Number 27 was marked for identification.)
Q. So before you is Exhibit 27. There are two rifles, correct?
A. Yes, sir.
Q. A and B. Could you describe for rifle A the features that we were talking about previously, identified in California Penal Code 30515. What features does the rifle next to the letter A possess?
A. I see a stock that appears to be capable of telescoping. I say appears to be because I've seen similar stocks that are not that bear the same outer characteristics. It has a pistol grip. It has a magazine which I can't determine for sure whether that's removable or permanent. It has a -- what appears to be a A2 flash hider on the front of

it. I can't tell whether it's centerfire or rimfire, but I would lean towards centerfire.

Q. And the rifle that's in -- next to the letter B in Exhibit 27?

A. Yes, sir.

Q. Do you see any of the features identified in California Penal Code 30515?

A. I see a pistol grip. I see a magazine that I can't determine whether it's detachable or nondetachable. And I can't tell on the barrel if that forward portion beyond the reduced diameter is a muzzle device or not. I can't tell whether that's a solid barrel or not. I also can't tell for sure whether this is centerfire or rimfire.

Q. You talk about centerfire and rimfire. And that is -- the rimfire is a term -- centerfire and rimfire are distinctions we talked about before?

A. Yes, sir.

Q. So visually are you able to tell a rifle equipped -- are you able to tell a rimfire rifle from a centerfire rifle?

A. In some cases if you're knowledgeable of firearms, yes. You might recognize a rifle that's only been manufactured as rimfire. There are many

centerfire rifles that have been converted or have a conversion kit placed in them for rimfire. The bottom rifle, B, here the ejection port appears very small.

Q. Does that suggest to you that it's a rimfire?

A. No, sir. That suggests it's for a shorter cartridge which could be centerfire.

Q. So in most cases -- you said in some cases if you're knowledgeable of firearms maybe visually you can tell a centerfire rifle from a rimfire rifle, correct?

Would you say in terms of intimidation to a criminal, you know, would a rimfire rifle be more or less intimidating than a centerfire rifle?

A. I would be surprised if they could take the time to notice the difference or even be able to determine the difference.

Q. Okay. And you understand the term AR-15 encompasses a large, large family of rifles, correct?

A. Yes, sir.

Q. And do you understand that assault rifles that we're talking about here in this case is a subset of the larger AR-15 family?

MR. SWEENEY: Objection.
A. The term "assault rifle" to me is a fully automatic weapon capable of fully automatic fire. The metrics that you have in the law apply to a large group of AR-15 type rifles. I hope that was clear.
Q. To be clear, the assault rifles we're talking about are the assault weapons, rifles that are assault weapons under California Penal Code Section 30510 and 30515?
A. Yes.
MR. SWEENEY: Objection.
Q. Those assault rifles -- not all AR-15s are assault rifles under California law; is that correct?
MR. SWEENEY: Objection.
A. May I review the --
Q. Absolutely.
A. I would say that the vast majority of AR-15 type rifles that I have witnessed would be under these metrics. It would be possible to make one that wasn't. For example, if you took the AR-15 and removed the pistol grip and put a plug in it so that there was nothing protruding below the frame, that's possible to do. But I don't think

I've ever seen it done.
Q. The AR-15 could be a rimfire like we talked about earlier, correct?
A. Yes. I forgot about rimfire, you're correct.
Q. So a rimfire AR-15 would not be an assault rifle under California law?
MR. SWEENEY: Objection.
A. I don't believe so. But my main goal was to look at centerfire. I didn't look at rimfire much.
Q. Sure. But there are AR-15s that are rimfire rifles, correct?
A. AR-15 type, yes, sir.
Q. And there are AR-15 types that are -- that have fixed magazines instead of detachable magazines; is that correct?
A. I don't know of any.
Q. But they could be made to have a fixed magazine; is that your understanding?
A. No, I don't know how it would load. Can I think about that for a moment?
Q. Sure.
A. I've never seen one that I'm aware of that has a fixed magazine but -- and I'm not trying

to be flippant. But to load that if it was fixed you would have to take the upper receiver off and then load cartridges in the magazine well and then put the -- so you would have to disassemble the rifle if it had a fixed magazine.

Q. Look at page seven of your report. See the third paragraph up from the bottom starting with the word "Therefore." The last sentence in that photograph says, "Based on my experience the AR-15 platform rifle is the most common rifle in use by American law enforcement today and has been for many years." Is that correct?

A. Yes, sir.

Q. What is the basis of that statement?

A. Having worked with and trained thousands of police officers and FBI agents.

Q. Is that -- over how many years was that training?

A. I began training police and FBI in 1989. And if I'm allowed to add a little bit, I remember these types of rifles in use back in my time with the Las Animas County Sheriff Department as a reserve officer. So that would be 1986 maybe.

Q. Los Angeles?

A. Las Animas, Colorado Sheriff Department.

So from my work and training experience that's been the most common type of rifle I've seen.

Q. And that's based on your personal experience, right? It's not based on any type of surveys or official reports?

A. Correct.

Q. And that statement is limited to rifles, correct? It's not -- the AR-15 type rifle is not the most common firearm used by American law enforcement; is that correct?

A. Correct.

Q. Do you know what the most common firearm used by American law enforcement is?

A. A handgun.

Q. Let's look at -- this was previously marked as Exhibit 3.

A. Yes, sir.

Q. And this is a -- it looks like a slide presentation entitled Data Analysis of .223 Caliber Ammunition, correct?

A. Yes, sir.

Q. And this was an attachment to your rebuttal report?

A. Yes, sir.

Q. So where did you get this report -- this

set of slides?
A. I don't recall. It was sent to me over unsecure communication, the Internet. I had an Internet account, e-mail account as well -- you know, an open account anybody can access as well as the secret computers. And this came to me over nonsecure means in my e-mail, but I don't recall who sent it to me.
Q. You received it while you were working for the Ballistics Research Facility?
A. Yes, sir.
Q. Do you remember which year?
A. I do not. But I specifically remember receiving it.
Q. Was it towards the end of your time at the FBI or the BRF, or was it in the beginning?
A. It would have been after 2000. I'm sorry. After 2001. Because I remember we were in the facility I retired from and we moved to that one in 2001.
Q. So sometime around 2001 and 2012?
A. Sometime between that, yes, sir.
Q. Do you know when this -- when the slide presentation was prepared?
A. I do not. No, sir.

Q. The first heading there says, "A number of ATF arrests involve arrests that take place in and around vehicles or making entry into residences," correct?
A. Yes, sir.
Q. Do you have sufficient understanding based on that to comment on these considerations?
A. I believe I do.
MR. SWEENEY: Objection.
A. I believe I do.
Q. What is your understanding of that first arrow there? What is it -- can you explain what consideration that first arrow references?
A. I believe they're setting the reader up to let them know that the myth of rifles and overpenetration in urban situations is just a myth.
Q. Where did you get that from?
A. Because I was instrumental in convincing the FBI that rifles were appropriate for close quarter battle type situations inside -- in vehicles and in homes. And I took on the work of a former agent in trying to convince people that because in the early days rifles were thought to be horribly over penetrative, in other words, shoot through the most number of walls when that's not

necessarily the fact. So convincing people of the facts as opposed to the myths was something that was paramount on our minds. That's the reason I wrote the weapon selection presentation and ATF asked to copy it, I believe.

Q. And from this first point in the slide here, it doesn't say anything about penetration level, right?

A. No, it doesn't.

Q. It just -- to me it seems to read just that they -- a number of ATF arrests involve arrests around vehicles or entry into residences. And that's a consideration for them?

A. Yes, sir.

Q. And for whatever this -- in this data analysis of the .223 caliber ammunition, correct?

MR. SWEENEY: Objection.

A. Yes, sir.

Q. Looking at that last arrow there's an increasing number of suspects using body armor. Why might that be a consideration for the ATF?

A. Because body armor, the most prevalent type found is soft body armor, which is designed to stop blunt slow projectiles like commonly found in handguns but rifles will penetrate body armor in

general terms.
Q. In general. So the ATF here is -- in looking at .223 caliber ammunition a consideration is to penetrate the soft body armor used by suspects?
A. I think that would be one of them in addition to be aware if you're using a rifle and you have a friendly fire incident it may also penetrate your partner's body armor. I don't think it's fair to take one slide and explain it without explaining the context of the entire situation at the time. ATF was in the process of moving to using rifles where they hadn't used them before. And as was explained to me, they want to tell the administrators of the facts so they can make an informed decision as to whether or not rifles are a good choice for what they do. Because previous to this time people who didn't understand the facts thought rifles were a bad choice.
Q. And before this time the ATF used only the handguns and shotguns; is that right?
A. I don't know for sure.
Q. Okay.
A. But my belief would be that they did not use rifles much but I don't know for sure.

Q. But they used handguns, correct?
A. Yes, sir. I know they came to me to seek help in putting the facts out and dispelling the myths.
Q. Myths about rifles?
A. Yes, sir.
Q. Flip a few more pages to the page with the slide title, FBI Bare Gelatin Test.
A. Yes.
Q. Have you seen this graph before?
A. I believe it's a direct copy of a graph that I made. I don't remember if I did it just with bare Jell-O with averages. But I've seen it certainly in his presentation.
Q. For each one of those the ammunition there are two round points along the line of the graph. What do the two points mean?
A. I believe they show the minimum and maximum depth of penetration for the test of the specific munition that they have failed to identify what that is. In other words, they've shown a caliber like 9 or .40. But I think it was for a specific loading of 9 and .40, and I think those numbers came from a test that I conducted.
Q. Okay. I see. So -- but this slide --

it doesn't show the specific configuration of the 9 millimeter or .40 Smith and Wesson, for example?
A. No, sir. And it only shows bare gelatin.
Q. So according to this chart the 9 millimeter, the minimum penetration was 12 and a half inches and the maximum was 13.25, correct?
A. Yes, sir.
Q. And that's within the optimal 12 to 18 inches?
A. Yes, sir.
Q. Can you tell from this slide what firearm this was fired out of?
A. No, sir.
Q. Can you tell what distance the -- if it was between the end of the barrel and the gelatin?
A. As it was my test and I believe the data all reflected the CQB test that I conducted, the bare gelatin would have either been at ten feet or it would have been an amalgamation of two tests, one at ten feet and one at 100 yards. And I don't know what they did, if they included just the ten feet data. For 9 and .40 it would have been only been ten feet. The .223 may have been an amalgamation of the two tests. I don't recall.

Q. How can you get the result from the amalgamation of two tests -- let's take a look at that last -- the .223, 55 grain SP. This shows a minimum penetration level of 11 inches and a maximum of 13.5?

A. Yes, sir.

Q. Wouldn't that change depending on the distance?

A. It depends on the projectile design. Again, we don't know whether that is 11 to 13 and a half of five shots at ten or 11 to 13 and a half of five shots at ten and five shots at 100.

Q. We can't tell?

A. Insufficient information.

Q. Let's go three pages over to the slide with the caption, Combined Penetration Averages Through Medium Into Gelatin.

A. Yes, sir.

Q. These -- along these graphs for each of the ammunition are three round points now. Do you know why there are three points?

A. I believe that's showing you the range of penetration and the average of all shots.

Q. The one in the middle would be the average?

belief that my successor has continued on the path that I was on when I left.

Q. What is the basis of that belief?

A. Because I trained him and I've heard from him that they have not changed their opinion of terminal performance.

Q. When did you hear from him?

A. The last time?

Q. Correct.

A. Maybe November.

Q. When did you last hear from him that the FBI has not changed its opinion of terminal performance?

A. September.

Q. Of this year?

A. Yes, sir.

Q. So between 2012 to 2018 of this year the FBI has not changed their opinion as to terminal performance of ammunition?

A. Not changed their opinion of what's desired. They may have changed the scoring value in the procurements, but it's still the same 12 to 18 maximum expansion. No shots less than 12.

Q. Right. But the test results --

A. Yes, sir.

Q. Do you know if that -- for example, is it your belief or is it your understanding that ballistics technology has improved over the past ten years?

A. Yes, sir.

Q. So do you know one way or the other whether the terminal effectiveness of ammunition has changed since 2012?

A. I haven't tested it, but my expectation is that the terminal effectiveness of all calibers has improved since 2012.

Q. Do you know whether the terminal effectiveness of the 9 millimeter cartridge has improved since 2012?

A. Certain 9 millimeter cartridges I would say yes.

Q. Would those be the ones that were made after 2012? What do you mean by certain 9 millimeter cartridges?

A. My successor told me that the most recent procurement resulted in the best 9 millimeter cartridge they'd ever tested.

Q. Do you have those test results?

A. I may have them. I don't know.

Q. Would you be able to provide it as part

of this --
A. No, sir, but you can get them from the FBI.
Q. Me personally?
A. The State of California can. It's a simple letterhead request to the FBI Ballistic Research Facility signed by a supervisor with an official use and nondisclosure agreement.
Q. Have you seen it?
A. The request letter?
Q. No, the most recent test results.
A. On the 9 millimeter?
Q. On the 9 millimeter.
A. No, sir. I don't believe I have.
Q. Have you seen any test results since you retired in 2012?
A. I believe I have, yes, sir.
Q. Do you recall which test results?
A. I do not. I have been hired to review the ammunition CD, the data that I mentioned you can get. I have had other police departments who have acquired it through official purposes or through official requests and ask me to come explain it to them.
Q. Right. Okay. Once it's released it's

out, right?
A. Well, no, sir. They sign the same agreement you would, that they will not release it outside their agency.
Q. But they showed it to you?
A. Right, but I was there to train them on it.
Q. There's some kind of agreement between you and them on confidentiality?
A. I always agree with my clients on confidentiality and err on the side of caution.
Q. Let's go to the last page. The heading is Results of Data for ATF's Mission.
A. Yes, sir.
Q. And under that is Weapon of Choice. And there's a check mark by Colt M4, right?
A. Yes, sir.
Q. Do you know what considerations the ATF examined in deciding their weapon of choice besides penetration level?
MR. CHANG: Can we take a brief break.
(Off the record.)
MR. CHANG: Can you read the question for us.
(Requested portion read.)

A. I do not know.
Q. Would you expect there to be -- to have been other considerations?
A. I would expect they would be the same types of considerations of all law enforcement.
Q. And what might those considerations be?
A. What they were using currently, what they had been trained on, size, overall size, availability, whether or not they had a contract that would allow them to purchase the firearms. The whole host of things.
Q. Cost, would cost be a consideration?
A. Cost could be, yes, sir.
Q. And here the slide showed Colt M4. Is a Colt M4 a semi-automatic centerfire rifle?
A. All the M4s I've seen are fully automatic. There may be three round bursts, I'm sorry. I think they're either three round bursts or fully auto.
Q. So here the ATF chose a fully automatic rifle?
A. Yes, sir.
Q. Do you know the barrel length of a Colt M4?
A. Should be 14 and a half inches.

Q. Do you know whether the ATF was planning to arm all of its agents with a Colt M4?

A. I do not know.

Q. Do you know if the ATF ultimately ended up procuring the Colt M4?

A. I've seen them with M4s, but I don't know if that's what they ended up with as a sole procurement. Most federal agencies are not going to have just one type of weapon. As you procure new ones you don't throw the old ones away unless they're broken. So I would expect them to have an amalgamation of -- a variety of AR-15 type weapons.

Q. All things being equal a -- we were talking about AR-15 type rifles. All things being equal a featureless AR-15 rifle would have the same penetration characteristics as an AR-15 rifle with the features described in California Penal Code section 30515; is that correct?

A. Yes, sir.

Q. Let's talk about shotguns for a bit. Now, is it your understanding that when someone fires a shotgun the shotgun pellets exit the barrel as a mass and spread as they travel forward?

A. If they're pellets being fired, yes, sir.

Q. What else could a shotgun fire?
A. Shotgun slugs or round balls, single projectile as well, loading for single projectiles.
Q. Now, for a shotgun shell with pellets, is there an optimal distance from which to fire a shotgun?
A. Depends on the pellets and the choke of the shotgun.
Q. Okay. You mentioned earlier the qualification test for -- FBI qualification test for shotguns is between seven and 50 yards, correct?
A. Yes, sir.
Q. Within that distance would the shotgun be an effective firearm?
A. Depending upon the cartridge used and where the projectile, or projectiles, hit because there are two different loads used for that qualification.
Q. What are the two different loads?
A. Double-aught buckshot and 12 gauge slug. So single projectile load and a -- currently I believe a nine pellet double-aught buckshot load.
Q. What would the difference in effectiveness be between the two loads shot between

seven and 50 yards?
A. At seven yards you have an okay chance of keeping all pellets within a scoring area, but it's no certainty. Because of the spread of the pellets it's not uncommon for the shooter through no mistake of his own to have one of the pellets miss the scoring area. Beyond seven yards I would think it would be almost impossible to put all the pellets on the target. And that's the reason the shotgun is not recommended for use with buckshot beyond close quarter distances. I believe that's the reason for the qualification course as well. It's only fired at seven yards with buckshot.
Q. What about for the slug?
A. The slug they fire at 50 yards and in.
Q. And what's the -- with the buckshot at 50 yards how accurate can you be?
A. Both accurate and inaccurate. You have nine projectiles.
Q. Even with the slug, I thought the slug was a single projectile.
A. I'm sorry. I thought you said with buckshot.
Q. With a slug.
A. With a slug I've made head shots at 50

yards.

Q. So the pellet is only -- the qualification test for the pellet shotgun load that's only tested at seven yards?

A. Yes, sir.

Q. At seven yards what's the penetration depth for that nine pellet shotgun load that you were describing?

A. I don't believe I tested it at seven yards. At ten feet that load would typically fully penetrate an 18-inch block of gelatin. At seven yards I think I would have difficulty keeping all the pellets in the block of gelatin.

Q. Do you know in the -- in a home intrusion situation in that kind of self -- there's a home intruder and the homeowner is in the self-defense situation and has to use his or her firearm, do you know what the average number of shots fired is?

A. I do not.

Q. In the law enforcement situation, do you know what the average number of shots fired by a law enforcement officer in an incident is?

A. I do not.

Q. Let's go to your report, page 11,

please. This is Exhibit 22.
A. Yes, sir.
Q. You've listed six characteristics that make it -- make the AR-15 rifle particularly suitable for defensive purposes, correct?
A. Yes, sir.
Q. Now, would all these -- and we previously discussed that the AR-15 could have -- could be a rimfire or could be a centerfire, correct?
A. Yes, sir.
Q. Are all these characteristics present in an AR-15 that's a rimfire?
A. I would say no, sir.
Q. And which one, which one of these characteristics would not be present in a rimfire AR-15?
A. Characteristic number five.
Q. How so? I'm sorry, could you describe characteristic number five?
A. Yes, sir. It can be chambered in a variety of cartridges so the user could choose one that is an ideal combination of effective while having relatively mild recoil.
Q. Could you describe why characteristic

five would not apply?
A. I don't know of any rimfire cartridges that I believe would be a good choice for home defense if you had a choice of something more appropriate or more effective.
Q. Why is that?
A. Because rimfire cartridges are inherently lower pressure and they're loaded with lighter weight or fragile projectiles. They're not intended -- although they have been used, they're not intended to stop violent actions of a mammal that weighs what a human being does. They're small game cartridges.
Q. Have you tested rimfire cartridges when you were at the BRF?
A. Only informally.
Q. In what situation -- in what type of informal situation did you test rimfire cartridges?
A. The first time I was asked by the FBI laboratory if I could catch some bullets for them.
Q. What do you mean by catch bullets?
A. Catch a bullet so that they can examine it later and look at the markings on it. And this happened before the man who taught me how to do it had left. And I ignorantly didn't raise the door

at the end of the bay thinking I was going to catch all the bullets. And when I fired the .22 into the block of gelatin and heard it hit the back wall or the back door he chuckled and said, "Went right through, didn't it?" So the .22 was a slow velocity projectile that did not deform much so it penetrated -- I believe the block was either 16 or 18 inches. It penetrated all the way through the block of gelatin. There was a time when we were asked to shoot some .22 Magnum rounds into a block of gelatin for use in a special purpose situation. And I was underwhelmed with their performance.

Q. So when you tested the rimfire .22 you said it went through -- it went beyond the 18 inches?

A. It went all the way through the block of gelatin, yes, sir.

Q. Isn't that -- didn't that accomplish the terminal effectiveness in that it reached beyond -- it reached at least 18 inches?

A. No, sir. Penetration is only one metric. It didn't expand at all and we didn't test it for barriers.

Q. Are there rimfire rounds that expand upon impact?

projectiles.

Q. But you were not aware of any configuration -- theoretically they could put a -- are there bullets that are more easily deformed than others?

A. There are bullets that are more easily deformed than others. But I've never seen a rimfire cartridge that averaged between 12 and 18 when expanded.

Q. But you haven't tested it?

A. I have not tested it.

Q. What is it about a telescoping or adjustable stock that makes a rifle particularly suitable for defensive purposes?

A. The tallest agent I can recall training probably was six foot seven. The smallest agent I can recall training was less than five feet tall. I can give each of them the same rifle, and they can both use it effectively without modifying the gun for them. That's one of the selling characteristics other than obviously making it compact so you can transport it.

Q. How much more compact might an adjustable stock make a rifle?

A. I don't know. A few inches. I need to

measure that to --

Q. What about a folding stock, are you familiar with a folding stock?

A. I'm familiar with some folding stocks, yes, sir.

Q. With a folding stock how much shorter might you make a rifle?

A. It would depend on the length of it unfolded. It would end where the hinge point was, from the hinge point to the butt.

Q. Sitting here today are you able to provide a general estimate?

A. I would be guessing and I prefer not to guess.

Q. All these characteristics, these six characteristics, you have listed on the bottom of page 11 that make the AR-15 particularly suitable for defensive purposes, would they also apply if a rifle has a fixed magazine?

A. Yes, I think they would.

Q. Other than that second characteristic, do these six -- do these characteristics that make a rifle particularly suitable for defensive purposes also apply to a handgun?

A. Not as much. No, sir.

Q. In what way?
A. The relatively mild recoil portion.
Q. What do you mean?
A. Full power handgun rounds, I would say are not relatively mild recoil.
Q. What do you mean by a full power handgun round?
A. Service cartridges you would load in, say, a 9 millimeter, a .40 or .45 auto which is not a cartridge that would be used by law enforcement. It does have relative mild recoil. But a 9 millimeter Luger loaded 35,000 PSI maximum average pressure, it's milder than a .40 loaded at 35,000 PSI, but I wouldn't call the recoil mild.
Q. And you mentioned the .25.
A. Yes, sir.
Q. I've had a law enforcement officer tell me that he'd rather be shot by a 9 millimeter than a .22. Do you know why he might say that?
A. I don't know why he told you that. I have had others tell me that they were under the impression that the .22 would go in the body and bounce around the body in a zigzag pattern damaging more tissue and organs.
Q. Is that true?

A. Not to my knowledge, no, sir.
Q. What happens to a .22 when it impacts the body?
A. Depending on where it hit and what it hit. But if it doesn't hit any hard structures, it's likely to go in one side and out the other like I experienced in my gelatin ballistic research. And I've heard more than one person espouse that myth.
Q. I've heard it too. So it's a nationwide theory.
A. Yes, sir.
Q. The last characteristic here that you listed on page 11 utilizes magazines of varying capacities depending on the need. When might one need a magazine of -- with larger capacity versus a magazine with fewer capacity?
MR. SWEENEY: Objection.
Q. With a lesser capacity?
A. Depending on the situation. I don't know anyone that would go into a planned event with less ammunition than they can reasonably carry. For example, when I walk around my farm I typically use a 20 round magazine because the 30 pokes me in the ribs. I've got the rifle slung on my shoulder.

So I have a 20 round magazine in the rifle. And it's nice to be able to do that. When I'm sitting in a stand and hunting hogs, for example, I switch the 20 to a 30. I have more need if I run into a sounder of hogs.

Q. What would you do in that situation?

A. Prosecute them with extreme prejudice.

Q. And previously we talked about how it's hard to make generalized statements about ammunition because they could -- projectile ballistics could depend on a lot of different factors, correct?

A. Yes, sir.

Q. It could depend on the -- they depend on the barrel configuration; is that correct?

A. The barrel can have an effect on it.

Q. And the barrel length would affect the projectile ballistics, correct?

A. It likely would affect the velocity.

Q. How so?

A. If the propellant is all burned before the projectile exits the barrel, then it would result in reduced velocity. But most cartridges and most firearms the size that are commonly used do not burn all the propellant prior to the

projectile exiting. Therefore, a longer barrel gives more time under pressure results in the projectile exiting at a little higher velocity.

Q. And what's the effect of a projectile exiting the barrel at a higher velocity?

A. It impacts the target at a higher velocity if all things are equal. It's very common in the long range hunting, for example, that you choose a longer barrel so the projectile will impact the animal in the desired performance window. So if your performance window occurs from, say, zero to 50 yards but you expect to need it 50 to 100, use a longer barrel and start the bullet faster. And then you impact during your performance window more reliably. That causes problems if you impact earlier as well.

Q. So at -- let's use the FBI qualification test distance of ten feet and 20 yards. A rifle with a -- let's compare the -- a rifle with a 16 inch barrel versus a rifle with a 14 and a half inch barrel. The rifle with the 16 inch barrel, the projectile will come out of that barrel at a higher velocity than the 14 and a half inch barrel, correct?

A. It's reasonable to assume that but you

can't determine without testing because there's variability in rifle barrels. And so if you had a fast 14 and a half inch barrel versus a slow 16, they may overlap.

Q. As a general matter?

A. It's expected, yes.

Q. It's expected?

A. A little bit higher velocity.

Q. And at, let's say, ten feet, would that higher velocity bullet coming out of the 16 inch barrel cause more damage to a target at the ten feet range?

A. Recognizing there are no absolutes, I would expect very little measurable difference between a 16 inch barrel AR-15 type rifle versus a 14 and a half.

Q. There would --

A. Because the velocity variation you would see is probably overlapped by the shot-to-shot velocity variation of the ammunition.

Q. Right. There would be variation from shot to shot?

A. Correct.

Q. But on average the 16 inch barrel is expected to have a higher velocity than the 14 and

a half inch, right?
A. Right. But I would not guess it to be much more than 40 feet per second depending on the load. It's not a significant difference in my opinion between a 14 and a half and a 16 inch in .223 with most loads.
Q. At what point does a shorter barrel start reaching -- would you see a significant decline in velocity?
A. Linear or rotational?
Q. Linear.
A. Linear velocity I would expect a significant decrease once you drop below about 11 inches on .223.
Q. What about rotational?
A. Depends on the twist rate of the barrel. For example, if you're using a one and nine twist, I don't think you should go below about 14 and a half. We'd prefer a one and seven for that. If you're going below 11 you absolutely need a one and seven twist because rotational velocity is dependent upon not only twist rate but also linear velocity.
Q. What is the effect of -- is there any effect on the -- on a target with differing

rotational velocity?
A. There certainly can be.
Q. How so?
A. The rotational velocity has been shown to contribute to the expansion of the projectile.
Q. So the greater the rotational velocity, the greater the expansion of the projectile?
A. In most cases. And sometimes it can go beyond what you want.
Q. So a 16 inch barrel compared to a 14 and a half inch barrel, would the 16 inch barrel have, as a general matter, have both greater linear velocity and rotational velocity?
A. If they were the same twist rate, yes.
Q. Another factor in barrel configuration is chamber, correct?
A. Yes, sir.
Q. What is chamber?
A. The internal dimensions of the firearms barrel where the cartridge is contained, and that's where the cartridge sits during ignition of the firing sequence. And it also includes what we call the lead area or the throat which is that area of the barrel from the mouth of the cartridge case to where the rifling action begins.

Q. How does the chamber affect projectile ballistics?
A. The chamber only would affect the projectile ballistics based on the lead if the same cartridge was fired in both chambers.
Q. How might that lead affect the projectile ballistics?
A. The more lead there is, the more room there is for the projectile to jump during the ignition sequence. As the projectile jumps the volume that's containing the powder is greater and, therefore, if all other things are equal you should have slightly lower pressure if you have more lead.
Q. And another factor in barrel configuration is the bore; is that correct?
A. Yes.
Q. And what does that refer to?
A. The diameter, the inside diameter of the barrel.
Q. And another factor in the barrel configuration is the rifling profile; is that correct?
A. Yes.
Q. What is the rifling profile?
A. Rifling is the method used to spin the

ammunition for the FBI. And recognizing that you're never perfect, we evaluated every instance where we procured ammunition. And if we thought we could make it better, we did. And I'm assuming they're still doing that. I know they've changed a few things in the formula.

Q. If two projectiles both reach at least the 12-inch depth in a gelatin, would you consider those two to have the same lethality?

A. I don't use the term lethality.

Q. Terminal --

A. And deride those who do. I'm sorry.

Q. Feel free to deride. I'm sure I've used many terms inappropriately here in this deposition.

Would terminal effectiveness be a better term?

A. That's a much better term, yes, sir.

Q. If two projectiles both reach at least the 12-inch penetration depth in a target, would you consider those two to have the same terminal effectiveness?

A. I can't answer that without knowing the other metrics.

Q. What are some other metrics?

A. Expansion, retained weight, shots less

than 12 inches, and range of penetration.
Q. What is shots less than 12 inches?
A. How many shots in your entire test failed to make it to the 12-inch mark.
Q. What is weight retention?
A. How much the projectile weighs once recovered as compared to how much it weighed prior to being fired.
Q. Does that relate to fragmentation?
A. It does, and it also relates to whether or not it picks up any of the intervening barriers.
Q. And do you want a greater weight -- sit preferable -- is it the greater the weight retention the more terminally effective the projectile is?
A. Weight retention is something we used in the beginning to discourage fragmentation, and my belief now -- although we still use weight retention -- is that overall expansion is far more important. But we used it as a metric to show that the projectile was more robust and less prone to fragment. I think they still use weight retention. But I'm not sure. My successor and I discussed whether or not to keep that in the protocol.
Q. If a rifle and a handgun had the same

barrel characteristics would firing the same cartridge have the same muzzle velocity?
A. I would expect it to.
Q. Do you know any handguns that have the same barrel characteristics as a rifle?
A. Yes, sir.
Q. Could you give an example?
A. Sure. Say, a nine inch .300 Blackout could be configured either as a rifle or a handgun. A nine inch .223 -- and I'm speaking again AR-15 type weapons -- could be figured either as a rifle or a handgun. If the barrels are the same, the projectile can't determine whether or not there's a shoulder stock.
Q. Right. So the -- what was that rifle that you mentioned could be configured into a handgun?
A. Both the .223 AR-15 or the .300 Blackout.
Q. Could be configured either as a rifle or handgun?
A. Yes, sir.
Q. Why might someone configure a .223 AR-15 into a handgun?
A. Because they wanted a shorter overall

length and to comply with the national laws for civilians that prohibit short barrel rifles unless you, I believe, pay the tax and register them.

Q. So a .223 AR-15 configured as a handgun, does that still have a 16-inch barrel?

A. It could. I don't know why you would, but it could.

Q. So the AR-15 designation, it doesn't say anything about the barrel length? It's unrelated to the barrel length?

A. Correct.

Q. Let's take a look at your rebuttal report. I think that's Exhibit 20. Take a look at page eight, bottom of page eight under the heading Reasonable Effective Range.

A. Yes, sir.

Q. And you quote a paragraph in a statement in the report made by Detective Mersereau?

A. Yes, sir.

Q. I'll just read it for the record. "It is highly unlikely that citizens would face a situation where the threat is beyond the effective range of a handgun and certainly not with any great frequency. It is even less likely that the law would be at such a distant perceived threat as

justifying a use of force at all, much less the use of lethal force delivered via a rifle." Is that correct?

A. Yes.

Q. And your response was, "This is especially curious inasmuch as he earlier cited an incident known to have occurred at extended range." And you quoted a section of Detective Mersereau's report in which he cited the Las Vegas shooting of a shooter firing from a 32nd floor hotel?

A. Yes, sir.

Q. Into a crowded outdoor concert venue, correct?

A. Yes, sir.

Q. And your opinion is that Detective Mersereau directly contradicted his assertion. Can you describe where you see this contradiction in Detective Mersereau's report?

A. Sure. He on one hand says that it's unlikely that you're going to face the situation and less likely that the law would view such a distant perceived threat as justifying the use of force at all, and at the same time talks about the shooting in Las Vegas which was quite a long distance away. I don't know the exact distance,

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my Supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

/s/Lisa Bailey
Lisa Bailey, CCR #289
CCR #289, Expires 9/30/19
Commissioner for the
State of Alabama at Large