JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN RUPP, et al., | CASE NO. 8:17-cv-00746-JLS-JDE |
| Plaintiffs, | **ORDER GRANTING ATTORNEY GENERAL'S MOTION FOR SUMMARY JUDGMENT (Doc. 73) AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. 77)** |
| vs. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, and DOES 1-10, | |
| Defendants. | |

On May 9, 2018, the Court granted the Attorney General's motion to dismiss Plaintiffs' due process and takings claims and denied Plaintiffs' motion for a preliminary injunction.  (May 2018 Order, Doc. 49.)  The issue now before the Court is whether California's Assault Weapons Control Act ("AWCA") violates the Second Amendment.[1]

---

[1] As discussed below, the Court's May 2018 Order gave Plaintiffs limited leave to amend their due process and takings claims.  Plaintiffs' Third Amended Complaint fails to plead any new facts to support the due process and takings claims, and Plaintiffs' Motion for Summary Judgment ignores the due process and takings claims altogether.

After considering the papers, holding oral argument, and taking the matter under submission, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS the Attorney General's Motion for Summary Judgment.

## I.   BACKGROUND[2]

### A.  The AWCA

The AWCA, originally passed in 1989, makes it a felony to manufacture assault weapons within the State of California, or to possess, sell, transfer, or import such weapons into the state without a permit.  (May 2018 Order at 2; Cal. Penal Code §§ 30600, 30605.) At the time of its passage, the AWCA included a list of specific assault weapons identified by their make and model.  Cal. Penal Code § 30510.  The legislature found that each of these firearms "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  Cal. Penal Code § 30505(a).

After the AWCA was enacted, gun manufacturers began to produce weapons that were "substantially similar to weapons on the prohibited list but different in some insignificant way, perhaps only the name of the weapon, defeating the intent of the ban." (*See* S.B. 880 Report, 2015–2016 Reg. Sess., Assembly Committee on Public Safety (June 14, 2016) at 4, attached as Ex. 29 to Chang Decl., Doc. 76-29.)  Thus, in 1999, the AWCA was amended to allow legislators to define a new class of restricted weapons according to their features rather than by model.  Under the 1999 amendments, a weapon was an "assault rifle" if it had "the capacity to accept a detachable magazine," *and* any of the following features: a pistol grip that protrudes conspicuously beneath the action of the

---

[2] The parties each filed numerous, largely boilerplate evidentiary objections. (*See* Docs. 91, 93, & 100.)  In such instances, it is "unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). To the extent that the Court relies on objected-to evidence, the relevant objections are overruled.  *Capitol Records, LLC v. BlueBeat*, Inc., 765 F. Supp. 2d 1198, n.1 (C.D. Cal. 2010).

weapon; a thumbhole stock; a folding or telescoping stock; a grenade launcher or flare launcher; a flash suppressor; or a forward pistol grip.  (*See* S.B. 23, § 7, attached as Ex. 34 to Chang Decl., Doc. 76-34.)  If a magazine required a "tool" to detach a magazine, the magazine was not considered detachable, and thus gun manufacturers developed technology, referred to as "bullet buttons," that enabled a magazine to be "removed and replaced in seconds" while not being technically "detachable."  (S.B. 880 Report at 5.)

In 2016, the California legislature again amended the AWCA to close the bullet button "loophole" in response to a December 2015 mass shooting in San Bernardino where two assailants used weapons equipped with bullet buttons to shoot 36 people in less than four minutes.  (S.B. 880 Report at 8.)  S.B. 880 amends the definition of assault weapons so that, rather than referring to a weapon "with the capacity to accept a detachable magazine," it refers to a weapon "that does not have a fixed magazine" in combination with other features.  Cal. Penal Code § 30515.  A fixed magazine is defined as "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action."  Cal. Penal Code § 30515(b).

To summarize, there are two avenues by which a semiautomatic rifle can be defined as an "assault weapon" and thus banned pursuant to the AWCA:  first, if it is listed by make and model in California Penal Code § 30510; and second, if it has certain features described in § 30515.  As is relevant to this action, § 30515 classifies a semiautomatic, centerfire rifle as an "assault weapon" if it does not have a fixed magazine and has one of the following features: a pistol grip that protrudes conspicuously beneath the action of the weapon; a forward pistol grip; a thumbhole stock; a folding or telescoping stock; or a flash suppressor.  Cal. Penal Code § 30515(a)(1)(A)-(F).  These features are defined by regulation as follows:

- A pistol grip that protrudes conspicuously beneath the action of the weapon "allows for a pistol style grasp in which the web of the trigger hand (between

the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing."  Cal. Code Regs. tit. 11, § 5471(z).

- A forward pistol grip is "a grip that allows for a pistol style grasp forward of the trigger."  Cal. Code Regs. tit. 11, § 5471(t).
- A thumbhole stock is "a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing."  Cal. Code Regs. tit. 11, § 5471 (qq).
- A flash suppressor is "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision."  Cal. Code Regs. tit. 11, § 5471(r).
- A telescoping stock is one that "is shortened or lengthened by allowing one section to telescope into another portion."  Cal. Code Regs. tit. 11, § 5471(oo).
- A folding stock is one that "is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm."  Cal. Code Regs. tit. 11, § 5471(nn).

Further, per § 30515(3), a semiautomatic, centerfire rifle that is less than 30 inches in overall length is an "assault weapon," and "[f]olding and telescoping stocks shall be collapsed prior to measurement."  *See* Cal. Code Regs. tit. 11, § 5471(x).

### B. **The Litigation**

The Individual Plaintiffs—Rupp, Dember, Johnson, Jones, Seifert, Valencia, Willis, and Martin—all reside in California and are legally eligible to possess firearms. (Plaintiffs' Statement of Undisputed Facts ("SUF") ¶¶ 1–3, Doc. 77-2.)  Plaintiffs Valencia, Dember, and Johnson do not currently own rifles within the AWCA's scope but would immediately acquire one if not for their fear of prosecution under the AWCA.  (*Id.* ¶ 13.)  Plaintiffs Rupp, Jones, Seifert, and Martin have parts that they would immediately

assemble into a rifle within the AWCA's scope if not for their fear of prosecution under the AWCA.  (*Id.* ¶¶ 7, 9–10.)  Plaintiffs Willis, Siefert, and Martin all own weapons within the AWCA's scope and wish to be free from the AWCA's transfer and use penalties.  (*Id.* ¶¶ 5–6, 8.)  Plaintiff Rifle & Pistol Association, Inc., represents its members who are similarly situated to the individual Plaintiffs.  (*Id.* ¶¶ 18–28.)

Plaintiffs bring a facial Second Amendment challenge to the "AWCA's restrictions on all rifles, whether listed as 'assault weapons' by their make and model or defined as 'assault weapons' by their features."  (Plaintiffs' Mem. at 4, Doc. 86.)  Specifically, Plaintiffs challenge the following California Penal Code sections: 30510(a) (list of assault weapons by make and model);[3] 30515(a)(1)(A-C) and (E-F) (defining the additional features which, in combination with a non-fixed magazine, render a weapon an "assault weapon"); 30515(a)(3) (defining as an assault rifle any semiautomatic, centerfire rifle that has an overall length of less than 30 inches); 30520 ("duties of Attorney General," allowing the California Attorney General to designate and/or describe weapons); 30600 (prohibiting the manufacture, distribution, transportation, importation, sale, gift, or loan of assault weapons); 30605 (penalties for possession); section 30925 (required actions for those bringing an assault weapon into the state); and section 30945 (conditions for possessing a registered assault weapon).  (Third Amended Complaint, Prayer for Relief ¶¶ 1–2, Doc. 60.)  The prayer for relief asks the Court to declare the code sections "unconstitutional facially and to the extent they apply to 'assault weapons' or, alternatively, to the extent they prohibit any semi-automatic, centerfire rifle with a detachable magazine having a 'pistol grip,' 'flash suppressor,' 'thumbhole stock,' or 'telescoping' stock, or any semi-automatic, centerfire rifle that is over 26 inches in overall length."  (*See* Third Amended Complaint, Prayer for Relief ¶ 1.)

---

[3] Plaintiffs also challenge California Code of Regulations, title 11, section 5499, which, pursuant to California Penal Code section 30510(f), prohibits more assault weapons by model.

## II. **LEGAL STANDARD**

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and a fact is "material" when it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried. The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

"When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. U.S*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not

1  constitute an agreement that if one is rejected the other is necessarily justified.").  Further,

2  the Court "must consider each party's evidence, regardless under which motion the

3  evidence is offered."  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

4  **III.**     **DISCUSSION**

5           **A.  Due Process and Takings Claims**

6           The Court's May 2018 Order dismissed Plaintiffs' due process and taking claims

7  and gave Plaintiffs leave to amend "only to the extent Plaintiffs can allege additional facts

8  to show standing and ripeness of their as-applied challenges to the date-and-source

9  requirement and conditions on devisees."  (May 2018 Order at 19.)  Plaintiffs' Third

10  Amended Complaint reasserts these claims without *any* new facts.  Indeed, rather than

11  plead additional facts to support these claims, Plaintiffs have removed the allegations

12  relating to the registration requirements.  (*Compare* First Amended Complaint ¶¶ 107–112,

13  Doc. 16 *with* Third Amended Complaint ¶¶ 105–109.)  Further, Plaintiffs' briefing ignores

14  the existence of these claims in the Third Amended Complaint and focuses only on the

15  Second Amendment claim.  The Attorney General notes that Plaintiffs' due process and

16  takings claims should be dismissed for the same reasons expressed in the Court's May

17  2018 Order.  (*See* AG Mem. at 6.)

18           Accordingly, in that Plaintiffs have failed to amend their due process and takings

19  claims in conformity with the Court's May 2018 Order and have not responded to the

20  Attorney General's argument for dismissal, the Court DISMISSES Plaintiffs' due process

21  and takings claims with prejudice.

22           **B.  Second Amendment Claim**

23           In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that

24  the Second Amendment confers an individual right to keep and bear arms.  *Id.* at 595.  The

25  Ninth Circuit applies a two-step inquiry to Second Amendment challenges: "(1) the court

26  'asks whether the challenged law burdens conduct protected by the Second Amendment,';

27  and (2) if so, what level of scrutiny should be applied."  *Fyock v. Sunnyvale*, 779 F.3d 991,

28

7

1    996 (9th Cir. 2015) (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir.

2    2013)).  If the challenged law falls outside the scope of the Second Amendment, then the

3    law "may be upheld without further analysis." *Silvester v. Harris*, 843 F.3d 816, 821 (9th

4    Cir. 2016).  "Intermediate scrutiny is appropriate if the regulation at issue does not

5    implicate the core Second Amendment right *or* does not place a substantial burden on that

6    right." *Fyock*, 779 F.3d at 998–99 (citing *Jackson v. City and County of S.F.*, 746 F.3d,

7    953, 964 (9th Cir. 2013)).

8        While they acknowledge that the Court is bound by the Ninth Circuit's two-step

9    inquiry (Plaintiffs' Mem. at 17 n.10), Plaintiffs devote a significant portion of their

10   briefing to arguing that the AWCA violates the Second Amendment under a "scope-based

11   analysis" derived largely from then-Judge Kavanaugh's dissent in *Heller v. District of*

12   *Columbia (Heller II)*, 670 F.3d 1244, 1269–96 (D.C. Cir. 2011) (Kavanaugh, J.,

13   dissenting).  (*See* Plaintiffs' Mem. at 11–17.)  Essentially, Plaintiffs' proposed test requires

14   a "historical justification" for firearm regulations.  (*See id.* at 11.)  If there is no historical

15   justification, the regulation is per se invalid.  (*Id.*)  The Court rejects Plaintiffs' proposed

16   test for two reasons.  First, it does not find it persuasive for the reasons expressed by the

17   majority opinion in *Heller II*.  *See* 670 F.3d at 1265 ("If the Supreme Court truly intended

18   to rule out any form of heightened scrutiny for all Second Amendment cases, then it surely

19   would have said at least something to that effect."); *id.* ("[T]he idea that *Heller* precludes

20   heightened scrutiny has eluded every circuit to have addressed that question since *Heller*

21   was issued."); *id.* at 1267 ("Although *Heller* renders longstanding regulations

22   presumptively constitutional, it nowhere suggests a law must be longstanding or rooted in

23   text, history, and tradition to be constitutional.").  Second, and more simply, the Court is

24   bound by the Ninth Circuit's two-step inquiry.

25       Accordingly, the Court applies the Ninth Circuit's two-step inquiry to determine the

26   constitutionality of the AWCA under the Second Amendment.

27

28

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**1. <u>Whether the AWCA Burdens Conduct Protected by the Second Amendment</u>**

In its May 2018 Order, the Court noted that "[t]he Ninth Circuit has not specifically addressed this issue post-*Heller*, but other circuits have questioned whether bans on certain assault weapons implicate the Second Amendment. *See, e.g., Heller II*, 670 F.3d at 1262; [*Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017)]." (May 2018 Order at 22 & n.9.) However, because *Kolbe* and *Heller II* were decided "at summary judgment when the deciding district courts had a full factual record available for review," the Court assumed without deciding that the first step of the Ninth Circuit's test was met. (*Id.*) However, now that this action is at the summary judgment stage, the issue is appropriate for the Court to examine.[4]

"The Supreme Court has emphasized that nothing in its recent opinions is intended to cast doubt on the constitutionality of longstanding prohibitions traditionally understood to be outside the scope of the Second Amendment." *Fyock*, 779 F.3d at 996 (citing *Heller*, 554 U.S. at 626–27). "Importantly, the Second Amendment does not 'protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'" *Id.* at 996–97. "Thus, longstanding prohibitions on the possession of 'dangerous and unusual weapons' have uniformly been recognized as falling outside the scope of the Second Amendment." *Id.* at 997 (citing *United States v. Henry*, 688 F.3d 637, 639–40 (9th Cir. 2012) (machineguns are "dangerous and unusual" weapons and outside scope of the Second Amendment)). "In determining whether a given regulation falls within the scope of the Second Amendment under the first step of this inquiry, 'we ask whether the

---

[4] The Ninth Circuit has "discouraged bypassing the historical analysis step and assuming without deciding that conduct burdens the Second Amendment" at the summary judgment stage. *See Fyock*, 779 F.3d at 997 n.3. Thus, the Court examines whether the AWCA burdens conduct protected by the Second Amendment even though the Court ultimately concludes that the AWCA survives intermediate security.

regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment.'" *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Jackson*, 746 F.3d at 960).

Here, the Attorney General argues that (1) "[a]ssault rifles may be banned because they are, like the M-16, 'weapons that are most useful in military service'"; and (2) "they are also not 'in common use' for lawful purposes like self-defense." (AG Reply at 2, Doc. 99 (quoting *Heller*, 554 U.S. at 624, 627).) Because the Court concludes that semiautomatic assault rifles are essentially indistinguishable from M-16s, which *Heller* noted could be banned pursuant to longstanding prohibitions on dangerous and usual weapons, the Court need not reach the question of whether semiautomatic rifles are excluded from the Second Amendment because they are not in common use for lawful purposes like self-defense.[5]  Moreover, such an inquiry is better suited to determine the level of scrutiny to apply.  *See Bauer*, 858 F.3d at 1222 (noting that how much a regulation burdens the "core" of the Second Amendment—self-defense in the home—determines the level of scrutiny to apply).

*Heller* noted that the "Second Amendment is not unlimited" and recognized the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627.  *Heller* then addressed a counterargument: "It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." *See id.*

---

[5] The Court notes, however, that analyzing the constitutionality of the AWCA based "on how common a weapon is at the time of the litigation would be circular." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) (noting that "[m]achine guns aren't commonly owned for lawful purposes today because they are illegal" and "semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal").

1  The prefatory clause, of course, reads: "A well regulated Militia, being necessary to the

2  security of a free State."  U.S. Const. amend. II. Ultimately, *Heller* concluded that "the fact

3  that modern developments have limited the degree of fit between the prefatory clause and

4  the protected right cannot change our interpretation of the right."  *Id.*

5       In *Kolbe*, the Fourth Circuit, reviewing a nearly identical ban on assault weapons,

6  concluded that the above-quoted passage in *Heller* creates a "dispositive and relatively

7  easy inquiry: Are the banned assault weapons and large-capacity magazines 'like' 'M-16

8  rifles,' *i.e.*, 'weapons that are most useful in military service,' and thus outside the ambit of

9  the Second Amendment?"  849 F.3d at 136; *see also Worman v. Healey*, 293 F. Supp. 3d

10  251, 266 (D. Mass. 2018) (granting summary judgment because "the undisputed facts

11  convincingly demonstrate that AR-15s and [large-capacity magazines] are most useful in

12  military service, they are beyond the scope of the Second Amendment").  The Court,

13  however, reads *Heller* more narrowly—it merely provides the M-16 as an example of a

14  historically banned "dangerous and unusual weapon," and does not endeavor to create a

15  test whereby any weapon that is "most useful in military service" is outside the scope of

16  the Second Amendment.  *Heller* sought to justify the fact that some dangerous and unusual

17  weapons that are most useful in military service—such as the M-16—can be banned

18  despite the prefatory clause's ostensible mandate that the right to bear arms be connected

19  to a well-regulated militia.  Given this context, the Court hesitates to read *Heller* to hold

20  that *any* weapon that is most useful in the military is outside the scope of the Second

21  Amendment.

22       *Heller*, however, does plainly provide that the M-16—and weapons "like" it—can

23  be banned as dangerous and unusual weapons.  Accordingly, the proper question is: are the

24  semiautomatic rifles at issue here "like" the military's M-16, a historically banned

25  dangerous and unusual weapon?  If so, the semiautomatic rifles are similarly outside the

26  scope of the Second Amendment.  This test makes practical sense.  It is undisputed that the

27  M-16 is outside the scope of the Second Amendment—thus, if a weapon is essentially the

28

same as the M-16, it is not protected by the Second Amendment merely because gun manufacturers have given it a different model number and dubbed it a "civilian rifle."  Gun manufacturers cannot determine the scope of Second Amendment protection; they cannot, for example, develop a grenade launcher, dub it a "civilian" model, and thereby bring it within the scope of the Second Amendment.

As to whether the semiautomatic rifles at issue are "like" the M-16, the Court agrees with *Kolbe*'s conclusion that "AR-15-type rifles are 'like' M16 rifles under any standard definition of that term."  849 F.3d at 136 (citing *Webster's New International Dictionary* 1431 (2d ed. 1948) (defining "like" as "[h]aving the same, or nearly the same, appearance, qualities, or characteristics; similar")).  Indeed, the Court concludes that semiautomatic rifles are virtually indistinguishable from M-16s.

The difference between the M-16 and semiautomatic rifles like the AR-15 is that the M-16 allows the shooter to fire in either automatic or semiautomatic mode, while semiautomatic rifles fire only in semiautomatic mode.  (Plaintiffs' Response to AG's SUF ¶¶ 7, 10, Doc. 92-1.)  However, based on the evidence presented by the Attorney General, this is a distinction without a difference.  In enacting the now-defunct federal ban on assault rifles, Congress found that their rate of fire—300 to 500 rounds per minute—makes semiautomatic rifles "virtually indistinguishable in practical effect from machineguns."[6] (*Id.* ¶ 11.)  *See Henry*, 688 F.3d at 639–40 (holding that machine guns are "dangerous and unusual" weapons and outside scope of the Second Amendment).  Reviewing similar evidence, other courts have noted that semiautomatic rifles' rate of fire is almost the same as the M-16's.  *See Kolbe*, 849 F.3d at 136 ("Although an M16 rifle is capable of fully automatic fire and the AR-15 is limited to semiautomatic fire, their rates of fire (two seconds and as little as five seconds, respectively, to empty a thirty-round magazine) are

---

[6] M-16s are considered machineguns.  *See* 26 U.S.C. § 5845(b) (defining machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger").

nearly identical."); *Heller II*, 670 F.3d at 1263 ("[S]emi-automatics still fire almost as rapidly as automatics.").

Further, the Attorney General points to a United States Army manual instructing soldiers on the use of the M-16. The manual notes that, although the M-16 is capable of automatic fire, "[t]he most important firing technique during fast-moving, modern combat is rapid *semiautomatic fire*." (Ex. 19 to Chang Decl. at 3, Doc. 76-19 (emphasis added).) This is because automatic fire "is inherently less accurate than semiautomatic fire." (*Id.* at 7.) Thus, the military is trained to use M-16s as if they were semiautomatic rifles because the semiautomatic mode is more effective. Reviewing similar evidence, *Kolbe* concluded that "in many situations, the semiautomatic fire of an AR-15 is more accurate and lethal than the automatic fire of an M16." *Kolbe*, 849 F.3d at 136.

Moreover, even if the ability to fire in automatic mode were significant, Congress found that "it is a relatively simple task to convert a semiautomatic weapon to automatic fire." (H.R. Rpt. No. 103-489 at 18, Ex. 27 to Chang Decl., Doc. 76-27.) The Attorney General's evidence shows that a semiautomatic weapon can easily be converted to automatic fire by installing certain parts, such as bump stocks or multiburst trigger activators. (Plaintiffs' Response to AG's SUF ¶ 13.) The Supreme Court in *Staples v. United States*, 511 U.S. 600 (1994) is in accord with the Attorney General's evidence, as it noted that "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon." *Id.* at 603.[7]

---

[7] Plaintiffs argue that *Staples* supports the proposition that semiautomatic rifles are *not* like the M-16. (Plaintiffs' Opp. at 11.) In *Staples*, an individual possessed an AR-15 that had been modified to fire automatically, like the M-16. 511 U.S. at 603. The Supreme Court's holding was merely that, to charge him for illegal possession of an unregistered machinegun, the government had to prove that he *knew* that the weapon had the capability to fire automatically. *Id.* at 619 (emphasizing narrowness of holding). That the Court found the similarities between the AR-15 and M-16 insufficient to impute *mens rea* for criminal prohibition on the possession of machineguns is irrelevant to the question presented here: whether semiautomatic rifles are within the scope of the Second Amendment. Nothing in *Staples* suggests, for example, that Congress
(footnote continued)

13

Finally, gun manufacturers carried over from the M-16 and other military assault rifles the enumerated features that bring a weapon within the AWCA's scope.  The Attorney General points to a 1989 Report from the Bureau of Alcohol Tobacco & Firearms (ATF) which notes that "semiautomatic assault rifles" are a "distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle . . . such as the *U.S. M16*, German G3, Belgian FN/FAL, and Soviet AK47 . . .." (ATF Report at 6, Doc. 76-22 (emphasis added).)   The ATF Report identifies the ability to accept detachable magazines, folding and telescoping stocks, pistol grips, and flash suppressors, as "military features and characteristics . . . carried over to the semiautomatic versions of the original military rifle."  (*Id.*; *see also* Plaintiffs' Response to AG's SUF ¶ 22 (admitting that flash suppressor is a standard feature of the M-16).)

Plaintiffs present no evidence to meaningfully distinguish the semiautomatic rifles at issue from the M-16.  Accordingly, the Court concludes that semiautomatic rifles within the AWCA's scope are virtually indistinguishable from M-16s and thus are not protected by the Second Amendment.  Thus, the AWCA does not burden conduct protected by the Second Amendment.

## 2.  Level of Scrutiny to Apply

Alternatively, assuming that the AWCA *does* burden conduct protected by the Second Amendment, the Court must decide the appropriate level of scrutiny to apply. "[C]ourts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'"  *Bauer*, 858 F.3d at 1221–22 (quoting *Silvester*, 843 F.3d at 821).  "*Heller* identified the core of the Second Amendment as 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'"  *Id.* at 1222 (quoting *Heller*, 554 U.S. at 635).  "Guided by this understanding, our test for the appropriate level of scrutiny

_____

could not ban semiautomatic rifles just as it had banned M-16s—indeed, Congress did so four months later.  (*See* AG Reply at 6.)

amounts to 'a sliding scale.'" *Id.* "A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Id.* (quoting *Silvester*, 843 F.3d at 821). "Further down the scale, a 'law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate.'" *Id.* (quoting *Silvester*, 843 F.3d at 821).

As the Court noted in its May 2018 Order, "[e]very circuit to have encountered statewide bans on semi-automatic weapons designated as assault weapons has applied intermediate scrutiny." (May 2018 Order at 22.) *See Heller II*, 670 F.3d at 1262 (prohibition on possession of certain semiautomatic weapons merited intermediate scrutiny as it "left a person 'free to possess any otherwise lawful firearm'" (quoting *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010))); *Kolbe*, 849 F.3d at 138 (4th Cir. 2017) (ban on certain assault weapons and detachable magazines left "citizens free to protect themselves with a plethora of other firearms and ammunition"); *N.Y.S. Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (holding that a prohibition on some semiautomatic weapons identified by feature was not a ban on an entire class of arms therefore "[t]he burden imposed by the challenged legislation [was] real, but . . . not 'severe'"); *Friedman*, 784 F.3d at 411 (applying intermediate scrutiny as the ban on assault weapons "leaves residents with many self-defense options"). Since the Court's Order, the chorus of circuits applying intermediate scrutiny to assault weapon bans has only grown, as the First Circuit applied intermediate scrutiny to an assault weapon ban in April of this year. *See Worman v. Healey*, 922 F.3d 26, 38 (1st Cir. 2019).

Indeed, as the Court noted in its May 2018 Order, the AWCA does not severely burden the core of the Second Amendment right because individuals "remain free to choose any weapon that is *not* restricted by the AWCA or another state law." (*See* May 2018 Order at 23.) The AWCA leaves individuals "with myriad options for self-defense– including the handgun, the 'quintessential' self-defense weapon per *Heller*." (*Id.*) Further,

1    the Attorney General's evidence reflects that the semiautomatic rifles within the AWCA's

2    scope are ill-suited for self-defense.  (*See* Brady Center to Prevent Gun Violence, *Assault*

3    *Weapons "Mass Produced Mayhem"* (2008) at 16, Ex. 20 to Chang Decl., Doc. 76-20 ("In

4    addition to utilizing military features useful in combat, but which have no legitimate

5    civilian purpose, assault weapons are exceedingly dangerous if used in self defense,

6    because the bullets many of the weapons fire are designed to penetrate humans and will

7    penetrate structures, and therefore pose a heightened risk of hitting innocent bystanders.");

8    Donohue Rpt. ¶ 107, Ex. 1 to Chang Decl., Doc. 76-1 (according to Maryland's Police

9    Superintendent, "in many home defense situations assault weapons are likely to be less

10   effective than handguns because they are less maneuverable in confined areas").)

11   Moreover, Plaintiffs' own evidence shows that while individuals may sometimes purchase

12   assault rifles for self-defense, it is not the primary purpose for doing so.  (*See, e.g.*, Ex. 21

13   to Brady Decl. at 10, Doc. 78-3 (noting that 30% of AR-style rifles were sold in 2016 for

14   "personal-protection purposes," compared to 59.5% of handguns for that purpose); Ex. 2.

15   Brady Decl. at 4, Doc. 78 ("Recreational target shooting was the most prevalent reason

16   cited for owning a [modern sporting rifle], followed by home defense.").)

17           Accordingly, because the Court's prior reasoning is bolstered by the evidence

18   presented at summary judgment, the Court applies intermediate scrutiny to the AWCA.

### 3.  **Application of Intermediate Scrutiny**

20           The Ninth Circuit's test for intermediate scrutiny instructs that "(1) the

21   government's stated objective must be significant, substantial, or important; and (2) there

22   must be a 'reasonable fit' between the challenged regulation and the asserted objective."

23   *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139).  The state need not

24   "show that [the regulation] is the least restrictive means of achieving its interest."  *Fyock*,

25   779 F.3d at 1000 (citation omitted).  Rather, the state is "required to show only that [the

26   regulation] promotes a 'substantial government interest that would be achieved less

27

28

1    effectively absent the regulation.'"  *Id*. (quoting *Colacurcio v. City of Kent*, 163 F.3d 545,

2    553 (9th Cir. 1998)).

3          As the Court noted in its May 2018 Order, "it is beyond question that the

4    government's interest in promoting public safety and reducing gun violence is important or

5    substantial."  (May 2018 Order at 24 (citing *Fyock*, 779 F.3d at 1000; *Silvester*, 843 F.3d at

6    827; *Kolbe*, 849 F.3d at 139; *N.Y.S. Rifle and Pistol Ass'n, Inc.,* 804 F.3d at 261).)  Indeed,

7    Plaintiffs admit (as they must) that California has an important interest in promoting public

8    safety and preventing crime.  (Plaintiffs' Mem. at 19.)

9          Thus, the issue is whether there is a "reasonable fit" between the AWCA and

10   California's public safety interests.  *Fyock*, 779 F.3d at 1000.  A reasonable fit is

11   established if the government's objective will be achieved "less effectively absent the

12   regulation."  *Id*. (quoting *Colacurcio*, 163 F.3d at 553.).  "In reviewing the

13   constitutionality of a statute, 'courts must accord substantial deference to the predictive

14   judgments of Congress.'" *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997).  "In

15   the context of firearm regulation, the legislature is 'far better equipped than the judiciary'

16   to make sensitive public policy judgments (within constitutional limits) concerning the

17   dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. County*

18   *of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012).  Thus, the Court's role is only "to assure

19   that, in formulating its judgments, [California] has drawn reasonable inferences based on

20   substantial evidence."  *Id*.   The Court "may consider 'the legislative history of the

21   enactment as well as studies in the record or cited in pertinent case law.'"[8]  *Fyock*, 779

22   F.3d at 1000.  Indeed, California is "entitled to rely on any evidence 'reasonably believed

23   to be relevant' to substantiate its important interests.'"  *Id.*

24

25   _____

26        [8] *Fyock* squarely rejects Plaintiffs' argument, on which they heavily relied at the hearing, that
27   the Attorney General can rely only on evidence that the California legislature considered when it
     passed the AWCA.

28

1    Here, in conformity with the "unanimous weight of circuit authority analyzing

2  Second Amendment challenges to similar laws," the Court concludes that there is a

3  reasonable fit between the AWCA and California's public safety interests.  *See Worman*,

4  922 F.3d at 39.   The Attorney General provides ample evidence to establish a reasonable

5  fit between the AWCA and California's public safety interest.

6    For example, in passing the federal assault weapons ban, Congress found that

7  "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal

8  gangs, hate groups, and mentally deranged persons bent on mass murder."  (H.R. Rpt. No.

9  103-489 at 13.)  Indeed, as justification for the federal ban, the Director of the ATF noted

10  that assault weapons are disproportionately used in crimes.  (*Id.* at 13; *see also* Giffords

11  Mem. at 6–7, Doc. 81-1.)  In enacting the AWCA, California made similar findings, noting

12  the alarming rate of drive-by shootings in Southern California, the number of police-

13  officer victims of semi-automatic weapons, and the many occasions when semiautomatic

14  weapons are confiscated during arrests.  *See Kasler v. Lockyer*, 23 Cal. 4th 472, 482 (2000)

15  (citing 1 Assem. J. (1989–1990 Reg. Sess.) at 437).

16    The California legislature was particularly concerned with semiautomatic rifles' use

17  in mass shootings.  (*See* S.B. 880 Report at 3, 7–8.)  The analysis by the Attorney

18  General's expert, Lucy Allen,[9] shows that, of 109 public mass shootings examined, an

19  assault rifle was used in 26 of them.  (*See* Ex. 6 to Chang Decl., Doc. 76-6.)  Further, in the

20  public mass shootings where an assault rifle was utilized, there were twice as many

21  fatalities (12 with assault rifles, 6 without any assault weapon), and six times as many

_____

23    [9] Plaintiffs challenge the reliability of Allen's analysis.  (Plaintiffs' Opp. at 20–21.)  First,

24  other courts have rejected similar challenges to Allen.  *See, e.g.*, *Kolbe v. O'Malley*, 42 F. Supp.
3d 768, 781 & n.17 (D. Md. 2014) ("To the extent the plaintiffs challenge Allen's reliance on the

25  Mother Jones data, their challenge must fail. . . . [T]he data was subject to independent review by
Koper and his graduate student."), *aff'd by Kolbe*, 849 F.3d 114.  Second, even if the Court were

26  to disregard Allen's analysis, the Attorney General, amici, and relevant caselaw provide more than

27  enough other evidence to show that assault weapons are often used in mass shootings and, when
they are used, there are more injuries and casualties.

28

injuries (30 with and 5 without).  (*Id.*)  Everytown for Gun Safety's amicus brief notes

similar findings: "[W]hen assault weapons are used, more than twice as many people are

killed on average (10.1 per shooting versus 4.9) and more than ten times as many are shot

and injured (11.4 per shooting versus 1.1)."  (Everytown Mem. at 16, Doc. 82-1 (citing

Everytown, *Mass Shootings in the United States: 2009-2016*, Appendix (Mar. 2017)).)

Moreover, Everytown points to a study finding that "between 1981 and 2017 . . . assault

weapons accounted for 86% of the 501 fatalities reported in 44 mass-shooting incidents."

(*Id.*  at 19 (citing Charles DiMaggio et al., *Changes in U.S. Mass Shooting Deaths

Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source

Data*, 86 J. of Trauma and Acute Care Surgery 11, 13 (2018))).[10]  Other courts have noted

that semiautomatic weapons are often used in mass shootings and that, when they are, such

shootings are deadlier.  *See, e.g.*, *Worman*, 922 F.3d at 39 (" . . . AR-15s equipped with

[large-capacity magazines] have been the weapons of choice in many of the deadliest mass

shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018),

Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and

Aurora (2012)."); *see also Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018)

("[W]hen 'assault weapons and large capacity magazines are used, more shots are fired

and more fatalities and injuries result than when shooters use other firearms and

magazines.'")

  The increased casualty rate is likely due, at least in part, to the fact that "[g]unshot

wounds from assault rifles, such as AR-15s and AK-47s, tend to be higher in complexity

with higher complication rates than such injuries from non-assault weapons, increasing the

likelihood of morbidity in patients that present injuries from assault rifles." (Ex. 4 to

Chang Decl. at 3, Doc. 76-4; *see* Everytown Mem. at 18 ("[Assault weapons] are designed

---

[10] The Brady Center also notes that mass shootings "carry tremendous social and economic
costs, incurred by both individuals and taxpayers."  (Brady Mem. at 14–18, Doc. 97-1.)

1   to fire far more bullets, at a far faster rate than other firearms, with each round from an

2   assault weapon having up to four times the muzzle velocity of a handgun round—and thus

3   able to inflict much greater damage.")[11]  Indeed, assault rifle rounds can penetrate the soft

4   body armor worn by police that is designed to stop common handgun rounds.  (Plaintiffs'

5   Response to AG's SUF ¶ 33.)

6          Plaintiffs argue that none of the challenged features that bring a firearm within the

7   AWCA's scope—pistol grips, non-fixed magazines, thumbhole stocks, folding or

8   telescoping stocks, and flash suppressors—have "any effect on the power of the projectile

9   it discharges and thus the trauma that projectile causes on impact."  (Plaintiffs' Opp. at 20.)

10  Plaintiffs miss the point—the enumerated features increase the capabilities of

11  semiautomatic rifles and thereby enhance their capacity for mass violence.  A pistol grip

12  increases a shooter's ability to control the rifle and reload rapidly while firing multiple

13  rounds.  (Plaintiffs' Response to AG's SUF ¶¶ 16–18.)  The ability to accept detachable

14  magazines makes semiautomatic rifles "capable of killing or wounding more people in a

15  shorter amount of time."  (S.B. 880 Report at 6.)   Indeed, AR-platform rifles capable of

16  accepting detachable magazines take 3 to 5 seconds less to reload than the same rifle with

17  a fixed magazine.  (Plaintiffs' Response to AG's SUF ¶ 15.)  The Attorney General's

18  expert notes that "[a]djustable stocks also contribute to the control of the rifle in that they

19  allow the shooter to optimize the rifle to their arm length."  (*See* Mersereau Report ¶ 10,

20  Ex. 3 to Chang Decl., Doc. 76-3.)  "This increases the shooter's ability to rapidly send

21  rounds down range with increased accuracy."  (*Id.*)  Further, the shorter the rifle, the easier

22  it is to conceal, as might be necessary to gain access to areas where a shooter wishes to

23  inflict mass violence, such as a school or concert.  Thus, the AWCA understandably bans

24

---

25          [11] Plaintiffs argued at the hearing, with no evidentiary support, that shots fired from
    semiautomatic rifles are no more powerful than shots fired from standard rifles. However, even
26  assuming Plaintiffs' unsupported assertion is correct, as the above-quoted passage from
    Everytown's brief notes, semiautomatic weapons fire more bullets at faster rates, and thus inflict
27  greater and more complex damage than a standard rifle.

28

20

1    semiautomatic rifles under 30 inches in length, and folding stocks that allow individuals to

2    collapse the weapon to a shorter length.  Finally, flash suppressors reduce the flash emitted

3    upon firing and aid a shooter in low-light conditions while also concealing his or her

4    position, especially at night.   (Plaintiffs' Response to AG's SUF ¶¶ 22–24.)

5            Further, bans on assault weapons appear to be effective means for reducing

6    violence.  For example, during the period in which the federal assault weapons ban was in

7    effect, Plaintiffs' own expert admits that the use of assault weapons in crimes was reduced.

8    (*Id.* ¶ 38.)  Plaintiffs dispute the efficacy of the federal assault weapons ban by pointing to

9    a 2004 study commissioned by the U.S. Department of Justice which found that, ten years

10   after the law was enacted, "there [had been] no discernible reduction in the lethality and

11   injuriousness of gun violence."  (*See* Koper 2004 Study, Ex. 25 to Brady Decl. at 96, Doc.

12   78-11.)  However, as the Attorney General notes, Plaintiffs conveniently exclude the

13   disclaimer at the beginning of the study: "it is premature to make definitive assessments of

14   the ban's impact on gun crime."  (*Id.* at 2 (capitalization removed).)  Further, immediately

15   following the sentence cited by Plaintiffs, the study notes that "the grandfathering

16   provision of the [federal ban] guaranteed that the effect of this law would occur only

17   gradually over time."  (*Id.* at 96.)  Thus, the "effects are still unfolding and may not be

18   fully felt for several years into the future."  (*Id.*)  Indeed, the 2004 study's principal author,

19   Christopher Koper, published an updated study in 2017.  (Koper 2017 Study, Ex. 23 to

20   Chang Decl., Doc. 76-23.)  The updated study confirmed that the criminal use of assault

21   weapons and large-capacity magazines declined during the years of the federal ban and

22   increased after its expiration in 2004.  (*Id.* at 8–9.)  Koper concluded that "the federal ban

23   curbed the spread of high-capacity semiautomatic weapons when it was in place, and in so

24   doing, may have had preventive effects on gunshot victimization."  (*Id.* at 9; *see also* Ex.

25   26 to Chang Decl. at 1, Doc. 76-26 ("'I was skeptical that the [federal] ban would be

26   effective, and I was wrong,' said Garen Wintemute, head of the Violence Prevention

27   Research Program at the University of California at Davis School of Medicine.  The

28

database analysis offers 'about as clear an example as we could ask for of evidence that the

ban was working.'").)  Indeed, *Worman* noted studies finding that "the majority of

individuals who have perpetrated mass shootings obtain their semiautomatic assault

weapons legally," suggesting that a "law proscribing semiautomatic assault weapons . . .

will help curtail outbreaks of mass violence."  *Worman*, 922 F.3d at 40 (citing Larry

Buchanan et al., *How They Got Their Guns*, N.Y. Times (updated Feb. 16, 2018),

https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-

guns.html; Mayors Against Illegal Guns, Analysis of Recent Mass Shootings (2013)).

        In short, the Attorney General has more than met his burden to show that there is a

reasonable fit between the AWCA and protecting public safety.  Plaintiffs do not truly

dispute any of the Attorney General's evidence, nor do they even attempt to distinguish the

AWCA from the laws upheld by other circuits.  Instead, they argue that California cannot

"isolate" the rifles within the AWCA's scope as the "culprit" for mass shootings and

higher casualty counts.  (Plaintiffs' Opp. at 21.)  However, the Court is "weighing a

legislative judgment, not evidence in a criminal trial."  *See Pena v. Lindley*, 898 F.3d 969,

979 (9th Cir. 2018).  Even assuming there is not direct *causal* evidence between mass

shootings and higher casualty rates and rifles within the scope of the AWCA, California is

entitled to make "reasonable inferences" from the available data that shows a correlation.

*See Worman*, 922 F.3d at 40.  Indeed, Plaintiffs' expert admits the obvious—that "a

correlation between the use of assault weapons and the number of victims injured or

killed" makes it "[m]ore likely" that there is a causal relationship.  (*See* Kleck Deposition

at 159:15–16, Ex. 15 to Chang Decl., Doc. 76-15.)

        More fundamentally, Plaintiffs argue that California is "depriving the public of

more accurate rifles that are easier to control."  (*See, e.g.*, Plaintiffs' Opp. at 15.)  Plaintiffs

miss the point.  As discussed throughout, that the rifles are more accurate and easier to

control is precisely why California has chosen to ban them.  Semiautomatic rifles with

non-fixed magazines, along with the other enumerated features, are incredibly effective

killing machines, and the Attorney General's evidence strongly suggests that such weapons are disproportionately used in mass shootings and that, when they are used, more people are injured and killed.  To be sure, Plaintiffs may have legitimate interests in possessing semiautomatic rifles within the AWCA's scope.  However, California has permissibly weighed those interests against the weapons' propensity for being used for mass violence and concluded that the weapons' lawful value is drastically outweighed by the danger they pose to California citizens.

Accordingly, the Court concludes that the AWCA withstands intermediate scrutiny.

## V. __CONCLUSION__

For the foregoing reasons, the Court GRANTS the Attorney General's Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment.  The Attorney General is ORDERED to submit a proposed judgment no later than five (5) days from the date of this Order.

Dated: July 22, 2019

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE