UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

| | | |
|---|---|---|
| STEVEN RUPP, ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| vs. | ) | SACV NO. 17-00746-JLS |
| | ) | |
| XAVIER BECERRA, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 31, 2019

10:57 A.M.

DEBORAH D. PARKER, CSR 10342
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
411 WEST FOURTH STREET
SUITE 1-053
SANTA ANA, CALIFORNIA 92701
(657) 229-4305
transcripts@ddparker.com

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFFS, STEVEN RUPP, ET AL.:

                    SEAN A. BRADY
                    MICHEL & ASSOCIATES, P.C.
                    180 EAST OCEAN BOULEVARD
                    SUITE 200
                    LONG BEACH, CALIFORNIA 90802
                    (562) 216-4444
                    sbrady@michellawyers.com


    FOR THE DEFENDANTS, XAVIER BECERRA, ET AL.:

                    PETER H. CHANG
                    CAAG - OFFICE OF THE ATTORNEY GENERAL
                    CALIFORNIA DEPARTMENT OF JUSTICE
                    455 GOLDEN GATE AVENUE
                    SUITE 11000
                    SAN FRANCISCO, CALIFORNIA 94102
                    (415) 510-3776
                    peter.chang@doj.ca.gov

                    JOHN D. ECHEVERRIA
                    OFFICE OF THE ATTORNEY GENERAL
                    300 SOUTH SPRING STREET
                    SUITE 1702
                    LOS ANGELES, CALIFORNIA 90013
                    (213) 897-4902
                    John.Echeverria@doj.ca.gov

**SANTA ANA, CALIFORNIA; FRIDAY, MAY 31, 2019; 10:57 A.M.**

THE CLERK:  Calling Calendar Item No. 3.

SACV 17-00746-JLS, Steven Rupp, et al., versus Xavier

Becerra.

Counsel, once you get situated, please, state your

appearances for the record.

MR. BRADY:  Good morning, Your Honor.

Sean Brady, on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. CHANG:  Good morning, Your Honor.

Peter Chang, on behalf of defendant Becerra.

MR. ECHEVERRIA:  Good morning, Your Honor.

John Echeverria for the defendant.

THE COURT:  Good morning.

All right.  We are here on the cross-motions for

summary judgment, and I will just hear from the parties.

I'll just give you a few minutes to be heard.  If

I have any questions to ask, I will jump in with those.  But

on summary judgment motions, I just want you to have an

opportunity to highlight whatever you think maybe wasn't

clear in your brief or what you think the high points of

your briefing would be.

And we'll begin with the plaintiff.

MR. BRADY:  Thank you, Your Honor.

This case is about whether the Government can ban

*Deborah D. Parker, U.S. Court Reporter*

10:59:01  1  an extremely popular class of firearms by merely declaring

2  them dangerous assault weapons and then, when challenged on

3  that designation, justify it with evidence gathered by third

4  parties *post hoc* that arguably show that those firearms can

10:59:20  5  result in slightly more casualties when used in an

6  exceedingly rare type of criminal attack:  A public mass

7  shooting.

8          The answer to whether the Government can do that,

9  Supreme Court precedent tells us is no.  And that's because

10:59:35  10  the tests that the *Heller* court laid out is that arms that

11  are typically possessed by law-abiding people for lawful

12  purposes are protected under the Second Amendment.  What

13  that means is, while they can be right, those arms that

14  qualify under that --

10:59:50  15          THE COURT:  Specifically, in that case, they were

16  talking about handguns, right?

17          MR. BRADY:  Indeed.

18          THE COURT:  But the common -- and they referenced

19  them as being "the most commonly used and preferred method

11:00:04  20  of self-defense in the home."

21          MR. BRADY:  Correct.

22          THE COURT:  Okay.  And they also distinguished

23  that from weapons that might be considered dangerous but

24  ones that they described as like military weapons, correct?

11:00:20  25          MR. BRADY:  Correct.  There was dicta, if you

11:00:24  1   will, about an M16 machine gun that's used by the military

2   that could conceivably be outside of the Second Amendment.

3   It suggested that there are arms that will be dangerous and

4   unusual, I assume, a rocket-propelled grenade or grenades or

11:00:40  5   that sort.  Because they are inherently dangerous, they can

6   explode.  They can accidentally kill just by having them.

7        The sort of arms, I believe, that the *Heller* court

8   was referring to, if you look at the *Staples* case, the

9   Supreme Court has expressly distinguished between the M16

11:00:58  10  and the AR-15 in this very fashion.

11       Now, they weren't -- this was pre-*Heller*, so they

12  weren't discussing it in the context of:  Is it

13  Second-Amendment protected?  But I think it's very telling

14  that the Supreme Court expressly distinguished the AR-15 as

11:01:14  15  so different from the M16 that -- *mens rea* that the gun was,

16  you know, problematic, was criminal to possess, could not be

17  inferred.  I think that that, basically, says that there is

18  such a distinction between these two types of guns that they

19  cannot be assumed to be the same.

11:01:32  20       THE COURT:  That was a very different context

21  though, wasn't it, that case?

22       MR. BRADY:  It is, but I think that -- you know,

23  because they are so -- you know, if the Court is going to

24  say that you cannot infer criminal intent -- that if it was

11:01:45  25  a machine gun, if it was an M16, the possessor should

| | | |
|---|---|---|
| 11:01:49 | 1 | know -- they should be on notice that it was a bad -- that |
| | 2 | it was a criminal gun [sic]. |
| | 3 | THE COURT:  In criminal cases, we have very |
| | 4 | different kinds of standards that are applied in deciding |
| 11:01:59 | 5 | whether you can hold someone criminally liable, correct? |
| | 6 | MR. BRADY:  Of course.  Yes.  I'm not trying to |
| | 7 | say that the standards are the same.  What I'm getting at is |
| | 8 | that in that case the Court made the distinction between the |
| | 9 | two that said they cannot -- they are apples and oranges and |
| 11:02:16 | 10 | went so far as to say that they are common -- that they're |
| | 11 | the civilian version of that rifle and that they have been |
| | 12 | lawfully owned -- generally lawfully owned. |
| | 13 | And I think it's telling that -- the author of |
| | 14 | that opinion, Justice Thomas, wrote a dissent to the |
| 11:02:33 | 15 | rejection of the *Freeman v. Highland Park* case which was, |
| | 16 | essentially, involving this very same issue -- a challenge |
| | 17 | to, essentially, the same type of law.  And Justice Thomas |
| | 18 | laid out his opinion that these types of rifles are |
| | 19 | protected by the Second Amendment. |
| 11:02:51 | 20 | Now, that doesn't -- you know, that's obviously |
| | 21 | not binding authority on this Court, but it goes to show you |
| | 22 | where Justice Thomas was in writing the *Staples* opinion and |
| | 23 | where he's at on this issue. |
| | 24 | So, on that point as to -- I think it's crucial |
| 11:03:07 | 25 | for the Court to understand that the plaintiffs do not need |

*Deborah D. Parker, U.S. Court Reporter*

11:03:12   1   to prove that these firearms are not dangerous or unusual.

2   The burden is wholly on the State to make that case, and

3   that's because *Heller* says that bearable arms are

4   *prima facie* protected by the Second Amendment.  And *Heller*

11:03:30   5   defines "bearable arms," "as" a weapon of offense or thing

6   that a man wears for his defense or takes into his hands

7   that is carried for the purpose of offensive or defensive

8   action."  Rifles of any sort necessarily meet that

9   definition of "bearable arms."

11:03:47   10          THE COURT:  Would a grenade?

11          MR. BRADY:  Yes, it would, but that's my point.

12   It would meet that definition.  And it is protected.  And

13   then it is the State's burden to show that they are

14   dangerous and unusual.  I think the State wouldn't meet its

11:04:00   15   burden to say that a grenade is dangerous and unusual,

16   because you can't go to Big Five, or Turner's, or Wal-Mart

17   and buy grenades.  I don't know anybody who owns grenades.

18          The evidence shows that you can -- or prior to

19   this law, you could go to Big Five, Wal-Mart, places to buy

11:04:17   20   these very rifles, but they are owned by the millions; that

21   there are --

22          The world series of shooting sports, if you will,

23   involves these very rifles.  These are not grenades.  These

24   are the most popular rifle [sic] in the country.  The

11:04:33   25   evidence -- the State's suggestion -- and I think it's

11:04:36   1    another crucial point to understand the evidence here

  2    that -- that --

  3         The State says*, Assault weapon registration*

  4    *numbers are the right number to look at in determining*

11:04:51   5    *commonality.* That is -- I'm sorry. I don't want to, you

  6    know, lose decorum. But it strains credulity to even

  7    suggest that that is a proper number, in light of the fact

  8    that there's been an Assault Weapon Control Act in place for

  9    30 years that people were able to modify their rifles so

11:05:09 10    that they didn't have to register them. People could take

11    them out of state. There was a -- it is known that there

12    was very low compliance with the registration rate for

13    people, not because they are scofflaws but out of ignorance

14    that they even had to register.

11:05:25 15         You have no idea how many people come into our

16    office saying, *Oh, I got arrested for having this assault*

17    *weapon. They told me I had to register it. I didn't know*

18    *that.*

19         So the suggestion that the California registration

11:05:36 20    numbers are a better barometer of the popularity to these

21    rifles is a farce. And the far better number is to look at

22    Professor English, plaintiffs' expert's, report where he

23    lays out industry reports and surveys where it shows up to

24    90-some percent of gun dealers sell these rifles, out of a

11:06:04 25    survey of 260 of them and that about half of hunters and

11:06:09  1    sport shooters were –– said that they own these rifles.

2           THE COURT:  Does it have –– is it just popularity,

3    in general?  Or is it popular use for self-defense in the

4    home?

11:06:20  5           MR. BRADY:  I think that self-defense is a

6    critical component.  You know, the *Heller* court says "lawful

7    purposes."  It doesn't specify self-defense, but

8    self-defense is certainly at the core.

9           And so, while a gun, say, an Olympic-style pistol

11:06:36 10  that wouldn't be used for self-defense may meet –– may have

11   some Second Amendment protection because it's used for

12   lawful purposes, I think that the Government's burden to

13   justify a restriction on an arm of that sort would be far

14   lower than an arm that is typically possessed for

11:06:53 15  self-defense.

16          And the evidence, again, shows that these arms are

17   indeed owned for self-defense.  The surveys that ––

18          THE COURT:  Is there any showing that they're,

19   typically, used in self-defense?

11:07:08 20          MR. BRADY:  Your Honor, I think that –– are you ––

21   when you say "used," are you ––

22          THE COURT:  People can own –– I understand that

23   what you might say is that there's some evidence that people

24   who purchase them, purchase them for purposes of

11:07:23 25  self-defense; that you can find people who do that.  And

10

| | |
|---|---|
| 11:07:26 | 1 |

your argument would be:  They're in large number.

2          What if the evidence were to reflect -- I'm not

3    sure how relevant this is.  I'm simply asking the question:

4    What if the evidence were to reflect that these are not

11:07:42  5    weapons that are useful in self-defense?  Because of the

6    nature of the weapon that it's most useful in military kind

7    of operation or using when you're, you know, out on a

8    killing field.  And it's not the most useful weapon or a

9    useful weapon or as useful of others for self-defense.

11:08:03  10          Do I look at what do people say they're buying it

11    for when they buy it, as opposed to what is -- whether it

12    really can be used effectively for self-defense in the home?

13    Or whether the legislature decided -- made that decision,

14    right?

11:08:18  15          I mean, if we get out -- there are two questions,

16    right?  Does it fall within the scope of the

17    Second Amendment?  And you disagree on that.  The defendants

18    argue that because this is most useful in military

19    circumstances that under *Heller*, it is not covered by the

11:08:38  20    Second Amendment.  It's outside the scope.

21          And then, the second argument is:  Okay.  Let's

22    assume that that is incorrect and that it is within the

23    scope of the Second Amendment.  Then, we look at the

24    intermediate scrutiny level.  There's no disagreement as to

11:08:57  25    that level of scrutiny, correct?

*Deborah D. Parker, U.S. Court Reporter*

11:08:59  1          MR. BRADY:  I would suggest that there is, but I

2    don't think it matters.  I don't even think you need to get

3    to the intermediate scrutiny standard, because it is a ban.

4    We're not talking about a regulation.

11:09:08  5          So once you meet the first step of *Chovan*; that

6    these rifles meet -- that they are protected by the Second

7    Amendment, what good is Second Amendment protection, if you

8    can then go and ban them?

9          THE COURT:  I'm not sure that that's consistent

11:09:23 10   with the facts or with the law.  Let's just assume that this

11   Court is going to use an intermediate scrutiny level that

12   doesn't treat this as an entire ban that is per se violative

13   of the Second Amendment and that the Court will actually

14   apply a level of scrutiny.

11:09:40 15          MR. BRADY:  Sure.

16          THE COURT:  And that that would be intermediate.

17          Then, if the legislature has made -- I'm just sort

18   of moving this on to the next argument, because I want to

19   make sure I have time to hear from both sides, and I've read

11:09:50 20   the papers.

21          If the legislature has decided that based on the

22   evidence before it in promoting general safety of all of its

23   citizens that a ban on these kinds of weapons -- ones that

24   have been used in mass shootings and are very effective in

11:10:13 25   mass shootings -- it's in the interest to -- not to allow

*Deborah D. Parker, U.S. Court Reporter*

11:10:16  1  the possession of those in the way that the law limits it.

2  Obviously, there's grandfathering.  There are other things.

3  But if the legislature has made that determination, tell me

4  why the Court should reject that.

11:10:32  5      MR. BRADY:  Sure.  As an initial point, the

6  legislature considered hardly any evidence in passing the

7  Assault Weapon Control Act, initially, and then it only

8  amended it to go after additional firearms when they

9  realized that their first iteration didn't cover the

11:10:50 10  firearms they wanted to, because, frankly, they don't know

11  how to write this law.  They don't know what they want.

12  They just know that they want a law that goes after

13  scary-looking guns.

14      So that's why I said in my opening statement that

11:11:02 15  they are justifying this law *post hoc* with evidence gathered

16  by third parties.  And the reason this Court should reject

17  that evidence that the State puts forth -- not that the

18  legislature considered but that the State puts forth to

19  *post hoc* justify the legislature's decision to ban these

11:11:22 20  firearms, is because the evidence is unreliable.  And

21  we've -- I don't want to go into the *Daubert* motions that

22  plaintiffs filed.  We can consider those later if they come

23  up, but I think in those motions you will see -- and we've

24  laid it out in these papers on a more limited basis.

11:11:39 25      You can put their evidence -- the State's evidence

*Deborah D. Parker, U.S. Court Reporter*

11:11:42  1   into four categories.  One of which is Dr. Colwell, the

2   expert who says that assault weapons cause worse injuries

3   and more injuries.  He is --

4           It is objectively unequivocally erroneous that

11:12:02  5   assault weapons cause a worse injury.  Nothing -- an

6   "assault weapon" is a technical term, right?

7           It is defined by a pistol with an adjustable stock

8   and a flash suppressor.  The undisputed evidence shows that

9   not one of those features has any effect on what a bullet

11:12:20 10   does when it leaves the rifle.  So if you take the pistol

11   grip off, you have a fixed stock.  You don't have a flash

12   suppressor.  You have the same rifle with the same barrel

13   length shooting the same ammo.  The identical wound results.

14           So it is -- it is unobjectively false to say that

11:12:33 15   assault weapons cause worse wounds.  Now, he moves on and

16   says, *Well, it's not just the individual wound*.  That's what

17   the State argues.  It is that they are able to produce

18   multiple of these wounds.

19           Well, in Dr. Colwell's testimony, he explained

11:12:50 20   that he could not say at what rate an assault weapon fires.

21   He can't say -- so he's basing on an assumption of technical

22   knowledge that he can't -- that he doesn't have, frankly.

23   He admits he has no technical knowledge of firearms.  He

24   can't say how rapidly rounds were fired just by looking at

11:13:11 25   wounds.  I think it's very telling that he was --

14

11:13:13  1          By the way, Dr. Colwell is a great man, a hero,

2     and I wish there were more of him in the work that he does;

3     but, frankly, he doesn't know what he thinks he knows in

4     this regard.  He's basing his entire premise that assault

11:13:28  5     weapons cause worse injuries on being told by a third

6     party -- by officers, usually, or the victim -- that

7     somebody shot -- the victim was shot with an assault weapon.

8     And he's -- from memory, over 30 years or so of practicing,

9     he's saying, *Yeah, I've been told, and I sort of noticed*

11:13:45  10    *that when people say they've been shot by assault weapons*

11    *that the wounds tend to be worse.*

12          That's just unreliable.  That's not scientific,

13    Your Honor.  It cannot be relied upon, especially when he

14    doesn't have the technical background.  So that's just the

11:14:03  15    wounding.

16          Then, you get to the very -- you know, the

17    argument from Lucy Allen that when assault rifles are used

18    in a mass shooting, that casualty rates go up.  Her analysis

19    where she says "Assault rifle shootings includes victims who

11:14:20  20    were shot" -- admittedly, in her deposition -- "were shot by

21    handguns, or shotguns, or non-assault weapon."

22          If a shooting used multiple firearms --

23          For example, the Aurora, Colorado shooting, the

24    shooter used an assault rifle, a shotgun and a pistol.  She

11:14:37  25    includes all of those victims in her assault rifle casualty

*Deborah D. Parker, U.S. Court Reporter*

11:14:44  1  counts.  That evidence is completely unreliable, just based

2  on that alone.

3          Setting aside the fact that the State's own

4  expert, Mike Mesereau, says that you have to have expert

11:14:54  5  knowledge of assault weapons in order to identify them --

6  and Lucy Allen has not indicated she has any background in

7  identifying technical firearms, let alone assault weapons,

8  so her entire analysis is unreliable.

9          Then we get to my favorite, Professor Donahue,

11:15:16 10  who -- if you read Professor Donahue's report -- and I

11  invite the Court to read it and pay attention to how it's

12  written and what he relies on -- it is not an expert report.

13  It is a legal brief.  He is literally making the case for

14  why assault weapon bans are good.  He is not objectively

11:15:39 15  evaluating anything.  And I think, just to give a prime

16  example of his 50-page report that I could go through and

17  bore the Court with every little detail on it, but --

18          THE COURT:  No, please.

19          MR. BRADY:  -- I will not --

11:15:51 20          THE COURT:  I have all the papers, so just

21  highlight -- I'm going to give you a few more minutes.

22          MR. BRADY:  Sure.  I just think it's very telling

23  that Professor Donahue has a section in his report where he

24  says, "Law enforcement and military support for assault

11:16:04 25  weapon bands," and then he cites to two individuals who

*Deborah D. Parker, U.S. Court Reporter*

11:16:09 1 support assault weapon bans:  One was a former military

2 officer turned U.S. Attorney.

3           What possible relevance does that have for an

4 expert?  That's the stuff of a State making an argument in a

11:16:25 5 brief, not an expert providing insight as to the credibility

6 of evidence.  Not to mention, you know, his initial findings

7 on gun ownership rates, which I don't even think it's

8 relevant here, but it's relevant to show that he's

9 unreliable because it's based on material he put together

11:16:51 10 three years ago.  He purports to opine on current rates of

11 gun ownership, and he's relying on material he put together

12 many years ago.  And then when confronted with, *Well, did*

13 *you consider this survey -- this more recent survey that you*

14 *cite in another part of your motion for another proposition?*

11:17:10 15 And he says, *No.*  And his excuse is, *Oh, that's old*

16 *material.  I didn't bother looking at updated things.*

17           That means he's either unreliable or he is biased

18 and trustworthy.  And I personally think it's both, frankly.

19 So that's their evidence.

11:17:29 20           Their other experts, Blake Graham and Michael

21 Mesereau, all they simply do is agree with our self-defense

22 experts that the features that are being restricted make a

23 firearm more user-friendly, more controllable and more

24 accurate.  They just think that that's a bad thing.  And I

11:17:51 25 don't --

11:17:51  1    I don't see how the State can say that people

2    should have less controllable, less accurate firearms in the

3    hopes that we might make a mass shooter less capable of

4    creating casualties.  I mean, think about that.  That would

11:18:12  5    be like saying, *Oh, we have to not allow adjustable seats in*

6    *a car so that the getaway driver, you know, has a tougher*

7    *time getting away from the bank.*  It's ––

8    Quite frankly, I'm trying to take this seriously.

9    The State's law is an unserious response to a very serious

11:18:35 10    issue and they cloak it in, you know, this facade that they

11    have evidence supporting this restriction, and they simply

12    do not.  The evidence that they've put forth is, frankly,

13    inadmissible, most of it.  And all it does show from their

14    two guys who don't have a clue about guns is that these guns

11:18:56 15    work good and that people should not have guns that work

16    good.

17    I would like to just close by saying that when the

18    the State –– all of the State's arguments that rely on

19    assault weapons being used disproportionately in particular

11:19:14 20    crimes, they should be barred from making that argument.

21    They put forth in discovery that's in the record that they

22    have no idea how many of these firearms are out there, and

23    they do not have sufficient material to even make an

24    estimate.  And, yet, they're able to figure out whether

11:19:31 25    these arms are disproportionately used or not.  You have to

*Deborah D. Parker, U.S. Court Reporter*

11:19:35  1   know the amount before you can say something is

2   disproportionate, right?

3           So unless Your Honor has any other questions --

4           THE COURT:  I don't have any other questions.

11:19:44  5   Thank you.

6           MR. CHANG:  Good morning --

7           THE COURT:  And since you each have -- you're each

8   filing cross-motions, I'm just going to hear from each side

9   once.  There's no burdens that are greater on one side than

11:20:01 10   the other, necessarily.

11          So go ahead.

12          MR. CHANG:  Yes, Your Honor.

13          I think it's significant in this case that the

14   plaintiffs has not addressed or attempted to distinguish

11:20:15 15   this case from the five Circuit Court decisions that have

16   upheld assault weapons bans in other -- in other

17   jurisdictions.

18          The uniform weight of the Circuit Court decision

19   is that assault -- States may restrict assault weapons,

11:20:34 20   including assault rifles.  The Fourth Circuit in *Kolbe* even

21   went so far as to hold that assault weapons are not within

22   the scope of the Second Amendment, because it is like the

23   M16, a weapon most useful in the military.

24          And I think the -- it's also significant to

11:20:56 25   establish clearly what the legal standard is, under an

| | | |
|---|---|---|
| 11:21:00 | 1 | intermediate scrutiny for the Court's review.  The Court -- |
| | 2 | and the Ninth Circuit made this very clear in the *Peña* |
| | 3 | case.  The Court is not to weigh evidence as in a criminal |
| | 4 | trial.  Instead, what the Court is looking for is whether |
| 11:21:15 | 5 | the State has put forward evidence that fairly supports the |
| | 6 | legislature's judgment as to how the law could further the |
| | 7 | public interest in public safety. |
| | 8 | THE COURT:  So if the legislature expressed its |
| | 9 | judgment as to how it would further public safety but |
| 11:21:36 | 10 | there's not evidence in the -- in the record that the |
| | 11 | legislature had all the evidence that you're presenting now |
| | 12 | in front of it at the time, does that mean that I disregard |
| | 13 | the evidence that you are providing now? |
| | 14 | MR. CHANG:  No, Your Honor. |
| 11:21:49 | 15 | And this was addressed squarely by the |
| | 16 | Ninth Circuit in *Peña*.  The Court said there that |
| | 17 | *Legislatures are not required to put together a record of* |
| | 18 | *everything it reviewed when it passes a law.* |
| | 19 | And, you know, for that reason, the Court |
| 11:22:06 | 20 | shouldn't just look to exactly what the legislature had |
| | 21 | looked at.  Instead, the Court may look at the statement put |
| | 22 | forward everything that it thinks that is relevant to the |
| | 23 | legislature -- you know, to the case and that these are |
| | 24 | legislative facts, not adjudicative facts. |
| 11:22:25 | 25 | But in any event, in this case, you know, we |

11:22:29  1    have -- the State has submitted an abundance of evidence to

          2    support its position.  But the legislature had also

          3    considered evidence when it passed the -- initially passed

          4    the AWCA in 1989, and also looked at additional evidence

11:22:46  5    every time it's been amended.  I believe that's also in the

          6    record.

          7           And so, while the parties, you know -- the State

          8    believes that, you know -- what the plaintiffs are asking

          9    for is for the Court to actually weigh the evidence, which

11:23:00 10    the Ninth Circuit said the Court shouldn't do and actually

         11    require the State to prove with scientific precision that

         12    the law actually enhances public safety or will actually

         13    enhance public safety and must be justified by a causal link

         14    that assault rifles cause harm.

11:23:24 15           And, you know, that's just not what the legal

         16    standard requires here.  But even under that standard, we

         17    believe that the State has put forward sufficient evidence

         18    that assault rifles do cause increased casualties when

         19    they're used in public mass shootings.  And that can be

11:23:43 20    clearly seen in Defendants' Exhibit 6, the data that has put

         21    been together by defendants' expert, Lucy Allen, who clearly

         22    had shown by the numbers that when -- in the case of public

         23    mass shootings, when there's no assault weapon, the

         24    large-capacity magazine used, you know, I believe it was

11:24:03 25    nine casualties on average per incident.

11:24:07  1        When you have assault weapons -- when you have --

2    just have large-capacity magazines, that number jumps up to,

3    I believe, 16.  And when you have assault weapons and

4    large-capacity magazines, that number jumps up even higher

11:24:23  5    to 41.  I think the record does show that assault weapons,

6    separate from large-capacity magazines, increases the number

7    of casualties.

8        And I want to say that the -- you know, the

9    plaintiffs -- I want to address a couple of things that the

11:24:44 10    plaintiffs have raised:  That the effect of the assault

11    rifle rounds that it causes when it's being used to shoot

12    someone, I don't believe that's actually -- I don't believe

13    there's an actual dispute about that, because plaintiffs'

14    own expert, the ballistic expert, Mr. Boone, testified that

11:25:10 15    the assault rifle rounds do cause more damage when

16    there's -- they're fired into a person, because the bullets,

17    themselves, they do more permanent damage because the bullet

18    actually rotates inside someone's body, and there's

19    tremendous cavitation that causes tissue [sic] beyond just

11:25:34 20    what the actual bullet penetrates.

21        And he also testified that, you know, in contrast

22    to a handgun round, that the assault rifle wounds -- wounds

23    caused by assault rifle rounds are much harder to repair.

24    Well, as with handgun rounds, physicians are -- it's much

11:25:55 25    easier for physicians to repair those wounds.

11:25:59  1          THE COURT:  I think -- and I may be wrong.  I

2    thought that the plaintiff was merely saying that assault

3    weapons that don't come within the scope of the band,

4    perhaps because they have a mixed magazine or something to

11:26:10  5    that effect, those don't cause any greater wounds or

6    different?

7          Am I mistaken in that?  Are you saying handguns

8    and assault weapons cause the same damage?

9          MR. BRADY:  No, you have it right, Your Honor.

11:26:23 10    The rifle -- comparing rifles and handguns is comparing

11    apples and oranges.  We're saying that the assault weapon

12    features have zero to do.  So their argument is against

13    rifles in general, not, you know, assault weapons.

14          MR. CHANG:  Thank you, Your Honor, for that

11:26:37 15    clarification.

16          In that case, then the difference is that the

17    assault weapons -- assault rifles with the features, while

18    they may cause the same damage as a hunting rifle, for

19    example, it's the fact that the features allow them to be

11:26:54 20    fired more rapidly and with more accuracy.  And evidence

21    does show that when assault rifles are used, more shots are

22    fired and more -- they're leading to more casualties.

23          Now, we think the Court could uphold the

24    challenged restrictions on assault rifles, based under

11:27:18 25    intermediate scrutiny.  As most other courts have done, we

*Deborah D. Parker, U.S. Court Reporter*

11:27:25  1   do also think that the evidence is also clear for the Court

2   to rule similarly to what the Fourth Circuit did in *Kolbe*

3   that assault rifles are simply outside the scope of the

4   Second Amendment.

11:27:38  5         The only difference between assault rifles, for

6   example, and the AR-15 that's restricted under the AWCA and

7   the M16, which is a machine gun, is that the M16 has the

8   ability to fire in semiautomatic mode and automatic mode,

9   which -- while the assault rifles can only fire in

11:27:58  10  semiautomatic mode but that difference -- there's,

11  essentially, very little difference.

12         Congress found, based on evidence, that the

13  semiautomatic weapons can be fired nearly as fast as

14  machine guns between 2- to 500 rounds per -- I believe it

11:28:19  15  was per minute.  And the military even instructs its

16  soldiers to normally deploy their M16s in a semiautomatic

17  configuration.

18         So there's -- while there is a technical

19  difference between the M16 machine gun and assault rifles,

11:28:39  20  that difference is for purposes of the Second Amendment and

21  for purposes in real-life applications, the State submits

22  that that purpose is inconsequential.

23         And, finally, if the Court has no more questions,

24  the State would ask that if the Court is considering

11:29:08  25  granting the plaintiffs' motion, that we would ask the Court

*Deborah D. Parker, U.S. Court Reporter*

11:29:11  1    to issue a stay at the same time it issues its decision so

2    there's not a mad rush for people to acquire these type of

3    weapons before -- and the stay can be eventually issued.

4              THE COURT:  All right.  Thank you.

11:29:28  5              I'll take the matter under submission.  And the

6    Court's ruling will be posted on the docket.

7              MR. CHANG:  Thank you, Your Honor.

8              Yes.  And the parties would like to jointly

9    request that the Court vacate the remaining dates on the

11:29:42  10   schedule.  I believe there's a motion for *in limine*,

11   pretrial conference and also the hearing notice for the

12   plaintiffs' *Daubert* motions, until the Court has resolved

13   the parties' cross-motions.

14             THE COURT:  I often don't do that; but in this

11:29:58  15   case, I will.  I think under the circumstance of

16   cross-motions here and the level of preparation, et cetera,

17   it makes sense to vacate the dates pending the Court's

18   resolution, depending upon the Court's resolution.

19             Then, what I will also order is that within 10

11:30:20  20   days of the Court's determination on a motion, to the extent

21   that any claim remains viable in terms of moving forward in

22   this Court, that the parties file a joint report

23   recommending new dates, all right?

24             MR. CHANG:  Thank you, Your Honor.

11:30:40  25             THE COURT:  Thank you.

*Deborah D. Parker, U.S. Court Reporter*

11:30:41  1          THE CLERK:  All rise.

2          *(At 11:30 a.m., proceedings were adjourned.)*

3

4                        -oOo-

11:30:41  1                        CERTIFICATE

          2            I hereby certify that pursuant to Section 753,

          3   Title 28, United States Code, the foregoing is a true and

          4   correct transcript of the stenographically reported

11:30:41  5   proceedings held in the above-entitled matter and that the

          6   transcript page format is in conformance with the

          7   regulations of the Judicial Conference of the United States.

          8

          9   Date:  October 27, 2019

11:30:41 10

         11

         12                        _____
                                   /s/DEBORAH D. PARKER
                                   DEBORAH D. PARKER, OFFICIAL REPORTER
         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

*Deborah D. Parker, U.S. Court Reporter*