1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   CHRISTINA R.B. LÓPEZ
4  Deputy Attorneys General
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3479
     Fax:  (415) 703-1234
8    E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity as Attorney General of the*
   *State of California*
10

11            IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14

15  **STEVEN RUPP; STEVEN**          Case No. 8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**               **DEFENDANT'S MEMORANDUM**
    **CHRISTOPHER SEIFERT;**         **OF POINTS AND AUTHORITIES**
17  **ALFONSO VALENCIA; TROY**       **IN SUPPORT OF MOTION FOR**
    **WILLIS; and CALIFORNIA RIFLE** **SUMMARY JUDGMENT**
18  **& PISTOL ASSOCIATION,**
    **INCORPORATED,**               Date:        July 28, 2023
19                                  Time:        10:30 a.m.
                        Plaintiffs,  Courtroom:   8A
20                                  Judge:       Hon. Josephine L. Staton
         **v.**                      Trial Date:  None set
21                                  Action Filed: April 24, 2017

22  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
23  **California; and DOES 1-10,**

24                       Defendants.

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................... 1

Background ...................................................................................................... 4

    I.     The Assault Weapons Control Act ..................................................... 4

    II.    Procedural History .............................................................................. 6

Legal Standard ................................................................................................ 7

Argument ......................................................................................................... 7

    I.     Plaintiffs Cannot Show that the AWCA Burdens Conduct Covered by the Plain Text of the Second Amendment ....................... 9

          A.    The Accessories and Parts Regulated by Section 30515(a) Are Not Arms or Necessary to Operate Any Arm for Self-Defense ................................................................................ 10

          B.    The AWCA Does Not Burden the Possession of Arms in Common Use for Self-Defense .................................................. 12

                1.    Semiautomatic Rifles that Qualify as Assault Weapons Are Like the M16 and Are Most Useful in Military Service ............................................................. 12

                2.    The Regulated Semiautomatic Rifles Are Not Commonly Used or Suitable for Lawful Self-Defense ............................................................................ 17

    II.    The AWCA's Restrictions on Particularly Dangerous Semiautomatic Rifles Are Consistent with the Nation's History of Firearms Regulation ............................................................ 19

          A.    This Case Requires a "More Nuanced" Analogical Approach ........................................................................... 20

                1.    Assault Weapons Represent a Dramatic Technological Change from the Firearms Widely Available During the Founding and Reconstruction Eras ...................................................................................... 21

                2.    The AWCA Addresses the Unprecedented Problem of Mass Shootings .................................................... 22

          B.    The Challenged Assault Weapon Restrictions Are Relevantly Similar to Historical Analogues .......................... 23

                1.    Governments Have Long Regulated Particularly Dangerous Weapons to Protect the Public from Harm ...................................................................... 23

                      a.    Medieval to Early Modern England (1300–1776) .................................................. 23

                      b.    Colonial and Early Republic Periods (1600–1812) .................................................. 24

                      c.    Antebellum and Reconstruction Periods (1813–1877) .................................................. 25

i

**TABLE OF CONTENTS**
**(continued)**

Page

        d.    Late 19th and Early 20th Centuries (1878–1930s) .................................................................. 27

    2.    The Surveyed Weapons Restrictions Are Relevantly Similar to the AWCA ................................... 28

        a.    Comparable Burden ............................ 28

        b.    Comparable Justification ..................... 30

Conclusion ................................................................ 32

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ................................................................ 7

*Barnett v. Raoul*
    __ F. Supp. 3d __, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ........................ 8

*Bevis v. City of Naperville, Ill.*
    __ F. Supp. 3d __, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ....... 8, 13, 18, 20

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
    (*DSSA*)
    2023 WL 2655150 (D. Del. Mar. 27, 2023) ................................. *passim*

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ...................................................... *passim*

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021) ........................................ 10, 13, 18, 19

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) .............................................. 27

*Friedman v. City of Highland Park*
    784 F.3d 406 (7th Cir. 2015) ............................................. 21

*Frlekin v. Apple, Inc.*
    979 F.3d 639 (9th Cir. 2020) .............................................. 7

*Hanson v. District of Columbia*
    __ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ................ *passim*

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) .......................................... 16

*Herrera v. Raoul*
    2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ........................... 8, 20, 30

*Jackson v. City & County of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ............................................ 11

# TABLE OF AUTHORITIES
### (continued)

Page

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) ................................................. 13, 17, 18

*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ........................................................................ 8

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
  618 F. Supp. 3d 901 (N.D. Cal. 2022) ............................................ 9

*Nat'l Rifle Ass'n v. Bondi*
  61 F.4th 1317 (11th Cir. 2023) ........................................... 9, 27, 31

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
  142 S. Ct. 2111 (2022) ........................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island* (*Ocean State*)
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) ....................... 8, 9, 10, 11

*Or. Firearms Fed'n, Inc. v. Brown*
  __ F. Supp. 3d __, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ........... *passim*

*People v. Bocanegra*
  __ Cal. Rptr. 3d __, 2023 WL 3142421 (Ct. App. Apr. 28, 2023) ............. 4, 8

*Presser v. People*
  116 U.S. 252 (1886) ...................................................................... 26

*Rupp v. Becerra*
  401 F. Supp. 3d 978 (C.D. Cal. 2019) ........................................... 1, 7

*Silveira v. Lockyer*
  312 F.3d 1052 (9th Cir. 2002) ....................................................... 4

*Staples v. United States*
  511 U.S. 600 (1994) ......................................................... 13, 14, 16

*Teixeira v. County of Alameda*
  873 F.3d 670 (9th Cir. 2017) ......................................................... 11

*United States ex rel. Kelly v. Serco, Inc.*
  846 F.3d 325 (9th Cir. 2017) ......................................................... 7

1
2

# TABLE OF AUTHORITIES
## (continued)

                                                                    **Page**

3

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018) ....................................................... 11

4

5

*United States v. Hasson*
    2019 WL 4573424 (D. Md. Sept. 20, 2019) ..................................... 11

6

7

*Worman v. Healey*
    922 F.3d 26 (1st Cir. 2019) ............................................................ 18

8

9

**STATUTES**

10

1837 Ala. Acts 7, §§ 1, 2 ......................................................................... 26

11

California Assault Weapons Control Act (AWCA) ......................................... *passim*

12

California Penal Code

13

    § 12276.5(a)(1)–(2) ........................................................................ 5
    § 30505(a) ....................................................................................... 4

14

    § 30510 ........................................................................................... 4

15

    § 30510(a) ............................................................................. 1, 5, 6
    §§ 30510(b– ...................................................................................... 1

16

    § 30515 .......................................................................................... 10

17

    § 30515(a) ......................................................................... 2, 5, 10, 11
    § 30515(a)(1) ......................................................................... 11, 15

18

    § 30515(a)(1)(A) ............................................................................. 6

19

    § 30515(a)(1)(A)-(C) ........................................................................ 1
    § 30515(a)(3) ....................................................................... 1, 6, 11

20

    § 30515(E)-(F) .................................................................................. 1

21

    § 30520 ............................................................................................ 1
    § 30600 ...................................................................................... 1, 6

22

    § 30605 ...................................................................................... 1, 6

23

    § 30925 ............................................................................................ 1
    § 30945 ............................................................................................ 1

24

25

1999 Cal. Stat., ch. 129 (S.B. 23) ............................................................... 5

26

2006 Cal. Stat., ch. 793 (A.B. 2728) ........................................................... 5

27

N.J. Laws 346, Chapter 539, § 10 ............................................................. 24

28

v

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3   Natonal Firearms Act, Pub. L. No. 275, Chapter 465, §§ 1, 14 (1932) ............ 27, 28

4   Tenn. Pub. Acts 200, Chapter 137, § 1 ................................................................. 26

5
**CONSTITUTIONAL PROVISIONS**
6

7   United States Constitution
        Second Amendment ..................................................................................... *passim*
8       Fourteenth Amendment ............................................................................... *passim*

9   **OTHER AUTHORITIES**

10  1 William Blackstone, Commentaries 139, ch. 1 (1765) ....................................... 23

11  California Code of Regulations, Title 11
12      § 5471(x) ......................................................................................................... 6
        §§ 5471(*ll*), (*oo*), (nn) ................................................................................... 6
13      § 5471(qq) ....................................................................................................... 5
14      § 5471(r) .......................................................................................................... 6
        § 5471(t) .......................................................................................................... 6
15      § 5471(z) .......................................................................................................... 5
16      § 5499 .............................................................................................................. 5
17      § 5499(a) ................................................................................................... 1, 5, 6

18  Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and*
19      *Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) .................................................. 22

20  English Bill of Rights of 1689, 1 Wm. & Mary 2d. Sess. ch. 2, § 6 ...................... 23

21
22
23
24
25
26
27
28

# INTRODUCTION

This Court should again uphold California's common sense, life-saving restrictions on semiautomatic rifles that qualify as "assault weapons" under California's Assault Weapons Control Act ("AWCA").  *See* Cal. Penal Code §§ 30510(a), 30515(a)(1)(A)–(C), (E)–(F), 30515(a)(3), 30520, 30600, 30605, 30925, 30945; Cal. Code Regs. tit. 11, § 5499(a).[1]  These restrictions on weapons and accessories that have featured prominently in mass shootings and other violent crime fully comport with the Second Amendment under the text-and-history standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  This Court previously upheld the AWCA under the Ninth Circuit's prior two-step framework for Second Amendment claims, including on the ground that the regulated rifles do not fall within the scope of the Second Amendment.  Dkt. 108 ("Order"); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 994 (C.D. Cal. 2019), *vacated and remanded sub nom. Rupp v. Bonta*, 2022 WL 2382319 (9th Cir. June 28, 2022).  Much of the Court's prior analysis remains valid and relevant post-*Bruen*, and the evidence demonstrates that the AWCA is constitutional under *Bruen*'s text-and-history standard.[2]

---

[1] Plaintiffs do not challenge AWCA provisions applicable to semiautomatic centerfire rifles with grenade or flare launchers; semiautomatic centerfire rifles that have a fixed magazine with a capacity to accept more than ten rounds; pistols; shotguns; and semiautomatic centerfire firearms that are not rifles, pistols, or shotguns.  *See* Cal. Penal Code §§ 30510(b)–(c), 30515(a)(1)(D), (a)(2), (a)(4)–(11).

[2] Defendant Rob Bonta, in his official capacity as California Attorney General ("Defendant"), incorporates by reference Defendant's exhibits submitted in connection with the previously filed motions for summary judgment.  In support of this motion, Defendant has filed additional evidence, attached as exhibits to the accompanying Declaration of John D. Echeverria.  Citations to Defendant's exhibits are prefaced with "DX," so that DX-1 refers to Defendant's Exhibit 1.  DX-1 through DX-45 were annexed to the Declaration of Peter H. Chang in Support of Defendant's Motion for Summary Judgment (Dkt. 76); DX-46 was

*First*, Plaintiffs cannot show that the semiautomatic rifles and combat-oriented accessories regulated by the AWCA are covered by the "plain text" of the Second Amendment. *Bruen*, 142 S. Ct. at 2126. The AWCA's features-based definition of an "assault weapon" in California Penal Code section 30515(a) ("Section 30515(a)") does not regulate "Arms," as that term was originally understood, but rather regulates the use of certain firearm accessories and parts that are not "Arms" or necessary to operate any weapon for self-defense. Moreover, rifles that qualify as assault weapons under the AWCA are not protected by the Second Amendment because they are not "commonly used" for "self-defense." *Bruen*, 142 S. Ct. at 2138. To the contrary, as this Court previously held, they are "like" M16 rifles that "may be banned." Order at 10 (citing *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). This Court should again hold that the AWCA does not burden conduct protected by the Second Amendment.

*Second*, the AWCA's restrictions on certain exceedingly dangerous rifle configurations are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Where, as here, the challenged law addresses "unprecedented societal concerns" or "dramatic technological changes," *Bruen* requires a "more nuanced approach" to the historical analysis. *Id.* at 2131–32. In such a case, the government need only identify a "well-established and representative historical *analogue*"—not a "historical *twin*" or "dead ringer"—that is "relevantly similar" according to "two metrics": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Defendant has met that burden here. When semiautomatic and automatic firearms technologies began circulating widely in society in the early 20th century, and

---

annexed to the Supplemental Declaration of Peter H. Chang in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 90); and DX-47 through DX-87 are annexed to the concurrently filed Declaration of John D. Echeverria.

began to be used frequently in crime, governments regulated them.  Those 20th century regulations, like modern assault weapon restrictions, were consistent with laws regulating other particularly dangerous weapons enacted earlier in American history, including around 1792 (when the Second Amendment was ratified) and 1868 (when the Fourteenth Amendment was ratified).[3]  These laws imposed a comparably low burden on the right to armed self-defense, which was comparably justified by public-safety concerns prevalent at the time.  Since *Bruen*, district courts examining the constitutionality of assault weapon restrictions and similar laws have largely held that the laws are consistent with the Nation's history of firearms regulation on a similar historical record.[4]  This Court should similarly uphold the AWCA at the historical stage of the *Bruen* standard.

There are no triable issues of material fact going to the facial constitutionality of the challenged AWCA provisions, and this Court should enter judgment for Defendant.[5]

---

[3] A survey of hundreds of relevant laws, ordinances, and authorities is attached as Appendix 1.  For the Court's convenience, Defendant has also filed a compendium of those laws and authorities.

[4] To date, six district courts have denied preliminary injunction motions to enjoin assault-weapon and large-capacity magazine restrictions under *Bruen*.  Only one has ruled otherwise.  *See infra* at p. 8.

[5] In addition to a Second Amendment claim, the Third Amended Complaint asserts claims under the Due Process and Takings Clauses of the Fourteenth Amendment to the United States Constitution.  Dkt. 60 ¶¶ 105–112.  This Court previously dismissed those claims with prejudice.  Order at 7.  That holding was unaffected by *Bruen*, and the Court should again enter judgment on Plaintiffs' non-Second Amendment claims.

# BACKGROUND

## I.   THE ASSAULT WEAPONS CONTROL ACT

In 1989, a semiautomatic AK-47 rifle was used to kill five schoolchildren and injure 32 others at an elementary school in Stockton, California.  SUF 28.[6]  Later that year, California enacted the AWCA to prohibit the manufacture, importation, sale, and possession of certain firearms identified by make and model, which were defined under the statute as "assault weapons."  Cal. Penal Code § 30510; *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir. 2002), *abrogated on other grounds by Heller*, 554 U.S. 570.  The statute listed certain "'civilian' models of military weapons that feature slightly less firepower than the military-issue versions, such as the Uzi, an Israeli-made military rifle; the AR-15, a semi-automatic version of the United States military's standard-issue machine gun, the M-16; and the AK-47, a Russian-designed and Chinese-produced military rifle."  *Silveira*, 312 F.3d at 1058.  In restricting assault weapons, the Legislature "was specifically concerned with the unusual and dangerous nature of these weapons."  *People v. Bocanegra*, __ Cal. Rptr. 3d __, 2023 WL 3142421, at *10 (Ct. App. Apr. 28, 2023) (citation omitted).  The Legislature found that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state."  Cal. Penal Code § 30505(a).  It further found that an assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings."  *Id.*

The AWCA, as originally enacted, also included a mechanism for the California Attorney General to seek a judicial declaration that certain additional weapons that were functionally identical to the assault weapons listed in the AWCA

---

[6] Citations to the concurrently filed Defendant's Statement of Uncontroverted Facts and Conclusions of Law will be to "SUF" followed by a number, so that "SUF 1" refers to the first uncontroverted fact on that statement.

4

are also deemed "assault weapons" subject to regulation under the AWCA. *See* former Cal. Penal Code § 12276.5(a)(1)–(2). Pursuant to that authority, the Attorney General added additional semiautomatic rifles to the prohibited list of "assault weapons," identified by make and model, which are currently listed in section 5499 of title 11 of the California Code of Regulations. The Attorney General's authority to designate additional weapons as "assault weapons" ended in 2006. *See* 2006 Cal. Stat., ch. 793 (A.B. 2728).

California amended the AWCA in 2000 to add a features-based definition of an assault weapon. 1999 Cal. Stat., ch. 129 (S.B. 23). The Legislature adopted this alternative definition to address the proliferation of "copycat" weapons that were "substantially similar to weapons on the prohibited list but differ[ent] in some insignificant way, perhaps only the name of the weapon, thereby defeating the intent of the ban." DX-29 at 4. The AWCA's features-based definition is set forth in Section 30515(a).

Currently, the AWCA designates 86 rifles as assault weapons by make and model. Cal. Penal Code § 30510(a); Cal. Code Regs. tit. 11, § 5499(a). It also defines as an assault weapon any semiautomatic centerfire rifle that lacks a fixed ammunition magazine and is equipped with any of the following accessories or parts, which generally are combat-oriented features that enhance the lethality of the rifle:

- a pistol grip that protrudes conspicuously beneath the action of the rifle, allowing for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing," Cal. Code Regs. tit. 11, § 5471(z); SUF 38;

- a thumbhole stock that enables the shooter to place the thumb of the trigger hand through the stock while firing, mimicking the ergonomics of a pistol grip, Cal. Code Regs. tit. 11, § 5471(qq); SUF 43;

- a folding or telescoping stock attached to the receiver, which can change the overall length of the rifle, Cal. Code Regs. tit. 11, §§ 5471(*ll*), (*oo*), (nn); SUF 48;

- a flash suppressor, including any device identified as a "flash hider," Cal. Code Regs. tit. 11, § 5471(r); SUF 53; or

- a forward pistol grip, which "allows for a pistol style grasp forward of the trigger," Cal. Code Regs. tit. 11, § 5471(t); SUF 46.

Cal. Penal Code § 30515(a)(1)(A)–(C), (E)–(F).  Section 30515(a)(3) further defines as an assault weapon any semiautomatic, centerfire rifle with an overall length of less than 30 inches.  *See* Cal. Code Regs. tit. 11, § 5471(x).

The AWCA prohibits the manufacture, distribution, transportation, importation, sale, and possession of any weapon that qualifies as an "assault weapon."  *See* Cal. Penal Code §§ 30600, 30605.

Currently, ten states and the District of Columbia—representing more than one quarter of the U.S. population—restrict assault weapons.  SUF 115.

## II.   PROCEDURAL HISTORY

Plaintiffs assert a facial Second Amendment challenge to the AWCA's restrictions applicable to rifles that qualify as assault weapons under the make-and-model definition of an "assault weapon," Cal. Penal Code § 30510(a); Cal. Code of Regs., tit. 11, § 5499(a), and the features-based definition of an "assault weapon," Cal. Penal Code § 30515(a)(1)(A)–(C), (E)–(F), 30515(a)(3).  *See* Dkt. 60 ¶ 4.

In July 2019, this Court granted Defendant's motion for summary judgment, upholding the challenged provisions of the AWCA under the Ninth Circuit's prior two-step framework for adjudicating Second Amendment claims.  This Court held at the first step that the challenged AWCA provisions do not burden conduct protected by the Second Amendment because the regulated rifles are "like" M16s that may be banned.  Order at 14. Alternatively, this Court held that the challenged provisions satisfy intermediate scrutiny.  *Id.* at 23.

6

While the appeal of that judgment was pending, the U.S. Supreme Court issued its decision in *Bruen*, replacing the two-step framework with a text-and-history standard. 142 S. Ct. at 2127. Following the issuance of *Bruen*, the Ninth Circuit vacated this Court's prior judgment and remanded the case "for further proceedings consistent with" *Bruen*. *Rupp*, 2022 WL 2382319, at *1; 9th Cir. No. 19-56004, Dkt. 71. This Court then issued a Scheduling Order providing for supplemental expert discovery and dispositive motions. Dkt. 131 at 2; Dkt. 134 at 2.

## LEGAL STANDARD

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Moreover, to survive summary judgment, a party "must establish *evidence* on which a reasonable jury could find for" that party. *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017).

## ARGUMENT

In *Bruen*, the Supreme Court announced a new standard for adjudicating Second Amendment claims, one "centered on constitutional text and history." *Id.* at 2128–29. Under this text-and-history approach, courts must first determine that "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If it does, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Under the text-and-history standard, the Second Amendment is not a "regulatory straightjacket." *Id.* It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring), and "experiment[ing]

with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).  Since *Bruen*, numerous courts have held that assault-weapon restrictions like the AWCA do not violate the Second Amendment on a substantially similar record as here.  *See Bevis v. City of Naperville, Ill.*, __ F. Supp. 3d __, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (denying preliminary injunction motion to enjoin state and local assault weapon and large-capacity magazine restrictions), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023), *mot. for inj. pending appeal denied*, No. 23-1353 (7th Cir. Apr. 18, 2023), *emergency app. for inj. pending appeal denied sub nom. Nat'l Ass'n for Gun Rights v. Naperville, Ill.*, No. 22A948 (U.S. May 17, 2023); *Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) (same), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 2023 WL 2655150 (D. Del. Mar. 27, 2023) (same), *appeal docketed*, No. 23-1641 (3d Cir. Apr. 7, 2023);[7] *see also Bocanegra*, 2023 WL 3142421 (upholding AWCA as constitutional under *Bruen*).[8]  Consistent

---

[7] One district court in the Southern District of Illinois granted a preliminary injunction motion to enjoin Illinois' assault weapon and large-capacity magazine restrictions.  *Barnett v. Raoul*, __ F. Supp. 3d __, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023), *appeal docketed*, No. 23-1825 (7th Cir. May 1, 2023).  That outlier decision has been stayed pending appeal by the Seventh Circuit.  Dkt. 91, No. 23-1353 (7th Cir. May 12, 2023).  It is also deeply flawed, as it failed to engage with the numerous district court decisions holding that assault-weapon and large-capacity magazine restrictions do not violate the Second Amendment, failed to address relevant pre-*Bruen* Seventh Circuit precedent, and incorrectly engaged in the "common use" inquiry at the historical stage of the *Bruen* analysis.  *See infra* Section I.B.

[8] Three additional district courts have denied preliminary injunction motions to enjoin state large-capacity magazine restrictions.  *See Hanson v. District of Columbia*, __ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Ocean State Tactical, LLC v. Rhode Island* (*Ocean State*), 2022 WL 17721175 (D.R.I. Dec. 14, 2022); *Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*), __ F. Supp. 3d __, 2022 WL 17454829 (D. Or. Dec. 6, 2022).

with these decisions, this Court should uphold the AWCA because the challenged provisions are constitutional under *Bruen*.

## I.     PLAINTIFFS CANNOT SHOW THAT THE AWCA BURDENS CONDUCT COVERED BY THE PLAIN TEXT OF THE SECOND AMENDMENT

Plaintiffs cannot meet their threshold burden of demonstrating that the items regulated by the challenged AWCA provisions are covered by the plain text of the Second Amendment.  Only "[w]hen the Second Amendment's plain text covers an individual's conduct," must the government "then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2129–30; *see also Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. 2023) ("[W]e read *Bruen* as articulating two analytical steps." (citation omitted)).

It is the burden of a party challenging a law under the Second Amendment to show that each of the "textual elements" of the Second Amendment's operative clause—which provides a right of the "People" to "keep" and "bear" protected "Arms," U.S. Const. amend. II—covers the proposed course of conduct.  *Bruen*, 142 S. Ct. at 2134 (citation omitted); *see Oregon Firearms*, 2022 WL 17454829, at *9 ("*Plaintiffs* have not shown, at this stage, that [large-capacity magazines] are necessary to the use of firearms for self-defense." (emphasis added)); *Ocean State*, 2022 WL 17721175, at *12 ("Although *it is their burden* to show that large-capacity magazines fall within the purview of the Second Amendment, *the plaintiffs* offer no expert opinion on the meaning of the word 'Arms.'" (emphasis added)); *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 914 (N.D. Cal. 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then *shifts* to the government . . . ." (emphasis added)).

Here, Plaintiffs cannot show that the acquisition and possession of semiautomatic rifles with certain combat-oriented features falls within the scope of the Second Amendment for two reasons:  (1) the tactical accessories listed in

Section 30515 are neither "Arms" nor necessary to operate any arm for self-defense, and (2) the rifles regulated under the AWCA are not in common use for self-defense.

### A.   The Accessories and Parts Regulated by Section 30515(a) Are Not Arms or Necessary to Operate Any Arm for Self-Defense

Plaintiffs' challenge to the features-based definitions of an "assault weapon" fails because the items listed in Section 30515(a), including pistol grips, flash suppressors, and telescoping stocks, are not protected by the Second Amendment's plain terms.  As the Supreme Court has explained, the Second Amendment protects "'instruments that constitute *bearable arms*'" that "facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added).  It guarantees a "right to possess and carry *weapons* in case of confrontation'"—not items that are not themselves bearable weapons.  *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592 (emphasis added)); *accord Heller*, 554 U.S. at 582 ("the most natural reading of 'keep Arms' in the Second Amendment is to 'have *weapons*.'" (emphasis added)).  Corpus linguistics analysis confirms that the term "Arms" in the 18th century referred to "weapons such as swords, knives, rifles, and pistols," and did not include "accoutrements," like "ammunition containers, flints, scabbards, holsters, or 'parts' of weapons."  DX-49 (Baron Suppl. Rpt.) ¶ 8; *Ocean State*, 2022 WL 17721175, at *13.

As the Ninth Circuit explained in its en banc opinion in *Duncan v. Bonta*, "*Heller*'s rejection of an outright ban on the most popular self-defense weapon" did not mean that "governments may not impose a much narrower ban on *an accessory that is a feature of some weapons* and that has no usefulness in self-defense."  19 F.4th 1087, 1108 (9th Cir. 2021) (emphasis added), *cert. granted and judgment vacated*, 142 S. Ct. 2895 (June 30, 2022), *vacated and remanded*, 49 F.4th 1228

(9th Cir. 2022).[9]  This is precisely the type of restriction imposed by Section
30515(a).  As with other accessories, like silencers and large-capacity magazines,
the items listed in Section 30515(a) are not themselves "Arms."[10]  *See Ocean State*,
2022 WL 17721175, at *12 ("LCMs, like other accessories to weapons, are not
used in a way that 'cast[s] at or strike[s] another.'"); *United States v. Cox*, 906 F.3d
1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in
itself (nor is it 'armour of defence').");  *United States v. Hasson*, 2019 WL 4573424
(D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Unlike, for example, ammunition or a trigger mechanism, the items listed in
Section 30515(a) are not necessary to operate any "Arm" for self-defense.
SUF 38–60; Busse Suppl. Rpt. ¶¶ 12–24; *cf. Oregon Firearms*, 2022 WL
17454829, at *9 (concluding that large-capacity magazines are not necessary to
operate a firearm for self-defense).  As such, they are not protected by an "ancillary
right[] necessary to the realization of the core right to possess a firearm for self-
defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *see
also Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)
(observing that "the right to possess firearms for protection implies a corresponding
right to obtain the bullets necessary to use them").

Because the components enumerated in Section 30515(a) are not "Arms" or
necessary to exercise the Second Amendment right, the AWCA's regulation of

---

[9] Defendant cites to cases abrogated on other grounds by *Bruen* or vacated
after *Bruen* for their persuasive value.

[10] There is one challenged definition that defines a semiautomatic centerfire
rifle as an assault weapon if it is less than 30 inches in length.  Cal. Penal Code
§ 30515(a)(3).  As with the provisions in section 30515(a)(1), this definition also
effectively regulates certain parts because the only ways to reduce the length of a
rifle are to equip it with a shortened barrel or a shortened or collapsible stock (or
both), neither of which is necessary to operate a rifle for self-defense.  *See* Busse
Suppl. Rpt. ¶ 21.

those components does not burden conduct protected by the plain text of the Second Amendment.

### B. The AWCA Does Not Burden the Possession of Arms in Common Use for Self-Defense

In *Bruen*, the Court reaffirmed that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626).  On the contrary, the Second Amendment protects only those weapons that are "'in common use' today for self-defense." *Id.* at 2135 (quoting *Heller*, 554 U.S. at 627)).  The Court has consistently held out "individual self-defense" as "'the *central component*' of the Second Amendment right."  *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554 U.S. at 599); *see also DSSA*, 2023 WL 2655150, at *4 ("*Bruen* tethered its 'common use' analysis to self-defense.").  This remains an "important limitation on the right to keep and carry arms" following *Bruen*.  *Id.* at 2162 (Kavanaugh, J., concurring).

Here, the rifles regulated by the AWCA are not protected by the plain text of the Second Amendment because they are not "Arms" in common use for self-defense.[11]

### 1. Semiautomatic Rifles that Qualify as Assault Weapons Are Like the M16 and Are Most Useful in Military Service

Semiautomatic rifles regulated by the AWCA are like the M16 and are most useful in military service; thus, they cannot be deemed "in common use" for lawful purposes.  The Supreme Court has not delineated "the full scope of the Second

---

[11] *Bruen* situated the "common use" inquiry at the textual stage of its analysis; before proceeding to the historical analysis, the Court concluded that the plaintiffs' proposed course of conduct was covered by the plain text of the Second Amendment because, *inter alia*, the handguns plaintiffs sought to "bear" in public "are weapons 'in common use' today for self-defense."  *Bruen*, 142 S. Ct. at 2134 (citations omitted).

Amendment," *Heller*, 554 U.S. at 626, but it has identified the M16 rifle "and the like"—"weapons that are most useful in military service"—as weapons that "may be banned" without infringing the Second Amendment.  *Id.* at 627; *see also Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct at 2126.  As this Court previously determined, "the M-16 as an example of a historically banned 'dangerous and unusual weapon,'" and the semiautomatic rifles regulated by the AWCA are "virtually indistinguishable from M-16s."  Order at 12.  An en banc panel of the Ninth Circuit characterized this analogy as having "significant merit," *Duncan*, 19 F.4th at 1102, and nothing in *Bruen* calls that analysis into question, *see Bruen*, 142 S. Ct. at 2127 (noting that "[s]tep one [of the prior two-step framework] is broadly consistent with *Heller*"); *id.* at 2157 (Alito, J., concurring) (noting that *Bruen* did not "decide anything about the kinds of weapons that people may possess"); *Bevis*, 2023 WL 2077392, at *9 ("*Bruen* does not displace the limiting examples provided in *Heller*."); *e.g.*, *Hanson*, __ F. Supp. 3d __, 2023 WL 3019777, at *8–9 (concluding post-*Bruen* that large-capacity magazines are unprotected because they are "most useful in military service").

AR-platform rifles[12] are semiautomatic versions of the select-fire M16.[13]  AR-platform rifles and other rifles restricted by the AWCA have a military pedigree and are nearly identical to the M16 in form and function.  *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle . . . ."); SUF 12.  Indeed, the AR-15 was originally developed as an automatic weapon for the military, and its name was changed to the M16 during the Vietnam

_____

[12] "AR-platform" refers to the AR-15 and generic versions of the AR-15.  *See* SUF 6.

[13] Automatic weapons are capable of firing multiple rounds with a single pull of the trigger, while semiautomatic weapons are capable of firing a single shot with each pull of the trigger.  Select-fire weapons are capable of firing in either automatic (or burst) mode or semiautomatic mode.  SUF 7.

1  War.  SUF 6.  Thereafter, the semiautomatic version was marketed to civilians as
2  the "AR-15."  *Id.*

3       AR-platform rifles regulated under the AWCA incorporate the functional
4  design features that make military assault rifles effective combat weapons,
5  including a pistol grip beneath the action of the rifle that enables more effective
6  rapid fire and the ability to accept detachable magazines.  DX-22 at 6–7; DX-21
7  at 9.  As explained by Colonel (Ret.) Craig Tucker, who commanded the 7th
8  Marine Regiment in Iraq and trained soldiers on the use of the M16 and M4,[14]
9  "[t]he AR-15 is an offensive combat weapon no different in function or purpose
10  than an M4."  DX-61 (Tucker Suppl. Rpt.) ¶ 22.  They are chambered in similar
11  caliber rounds (generally, .223 for AR-platform rifles and 5.56 NATO for M16
12  rifles) and fire projectiles at very high velocities, causing the projectiles to become
13  "unstable when they penetrate[] a human body, tumbling through flesh to create
14  devastating wounds."  DX-72 at 2878; SUF 16–18.  Both contain the same "cycles
15  of functioning," the same barrel rifling, the same rates of fire when fired
16  semiautomatically, the same ballistics, and the same attachments, sights, and rails.
17  DX-62 (Tucker Suppl. Sur-Rebuttal Rpt.) ¶ 3.  Both have approximately the same
18  muzzle velocity (3,300 feet per second).  DX-57 (Roth Suppl. Rpt.) ¶ 49.  Both
19  have the same gas system, which redirects gas from fired cartridges to "dampen[]
20  recoil, making it easier to keep steady aim on a target" while firing repeatedly.
21  DX-72 at 2878.  And both have similar long-range capabilities.  *See DSSA*, 2023
22  WL 2655150, at *11.

23       A report of the federal government's Advanced Research Projects Agency
24  ("ARPA")—now, the Defense Advanced Research Projects Agency, or
25  "DARPA"—on the performance of the fully automatic AR-15 in the Vietnam War
26  (before its name was changed to the M16) concluded that it was "superior in

27  _____

28       [14] The M4 is a shorter, carbine variant of the M16.  SUF 8.

virtually all respects" to other military small arms, like the Thompson submachinegun and Browning Automatic Rifle.  DX-65 at 2512.  The report vividly illustrates the combat effectiveness of the "Small Caliber, High Velocity Rifle" on a round-for-round basis.  *Id.* at 2516.  In one account, a Viet Cong soldier was struck by three AR-15 rounds at a range of 15 meters, each of which would have been fatal:  "One round in the head . . . took it completely off.  Another in the right arm, took it completely off, too.  One round hit him in the right side, causing a hole about five inches in diameter."  *Id.* at 2530.  Automatic capability would not account for the extent of these injuries, each of which was caused by a single .223 round.  *See id.* at 2517; Tucker Suppl. Rpt. ¶ 13; Tucker Suppl. Sur-Rebuttal Rpt. ¶¶ 8–10.  These devastating wartime injuries are consistent with injuries sustained by civilians in mass shootings involving AR-platform rifles chambered with similar ammunition.  *See, e.g.*, DX-75 (Michael Levenson, *Parents Were Asked for DNA Samples to Help Identify Victims*, N.Y. Times, May 25, 2022); DX-77 (Alan Feuer et al., *After Texas Mall Shooting, Searching for Motive and Grieving for Children*, N.Y. Times, May 8, 2023); DX-4 (Colwell Rpt.) at 3–5 (describing assault weapon injuries); DX-68 (Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage*, Wash. Post, Mar. 27, 2023), *available at* https://tinyurl.com/4vfz4y4b.

In addition, the components and parts listed in Section 30515(a)(1) are "military features and characteristics . . . carried over to the semiautomatic versions of the original military rifle."  Order at 14 (quoting DX-22 at 1048).  They are most useful in military service:

- Pistols grips and thumbhole stocks can be used with semiautomatic and automatic rifles to enable a shooter to shoot more effectively during rapid fire, by reducing muzzle rise and facilitating the quick reloading of detachable magazines.  SUF 39–41, 44.

- A forward pistol grip on any firearm can help a shooter shoot more effectively during rapid fire, by insulating the non-trigger hand from heat generated during rapid fire and securing the stock of a shorter-barreled rifle, like the M4, to the shoulder.  SUF 47.

- Rifles with adjustable stocks and rifles shorter than 30 inches make those rifles more portable (and potentially concealable), and can enable a shooter to conduct room-to-room tactical maneuvers and maintain an element of surprise.  SUF 49–50.  Adjustable stocks can also hinder effective self-defense because they are less stable than fixed stocks.  SUF 51.

- Flash suppressors can enable a shooter to shoot more effectively during rapid fire by counteracting muzzle rise.  SUF 54–55.  Flash suppressors can also help a shooter avoid detection in low-light conditions.  SUF 56.  Flash suppressors are also needed in combat by soldiers using night-vision goggles to reduce the impact of flash.  SUF 57.

These items are "'military' features" that, individually and combined, "increase the[] lethality" of AR-platform rifles and M16s.  *DSSA*, 2023 WL 2655150, at *10; Tucker Suppl. Rpt. ¶ 22.

The only difference between the rifles regulated by the AWCA and the M16 is that the latter is capable of firing in either semiautomatic or automatic mode; the AWCA, by its terms, regulates only semiautomatic rifles.  SUF 13.  However, as this Court has correctly noted, this is a "distinction without a difference."  Order at 12.  In enacting the federal ban on assault weapons, Congress found that semiautomatic weapons can be "virtually indistinguishable" from machine guns.  SUF 24; *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011).  And semiautomatic rifles regulated under the AWCA can be readily converted to fire at rates approaching automatic fire by installing certain parts or accessories, like bump stocks or multiburst trigger activators.  Order at 13; SUF 23; *Staples*, 511

U.S. at 603; *DSSA*, 2023 WL 2655150, at *10 (discussing "numerous, inexpensive products" that "allow AR-style rifles to fire at rates comparable to fully automatic weapons").

Moreover, because automatic fire is less accurate than semiautomatic fire, soldiers are instructed to fire M16s and M4s in semiautomatic mode in combat to maximize lethality and conserve ammunition. Order at 13; *Kolbe*, 849 F.3d at 125; Tucker Suppl. Rpt. ¶ 13. When fired semiautomatically, both AR-platform rifles and M16s have the same maximum rate of fire of 45 rounds per minute. SUF 26, 37. This rate of fire is referred to in the military as "rapid semiautomatic fire" and is a combat tactic. SUF 26. Thus, in active combat, soldiers typically fire the M16 and M4 at the same rate that a civilian can fire a semiautomatic AR-platform rifle.

Because the regulated rifles are like the M16 and most useful in military service, Plaintiffs cannot meet their burden of showing that the regulated weapons are in "common use" for self-defense to warrant Second Amendment protection.

### 2. The Regulated Semiautomatic Rifles Are Not Commonly Used or Suitable for Lawful Self-Defense

Nor can Plaintiffs show that the regulated weapons are commonly used or suitable for lawful self-defense, such that they would qualify as protected "Arms" under the Second Amendment. The record reflects that rifles are rarely used in self-defense—approximately only 2 to 4 percent of all defensive gun uses involved any type of rifle, according to the Heritage Foundation's database on defensive gun uses. DX-47 (Allen Suppl. Rpt.) ¶ 10. That number is not limited to *semiautomatic* rifles, let alone semiautomatic rifles equipped with any of the accessories that would qualify them as "assault weapons." In stark contrast to the infrequent use of rifles in self-defense, handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—were reportedly used in 41 to 90 percent of the incidents in the database, Allen Suppl. Rpt. ¶ 10.

Not only are the regulated semiautomatic rifles and accessories rarely used in self-defense, they are not well suited to that constitutionally protected purpose. Order at 15–16; Busse Suppl. Rpt. ¶ 24.  Any weapon could be used for self-defense, including an M16 or a flamethrower, but like those weapons, the rifles regulated by the AWCA are *most* useful in military service and have marginal, if any, self-defense utility.  *See supra* Section I.B.1; *Hanson*, 2023 WL 3019777, at *8 ("'Most' is a superlative.  A weapon may have *some* useful purposes in both civilian and military contexts, but if it is *most* useful in military service, it is not protected by the Second Amendment.").  Because they are most suitable for military service, they are not well suited to lawful self-defense.

AR-platform and similar rifles make up a small fraction of the U.S. gun stock and are not commonly owned.  SUF 64–67.  Notwithstanding the number of certain assault weapons in circulation, "only 5 percent of firearms are assault weapons," and "[a]s a percentage of the total population, less than 2 percent of all Americans own assault weapons."  *Bevis*, 2023 WL 2077392, at *16.  In any event, the number of weapons purportedly produced and owned in the United States cannot be dispositive of whether a weapon is in common *use*.  *See Kolbe*, 849 F.3d at 141–42 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citation omitted)).  Courts must also consider the actual use of the weapon and its suitability for self-defense.  *See Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("*Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."); *Oregon Firearms*, 2022 WL 17454829, at *10 n.13 ("The Second Amendment . . . requires a court to not only consider the prevalence of a particular firearm, but also the nature of that firearm's use among civilians."); *see also Heller*, 554 U.S. at 629 (explaining the "*reasons* that a citizen may prefer a handgun for home defense" (emphasis added)).

1    Otherwise, the "common use" inquiry would be circular, authorizing government

2    regulation of weapons simply because governments regulated those weapons.

3         It could also extend Second Amendment protection to weapons simply

4    because the government declines to regulate them or fails to regulate them quickly

5    enough.  *See Duncan*, 19 F.4th at 1126 (Berzon, J., concurring).  It would not make

6    sense if M16s could someday be protected if longstanding restrictions on their

7    possession and sale were lifted and more M16s were sold to civilians.  The same

8    would be true for extremely dangerous weapons that have yet to be invented.  Such

9    a result, however, would contradict *Heller*'s guidance that M16s and the "like"

10   "may be banned" and that a contrary interpretation of the Second Amendment

11   would be "startling."  *Heller*, 554 U.S. at 624, 627.  It would also give

12   manufacturers and retailers a veto power over firearms regulation.  *See* Order at 12

13   ("Gun manufacturers cannot determine the scope of Second Amendment protection

14   . . . .").  As one prominent online retailer attests, its "mission" is to put "any gun

15   into 'common use'" to stifle government regulation by "sell[ing] as many guns to

16   as many law-abiding Americans as possible":  "We want to sell as many AR-15 and

17   AK-47 rifles as we can and put them into common use in America today."  DX-78

18   at 2929.  Not only would such a rule make little sense, but it would also endanger

19   public safety.

20        Plaintiffs cannot show that the regulated rifles are protected "Arms" that are

21   commonly used or suitable for self-defense.  Therefore, the plain text of the Second

22   Amendment does not cover their possession.

23   **II.   THE AWCA'S RESTRICTIONS ON PARTICULARLY DANGEROUS
         SEMIAUTOMATIC RIFLES ARE CONSISTENT WITH THE NATION'S
24       HISTORY OF FIREARMS REGULATION**

25        Even if Plaintiffs could meet their threshold burden, the AWCA's restrictions

26   on semiautomatic rifles with combat-oriented features are consistent with the

27   Nation's tradition of firearms regulation.  Defendant has identified hundreds of

28   laws and authorities from before the founding through the 1930s, including around

the time that the Second and Fourteenth Amendments were ratified, demonstrating

that governments have historically retained substantial latitude in enacting

restrictions on certain weapons deemed to pose significant dangers to the public,

while allowing access to other arms for effective self-defense. *See* Appendix 1.

This historical record is more than sufficient to uphold the AWCA. *DSSA*, 2023

WL 2655150, at *9–13 (holding that ban on "assault long guns" is consistent with

the Nation's regulatory traditions); *Bevis*, 2023 WL 2077392, at *9–16 ("history

and tradition demonstrate that particularly 'dangerous' weapons are unprotected");

*Herrera v. Raoul*, 2023 WL 3074799, at *6 (holding that "restrictions on

possession of certain semiautomatic rifles" "are consistent with the Nation's

'history and tradition' of treating particularly 'dangerous' weapons as

unprotected").

### A.   This Case Requires a "More Nuanced" Analogical Approach

As a preliminary matter, a "more nuanced" approach is required when

comparing the AWCA to the surveyed historical laws. *Bruen*, 142 S. Ct. at

2131–32.  When a challenged law addresses either "unprecedented societal

concerns or dramatic technological changes," a "more nuanced approach" is needed

because "[t]he regulatory challenges" of today would not be "the same as those that

preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at

2132.  Governments generally regulate problems as they arise, and thus prior

generations cannot be expected to address concerns that were not prevalent at the

time. *See* Spitzer Suppl. Rpt. ¶ 37–38 (describing process of firearms regulation);

*Hanson*, 2023 WL 3019777, at *16 (discussing the non-regulation of jetpacks

despite their existence and "obvious safety issues and dangers").

Here, unlike the "fairly straightforward" historical analysis in *Bruen* that

required the government to identify a "distinctly similar historical regulation,"

*Bruen*, 142 S. Ct. at 2131, a more nuanced analogical approach is required because

assault weapons "implicate dramatic technological change and unprecedented societal concerns for public safety." *DSSA*, 2023 WL 2655150, at *9–12.

### 1. Assault Weapons Represent a Dramatic Technological Change from the Firearms Widely Available During the Founding and Reconstruction Eras

Semiautomatic rifles utilize firearms technologies that were not widespread when either the Second or Fourteenth Amendments were ratified. In fact, they did not exist. Firearms capable of multiple shots without reloading may have existed at the founding, but they were "experimental, designed for military use, rare, defective, or some combination of these features." *Oregon Firearms*, 2022 WL 17454829, at *12. They were "not common in 1791." *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015); *see also* DX-60 (Sweeney Suppl. Sur-Rebuttal Rpt.) ¶¶ 4–6, 22–45; *Hanson*, 2023 WL 3019777, at *13 (crediting Professor Sweeney's testimony that "review of 1,170 newspaper ads and reports in the 18th century shows that 'repeating firearms in eighteenth-century America' 'were extraordinarily rare'"). Decades later, during Reconstruction, the only bearable, high-capacity repeaters were the lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm. DX-63 (Vorenberg Suppl. Rpt.) ¶ 21. These lever-action rifles were not comparable to semiautomatic rifles, and they were not widely owned by civilians during Reconstruction. Spitzer Suppl. Rpt. ¶ 34. After the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians. Vorenberg Suppl. Rpt. ¶ 24. By the time the Fourteenth Amendment was ratified, the lever-action Winchester Model 1866 was a "huge commercial success," but only due to "sales to foreign armies," not to Americans. *Id.* ¶ 50. Semiautomatic weapons "did not become feasible and available until the beginning of the twentieth century, and the primary market was the military." Spitzer Suppl. Rpt. ¶ 30; *see also DSSA*, 2023 WL

2655150, at *10 (quoting Professor Spitzer).  And semiautomatic rifles like the AR-10 and AR-15 did not appear until the mid-20th century and were "utterly without precedent."  DX-67 at 2821.[15]

In regulating certain semiautomatic rifles, the AWCA addresses firearms technologies that legislators during the founding or Reconstruction did not have to confront.

### 2. The AWCA Addresses the Unprecedented Problem of Mass Shootings

The AWCA also addresses a societal concern that did not exist during the founding or Reconstruction eras:  mass shootings.  Excluding inter-group violence, such as mob violence, riots, and battles, shooting incidents in the United States involving ten or more fatalities did not occur before 1949, and the number of double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban.  SUF 78; *see Oregon Firearms*, 2022 WL 17454829, at *13.  Over one half of the 35 deadliest mass shootings in the last 100 years occurred in the last decade.  SUF 79.  From the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological constraints limited the ability of a single person to commit mass murder.  *See* Roth Suppl. Rpt. ¶ 41.  The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies.  *See* Spitzer Suppl. Rpt. ¶¶ 11–17; Roth Suppl. Rpt. ¶ 44.  Assault weapons in particular have featured prominently in high-fatality mass shootings and result in more deaths and injuries on average.

---

[15] The lethality of semiautomatic firearms far exceed the capabilities of muskets and rifles commonly used during the founding or Reconstruction.  *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508–10 (2022).

Order at 18–22; *DSSA*, 2023 WL 2655150, at *10; SUF 72–84. Accordingly, one of the primary concerns addressed by the AWCA—mass shootings—is a problem that simply did not exist in 1792 or 1868. For this additional reason, a more nuanced approach is required.

### B. The Challenged Assault Weapon Restrictions Are Relevantly Similar to Historical Analogues

Defendant has identified hundreds of laws from pre-founding England and colonial America through the 1930s, including clusters of similar laws enacted around the time that the Second and Fourteenth Amendments were ratified. *See* Appendix 1. Even if the AWCA burdened conduct covered by the plain text of the Second Amendment (it does not), these analogues represent "significant historical evidence to overcome the presumption of unconstitutionality of a measure that infringes upon conduct covered by the Second Amendment." *Oregon Firearms*, 2022 WL 17454829, at *12.

#### 1. Governments Have Long Regulated Particularly Dangerous Weapons to Protect the Public from Harm

##### a. Medieval to Early Modern England (1300–1776)

In pre-founding England, the English Bill of Rights recognized as the fifth and final auxiliary right a right to keep and bear arms "as allowed by law." English Bill of Rights of 1689, 1 Wm. & Mary 2d. Sess. ch. 2, § 6 [6]; 1 William Blackstone, Commentaries 139, ch. 1 (1765) [9].[16] This auxiliary right was the "predecessor to our Second Amendment." *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593). Consistent with that right, the Crown prohibited the possession of certain weapons, like launcegays [1, 2], crossbows, handguns, hagbutts, and demy hakes [3, 4]. These restrictions are part of the tradition inherited from England when the

---

[16] Numbers in brackets refer to the numbers assigned to the laws and authorities listed in Appendix 1.

Second Amendment was ratified. *See Bruen*, 142 S. Ct. at 2127 (noting that the Second Amendment "codified a right inherited from our English ancestors" (quoting *Heller*, 554 U.S. at 599)).

These pre-ratification English authorities are relevant because they are consistent with laws that existed when the Second and Fourteenth Amendments were ratified. *Id.* at 2136 (suggesting that it is permissible for "courts to 'reach back to the 14th century' for English practices that 'prevailed up to the 'period immediately before and after the framing of the Constitution'" (cleaned up)).

### b.   Colonial and Early Republic Periods (1600–1812)

During the colonial period and the early Republic, several jurisdictions enacted restrictions on certain weapons deemed to pose unreasonable dangers to public safety.[17]  For example, New Jersey responded to the "great complaint" "that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeins, or other unusual or unlawful weapons" caused "great abuse of the inhabitants of" the colony by enacting restrictions on the "private[]" carrying of those particular weapons. *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289–90 (1881) [5].  Other laws prohibited the carry of certain weapons in certain circumstances, such as clubs while riotously assembling with others [8, 11, 12, 13, 18, 19, 24].

In addition, during this period, the colony of New Jersey prohibited the keeping of "trap guns," firearms configured with certain components to fire remotely (without the user operating the firearm), typically by rigging the firearm to be fired by a string or wire when tripped.  1763–1775 N.J. Laws 346, ch. 539, § 10 [10]; Spitzer Suppl. Rpt. ¶ 72, Exs. B & F.  Trap guns were used to protect personal

---

[17] In addition to regulating the carrying of particularly dangerous weapons, governments heavily regulated the keeping of gunpowder, including inside the home [341–344], further demonstrating the reach of governmental power to protect public safety. *See* DX-52 (Cornell Suppl. Rpt.) ¶ 47.

or commercial property, Spitzer Suppl. Rpt. ¶ 73, and yet their possession was prohibited.

Such pre-ratification restrictions should "guide [this Court's] interpretation" of the Second Amendment. *Bruen*, 142 S. Ct. at 2137. And laws enacted after ratification of the Second Amendment during this period are relevant in showing the continuing tradition of regulating certain enumerated weapons.[18]

### c.   Antebellum and Reconstruction Periods (1813–1877)

During the antebellum and postbellum period, including around the time that the Fourteenth Amendment was ratified, a growing number of states restricted weapons deemed to be particularly dangerous or susceptible to criminal misuse.

As homicide rates increased in the South in the early 1800s, states began restricting the carrying of particular concealable weapons. *See* Roth Suppl. Rpt. ¶ 23; Spitzer Suppl. Rpt. ¶¶ 53–62, Exs. C & E; DX-56 (Rivas Suppl. Rpt.) ¶¶ 15-17.[19] From 1813 to the Mexican War, in 1846, at least nine states and territories (Kentucky, Louisiana, Indiana, Arkansas, Georgia, Florida, Tennessee, Alabama, and Virginia) restricted the carrying of particular concealable weapons, including Bowie knives, pistols, dirks, and sword-canes [25, 26, 30, 31, 33, 34, 37, 38, 42, 45, 46]. Roth Suppl. Rpt. ¶ 24–26. These concealable weapons laws were intended to address the "craze" for fighting knives and their widespread use in fights and duels. Spitzer Suppl. Rpt. ¶ 42; *DSSA*, 2023 WL 2655150, at *11 (discussing "extensive and ubiquitous" anti-knife legislation). Class and racial tensions in the region led to a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals,

---

[18] Indeed, post-ratification practice can "liquidate" indeterminacies in the meaning of a constitutional text. *Bruen*, 142 S. Ct. at 2136 (citation omitted).

[19] During this period, several laws also continued the regulation of gunpowder [344, 345, 346] and the setting of trap guns [89].

to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. Roth Suppl. Rpt. ¶¶ 23–24.

After the Civil War, the federal government regulated access to particularly dangerous weapons, including the Henry and Winchester lever-action repeating rifles, and along with state militias sought to prevent access to those weapons by insurrectionary groups and Native Americans. *See* Vorenberg Suppl. Rpt. ¶¶ 7–10, 21–22, 63–64.

During the 19th century—including around the time that the Fourteenth Amendment was ratified—49 states (all except New Hampshire) enacted restrictions on Bowie knives and other "fighting knives." Spitzer Suppl. Rpt. ¶ 50 & Ex. C. Notably, an 1837 Alabama law imposed a prohibitive tax of $100 on any person selling, giving, or disposing of a Bowie knife or Arkansas toothpick, and a Tennessee law enacted that year prohibited the sale of those weapons outright. 1837 Ala. Acts 7, §§ 1, 2 [36]; 1837–1838 Tenn. Pub. Acts 200, ch. 137, § 1 [41]. Bowie knives were restricted extensively even though "it would be hard to imagine that there was a more useful weapon for self-defense in the 1830s" and "[t]hose who carried such weapons claimed to do so for self-defense, although they weren't always believed." *DSSA*, 2023 WL 2655150, at *12 n.15.

Just two years before the ratification of the Fourteenth Amendment, New York prohibited "furtively possess[ing]" any slungshot, billy, sandclub, metal knuckles, or dirk [90]. And after 1868, governments continued to regulate enumerated, unusually dangerous weapons. *See* Appendix 1 at 27–38. Additionally, laws restricting unauthorized militias during this time "demonstrate[] the government's concern with the danger associated with assembling the amount of firepower capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively." *Oregon Firearms*, 2022 WL 17454829, at *14 (discussing *Presser v. People*, 116 U.S. 252, 253, 258 (1886)).

1    These laws further demonstrate a national tradition of regulating uniquely

2    dangerous weapons.  These regulations bear particular importance, because as

3    noted in *Bruen*, the Second Amendment was made applicable to the states not in

4    1791, but in 1868, with the ratification of the Fourteenth Amendment.  143 S. Ct. at

5    2138; *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)

6    ("*McDonald* confirms that when state- or local-government action is challenged,

7    the focus of the original-meaning inquiry is carried forward in time; the Second

8    Amendment's scope as a limitation on the States depends on how the right was

9    understood *when the Fourteenth Amendment was ratified*." (emphasis added));

10   *Bondi*, 61 F.4th at 1321 (concluding that "Reconstruction Era historical sources are

11   the most relevant to our inquiry on the scope of the right to keep and bear arms").

### d.    Late 19th and Early 20th Centuries (1878–1930s)

13   From the end of Reconstruction to the end of the 19th century, states and

14   localities continued to restrict particular dangerous weapons, like slungshots and

15   Bowie knives.  *See* Appendix 1 at 39–74.  In 1881, Illinois enacted a prohibition on

16   the possession of a slungshot or metallic knuckles [158].  And in 1885, the

17   Territory of Montana prohibited possession of dirks and sword-canes [186].  During

18   the early 20th century, dangerous weapons laws continued to proliferate.  *See*

19   Appendix 1 at 75–88.  And once semiautomatic and automatic weapons began to

20   circulate more widely in society and appear more frequently in crime in the 1920s,

21   *see* Spitzer Suppl. Rpt. ¶ 11 (describing the St. Valentine's Day Massacre), states

22   began to regulate them.

23   Between 1925 and 1934, 32 states enacted anti-machine gun laws, and the

24   federal government enacted the National Firearms Act in 1934 severely restricting

25   the sale and circulation of automatic weapons, like the Tommy Gun.  *See* Spitzer

26   Suppl. Rpt. ¶¶ 11–13.  At least 11 states, including the District of Columbia, also

27   enacted restrictions on the manufacture, sale, and possession of *semiautomatic*

28   firearms capable of firing a certain minimum number of rounds without reloading.

1   *Id.* ¶ 16 & tbl.1, Ex. B.  Notably, in 1932, Congress enacted a prohibition on the

2   possession of semiautomatic weapons capable of firing more than 12 shots without

3   reloading in the District of Columbia.  Pub. L. No. 275, ch. 465, §§ 1, 14 (1932)

4   [321].

5        These 20th century analogues are relevant under *Bruen* because they are

6   consistent with earlier-enacted laws restricting other dangerous weapons.  *Cf.*

7   *Bruen*, 142 S. Ct. at 2154 n.28 (discounting probative value of 20th century laws

8   that "contradict[ed] earlier evidence"); *see Hanson*, 2023 WL 3019777, at *16

9   (finding that "the 1920s and 1930s regulations do not contradict any earlier

10  evidence . . . because semiautomatic and high-capacity weapons were not

11  technologically feasible and commercially available in meaningful quantities until

12  the early 1900s").  Indeed, "[b]y defining 'machine gun' broadly, these regulations

13  revealed a widespread tradition dating back to the 1920s and 1930s of regulating

14  high-capacity weapons that could fire rapidly without reloading."  *Id.* at *15.

15            **2.     The Surveyed Weapons Restrictions Are Relevantly**
16                     **Similar to the AWCA**

17       The surveyed dangerous weapons laws enacted from the pre-founding era

18  through the early 20th century are relevantly similar to the AWCA in light of their

19  comparable burdens and justifications in at least three significant ways.  Here, the

20  government need only identify a "well-established and representative historical

21  *analogue*"—not a "historical *twin*" or "dead ringer"—to the challenged law, which

22  is "relevantly similar" in terms of "how and why the regulations burden a law-

23  abiding citizen's right to armed self-defense."  *Id.* at 2133.  Thus, the historical

24  comparator must have "impose[d] a comparable burden on the right of armed self-

25  defense" that is also "comparably justified."  *Id*.

26                 **a.     Comparable Burden**

27       The dangerous weapons laws imposed a comparable burden on the right to

28  armed self-defense because, like the AWCA, they did not restrict weapons that are

1    well suited to self-defense and left available alternative weapons to be used for

2    lawful self-defense.  This Court previously held that the AWCA's restrictions do

3    not severely burden the right Second Amendment right.  Order at 15–16.  The

4    AWCA "leaves individuals 'with myriad options for self-defense'—including

5    handguns, the "quintessential" self-defense weapon per *Heller*,'" *id.* (citations

6    omitted), as well as a range of long guns, including semiautomatic rifles and AR-

7    and AK-platform rifles, that do not qualify as "assault weapons."  And the regulated

8    assault weapons are "ill-suited for self-defense." *Id.*  The slight burden of the

9    AWCA stands in stark contrast with the law at issue in *Bruen*, which made it

10   "virtually impossible" for most "law-abiding people to carry a gun outside the

11   home for self-defense." *Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring).  Like the

12   AWCA, the historical restrictions on unusually dangerous weapons, including

13   dirks, Bowie knives, and billies in the 19th century and automatic and

14   semiautomatic firearms in the early 20th century did not restrict weapons that are

15   well suited to self-defense, and they left available alternative weapons to be used

16   for lawful self-defense. *See DSSA*, 2023 WL 2655150, at *12 (finding that assault

17   weapon restrictions "do not impose a greater burden on the right of armed self-

18   defense than did analogous historical regulations"); *Oregon Firearms*, 2022 WL

19   17454829, at *13 (determining that the ban on possession of large-capacity

20   magazines imposed a comparable burden on "the right to self-defense" as laws

21   regulating "certain types of weapons, such as Bowie knives, blunt weapons,

22   slingshots, and trap guns because they were dangerous weapons commonly used

23   for criminal behavior and not for self-defense").  Restrictions on the setting and

24   keeping of trap guns, such as New Jersey's 1771 law [10], are also particularly

25   analogous to the AWCA, because they regulated the types of accessories that could

26   be attached to a firearm without prohibiting the possession of the underlying

27   firearm for lawful self-defense.  These historical analogues therefore imposed a

28

1   comparably modest burden on Second Amendment rights, as compared to the

2   AWCA.

3       It does not matter that some of the historical laws generally restricted the carry

4   (and not possession) of certain weapons.  The comparator laws need not employ the

5   same *mode* of regulation, so long as the burden on the right to armed defense is

6   comparable.  *See Herrera*, 2023 WL 3074799, at *7 (rejecting the argument that the

7   historical analogues "concern[ed] public carry" and not "defense of the home" as

8   "unavailing" because the analogues need not be "identical").  In any event, the

9   Supreme Court has already settled this question, explaining that the "historical

10  tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'"—a

11  tradition reflected by many of the surveyed dangerous weapons laws, *see*

12  Appendix 1—"fairly support[s]" limitations "on the right to *keep* and [not just]

13  carry" weapons.  *Heller*, 554 U.S. at 626–27 (emphases added) (citation omitted).

14  What matters is whether the historical law is "analogous enough" by "impos[ing] a

15  comparable burden on the right of armed self-defense" that is "comparably

16  justified."  *Bruen*, 142 S. Ct. at 2133.

17                    **b.    Comparable Justification**

18      The modest burdens imposed by the AWCA and its analogues are comparably

19  justified by pressing public-safety concerns.  In response to mass shootings,

20  California restricted access to the accessories and weapons configurations used to

21  make those shootings more deadly.  SUF 80–83.  These laws are justified by the

22  public-safety concern that stems from greater numbers of deaths and injuries in

23  mass shootings involving assault weapons, including AR-platform rifles equipped

24  with features regulated by the AWCA.  SUF 72–76.  Such weapons have been used

25  in several recent, prominent mass shootings.  SUF 84.  "Semiautomatic rifles with

26  non-fixed magazines, along with the other enumerated features, are incredibly

27  effective killing machines," they are used disproportionately in mass shootings, and

28  when used in mass shootings, more people are killed and injured.  Order at 22–23;

SUF 83. Assault weapon restrictions are also justified by evidence that restrictions on them can reduce the incidence and lethality of mass shootings. SUF 73–75. These public-safety justifications remain relevant to the Court's analysis under *Bruen*. Although *Bruen* rejected interest balancing as an independent step of Second Amendment analysis, "pressing public safety concerns" posed by assault weapons remain relevant to the Court's comparison of the AWCA's justifications with those of the historical analogues under *Bruen*. *See DSSA*, 2023 WL 2655150, at *13; *Oregon Firearms*, 2022 WL 17454829, at *14 (courts "may consider the public safety concerns of today" under *Bruen*); Dkt. 144 at 7–8, 10–14.

As with modern assault weapon restrictions, the historical analogues surveyed by Defendant were similarly enacted in response to public-safety dangers at the time, such as the widespread use of machine guns in crime in the early 20th century and the widespread use of concealable weapons, like dirks and Bowie knives, in assaults in the 19th century. *See DSSA*, 2023 WL 2655150, at *13 (concluding that the burden imposed by restrictions on assault long guns and concealable weapons is comparably justified). As those weapons circulated more widely in society and were used more frequently in violent crime, governments restricted them, while permitting access to other weapons for self-defense. The historical record confirms that, when confronted with indiscriminate violence and public disorder, "[s]tate governments have never been required to stand idly by and watch the carnage rage." *Bondi*, 61 F.4th at 1320.

In sum, even if Plaintiffs' proposed course of conduct of acquiring and possessing certain semiautomatic rifles with combat-oriented accessories is covered by the Second Amendment, the AWCA's restrictions on those weapons and accessories is consistent with the Nation's tradition of firearms regulation, including the "how" and "why" of relevantly similar analogues. Accordingly, the AWCA does not violate the Second Amendment.

1

**CONCLUSION**

2

The Court should enter summary judgment in favor of Defendant.

3

Dated:  May 26, 2023

Respectfully submitted,

4

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney
General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General

5

6

7

8

9

*/s/ John D. Echeverria*

10

11

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,
in his official capacity as Attorney
General of the State of California*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Rob Bonta, in his official capacity as Attorney General of California, certifies that this brief contains 9,972 words, which complies with the word limit set by court order dated May 16, 2023. *See* Dkt. 148 at 2.

Dated:  May 26, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney
General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General


*/s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,
in his official capacity as Attorney
General of the State of California*