ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as Attorney General*
*of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | Case No. 8:17-cv-00746-JLS-JDE<br><br>**DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          July 28, 2023<br>Time:          10:30 a.m.<br>Courtroom:  8A<br>Judge:         Hon. Josephine L. Staton<br>Trial Date:   None set<br>Action Filed: April 24, 2017 |

## DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| No. | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
| 1 | In 1957, the U.S. Army requested Armalite, a small arms manufacturer, to produce a lightweight, high-velocity rifle that could operate in both semi-automatic and full-automatic modes, with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." | DX-1 at 29 (Donohue Rpt. ¶ 68).[1] |
| 2 | According to one of the designers of the AR-15, the rifle was engineered to generate "maximum wound effect." | DX-1 at 30 (Donohue Rpt. ¶ 73). |
| 3 | After field testing in combat operations in Vietnam, the Advanced Research Projects Agency ("ARPA") noted that the "lethality of the AR-15 and its reliability record were particularly impressive." | DX-1 at 29 (Donohue Rpt. ¶ 69); DX-65 at 2523 (ARPA Study at 8). |
| 4 | ARPA found that all casualties inflicted by the AR-15 in combat were fatal, including hits to only extremities. | DX-1 at 29–30 (Donohue Rpt. ¶¶ 69–70); DX-65 at 2530 (ARPA Study, Annex A at 5). |
| 5 | ARPA found that the AR-15 was "superior in virtually all respects" to other military small arms, like the Thompson submachinegun and Browning Automatic Rifle. | DX-65 at 2512 (ARPA Study, Cover Memo (Aug. 20, 1962)). |
| 6 | Armalite sold the patent and trademark rights to Colt in 1959. | DX-70 at 2839 (Alex Horton et al., *Decades of Marketing* |

[1] Citations to Defendant's exhibits are prefaced with "DX," so that DX-1 refers to Defendant's Exhibit 1. DX-1 through DX-45 were annexed to the Declaration of Peter H. Chang in Support of Defendant's Motion for Summary Judgment (Dkt. 76); DX-46 was annexed to the Supplemental Declaration of Peter H. Chang in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 90); and DX-47 through DX-87 are annexed to the concurrently filed Declaration of John D. Echeverria in Support of Defendant's Motion for Summary Judgment. In accordance with Local Rule 11-5.2, and for the Court's convenience, the pages of Defendant's exhibits have been numbered consecutively, continuing from the final page of DX-46.

| | | | |
|---|---|---|---|
| | | During the Vietnam War, the AR-15 was approved for use by U.S. armed forces, after which its name was changed to the M16.  Thereafter, the AR-15 was the name used for the semiautomatic rifle sold to civilians.  After Colt's patent expired in 1977, other manufacturers began to produce their own versions of the AR-15 under different names. | *Reinvented the AR-15 into a Top-Selling Firearm*, Wash. Post., Mar. 27, 2023, at 2); DX-72 at 2878–79 (Todd Frankel et al., *How the AR-15 Became a Powerful Political, Cultural Symbol in America*, Wash. Post, Mar. 27, 2023, at 4–5); DX-79 at 2938–39 (Chris Linville, *AR-15 vs M4: Exploring Key Differences & Similarities*, GunsAmericaDigest.com, May 18, 2023). |
| | 7 | An automatic weapon is capable of firing repeatedly as long as the trigger is depressed, until ammunition is exhausted or the weapon malfunctions.  Burst fire is automatic fire that fires a fixed number of shots (e.g., 3 shots) with each pull of the trigger.  A semiautomatic weapon is capable of firing a single shot with each pull of the trigger.  A select-fire weapon is capable of firing in automatic (or burst) mode or in semiautomatic mode. | DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-50 at 1686–87 (Busse Suppl. Rpt. ¶ 11); DX-16 at 749 (Helsley Dep. Tr. at 44). |
| | 8 | The M4 is a shorter, carbine variant of the M16.  It is a select-fire weapon. | DX-61 at 2391 (Tucker Suppl. Rpt.) ¶ 4 n.2. |
| | 9 | In a 1989 report, the Bureau of Alcohol Tobacco & Firearms ("ATF") described features such as folding and telescoping stocks, pistol grips, and flash suppressors as "military features and characteristics . . . carried over to the semiautomatic versions of the original military rifle." | DX-22 at 1048–49 (1989 ATF Rpt. at 6–7). |
| | 10 | According to the 1989 ATF Report, large-capacity magazines "are indicative of military firearms," and | DX-22 at 1048 (1989 ATF Rpt. at 6). |

| | | | |
|---|---|---|---|
| | | the fact "[t]hat a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle." | |
| | 11 | In a 1998 study, ATF examined semiautomatic assault rifles with a "military configuration," which incorporated physical features such as the ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, and flash suppressors.  The 1998 study referred to rifles capable of accepting detachable ammunition magazines as "large capacity military magazine rifles." | DX-21 at 992–93 (1998 ATF Rpt. at 1). |
| | 12 | The AR-15 is the civilian version of the military's M16. | DX-2 at 121–22 (Graham Rpt. ¶ 15); DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). |
| | 13 | The difference between the M16 and the AR-15 is that the M16 is a select-fire rifle that allows the shooter to fire in either automatic or semiautomatic mode, while the AR-15 fires only in semiautomatic mode (unless modified). | DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13). |
| | 14 | AR-platform rifles are generally chambered in similar caliber rounds as the M16 and M4 (generally, .223 for AR-platform rifles and 5.56 NATO for M16 rifles). | DX-62 at 2408 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 7); DX-2 at 128 (Graham Rpt. ¶ 34); DX-10 at 320 (Graham Dep. Tr. at 130); DX-42 at 1533 (2013 NSSF Rpt. at 7). |
| | 15 | AK-platform rifles are generally chambered in 7.62 rounds, which is almost twice as large as a .223 round. | DX-87 at 3023 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, June 21, 2017, at 3). |
| | 16 | Rounds used with AR-platform rifles | DX-72 at 2878 (Todd C. |

4

| | | and the M16 and M4 contain projectiles fired at high velocity and, when the projectiles penetrate the human body, they tumble through flesh, tissue, and bone, causing significant injury. | Frankel et al., *How the AR-15 Became a Powerful Political, Culture Symbol in America*, Wash. Post, Mar. 27, 2023, at 4); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-4 at 146–47 (Colwell Rpt. at 3–4); DX-38 at 1505 (Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. of Acute Disease 178, 180 (2014)); DX-68 at 2823 (Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage*, Wash. Post, Mar. 27, 2023). |
| | 17 | When a bullet enters a victim's body, it results in permanent and temporary cavitation.  A permanent cavity "is the tissue that is actually crushed or destroyed by the projectile's interaction with it."  A temporary cavity is caused by tissue being stretched away from the permanent cavity. | DX-14 at 504–05 (Boone Dep. Tr. at 57–58); DX-38 at 1505 (Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. of Acute Disease 178, 180 (2014)); DX-44 at 1541 (2014 FBI Training Mem. at 4). |
| | 18 | The temporary cavity, if one is created, by a handgun wound is typically not as injurious to the tissue as the temporary cavity typically caused from a rifle wound, and can be more easily treated by a physician. | DX-44 at 1541 (2014 FBI Training Mem. at 4); DX-4 at 146–47 (Colwell Rpt. at 3–4). |
| | 19 | Rifle rounds, such as .223 or 5.56 NATO, will penetrate soft body armor designed to stop common handgun rounds. | DX-14 at 551–52 (Boone Dep. Tr. at 123–24); DX-11 at 370 (Mersereau Dep. Tr. at 94). |
| | 20 | AR-platform rifles have a similar muzzle velocity as the M16 and M4—more than 3,000 feet per second. | DX-57 at 2031 (Roth Suppl. Rpt. ¶ 49); DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). |

| 21 | The muzzle velocity of an AR-platform rifle and an M16 or M4 is three times the velocity of a typical handgun. | DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11); DX-85 at 2987 (Mem. from Rep. Carolyn B. Maloney to Members of the H.R. Comm. on Oversight & Reform, July 27, 2022, at 3). |
|---|---|---|
| 22 | A projectile fired by firearm imparts kinetic energy on a target equal to one half the projectile's mass multiplied by the square of its velocity. | DX-87 at 3022 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, June 21, 2017, at 2). |
| 23 | A semiautomatic weapon can be converted to automatic fire by installing certain parts, such as bump stocks or multiburst trigger activators. | DX-27 at 1095 (P.L. 103-489 at 18); DX-57 at 2033 (Roth Suppl. Rpt. ¶ 52); DX-51 at 1728 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 28). |
| 24 | According to a Congressional report, semiautomatic firearms can be "virtually indistinguishable in practical effect from machineguns." | DX-27 at 1095 (P.L. 103-489 at 18). |
| 25 | U.S. soldiers are instructed to fire M16s and M4s in semiautomatic mode to improve accuracy and lethality in rapid fire and conserve ammunition. | DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-57 at 2032 (Roth Suppl. Rpt. ¶ 49); DX-19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8). |
| 26 | When fired semiautomatically, AR-platform rifles and M16s have an effective maximum rate of fire of 45 rounds per minute, which is referred to as "rapid semiautomatic fire." Rapid semiautomatic fire is a combat tactic. | DX-62 at 2411 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 22); DX-19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC-3-22 (May 2016) at 8-6). |
| 27 | Automatic or burst fire is inherently less accurate than semiautomatic fire. | DX-19 at 911 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7- |

|    |                                                                                                                                                                                                                                                                                                                                                                              |                                                                              |
|----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|------------------------------------------------------------------------------|
|    |                                                                                                                                                                                                                                                                                                                                                                              | 12); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC-3-22 (May 2016) at 8-6); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13). |
| 28 | In 1989, a semiautomatic AK-47 rifle was used to kill 5 schoolchildren and injure 32 others at an elementary school in Stockton, California.                                                                                                                                                                                                                                   | DX-2 at 129 (Graham Rpt. at ¶ 40(a)).                                         |
| 29 | In 1989, California enacted the Assault Weapons Control Act ("AWCA"), finding that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state" and that the restricted assault weapons have "a high rate of fire and capacity for firepower."                                                                 | Cal. Penal Code § 30505(a).                                                   |
| 30 | The AWCA defines a rifle as an "assault weapon" if it is listed in California Penal Code section 30510(a) or if it is a semiautomatic centerfire rifle that lacks a fixed ammunition magazine and has one of certain accessories, parts, or configurations enumerated in California Penal Code section 30515(a).  The definitions in Section 30515(a) do not apply to rifles that are not semiautomatic, that are rimfire, or that have a fixed ammunition magazine. | Cal. Penal Code §§ 30510(a), 30515(a).                                        |
| 31 | Rifles restricted by the AWCA possess many of the same features, like pistol grips and adjustable stocks, as the M16 and M4.                                                                                                                                                                                                                                                  | DX-61 at 2393–94 (Tucker Suppl. Rpt. ¶ 14).                                   |
| 32 | Generally, rifles listed in California Penal Code section 30510(a) have one or more of the accessories or parts enumerated in California Penal Code                                                                                                                                                                                                                            | DX-2 at 122 (Graham Rpt. ¶ 15); DX-11 at 348 (Mersereau Dep. Tr. at 31).     |

7

| | | section 30515(a)(1). | |
|---|---|---|---|
| | 33 | AR-platform rifles capable of accepting detachable magazines take 3 to 5 seconds less to reload than the same rifle with a fixed magazine. | DX-10 at 331–33 (Graham Dep. Tr. at 188–90). |
| | 34 | Centerfire cartridges have the primer located in the center of the base of the case, in contrast with rimfire cartridges that contain the primer on the rim of the cartridge. | DX-50 at 1686 (Busse Suppl. Rpt. ¶ 11). |
| | 35 | Centerfire ammunition is more powerful than rimfire ammunition. | DX-50 at 1686–87 (Busse Suppl. Rpt. ¶ 11); DX-16 at 753–54 (Helsley Dep. Tr. at 48–49); DX-2 at 123 (Graham Rpt. ¶ 18). |
| | 36 | A rifle's capability of accepting detachable magazines allows a shooter to rapidly change magazines and continue firing. | DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15). |
| | 37 | During combat, detachable magazines provide a rifleman with the capability to fire 120 rounds semiautomatically in three minutes at a sustained rate of 45 rounds per minute. | DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15). |
| | 38 | A pistol grip that protrudes conspicuously beneath the action of the rifle allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing. | Cal. Code Regs. tit. 11, § 5471(z); DX-2 at 123 (Graham Rpt. ¶ 19); DX-50 at 1687–88 (Busse Suppl. Rpt. ¶ 13). |
| | 39 | A protruding pistol grip helps to stabilize a semiautomatic or automatic rifle and enhance lethality during rapid fire. | DX-50 at 1687–90 (Busse Suppl. Rpt. ¶¶ 13, 18); DX-2 at 126 (Graham Rpt. ¶ 26); DX-61 at 2394–95 (Tucker Suppl. Rpt. ¶ 16); DX-22 at 1048 (1989 ATF Rpt. at 6); DX-3 at 137–38 (Mersereau Rpt. ¶ 9). |

| 40 | An assault rifle with a pistol grip would allow a shooter to shoot more accurately and reload faster. | DX-3 at 137–38 (Mersereau Rpt. ¶ 9). |
| 41 | According to a 1989 ATF Report, a pistol grip beneath the action of the rifle can also "be an aid in one-handed firing of the weapon in a combat situation." | DX-22 at 1048 (1989 ATF Report at 6). |
| 42 | A pistol grip is not necessary to operate a rifle, including for self-defense. | DX-50 at 1688 (Busse Suppl. Rpt. ¶ 13). |
| 43 | A thumbhole stock enables the shooter to place the thumb of the trigger hand through the stock while firing, mimicking the ergonomics of a pistol grip. | Cal. Code Regs. tit. 11, § 5471(qq); DX-2 at 123 (Graham Rpt. ¶ 20); DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). |
| 44 | A thumbhole stock allows a shooter to insert a thumb through the stock, mimicking the effects of a pistol grip and assisting a shooter in rifle control during periods of rapid fire. | DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). |
| 45 | A thumbhole stock is not necessary to operate a rifle, including for self-defense. | DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). |
| 46 | A forward pistol grip "allows for a pistol style grasp forward of the trigger." | Cal. Code Regs. tit. 11, § 5471(t); DX-2 at 125 (Graham Rpt. ¶ 23); DX-50 at 1689–90 (Busse Suppl. Rpt. ¶ 18). |
| 47 | A forward pistol grip on a rifle was a feature of early machineguns; it can help insulate the non-trigger hand from heat during rapid fire and stabilize a rifle during rapid fire. | DX-16 at 774 (Helsley Dep. Tr. at 79); DX-50 at 1689–90 (Busse Suppl. Rpt. ¶ 18); DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 17). |
| 48 | A folding or telescoping stock is attached to the receiver, which can change the overall length of the rifle. | Cal. Code Regs. tit. 11, §§ 5471(ll), (oo), (nn); DX-2 at 124 (Graham Rpt. ¶ 21); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 15). |
| 49 | According to a 1989 ATF Report, the | DX-22 at 1048 (1989 ATF |

9

| | | "predominant advantage" of a folding or telescoping stock "is for military purposes, and it is normally not found on the traditional sporting rifle." | Report at 6). |
|---|---|---|---|
| | 50 | A folding or telescoping stock renders the rifle more concealable. | DX-2 at 124, 126 (Graham Rpt. ¶¶ 21, 27). |
| | 51 | A folding or telescoping stock can make a rifle less stable when firing, if not properly locked in place. | DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 18). |
| | 52 | A rifle does not need a folding or telescoping stock to operate, including for self-defense. | DX-50 at 1689 (Busse Suppl. Rpt. ¶ 15). |
| | 53 | A flash suppressor is any device attached to the end of the barrel that reduces or redirects muzzle flash, including any device identified as a "flash hider." | Cal. Code Regs. tit. 11, § 5471(r); DX-2 at 125 (Graham Rpt. ¶ 22); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17). |
| | 54 | Flash suppressors can be affixed to the muzzle of a rifle to reduce the flash emitted upon firing, which can aid a shooter in low-light conditions to maintain more effective fire. | DX-2 at 125 (Graham Rpt. ¶ 22); DX-3 at 138 (Mersereau Rpt. ¶ 11); DX-22 at 1049 (1989 ATF Report at 7). |
| | 55 | A flash suppressor can reduce muzzle climb during rapid fire. | DX-22 at 1049 (1989 ATF Report at 7). |
| | 56 | A flash suppressor can help conceal the location of a shooter, especially in low-light conditions. | DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25); DX-22 at 1049 (1989 ATF Report at 7). |
| | 57 | A flash suppressor facilitates night combat operations by mitigating the effects of muzzle flash on night vision goggles. | DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25). |
| | 58 | A flash suppressor is not necessary to operate a firearm, including for self-defense. | DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17). |
| | 59 | A semiautomatic centerfire rifle under 30 inches in length is more concealable than the same rifle that is 30 inches or longer. | DX-2 at 126 (Graham Rpt. ¶ 27); DX-50 at 1691 (Busse Suppl. Rpt. ¶ 21). |

| 60 | Generally, the only way to reduce the overall length of a rifle is to use shorter barrels or shorter or collapsible stocks (or both).  Neither a shortened barrel nor a shorter or collapsible stock is necessary to operate a rifle, including for self-defense. | DX-50 at 1691 (Busse Suppl. Rpt. ¶ 21). |
|---|---|---|
| 61 | Manufacturers of rifles restricted by the AWCA have marketed the rifles to civilians based on their military features and military design. | DX-51 at 1720–35 (Busse Suppl. Sur-Rebuttal Rpt. ¶¶ 17–37); DX-32 at 1277 (Violence Policy Ctr., The Militarization of the U.S. Civilian Firearms Market 1 (2011)); DX-35 at 1459 (Guns & Ammo (July 1981) at 48); *e.g.*, DX-24 at 1071 (Colt AR15A4 Advertisement); DX-25 at 1072 (About Colt Rifles); DX-85 at 2986, 2994–97 (Mem. from Rep. Carolyn B. Maloney to Members of the H.R. Comm. on Oversight & Reform, July 27, 2022, at 2, 10–13). |
| 62 | AWCA-compliant semiautomatic rifles, including AR-platform rifles, are available for purchase and possession in California. | DX-50 at 1688–89, 1694–708 (Busse Suppl. Rpt. ¶¶ 13–15 & Ex. A); DX-16 at 740–41 (Helsley Dep. Tr. at 21–22); DX-2 at 126 (Graham Rpt. ¶ 30). |
| 63 | Gun ownership in the United States is becoming more concentrated. | DX-1 at 6–9 (Donohue Rpt. ¶¶ 18–26). |
| 64 | AR- and AK-platform rifles comprise approximately 5% of all firearms in circulation in America; this estimate likely includes rifles in the possession of domestic law enforcement agencies. | DX-54 at 1852 (Klarevas Suppl. Rpt. ¶ 15). |
| 65 | AR-platform and similar semiautomatic rifles did not sell in substantial numbers until the late | DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). |

11

| | | | |
|---|---|---|---|
| | | 2000s and particularly after the 2012 shooting at Sandy Hook Elementary in Newtown, Connecticut. | |
| | 66 | As of 2013, 66 percent of AR- or AK-rifles owners owned two or more such rifles, and such owners owned on average 3.1 AR- or AK-platform rifles. | DX-42 at 1532–33 (2013 NSSF Rpt. at 6–7). |
| | 67 | As of 2013, over 30 percent of AR- or AK-platform rifle owners owned three or more such rifles, and over one quarter of owners reported having four or more such rifles. | DX-42 at 1535 (2013 NSSF Rpt. at 13). |
| | 68 | As of 2013, approximately 99% of owners of an AR- or AK-platform rifle also owned a firearm that was not an AR- or AK-platform rifle. | DX-42 at 1532 (2013 NSSF Rpt. at 6). |
| | 69 | An analysis of incidents reported in the NRA Armed Citizens database compiled from January 2011 through May 2017 reveals that it is rare for individuals to defend themselves using more than ten rounds; on average, only 2.2 shots were fired by defenders. No shots were fired in 20.9% of incidents. | DX-47 at 1566–67 (Allen Suppl. Rpt. ¶ 13). |
| | 70 | An analysis of published news stories revealed a similar number of average shots per incident of self-defense (i.e., 2.34). No shots were fired in 11.6% of incidents. In 97.3% of the incidents, the defender fired five or fewer shots. | DX-47 at 1572–73 (Allen Suppl. Rpt. ¶ 20). |
| | 71 | An analysis of the Heritage Foundation's database on defensive gun uses in the United States revealed that approximately 2 to 4 percent of all defensive gun uses involved any type of rifle. | DX-47 at 1576–77 (Allen Suppl. Rpt. ¶ 28). |
| | 72 | A greater number of fatalities and | DX-15 at 728 (Kleck Dep. Tr. |

| | | | |
|---|---|---|---|
| | | injuries that occur in a mass shooting is correlated with the use of an assault weapon. | at 263); DX-47 at 1582–83, 1585 (Allen Suppl. Rpt. ¶¶ 34–37, 42); DX-54 at 1853–56 (Klarevas Suppl. Rpt. ¶¶ 16–18 & tbls. 3 & 4); DX-57 at 2034–35 (Roth Suppl. Rpt. ¶ 54 & fig. 1). |
| | 73 | During the period in which the federal assault weapons ban was in effect, the use of banned assault weapons in crimes was reduced. | DX-15 at 662–63 (Kleck Dep. Tr. at 153–54); DX-53 at 1802 (Donohue Suppl. Rpt. ¶ 23). |
| | 74 | The AWCA is more comprehensive than the federal assault weapons ban because, unlike the federal ban's two-feature test, the AWCA restricts centerfire rifles capable of accepting a detachable magazine if it has one of the listed features. | DX-15 at 610 (Kleck Dep. Tr. at 70). |
| | 75 | An analysis of mass shootings reveals that states that prohibited assault weapons experienced fewer mass shootings and fewer fatalities in such shootings. | DX-54 at 1866–69 (Klarevas Suppl. Rpt. ¶ 37 & tbls. 6 & 7). |
| | 76 | An analysis of mass shooting data from 1982–2019 reveals a statistically significant relationship between assault weapon restrictions and reductions in mass shooting deaths and injuries. | DX-53 at 1805–06 (Donohue Suppl. Rpt. ¶¶ 28–30 & tbl. 1). |
| | 77 | Between January 1, 1998 and December 31, 2001, at least 41 of the 211 law enforcement officers slain in the line of duty were killed with assault weapons. | DX-31 at 1249 (Violence Policy Ctr., Officer Down 5 (2003)). |
| | 78 | Excluding inter-group violence, such as mob violence, riots, and battles, shooting incidents involving ten or more fatalities did not occur before 1949, and the number of double-digit mass shootings increased dramatically | DX-54 at 1857–60 (Klarevas Suppl. Rpt. ¶¶ 19–22 & tbl. 5). |

| | | | |
|---|---|---|---|
| | | in the period before and after the federal assault weapons ban. | |
| | 79 | Over one half of the 35 deadliest mass shootings in the last 100 years occurred in the last decade. | DX-86 at 3010 (The Violence Project, Key Findings). |
| | 80 | An increasing percentage of mass shootings has involved the use of assault weapons, including 52% of mass shootings involving six or more fatalities and 50% of mass public shootings involving four or more fatalities during the past five years. | DX-54 at 1849–50 (Klarevas Suppl. Rpt. ¶ 14 & figs. 5 & 6); DX-86 at 3011 (The Violence Project, Key Findings). |
| | 81 | In the seven deadliest acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, six involved the use of assault weapons (five involved an AR-platform rifle and one involved an AK-platform rifle). | DX-54 at 1853 (Klarevas Suppl. Rpt. ¶ 16 & tbl. 2). |
| | 82 | As fatality thresholds increase in high-fatality mass shootings involving six-or-more fatalities and mass public shootings involving four-or-more fatalities in a public place, the share of such incidents involving assault weapons also increases. | DX-54 at 1853–54 (Klarevas Suppl. Rpt. ¶ 16 & figs. 9 & 10). |
| | 83 | AR-platform rifles are disproportionately used in mass shootings relative to the percentage of such weapons in circulation in America relative to the overall U.S. gun stock. | DX-54 at 1852 (Klarevas Suppl. Rpt. ¶ 15). |
| | 84 | In the past two years, the United States has experienced numerous, devastating mass shootings with assault weapons, including rifles regulated by the AWCA, including the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the | DX-53 at 1799 (Donohue Suppl. Rpt. ¶ 16); DX-80 at 2948 (Jack Healy et al., *At Least 5 Dead and 25 Injured in Gunman's Rampage at an L.G.B.T.Q. Club in Colorado*, N.Y. Times, Nov. 20, 2022); DX-81 at 2956 (Jeremy White |

14

| | | July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed); the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded; the January 2023 shooting at a dance studio in Monterey Park, California that killed 11 and wounded nine others; the March 2023 shooting at the elementary school in Nashville that killed six, including three 9-year-old children; the April 10, 2023 shooting at a Louisville bank that killed five; and the May 6, 2023 shooting at a shopping center in Allen, Texas that killed 8 and wounded 7 others. | & K.K. Rebecca Lai, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023); DX-82 at 2966 (Adeel Hassan & Emily Cochrane, *What We Know About the Nashville School Shooting*, N.Y. Times, May 20, 2023); DX-83 at 2971 (Kevin Williams et al., *Gunman Who Killed Five in Louisville Left Note and Bought Rifle Legally*, N.Y. Times, Apr. 11, 2023); DX-84 at 2977 (J. David Goodman et al., *After Mass Killings in Texas, Frustration but No Action on Guns*, N.Y. Times, May 7, 2023). |
|---|---|---|---|
| | 85 | From the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations limited the ability of a single person to commit mass murder. | DX-57 at 2025 (Roth Suppl. Rpt. ¶ 41); DX-58 at 2083 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 25). |
| | 86 | The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. | DX-59 at 2099–103 (Spitzer Suppl. Rpt. ¶¶ 11–17); DX-57 at 2027 (Roth Suppl. Rpt. ¶ 44). |
| | 87 | Historically, the term "Arms" referred to weapons such as "swords, knives, rifles, and pistols," and did not include "accoutrements," like "ammunition containers, flints, scabbards, holsters," or "parts of weapons." | DX-49 at 1641 (Baron Suppl. Rpt. ¶ 8). |

| 88 | It was time-consuming to load a gun in the late 18th and early 19th century. | DX-52 at 1753 (Cornell Suppl. Rpt. ¶ 27); DX-59 at 2110–13 (Spitzer Suppl. Rpt. ¶¶ 24–28). |
|---|---|---|
| 89 | Repeater firearms (capable of holding several rounds in a magazine or revolving cylinder and firing successive shots) were "extraordinarily rare" in the 18th century. | DX-60 at 2363 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶ 22). |
| 90 | There is no evidence that many early repeating firearms were commercially available during the 18th century. | DX-60 at 2363–77 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶¶ 23–45). |
| 91 | In 1800, it "was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder" that repeaters required. | DX-60 at 2378 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶ 47). |
| 92 | The historical record is replete with reference to faultiness of repeaters manufactured before and during the founding. | DX-60 at 2366, 2371, 2378 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶¶ 26, 36, 47). |
| 93 | 19th century repeaters, like the Henry and Winchester rifles, were understood during the era of Reconstruction to be weapons of war or anti-insurrection, not weapons of individual self-defense. | DX-63 at 2419 (Vorenberg Suppl. Rpt. ¶ 7). |
| 94 | The lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm, were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War. | DX-63 at 2425–27 (Vorenberg Suppl. Rpt. ¶¶ 20–21, 24). |

16

| | | |
|---|---|---|
| 95 | Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians. | DX-63 at 2429–30 (Vorenberg Suppl. Rpt. ¶ 27). |
| 96 | By the time the Fourteenth Amendment was ratified, the commercial viability of the Winchester Model 1866 was due "almost entirely to sales to foreign armies," not to Americans. | DX-63 at 2444 (Vorenberg Suppl. Rpt. ¶ 50). |
| 97 | In the 18th and 19th centuries, laws required gunpowder to be stored on the top floor of a building and permitted government officials to remove it when necessary to prevent explosions and to transfer the powder to the public magazine. | DX-52 at 1759–60 (Cornell Suppl. Rpt. ¶¶ 35–37). |
| 98 | During the colonial period, states began to enact restrictions on "trap guns," laws that proliferated in the 19th century. | DX-59 at 2135, 2136–37, 2190–92, 2331–39 (Spitzer Suppl. Rpt. ¶¶ 63, 66 & Exs. B & F). |
| 99 | A trap gun was a firearm that was configured in a way to fire remotely (without the user operating the firearm), typically by rigging the firearm to be fired by a string or wire when tripped. | DX-59 at 2135 (Spitzer Suppl. Rpt. ¶ 63). |
| 100 | Trap guns were used to protect personal or commercial property. | DX-59 at 2136 (Spitzer Suppl. Rpt. ¶ 64). |
| 101 | As homicide rates increased in the South in the early 1800s, states began restricting the carrying of certain concealable weapons. | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶¶ 23–24); DX-59 at 2123–24 (Spitzer Suppl. Rpt. ¶ 44); DX-56 at 1975–76 (Rivas Suppl. Rpt. ¶ 14). |
| 102 | These concealed weapons laws targeted the specific types of weapons that were commonly used in the murders and serious assaults that | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶ 24). |

| | | caused an alarming rise in homicides at the time. | |
|---|---|---|---|
| | 103 | From 1813 to the Mexican War, in 1846, numerous states and territories also restricted the concealed carrying of particular weapons.  These concealed weapons laws were intended to specifically address the rise in murders and assaults throughout the South at that time. | DX-57 at 2012 (Roth Suppl. Rpt. ¶ 26); DX-59 at 2122–23 (Spitzer Suppl. Rpt. ¶¶ 42–43). |
| | 104 | Class and racial tensions led to a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. | DX-57 at 2010–12 (Roth Suppl. Rpt. ¶¶ 23–26). |
| | 105 | During the 19th century, states enacted a range of laws restricting the carrying of blunt weapons: 12 states restricted "bludgeons"; 14 states restricted "billies"; 43 states restricted "slungshots"; six states restricted "sandbags"; and 13 states broadly restricted any concealed weapon. | DX-59 at 2121–34, 2194–97 (Spitzer Suppl. Rpt. ¶¶ 42–61 & Ex. C). |
| | 106 | During the 19th century, including around the time that the Fourteenth Amendment was ratified, 49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives." | DX-59 at 2128, 2194–97 (Spitzer Suppl. Rpt. ¶ 50 & Ex. C). |
| | 107 | Many state laws enacted during the 19th century also included revolvers and pistols in their lists of proscribed weapons. | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶¶ 24–25). |
| | 108 | These laws aimed to curb the general use of concealable weapons in | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶ 24); DX-58 at |

| | | | |
|---|---|---|---|
| | | opportunistic crimes and assaults that exacerbated rising homicide rates in the South and its borderlands. | 2090 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 37 n.44). |
| | 109 | State constitutions adopted during Reconstruction expressly linked the right to keep and bear arms to the state's authority to regulate arms: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or of the government, under such regulations as the Legislature may prescribe." | DX-52 at 1764–69 (Cornell Suppl. Rpt. ¶¶ 43–51). |
| | 110 | During this period, the federal government regulated access to particularly dangerous weapons, including the Henry and Winchester lever-action repeating rifles that began to circulate in the postbellum period, and along with state militias sought to prevent access to those weapons to insurrectionary groups and Native Americans. | DX-63 at 2419–20, 2425–26, 2450–51 (Vorenberg Suppl. Rpt. ¶¶ 8–9, 21–22, 63–64. |
| | 111 | Notably, when semiautomatic and automatic weapons began to circulate more widely in society and appear more frequently in crime in the 1920s, states began to regulate semiautomatic and automatic weapons capable of firing a certain number of rounds successively and weapons capable of receiving ammunition from feeding devices. | DX-59 at 2098–107 (Spitzer Suppl. Rpt. ¶¶ 10–20 & tbl. 1). |
| | 112 | In 1923, the National Conference of Commissioners on Uniform State Laws (now, the Uniform Law Commission) issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading." | DX-59 at 2100 (Spitzer Suppl. Rpt. ¶ 11). |

| 113 | Eleven states enacted restrictions on semiautomatic or fully automatic firearms capable of firing a certain number of rounds without reloading; eight states regulated fully automatic weapons, defined as a firearm capable of firing a certain number of rounds without reloading or accepting an ammunition feeding device; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner, including a 1927 California law. | DX-59 at 2103–06 (Spitzer Suppl. Rpt. ¶¶ 16, 19 & tbl. 1). |
| 114 | These early 20th century firearm regulations followed the same regulatory pattern of state and federal restrictions on large-capacity magazines in the late 20th century after the rise in mass shootings. | DX-59 at 2097–98 (Spitzer Suppl. Rpt. ¶¶ 9–10). |
| 115 | As of May 26, 2023, eleven jurisdictions representing more than one quarter of the U.S. population, restrict assault weapons:  California, Connecticut, Delaware, the District of Columbia, Hawaii (assault pistols only), Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington. | DX-59 at 2095 (Spitzer Suppl. Rpt. ¶ 7 & n.3); DX-54 at 1865 (Klarevas Suppl. Rpt. ¶ 35); H.B. 5471, 103d Gen. Assemb. (Ill. 2023); Substitute H.B. 1240, 68th Legis. (Wash. 2023). |

Dated:  May 26, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General


*/s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*

21