C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Matthew D. Cubeiro – SBN 291519
mcubeiro@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN RUPP, et al.,<br><br>                              Plaintiffs,<br><br>          vs.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>                              Defendant. | Case No.: 8:17-cv-00746-JLS-JDE<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:     July 28, 2023<br>Hearing Time:    10:30 a.m.<br>Judge:               Josephine L. Staton<br>Courtroom:        8A<br><br>[Filed concurrently with Notice of Motion for Summary Judgment; Statement of Uncontroverted Facts; Request for Judicial Notice; Declarations of Sean A. Brady, Steven Rupp, Steven Dember, Cheryl Johnson, Christopher Seifert, Alfonso Valencia, Troy Willis, Dennis Martin, and Richard Minnich; Proposed Judgment] |

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

I.      Introduction.............................................................................................1

II.     Background...............................................................................................1

        A.      California's Assault Weapons Control Act ("AWCA") .......................1

        B.      The Banned Rifles Are Common ........................................................4

        C.      Plaintiffs Include Law-Abiding, Responsible Adult Citizens
                Seeking to Exercise Their Fundamental Rights .................................5

        D.      Procedural History..............................................................................6

III.    Argument .................................................................................................7

        A.      Proper Second Amendment Scrutiny Post-*Bruen* ...............................8

        B.      The Second Amendment's Plain Text Covers Acquiring
                and Possessing the Banned Rifles .....................................................11

                1.      *Heller* Establishes That *All* Rifles Are "Arms" .........................12

                2.      *Bruen* Confirmed That the Banned Rifles Cannot Be
                        Excluded from the Second Amendment's Scope on
                        the Asserted Ground That They Are "Like" M-16s ..................13

        C.      *Heller* and *Bruen* Eliminated the Need for Further
                Historical Scrutiny Here: The AWCA Unconstitutionally
                Bans Rifles That Are in Common Use and Thus
                Necessarily Not "Dangerous and Unusual" Weapons .......................16

                1.      Firearms "In Common Use" Cannot Be "Dangerous
                        And Unusual"..............................................................................18

                2.      Firearms "In Common Use" Cannot Be "Dangerous
                        And Unusual"..............................................................................20

        D.      No Historical Firearms Regulation Justifies the AWCA's
                Rifle Ban............................................................................................23

IV.     Conclusion .............................................................................................28

ii

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................7

*Andrews v. State*,
50 Tenn. 165 (1871)......................................................................12

*Antonyuk v. Hochul*,
No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965,
(N.D.N.Y. Oct. 6, 2022) ..............................................10, 25, 27, 28

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ...........................................................20

*Caetano v. Massachusetts*,
577 U.S. 411 (2016).....................................................7, 12, 18, 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................7

*Del. State Sportsmen's Ass'.n, Inc. v. Del. Dep't of Safety & Homeland
Sec.*, No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, (D. Del.
Mar. 27, 2023) .........................................................................21, 22

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................passim

*Drummond v. Robinson Twp.*,
9 F.4th 217 (3rd Cir. 2021)..............................................................9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .........................................................12

*Firearms Pol'y Coal., Inc. v. McCraw*,
No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834, (N.D. Tex. Aug.
25, 2022) ......................................................................................25

*Friedman v. City of Highland Park*,
577 U.S. 1039 (2015).................................................................15, 22

*Fyock v. City of Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) .......................................................6, 23

*Heller v. District of Columbia*,
399 U.S. App. D.C. 314 (2011) .......................................................15

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)...................................21, 22, 24, 26

*Jackson v. City & Cty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) .........................................................12

iii

TABLE OF CONTENTS

*Kolbe v. Hogan*,
    813 F.3d 160 (4th Cir. 2016) ............................................................. 21

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961) ............................................................................. 9

*Luis v. United States*,
    578 U.S. 5 (2016) ............................................................................. 11

*Maloney v. Singas*,
    351 F. Supp. 3d 222 (E.D.N.Y. 2018) ............................................. 20

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................................... 7, 13

*Miller v. Bonta*,
    542 F. Supp. 3d 1009 (S.D. Cal. 2021) .................................. 21, 22, 24

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................................. passim

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. __, 142 S. Ct. 2111 (2022) ................................................ 1

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ........................................................... 21

*Ramirez v. Commonwealth*,
    94 N.E.3d 809 (Mass. 2018) ........................................................... 20

*Rocky Mt. Gun Owners v. Town of Superior, Colo.*,
    22-cv-01685 (July 22, 2022) ..................................................... 17, 21

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ...................................... 6, 13, 16

*Rupp v. Bonta*,
    No. 19-56004, 2022 U.S. App. LEXIS 18769 (9th Cir. June 28, 2022) ............................................................................................... 7

*Staples v. United States*,
    511 U.S. 600 (1994) ....................................................................... 15

*Teixeira v. Cty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) .......................................................... 12

*United States v. Benitez*,
    No. 17-cr-00348, 2018 U.S. Dist. LEXIS 211398 (D. Idaho Dec. 14, 2018) ....................................................................................... 21

*United States v. Chovan*,
    735 F.3d 1127 (9th Cir. 2013) .......................................................... 6

*United States v. Marzzarella*,
    614 F.3d 85 (3rd Cir. 2010) ............................................................ 12

iv

TABLE OF CONTENTS

*United States v. Nutter,*
No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038 (S.D. W. Va. Aug. 29, 2022) ............................................................. 25

**Statutes**

1927 Mich. Pub. Acts 887, § 3 ......................................................... 24

1927 R.I. Pub. Laws 256 § 1 ......................................................... 24

1927 R.I. Pub. Laws 256 § 3 ......................................................... 24

1933 Ohio Laws 189, §§ 12819 ......................................................... 24

1959 Mich. Pub. Acts 249 ......................................................... 24

1959 Mich. Pub. Acts 250 ......................................................... 24

1959 R.I. Acts & Resolves 260 ......................................................... 24

1959 R.I. Acts & Resolves 263 ......................................................... 24

1972 Ohio Laws 1866 ......................................................... 24

1972 Ohio Laws 1963 ......................................................... 24

2013-2014 Leg., H.R. 234 (Ohio) ......................................................... 24

26 U.S.C. §§ 5801-72 ......................................................... 24

47 Stat. 650, § 1 (1932) ......................................................... 24

47 Stat. 650, § 14 (1932) ......................................................... 24

48 Stat. 1236 (1934) ......................................................... 24

Assemb. B. 1135, 2015-2016 Reg. Sess. (Cal. 2016) ......................................................... 2

Cal. Penal Code § 30510 ......................................................... 1, 2, 12

Cal. Penal Code § 30515 ......................................................... 1, 2, 3, 8

Cal. Penal Code § 30600 ......................................................... 1

Cal. Penal Code § 30605 ......................................................... 1

Cal. Penal Code § 30900 ......................................................... 3, 12

Cal. Penal Code § 30915 ......................................................... 4

Cal. Penal Code § 30960 ......................................................... 3

Cal. Penal Code § 30520 ......................................................... 3

Pub. L. No. 103-322, Title XI, § 110105(2) ......................................................... 24

v

TABLE OF CONTENTS

Sen. B. 263 (1991-1992 Reg. Sess.) (Cal. 1991) ....................................................1

Sen. B. 880 (2015-2016 Reg. Sess.) (Cal. 2016) ..................................................2

**Rules**

Fed. R. Civ. P. 56 .................................................................................................7

**Regulations**

11 C.C.R. § 5471 ..............................................................................................2, 3

11 C.C.R. § 5478 .................................................................................................4

11 C.C.R. § 5495 ..............................................................................................1, 2

11 C.C.R. § 5496 .................................................................................................2

11 C.C.R. § 5497 .................................................................................................2

11 C.C.R. § 5498 .................................................................................................2

11 C.C.R. § 5499 ..............................................................................................1, 2

**Other Authorities**

Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003* (2004) ...................................................................................24

Chuck Willis & Robert A. Sadowski, *The Illustrated History of Guns* 256 (2017) ...................................................................................................26

David Kopel, Reason Magazine, *The Founders were well aware of continuing advances in arms technology*, available at https://rb.gy/k23pf (last accessed May 26, 2023) ...........................................26

Emily Guskin, et al., Wash. Post, *Why Do Americans Own AR-15s?* (May 22, 2023) (available at bit.ly/3G0vbG9) ...............................................5

Henry, *Henry History*, https://www.henryusa.com/about-us/henry-history/ (last visited May 26, 2023) ....................................................................26

Jeff Zimba, *The Evolution of the Black Rifle: 20 Years of Upgrades, Options, and Accessories* 10 (2014) .............................................................26

Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle: Comprehensive Consumer Report: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles* 18 (July 14, 2022), https://bit.ly/3SSrVjM (last visited May 26, 2023) ..........................................................................................................22

Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*, available at https://bit.ly/3sPuEQl ...........................................22

*National Shooting Sports Foundation, Inc., Commonly Owned: NSSF
        Announces Over 24 Million MSRs in Circulation* (July 20, 2022)
        ("NSSF"), https://bit.ly/3QBXiyv (last visited May 22, 2023) ........................4

Remington, *Model 8 Autoloading Centerfire Rifle, available at*
        https://web.archive.org/web/20130520070354/http://remington.co
        m/products/archived/centerfire/autoloading/model-8.aspx (last
        visited May 26, 2023) .......................................26

Stephen P. Halbrook, *America's Rifle, The Case for the AR-15* (2022)..................26

*The Federalist No. 44* (Charles R. Kesler ed., 2003)................................................11

William English, Ph.D*., 2021 National Firearms Survey: Updated
        Analysis Including Types of Firearms Owned* (May 13, 2022),
        https://bit.ly/3yPfoHw (last visited May 22, 2023)..........................................4

TABLE OF CONTENTS

# I.     INTRODUCTION

The Supreme Court recently reaffirmed that modern gun control laws withstand Second Amendment scrutiny only if the government meets its burden to prove that the Nation's historical tradition supports such a law. (*N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. __, 142 S. Ct. 2111, 2126 (2022) ("*Bruen*")). In so doing, it also reaffirmed that there is no tradition of banning arms "typically possessed for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). California has taken the extraordinary step of generally banning acquisition and possession of certain rifles that it has unilaterally dubbed with the political pejorative "assault weapons," which include the most popular rifles in the country, owned by the many millions. This case is thus an easy one. The relevant historical analysis has already been done. Because California cannot show that there is a tradition of banning these commonly owned rifles, its law banning them violates the Second Amendment. This Court should thus enter summary judgment in Plaintiffs' favor and vindicate the rights of Plaintiffs and all law-abiding adult Californians to access these banned arms.

# II.    BACKGROUND

## A.     California's Assault Weapons Control Act ("AWCA")

The AWCA generally makes it a felony to manufacture, distribute, transport, or import into the state, sell or offer to sell, or give or lend an "assault weapon." Cal. Penal Code § 30600(a). It also punishes possession of an unregistered "assault weapon" as a crime up to a felony. Cal. Penal Code § 30605(a). Since California first enacted the AWCA in 1989, the state has adopted various definitions of "assault weapon," continually adding to what qualifies as one. *See* Cal. Penal Code § 30510 (former Cal. Penal Code § 12276) (listing "assault weapons" by make and model); Sen. B. 263 (1991-1992 Reg. Sess.) (Cal. 1991) (expanding make/model list of "assault weapons"); 11 C.C.R. §§ 5495, 5499 (further expanding the list); Cal. Penal Code § 30515(a)(1-3) (former Cal. Penal Code § 12276.1(a)(1-3) (identifying

"assault weapons" by features).[1] The latest definition was created in 2016. Cal. Penal Code § 30515 (added by Assemb. B. 1135, 2015-2016 Reg. Sess. (Cal. 2016); Sen. B. 880, 2015-2016 Reg. Sess. (Cal. 2016)) (defining "assault weapon" as any semiautomatic, centerfire rifle that does *not* have a "fixed magazine," if it has at least one of the features enumerated in section 30515(a)).

Essentially, there are now four ways a rifle[2] can qualify as an "assault weapon" under California law. One, if it is semiautomatic and statutorily listed by make and model. Cal. Penal Code § 30510; Cal. Code Regs. tit. 11, §§ 5495-5499. "A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds," is also an "assault weapon" even if it *lacks* the Enumerated Features. Cal. Pen. Code § 30515(a)(2). So is any semiautomatic, centerfire rifle measuring fewer than 30 inches in overall length, regardless of its features or magazine function or capacity. *Id*. § 30515(a)(3); Cal. Code Regs. tit. 11, § 5471(x). Finally, the most common way to qualify as an "assault weapon" is if the rifle has certain enumerated features; specifically, a semiautomatic, centerfire rifle that does *not* have a "fixed magazine" is an "assault weapon" if it has either: a pistol grip that protrudes conspicuously beneath the action of the weapon; a forward pistol grip; a thumbhole stock; a folding or telescoping stock; or a "flash suppressor" ("Enumerated Features"). Cal. Penal Code § 30515(a)(1)(A)-(F).[3]

A rifle is "semiautomatic" if it fires a single cartridge with each separate trigger pull. *See* Cal. Code Regs. tit. 11, § 5471(hh). "Centerfire" is the type of ammunition. *See* Cal. Code Regs. tit. 11, § 5471(j). A "fixed magazine" is "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm

---

[1] In 2010, the legislature reorganized, without substantive change, all Penal Code sections relating to "deadly weapons," including those relating to "assault weapons." *See* Sen. B. 1080, 2009-2010 Reg. Sess. (Cal. 2010).
[2] Though not at issue, some pistols and shotguns are also "assault weapons" under the AWCA.
[3] The "grenade launcher or flare launcher" restriction is not challenged here.

2

action." Cal. Penal Code § 30515(b).[4] This is unlike a "detachable magazine," which is a separate component typically removed from the rifle for loading with the push of a finger on a button. *See* Cal. Code Regs. tit. 11, § 5471(m); *see also* Brady Decl., Ex. 3. The Enumerated Features are defined by regulation. Cal. Code Regs. tit. 11, § 5471(z) (defining "pistol grip"); Cal. Code Regs. tit. 11, § 5471(t) (defining "forward pistol grip"); Cal. Code Regs. tit. 11, § 5471 (qq) (defining "thumbhole stock"); Cal. Code Regs. tit. 11, § 5471(r) (defining "flash suppressor"); Cal. Code Regs. tit. 11, § 5471(oo) (defining "telescoping stock"); Cal. Code Regs. tit. 11, § 5471(nn) (defining "folding stock").

The AWCA contains a byzantine grandfathering provision under which individuals who lawfully possessed a firearm before it was considered an "assault weapon" may continue to possess it, if it had been timely registered with the California Department of Justice ("DOJ") by the applicable statutory deadline, which varies depending on when the firearm was brought within the "assault weapon" definition.[5] Other than authorized peace officers, Californians can no longer legally acquire and register firearms identified as "assault weapons" under any of the AWCA's various definitions. *See id.* §§ 30680, 30900(b)(1) (limiting registration to those firearms lawfully acquired between January 1, 2001, and December 31, 2016, and ending registration on July 1, 2018);[6] *see also id.* §§ 30625-30630 (exempting law enforcement agencies and authorized peace officers).

---

[4] "'Disassembly of the firearm action' means the fire control assembly is detached from the action in such a way that the action has been interrupted and will not function. For example, disassembling the action on a two-part receiver, like that on an AR-15 style firearm, would require the rear take down pin to be removed, the upper receiver lifted upwards and away from the lower receiver using the front pivot pin as the fulcrum, before the magazine may be removed." 11 C.C.R. § 5471(n).

[5] *See* Cal. Penal Code § 30960(a) (former § 12285(f)); *id.* § 30520 (former § 12276.5) (added by Assemb. B. 2718, 2005-2006 Reg. Sess. (Cal. 2006), 2006 Cal. Stat. 6342-43); *id.* § 30515 (former § 12276.1) (added by Sen. B. 123, 1999-2000 Reg. Sess. (Cal. 1999), 1999 Cal. Stat. 1805-06); *id.* § 30900(b) (former § 30900(c) (2012-2016); former § 12285(a)).

[6] *But see* https://oag.ca.gov/firearms/bullet-button-assault-weapon (noting "assault weapon" registration reopened under a stipulation in *Sharp v. Becerra*, E.D. Cal. Mar. 29, 2021). This registration window was open from January 13, 2022, to April 12, 2022, and has now closed.

3

Those possessing a registered "assault weapon" are subject to strict limitations on its use. *Id.* § 30945. They are also limited on how they can lawfully dispose of it. They can generally only transfer their firearm out of state, surrender it to law enforcement, permanently alter it so as to no longer be an "assault weapon," or render it permanently inoperable. *See id.* § 30920(a); *see also* Cal. Code Regs tit. 11, § 5478. If bequeathed, the devisee has 90 days to take one of those steps or annually obtain a discretionary permit from DOJ to keep it. Cal. Penal Code § 30915.[7]

## B.   The Banned Rifles Are Common

Many millions of rifles banned by the AWCA are in the hands of the American people. SUF No. 29. While the precise number cannot be known—as regulators do not keep track—it can be estimated with some degree of confidence "by drawing on publicly available government records, industry reports, and survey responses." Brady Decl., Ex. 2 at 4. Having performed that very analysis, Plaintiffs' expert witness, Professor William English, estimated in 2015 that Americans possess at least 9 million such firearms—and possibly around 15 million or more. *Id*., Ex. 2 at 2-6. In his more recent work, published in 2022, Professor English found that over 24 million Americans have owned AR-15s or similar modern rifles. SUF No. 29; (citing William English, Ph.D.*, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw (last visited May 22, 2023)*; see also National Shooting Sports Foundation, Inc., Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022) ("NSSF"), https://bit.ly/3QBXiyv (last visited May 22, 2023)). Professor English also concluded that Banned Rifles made up twenty percent of all firearms sold in recent years. English, *supra*, at 2, 33.

According to a survey conducted in 2015, around 47.1% of active hunters and shooters in the country own a Banned Rifle. Brady Decl., Ex. 2 at 3-4; Ex. 19. And a

---

[7] DOJ only issues a "dangerous weapons permit" to applicants establishing "good cause." Cal. Code Regs. tit. 11, § 4128(c); Cal. Code Regs. tit. 11, §§ 4132-4137.

4

2017 survey of 226 firearm retailers, revealed that 92.9% of them sell Banned Rifles and that they are the most popular selling long-guns. *Id*., Ex. 2 at 4; Ex. 21. A recent report by the Washington Post found that 6% of American adults (about 16 million citizens) own an AR-15-style rifle. Emily Guskin, et al., Wash. Post, *Why Do Americans Own AR-15s?* (May 22, 2023) (available at bit.ly/3G0vbG9).

Plaintiffs' other firearm experts corroborate these figures. Mark Hanish, a firearms industry senior executive with twenty years in the field, explains that "AR-15 style rifles are one of the most common rifles sold and used by law abiding consumers today." Brady Decl., Ex 53, at 6. Expert Stephen Helsley adds that "AR platform rifles and other semiautomatic/detachable magazine rifles will be found not only at rifle ranges but in rancher's pick-up trucks, slung over hunters' shoulders, and strategically placed for home defense. These rifles have endured 'the slings and arrows' of their detractors for decades. They are however what American shooters want." *Id*., Ex. 3, at 12. A book discussing firearm evolution explains that "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." *Id*., Ex. 59.

## C. Plaintiffs Include Law-Abiding, Responsible Adult Citizens Seeking to Exercise Their Fundamental Rights

The individual Plaintiffs are responsible, adult California residents who are legally eligible to possess firearms. SUF No. 2. Some do not currently own any Banned Rifles but wish to, and would acquire one for lawful purposes, including self-defense, but refrain from doing so for fear of prosecution under the AWCA. SUF No. 13. Others have parts they wish to, and immediately would, assemble into a Banned Rifle to use for lawful purposes, including self-defense, but refrain from doing so for

1  fear of prosecution under the AWCA. SUF No. 10. Some already own at least one

2  Banned Rifle and wish to be free from the transfer and use restrictions that the

3  AWCA places on those rifles, under threat of criminal penalty. SUF No. 8. Appellant

4  California Rifle & Pistol Association, Incorporated is a nonprofit membership

5  organization that represents its tens of thousands of law-abiding members and

6  supporters, many of whom are similarly situated to the individual Plaintiffs. SUF

7  Nos. 17-28. Plaintiffs facially challenge the AWCA's restrictions on the Banned

8  Rifles as a violation of the Second Amendment.

9       **D.   Procedural History**

10       This Court denied Plaintiffs' summary judgment motion on their Second

11  Amendment claim and granted the State's cross-motion. *Rupp v. Becerra*, 401 F.

12  Supp. 3d 978, 994 (C.D. Cal. 2019). In doing so, this Court applied the Ninth

13  Circuit's now overruled two-step inquiry, under which "(1) the court 'asks whether

14  the challenged law burdens conduct protected by the Second Amendment' and (2) if

15  so, what level of scrutiny should be applied." *Id*. at 984 (quoting *Fyock v. City of*

16  *Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015); *United States v. Chovan*, 735 F.3d

17  1127, 1136, 1136 (9th Cir. 2013)). This Court held that Plaintiffs' challenge fails

18  under the first prong because the "semiautomatic rifles within the AWCA's scope are

19  virtually indistinguishable from M-16s and thus are not protected by the Second

20  Amendment." *Id*. at 988. Alternatively, this Court held that under the second prong,

21  even if the AWCA's restriction on the Banned Rifles does implicate the Second

22  Amendment, it would only warrant intermediate scrutiny and that it passes muster

23  under that standard. *Id*. at 990-93.

24       On July 31, 2019, this Court entered judgment for Defendant California

25  Attorney General and against Plaintiffs on every claim, stating that "Plaintiffs shall

26  take nothing by way of their Third Amended Complaint from Defendant" and

27  declaring Defendant the prevailing party. Dkt. No. 108.

28       Plaintiffs appealed to the Ninth Circuit, but after both briefing and oral

1    argument, this case was remanded for further consideration in light of *Bruen*. *Rupp v.*
2    *Bonta*, No. 19-56004, 2022 U.S. App. LEXIS 18769 (9th Cir. June 28, 2022).

3           Plaintiffs filed *Daubert* motions challenging testimony from several of the
4    State's proffered expert witnesses. This Court denied those motions, reasoning that it
5    needs "the benefit of complete substantive briefing from the parties" on how to
6    "interpret and apply *Bruen*" before it can decide on the value of the State's witnesses,
7    but that it would take Plaintiffs' arguments into account when ruling on summary
8    judgment. Dkt. No. 146, at 6.

9    **III.   ARGUMENT**

10          This Court should grant Plaintiffs' motion for summary judgment because
11   there is "no genuine dispute as to any material fact ... and [Plaintiffs are] entitled to
12   judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*,
13   477 U.S. 317, 323-24 (1986). Material facts are those which may affect the outcome
14   and a dispute is genuine if there is sufficient evidence for a reasonable jury to return a
15   verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
16   (1986). The Supreme Court has confirmed that the only material fact relevant to the
17   resolution of the AWCA's constitutionality is whether the Banned Rifles are
18   "typically possessed" for lawful purposes by the American people. *Heller*, 554 U.S.
19   at 625. Because there can be no genuine dispute that they are, Plaintiffs are entitled to
20   judgment as a matter of law.

21          Indeed, "the Second Amendment protects the possession and use of weapons
22   that are 'in common use [today].'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.
23   Ct. 2111, 2128 (2022) (quoting *Heller*, 554 U.S. at 627); see *Caetano v.*
24   *Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (invalidating stun gun ban);
25   *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating Second
26   Amendment). "[A]ll instruments that constitute bearable arms, even those that were
27   not in existence at the time of the founding," come under the Second Amendment.
28   *Heller*, 554 U.S. at 582, 624-25. If an arm is "typically possessed by law-abiding

citizens for lawful purposes" today, then it may not be banned. *Id.* That is the irreducible minimum of the fundamental "right of the people to keep and bear Arms." *See* U.S. Const. amend. II. A state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

Yet that is precisely what California has done. Under the AWCA, subject to certain limited exceptions unavailable to the public, it is generally unlawful to acquire or to possess any rifle that the State has classified as an "assault weapon." Cal. Penal Code § 30515(c)-(d). Such a sweeping prohibition might make sense (or at least be defensible) if, by "assault weapon," California meant some class of "dangerous and unusual weapons" that has long been restricted in this country and that law-abiding Americans do not typically own for lawful purposes. *See Heller*, 554 U.S., at 627. But that is not what California has done. Its AWCA bans the most popular rifles on the market today.

That makes this an easy case. The Supreme Court has made clear that when a court confronts a flat ban on the possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. If the answer is yes, then the ban is unconstitutional because a state cannot prohibit ordinary law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep." And, as explained below, the answer here is unequivocally yes.

## A. Proper Second Amendment Scrutiny Post-*Bruen*

The Supreme Court's recent *Bruen* decision established a clear framework that courts must follow when analyzing *any* Second Amendment challenge. After expressly disclaiming "intermediate scrutiny" that involves "interest balancing" as not what "the Constitution demands here," *Bruen*, 142 S. Ct at 2118, the *Bruen* Court articulated the correct test as follows:

/ / /

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.

*Id*. at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)). *Bruen* provided detailed guidelines for how to analyze the historical tradition of firearm regulation when Second Amendment conduct is at issue.

Most importantly, government must produce evidence of a "well-established and representative historical analogue" and not an unrepresentative "outlier that our ancestors would never have accepted." *Id*. at 2133 (quoting *Drummond v. Robinson Twp*., 9 F.4th 217, 226 (3rd Cir. 2021)). The State must thus present evidence of a genuine tradition of regulation; a few sparse enactments is insufficient.

Second, the relevant historical timeframe is limited. "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id*. at 2136. "[T]o the extent later history contradicts what the text says, the text controls," *Id*. at 2137.

Third, when "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131 (emphasis added). In that case, the historical inquiry would be "fairly straightforward." *Id*. When a challenged law is intended to address a concern that existed in the relevant historical timeframe, the government must show historical laws that are "distinctly similar" to the modern law being challenged. *Id.*

When a modern law addresses "unprecedented societal concerns or dramatic technological changes," however, *Bruen* allows "a more nuanced approach" to the historical inquiry. *Id*. at 2132. In that situation, the government need not establish a

9

tradition that is "a historical twin" to the modern law, but may use "reasoning by analogy" to show that the modern law is "relevantly similar" to a "well-established and representative historical analogue." *Id*.

Although *Bruen* does not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it noted that where analogizing is allowed, *Heller* and *McDonald* "point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*. (citations omitted). But proposed historical analogues must actually be similar to the modern law. *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *19-20 (N.D.N.Y. Oct. 6, 2022) (quoting *Bruen*, 142 S. Ct. at 2133).

To sum up the proper historical scrutiny, there are two potential approaches. The strict-historical approach dictates that where a modern law addresses problems that also existed during the relevant historical timeframes, the government must find very similar regulations from that era to justify its modern law. The analogical-historical approach dictates that where the challenged law addresses "unprecedented societal concerns or dramatic technological changes" *Bruen*, 142 S. Ct. at 2132, the government can meet its burden with evidence of an established tradition of analogically similar regulations that address the same "how" and "why" as the modern law being challenged. Analogies are relevant in the latter approach only. *Id*. at 2132. Whatever the appropriate approach, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. It is thus *always* the government's burden to meet the applicable historical evidentiary standard; the burden is just relatively lighter where the analogical-historical approach is allowed.

1    Fortunately, this Court need not struggle with determining which approach is

2    correct here because *Bruen* and *Heller* already established that there is no tradition of

3    banning commonly possessed arms, which the Banned Rifles undeniably are. If the

4    State cannot show that the Banned Rifles are "dangerous and unusual weapons" (and

5    it cannot), then Plaintiffs necessarily prevail. No further analysis is required. And

6    even if this Court were to permit the State to attempt to justify the AWCA's rifle ban

7    under *Bruen*'s "more nuanced approach," it would quickly become obvious that the

8    State cannot meet its burden even under that more lenient standard because there

9    simply is no tradition of banning arms commonly owned for lawful purposes;

10   particularly just for having features that increase their accuracy and control.

11          **B.    The Second Amendment's Plain Text Covers Acquiring and
12                  Possessing the Banned Rifles**

13   The inquiry of whether the "Second Amendment's plain text covers an

14   individual's conduct" is not complicated because that text is not cryptic. It provides

15   that "the right of the people to keep and bear Arms … shall not be infringed." U.S.

16   Const. amend. II. Thus, when a regulation directly touches on keeping or bearing

17   (i.e., possessing) arms, the Second Amendment's plain text is implicated. No further

18   analysis is required because the extent of a restriction is irrelevant for determining

19   whether it implicates the plain text. It is only relevant to whether there is a historical

20   tradition supporting such a restriction.

21   The text thus plainly covers the possession of *any* instrument that could qualify

22   as an "arm." But the Second Amendment is not limited to just *possession* of arms.

23   Indeed, constitutional rights "implicitly protect those closely related acts necessary to

24   their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J.,

25   concurring) (recognizing that "without bullets, the right to bear arms would be

26   meaningless"). "No axiom is more clearly established in law, or in reason, than that

27   wherever the end is required, the means are authorized." *The Federalist No. 44*, at

28   282 (Charles R. Kesler ed., 2003). For that reason, even pre-*Bruen* precedent from

11

the Ninth Circuit and others confirms that the right to possess firearms implies a corresponding right to obtain them. *See Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (hollow-point ammunition); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (discussing authorities acknowledging the right to acquire arms); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (Second Amendment "implies a corresponding right to acquire and maintain proficiency" with arms); *United States v. Marzzarella,* 614 F.3d 85, 92 n.8 (3rd Cir. 2010) (prohibiting the commercial sale of protected arms is untenable under *Heller*). These authorities are consistent with *Heller*'s approving citation to *Andrews v. State*, 50 Tenn. 165 (1871), which recognized that the "[t]he right to keep arms[] *necessarily* involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Id*. at 178 (emphasis added).

### 1.     *Heller* Establishes That *All* Rifles Are "Arms"

The AWCA prohibits Plaintiffs from acquiring or possessing[8] certain makes and models of extremely popular semiautomatic rifles. Cal. Penal Code § 30510(a). Supreme Court precedent leaves no doubt that these rifles are among the "Arms" contemplated by the Second Amendment. The *Heller* Court explained that "[t]he 18th-century meaning is no different from the meaning today. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" 554 U.S. at 581. That definition "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *accord Caetano*, 577 U.S. at 411; *see also Bruen*, 142 S. Ct. at 2132. The Supreme Court also pointed to the 1773 edition of Samuel Johnson's dictionary, which defined "arms" as "[w]eapons of offence, or armour of defence." *Heller*, 554 U.S. at 581 (citing 1 Dictionary of the English

---

[8] Except for "grandfathered" rifles possessed by an individuals who registered them when that was still an option, which it no longer is. Cal. Penal Code § 30900.

MEMORANDUM OF POINTS AND AUTHORITIES

Language 106 (4th ed.) (1773) (reprinted 1978)).

The rifles that the AWCA bans undeniably meet that description and are thus "Arms," possession and acquisition of which the Second Amendment presumptively protects. Thus, they cannot be banned unless the State proves that such rifles are "dangerous and unusual." *Heller*, 554 U.S. at 627. It cannot because they are not.

### 2. *Bruen* Confirmed That the Banned Rifles Cannot Be Excluded from the Second Amendment's Scope on the Asserted Ground That They Are "Like" M-16s

The Supreme Court has declared that "the Second Amendment protects the possession and use of weapons that are 'in common use [today].'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *McDonald*, 561 U.S. at 742. In ruling on the parties' previous cross-motions for summary judgment, this Court believed it unnecessary to decide whether the Banned Rifles meet the "common use" standard based on its "conclu[sion] that semiautomatic assault rifles are essentially indistinguishable from M-16s, which *Heller* noted could be banned pursuant to longstanding prohibitions on dangerous and usual weapons...." *Rupp*, 401 F. Supp. 3d at 986. In so holding, this Court was interpreting *Heller*'s observation that "weapons that are most useful in military service—M-16 rifles and the like—may be banned," as setting forth a dispositive test. And under that test, this Court identified the relevant question for resolution of Plaintiffs' claims to be whether "the semiautomatic rifles at issue here [are] 'like' the military's M-16, a historically banned dangerous and unusual weapon[.]" *Id*.

Respectfully, as *Bruen* makes clear, that is not the correct question for resolving this, or any, case; whether the Banned Rifles are in "common use" is. Indeed, that section of *Heller* was engaged not in identifying another limit on the word "arms," but in analyzing the *historical* limitations of the right. And in the paragraph immediately preceding its reference to "M-16 rifles and the like," the Court had identified the historical dividing line between protected and unprotected arms: arms "in common use" are protected, while "dangerous and unusual weapons"

MEMORANDUM OF POINTS AND AUTHORITIES

1   are not. *Id*. at 985. This is a historical test and one that the Banned Rifles easily

2   satisfy, as Plaintiffs discuss below. *Bruen* confirms that the *Heller* Court was not

3   adding a limitation to its textual interpretation of the word "arms" by clarifying that

4   *every* Second Amendment case must proceed first by analyzing the text of the

5   Amendment and then by examining our nation's history of firearm regulation, which,

6   in challenges to a ban on a type of firearm, requires determining whether the specific

7   arm is "dangerous and unusual." *Bruen*, 142 S. Ct. at 2127-28.

8          *Heller*'s reference to "M-16 rifles and the like" was, therefore, not intended to

9   exempt from Second Amendment protection any firearm that could be likened to an

10  M-16 rifle in some unspecified way. Rather, as this Court correctly observed in its

11  previous ruling on this matter, *Heller*'s mention of the M-16 was in the context of

12  "justify[ing] the fact that some dangerous and unusual weapons ***that are most useful***

13  ***in military service***—such as the M-16—can be banned despite the prefatory clause's

14  ostensible mandate that the right to bear arms be connected to a well-regulated

15  militia...." *Rupp*, 401 F. Supp. 3d at 986 (double emphasis added). In other words, the

16  *Heller* Court was merely anticipating the objection that application of its *historical*

17  "common use" test—which could permit the government to ban some firearms like

18  fully automatic machine guns *even though* they are used by the military—is out of

19  step with the Amendment's stated purpose to preserve the militia. 554 U.S. at 267.

20  The M-16 was merely an example of a *military* weapon that might be banned

21  consistent with the Second Amendment, despite the militia clause, *assuming* it is not

22  in common use by law-abiding citizens.

23         What's more, the passing reference to "M-16 rifles and the like" simply cannot

24  be some sort of dispositive test for Second Amendment protection because it is far

25  too vague and amorphous a standard to be extended to any arm beyond the expressly

26  mentioned, fully automatic M-16. Tellingly, former Justice Scalia, the author of

27  *Heller*, did not share the interpretation of his opinion that Banned Rifles are so "like"

28  the M-16 that they lack Second Amendment protection. Otherwise, he would not

14

MEMORANDUM OF POINTS AND AUTHORITIES

have joined a dissent to the Supreme Court's refusal to review a Seventh Circuit opinion upholding a law nearly identical to the AWCA. That dissent explained: "Roughly 5 million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park*, 577 U.S. 1039, 1039 (2015) (Thomas, J., and Scalia, J., dissenting from the denial of certiorari).

The author of the *Friedman* dissent, Justice Thomas, also authored *Staples v. United States*, 511 U.S. 600 (1994). That case contrasted AR-15s with weapons of "quasi-suspect character" and found them to "traditionally have been widely accepted as lawful possessions." *Id.* at 612. In fact, *Staples* expressly distinguished the AR-15 from the M-16, calling it a "civilian version" because it is semiautomatic, while "[t]he M-16, *in contrast*, is a selective fire rifle," meaning it can also produce "automatic fire," like a machine gun. *Id.* at 603 (emphasis added). The entire premise of *Staples* was that the AR-15 is so different from the M-16 as far as its general acceptability as a lawful possession that it could not be assumed "that Congress did not intend to require proof of *mens rea* to establish an offense" for illegal possession of a machine gun physically resembling an AR-15. *Id.* at 606. Justice Thomas also authored *Bruen*. If the authors of *Heller*, *Bruen*, and *Staples* have expressly described rifles that the AWCA bans as commonly owned for lawful purposes, the vague term "and the like" cannot reasonably be read to create a test that produces the opposite conclusion.[9] Such rifles simply cannot be considered "dangerous and unusual."

---

[9] *See also Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 339-40 (2011) (Kavanaugh, J., dissenting) ("Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use by law-abiding citizens for self-defense in the home, hunting, and other lawful uses…It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected and that D.C.'s ban on them is unconstitutional. (By contrast, fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller*.).")

15

1    In any event, while some, but not all, Banned Rifles share various

2    characteristics with the M-16 rifle, including appearance, none is "like" the M-16 in

3    the way relevant to *Heller*'s discussion of it. The context of *Heller*'s "M-16"

4    reference was a discussion of "dangerous and unusual" arms that are "most useful in

5    military service." 554 U.S. at 627. To be sure, as this Court also correctly observed in

6    its previous ruling, *Heller* did not "create a test whereby *any* weapon that is 'most

7    useful in military service' is outside the scope of the Second Amendment." *Rupp*, 401

8    F. Supp. at 986 (emphasis added). But it was discussing *only* dangerous and unusual

9    weapons that happen to be used in the military. Reason dictates that to be considered

10   "most useful in military service," a weapon must at least be in use by an actual

11   military. Yet, the State's own expert could not identify a single military anywhere in

12   the world (with the *possible* exception of Israel) that employs the Banned Rifles. SUF

13   Nos. 71-72. That should be the end of this inquiry, even if the "like" M-16 was a

14   test—and it is not.

15   In sum, while this Court's analysis of *why* the *Heller* Court made its reference

16   to "M-16 rifles and the like" was accurate, its conversion of that reference into a

17   dispositive test that excludes from Second Amendment protection any weapon that

18   may be "like" the M-16 in some unspecified way, however, missed the mark, as

19   *Bruen* makes clear. Thus, if the State argues that the Banned Rifles are outside the

20   Second Amendment's text because they are "like" the M-16, this Court should reject

21   that argument. The sole question before this Court post-*Bruen* is whether the Banned

22   Rifles are in common use for lawful purposes. The answer is undeniably yes.

23

24   **C.    *Heller* and *Bruen* Eliminated the Need for Further Historical Scrutiny Here: The AWCA Unconstitutionally Bans Rifles That Are in Common Use and Thus Necessarily Not "Dangerous and Unusual" Weapons**

25

26   Because the Banned Rifles are "arms" under the Second Amendment's plain

27   text, the AWCA's banning them is "presumptively unconstitutional." The State thus

28   bears the burden of proving its ban on their acquisition and possession is "consistent

with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. In other contexts, applying this test could require research into this Nation's history of firearm regulation. That exercise is unnecessary here, however, because between *Bruen* and *Heller*, the Supreme Court has already established the contours of the relevant historical tradition: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And a law by definition will not fit into that tradition if it bans "the possession and use of weapons that are 'in common use at the time.'" *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

As explained above, this is *not* a textual question. The text of the Amendment reaches *all* arms, dangerous, unusual, or otherwise because we begin from the premise that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). Nor is it an exception to the method laid out in great detail by *Bruen*. Instead, it is an *application* of that historical analysis based on Supreme Court precedent that *Bruen* reaffirmed and which controls this case.

In *Heller*, the Court's discussion of "dangerous and unusual" firearms was part of its analysis of the history of recognized limitations on Second Amendment rights, and the Supreme Court specifically noted that it was an exception to the Second Amendment's broad language that was "fairly supported by ... historical tradition." 554 U.S. at 627. *Bruen* quoted this same language from *Heller* to explain that the *Heller* Court was "rel[ying] on the historical understanding of the Amendment to demark the limits on the exercise of that right." 142 S. Ct. at 2128; *see also* TRO at 10, *Rocky Mt. Gun Owners v. Town of Superior, Colo.*, 22-cv-01685 (July 22, 2022),

17

ECF No. 18 (granting, post-*Bruen*, a temporary restraining order against enforcement of a similar ban on certain semiautomatic rifles and noting "the [c]ourt is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes").

In sum, *Bruen* and *Heller* confirmed that whether an arm is "dangerous and unusual" is a *historical* question, not a textual one. The State thus bears the burden of fitting the AWCA's rifle restrictions into a historical paradigm. *See Bruen*, 142 S. Ct. at 2126. It cannot meet that burden because the Supreme Court has already decided that there is no tradition of prohibiting arms in "common use" like the Banned Rifles.

### 1.    Firearms "In Common Use" Cannot Be "Dangerous And Unusual"

Whether a firearm is "dangerous and unusual" is a conjunctive question. "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Because a firearm that is in common use for lawful purposes by definition is not "unusual," such a firearm does not fall within this category and cannot be banned. *Bruen*, 142 S. Ct. at 2143. And in assessing common use, the Supreme Court has made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just the state or locality whose law is being challenged. *See id.* at 2131 ("It is this balance—struck by the traditions of the American people—that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("[S]tun guns are widely owned and accepted as a legitimate means of self-defense across the country.").

Furthermore, the "common use" test makes clear that courts and legislatures cannot second-guess law-abiding citizens' choices by questioning whether they really "need" the arms that they have chosen. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[*w*]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense

in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). And in *Bruen*, the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms—"demand[ ] [courts'] unqualified deference." 142 S. Ct. at 2131. So unless government can show that a type of firearm is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, that is the end of the matter. When law-abiding Americans own firearms for lawful purposes, banning them is a policy choice that the Second Amendment "necessarily takes ... off the table." *Heller*, 554 U.S. at 636.

Finally, the Second Amendment inquiry focuses on the choices made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument ... that only those arms in existence in the 18th century are protected." *Id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411-12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of weapon's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

This case thus reduces to the following, straightforward inquiry: are the rifles that the AWCA bans "in common use" according to the lawful choices of contemporary Americans? Because they unquestionably are, the AWCA's ban on them is unconstitutional.

/ / /

/ / /

MEMORANDUM OF POINTS AND AUTHORITIES

**2.      The State Cannot Meet Its Burden to Show that the Banned Rifles Are "Dangerous and Unusual" Weapons Unprotected by the Second Amendment Because They Are Undeniably in "Common Use" for Lawful Purposes**

The State has conceded that it does not know how many Banned Rifles are possessed in the United States. Brady Decl., Ex. 8 at 4. And it "does not have sufficient information to estimate the approximate number" of them. *Id.*, Ex. 10 at 8. Nor has the State proffered testimony from any expert witness disputing that Americans own the Banned Rifles by the millions. The State thus cannot rebut the presumption that the Banned Rifles are protected by the Second Amendment. *Caetano*, 577 U.S. at 411.

Even though it is not their burden, Plaintiffs, on the other hand, have provided substantial evidence and several experts to corroborate Americans' ownership of Banned Rifles by millions. SUF Nos. 29-36. That indisputable fact comfortably qualifies the Banned Rifles as being in "common use." The number of a particular arm in circulation among civilians is the "relevant statistic" for determining "common use." *Caetano,* 577 U.S. at 420 (Alito, J., concurring); *see also Ass'n of N.J. Rifle & Pistol Clubs*, *Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated by Bruen* (finding an "arm" is commonly owned because "[t]he record shows that millions ... are owned").

To put it in perspective, stun guns "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that just "*hundreds of thousands* of Tasers and stun guns have been sold to private citizens." *Caetano*, 577 U.S. at 420 (2016) (Alito, J., concurring) (emphasis added). Because "stun guns are 'arms' within the protection of the Second Amendment," a Massachusetts law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018).[10]

---

[10] "Any attempt by the state to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons

20

*See also Maloney v. Singas*, 351 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (the "at least 64,890 metal and wood nunchaku" are in common use). If the 200,000 stun guns in the country are in "common use" and thus protected, certainly the millions of Banned Rifles in circulation are too.

It is no wonder then that numerous courts have found that the Banned Rifles are in "common use." For example, in *Heller v. District of Columbia,* 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*"), the Court held that:

> We think it clear enough in the record that semi-automatic rifles are indeed in "common use," as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.

Likewise, the Second Circuit observed that "Americans own millions of the firearms that the challenged legislation prohibits.... Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons ... at issue are 'in common use' as that term was used in *Heller*." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *see also* TRO at 9-10, *Rocky Mt. Gun Owners*, No. 22-cv-01685; *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022) ("Over the last three decades, 19,797,000 … rifle[s] built on the AR-15 platform have been manufactured or imported into the United States."); *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) ("Like a number of courts that have previously considered this question, we have little difficulty in concluding the banned semi-automatic rifles are in common use by law-abiding citizens."), rev'd, 849 F.3d 114 (4th Cir. 2017) (en banc); *United States v. Benitez*, No. 17-cr-00348, 2018 U.S. Dist. LEXIS 211398, at *6 (D. Idaho Dec. 14, 2018) ("AR-15s are commonly owned throughout Idaho"); *Del. State Sportsmen's Ass'.n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 22-

are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E.3d 93, 96 (Ill. 2019).

951-RGA, 2023 U.S. Dist. LEXIS 51322, at *14 (D. Del. Mar. 27, 2023) ("Plaintiffs provide ample support for their argument that such weapons are 'in common use' for lawful purposes that include self-defense.").

What's more, "[t]he overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home." *Miller*, 542 F. Supp. 3d 1009 at 1021, *vacated as moot* 2022 U.S. App. LEXIS 21172 (9th Cir. Aug. 1, 2022); *see also Friedman*, 577 U.S. at 1042 (Thomas, J., & Scalia, J., dissenting from denial of certiorari); *Del. State Sportsmen's Ass'n*, 2023 U.S. Dist. LEXIS at *14-1. Indeed, when asked, a majority of purchasers said they owned these firearms for self-defense. English, *supra*, at 34 (61.9% owned for home defense; 34.6% owned for defense outside the home); Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle: Comprehensive Consumer Report: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles* 18 (July 14, 2022), https://bit.ly/3SSrVjM (last visited May 26, 2023).

Although self-defense is central to the Second Amendment, "the [Supreme Court] also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting." *Heller II*, 670 F.3d 1244 at 1260; *see also Bruen*, 142 S. Ct. at 2167 (Breyer, J., dissenting) (listing various "legitimate purposes" for firearms). The Banned Rifles are used not just for hunting, but also target shooting for competition, recreation, and training. SUF Nos. 30-33. The same Washington Post survey cited above also found that AR-15s are owned for various lawful purposes including self-defense (33% of respondents), target shooting (15%), recreation (15%), and hunting (12%). Guskin, *supra* available at bit.ly/3G0vbG9. In 2020, more than 20 million adults participated in target or sport shooting with rifles like those California bans. Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*, at iii (2021), available at https://bit.ly/3sPuEQl.

The State cannot dispute that Americans typically possess the Banned Rifles for these lawful purposes. It admits that it "lacks sufficient information or belief"

1   about the extent of their lawful use for self-defense, hunting, or competition, Brady

2   Decl., Ex. 8 at 15-16, 18-19, 22-23, and expressly does not dispute that they are used

3   for lawful target practice. *Id.*, Ex. 8 at 20-21, which is a "corollary right to ...

4   maintain proficiency in their use." *Ezell*, 651 F.3d at 704.

5        In short, it cannot be seriously disputed that the Banned Rifles are typically

6   possessed for lawful purposes and are in no way "dangerous and unusual" weapons.

7   They are among the most popular firearms in the country and are used for various

8   lawful purposes. Under *Heller* and *Bruen*, the inquiry should end there.

9        **D.    No Historical Firearms Regulation Justifies the AWCA's Rifle Ban**

10       To reiterate, the only historical tradition that the Supreme Court has recognized

11  as justifying bans on types of firearm is that of regulating "dangerous and unusual

12  weapons" and because that historic limitation on the right does not permit banning

13  firearms in common use for lawful purposes, it cannot justify the AWCA's rifle ban.

14  This Court can end its analysis here.

15       At the very least, because the AWCA bans acquisition and possession of

16  bearable arms—conduct that "the Constitution presumptively protects"—California

17  must "justify its regulation by demonstrating that it is consistent with the Nation's

18  historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. "Only

19  then may [this] court conclude that" the conduct Plaintiffs wish to engage in "falls

20  outside the Second Amendment's 'unqualified command.'" *Id.* California cannot

21  meet this heavy burden. The AWCA's rifle *ban* does not "resemble prohibitions

22  historically exempted from the Second Amendment." *Fyock*, 779 F.3d at 997. And

23  the Banned Rifles have not been "the subject of longstanding, accepted regulation."

24  *Id.* To the contrary, the Supreme Court has observed that the semiautomatic rifles that

25  California seeks to ban "traditionally have been widely accepted as lawful

26  possessions." *Staples*, 511 U.S. at 612.

27       Indeed, there have been virtually no laws at the local, state, or federal level

28  targeting semiautomatic rifles, other than laws in a few jurisdictions adopted in the

1920s and 1930s. Most of those laws appear to have been targeting machine guns whose clumsy definitions unintentionally included some semiautomatics. Of note, all but one were repealed within decades. *Heller II*, 670 F.3d at 1250.[11]

Nor is there any tradition of targeting the Banned Features for regulation. "Prior to the 1990s, there was no national history of banning weapons because they were equipped with features like pistol grips, collapsible stocks, [or] flash hiders...." *Miller*, 542 F. Supp. 3d at 1024. The AWCA, adopted in 1989, was the first law in the country's history specifically targeting features on a rifle designed to increase its accuracy and control. Only nine other states and the District of Columbia have adopted "assault weapon" laws. SUF No. 67. And all of those laws were adopted in the 1990s or later (including three adopted just in that last year) and vary as to what constitutes an "assault weapon." SUF No. 68. Even the federal government allowed its "assault weapon ban," adopted in 1994, to expire just ten years later because it produced no "discernable reduction" in gun violence. *See* Pub. L. No. 103-322, Title XI, § 110105(2); Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, at 96 (2004).

Each less than 35 years old (some much younger), these outlier restrictions are certainly *not* the sort of longstanding, historical regulations that might justify the AWCA. *See Heller*, 554 U.S. at 635 (overturning 33-year-old handgun ban); *Heller II*, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity rifles are longstanding and thereby deserving of a

_____

[11] *See* 1927 Mich. Pub. Acts 887, § 3 (prohibiting firearms able to be "fired sixteen times without reloading"), repealed via 1959 Mich. Pub. Acts 249, 250; 1927 R.I. Pub. Laws 256 §§ 1, 3 (prohibiting firearms "which shoot[] more than twelve shots semi-automatically"), repealed via 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§ 12819-3, -4 (prohibiting "any firearm which shoots more than eighteen shots semi-automatically"), repealed via 1972 Ohio Laws 1866, 1963 (setting 32-round limit); see also 2013-2014 Leg., H.R. 234 (Ohio) (fully repealing magazine ban); 47 Stat. 650, §§ 1, 14 (1932) (D.C. law prohibiting "any firearm which shoots … semiautomatically more than twelve shots without reloading"), repealed via 48 Stat. 1236 (1934), currently codified as amended at 26 U.S.C. §§ 5801-72.

MEMORANDUM OF POINTS AND AUTHORITIES

1  presumption of validity.") They are far from establishing the sort of "*enduring*

2  American tradition of state regulation*" that the State must show to save the AWCA's

3  rifle ban. *Bruen*, 142 S. Ct. at 2155-56 (emphasis added). First, such short-lived

4  statutes cannot reasonably be considered "enduring." Second, relying on a handful of

5  laws "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.*

6  at 2155-56. Third, *Bruen* cautioned that not all history is created equal. Indeed, it

7  questioned the relevance of 19th-century laws in establishing tradition. *Id.* at 2136-

8  38. And it refused to even address 20th-century historical evidence raised by the

9  government and its amici because "it does not provide insight into the meaning of the

10  Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

11  Considering *Bruen*'s clear guidance, the earliest wave of post-*Bruen* Second

12  Amendment decisions have rebuked government calls to rely on 20th-century

13  regulations. *See, e.g.*, *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS

14  201944, at *127 (N.D.N.Y. Nov. 7, 2022); *United States v. Nutter*, No. 21-cr-00142,

15  2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W. Va. Aug. 29, 2022) (holding that laws

16  originating in the 20th-century alone cannot uphold a law unless similar laws existed

17  in the Founding era); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-cv-1245, 2022

18  U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22 state

19  laws adopted in the 20th-century were insufficient historical justification for a ban on

20  firearms purchases for those under the age of 21). In any event, these obscure laws

21  contradict this Nation's long history of *not* banning classes of arms in common use

22  for lawful purposes. They are thus irrelevant outliers that provide no insight into the

23  original meaning of the Second Amendment. *Bruen*, 142 S. Ct. at 2153.

24       In sum, the State cannot meet its burden under the strict-historical approach.

25  Given that reality, the State will no doubt argue that it should be allowed to engage in

26  the analogical-historical approach because this is a case "implicating unprecedented

27  societal concerns or dramatic technological changes" where "a more nuanced

28  approach" is called for. *Id.* at 2132. This Court should not indulge it.

1   There is nothing *dramatically* novel about the technology of these condemned

2   rifles. The Founding Fathers were aware of—and coveted—multi-shot rifles with

3   detachable magazines. *Id.*, Ex. 3 at 3-4. And they were aware of the technological

4   advances being made with firearms.  David Kopel, Reason Magazine, *The Founders*

5   *were well aware of continuing advances in arms technology*, available at

6   https://rb.gy/k23pf (last accessed May 26, 2023). Repeating rifles able to fire over a

7   dozen rounds rapidly have been commercially available since around the Civil War

8   days. Brady Decl., Ex. 57, at 18-22 (Hlebinsky report).[12] And semiautomatic,

9   centerfire rifles with detachable (not "fixed") magazines have been widely available

10  to the public for over a century. SUF No. 34; Chuck Willis & Robert A. Sadowski,

11  *The Illustrated History of Guns* 256 (2017); *see also Heller II*, 670 F.3d at 1287

12  (Kavanaugh, J., dissenting); Stephen P. Halbrook, *America's Rifle, The Case for the*

13  *AR-15* at 145-148 (2022).[13]

14  Yet, as explained above, these rifles were almost never targeted for regulation.

15  To the contrary, the federal government, through the Director of Civilian

16  Marksmanship—which was later replaced by the quasi-privatized Civilian

17  Marksmanship Program in 1996 and is still in operation today—has sold these rifles

18  directly to the public by the hundreds of thousands. SUF No. 69; *see also* Halbrook,

19  *supra*, at 198. The only difference between those and the Banned Rifles is the former

20  mostly lacked the Banned Features—although, some had folding stocks and would

21  thus be banned under the AWCA. Brady Decl., Ex. 3 at 5; Ex. 43.

22  Banned Features like the pistol grip and adjustable stocks have also been

23  around for centuries. Brady Decl., Ex. 3, at 3-11 (Helsley report); Ex. 57, at 27-29

24  (Hlebinsky report). The AR-15 platform rifle, which possesses the Banned Features,

25  has been available to the American public for over 60 years. SUF No. 35; *see also*

---

[12] *See also*, Henry, *Henry History*, https://www.henryusa.com/about-us/henry-history/ (last visited May 26, 2023).

[13] *See also* Remington, *Model 8 Autoloading Centerfire Rifle*, *available at* https://web.archive.org/web/20130520070354/http://remington.com/products/archived/centerfire/autoloading/model-8.aspx (last visited May 26, 2023).

MEMORANDUM OF POINTS AND AUTHORITIES

Jeff Zimba, *The Evolution of the Black Rifle: 20 Years of Upgrades, Options, and Accessories* 10 (2014). It was reviewed in a 1959 issue of *The American Rifleman*, one of the most widely circulated firearm magazines. *Id.*, Ex. 3 at 6, Ex. 2 at 3. The Banned Rifles thus simply cannot be described as "*dramatic* technological changes" but merely the progression of very old technology.

What's more, the notion that firearm technology that has been around and widely available for so long without regulation all of a sudden raises some "*unprecedented* societal concern" is untenable. The State has explained that it targets the Banned Rifles with the Banned Features solely because they increase those rifles' control and accuracy, which can be exploited by criminals to inflict greater casualties. Society has never had, nor should it ever have, a concern about limiting the controllability or accuracy of a firearm, even if it can be exploited for criminal means. Indeed, *Heller* rejected the argument that protected arms may be banned because criminals might misuse them. The government there argued that handguns make up a significant majority of all stolen guns and that they are overwhelmingly used in violent crimes. *Heller*, 554 U.S. at 636; *see also id.* at 698 (Breyer, J., dissenting). But despite the government's clear interest in keeping handguns out of criminal hands, the Court rejected that argument, concluding that a ban on the possession of handguns by all citizens is far too blunt an instrument for preventing their misuse by criminals. *Id.* at 628-29.

In sum, because the Banned Rifles simply do not constitute "dramatic technological changes" nor does the AWCA's banning of them address any "unprecedented societal concern," the analogical-historical approach is not appropriate here. Even if it were, however, California must still present "well-established and representative" analogues that are "relevantly similar" to the challenged modern law. *Bruen*, 142 S. Ct. at 2131-32. "[G]enerally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk,* No. 22-cv-0986, 2022 U.S.

Dist. LEXIS 182965, at *20. Whether a proposed analogue from the past is "relevantly similar" includes an analysis of "how" and "why" the regulations were enacted. *Bruen*, 142 S. Ct. at 2133. It is not enough for a proposed analogue to be superficially similar if the burden it imposed was different in kind or in justification.

Critically, however, "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry.... Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances.... It is not an invitation to revise that balance through means-end scrutiny." *Id.* at n.7. There is no historical analogy that supports banning firearms commonly owned for lawful purposes just because they have features that increase control and accuracy, despite criminal exploitation. When a modern regulation addresses a general societal problem that has persisted since before the 18th century, "the lack of a historical analogue is relevant evidence that the challenged regulation is inconsistent with the Second Amendment...." *Antonyuk*, *supra* at *19 (citing *Bruen,* 142 S. Ct. at 2131). The AWCA's rifle ban is thus doomed even if the State is allowed to engage in the analogical-historical approach.

## IV.   CONCLUSION

In sum, there is no genuine dispute that the Banned Rifles are in common use for lawful purposes. Because there is no "enduring American tradition" of laws flatly banning such arms, the AWCA's prohibitions on the Banned Rifles violates the Second Amendment, as a matter of law. Even if the State can point to a few historical laws restricting similar rifles, they would be outliers that do not satisfy *Bruen*'s demand for a broad and enduring historical tradition, even under the more lenient analogical approach. California thus cannot meet its burden to defend the AWCA under *Bruen*. This Court should grant Plaintiffs' motion for summary judgment.

Dated: May 26, 2023                              **MICHEL & ASSOCIATES, P.C.**

                                                 */s/ Sean A. Brady*
                                                 Sean A. Brady, Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Rupp, et al. v. Bonta*
Case No.: 8:17-cv-00746-JLS-JDE

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Xavier Becerra
Attorney General of California
Anna Ferrari
Deputy Attorney General
Email: anna.ferrari@doj.ca.gov
Christina R.B. Lopez
Email: christina.lopez@doj.ca.gov
John D. Echeverria
Email: john.echeverria@doj.ca.gov
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 26, 2023.

_____
Laura Palmerin

CERTIFICATE OF SERVICE