# EXHIBIT 48

Def. Exhibit 48
Page 001617

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  State Bar No. 261579
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3479
     Fax:  (415) 703-1234
8    E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity*[1]

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                      WESTERN DIVISION

14

15  **STEVEN RUPP; STEVEN**          8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**               **SUPPLEMENTAL SUR-**
    **CHRISTOPHER SEIFERT;**         **REBUTTAL EXPERT REPORT**
17  **ALFONSO VALENCIA; TROY**       **AND DECLARATION OF LUCY P.**
    **WILLIS; and CALIFORNIA RIFLE** **ALLEN**
18  **& PISTOL ASSOCIATION,**
    **INCORPORATED,**

19                        Plaintiffs,

20          **v.**                   Courtroom:   8A
                                     Judge:       The Honorable Josephine
21                                                L. Staton

22  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**  Action Filed: April 24, 2017
23  **California; and DOES 1-10,**

24                        Defendants.

25  _____

26        [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
    Attorney General of the State of California. Pursuant to Federal Rule of Civil
27  Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
    the defendant in this case.
28

                                    1

Def. Exhibit 48
Page 001618

1

2  **TABLE OF CONTENTS**

3

4  I.    Scope of Assignment ......................................................................... 3

5  II.   Qualifications and Remuneration ...................................................... 3

6  III.  Materials Considered ........................................................................ 3

7  IV.   Responses to the Kleck Rebuttal Report ........................................... 4

8        A.   The Kleck Rebuttal Report's claims that the list of mass shootings in the
             Allen Report is "trivially tiny," "arbitrary," and "unrepresentative" are
9            misleading and incorrect .......................................................... 4

10       B.   The Kleck Rebuttal Report, while criticizing the list of mass shootings in
             my analysis, agrees with my finding that both injuries and deaths are
11           greater in mass shootings in which LCMs or assault weapons are involved
12           ....................................................................................................... 8

13       C.   The Kleck Rebuttal Report's estimate that only 14% of mass shootings
             involve LCMs is based primarily on incidents in the home and/or ones
14           with unknown magazine type; restricting the analysis to public mass
15           shootings validates the findings in the Allen Report ................................. 9

16       D.   The Kleck Rebuttal Report's claim that my analysis of DGUs is not
             reliable is unfounded and ignores my systematic and scientific analysis of
17           DGUs from Factiva news stories that yields similar results to my analysis
18           of the NRA database ...................................................................... 15

19       E.   The Kleck Rebuttal Report's claim that there are 2 million DGUs a year is
20           based on his own survey and study that have been heavily criticized in the
21           past and overstate the numbers ................................................................. 16

22

23

24

25

26

27

28

Def. Exhibit 48
Page 001619

### SUPPLEMENTAL SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF LUCY P. ALLEN

I, Lucy P. Allen, declare:

1.      I previously submitted a supplemental expert report and declaration in this case dated January 6, 2023 (the "Allen Report").[2]

## I.   SCOPE OF ASSIGNMENT

2.      I have been asked by the Office of the Attorney General of California to review and comment on portions of the Expert Witness Rebuttal Report of Gary Kleck, dated February 3, 2023 that relate to the Allen Report.

3.      This sur-rebuttal Report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in it.

## II.   QUALIFICATIONS AND REMUNERATION

4.      My qualifications and remuneration were set forth in the Allen Report.

## III.   MATERIALS CONSIDERED

5.      In preparing this report, I considered the materials previously considered in the Allen Report. In addition, I considered the following materials:

a) Expert Witness Rebuttal Report of Gary Kleck, dated February 3, 2023 (the "Kleck Rebuttal Report"), including materials cited;

b) Declaration and Deposition of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.,* including materials cited; [3]

---

[2] I also submitted an expert report in this case on October 25, 2018.

[3] The Kleck Declaration in the Oregon case was responding to my Supplemental Declaration, dated November 10, 2022, in the *Virginia Duncan et al. v. California Attorney General* case, where I performed similar analyses as in the Allen Report in this case.

3

c) Information on mass shootings from the Gun Violence Archive and the Violence Policy Center;

d) News stories from Factiva and Google; and

e) Academic articles on mass shootings and crime.

## IV. RESPONSES TO THE KLECK REBUTTAL REPORT

6.     Below are responses to comments and criticisms raised in the Kleck Rebuttal Report that relate to material discussed in the Allen Report.[4]

### A. The Kleck Rebuttal Report's claims that the list of mass shootings in the Allen Report is "trivially tiny," "arbitrary," and "unrepresentative" are misleading and incorrect

7.     Dr. Kleck's claims that the list of mass shootings in the Allen Report is "trivially tiny," "arbitrary," and "unrepresentative" are misleading and incorrect.[5] The list of mass shootings in the Allen Report is based on the specific and commonly used definition of a mass shooting that is outlined in the Allen Report, and Dr. Kleck fails to identify any incidents within that definition that are missing.

8.     Dr. Kleck criticizes the focus of the Allen Report because he claims that the number and impact of public mass shootings in the Allen Report is "trivially tiny" and that the "legislative intent" behind California's weapons bans is unrelated to these public mass shootings.[6] First, contrary to Dr. Kleck's assertion, it is my understanding that California passed its first assault weapon ban, the Roberti-Roos Assault Weapons Control Act of 1989, in response to a public mass shooting – the public mass shooting in Stockton, CA.[7] Second, Dr. Kleck's claim that public

---

[4] Kleck Rebuttal Report, ¶¶7-46.

[5] Kleck Rebuttal Report, ¶¶7,11 and Deposition of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.,* taken on January 25, 2023, 20:22-21:3.

[6] Kleck Rebuttal Report, ¶7.

[7] See, for example, Carter, Greg L., *Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law* (ABC-CLIO, Santa Barbara, CA, 2nd ed. 2012), p. xli.

4

mass shootings are "trivially tiny" is based on his claim that "less than 1% of all U.S. murder victims are killed in *any* kind of mass shooting," and that public mass shootings are "even tinier."[8] Dr. Kleck's implication that the only impact of mass shootings is based on the number of victims killed is misguided. To claim, for example, that the only impact in the Newtown, CT mass shooting was on the 27 children and adults killed ignores the greater impact that mass shootings have had on American society.[9] For example, according to the Department of Education, 98% of public schools in the U.S. now have drills and procedures regarding active shooters.[10] Moreover, the very source cited by Dr. Kleck to support his claim that the list of mass shootings in the Allen Report is "trivially tiny" also states that "[m]ass shootings are arguably one of the worst manifestations of gun violence" and that "the national dialogue on gun violence has been focused on mass public shootings."[11]

9.    Contrary to Dr. Kleck's claims, the list of mass shootings in the Allen Report is not "arbitrary" and "unrepresentative." [12] The list of mass shootings in the Allen Report was compiled using the specific definition of a mass shooting as outlined in the Allen Report: an incident in which four or more people are killed in a public place, excluding incidents involving other criminal activity such as a

---

[8] Kleck Rebuttal Report, ¶8.

[9] *See* mass shooting #66 in Exhibit B of the Allen Report.

[10] "Safety and Security Practices at Public Schools," *National Center for Education Statistics of the U.S. Department of Education,* 2022.

[11] Krouse, William J. and Daniel J. Richardson, "Mass Murder with Firearms: Incidents and Victims, 1999-2013," *Congressional Research Service,* July 30, 2015, pp. 2 and "Summary".

[12] Kleck Rebuttal Report, ¶¶7,11, Declaration of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.*, dated January 5, 2023, ¶¶11-14 and Deposition of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.*, taken on January 25, 2023, 20:22-21:3.

Def. Exhibit 48
Page 001622

robbery. Different researchers and aggregators have defined mass shootings differently, but the definition outlined in my analysis is the definition employed by four different, frequently cited sources: the Washington Post, the Citizens Crime Commission, the Violence Project, and Mother Jones. These four databases largely overlap, showing that the definition used in the Allen Report is a standard and commonly used definition for mass shootings and is consistent with that used by a number of other sources. Dr. Kleck fails to identify any mass shooting consistent with my definition that is missing from the list of mass shootings in the Allen Report.[13]

10.    Moreover, the very source that Dr. Kleck claims proves the list of mass shootings in the Allen Report is incomplete in fact shows the opposite. Dr. Kleck claims that the "most comprehensive list of *all* mass shootings" can be found in the Gun Violence Archive ("GVA").[14] The Kleck Rebuttal Report provides counts of mass shootings that included "4+ dead in a single incident" from GVA.[15] However, if we repeat Dr. Kleck's system of obtaining mass shootings from GVA and exclude those that do not meet my definition, *e.g.*, those occurring in the home (approximately two thirds) and those related to other criminal activity (approximately 5%), we get essentially the same number of mass shootings as in my analysis for the years 2014-2021.[16] In fact, using GVA for the years 2014-2021, I not only get essentially the same *number* of mass shootings, I get essentially all

---

[13] Kleck Rebuttal Report, ¶¶7, 17-18 and Deposition of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.,* taken on January 25, 2023, 18:7-18.

[14] Kleck Rebuttal Report, ¶17.

[15] Kleck Rebuttal Report, ¶17.

[16] The approximate 5% includes incidents with insufficient detail to determine locale.

6

the same *incidents* that are in my analysis. Thus, Dr. Kleck's own compilation of mass shootings, rather than contradicting my analysis, actually validates it.

11.    The Kleck Rebuttal Report implies that mass shootings are commonly defined as having four or more victims killed and claims that the definition in my analysis, which excludes incidents in the home or related to other crimes, is arbitrary.[17] However, he provides no support for this claim, and the very sources he relies upon define mass shootings differently than Dr. Kleck's asserted common definition. The Kleck Rebuttal Report relies on two sources of incidents for his analysis of mass shootings: GVA and the Violence Policy Center ("VPC"). Both of these sources define a mass shooting differently than what Dr. Kleck implies is the common definition. GVA uses the definition "four or more people are shot or killed in a single incident, not including the shooter" and VPC uses "*three* or more fatalities."[18] Moreover, the allegedly common definition that Dr. Kleck applies in his current Kleck Rebuttal Report is inconsistent with his own definition of a mass shooting. In his own academic work, which he also cites in the Kleck Rebuttal Report,[19] Dr. Kleck has defined a mass shooting as "more than *six* people were *shot, either fatally or nonfatally,* in a single incident."[20]

---

[17] Kleck Rebuttal Report, ¶¶7, 11, 17-18 and Declaration of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.*, dated January 5, 2023, ¶10 (mass shootings are "commonly defined as incidents in which 4 or more victims are killed").

[18] "General Methodology," *Gun Violence Archive Website*, accessed on February 3, 2023, and "Mass Shootings in the United States Involving Large Capacity Ammunition Magazines," *Violence Policy Center,* September 16, 2022, emphasis added.

[19] Kleck Rebuttal Report, ¶¶15-16.

[20] See, for example, Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016), emphasis added.

Def. Exhibit 48
Page 001624

**B.    The Kleck Rebuttal Report, while criticizing the list of mass shootings in my analysis, agrees with my finding that both injuries and deaths are greater in mass shootings in which LCMs or assault weapons are involved**

12.    Although the Kleck Rebuttal Report criticizes the list of mass shootings in the Allen Report for being "arbitrary" and "unrepresentative," Dr. Kleck agrees with the conclusions of my analysis. In particular, he agrees with my finding that the number of both casualties and deaths are greater in mass shootings in which large capacity magazines ("LCMs") or assault weapons ("AWs") are involved. In particular, the Kleck Rebuttal Report states: "Allen accurately notes that casualty counts tend to be higher in incidents in which AWs or LCMs are used by the offenders."[21]

13.    Moreover, Dr. Kleck's own study of mass shootings (which was based on his own definition of a mass shooting of more than 6 people shot in a single incident) also shows that casualties are greater in mass shootings in which LCMs are involved. In particular, an analysis of the mass shooting incidents in his 2016 article yields similar results (21 fatalities or injuries in mass shootings involving LCMs versus 8 for those without).[22]

14.    Thus, based on either definition of a mass shooting, there is a consistent finding that there are on average more deaths and injuries if a mass shooting involves an LCM or an assault weapon.[23]

---

[21] Kleck Rebuttal Report, ¶40.

[22] The article covered 88 mass shooting incidents between 1994 and 2013. *See* Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[23] In addition to the results in the Allen Report (as well as prior analyses I have done) and Dr. Kleck's 2016 article, the finding that there are on average more deaths and injuries in mass shootings involving LCMs is also in Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," *American Journal of Public Health* (2019), and Koper et al.,

(continued…)

8

15.    Furthermore, although Dr. Kleck claims that there is no causal relation between the use of LCMs or AWs and the number of casualties inflicted, Dr. Kleck's support for this claim is speculative, and it ignores that controlled scientific experiments cannot be practically or ethically done to assess the presence of a causal relation.[24] Moreover, Dr. Kleck himself admits that mass shooters believe there is a causal relation. According to Dr. Kleck:

> **Offenders more intent on hurting many people** would be more likely to do so (lethal intentions cause lethal outcomes) but **are also more likely to use [AWs or LCMs] they believe – correctly or not – will help them achieve this goal** (lethal intentions cause use of **purportedly more lethal weaponry).** [25]

16.    Thus, Dr. Kleck's own logic appears to argue that there is a causal relation between the use of LCMs or AWs and the number of casualties inflicted.

**C.    The Kleck Rebuttal Report's estimate that only 14% of mass shootings involve LCMs is based primarily on incidents in the home and/or ones with unknown magazine type; restricting the analysis to public mass shootings validates the findings in the Allen Report**

17.    In the Allen Report I find that 63% of mass shootings with known magazine capacity involved LCMs and, assuming that *none* of the mass shootings with unknown magazine involved LCMs, 41% of mass shootings involved LCMs. Dr. Kleck claims that my estimate of the percent of mass shootings involving LCMs is too high and that only 14% of mass shootings involve LCMs.[26]

18.    Dr. Kleck's 14% estimate is based on taking a simple ratio of incidents in VPC, a source that maintains a report listing mass shootings for which it is

---

"Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018).

[24] Kleck Rebuttal Report, ¶¶40-46.

[25] Kleck Rebuttal Report, ¶40, emphasis added.

[26] Kleck Rebuttal Report, ¶18.

9

known that an LCM was involved ("Mass Shootings in the United States Involving
Large Capacity Ammunition Magazines"), to incidents in GVA, a source that
includes mass shootings regardless of the magazine capacity.[27] Dr. Kleck first
isolates the incidents in each source for which at least 4 people were killed, finding
29 in VPC and 201 in GVA for the years 2014 to 2022.[28] Dr. Kleck divides the 29
incidents with LCMs in VPC by the 201 incidents in GVA and concludes that only
14% of mass shootings involve LCMs.[29]

19.    Dr. Kleck's analysis yields very different results from mine for
primarily two related reasons. First, his analysis erroneously assumes that all
incidents with an LCM have been identified and included in the VPC list. Second,
the majority of incidents in his analysis occurred in the home, while the focus of my
analysis is on public mass shootings.

**1.    The Kleck Rebuttal Report does not address the fact that
magazine capacity is unknown for a substantial portion of
mass shootings**

20.    The Kleck Rebuttal Report relies on a report published by the VPC
which includes a list of mass shootings that involved LCMs to draw the conclusion
that "mass shooters *rarely* use LCMs."[30] The first page of the VPC's report
explains that its list of mass shootings involving LCMs "*is likely a significant
undercount* of actual incidents as there is no consistent collection or reporting on
this data" and "[e]ven in many high-profile shootings, information on magazine

---

[27] Kleck Rebuttal Report, ¶¶17-18.

[28] Kleck Rebuttal Report, ¶¶17-18.

[29] Kleck Rebuttal Report, ¶¶17-18.

[30] "Mass Shootings in the United States Involving Large Capacity
Ammunition Magazines," The Violence Policy Center,
https://vpc.org/fact_sht/VPCshootinglist.pdf, accessed February 1, 2023, and Kleck
Rebuttal Report, ¶¶17-18.

10

capacity is neither released nor reported."[31] Dr. Kleck does not address the fact that the source he relies upon states that the magazine capacity is unknown for a substantial portion of mass shootings. Instead, he assumes that *all* incidents not included in VPC did not involve LCMs.

21.    Moreover Dr. Kleck has testified that there are a number of incidents involving LCMs that are not included in the VPC list.[32] For example, he testified that the mass shooting in Rancho Tehama, California on November 14, 2017 (#39 in Exhibit B of the Allen Report and incident #987611 in the GVA database) is not included in the VPC list but according to news reports did involve an LCM.[33] There are other mass shootings involving LCMs that are not included in the VPC list. For example, the mass shooting in Indianapolis, Indiana on April 15, 2021 (#10 in Exhibit B of the Allen Report and incident #1978635 in the GVA database) is also not included in the VPC list but did involve an LCM.[34] Similarly, the mass shooting in Melrose Park, Illinois on February 5, 2001 (#118 in Exhibit B of the

---

[31] "Mass Shootings in the United States Involving Large Capacity Ammunition Magazines," The Violence Policy Center, https://vpc.org/fact_sht/VPCshootinglist.pdf, accessed February 1, 2023, emphasis added.

[32] Deposition of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.,* taken on January 25, 2023, 46:13-49:12.

[33] "Terror in Northern California town as gunman goes on rampage, kills 5," *Los Angeles Times,* November 14, 2017, which states that "staffers described the scene as 'horrific,' with multiple rounds fired and multiple high-capacity magazines found at the school." *See also*, Deposition of Gary Kleck in *Oregon Firearms Federation, Inc., et al., v. Brown, et al.,* taken on January 25, 2023, 46:13-47:10.

[34] "Prosecutor: FedEx shooter didn't have 'red flag' hearing," *WishTV*, April 19, 2021, and "HM DEFENSE HM15F-MB-556 DEFENDER M5 223 REM,5.56X45MM NATO 16" 30+1 BLACK HARD COAT ANODIZED BLACK MIL-SPEC HM STOCK," *Carter's Country*, https://www.carterscountry.com/product/hm-defense-defender-m5-223-rem5.56-nato-16-301-black-hard-coat-anodized-mil-spec-hm-stock, accessed February 3, 2023.

Def. Exhibit 48
Page 001628

Allen Report) is another example of an incident involving an LCM but excluded from the VPC list. [35]

22.    Thus, not only has VPC not identified every mass shooting where public information indicates that there was an LCM involved but critically, as VPC itself explains, there is often not enough information to determine the magazine capacity and there are likely many mass shootings with LCMs omitted from the VPC list. As detailed in Exhibit B of the Allen Report, after a search of public information and news stories, we found that magazine capacity was unknown for 36% of mass shootings (64 of the 179 mass shootings).

**2.    The Kleck Rebuttal Report's calculation of LCM use is heavily affected (and reduced) by its inclusion of incidents in the home**

23.    Dr. Kleck claims that my estimate of the percent of mass shootings involving LCMs is too high and that only 14% of mass shootings involved an LCM.[36] However, his data do not demonstrate that my estimate is too high – the primary reason why Dr. Kleck's calculation yields a lower proportion is that it includes incidents that occurred in the home, whereas the focus of my analysis is on public mass shootings.

24.    Contrary to Dr. Kleck's claim that he has shown that my estimate of the percent of mass shootings involving LCMs is too high, an analysis of Dr. Kleck's set of mass shootings validates the findings in the Allen Report. As discussed above, I find that 63% of mass shootings with known magazine capacity involved LCMs and, assuming that *none* of the mass shootings with unknown magazine involved LCMs, 41% of mass shootings involved LCMs.

---

[35] "Ex-Employee Kills 4, Self in Rampage," *ABC News*, February 6, 2001, and "Kalashnikov AK-47," *WeaponSystems.net*, https://weaponsystems.net/system/605-Kalashnikov%20AK-47, accessed February 5, 2023.

[36] Kleck Rebuttal Report, ¶18.

Def. Exhibit 48
Page 001629

25.    Using Dr. Kleck's method of taking the ratio of VPC to GVA incidents but limiting Dr. Kleck's incidents to only public mass shootings for the years 2014-2021 results in an estimate that approximately 40% of public mass shootings involved known LCMs and is therefore entirely consistent with and validates the findings in the Allen Report.

26.    Instead, focusing on mass shootings in the home, which account for almost two thirds of Dr. Kleck's mass shootings from GVA, yields very different results.[37] In particular, limiting Dr. Kleck's method to only mass shootings in the home results in a finding that less than 2% of mass shootings in GVA are listed in VPC and thus, according to Dr. Kleck, less than 2% involved LCMs. Thus, compared to public mass shootings, the evidence indicates that mass shootings in the home are less likely to involve known LCMs, suggesting that LCMs are less frequently used in mass shootings in the home and/or there is less information about magazine capacity for mass shootings in the home.

27.    I performed an analysis comparing the news coverage for public mass shootings versus mass shootings in the home. The results suggest that there is less information about mass shootings in the home and thus it would presumably be more likely that magazine capacity is unknown for these incidents. I found that public mass shootings are covered by news stories substantially more (4 to 36 times more) than mass shootings in the home. In particular, we performed a news search using Factiva for the 3-day and 10-day periods after each incident in the GVA set of mass shootings using Dr. Kleck's method for the years 2017, 2019 and 2021.[38] In

---

[37] Approximately 5% of Dr. Kleck's mass shootings from GVA related to other criminal activity and/or had insufficient detail on shooting locale. This analysis covers the years 2014-2021.

[38] The specific search string used in Factiva was: (gun* or shoot* or fire* or arm* or shot*) AND (kill* or "dead" or "death") AND ("[City]") AND ("[Street]") NOT (covid* or "coronavirus" or "virus"). The region was set to United States and the state in which the shooting took place, and the search excluded duplicate stories

(continued…)

Def. Exhibit 48
Page 001630

the 3-day period after an incident, the mean and median number of news stories for public mass shootings was 193 and 21, while for mass shootings in the home it was 6 and 5. In the 10-day period after an incident, the mean and median number of news stories for public mass shootings was 296 and 25, while for mass shootings in the home it was 8 and 6. The table below summarizes these results. As can be seen in the table below, the number of news stories is far greater for public mass shooting than incidents in the home, suggesting that magazine capacity would be more unknown for incidents in the home than the 36% percent of unknowns I find for public mass shootings.

### Number of News Stories Covering Mass Shootings

|  | 3-Day Window | | 10-Day Window | |
|---|---|---|---|---|
|  | **Mean** | **Median** | **Mean** | **Median** |
| Public Mass Shootings | 193 | 21 | 296 | 25 |
| Mass Shootings in the Home | 6 | 5 | 8 | 6 |

**Notes and Sources:**

Data from Factiva and the Gun Violence Archive. The search covers the years 2017, 2019, and 2021 and uses the search string (gun* or shoot* or fire* or arm* or shot*) AND (kill* or "dead" or "death") AND ("[City]") AND ("[Street]") NOT (covid* or "coronavirus" or "virus"). The region was set to the United States and the state in which the shooting took place, and the search excludes duplicate stories classified as "similar" as well as "republished news," and "recurring pricing and market data."

28.    Thus, using Dr. Kleck's two sources, GVA and VPC, I find evidence that unknown magazine capacity can be a substantial issue, particularly for mass shootings in the home, and that even assuming all mass shootings where the

---

classified as "similar" as well as "republished news," "recurring pricing and market data," and "obituaries, sports, calendars..." The "City" and "Street" for each incident were obtained from GVA.

Def. Exhibit 48
Page 001631

1    magazine capacity is unknown are not LCMs, approximately 40% of public mass

2    shootings involve LCMs.

3

4    **D.    The Kleck Rebuttal Report's claim that my analysis of DGUs is**
      **not reliable is unfounded and ignores my systematic and**
5     **scientific analysis of DGUs from Factiva news stories that yields**
      **similar results to my analysis of the NRA database**
6

7        29.    Dr. Kleck claims that the analysis of defensive gun uses ("DGUs")

8    from the NRA Armed Citizen database in the Allen Report is biased and unreliable

9    because, due to the NRA's incentives, it is not based on a representative sample. [39]

10   However, Dr. Kleck has no support for his argument that the NRA has the incentive

11   to exclude DGU incidents in which the defender fired more than ten shots.[40] The

12   NRA would presumably better serve its political ends by showing that individuals

13   regularly require more than ten rounds to defend themselves. Note that the NRA,

14   which maintains the Armed Citizen database, is affiliated to Plaintiff California

15   Rifle & Pistol Association, Inc.[41]

16       30.    Dr. Kleck claims that the systematic and scientific analysis of DGUs

17   using Factiva news stories in the Allen Report is biased because news stories are

18   less likely to cover incidents where many rounds are fired. Dr. Kleck asserts that

19   the "Factiva-discovered DGUs would tend to omit cases with many rounds fired,"

20   particularly when defenders "fired over 10 rounds in self-defense."[42] However, this

21   claim is implausible, completely unsupported, and contrary to the empirical

22   evidence. In particular, as detailed in the Allen Report, the data shows that, on

23   average, the more shots fired in a DGU incident, the greater the number of stories

24   _____

25       [39] Kleck Rebuttal Report, ¶¶26-28.

26       [40] Kleck Rebuttal Report, ¶¶26-28.

27       [41] "Membership," *California Rifle & Pistol Association website*,
     https://crpa.org/membership/.

28       [42] Kleck Rebuttal Report, ¶30.

Def. Exhibit 48
Page 001632

covering that incident.[43] Thus, not only does Dr. Kleck offer no support for his implausible claim but the empirical evidence directly contradicts it.

### E. The Kleck Rebuttal Report's claim that there are 2 million DGUs a year is based on his own survey and study that have been heavily criticized in the past and overstate the numbers

31.     The Kleck Rebuttal Report claims that "national surveys" have "consistently indicated that 0.5-3.5 million DGUs occur per year in the U.S., so it would be reasonable to assume an annual average of around 2 million DGUs."[44] However, this estimate is unreliable for a number of reasons, including that the surveys Dr. Kleck references do not actually estimate the number of DGUs per year in the United States, have been criticized by Dr. Kleck himself, and do not account for the reduction in crime from the time when the surveys were conducted to the present.

32.     Many of the surveys referenced by Dr. Kleck do not *actually* estimate the number of annual DGUs. Instead, Dr. Kleck applies 12 different adjustments, which themselves are mostly derived from a study he conducted almost 30 years ago, to calculate the 2 million estimate reported in the Kleck Rebuttal Report.[45] Dr. Kleck himself admitted that several of the surveys he referenced had "serious problems" and that they are not "very thorough or satisfactory for estimating DGU frequency."[46] Further, 19 of the 21 surveys he cites were conducted between 1978

---

[43] For more information, see Allen Report, ¶19.

[44] Kleck Rebuttal Report, ¶31, citing his own paper Gary Kleck, "What Do CDC's Surveys Say About the Prevalence of Defensive Gun Use?," *American Journal of Criminal Justice*, 2020.

[45] Appendix of Gary Kleck, "What Do CDC's Surveys Say About the Prevalence of Defensive Gun Use?" *American Journal of Criminal Justice*, 2020.

[46] Kleck, Gary and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," *Journal of Criminal Law and Criminology,* 1995, pp. 157-159.

Def. Exhibit 48
Page 001633

and 2000.[47] In a 2015 interview, Dr. Kleck claimed that DGU estimates from these
surveys would need to be cut by half to account for the reduction in crime from the
time when the surveys were conducted to the present.[48]

33.    Moreover, unlike the majority of the 21 surveys mentioned above, one
of the sources cited by Dr. Kleck, the National Crime Victimization Survey
("NCVS"), repeatedly calculates the number of DGUs per year in the U.S., and
consistently finds substantially lower estimates, less than one tenth the rate that Dr.
Kleck estimates. For example, a brief analyzing NCVS data by the Bureau of
Justice Statistics ("BJS"), which the Kleck Rebuttal Report relies on,[49] estimates
82,500 DGUs per year (62,200 DGUs related to violent crimes and 20,300 DGUs
related to property crimes), less than one twentieth the rate that Dr. Kleck
estimates.[50] The NCVS, which is conducted annually by the BJS, is "the nation's

[47] Kleck, Gary "What Do CDC's Surveys Say About the Prevalence of
Defensive Gun Use?" *American Journal of Criminal Justice*, 2020, pp. 12-14.

[48] Dr. Kleck stated in an interview that "the violent crime rate is about half
now of what it was circa 1993, when we did that survey on defensive gun uses, so,
best guess, the number of defensive gun uses would be about half. So, if it was 2.5
million then, it would be 1.2 million or so now." See "Criminologist Gary Kleck on
Guns, Crime, and Their Study, *Ari Armstrong Website,* November 7, 2017
(Available at: http://ariarmstrong.com/2015/11/criminologist-gary-kleck-on-guns-
crime-and-their-study/).

[49] Kleck Rebuttal Report, ¶¶9, 15, 58 and 60, citing Kleck, Gary, "Targeting
Guns: Firearms and their Control," NY: Aldine de Gruyter, 1997, p. 123. For
example, Dr. Kleck supports his claim in his Rebuttal Report that "LCMs are of
little or no significance in ordinary gun crimes with few victims and few shots
fired" by citing his own book *Targeting Guns: Firearms and their Control,* which
cites a BJS brief analyzing NCVS data. In particular, Dr. Kleck's book finds that
"gun assaults usually involve [] no shots (the victim is shot at in only 17% of gun
assaults, and wounded in 3%," by citing directly to the BJS's analysis of NCVS
data. See "Guns and Crime," *U.S. Bureau of Justice Statistics,* April 1994, p. 2.

[50] "Guns and Crime," *U.S. Bureau of Justice Statistics,* April 1994, p. 2,
citing the NCVS. See, also, "Trends and Patterns in Firearm Violence, 1993–2018,"
*Bureau of Justice Statistics,* p. 12, citing the NCVS, which estimates 70,040 DGUs
(continued…)

Def. Exhibit 48
Page 001634

1  primary source of information on criminal victimization"[51] and frequently cited by

2  Dr. Kleck.[52]

3

4  I hereby declare that the above statement is true to the best of my knowledge and

5  belief and that I understand it is made for use as evidence in court and is subject to

6  penalty for perjury.

7

8  Dated this 24th day of February, 2023.

9

10

11  _____

12                                    Lucy P. Allen

13

14

15

16

17

18

19

20

21

22  _____

23  per year from 2014-2018.

24      [51] "National Crime Victimization Survey," *U.S. Bureau of Justice
*Statistics*, accessed February 23, 2023 at https://bjs.ojp.gov/programs/ncvs.

25      [52] See, for example, Kleck Rebuttal Report, ¶36, Kleck, Gary and Jongyeon

26  Tark, "Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes."
*Criminology* 42(10): 2004, and Kleck, Gary and Miriam A. DeLone, "Victim

27  Resistance and Offender Weapon Effects in Robbery," *Journal of Quantitative
*

28  *Criminology* 9(1): 1993.

18

Def. Exhibit 48
Page 001635