**EXHIBIT 49**

1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   State Bar No. 261579
    JOHN D. ECHEVERRIA
5   Deputy Attorney General
    State Bar No. 268843
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3479
     Fax:  (415) 703-1234
8    E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Rob Bonta,*
9   *in his official capacity[1]*

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                           WESTERN DIVISION

13

14

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,** | 8:17-cv-00746-JLS-JDE **SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF DENNIS BARON** |
| Plaintiffs, | Courtroom:  8A |
| **v.** | Judge:      The Honorable Josephine L. Staton |
| **ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,** | Action Filed:  April 24, 2017 |
| Defendants. | |

---

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California. Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as the defendant in this case.

1

Def. Exhibit 49
Page 001637

## SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF DENNIS BARON

I, Dennis Baron, declare:

1.    I have been asked by the Office of the Attorney General for the State of California to prepare an expert report and declaration regarding Corpus Linguistics research.  This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

2.    I have evaluated the historical use of the terms *arms* and *accoutrements* and have concluded that there existed, from the Founding Era through the period following the ratification of the Fourteenth Amendment, a distinction between *arms* and *accoutrements*.  In my opinion, optional firearm accessories that are not integral or necessary for the functioning of a weapon— including large-capacity magazines (henceforth, LCMs), along with other magazines, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices—are not *arms*, but are part of the category known as *accoutrements*, as those terms were used in the 18th and 19th centuries.  I have also evaluated the lexical evidence for "repeater" *air guns*, *wind guns*, and *magazine wind-guns*, also called *magazine guns*, in the Founding era.  Air guns used compressed air instead of gunpowder to propel a ball.  The lexical evidence leads me to conclude that, although several artisans did invent air guns capable of firing multiple balls without reloading the ammunition or recharging the air cylinder, such guns were rare in England and America.  There are very few mentions of them in newspapers, and no mentions in the other historical databases that I consulted.  Some of these guns were one-offs and others did not seem to have been manufactured in any large quantity; and they were typically treated as curiosities, with the inventor (often a clockmaker) or owner exhibiting them for a fee.  The

Def. Exhibit 49
Page 001638

mechanisms of repeater air guns were complex—as noted, they were often made by clockmakers rather than armorers—and they were difficult to maintain in normal circumstances, let alone in times of conflict.  There is no lexical indication that these repeater air guns were ever adopted as military weapons in England or American in the eighteenth and early nineteenth centuries.  And there is no indication that they were ever used for personal self-defense.

## BACKGROUND AND QUALIFICATIONS

3.      I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975.  I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years.  I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law.  I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and law.  I have also published books on language reform, on usage, and on gender in language.

4.      Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, 2023).  In addition, I served as lead author on what came to be called "the Linguists Brief" in *District of Columbia v. Heller* (544 US

3

570 2008), a brief cited both by Justice Scalia in his opinion in the case, and by Justice Stevens in his dissent.  I was a co-author on another brief by professors of linguistics and corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843, 2022), which Justice Breyer cited in his dissent.  In that dissent, Justice Breyer also quoted directly from my essay "Corpus evidence and the meaning of 'bear arms'" (*Hastings Constitutional Law Quarterly*, 46.3: 2019).  I have spoken about historical meaning and the Second Amendment at the Federalist Society at the University of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at UC Hastings College of the Law.  I have also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*.  And I have submitted a declaration on behalf of the State of California in *Duncan et al. v. Bonta* (Case No. 3:17-cv-01017-BEN-JLB), a case challenging California's restrictions on LCMs, and a declaration on behalf the State of Rhode Island in *Ocean State Tactical, LLC, et al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.), which also concerns the constitutionality of LCM restrictions.  In the past twenty years I have been an expert consultant in fourteen cases involving document interpretation.

5.    My recent essay, "Look It Up in Your *Funk and Wagnalls*: How Courts Define the Words of the Law," an analysis of how judges incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, appears in the latest issue of *Dictionaries,* the academic journal of the Dictionary Society of North America.

6.    This report is based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

Def. Exhibit 49
Page 001640

7.     I have been retained by the California Department of Justice to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

## OPINIONS

### I.    SUMMARY OF OPINIONS

8.     Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields.  Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine that holds the bullets.  Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements.*  A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier's or militia member's kit, or equipment.  For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on).  When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories.  But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories.  And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

9.     Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks).  And they often specified, separately, the

5

different accessories that officers and the rank and file soldiers were also required to have.

10.    I have found no lexical evidence that repeater air guns were used as military weapons in England or America in the Founding Era, or that they were used as weapons of personal self-defense at that time.

## II.    THEORY AND METHODOLOGY

11.    Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text.  Initial work in corpus linguistics did not typically involve legal issues.  Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers.  Scholars plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt.  Soon, in addition to solving literary mysteries, the methodologies developed by corpus linguists were successfully applied in a number of criminal cases in the U.S. and in England involving, for example, the authorship of a ransom note or an email. Lexicographers, who began compiling large analog databases of text in the late 19th century, began to digitize their libraries of paper data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.  As a graduate student at the University of Michigan in 1970, I coded analog texts from the *Oxford English Dictionary* files to help build the computerized database for the Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to the language of the Founding Era.  Today, major dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The

6

major dictionary makers of Europe use similar databases in their own work.

12.    Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics.  LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and constitutional texts.  The promise of LCL attracted jurists as well as scholars with a specific interest in language and law.  In *Muscarello v. United States* (524 U.S. 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" Justice Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon*.  In her dissent, Justice Ginsburg expressed skepticism that either dictionary evidence, or Justice Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question.  Her critique did not deter courts from performing other computerized data searches to determine legal meaning.  In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute.  Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello*, No. 11-2917 [7th Cir. 2012]).  Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from the authorities.'  But in the context of the version of the Immigration Act current at the time of Costello's conviction (8 U.S.C. § 1324 (a)(1)(B)(ii);18 U.S.C.§ 3571(b)(3), *harbor* appears alongside

7

Def. Exhibit 49
Page 001643

1    other terms involving secret, illegal activity, and so even though Gries and Slocum,

2    using more rigorous parameters, showed that Judge Posner's Google search may

3    have been flawed (Stefan Th. Gries and Brian G. Slocum, "Ordinary Meaning and

4    Corpus Linguistics," 2017 *BYU L. Rev.* 1417 (2018): 1417–71), his understanding

5    of the word *in context* seems clearly to be correct.

6        13.    More principled, scientific database searches soon followed.  In 2018,

7    Justice Thomas Lee of the Utah Supreme Court, a long-time champion of corpus

8    linguistics, together with the legal scholar Stephen Mouritsen, summarized the

9    latest research in corpus linguistics and LCL as a way to determine ordinary

10    meaning, and more specifically, OPM, with more clarity (Thomas Lee and Stephen

11    Mouritsen, "Judging Ordinary Meaning," *Yale Law Journal* 127(2018): 788–879).

12    Jurists over the past few years have found that in several cases, LCL proves more

13    useful than the period dictionaries (for example, the dictionaries of Samuel Johnson

14    and Noah Webster) that courts have often relied on to determine historical meaning.

15    LCL often supplements the historical interpretations found in older dictionaries and

16    in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of

17    historical text data.

18        14.    In addition to the publication of several significant law review articles

19    by experts in the field of corpus linguistics, there have been several conferences on

20    Legal Corpus Linguistics in the past few years, and a number of continuing-

21    education seminars on LCL are now offered for judges and lawyers.  As a result,

22    Corpus Linguistics has drawn increased attention from the courts, including recent

23    mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a

24    comment by Justice Alito in his concurrence in *Facebook v. Duguid* (19-511 2021),

25    where he suggested that LCL may one day provide a useful alternative to the

26    canons of interpretation.  Over the past decade, LCL has become an important tool

27    in helping to determine original public meaning when such meaning is in doubt.

28        15.    Several large databases have come online in the past few years that

Def. Exhibit 49
Page 001644

1  facilitate LCL research.  They have proved invaluable to me in compiling this

2  Report.  Brigham Young University's Center for Law and Corpus Linguistics hosts

3  the Corpus of Founding Era American English (COFEA), with more than 126,000

4  texts, comprising close to 137 million words and covering the years 1760–1799.

5  BYU's Corpus of Early Modern English (COEME), with data from 1475–1800,

6  contains over 40,000 texts and 1.1 billion words.  For the nineteenth century, the

7  Corpus of Historical American English (COHA), initially developed at BYU but

8  now independent of that institution, currently contains 475 million words of text

9  from 1820–2020.  The size of these databases continues to grow as more works are

10  digitized, coded, and added to the corpora.

11  16.    Critics of LCL have complained that databases like COFEA and

12  COEME contain only texts written by "elites," whose language may differ from

13  that of "ordinary people" who do not write at all, or who for various reasons do not

14  write texts likely to be included in the available corpora.  It is certainly the case that

15  many printed books and periodicals, along with documents like the Constitution, its

16  amendments, and state and federal statutes, tend to be written by educated

17  specialists and professional writers, and although ordinary people are expected to

18  understand the language of the Constitution, the Declaration of Independence, and

19  other founding documents, as well as the laws that govern the nation, such texts

20  typically require specialized knowledge.  A reading-difficulty formula like the

21  commonly-used Flesch-Kincaid scale suggests that the Declaration of

22  Independence and the Constitution require a fifteenth-grade reading level, while

23  according to one comprehensive study, *Adult Literacy in America* (US Department

24  of Education, 1993), the average American today tends to have a seventh-grade

25  reading level.

26  17.    In order to counter any "elite" bias that may be found in databases like

27  COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases

28  covering the period 1750–1900, focusing for this report on the Founding Era and on

9

Def. Exhibit 49
Page 001645

the period of Reconstruction after the passage of the Fourteenth Amendment. Because of changes in print technology and the spread of literacy, Founding Era newspapers differed from the newspapers of the post-Civil War era.  Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early 19th century, when the Industrial Revolution drastically changed printing methods.  The first printing press was adapted by Gutenberg from the design of the traditional wine press, and printing was a slow and labor-intensive process.  As a result, newspapers in the founding era were small, averaging four to eight pages.  Publication was less frequent as well.  Papers tended to appear weekly or semi-weekly, rather than daily.  Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news.  Although newspaper subscribers tended to be "elites," newspaper content was widely shared by word-of-mouth:  ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

18.    The invention of the steam engine in the 19th century, along with growth of paper mills that facilitated the production from wood pulp of large, inexpensive rolls of newsprint, led to a revolution in print technology.  This, in turn, led to an explosion in the size of newspapers and the frequency of their publication, to the point where, at their height, papers in big cities were publishing several editions a day.  This growth in newspapers, along with a substantial increase in periodical and book production, paralleled a growth in literacy in the US and Europe that tracked the industrial revolution and the subsequent rise in universal public education.  By the end of the Civil War, there were more readers in America than ever, and they demanded more reading material.

19.    As for the question of "elites," newspapers of the 18th and 19th

Def. Exhibit 49
Page 001646

centuries were the principal means of communicating news and information. As such, they embodied much of the language of the "ordinary people" who read them. These early newspapers also provide researchers with more data for the 19th century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.

20.    Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though for obvious reasons, none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

21.    The newspaper databases that I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (a service of the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, newspapers.com provides the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later 19th century.

22.    All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work; and the newspaper databases contain a number of duplicate stories because, particularly in the period of newspaper growth during the 19th century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand and Felix Frankfurter to Frank Easterbrook and Richard Posner have warned their colleagues not to make a

Def. Exhibit 49
Page 001647

fortress of the dictionary.  The corpora are by necessity incomplete.  LCL doesn't replace dictionary look-ups, but it does provide an important supplement to them.

### III.    THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES

23.    I was asked to look at the meaning of *arms* and *accoutrements* as used individually, along with the phrase *arms and accoutrements,* current in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment.

24.    In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.'  A *magazine* was a place, often a building or warehouse, to store goods and supplies.  When used in a military sense, a *magazine* was a building designated for storing gunpowder, and as such, it was subject to strict regulation.  Because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits.  The word *magazine* was not typically used to refer to the compartment of a gun containing bullets until late in the nineteenth century.  Although the term *magazine* appears in the phrase *magazine wind gun* in 1744, that usage is marked as "rare" by the Oxford English Dictionary, which also marks the phrase *magazine wind gun* as "obsolete."  In its separate, main entry for *magazine,* the OED gives the earliest use of *magazine* to mean a bullet storage container as 1888, and the term remained relatively rare until the 1920s.  Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.    The data on *accoutrements* suggest that parts of firearms such as magazines are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military.  *Cartridges, cartridge boxes* and later, *detachable magazines*, are not arms in and of themselves.

26.    The OED, the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, "items of apparel; (more generally)

Def. Exhibit 49
Page 001648

additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments." [OED online, s.v. *accoutrement*; the *OED* and the corpus evidence makes clear that *accoutrements* typically occurs as a plural].

27.    *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire).  But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers.  The example given by the OED to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813:  "In order to collect the wounded and their arms and accoutrements."  Here Wellington, widely recognized as a consummate soldier, and who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms* and *accoutrements*.

28.    The term *accoutrement-maker*, though not defined separately by the OED, is illustrated with examples referring to a manufacturer of military accessories rather than arms; and the term *accoutrement shop* has this 1831 example where guns and accoutrements are differentiated:  "The crowd was so great in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops in the vicinity of the Palais Royal."  [*United Service Jrnl*. i. 325]

29.    The OED definitions are instructive.  But in order to determine more specifically what the term *accoutrements* refers to, I consulted two digitized historical databases, or corpora.  A COFEA database search for the occurrence *accoutrements* within 6 words of *arms* returned 873 hits (including a small number of duplicates).  A similar search of COEME returned 126 hits, the earliest from 1656. I determined that the two search terms, *arms* and *accoutrements*, often appear together as a single phrase, *arms and accoutrements*, typically in military contexts having to do with an army or militia unit.  *Accoutrements* often occurs in a list alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,*

13

though when *ammunition* is not listed separately, the term *accoutrements* will generally include *ammunition*. *Accoutrements* sometimes occurs in a list alongside *clothing*, suggesting it may not always include uniforms (this finding informs the *OED* definition: military equipment other than arms and uniforms). But occasionally, *accoutrements* may include items classified as part of a uniform (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where the term usually refers to clothing associated with particular professions or activities). In sum, in the vast majority of examples, *accoutrements* functions as a catch-all term for military equipment *separate* from, and not including, *arms*.

30.    But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military *accoutrements*, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston. [*The American jest book*: Part I[-II], 1789; emphasis added; here military accoutrements includes toy swords.]

31.    This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements provided by the militia law.

32.    But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

**1776**: Fire arms and accoutrements
**1780**: arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments.
**1795**: you will march . . . with arms and accoutrements in good order. If any volunteer should want arms and ammunition, bring them forward, and they shall be supplied as well as possible. [COEME; the other examples in this list are from COFEA]
**1798**: To hold his powder and his ball, his gun, accoutrements and all . . . [This example rhymes because it's from a poem, indicating that the idiomatic phrase *arms and accoutrements* has become part of the general language available not just to military specialists but also to poets and novelists.]

33.    A second COFEA search, for *accoutrements* alone, returned 1,235 hits. COEME yields 771 hits.  These searches add a number of non-military contexts, where accoutrements refers to religious gear (robes, mitres, and so on) as well as other sorts of fancy or special clothing.  These non-military examples do not reference weapons, ammunition, or other military equipment.

34.    I supplemented my COFEA search with a search of the newspaper database, newspapers.com, for the Founding Era period, 1750–1800.  The newspaper databases do not permit the kind of collocate searches that COFEA, COEME, and COHA allow.  Entering two search terms returns results in which either one or both terms occur on the same page, though not necessarily in the same sentence, or even in the same article, and not necessarily as linked terms.  There are 1,392 hits for *accoutrements*.  There are 692 matches for the exact phrase *arms and accoutrements*.

35.    Here's a mid-18th century British example from the newspapers.com corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*: "This Militia shall receive their Arms, Accoutrements, and Ammunition from the Ordnance." *Derby Mercury*, 1756.

36.    Similarly, there's this "ploughshares into swords" example of a Cambridge University library to be converted to military use:  "[T]he new Building intended for a publick Library . . . may be converted into a Barrack, and be supplied

Def. Exhibit 49
Page 001651

1  with Provisions, Arms, and Accoutrements, at the Expence of the University."

2  *Jackson's Oxford Journal* 1756.

3      37.    A search of the Readex database of America's Historical Newspapers

4  returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880.  This early

5  example from the colonial period appeared in the *Boston Evening Post* in 1750. It

6  distinguishes *arms* from uniforms, accoutrements, and other military equipment:

7  "All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in

8  blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things

9  necessary for a Gentleman Ranger."

10      38.    This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that

11  arms and accoutrements are distinct categories in the new nation as well:  "The

12  militia . . . must be considered as the palladium of our security . . . .The formation

13  and discipline of the militia of the continent should be absolutely uniform; and that

14  the same species of arms, accoutrements, and military apparatus, should be

15  introduced in every part of the United States."

16      39.    The text of a bill in Congress to establish a uniform militia appeared in

17  the *New York Journal*, in 1790.  It confirms the Founding-Era sense that *arms*,

18  *ammunition*, and *accoutrements* make up distinct and separate elements of a

19  soldier's kit:  "There shall be appointed an adjutant general for each state . . . whose

20  duty it shall be to . . . report[] the actual situation of their arms, accoutrements, and

21  ammunition. . . Every non-commissioned officer or private . . . for appearing at

22  such meeting or rendezvous without his arms, ammunition, or accoutrements, as

23  directed by this act, shall pay the sum of twenty-five cents."

24      40.    And this cite from 1868 clearly distinguishes what counts as arms, and

25  what counts, separately, as accoutrements:  "At Watertown Arsenal, Massachusetts

26  . . . the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets . .

27  . ; 261 Carbines . . . ; 305 Sabres . . . ; lot of cavalry accoutrements, consisting of

28  Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

*Daily Morning Chronicle* (Washington, DC).

41.    The newspaper data parallels that of COFEA:  the phrase *arms and accoutrements* is almost always military.  The phrase sometimes occurs alongside *ammunition* as a separate list item.  *Accoutrements*, when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than 'equipment' (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the OED citations.  In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

42.    It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*.  Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random).  *Eggs and bacon* is rarer than *bacon and eggs*.  And it would be unusual to find *battery and assault*.  Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in *breaking and entering*) to prevent anyone from reversing the order.

43.    The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

44.    There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*.  Examining a selection of the 15,799 citations of the phrase confirms that both in England and the US, *arms* and *accoutrements* are separate categories. Here is one example from Gloucestershire, in England, dated 1868: "[A]

17

Def. Exhibit 49
Page 001653

letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot" *Gloucestershire Chronicle* (Gloucester, England), 1868.

45.    A similar cite from Iowa in 1868:  "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property" *Cedar Falls Gazette* (Cedar Falls, Iowa), 1868.

46.    And this, from Stroudsburg, PA, also 1868:  "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana," *The Jeffersonian* (Stroudsburg, Pennsylvania), 1868.

47.    The circa-1868 data confirmed the Founding Era data that *accoutrements* is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the terms refer to separate categories of equipment.

48.    One final note on *accoutrements*.  The U.S. Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843, 2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328.  In that decision, the Court states, "A gun is an 'unusual weapon,' wherewith to be armed and clad.  No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress."

49.    In the citation above, *accoutrements* does not refer to weaponry, but to the more general category of 'everyday attire, or clothing.' the Court is saying that it may be normal to wear a shirt, or a belt, or shoes, but it's not normal to wear a

gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it's not *normal* or typical to do so. In affirming Huntley's conviction, the Court noted that his purpose in carrying a shotgun was not a legal one.

## IV. SOME HISTORICAL NOTES ON THE USE OF THE WORDS *MAGAZINE* AND *MAGAZINE WIND GUN,* AND ON REPEATER AIR GUNS IN THE FOUNDING ERA

50.    Today a gun magazine refers to a bullet container for a gun. That use of *magazine* began to appear in the mid-nineteenth century and became common by the early twentieth. According to the OED, in the 18th and early 19th centuries, the word *magazine* referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

51.    Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The OED defines *magazine*, sense IV b, as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

52.    However, as with a very few instances of *accoutrements* including *arms,* there are an extremely small number of early counterexamples where *magazine* refers to the bullet compartment of a gun. The term "magazine wind gun" first appears in 1744 as the name of an air gun invented by one L. Colbe. The common, single-shot wind gun, or air gun, used compressed air rather than ignited gunpowder to propel a ball, and was much quieter than a traditional gun. Although

Def. Exhibit 49
Page 001655

the air gun did not require powder or a match, the user had to re-charge the compressed air cylinder once the air had been expended.  The writer Oliver Goldsmith found air guns to be useful for experiments in physics, adding, "THIS, however, is but an instrument of curiosity, and sometimes of mischief."  [Oliver Goldsmith, *A survey of experimental philosophy, considered in its present state of improvement,* 1776.]  This newspaper story reports that the scientist Joseph Priestley was injured by an accidental discharge of an air gun:  "We hear from Birmingham, that the celebrated Dr Priestley, in a late trial of some experiments with an air gun, was badly wounded by an accidental discharge of it; the ball with which it was loaded, passing thro' one of his hands, and shattering it to pieces." [*The Leeds Intelligencer and Yorkshire General Advertiser,* June 5, 1781, p. 3.]

53.    A number of newspaper references suggest that its quietness made the air gun popular with criminals, and many references to air guns refer either to accidental discharges or to criminal assaults (for example, numerous newspaper accounts in 1785 suggested that the weapon which broke a window in the carriage of King George III was an air gun).

54.    Air guns typically fired a single shot.  However, there are references to approximately eight inventors between 1744 and 1820 who built air guns capable of firing anywhere from 9 to 50 balls without reloading the ammunition or recharging the compressed-air cylinder.  Lexical evidence suggests almost all of these repeater air guns were experimental models rather than guns available for military or civilian use.

55.    The OED dates the term *magazine wind-gun* to 1744 in a reference to an air gun capable of firing more than one shot without reloading. *Magazine wind-gun* is the term used by its inventor, a man named L. Colbe, who also uses the term *magazine gun* for that device. In an entry separate from its entry for *magazine,* the OED marks the usage of both "magazine wind gun" and "magazine gun" as "rare" and "obsolete":

Def. Exhibit 49
Page 001656

†magazine wind-gun  *n. Obsolete rare* a type of wind-gun fitted with a magazine of bullets. 1744 J. T. Desaguliers *Course Exper. Philos.* II. 399  An ingenious Workman call'd L. Colbe has very much improv'd it [*sc.* the old Wind-Gun], by making it a Magazine Wind-Gun; so that 10 Bullets are so lodg'd in a Cavity..that they may be..successively shot. [Oxford English Dictionary Online, s.v. magazine wind-gun.]

56.    The OED citation is from John Theophilus Desaguliers, *A Course of experimental philosophy.*  London, 1744, vol. II:399–402.  Desaguliers, a "philosopher" or scientist who specialized in mechanics and hydraulics, was a member of the Royal Society and an assistant to Isaac Newton.  In his treatise, he offers an elaborate description of the common, single-shot wind gun, more typically referred to as an air gun, along with a three-page description of Colbe's so-called "Magazine Wind-Gun," accompanied by a detailed drawing of the mechanism.  I have found no biographical information about L. Colbe, inventor of the gun, and there is no lexical evidence that Colbe made more than one such gun, or if he did, that it was produced in any significant numbers.  There is no lexical evidence that the other repeater air guns or magazine wind guns were ever more than a curiosity until workable models of what we now call machine guns, which used conventional gunpowder and bullets, not compressed air and balls, were produced during and after the Civil War.

57.    As further confirmation that the *magazine wind gun* was an anomalous and uncommon term, the OED definition of *magazine,* updated most-recently in 2022, gives the earliest date of the sense of the word as a bullet-container as 1888. The corpus evidence confirms that the magazine wind gun is correctly dated by OED as 1744, and I have found references to *magazine air guns* in the 1790s and early 1800s, but this usage of the word remained rare.  "Magazine wind-gun" and "magazine gun" do not appear in the COEME or COFEA corpora.  I have found no information in the corpora on the availability or popularity of such guns, but the sparse lexical data suggests they were not in common use.  In addition, although Desaguliers describes the mechanism of the wind gun as "not to be easily put out of

21

order," his description and accompanying drawing shows that it is in fact quite complex, not something that could be repaired by a soldier or non-specialist civilian.  A small number of references to later repeater wind guns indicate they were made by clockmakers and other highly-skilled artists or artisans, and it is reasonable to assume that they too would require a specialist knowledge and specialist tools to repair the mechanism.  There is no indication in the lexical evidence that repeater air guns were ever mass produced or publicly available in the Founding Era (1776–1820).  Several of the citations I found treat these guns as curiosities and their owners charge a small fee to anyone interested in looking at them (and in one case, trying the gun out).

58.     Here is what Desaguliers says:  "An ingenious Workman called L. Colbe, has very much improved it [the air gun, or wind gun as Desaguliers calls it], by making it a Magazine Wind-Gun; so that 10 Bullets are so lodg'd in a Cavity near the Place of Discharge, that they may be drawn into the shooting Barrel, and successively shot so fast as to be of the same use as the same Number of Guns; the only Motion requir'd (when the Air has been injected before-hand) being the shutting and opening of the Hammer, and cocking and pulling the Trigger. . . . The Excellency of the Magazine-Gun, as he calls it; the rest being like another Wind-Gun." [Vol II, p. 399; following this are two pages describing the mechanism in painstaking detail.]

59.     Desaguliers then continues:

The 10 or 11 very effectual Shot may be made one after another, without new injection of Air. . . .  The Magazine . . . receives the Bullets at its Opening D, over which a Plate X comes to Shut them in; and they are kept in readiness to be brought into the shooting Barrel by the Motion of the Hammer in the expeditious manner describ'd. This is far preferable to any of the old Wind-Guns; because t'ho some of them will hold Air for several Discharges, the Bullet must be put down the Mouth of the Barrel every time, which cannot be done soon; but in Colbe's Gun the Bullet is brought into the Barrel in a Moment. . . .; and the whole so well executed as not to be easily put out of order. For these Reasons it may be look'd upon as the best Defence against

> Highway-men, or Robbers that Travellers are aware of because when they have cause to suspect them, they may make five or six Discharges before a Thief can come within Pistol-Shot." [Pp. 401–402; in this transcription I have modernized the long ſ as the letter *s* to make the passage easier to read for the modern reader.]

Despite Desaguliers' optimism, there is no evidence in the corpora that Colbe's "machine wind gun" was ever used either as a military weapon or as a weapon of self-defense.

60.     There are several other references in newspaper databases to repeater air guns in the period 1776–1820. They too seem to be rare inventions or curiosities, not weapons commonly available to the military or the American or English public:

> 1783 "Vienna. A watchmaker has invented an Air Gun, which, without recharging, fires 15 times successively. A corps of Hunters are to be armed with these guns." *The Newcastle Weekly Courant* (England), May 10, 1783, p. 3. The writer does not use the term *magazine* to describe this gun, and there is no follow-up to indicate whether the corps of Viennese hunters did employ such a weapon.

> 1784 "An artist of this town [Birmingham, Eng; the artist is also identified as a compass maker] has lately invented a magazine gun, that will discharge 45 bullets separately in two minutes and a half, each bullet would kill an ox at 40 yards distance; it is only charged once, and aim is taken with more certainty than with the fowling piece." *New York Packet and American Advertiser* (New York, NY), Aug. 5, 1784.

> 1792 A number of American newspapers report on the invention by a man from Rhode Island of a repeating air gun capable of firing 20 times without reloading. Here is one: "A person in Rhode Island has invented an Air-gun, which can be discharged, to do execution, 20 times, each time it is loaded.—As nothing is cheaper, and easier to be transferred, than the ammunition for the above pieces; and as saving much expense, they recommend themselves strongly to the Secretary at War, to be used in the approaching campaign against the Indians." *National Intelligencer: National Gazette,* April 26, 1792, p. 3.

61.     These articles do not use the word *magazine* in reference to the gun, and there is no indication that the Secretary of War acted on the suggestion in the article from the *National Intelligencer*. In fact, the following advertisement suggests that the repeater air gun in question was treated as a curiosity to be

Def. Exhibit 49
Page 001659

admired in a museum:  "An air-gun, made by a young man, a native of Rhode-Island, but now resident in this city [New York], and which has been purchased by the subscriber, with a view eventually to make it the property of the American museum but wishes to reimburse himself in the following manner, viz.  He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence.  This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13 Maiden Lane, every day in the week, from 10 to 12 in the forenoon, and from 3 to 5 in the afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at the Museum.  Gardiner Baker, Keeper of the Museum." *New York Daily Advertiser,* Feb. 9, 1792.

62.    There is a report in 1796 of German troops being issued a repeater air gun, invented in the reign of Joseph II, of the Holy Roman Empire (*reg.* 1765–1790):  "This carabine, lighter and smaller than the common ones, is composed of two barrels, the smallest of which contains 25 balls: and by a slight movement, they pass from the one to the other; which ball, by lowering the firelock, goes off with the same rapidity and carries further than if fired with powder, without the least noise, and that as often as a hundred times alternately, during the space of 8 or 10 minutes; after which, the reservoir being exhausted, it requires to pump in fresh air, which takes up at most, 16 minutes." *The Independent Gazetteer* (Philadelphia), Aug 6, 1796, p. 1.  The article adds that a sample weapon was given to the Prince of Wales, and the writer suggests such guns would be useful at sea, since they are not affected by dampness.  But there is no indication in the corpora that the Royal Navy ever considered such a weapon.  The article does not use the word *magazine* in connection with the weapon.

63.    Here is another instance, in 1797, referring to a repeater air gun: "An Air GUN has been constructed by Messrs. Darlings and Wilkinson, of Cumberland,

24

Rhode Island, upon a plan entirely new. It can be discharged twelve times with once loading, and will do execution with great exactness, at fifty yards distance." *Columbian Centinel* (Boston), June 21, 1797. Again, there is no use of *magazine* in the article.

64.    In 1801, multiple newspapers run the story of a repeater air gun invented by a man known as Girardami, identified as a "peasant" and watchmaker and variously referred to in gun history articles as Girandoni or Girardoni (those spellings do not appear in the corpora): "Girardami, a Tyrolese peasant, and self-taught artist, has invented an air-gun, which may be discharged fifty times without pumping again. The first twenty shots penetrate through a door at an uncommon distance. Girardami makes these air-guns himself, and likewise very good wooden watches." *The Caledonian Mercury* (Edinburgh), Mar. 2, 1801, p. 2. There is no use of *magazine* in these articles.

65.    And in 1802 we find this reference to an exhibitor charging admission to see repeater air gun: "The Newly-Invented Philosophical Air Gun That can be used as Gun or Pistol, and discharge 20 balls with one loading of the globe [that is, the compressed-air cylinder], unless the charge of air is let out at once. To be seen at Mr. Wyant's tavern, Market street, both night and day. Admittance one fourth of a dollar." *Telegraphe and Daily Advertiser* (Baltimore), March 17, 1802. *Philosophical* in this sense is often used to refer to physicists experimenting with air guns to measure air temperature, pressure, and volume, among other things (see, for example, the work of Desaguliers and the experiments of Goldsmith and Boyle mentioned above). And again, no use of *magazine*.

66.    A brief ad appears in 1807 for an auction includes, among other items, "an air gun in compleat order which, when loaded will discharge twenty five times after being pumped." *American Citizen* (New York, NY), May 28, 1807. No mention of *magazine*.

67.    There are several accounts that Lewis and Clark took a repeater air gun

on their expedition to the Pacific.  Only one instance in the databases, in 1814, alludes to that weapon, though the article itself has nothing to do with the expedition.  Instead, this letter to the newspaper, criticizing a politician for repeating the same things he's been saying for years, suggests as well that the Lewis and Clark repeater air gun was used not for hunting or warfare but rather to dazzle the Indians that the explorers encountered with their "great medicine," thereby ensuring a peaceful encounter:  "he [the politician in question], forthwith, becomes a "great medicine," as the Shoshones called captain Lewis' air gun." *National Advocate,* Mar. 23, 1814.  There is no use of *magazine* in reference to the weapon.

68.    Here is another advertisement, from 1815, for "one magazine Gun, when once loaded can be discharged ten times in a minute." *New York Gazette,* Aug. 30, 1815.  This is the third and last use of *magazine* to refer to a bullet holding compartment of a gun before the mid-19th century.

69.    Finally, there is an ad in 1819 for a French repeater air gun, for sale at 90 crowns: "which discharges 20 times before the air is expended." *Salem Gazette* (Massachusetts), Feb. 5, 1819.  There is mention of *magazine* in reference to the gun.

70.    Corpus data shows that *magazine gun* and *magazine air gun* are extremely rare terms, occurring a mere three times in the corpora.  In contrast, there are approximately 1,200 references to the phrase "air gun" in the several databases that I consulted.  Subtracting an estimated 150 duplicates, that leaves about 1,050 references to a single-shot air gun.  In contrast, subtracting estimated duplicates, I found 12 references to repeater air guns.  Two of these references suggest that they would be useful weapons for the military; one recommends their use to hunters; and, in one case, the writer speculates that the weapon would be useful for self-defense.  But for the most part, these early repeaters seem to be treated as curiosities: marvels of engineering constructed by clockmakers or other skilled

Def. Exhibit 49
Page 001662

artisans, items to be seen in a museum or exhibited at a tavern. There is no lexical evidence that they were manufactured in quantity. Their mechanisms were complex, requiring a clockmaker's skill to design, make, and repair. And it took time to re-charge the air cylinder (one source suggests 16 minutes for one such repeater air gun, which would render them suboptimal in battle situations). A couple of entrepreneurs charged admission to view them, and in one case, to try shooting the gun. The Lewis and Clark example seems to have been used to "impress" potentially hostile Indians rather than as a weapon against them. It too may have been a one-off. Furthermore, only three of the twelve references to repeater air guns refer to the bullet container as a *magazine,* a further indication that this usage is extremely rare.

71.    With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier terms *cartridge box* or *cartridge case*), not in air guns but in ones using gunpowder and bullets.

72.    COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons in the 1890s, and only three such uses before 1820. Most COHA cites for *magazine* refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. After its appearance in the 1880s, it took some thirty to forty years for the 'bullet holder' sense of the word *magazine* to become more common, and even then, text references to ammunition magazines often appear, not in general discourse, but in legislation restricting their size or use.

73.    Most militia laws and regulations from the Founding Era specify

Def. Exhibit 49
Page 001663

minimum requirements for soldiers' weapons, ammunition, and accoutrements. Most laws regulating weapons in the mid-19th century restrict or ban specific kinds of weapons, often enumerating them, sometimes in terms we find colorful today but which were common at the time (Arkansas toothpicks, Bowie knives, slung shots, swords in canes, pistols capable of being concealed in a pocket). Occasionally, these laws further identified such weapons as those used by "brawlers," thieves, robbers, or others bent on illegal activities. Other weapons restrictions follow the English tradition of limiting possession of weapons by social class, nationality, or race.

74.    Although militia laws do specify weapons and other required accoutrements or pieces of military equipment, including horses for the officers, those laws that prohibit certain kinds of weapons during the two critical periods (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being." [1776 Md. Laws 146].

75.    I surveyed the gun regulations in the Duke Historical Database from the early medieval period through 1885 to see what terminology was used. None of the laws that prohibit weapons, aside from the Maryland statute above, specifies a gun part or ammunition case or accoutrements of any kind. Although many present a list of banned or prohibited weapons—usually without defining them [the assumption is that the reader knows what they refer to], none of the laws mention cartridge boxes, bullets, barrels, or other parts of any weapons.

76.    Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of one or more bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: "No person shall have a rifle or shotgun, either loaded or with a

Def. Exhibit 49
Page 001664

cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests."

77.     Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states.  Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."

78.     A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

79.     Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms:  "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

80.     The Act also provides a specific definition of "machine gun":  "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger."  [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

## CONCLUSION

In sum, the term *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms.  In non-military contexts, *accoutrements* does not refer to

Def. Exhibit 49
Page 001665

1   arms but instead to civilian attire associated with specific professions, like the

2   clergy, or to fancy dress. Such garb *does not* normally include weaponry.  But there

3   is no data that I have found showing that arms includes accoutrements, magazines,

4   or any other parts of weapons.

5         I declare under penalty of perjury of the laws of the United States that the

6   foregoing is true and correct.

7         Executed on January 6, 2023 at Hove, England.

8

9

10

11   _____

12                 Dennis Baron

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Def. Exhibit 49
Page 001666

# EXHIBIT A

Def. Exhibit 49
Page 001667

**DENNIS BARON**

Professor of English, Emeritus                                      *mobile:* +1-217-419-8377
Research professor of English                                      *email:* debaron@illinois.edu
University of Illinois at Urbana-Champaign      Web Page *url:* http://faculty.las.illinois.edu/debaron/
Home: 1801 Foxborough Ct
Champaign IL 61822-8501


**VITA**


**Education:**

Ph.D., University of Michigan (English Language and Literature), 1971.
M.A., Columbia University (English and Comparative Literature), 1968.
A.B., Brandeis University (English and American Literature), 1965.

**Positions held:**

Research Professor of English and linguistics, University of Illinois, 2018–present.
Professor English, Emeritus, University of Illinois, 2018–present.
Professor of English and Linguistics, University of Illinois at Urbana-Champaign, 1984–2018.
Head, Department of English, University of Illinois at Urbana-Champaign, 1998–2003.
Acting Head, Department of English, Univ. of Illinois at Urbana-Champaign, 1997–98.
Director of Rhetoric, University of Illinois, 1985–97.
Director, Writing Outreach Workshop, Univ. of Illinois, 1985–88.
Professor, Campus Honors Faculty, Univ. of Illinois, 1988–2018.
Professor, College of Education, UIUC, Summer 1988.
Associate Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1981–84.
Assistant Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1975–81.
Assistant Professor of English, The City College of CUNY, 1973–74.
Assistant Professor of English, Eastern Illinois University, 1971–73.

**Fellowships and Grants:**

John Simon Guggenheim Memorial Foundation Fellow, 2016–17.
Faculty Fellow, Program for the Study of Cultural Values and Ethics, Univ. of Illinois, Spring 1992.
National Endowment for the Humanities Fellowship, calendar year 1989.
Newberry Library National Endowment for the Humanities Fellowship, 1988–89 (offered, not held).
IBM Project Excel Grant C-41, 1986-87: "Computer Analysis of Student Writing."
Associate, Center for Advanced Study, University of Illinois 1984–85.
Fulbright Lecturer, University of Poitiers, France, 1978–79.
Fellow, Center for Advanced Study, University of Illinois, 1978 (offered, not held).
University of Illinois Research Board grants, multiple years, 1978–2017.

**Books:**

1. ***You Can't Always Say What You Want: The Paradox of Free Speech.*** Cambridge University Press, 2023. (In press; available Dec., 2022).

Def. Exhibit 49
Page 001668

Dennis Baron, *Vita,*  2

2.    ***What's Your Pronoun? Beyond He and She.*** Liveright, 2020; paperback, 2021. Reviews: *New York Times Book Review, The Times* (London); *The London Review of Books; Harpers; The Atlantic; The Economist; Attitude.*

3.    ***A Better Pencil: Readers, Writers and the Digital Revolution.*** Oxford University Press, 2009, pp. xviii + 259. Paperback edition, 2012. Chinese translation, 2012. Reviews: *Salon; City Journal*; History News Network; *The Scotsman; Library Journal; internet review of books; Montreal Mirror*; Innovation Leadership Network; mantex.com (Manchester, England)*; The Star* (Malaysia); *Times Higher Education; International Journal of Communication; The Guardian; Choice; American Scientist; 3quarksdaily, The New Yorker*; *Arts Journal.*

4.    ***Guide to Home Language Repair*** (questions, answers, and essays on the English language)*.* National Council of Teachers of English (1994), viii + 165. Reviews: *Boston Book Review*; *New York Times Magazine.*

5.    ***The English-Only Question: An Official Language for Americans?***  Yale University Press, 1990; paper ed., 1992. Reviews: *Publishers Weekly; Washington Post Book World; Booklist; Library Journal; Education Week;* Hazel *New York City Tribune; The Bookwatch—Midwest Book Review; Change; Choice; The Jerusalem Post; Times Literary Supplement; American Political Science Review; Book Review Digest; American Journal of Sociology; Publishers Weekly; College English; Modern Language Journal; Language Problems and Language Planning; Language.*

6.    ***Declining Grammar and Other Essays on the English Vocabulary*** National Council of Teachers of English. Reviews: *Newsweek* (Dec. 11, 1989), p. 71; William Safire, *New York Times Magazine; The State Journal-Register* (Springfield, IL); *The Chicago Tribune; The Chicago Sun-Times; The Denver Post*; *Library Materials Guide; Book Report; NATE News; Language; Young Adult Paperback Book Guide.*

7.    ***Grammar and Gender*** Yale University Press, 1986; paper ed., 1987. Reviews: *Kirkus Reviews; Publishers Weekly; Patriot Ledger* (Quincy, MA); *The Washington Times Magazine;* John Simon, *The New Leader; Chronicle of Higher Education; Los Angeles Times; Library Journal; Insight; Champaign-Urbana News-Gazette; Choice; Language Monthly; The Times Literary Supplement; Psychology Today; Virginia Quarterly Review; The Toronto Star; ETC.; Book Review Digest; Chicago Tribune; Akron* (OH) *Beacon Journal; Clearwater* (FL) *Sun; Corpus Christi* (TX) *Caller-Times*; *Wilkes-Barre* (PA) *Times Leader; Troy* (NY) *Record; The Editorial Eye; Studies in the American Renaissance; Lingua; Modern Language Review; Review 9; American Speech; Southern Quarterly Review; Signs; Language; JEGP; Frontiers; Anglia; Journal of English Linguistics* Nominated for the Mina P. Shaughnessy Medal of the Modern Language Association.

8.    ***Grammar and Good Taste: Reforming the American Language*** Yale University Press, 1982; paper ed., 1984. Reviews: *Library Journal; America; The New York Times Book* Review; *The Washington Post Book World; Chronicle of Higher Education; The Times* (London); *The Los Angeles Times Book Review; Journal of American History; Encounter; American Literature; Journal of American Studies; Amerikastudien; Book Review Digest; Journal of English and Germanic Philology; Technical Communication; The Augusta Chronicle, Augusta Herald; American Studies; South Atlantic Quarterly; English Language Notes; World Literature Today; History of Education Quarterly;* Caroline Bokinsky, *Studies in the American* Renaissance; *Etudes Anglaises; Review of English Studies; College Composition and Communication; American Speech; Anglia; Book Review Digest; ESQ; English Journal.* Selected for the "Editor's Choice" section of *The New York Times Book Review.* Selected by the Library of Congress for recording for the blind. Nominated for the 1982 Mina P. Shaughnessy Medal and the 1987 James Russell Lowell award of the Modern Language Association; selected by the Editorial Board of the National Council of Teachers of English for distribution as an affiliate publication of the NCTE.

Def. Exhibit 49
Page 001669

9.  ***Going Native: The Regeneration of Saxon English.*** Publication of  *The American Dialect Society,* No. 69, University of Alabama Press, 1982.

10. ***Case Grammar and Diachronic English Syntax.*** Mouton, 1974. Reviews: *Linguistics; Indogermanische Forschungen; The Year's Work in Old English Studies; Revue Belge de Philologie et d'Histoire.*

**Supreme Court Amicus Briefs:**

Brief for Corpus Linguistics Professors and Experts as Amici Curiae Supporting Respondents. *New York State Rifle and Pistol Assn. v. Bruen,* No. 20-843 (2022). [Cited by J. Breyer in his dissent]

Brief for Professors of Linguistics and English Dennis E. Baron, Ph.D., Richard W. Bailey, Ph.D., and Jeffrey P. Kaplan, Ph.D. in support of petitioners. *District of Columbia, et al., v. Dick Anthony Heller.* 554 U.S. 570 (2008)

**Recent Media:**

"Does the Second Amendment Actually Give You the Right to Own a Gun?" *Think,* with Andrew Miller, NBC News, May 26, 2022. https://www.nbcnews.com/think/video/does-the-2nd-amendment-actually-give-you-the-right-to-own-a-gun-140886597910

"The Plain Language Movement." Part of Stephen Fry's series "English Delight,"  BBC Radio 4, August 2014.

"Latinos in America." PBS Documentary aired in Oct. 2013. In episode 6 of the 6-part series I discuss official English, bilingualism, and minority language rights.

**Book Chapters:**

1.  "Post on Facebook, go directly to jail." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
2.  "Don't make English official, ban it instead." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
3.  "Facebook multiplies genders but offers users the same three tired pronouns." Melissa Goldthwaite, *et al.,* eds. *The Norton Reader,* 14/e New York: W.W. Norton. Forthcoming, January, 2016.
4.  "Facebook multiplies genders but offers users the same three tired pronouns." *The Little Norton Reader.* New York: W.W. Norton. A special edition containing 50 essays from the first 50 years, to celebrate the 50th anniversary of *The Norton Reader.* Forthcoming, 2016.
5.  "Who owns global English?" *The Norton Reader,* ed. Linda H. Peterson and John C. Brereton. New York: Norton.
6.  "Should Everybody Write?" In Andrea Lunsford, *Everyone's an author, with readings.* New York, NY: W. W. Norton, 2012
7.   "The Noun Game: A simple grammar lesson leads to a clash of civilizations." *The Simon and Schuster Short Prose Reader.* Robert Funk, Susan Day, et. al. Boston: Prentice Hall, 2011. Pp. 128-34.
8.  "#Twitter Revolution." *They Say, I Say, with Readings 2e.* New York: W.W. Norton, 2012.
9.   "The More Things Change: Language and Education." In Anne Curzan and Michael Adams, eds., *Contours of English.* Univ. of Michigan Press (2010).
10. "The New Technologies of the Word." In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 136-51.  Rpt. in Lynn Bloom and Louise Smith, *The Arlington Reader,* 2e., New York: Bedford/St. Martin's, 2008; rpt. 2010.

Dennis Baron, *Vita,*  4

11. "Don't Make English Official—Ban It Instead." [rpt. of 1996 essay]. In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 477-79.

12. "Forget Everything You Learned About Writing." In Chris Anson, ed., *The WAC Casebook: Scenes for Faculty Reflection and Program Development.* New York: Oxford Univ. Press, 2003, pp. 261-65.

13. "Language Legislation and Language Abuse: American Language Policy through the 1990s." In *Language Ideologies: Critical Perspectives on the Official English Movement,* vol. 2: History, Theory and Policy, ed. Roseann D. Gonzalez with Ildiko Melis (Urbana: NCTE, and Lawrence Earlbaum Assoc., 2001), pp. 5-29.

14. "From Pencils to Pixels: The Stages of Literacy Technologies." In *Passions, Pedagogies and 21st-Century Technologies,* ed. Gail Hawisher and Cynthia Selfe (Logan: Utah State Univ. Press and the National Council of Teachers of English, 1999), pp. 15-33. [This is the lead essay in the book.] Rpt. in Ellen Cushman, Eugene R. Kintgen, Barry M. Kroll, and Mike Rose, eds., *Literacy: A Critical Sourcebook.* Boston: Bedford St. Martin's, 2001. Pp. 70-84.

15. "An Official Language."  Rpt. (from *The English Only Question*) in *Writing About Diversity: An Argument Reader and Guide*, ed. Irene L. Clark (Fort Worth: Harcourt Brace, 1994), pp. 284-302.

16. "Language Is the Enemy." Rpt. (from *Declining Grammar*) in *Dimensions of Language*, ed. Boyd Davis.  (New York: Macmillan, 1993), pp. 427-31.

17. "Language, Culture, and Society," in *Introduction to Scholarship in Modern Languages and Literatures*, ed. Joseph Gibaldi.  2nd ed. (New York: Modern Language Association, 1992), pp. 28-52.

18. "Federal English and the Constitution," rpt. in *Language Loyalties*, ed. James Crawford.  Chicago: Univ. of Chicago Press (1992), pp. 36-40.

19. "The Legal Status of English in Illinois: Case Study of a Multilingual State," in *Not Only English: Affirming America's Multilingual Heritage*, ed. Harvey A. Daniels (Urbana: National Council of Teachers of English, 1990), pp. 13-26.

20. "Watching Our Grammar: The English Language for English Teachers," in *On Literacy and Its Teaching: Issues in English Education,* ed. Gail Hawisher and Anna Soter (Albany: State Univ. of New York Press, 1990), pp. 208-23.  [Review: Sharon J. Hamilton, *College English* 55 (1993): 794-800.

21. "Watching Our Grammar" (rpt. from *Grammar and Good Taste*), in *The Story of English: Study Guide and Reader* (Dubuque, IA: Kendall/Hunt, 1986).

22. "Nonstandard English, Composition, and the Academic Establishment," 1975; rpt. in *Readings in Applied English Linguistics,* ed. Harold B. Allen and Michael Linn, 3rd. ed. (New York: Alfred Knopf, 1982), pp. 436-43.

**Recent Articles:**

1. "Look it up in your *Funk & Wagnalls*: How Courts Define the Words of the Law," *Dictionaries* (forthcoming).

2. "A brief history of singular 'they,' *Oxford English Dictionary Blog,* Sept. 4, 2018. https://public.oed.com/blog/a-brief-history-of-singular-they/#__prclt=9gZeU4Sf

3. "Antonin Scalia Was Wrong about the Meaning of 'Bear Arms," *Washington Post,* May 21, 2018. https://www.washingtonpost.com/opinions/antonin-scalia-was-wrong-about-the-meaning-of-bear-arms/2018/05/21/9243ac66-5d11-11e8-b2b8-08a538d9dbd6_story.html?utm_term=.9f23ab854a09

4. "Nowadays, 'Like' Just Means 'Uh-Huh'" *Visual Thesaurus.* August 11, 2014. http://www.visualthesaurus.com/cm/wc/nowadays-like-just-means-uh-huh/" *Vocabulary.com* *http://www.vocabulary.com/articles/wc/nowadays-like-just-means-uh-huh/*

5. "America's war on language." *OxfordWords Blog.* Sept. 17. http://blog.oxforddictionaries.com/2014/09/americas-war-language/ Days and Memories Blog. http://hgmsblog.weebly.com/blog/americas-war-on-language  Sept. 3.

6. "Changing gender in language isn't easy." *New York Times,* "Room for Debate" Oct. 19, 2014. http://nyti.ms/1tDISSa

Def. Exhibit 49
Page 001671

Dennis Baron, *Vita,* 5

7.  "Nobody likes a whistleblower, wrayer, snitch, narker, denunciator, quadruplator, or emphanist." *Visual Thesaurus.* Feb. 23, 2014.
8.  "Plain English: It's the law." *Visual Thesaurus.* Feb. 7, 2014.
    http://www.visualthesaurus.com/wc/plain-english-its-the-law/
9.  "Banning words for the new year." *Vocabulary.com.* January 20, 2914.
    http://www.vocabulary.com/articles/wc/banning-words-for-the-new-year/" *Visual Thesaurus.*
    January 20, 2014. http://www.visualthesaurus.com/cm/wc/banning-words-for-the-new-year/
10. "Dennis Baron's Word of the Year for 2013: 'marriage'" *Visual Thesaurus.* Dec. 24, 2013.
    http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2013-marriage/
11. "The highest dictionary in the land?" *Oxford University Press Blog.* June 23, 2013.
    http://bit.ly/11UkV54
12. "The highest dictionary in the land?" *Visual Thesaurus.* June 24, 2013. http://bit.ly/11GYbGK
13. "Will the real Gettysburg Address please stand up?" *Visual Thesaurus.* Nov. 19, 2013.
    http://www.visualthesaurus.com/cm/wc/will-the-real-gettysburg-address-please-stand-up/
14. "Pens and Pencils Down: New York City's 'Banned Words' Controversy." *Visual Thesaurus.*
    April 4, 2012. http://www.visualthesaurus.com/wc/3212/
15. "Wikipedia: Write first, ask questions later." Rpt. in James C. McDonald, *The Reader.* New York:
    Pearson, 2012.
16. "Learning not to curse in Arizona." *Oxford Univ. Press blog.* May 27, 2012
17. "Why we misread." *Visual Thesaurus.* July 3, 2012. http://www.visualthesaurus.com/cm/wc/why-
    we-misread/
18. "Grammar freaks really *are* strange." *Cultural Weekly.* July 19, 2012.
    http://www.culturalweekly.com/grammar-freaks-strange.html
19. "Grammar sticklers may have OCD." *Oxford Univ. Press Blog.* Aug. 18, 2012.
    http://blog.oup.com/2012/08/grammar-sticklers-may-have-ocd/
20. "The e-reader over your shoulder." *Visual Thesaurus.* Nov. 12, 2012.
    http://www.visualthesaurus.com/cm/wc/the-e-reader-over-your-shoulder/
21. "The e-reader over your shoulder." *Oxford University Press blog,* Nov. 24, 2012.
    http://blog.oup.com/2012/11/the-e-reader-over-your-
    shoulder/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+oupblog+%2
    8OUPblog%29
22. "Apple patents page-turning. What's next, the letter "i"? *Visual Thesaurus.* Nov. 27, 2012.
    http://www.visualthesaurus.com/cm/wc/apple-patents-page-turning-whats-next-the-letter-i/
23. "Dennis Baron's Word of the Year for 2012 is #hashtag." *Visual Thesaurus,* Dec. 16, 2012.
    http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2012-hashtag
24. "No laptops: Classroom bans on digital devices are spreading." *Visual Thesaurus,* Jan. 14, 2013.
    http://www.visualthesaurus.com/cm/teacherstwork/no-laptops-classroom-bans-on-digital-
    devices-are-spreading/
25. "National Grammar Day in Wartime." *Visual Thesaurus.* Mar. 4, 2013.
    http://www.visualthesaurus.com/cm/wc/national-grammar-day-in-wartime/
26. "The Great Language Change Hoax." *Academe.* (The AAUP blog). April 1, 2013.
    http://academeblog.org/2013/04/01/the-great-language-change-hoax/
27. "English-only in the exit row." *Oxford Univ. Press Blog.* April 29, 2011.
    http://blog.oup.com/2011/04/exit-row/
28. "The most human computer?" *Oxford Univ. Press Blog.* May 5, 2011.
    http://blog.oup.com/2011/05/human-computer/
29. "Teaching commas won't help." *Visual Thesaurus,* May 16, 2011.
    http://www.visualthesaurus.com/cm/wc/2848
30. "Teaching commas won't help." *Oxford Univ. Press Blog.* June 14, 2011.
    http://blog.oup.com/2011/06/teaching-commas/
31. "Webster's lays down the law." *Visual Thesaurus Magazine.* June 15, 2011.
    http://www.visualthesaurus.com/cm/dictionary/2883/
32. "But the dictionary says. . ." *Oxford Univ. Press Blog.* June 27, 2011.
    http://blog.oup.com/2011/06/dictionary-courtroom/

Def. Exhibit 49
Page 001672

Dennis Baron, *Vita,* 6

33. "Content-Free Prose: Death of Writing or Next Big Thing?" *Visual Thesaurus.* June 29, 2011. http://www.visualthesaurus.com/cm/wc/2893?utm_source=rss

34. "Content-Free Prose: Death of Writing or Next Big Thing?" *Oxford Univ. Press Blog.* July 8, 2011. http://blog.oup.com/2011/07/content-free-prose/

35. "Are laws requiring English signs discriminatory?" *Oxford Univ. Press Blog.* July 21, 2011. http://blog.oup.com/2011/07/english-signs/

36. "Computers remember so you don't have to." *Oxford Univ. Press Blog.* July 28, 2011. http://blog.oup.com/2011/07/google-effect/

37. "That ugly Americanism? It could well be British." *Oxford Univ. Press Blog.* Aug. 5, 2011. http://blog.oup.com/2011/08/ugly-americanism/

38. "New words are great for back to school." *Visual Thesaurus.* Aug. 30, 2011. http://www.visualthesaurus.com/cm/dictionary/2956/?utm_source=rss

39. "New words are great for back to school." Oxford Univ. Press Blog, Sep. 1, 2011. http://blog.oup.com/2011/09/school-words/

40. "The linguistic impact of 9/11? '9/11' itself." Visual Thesaurus. Sep. 12, 2011. http://www.visualthesaurus.com/cm/dictionary/2969/

41. "The linguistic impact of 9/11". *Oxford Univ. Press Blog.* Sep. 12, 2011. http://blog.oup.com/2011/09/linguistic-impact/

42. "The only linguistic impact of 9/11 is '9/11' itself." *Cultural Weekly,* Sep. 14, 2011. http://www.culturalweekly.com/only-linguistic-impact-of-911-is-911-itself.html

43. "Are there alternatives to global English?" *Visual Thesaurus.* Sept. 27, 2011. http://www.visualthesaurus.com/cm/wc/2985/

44. "Is resistance futile? Are there alternatives to global English?" *Cultural Weekly.* Sept. 29, 2011. http://www.culturalweekly.com/is-resistance-futil-are-there-alternatives-to-global-english.html

45. "Resistance may be futile: Are there alternatives to global English?" *OUP Blog,* Oct. 11, 2011. http://blog.oup.com/2011/10/global-english/; reposted in the Daily Beast, Oct. 12, 2011. http://andrewsullivan.thedailybeast.com/2011/10/english-has-taken-over.html

46. "Is this the last print dictionary?" *Cultural Weekly.* Oct. 19, 2011. http://www.culturalweekly.com/is-this-the-last-print-dictionary.html

47. "The laws of English punctuation." *Visual Thesaurus.* Oct. 24, 2011. http://www.visualthesaurus.com/cm/wc/3011/

48. "Talk like Shakespeare Day." *Cultural Weekly.* Oct. 27, 2011. http://www.culturalweekly.com/talk-like-shakespeare-day.html

49. "Occupy Wall Street: Can the revolution be trademarked?" *Oxford University Press Blog.* Nov. 28, 2011. http://blog.oup.com/2011/11/occupy-trademark/

50. "Dennis Baron's Word of the Year for 2011: 'Volatility.'" *Visual Thesaurus.* Dec. 2, 2011. http://www.visualthesaurus.com/cm/wc/3052/

51. "How to save an endangered language." *Oxford University Press Blog.* Dec. 4, 2011. http://blog.oup.com/2011/12/endangered-language/

52. "The top language stories of 2011." *Visual Thesaurus.* Dec. 20, 2011. http://www.visualthesaurus.com/cm/wc/3072

53. "Dictionary droids write definitions untouched by human hands." *Oxford Univ. Press Blog.* Jan. 24, 2012. http://blog.oup.com/2012/01/dictionary-droids-write-definitions-untouched-by-human-hands/

54. "The Writer's Meme." *Cultural Weekly.* Feb. 22, 2012. http://www.culturalweekly.com/the-writers-meme.html

55. "Alejandrina Cabrera should be on the San Luis City Council ballot." *Oxford Univ. Press Blog.* Feb. 28, 2012. http://blog.oup.com/2012/02/alejandrina-cabrera-san-luis-city-council/

56. "Learning not to curse in Arizona." *Cultural Weekly.* Mar. 15, 2012. http://www.culturalweekly.com/learning-not-to-curse-in-arizona.html

57. "The iPad: What's a Gutenberg moment, anyway?" *Visual Thesaurus,* March 7, 2010. http://www.visualthesaurus.com/cm/wc/2240/

58. "The iPad: What's a Gutenberg moment, anyway?" *Oxford University Press Blog.* March 8, 2010. http://blog.oup.com/2010/04/ipad/

59. "Yes, we want": Who owns global English? *Visual Thesaurus,* May 4, 2010, http://www.visualthesaurus.com/cm/wc/2264/

Dennis Baron, *Vita,*  7

60. "The New Technologies of the Word." Rpt. in *The Arlington Reader* (New York: Bedford St. Martins, 2010.

61. "Don't read this: What Kindle's Highlights tell us about popular taste." The Visual Thesaurus. July 2, 2010. http://www.visualthesaurus.com/cm/wc/2339/

62. "Revising our freedom: Digital archeology and Jefferson's rough draft of the Declaration of Independence." Oxford University Press blog, July 9, 2010. http://blog.oup.com/2010/07/revising-our-freedom/

63. "Robot teachers!!! Coming soon, to a classroom near you!!!" Oxford University Press blog, July 13, 2010. http://blog.oup.com/2010/07/robot-teachers; repost, io9.com, July 28, 2010. http://io9.com/5599084/robot-teachers-coming-soon-to-a-classroom-near-you

64. "The gender-neutral pronoun: Still an epic(ene) fail." *Visual Thesaurus*. August 9, 2010. http://www.visualthesaurus.com/cm/dictionary/2384/; OUP blog, Aug. 26, 2101, http://blog.oup.com/2010/08/gender-neutral-pronoun/

65. "Technology update: Flying books can be dangerous." Oxford University Press blog, August 13, 2010. http://blog.oup.com/2010/08/ebooks-3/

66. "Is it 'Miss' or 'Ms'?" Oxford University Press blog. Aug. 16, 2010. http://blog.oup.com/2010/08/miss-or-ms/; rpt. as "What's in a Name? For "Ms.," a Long History." on *Ms. Magazine blog*, Aug. 27, 2010, http://msmagazine.com/blog/blog/2010/08/27/whats-in-a-name-for-ms-a-long-history/

67. "Good grammar leads to violence at Starbucks?" *Visual Thesaurus.* August 17, 2010. http://www.visualthesaurus.com/cm/wc/2394/

68. "Good grammar leads to violence at Starbucks?" *Oxford University Press* blog. Aug. 20, 2010. http://blog.oup.com/2010/08/starbucks/

69. "Facebook says, 'All your face are belong to us.'" Oxford University Press blog, Aug. 31, 2010. http://blog.oup.com/2010/08/facebook-trademark/

70. "Facebook says, 'All your face are belong to us.'" *Visual Thesaurus.* Sept. 9, 2010. http://www.visualthesaurus.com/cm/wc/2414/

71. "The English Language Unity Act: Big government only a tea partier could love." *Oxford University Press blog,* Sept. 24, 2010. http://blog.oup.com/2010/09/english-language-unity/; rpt *Dallas Morning News,* Sept. 24, 2010. http://topics.dallasnews.com/article/0gsfem7buy0AM; rpt. NPR quotes, Sept. 24, 2010. http://topics.npr.org/quote/0bqS3ST97z0yC; rpt. Latest Law News, Sept. 24, 2010, http://www.tollfree800legal.com/news/latest-law-news.cfm?Next-News-ID=3524647&start=51;

72. "It's alive! New computer learns language like a human, almost." *Oxford University Press blog.* Oct. 11, 2010. http://blog.oup.com/2010/10/computer-learns-language/  Picked up by NPR, the BBC, technorati, and techeye.

73. "Killer app: Seven dirty words you can't say on your iPhone." *Oxford University Press Blog.* Oct. 18, 2010. http://blog.oup.com/2010/10/dirty-words/

74. "Killer app: Will the iPhone monitor your language?" *The Visual Thesaurus.* Oct. 19, 2010. http://www.visualthesaurus.com/cm/wc/2455/

75. "A Literal Paradox." *Visual Thesaurus.* Oct. 26, 2010. http://www.visualthesaurus.com/cm/dictionary/2465/

76. "A Literal Paradox: *literally* generally means 'figuratively.' *Oxford Univ. Press Blog.* Oct. 29, 2010. http://blog.oup.com/2010/10/literal-paradox/

77. "All hail Goddess English." *Oxford University Press Blog.* Nov. 9, 2010. http://blog.oup.com/2010/11/all-hail-goddess-english/

78. "The tweet police are watching." *The Visual Thesaurus.* Nov. 17, 2010. http://www.visualthesaurus.com/cm/wc/2506/

79. " ☺ when you say that, pardner," – the tweet police are watching." *Oxford University Press Blog,* Nov. 22, 2010. http://blog.oup.com/2010/11/tweet-police/

80. "On the internet, nobody knows you can't spell." *Oxford University Press Blog,* Nov. 29, 2010. http://blog.oup.com/2010/11/you-cant-spell/

81. "The Noun Game: A simple grammar lesson leads to a clash of civilizations." Oxford Univ. Press blog. Dec. 10, 2010. http://blog.oup.com/2010/12/noun-game/

82. "President has Americans running to the dictionary." *Visual Thesaurus.* Dec. 13, 2011. http://www.visualthesaurus.com/cm/dictionary/2531/

Dennis Baron, *Vita,* 8

83. "Books by the numbers." *Visual Thesaurus.* Dec. 20, 2010. http://www.visualthesaurus.com/cm/wc/2546/
84. "Books by the numbers." *Oxford Univ. Press Blog.* Jan. 6, 2011. http://blog.oup.com/2011/01/books-by-the-numbers/
85. "Defending the language with bullets." *Oxford Univ. Press Blog.* Jan. 14, 2011. http://blog.oup.com/2011/01/bullets/
86. "The government does not control your grammar." *Oxford Univ. Press Blog,* Jan. 28, 2011. http://blog.oup.com/2011/01/grammar/
87. "The Supreme Court Debates: What does 'personal' mean?" *Visual Thesaurus.* Jan. 24, 2011. http://www.visualthesaurus.com/cm/dictionary/2582/
88. "#twitterrevolution—reforming Egypt 140 characters at a time." *Oxford Univ. Press Blog,* Feb. 17, 2011. http://blog.oup.com/2011/02/twitter-revolution/
89. "The government's out-of-date definition of writing." *Visual Thesaurus.* Feb. 18, 2011. http://www.visualthesaurus.com/cm/dictionary/2628/
90. "The government's definition of writing is seriously out of date." *Oxford Univ. Press Blog.* Feb. 28, 2011. http://blog.oup.com/2011/02/dictionary-act/
91. "Who cares about National Grammar Day? Or is it *whom?*" *Oxford Univ. Press Blog.* Mar. 4, 2011. http://blog.oup.com/2011/03/grammar-day
92. "When news breaks, people look it up in the dictionary." *Visual Thesaurus.* March 10, 2011. http://www.visualthesaurus.com/cm/dictionary/2655/
93. "It's time for English teachers to stop teaching that the world is flat." *Oxford Univ. Press Blog.* Mar. 18, 2011. http://blog.oup.com/2011/03/english-teachers
94. "Happy birthday OK: the world's most-popular word turns 172," *Oxford Univ. Press Blog.* Mar. 23, 2011. http://blog.oup.com/2011/03/ok-day/
95. "OED Hearts OMG." *Visual Thesaurus*. April 11, 2011. http://www.visualthesaurus.com/cm/dictionary/2815/
96. "TSA bans reading on international flights." *Indyposted,* Jan. 4, 2010. http://indyposted.com/8627/tsa-bans-reading-on-international-flights/
97. "Say goodbye to the decade with no name." *Visual Thesaurus,* Dec. 18, 2009. http://www.visualthesaurus.com/cm/wc/2100/
98. "English teachers council gives Glenn Beck the 'Doublespeak Award'." My statement was reprinted verbatim in a *Washington Post* article about the Doublespeak Award by Valerie Strauss, Nov. 23, 2009, http://voices.washingtonpost.com/answer-sheet/accountability/ncte-award-glenn-beck-the-doub.html
99. "The Noun Game." *The Visual Thesaurus.* Nov. 16, 2009. http://www.visualthesaurus.com/cm/wc/2067/
100. "Technology reduces the value of old people, MIT computer guru warns." Oxford Univ. Press, OUPBlog, Nov. 11, http://blog.oup.com/2009/11/old-people/
101. "Happy belated 40th birthday to the internet." Oxford Univ. Press, OUPBlog, Nov. 3, http://blog.oup.com/2009/11/40th-birthday-internet/
102. "Two thumbs up? Researchers predict that by 2013, we'll all be Tweeting." Oxford Univ. Press, OUPBlog, Oct. 27 http://blog.oup.com/2009/10/universal_authorship/
103. "Blogging for pay." Oxford Univ. Press, OUPBlog, Oct. 8, http://blog.oup.com/2009/10/blogging-for-pay/
104. "Amazon sales rank: I'm being outsold by a book on tattoos." Oxford Univ. Press, OUPBlog, Sept. 25, http://blog.oup.com/2009/09/amazon-rank/
105. "The Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and Communication* 61.1 (Sept. 2009): W424-35.
106. "The Elements of Style at 50: If You Celebrate, Use the Active Voice." Visual Thesaurus, April 6, 2009, http://www.visualthesaurus.com/cm/dictionary/1805
107. " 'Tis Talk Like Shakespeare Day in Chicago, Methinks." Visual Thesaurus, April 23, 2009. http://www.visualthesaurus.com/cm/dictionary/1827/
108. "Amazon Fail 2.0: Orwell Removed from Kindles." Visual Thesaurus, July 21, 2009. http://www.visualthesaurus.com/cm/wc/1922/

109. "Amazon Fail 2.0: Bookseller's Big Brother removes Orwell's Big Brother from Kindles everywhere." Oxford Univ. Press  OUPblog. July 21, 2009. http://blog.oup.com/2009/07/amazon_fail2/

110. "Digital Text." Letters. *Wilson Quarterly* (winter, 2010), p. 6.

111. "Multitasking: Learning to teach and text at the same time." Oxford Univ. Press Blog, Jan. 25, 2010. http://blog.oup.com/2010/01/teach-and-text/#more-7305

112. "Will the iPad change your life?" Oxford Univ. Press Blog, Jan 28, 2010. http://blog.oup.com/2010/01/will-the-ipad-change-your-life/

113. "Sliced Bread 2.0." Oxford Univ. Press Blog, Feb. 24, 2010. http://blog.oup.com/2010/02/sliced-bread-2-0/

114. "Should everybody write? The destabilizing technologies of communication." Oxford Univ. Press Blog, Mar. 16, 2010. http://blog.oup.com/2010/03/should-everybody-write/   a day later, there were 25 reposts of the essay.

115. "Should everybody write?" *Visual Thesaurus.* Mar. 16, 2010. http://www.visualthesaurus.com/cm/wc/2204/

116. "Multitasking: Learning to Teach and Text at the Same Time" *Quality Teacher* (a quarterly journal of Bato Balani Foundation, the Philippines; forthcoming).

117. "The book, the scroll, and the web." Oxford Univ. Press Blog, April 2, 2010. http://blog.oup.com/2010/04/scroll-book/

118. "March 10: The telephone is 133 years old today. Call me." *Visual Thesaurus.* March 10, 2009. http://www.visualthesaurus.com/cm/dictionary/1768/

119. "Lincoln the writer at 200." *The Visual Thesaurus.* Feb 13, 2009. http://www.visualthesaurus.com/cm/wc/1722/

120. "No Students Left Behind: Why Reports on the Literacy Crisis from the Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and Communication* 61.1 (Sept. 2009): W424-35.

121. "Noah Webster at 250: A Visionary or a Crackpot?" *The Visual Thesaurus.* Oct. 16, 2008. http://www.visualthesaurus.com/cm/dictionary/1576/

122. "Can commas shoot down gun control?" *Los Angeles Times,* March 22, 2007.  Rpt. *Oxford Magazine* no. 264 (Oxford Univ.), Spring (second week, Trinity term) 2007, pp. 12-13.; also rpt., *The Green Bag,* second series, vol. 10, no. 40 (Quarterly Law review of the George Mason School of Law), Summer 2007.

123. "Don't write off the pencil just yet." *Los Angeles Times,* Jan. 23, 2007, A15.

124. "No academic bill of rights?" *Inside Higher Education,* June 13, 2006. www.ihe.com.

125. "Churchill fallout: It's about academic freedom." *Inside Higher Education,* May 26, 2006. www.ihe.com.

126. "I'm not really a professor, I just play one on TV." *Inside Higher Education,* Oct. 14, 2005.

127. "The College Board's New Essay Reverses Decades of Progress Toward Literacy." *Chronicle of Higher Education.* May 6, 2005. Pp. B14-15; rpt. in *Newsletter of the Northeast Association of Pre-Law Advisors,* Fall 2005.

128. "The New Nativism: Language Policy and Linguistic Ideology in the United States." *Ryukyus Journal of American Studies* (April, 2005): 1-12.

129. "Not Searching for Skeletons." *Chronicle of Higher Education,* Jan. 14, 2005, C1;4.

130. "The Tongue Who Would Be King." *Science and Spirit,* November/December 2004, pp. 28-33.

131. "The President's Reading Lesson." *Education Week,* Sept. 8, 2004, p. 43.

132. "A Diverse Department." *Chronicle of Higher Education,* August 13, 2004, C2-3.

133. "Avoiding the Role of Straight Man." *Chronicle of Higher Education,* June 18, C1;4.

134. "Around the Clock." *Chronicle of Higher Education,* May 21, 2004, C1;4.

135. "It's Just Grammar. Whom Really Cares?" *Los Angeles Times,* May 7, 2004, B17; rpt., *Austin* (Texas) *American-Statesman, Adrian* (Michigan) *Daily Telegram,* May 12, 2004.

136. "What Am I Worth?" *Chronicle of Higher Education.* April 23, 2004, C1;4.

137. "Lessons in Department Budgeting." *Chronicle of Higher Education.* March 26, 2004, C2-3.

138. "Language and society." For PBS Documentary, "Do you speak American?" www.pbs.org/speak/words/sezwho/socialsetting.  [Rpt. in Insightful Writing, ed. David Sabrio and Mitchel Burchfield.  Boston: Houghton, Mifflin, 2008.

Dennis Baron, *Vita,* 10

139. "No Translation Needed: 'Door Is Closed.'" *Los Angeles Times,* March 14, 2004, M5 [rpt. *Atlanta Journal-Constitution, Kansas City Star; Myrtle Beach* (South Carolina) *Sun-News;* Bryan-College Station (TX) *Eagle;* translated into Finnish for *Helsingin Sanomat* (Helsinki, Finland), March 28, 2004].
140. "New Programs, New Problems." *Chronicle of Higher Education.* Feb. 27, 2004. C1;4.
141. "Intervening in the Classroom." *Chronicle of Higher Education.* Jan. 30, 2004, C1;4
142. "Sharing Inside Information." *Chronicle of Higher Education.* Dec. 19, 2003, C1; 4.
143. "McLanguage Meets the Dictionary." *Chronicle of Higher Education.* Dec. 19, 2003, B14.
144. "Not What I Signed Up For." *Chronicle of Higher Education,* Nov. 21, 2003, C1; C4.
145. "Professors Behaving Badly." *Chronicle of Higher Education,* October 24, 2003, C3-4.
146. "Learning to Be a Department Head." *Chronicle of Higher Education,* Sept. 22, 2003, C5.
147. "Life After Tenure." *Chronicle of Higher Education,* July 21, 2003.
148. "When Tenure Fails." *Chronicle of Higher Education,* June 10, 2003.
149. "Teaching Grammar Doesn't Lead to Better Writing." *Chronicle of Higher Education,* May 16, 2003, B20.
150. "Promoting Late Bloomers." *Chronicle of Higher Education,* April 25, 2003.
151. "The Tenure Files: Getting Through the College." *Chronicle of Higher Education,* Feb. 14, 2003.
152. "External Reviewers." *Chronicle of Higher Education,* January 7, 2003.
153. "A Look at the Record." *Chronicle of Higher Education,* Nov. 7, 2002.
154. "I Teach English—and I Hate Reader's Guides." *Chronicle of Higher Education,* Oct. 4, 2002, p. B5.
155. "Good Grammar and the Career Network." *Chronicle of Higher Education,* July 31, *2002.*
156. "Language Use and Grammar." The September, 2002, module for "Teaching *Composition,*" a listserv for the composition teaching community, published by McGraw-Hill. http://www.mhhe.com//socscience/english/tc.
157. "Getting Promoted." *Chronicle of Higher Education,* Sept. 5, 2002.
158. "The Job Search: You're the One." *Chronicle of Higher Education,* April 12, 2002.
159. "The Campus Visit." *Chronicle of Higher Education,* Feb. 24, 2002.
160. "Will Anyone Accept the Good News on Literacy?" *Chronicle of Higher Education,* Feb. 1, 2002, B10.
161. "The Job Interview." *Chronicle of Higher Education,* Jan. 21, 2002.
162. "To Whom It May Concern: Reading Job Applications." *Chronicle of Higher Education,* Dec, 21, 2001.
163. "The Hiring Season." *Chronicle of Higher Education,* Nov. 9, 2001.
164. "America Doesn't Know What the World Is Saying." Op-Ed essay, *The New York Times,* Oct. 27, 2001, A21. Rpt. *Cleveland Plain Dealer,* Oct. 30, 2001, B11.
165. "The End of Linguistics: a response" letter to the editor, *The American Scholar* (Spring, 2001): 155-56.
166. "The Official Secrets Act in Academic Publishing." *Chronicle of Higher Education,* Feb. 16, 2001, B5.
167. "Literacy and technology." In Linda K. Shamoon, R. M. Howard, S. Jamieson, and R. A. Schwegler, eds., *Coming of Age: The Advanced Writing Curriculum.* Portsmouth, NH: Heinemann, Boynton/Cook, 2000 and on CD-rom. Approx. 8 pp.
168. "Ebonics and the Politics of English." *World Englishes* 19 (March, 2000): 5-19.
169. "Technology's Impact on Writing." Letter. *Chronicle of Higher Education,* Jan. 21, 2000, B11.
170. "To Sir, or Ma'am, with Love." *Education Week.* Sept. 8, 1999, 45.

**The Web of Language:** a blog running from 2007 to the present dealing with issues of language and technology: http://bit.ly/1B29f6v Over 1.5 million page views..

**Recent Invited Lectures, Workshops and Conference Presentations:**

1. "Corpus Linguistics and the Original Meaning of the Second Amendment." University of Chicago Law School, 12 January, 2021.
2. Author interviews, "What's Your Pronoun?" New York Public Library, 4 February, 2020; Politics and Prose Books (Washington, DC), 5 February; Cuyahoga County Public Library. 6 February;

Kansas City Public Library (MO), 11 February; Town Hall Seattle, 16 February; Powells Books, Portland OR, 17 February; City Lights Books, San Francisco, 18 February.

3. "Guns and Grammar: Big Data and the Meaning of 'bear arms' in the Second Amendment." Conference on Law and Corpus Linguistics, Brigham Young Univ. Law School, Feb. 6-8, 2019.

4. "Corpus evidence and the meaning of 'bear arms.'" Symposium: *District of Columbia v. Heller* 10 years on, Hastings College of Law, San Francisco, CA, Jan. 18, 2019.

5. "What's Your Pronoun?" Language Policy Forum, Sheffield Hallam University, UK, June 1, 2018.

6. "America's War on Language," Invited Lecture, University of Pennsylvania, April 19, 2018.

7. "Guns and Grammar: The Linguistics of the Second Amendment," Neubauer Symposium on Historical Semantics, University of Chicago, April 13, 2018.

8. "Speak the Language of Your Flag: Language and Immigration in the US, 1918-2018," Language and Borders Conference, University of Bristol, UK, March 26, 2018.

9. "Pronoun Showdown," Invited lecture, University of Essex, UK, Nov. 23, 2017.

10. "Going native: Brexit prompts linguistic cleansing." Conference on UK Language Policy after Brexit. Sheffield Hallam University (Sheffield, UK), Sept. 15, 2016.

11. "Pronoun Showdown: Are nonbinary pronouns and singular *they* ruining the language or making English great again?" Univ. of Tennessee (Knoxville), April 11, 2016.

12. "Speak the language of your flag." Present-Day English Discussion Group, Modern Language Association. Jan. 9, 2014.

13. "*#twitterrevolution*: Destabilizing the world, 140 characters at a time." Univ. of Sussex (Brighton, UK). March 21, 2013.

14. "Speak the language of your flag." In "creative" conversation, with Michael Erard. *Modern Language Association.* Boston, Jan. 3, 2013. Speakers invited by MLA Executive Director Rosemary Feal.

15. "Official English from the school house to the White House." Englishes in Europe Conference. Univ. of Sheffield. April, 2012.

16. "*#twitterrevolution*: Destabilizing the world, 140 characters at a time." Temple Contemporary, Temple University Art Museum. Oct. 11, 2012.

17. "Guns and grammar: Linguistic authority and legal interpretation in *Washington, D.C., v. Heller"* Stanford University. Nov. 10, 2011.

18. "Should everybody write? The destabilizing technologies of communication." Univ. of Chicago Semiotics Workshop, March 11, 2010.

**19.** "Guns and grammar: The linguistics of the Second Amendment." Law and Society Annual Conference, Denver, CO, June 30, 2009.

**20.** "Let's go to the phones." Univ. of Michigan invited lecture. Dec. 5, 2008.

21. "Policing English in America from the White House to the schoolhouse." Conference on prescriptivism in language. Univ. of Paris VII (Sorbonne), Paris, FR. Nov. 15, 2007.

22. "It's All Your Fault: Who's Really to Blame for the Literacy Crisis?" Conference on College Composition and Communication. New York City, March 2007.

23. "No University Student Left Behind: Writing and the Secretary of Education's Commission on Higher Education." Conference on College Composition and Communication. Chicago, March 2006.

24. "The Perils of the new SAT Writing Test." Conference on College Composition and Communication. San Francisco. March 17, 2005.

25. "Spanish, English and the New Nativism." Modern Language Association. Philadelphia. Dec. 30, 2004.

26. "Reading and Writing in the Digital Age." Invited presentation. Illinois Library Association, Chicago, September 30, 2004.

27. "Language Policies and Language Politics in the United States." "English and Minority Languages in the 2000 Census." Invited lectures, Univ. of Ryukyu, Okinawa, Japan, June, 2004.

28. "TeknoFear." Invited lecture, Northeastern Illinois University, April 15, 2004.

29. "Standards: They're Not for Everybody." Conference on College Composition and Communication. San Antonio, TX, March 25, 2004.

30. "The New Technologies of the Word." Plenary lecture. International Association of World Englishes Conference, Univ. of Illinois, October 17, 2002.
31. "Writing Effective Promotion Dossiers," Provost's Seminar, Univ. of Illinois, Sept. 7, 2001.
32. "Promotion and Tenure," a workshop for new executive officers, Association of Departments of English seminar, Monterey, California, June 29, 2001.
33. "From Pencils to Pixels: The New Technologies of Literacy." Invited lecture, UC Davis, March 2, 2001.
34. "The Illinois Professional Learning Partnership." Conference on College Composition and Communication, Denver, CO, March 15, 2001.
35. "Writing Effective Third-Year Faculty Reviews," Provost's Seminar, Univ. of Illinois, Feb. 26, 2001.
36. "Outreach for the Humanities," response to Graham Spanier; Chancellor's Conference, Univ. of Illinois, Jan. 31, 2001.
37. "Other Teachers' Students." Conference on College Composition and Communication, Minneapolis, MN, April 15, 2000.

**Recent Media Interviews**

1. Interviews for *What's Your Pronoun?* 2020-21: CBS Radio (NYC); NPR Weekend All Things Considered; CAP Radio (Sacramento, CA); Wisconsin Public Radio; KPBS San Diego; KWGS, Tulsa, OK; Slate: The Gist; KERA Radio; KATU TV, Portland, OR; KQED, San Francisco Public Radio; KPCC, Los Angeles; Talk the Talk (podcast); The Vocal Fries (podcast); That Word Chat (podcast).
2. "Tapestry," CBC-Radio "The Longing for Belonging," interview on pronouns, June 28, 2018.
3. "Air Talk," Larry Mantle, KPCC-NPR Los Angeles, Pronouns, Mar. 6, 2018.
4. "Do Official English laws work?" interview, KCBS, San Francisco. Aug. 24, 2017.
5. "Latinos in America." PBS documentary, aired October, 2013.
6. Various radio appearances on WILL-AM discussing language issues 1984-present.
7. "Extension 720" with Milt Rosenberg. WGN radio, Oct. 16, 2009. 2-hour interview about *A Better Pencil.*
8. Steve Fast, "The Classroom Connection" Oklahoma Public Radio, interview about *A Better Pencil.* Oct. 1, 2009.
9. Valerie Richardson Show. WPKN, Bridgeport CT, April 21, 2009. Half-hour interview about my work on usage and on technology.
10. Jim Brown, "The Current." CBC-Radio, Canada. July 15, 2008. Interview on Esperanto.
11. "The Peter Laufer Show", Green Radio 960 (San Francisco). 60 min. interview on Broadcast English, Dec. 28, 2008.
12. "Official English in Small Town America," *Eight Forty-Eight,* WBEZ-FM (Chicago public radio), June 13, 2007.  Lead interview for the show, also featured on the WBEZ web site: http://www.wbez.org/Program_848_Segment.aspx?segmentID=11395
13. "The English Language." Focus 580, WILL-AM, multiple appearances each year from 1982-present.
14. "Good English." The Robin and Maynard Show. KQBZ-FM (Seattle), May 3, 2005.
15. "Pronunciation in American English." Interview by Avi Arditti and Roseann Skirble broadcast on "Coast to Coast" by Voice of America (4/24/03); posted on voanews.com/wordmaster.
16. "The English Language," The Joan Rivers Show, WOR-AM, New York, June 25, 2001.
17. "The *New Oxford Dictionary of English*," "Sandy Rios Live," WYLL-FM, Chicago, Aug. 14, 1998.

**Editorships and Commissions:**

Chair, Committee on Public Policy, Conference on College Composition and Communication, National Council of Teachers of English, 2003-06.

Dennis Baron, *Vita,* 13

Member, Board of Advisors for the television series "Do You Speak American?" with
   Robert MacNeil.
Member, *PMLA* Advisory Committee, 1998-2001.
Member, editorial advisory board, *Liverpool Studies in Language and Discourse*, 1993-
   present.
Member, MLA Delegate Assembly, 1998-2003.
Chair, MLA Division on Language and Society, 2001-02.
Member, Commission on Language, National Council of Teachers of English, 1984-87;
   1999-2002.
Editor, *Publication of the American Dialect Society* (monograph series) 1984-93.
Member, Committee on Language and the Schools, Linguistic Society of America, 1992-
   1997.
Associate Editor, *Publication of the American Dialect Society,* 1982-84.


**Memberships in Professional Organizations:**

American Dialect Society (life member; member, Committee on New Words, 1975-82;
   member, Committee on Usage, 1982-present; member, Centennial Publications
   Committee; Centennial Publicity Committee; Centennial Documentaries Committee).
Modern Language Association (member, Delegate Assembly, 1996-99).
National Council of Teachers of English (member, Commission on the English Language,
   two terms). Chair, Committee on Public Language, 2009-12.
Conference on College Composition and Communication.
Conference of Editors of Learned Journals, 1985-93.
Linguistic Society of America; member, Committee on Language in the Schools, 1992-94.
Illinois Association of Teachers of English (member, program committee, 1987-88).

**Biographical Notices:**

   *Who's Who in America*
   *Directory of American Scholars*
   *Contemporary Authors*
   *Who's Where Among Writers*
   *International Authors and Writers Who's Who*
   *International Linguistic Directory*
   *Who's Who in American Education*
   *Who's Who in the World*
   *Who's Who in the Humanities*

**Consulting:**

   *Legal consulting and expert witness reports and testimony for a variety of law firms and
   for the Sate of California Attorney General..*

   *Media consulting for television, radio, and newspapers, including ABC's Nightline,
   Champaign-Urbana News-Gazette, The Chicago Tribune, Cincinnati Enquirer, Los
   Angeles Times, The McNeil-Lehrer Report, The New York Times, Newsweek, Orlando
   Sentinel,* Prentice-Hall, *Scripps-Howard Newspapers,* Scott-Foresman, Inc., *Springfield*
   (IL) *Register, USA Today, U.S. News and World Report***,** WICD-TV (Champaign, IL),
   William Safire**.**

   *Professional consulting for numerous academic and university presses.*

Def. Exhibit 49
Page 001680