# EXHIBIT 52

1    ROB BONTA
     Attorney General of California
2    P. PATTY LI
     Supervising Deputy Attorney General
3    ANNA FERRARI
     Deputy Attorney General
4    State Bar No. 261579
     JOHN D. ECHEVERRIA
5    Deputy Attorney General
     State Bar No. 268843
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 510-3479
      Fax:  (415) 703-1234
8     E-mail:  John.Echeverria@doj.ca.gov
     *Attorneys for Defendant Rob Bonta,*
9    *in his official capacity[1]*

10                    IN THE UNITED STATES DISTRICT COURT

11                   FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                             WESTERN DIVISION

13

14

15   **STEVEN RUPP; STEVEN**         8:17-cv-00746-JLS-JDE
     **DEMBER; CHERYL JOHNSON;**
16   **MICHAEL JONES;**              **SUPPLEMENTAL EXPERT**
     **CHRISTOPHER SEIFERT;**        **REPORT AND DECLARATION**
17   **ALFONSO VALENCIA; TROY**      **OF SAUL CORNELL**
     **WILLIS; and CALIFORNIA RIFLE**
18   **& PISTOL ASSOCIATION,**
     **INCORPORATED,**
19
                                     Courtroom:   8A
20                      Plaintiffs,  Judge:       The Honorable Josephine
                                                  L. Staton
21        v.

22                                   Action Filed:  April 24, 2017
     **ROB BONTA, in his official capacity**
23   **as Attorney General of the State of**
     **California; and DOES 1-10,**
24
                        Defendants.
25

26   _____

27        [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
     Attorney General of the State of California. Pursuant to Federal Rule of Civil
28   Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
     the defendant in this case.

                                     1

## SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare that the following is true and correct:

1.      I have been asked by the Office of the Attorney General for the State of California to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  My report explores these issues in some detail.  Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given

2

invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[2]

4.      My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[3] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[4] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.  I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-

---

[2] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[3] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[4] Saul Cornell, *The Right to Bear Arms, in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System, in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

Def. Exhibit 52
Page 001740

cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); and *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.).

## RETENTION AND COMPENSATION

5.     I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

6.     The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the local ordinances at issue in this lawsuit, my education, expertise, and research in the field of legal history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## SUMMARY OF OPINIONS

7.     Understanding text, history, and tradition require a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between

Def. Exhibit 52
Page 001741

English law and the common law in America.[5]  Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[6]  No legal principle was more important to the common law than the concept of the peace.[7]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[8]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[9]

9.    In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[10]  The dominant understanding of

[5] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[6] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[7] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[8] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[9] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[10] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous

Def. Exhibit 52
Page 001742

the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[11]

10.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[12] Included in this right was the most basic right of all: the right of the people to regulate their own internal police.  Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[13]  The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear

_____

and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

[11] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).  For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013).  On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[12] *Heller*, 554 U.S. at 634–35; William J. Novak, *Common Regulation: Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

[13] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

6

arms.[14] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same. Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police. The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point.

11.    In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the individual states exercised their police powers to address longstanding issues and novel problems created by firearms in American society. In particular, the states regulated and when appropriate prohibited categories of weapons deemed to be dangerous *or* unusual.

## I.    THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER*

12.    The United States Supreme Court's decisions in *Heller*, *McDonald*[15], and *Bruen* have directed courts to look to text and history for guideposts in evaluating the scope of permissible firearms regulation under the Second Amendment. In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[16] Legal texts must not be read in a decontextualized fashion detached from the web of

---

[14] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[15] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[16] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

Def. Exhibit 52
Page 001744

historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[17]

13.    Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history provides essential guideposts in evaluating the scope of permissible regulation under the Second Amendment.[18]  Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[19]  The Court acknowledged that when novel problems created by firearms are issue the analysis must reflect this fact:  "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

14.    In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[20]  Indeed, such research is still ongoing: new materials continue to emerge; and in the months since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[21]

---

[17] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[18] *Bruen*, 142 S. Ct. 2111.

[19] *Id.*

[20] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[21] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495

Def. Exhibit 52
Page 001745

15.     Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[22]

16.     One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the

(2022); New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[22] *Bruen*, 142 S. Ct. at 2132–33.

Def. Exhibit 52
Page 001746

First Amendment prohibits a diminishment of the rights it protects.  The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[23]  In Founding-era American English, the word "infringement" meant to "violate" or "destroy."  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*.

17.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[24]

18.    Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[25]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten"

---

[23] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

[24] *Liberty,*  A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[25] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

Def. Exhibit 52
Page 001747

and "infringe" as "to break a law, custom, or privilege."[26]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[27]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[28]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[29]

19.    Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[30]  As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution:  "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[31]

---

[26] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[27] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[28] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[29] *Abridge, Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[30] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[31] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

Def. Exhibit 52
Page 001748

By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[32]

20.    The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty were not antithetical to one another.  The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control.  "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[33]  Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[34]  In fact, without robust regulation of arms, it would have been impossible

---

[32] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[33] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) s (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[34] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf

Def. Exhibit 52
Page 001749

to implement the Second Amendment and its state analogues.  Mustering the militia
required keeping track of who had weapons and included the authority to inspect
those weapons and fine individuals who failed to store them safely and keep them
in good working order.[35]  The individual states also imposed loyalty oaths,
disarming those who refused to take such oaths.  No state imposed a similar oath as
pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms
of prior restraint, impermissible in the case of expressive freedoms protected by the
First Amendment or comparable state provisions, were understood by the Founding
generation to be perfectly consistent with the constitutional right to keep and bear
arms.[36]

21.    In keeping with the clear public meaning of the Second Amendment's
text and comparable state provisions, early American governments enacted laws to
preserve the rights of law-abiding citizens to keep and bear arms and promote the
equally vital goals of promoting public safety.  As long as such laws did not destroy
the right of self-defense, the individual states enjoyed broad latitude to regulate
arms.[37]

## II.    FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.    Guns have been regulated from the dawn of American history.[38]  At the
time *Heller* was decided, there was little scholarship on the history of gun

[https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[35] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[36] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[37] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[38] Robert J. Spitzer, *Gun Law History in the United States and Second*

Def. Exhibit 52
Page 001750

regulation and a paucity of quality scholarship on early American gun culture.[39] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[40]

23.    The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace.[41]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[42]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[43]

24.    *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[44]  Unfortunately, many of these myths

*Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[39] *Id.*

[40] Ruben & Miller, *supra* note 19, at 1.

[41] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[42] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[43] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[44] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF

1  continue to cloud legal discussions of American gun policy and Second

2  Amendment jurisprudence.[45]

3      25.    Although it is hard for many modern Americans to grasp, there was no

4  comparable societal ill to the modern gun violence problem for Americans to solve

5  in the era of the Second Amendment.  A combination of factors, including the

6  nature of firearms technology and the realities of living life in small, face-to-face,

7  and mostly homogenous rural communities that typified many parts of early

8  America, militated against the development of such a problem. In contrast to

9  modern America, homicide was not the problem that government firearm policy

10 needed to address at the time of the Second Amendment.[46]

11     26.    The surviving data from New England is particularly rich and has

12 allowed scholars to formulate a much better understanding of the dynamics of early

13 American gun policy and relate it to early American gun culture.[47]  Levels of gun

14 violence among those of white European ancestry in the era of the Second

15 Amendment were relatively low compared to modern America.  These low levels of

16 violence among persons of European ancestry contrasted with the high levels of

17 violence involving the tribal populations of the region.  The data presented in

18 Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth.

19

20 AMERICAN GUN CULTURE (2016).

21     [45] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN
   TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN
22 CULTURE AND AMERICAN DEMOCRACY (2006).

       [46] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

23     [47] It is important to recognize that there were profound regional differences in
24 early America.  *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL
   DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF
25 AMERICAN CULTURE (1988).  These differences also had important consequences
   for the evolution of American law.  *See generally* David Thomas Konig,
26 *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN
   AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).
27

28

Def. Exhibit 52
Page 001752

It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment. The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[48] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[49]

27.     Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it

---

[48] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[49] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

Def. Exhibit 52
Page 001753

corrodes your barrel, you can't keep it loaded.  Why do they always show the gun over the fireplace?  Because that's the warmest, driest place in the house."[50] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[51]

**Figure 1**



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

28.    As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment.  Nor were guns the primary weapon of choice for those with evil intent during this period.[52]  The problem the Founding generation faced was that Americans were reluctant to purchase the type of weapons needed to effectively arm their militias.  When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in

[50] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[51] Sweeney, *supra* note 47.

[52] HAAG, *supra* note 43.

Def. Exhibit 52
Page 001754

1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[53]

29.    Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.  Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[54]  Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity, at least in terms of militia weapons, have limited value in illuminating the challenges Americans face today.

30.    The other aspect of gun policy that needs to be acknowledged is the active role the federal government took in encouraging the manufacturing of military arms.  The American firearms industry in its infancy was largely dependent on government contracts and subsidies.  Thus, government had a vested interest in determining what types of weapons would be produced. [55]  Government regulation of the firearms industry also included the authority to inspect the manufactures of

---

[53] Sweeney, *supra* note 47.

[54] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

[55] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

Def. Exhibit 52
Page 001755

weapons and impose safety standards on the industry.[56]  Some states opted to tax some common weapons to discourage their proliferation.[57]

31.    The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[58]  The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[59]  The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes also transformed American gun culture.[60]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common.  The culmination of this gradual evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols

---

[56] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[57] 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. ("The following subjects The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.").  *See also* 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same.

[58] Cornell, *supra* note 3, at 745.

[59] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 Bus. Hist. Rev. 57 (2018).

[60] Sean Wilentz, *Society, Politics, and the Market Revolution*, in The New American History (Eric Foner ed., 1990).

19

Def. Exhibit 52
Page 001756

around the time of the Mexican-American War.[61]  Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.  The change in behavior was most noticeable in the case of handguns.[62]

32.    The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws.  In sort, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems.  In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise a right to keep and bear arms.  The primary limit identified by courts in evaluating such laws was the threshold question about abridgement: did the law negate the ability to act in self-defense.[63]  In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition.  Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.

33.    Not all guns were treated equally by the law in early America.  Some guns were given heightened constitutional protection and others were treated as ordinary property subject to the full force of state police power authority.[64]  The

---

[61] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st ed. 1996).

[62] Cornell, *supra* note 9, at 716.

[63] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[64] Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022).

Def. Exhibit 52
Page 001757

people themselves acting through their legislatures retained the fundamental right to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms.

### III. THE POLICE POWER AND FIREARMS REGULATION

34.     The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[65] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[66] By the early nineteenth century, the term "police" was a fixture in American law.[67] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[68] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

---

[65] PA. CONST. OF 1776, Ch. I, art iii.

[66] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[67] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[68] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

Def. Exhibit 52
Page 001758

35.    The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[69]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[70]

36.    Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[71]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[72]  State police power authority was at its pinnacle in

---

[69] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[70] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[71] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[72] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

Def. Exhibit 52
Page 001759

matters relating to guns or gun powder.[73]  Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[74] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[75]

37.   The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[76]  This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

---

[73] CORNELL, *supra* note 33.

[74] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[75] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[76] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

Def. Exhibit 52
Page 001760

38.    A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[77]

39.    Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law.[78]  The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety in early America.[79]  Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.  Shaw described the police power in the following manner:

[77] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864**.** See "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-taney-court-1836-1864/.

[78] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[79] FREUND, *supra* note 66, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996): Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); DUBBER, *supra* note 12; GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (Princeton Univ. Press, 2015).

Def. Exhibit 52
Page 001761

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.  There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[80]

40.    In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[81]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[82]

41.    No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.  Rather, it was well

---

[80] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[81] CORNELL, THE POLICE POWER, *supra* note 33.

[82] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

25

understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.  This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[83]  Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[84]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[85]

42.    One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[86]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns.  "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by

---

[83] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[84] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[85] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[86] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

Def. Exhibit 52
Page 001763

the safety of the people and the advancement of public morals."[87]  In the court's view, the regulation of arms was at the very core of state police power.[88]  The judicial determination was straight forward: was the challenged law a legitimate exercise of the police power or not?

## IV.   RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO REGULATE FIREARMS (1863-1877)

43.    Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing:  both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.  This change reflected two profound transformations in American politics and law between 1776 and 1868.  First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.  As a result, state constitutions no longer included positive affirmations of a police right.  Secondly, the constitutional "mischief to be remedied" had changed as well.[89]  Constitution writers in the era of

_____

[87] *Id.* at 616.

[88] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 66, at 91.

[89] The mischief rule was first advanced in *Hevdon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century.  For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH

Def. Exhibit 52
Page 001764

the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[90]

44.    The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[91]  For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[92]  Nor was Texas an outlier in this regard.  Sixteen state constitutions adopted during this period employed similarly expansive

---

SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[90] *See McDonald*, 561 U.S. at 767–68

[91] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[92] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

Def. Exhibit 52
Page 001765

language.[93]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms.  Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[94]

45.    This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.  The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[95]

46.    Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety.  Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder.  In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power.  As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[96]

---

[93] Cornell, *supra* note 90, at 75–76.

[94] *Id.*

[95] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[96] Robert J. Kaczorowski. *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and*

Def. Exhibit 52
Page 001766

47.    Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[97]  As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good.[98]

48.    It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation.  Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[99]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[100]

49.    Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the

*Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[97] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[98] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[99] *See* Spitzer, *supra* note 37, at 59–61 tbl. 1.

[100] *Id.*

Def. Exhibit 52
Page 001767

determination of its limits was best left to courts on a case-by-case basis.[101]  Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[102]

50.    In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety.  Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[103]  The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction.  The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[104]

---

[101] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[102] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

[103] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[104] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

Def. Exhibit 52
Page 001768

51.    The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.   American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## V.    ASSAULT WEAPONS BANS, THE POLICE POWER, AND THE LATEST FACE OF TERROR

52.    Another major inflection point in the debate over firearms regulation focused on assault weapons, and was closely connected to the rise of mass shootings in the last decades of the twentieth century.[105]  California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[106]  Proposals to ban assault weapons are part of a larger national movement to deal with the carnage caused by high capacity, high velocity weapons.[107]  The effort to ban such weapons parallels earlier efforts to deal with machine guns and semi-automatic weapons during the 1920s.[108]

53.    Gun rights advocates have insisted that the term "assault weapon" is an invention of gun control activists and that the term is essentially meaningless.[109]

---

[105] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020).

[106] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[107] ROBERT SPITZER, THE POLITICS OF GUN CONTROL 14 (2012).

[108] *Supra* note 37

[109] For a good illustration of the gun rights point of view, Stephen P. Halbrook, *New York's Not So "SAFE" Act: The Second Amendment in an Alice-In-Wonderland World Where Words Have No Meaning*, 78 ALBANY L. REV. 789 (2015).

For those in the gun rights community, these "modern sporting rifles" share functions and features with many other guns including some hunting rifles.[110] Much of the current controversy over bans or restrictions on dangerous or unusual weapons revolves around the AR-15 and similar types of weapons and accessories.[111]  The debate's heavy focus on technological factors obscures the fact that legislative efforts to ban these weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.  During America's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed and in the New Deal era, states singled out gangster weapons such as the notorious "Tommy Gun" [Thompson sub-machine gun" as sufficiently dangerous or unusual to warrant extensive regulation, or prohibition.  The same imperatives and constitutional logic guided both regulatory regimes.[112]

54.    The history of the AR-15 illustrates that the earlier dynamic governing firearms regulation established in the nineteenth-century continues to shape American public policy and law.  Regulation of firearms follows a well-worn path. Technological innovation is only part of this equation.  In addition, weapons must also achieve sufficient market penetration to create a potential for criminal abuse.

---

[110] On modern marketing of firearms, *see* HAAG, *supra* note 43.  Among the most important insights of Haag's work is that breech-loading rifles introduced after the Civil War did not achieve sufficient market penetration a fact that partially accounts for the absence of any movement to limit access to these weapons which remained primarily of interest to sportsmen and the military.

[111] James Jacobs, *Why Ban 'Assault Weapons'?*, 37 CARDOZO L. REV. 681, 687 (2015). For a useful overview of the legal issues in regulating this class of weapons, *see* Vivian S. Chu, *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013.

[112] Spitzer, *supra* note 37.

Def. Exhibit 52
Page 001770

At this point legislatures attempt to find a means to address the problem posed by these weapons without trenching on constitutionally protected liberties.[113]

55.    The development of the AR-15 was tied to the strategic requirements of the American military to find a replacement for heavier World War II-era rifles. The military M-16 and the civilian AR-15 are closely related.  In contrast to standard issue military weapons such as the M-16, the AR-15 and other similar civilian weapons are all semi-automatic, rather than selective fire weapons capable of firing in either fully automatic or semi-automatic modes.

56.    When they were first introduced military-style AR-15 types of weapons were not especially popular.[114]  Gun makers eventually developed a more effective set of marketing strategies.[115]  When first marketed, the AR-15's connection to the military was a liability because lingering opposition to the Vietnam War slowed down early civilian interest in a weapon that was closely related to the M-16.[116]

57.    There is no doubt that many of the pragmatic and cosmetic features of AR-15 type weapons now account for their popularity among some segments of the gun-owning public.[117]  The weapons are lighter, produce less recoil, and are easier to fire than an older generation of hunting rifles.  The fact that these weapons are

---

[113] *Id.*

[114] David M. Studdert et al., *Testing the Immunity of the Firearm Industry to Tort Litigation*, 177 JAMA INTERNAL MEDICINE 102, 102-05 (2017).

[115] Joseph Blocher, *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U. L. Rev. 813 (2014) and Joseph Blocher, *Hunting and the Second Amendment*, 91 NOTRE DAME L. REV. 133 (2015).

[116] On the insurrectionary tradition, see David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment*, 74 TUL. L. REV. 387 (1999).

[117] Rachel A. Callcut et al. *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective*, 87 J. TRAUMA ACUTE CARE SURGERY 531 (2019).

also highly customizable has increased their consumer appeal but has also rendered them more lethal.  Commentators have analogized them to other consumer products, describing them as an adult and hyper-masculine version of a "Barbie Doll."[118]  Opponents of robust regulation of assault weapons insist that the targeted weapons are neither especially dangerous nor unusual.  Moreover, gun rights advocates insist that the term "assault weapons" is an invention of gun control advocates and the prohibition targets cosmetic features.[119]

58.    Understanding the marketing strategies tying these weapons to the military makes clear that efforts to regulate these weapons by using these same features is hardly cosmetic.  Moreover, focusing exclusively on technology and ignoring the social history of these weapons, their popularity and potential for abuse, misses an important point about the history of firearms technology and government regulation.  The history and tradition of arms regulation has always recognized that weapons that had the ability to inspire *terrorem populi* is a legitimate justification for regulation.  The perpetrator of the Sandy Hook Elementary Mass Shooting used a Bushmaster AR-15-type weapon that was marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity: "Consider Your Man Card Reissued."[120]  There is little disputing  the fact that

[118] Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015.

[119] Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence*, 14 GEORGETOWN J. OF L. & PUB. POL'Y. 47 (2016).  For a good example of this type of flawed technological determinist approach, *see* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994).  For a general discussion of the problems with technological determinism, *see* Merritt R. Smith, and Leo Marx, DOES TECHNOLOGY DRIVE HISTORY?  THE DILEMMA OF TECHNOLOGICAL DETERMINISM (Cambridge, MA: MIT, 1994); Allan Dafoe, *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECH. & HUM. VALUES 1047 (2015).

[120] Alexander DeConde, GUN VIOLENCE IN AMERICA; Cornell and DeDino, *supra* note 36.

Def. Exhibit 52
Page 001772

1    despite protestations by gun rights advocates and industry executives that these

2    weapons are merely "sporting rifles" the marketing campaigns used to sell these

3    tells a different story.  The success of these weapons commercially was inextricably

4    linked to marketing strategies that tied these weapons to their origins in the

5    military. These sales strategies deliberately evoked images of military assault

6    capabilities.[121] The advertisement from two popular arms manufacturers pictured

7    below are illustrative of these campaigns.[122]  Ruger explicitly employs the term

8    "Tactical Rifle" and Sig Sauer's choice of imagery unambiguously links its

9    weapons to images of military close quarter combat.



121  Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM), https://www.washingtonpost.com/national-security/2022/07/27/companies-made-more-than-1b-selling-powerful-guns-civilians-report-says/.

122  CAROLYN MALONEY, SUPPLEMENTAL MEMORANDUM: THE COMMITTEE'S INVESTIGATION INTO GUN INDUSTRY PRACTICES AND PROFITS (JUL. 27, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf.

Def. Exhibit 52
Page 001773

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15      59.    *Bruen* did not address these technology-focused arguments.  The New

16  York law in question singled out handguns, not assault weapons.  From the

17  perspective of text, history, and tradition, the key legal fact is that that these

18  weapons are perceived by important segments of the public to weapons capable of

19  provoking a terror. [123]  Even if one accepted that some of the specified features on

20  these weapons were simply cosmetic, a point hotly contested by proponents of

21  stronger regulation, this fact does not negate the undeniable fact that these weapons

22  _____

23      [123] Mass shootings have been rendered more deadly by the proliferation of
     assault weapons, *see* John Donahue III & Theodora Boulouta, *The Assault Weapon*
24  *Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019),
     https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/.  For the
25  most recent assessment of the impact of assault weapons on the American gun
     violence problem, *see* Christopher S. Koper et. al., *Criminal Use of Assault*
26  *Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of*
     *Local and National Sources*, 95 J. URB. HEALTH 313 (2018).
27

28

Def. Exhibit 52
Page 001774

produce the type of terror that Anglo-American law has always recognized as a threat to the peace.[124]  Firearms manufacturers created a type of weapon and marketed it to distinct demographics, stressing characteristics and cultural associations that tied them to war and then used these associations to effectively market them.  The fact that a successful marketing strategy earned gun companies over a billion dollars is a fact that contradicts the claims of gun rights advocates these weapons are no different than other guns available to consumers.  If that were true, then gun companies would have abandoned these marketing strategies long ago and replaced them with something more effective.  It would be illogical and run counter to the most basic principles of Anglo-American law to argue that people themselves are powerless to regulate these weapons to mitigate the threats they pose to peace and public safety.  The appeal of these weapons and their contribution to gun violence are two sides of the same coin.[125]  A government's ability to address the negative effects of these weapons is well within the scope of its police powers, as historically understood.

## VI.  *BRUEN*'S FRAMEWORK AND MODERN ASSAULT WEAPONS BANS

60.    The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.  At different moments in American history communities have deemed

---

[124] Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 SOUTH. ILL. UNIV. L.J. 61 (2018).

[125] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM), https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-rather-sell-ar-15s-than-handguns; John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 Law & Contemp. Problems 117 (2020); Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*, CRIMINOLOGY & PUBLIC POLICY 147 (2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 APPLIED ECON. LETTERS 281 (2014).

Def. Exhibit 52
Page 001775

categories of weapons to be especially dangerous and have regulated them, and when it appeared necessary enacted bans on some types of weapons. Such determinations were not made based on technological features in isolation but reflected the ancient common law tradition of singling out weapons capable of producing a terror. Such weapons undermined the peace and the constitutional imperative embedded in the text of the Second Amendment to protect the security of a free state. Defining exactly which category of weapons have fallen outside of the scope of constitutional protection has shifted over time as society has addressed new developments in firearms technology, evolving societal norms, and other changes. In short, social, and economic transformation were always accompanied by legal transformation. Put another way, as times change, the law changes with them.[126]

61.    Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[127]   States and localities have regulated gunpowder and arms, since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[128]   The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

_____

[126] Spitzer, *supra* note 37.

[127] *Id.*

[128] GERSTLE, *supra* note 78.

1

2          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

3    laws of the United States of America that the foregoing is true and correct.

4          Executed on January 6, 2023, at Philadelphia, Pennsylvania.

5

6

7                                          _Saul Cornell_

8                                          Saul Cornell

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Def. Exhibit 52
Page 001777

# EXHIBIT 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✷ Bronx, NY 10458 ✷ 203 826-6608 (c) ✷ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

Def. Exhibit 52
Page 001779

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Book Publications** |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

Def. Exhibit 52
Page 001780

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 <u>Fordham Law Review</u> (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 <u>Law and Contemporary Problems</u> (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." <u>Law and History Review</u> 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> <u>Controversies in American Constitutional Law Series</u> (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 <u>Northwestern Journal of Criminal Law</u>  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," <u>Wisconsin Law Review Forward</u>  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal  Forum</u>  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review *Res Gestae*</u>  84 (2015):  1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  <u>Fordham Law Review</u> 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

Def. Exhibit 52
Page 001781

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed: The Bill of Rights (University of Virginia Press, 1998): 175-208

Def. Exhibit 52
Page 001782

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies  Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

Def. Exhibit 52
Page 001783

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

### **Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### **Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

Def. Exhibit 52
Page 001784

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

Def. Exhibit 52
Page 001785

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

Def. Exhibit 52
Page 001786

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

Def. Exhibit 52
Page 001787

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

### Interviews, Editorials, Essays, Podcasts:

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

Def. Exhibit 52
Page 001788

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),*

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post,* January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

Def. Exhibit 52
Page 001789

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

Def. Exhibit 52
Page 001790

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## Federal Courts:

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

Def. Exhibit 52
Page 001791

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th
    Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008),
    report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008),
    aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).


**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019)
    (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


**Amicus Briefs:**

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd
Amendment]
Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court, 2010) [14th Amendment]
Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Def. Exhibit 52
Page 001792

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

Def. Exhibit 52
Page 001793