# EXHIBIT 55

Def. Exhibit 55
Page 001946

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  State Bar No. 261579
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 510-3479
    Fax:  (415) 703-1234
8   E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity*[1]

10                 IN THE UNITED STATES DISTRICT COURT

11              FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                          WESTERN DIVISION

13

14

15  **STEVEN RUPP; STEVEN**              8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**                   **SUPPLEMENTAL SUR-**
    **CHRISTOPHER SEIFERT;**             **REBUTTAL EXPERT REPORT**
17  **ALFONSO VALENCIA; TROY**           **AND DECLARATION OF LOUIS**
    **WILLIS; and CALIFORNIA RIFLE**     **KLAREVAS**
18  **& PISTOL ASSOCIATION,**
    **INCORPORATED,**
19
                                          
20                     Plaintiffs,        Courtroom:   8A
                                          Judge:       The Honorable Josephine
21        **v.**                                       L. Staton

22  **ROB BONTA, in his official capacity**   Action Filed:  April 24, 2017
    **as Attorney General of the State of**
23  **California; and DOES 1-10,**

24                      Defendants.

25

26        ---
         [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
27  Attorney General of the State of California. Pursuant to Federal Rule of Civil
    Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
28  the defendant in this case.

                                    1

Def. Exhibit 55
Page 001947

**SUPPLEMENTAL SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF LOUIS KLAREVAS**

I, Louis Klarevas, declare under penalty of perjury that the following is true and correct:

1.     Plaintiffs' witness Gary Kleck has submitted an expert witness rebuttal report responding, in part, to my expert findings and opinions in the present case ("Kleck Rebuttal Report").[2] This sur-rebuttal expert report and declaration ("Sur-Rebuttal") responds to paragraphs 47 through 69 of the Kleck Rebuttal Report, the section that pertains directly to my supplemental expert report and declaration submitted in this matter on January 6 ("Klarevas Supplemental Report").[3] I shall address Kleck's rebuttal opinions in the order that he presents them.

2.     This Sur-Rebuttal Report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in it.

## I. MASS SHOOTINGS ARE A THREAT TO PUBLIC SAFETY

3.     *Kleck Rebuttal Opinion #1:* Mass shootings, in the aggregate, do not constitute the most serious threat to public safety.

4.     Purportedly quoting my Supplemental Report, Kleck writes, "However horrific individual mass shootings may be, it is absurd to describe their threat to the safety of Americans as '*the greatest threat* … to the … safety of American society in the present era.'"[4] Kleck provides no page citation for this quotation because this quote does not appear in my Supplemental Report. What I actually wrote in

---

[2] Expert Witness Rebuttal Report of Gary Kleck, *Rupp v. Bonta*, Case No.: 8:17-cv-00746-JLS-JDE (C.D. Cal.), February 3, 2023 ("Kleck Rebuttal Report" hereinafter).

[3] Supplemental Expert Report and Declaration of Louis Klarevas, *Rupp v. Bonta*, Case No.: 8:17-cv-00746-JLS-JDE (C.D. Cal.), January 6, 2023 ("Klarevas Supplemental Report" hereinafter). My background and qualifications, including my CV, are available in *ibid*.

[4] Kleck Rebuttal Report, para. 48; emphasis added.

Def. Exhibit 55
Page 001948

my Supplemental Report is that "the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings."[5]  This is not merely an opinion.  It is a fact.  In the post-9/11 era, *in terms of individual acts*, no other form of intentional criminal violence has been deadlier than the mass shooting.[6]

5.   If Kleck's point is that there are things that, *in the aggregate*, kill more Americans than mass shootings, that would be accurate.  After all, annually, nearly 700,000 Americans will die from heart disease, and approximately 600,000 Americans will die from cancer.[7]

6.   But this does not appear to be Kleck's overarching point.  Instead, Kleck writes, "we can state the seriousness of the threat to the safety of American[s] by computing the fraction who will be killed in a 'gun massacre' in a given year."[8]  Kleck then attempts to dismiss "the seriousness of the threat" of mass shootings by comparing the odds of dying in a gun massacre (which in the academic literature is also known as a "high-fatality mass shooting" that results in 6

---

[5] Klarevas Supplemental Report, para. 6.

[6] In his Rebuttal Report, apparently citing p. 5 of my Supplemental Report, Kleck claims, "[Klarevas] documented 113 'gun massacres' (which he defines as incidents involving 6 or more dead), in which 1,009 people were killed, over the period from 1968 through September 2017."  Kleck Rebuttal Report, para. 48.  The section of my Supplemental Report that Kleck is referencing covered January 1, 1973, through December 31, 2022, not "1968 through September 2017."  This section of my Supplemental Report not only examined gun massacres, but also mass public shootings, identifying 50-year patterns for the 136 gun massacres (also known as "high-fatality mass shootings") that resulted in 1,253 deaths and the 175 mass public shootings that resulted in 1,259 deaths.  *See*, Klarevas Supplemental Report, para. 13 and Exhibits. B-C.  The statistics that Kleck attributes to me in para. 48 of his Rebuttal Report do not appear in my Supplemental Report.

[7] Centers for Disease Control and Prevention, "Wide-ranging ONline Data for Epidemiologic Research (WONDER)," *available at* wonder.cdc.gov (last accessed February 20, 2023).

[8] Kleck Rebuttal Report, para. 49

3

Def. Exhibit 55
Page 001949

or more victims killed) to the odds of dying in a lightning strike.[9]  This is a bizarre exercise for a couple of reasons.

7.      For starters, why compare high-fatality mass shootings (which have a minimum fatality threshold of 6 deaths) to lightning strikes (which do not have a minimum fatality threshold)?  Why not instead compare high-fatality mass shootings to high-fatality lightning strikes?  Or, alternatively, why not compare all shooting deaths to all lightning-strike deaths?  Perhaps the answer lies in the fact that such symmetrical comparisons would establish that lightning strikes are not deadlier than gun violence—not even close—thus undermining Kleck's entire point.  For instance, comparing high-fatality mass shootings resulting in 6 or more victims killed to high-fatality lightning strikes resulting in 6 or more victims killed would show that, between 2001-2021, there were 71 such mass shootings, resulting in 736 cumulative deaths, compared to no such lightning strikes, resulting in zero cumulative deaths.[10]  Similarly, using the same timeframe of 2001-2021, comparing all shooting deaths to all lightning-strike deaths would show that the former resulted in a total of 728,278 deaths and the latter resulted in a total of 700 deaths.[11]

8.      Next, and arguably more relevant, it appears that this exercise of comparing mass shootings to lightning strikes is meant to suggest that addressing mass shootings should not be a policy priority.  I counted at least six occasions in his Rebuttal Report where Kleck advanced an argument that "mass shootings are rare," including at one point insisting that being killed in a gun massacre is comparable to "being killed by a bolt of lightning—itself a freakishly rare event."[12]  Bombings on American soil occur with far less frequency than mass shootings.  So too do hijackings of commercial airliners for purposes of crashing them into critical

---

[9] *Ibid.*
[10] CDC, *supra* note 7.
[11] *Ibid.*
[12] Kleck Rebuttal Report, paras. 11, 13-14, 29, 49, 52.

4

infrastructures, which are arguably the rarest of all acts of violence in United States history, having occurred only once.  By Kleck's reasoning, these events are not appropriate targets for policy interventions on account of their relative infrequency.

9.    Frequency of occurrence is not a reason to dismiss a threat to public health, societal safety, or homeland security.  Just like securing America's infrastructure, public spaces, and airspace are important public policy objectives, so too is securing America's citizenry from mass-casualty acts of gun violence, which in the post-9/11 era have accounted for the deadliest individual acts of criminal violence in the United States.

## II.  MASS SHOOTING VIOLENCE IS ON THE RISE

10.    *Kleck Rebuttal Opinion #2:* There is no upward trend in the frequency of mass shootings in recent years.

11.    Next, Kleck attempts to disprove my analysis which found that mass shooting violence is on the rise.  His rebuttal on this point is flawed for two reasons.

12.    First, Kleck asserts that my conclusion that there is "an upward trend" is the result of "narrowing [my] focus to just a tiny subset of mass shootings—cases in which 10 or more victims were killed."[13]  Kleck then acknowledges, "There was indeed an upward trend in this subset."[14]  But, according to Kleck, "the numbers involved are so small that any statements about trends are trivial and not indicative of any increase in the aggregate level of threat to Americans' safety."[15]  Leaving aside his claim that 30 mass shootings resulting in double-digit fatalities is a "small" number that results in "trivial" trends, Kleck ignores my parallel findings drawing on two distinct, larger data sets of high-fatality mass shootings (resulting in six or more fatalities, regardless of location or motive) and mass public shootings (resulting in four or more fatalities in an incident that primarily occurs in a public

---

[13] *Ibid*., para. 51.
[14] *Ibid*.
[15] *Ibid*.

Def. Exhibit 55
Page 001951

setting and is unrelated to an underlying criminal activity) to establish an upward trend. Whether examining the 136 high-fatality mass shootings that resulted in 1,253 deaths or the 175 mass public shootings that resulted in 1,259 deaths, the upward trends across the last 50 years (1973-2022) are undeniable.[16] Yet, Kleck ignores this entire section of my Supplemental Report and, instead, misrepresents my conclusion that mass shooting violence is on the rise as being based on a single data set that he feels is "so small that any statements about trends are trivial."[17]

13. Second, Kleck insists that if we use a totally different—fourth—data set, "it shows no meaningful trend of any kind."[18] The data set that Kleck references is maintained by the Gun Violence Archive (GVA). The GVA uses a broad definition of mass shootings: an incident resulting in four or more people being shot, regardless of whether the wounds are fatal or non-fatal.[19] In his Rebuttal Report, Kleck argues, "The most comprehensive listing of *all* mass shootings … can be found in the Gun Violence Archive."[20] The contribution of the GVA to the identification of mass shootings, broadly defined, is indeed valuable. However, GVA data is limited for two reasons: 1) the GVA data set does not contain any incidents that occurred prior to 2013; and 2) the GVA data set does not systematically identify the instruments of violence that were used in mass shootings. Because of these two limitations, GVA data is not particularly useful for tracking the use of assault weapons and large-capacity magazines (LCMs) in mass shootings, especially over a period of time going back to January 1, 1990, when California became the first state to institute an assault weapons ban.

---

[16] Klarevas Supplemental Report, Figs. 1-4 and Exhibits B-C.
[17] Kleck Rebuttal Report, para. 51.
[18] *Ibid*., para. 50.
[19] Gun Violence Archive, "General Methodology," *available at* https://www.gunviolencearchive.org/methodology (last accessed February 20, 2023).
[20] Kleck Rebuttal Report, para. 17; emphasis in original.

Def. Exhibit 55
Page 001952

14.     Nevertheless, Kleck appears to be of the view that 9 years of GVA data is more robust than the three mass shooting data sets I consulted, which each span at a minimum 50 years of data.  Again, Kleck's approach to this issue is problematic, resulting in flawed conclusions.

15.     To begin with, Kleck lauds the GVA data set.  But then, *without any explanation*, Kleck opts not to use the full GVA data set.  The GVA captures all shootings resulting in four or more casualties, regardless of whether the casualties are fatal or non-fatal.  Kleck instead chose to limit his analysis of GVA data to shootings resulting in four or more fatalities, excluding the hundreds of cases in the GVA data set that occur annually that do not result in a minimum of four deaths. Without explaining why he does this, his decision appears to be arbitrary.[21]  What would the data show if the full GVA data set were plotted in a chronological fashion?  Figure 1a provides the answer.  As can be seen, tracking all the incidents in the GVA data set results in the undeniable conclusion that mass shootings, broadly defined, have occurred with increased frequency in the past decade.  Kleck, however, insists on assessing only those incidents in the GVA data set that resulted in four or more deaths.  But even limiting the data points to this casualty threshold still results in an upward trend between 2014 and 2022, as shown in Figure 1b.

---

[21] In the past, Kleck has defined mass shootings as involving more than six casualties.  In a 2016 article, he noted that "The six-victim cutoff was used because an offender could shoot as many as six persons using a typical old-fashioned six-shot revolver."  As he explained, he "did not employ the oft-used definition of 'mass murder' as a homicide in which four or more victims were killed, because most of these involve just four to six victims, which could therefore have involved as few as six rounds fired, a number that shooters using even ordinary revolvers are capable of firing without reloading."  Gary Kleck, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016), at 33; internal citations omitted.

Def. Exhibit 55
Page 001953

**Figure 1.  Gun Violence Archive (GVA) Annual Mass Shooting Trends**

**Figure 1a.  GVA Mass Shootings (4+Shot), 2014-2022**



**Figure 1b.  GVA Mass Shootings (4+Killed), 2014-2022 [Kleck *Rupp* Rebuttal Report]**



16.     Kleck's analysis is suspect for another reason as well.  In an expert declaration filed in *Duncan v. Bonta*, Kleck identified 222 mass shootings between 2013 and 2021 resulting in four or more deaths in the GVA data set.[22]  In his present Rebuttal Report, Kleck identified 201 mass shootings between 2014 and 2022 resulting in four or more deaths in the GVA data set.[23]  Mysteriously, the 25 incidents from 2013 that Kleck identified in his *Duncan* declaration have disappeared from his current Rebuttal Report (*see* Figure 2).  But Kleck has added

[22] Declaration of Gary Kleck in Support of Plaintiffs' Supplemental Brief, *Duncan v. Bonta*, Case No.: 17-cv-1017-BEN-JLB (S.D. Cal.), December 1, 2022, Table 1.

[23] Kleck Rebuttal Report, Table 1.

Def. Exhibit 55
Page 001954

35 incidents from 2022.  Accounting for new data points that were previously unavailable is an appropriate methodological approach.  But it is unclear why Kleck removed the incident data points from 2013.  Regardless, if Kleck's numbers were consistent, he should list 232 incidents from 2014 through 2022 (222-25+35=232).  However, Kleck now claims that, according to the GVA, there have been only 201 mass shootings resulting in 4 or more people killed from 2014 through 2022.  Clearly, there is a data mismatch between his two analyses (his *Duncan* Declaration and his Rebuttal Report in the present case), meaning that *at least* one of them must be incorrect.

**Figure 2.  Kleck Tables on Gun Violence Archive Mass Shootings (4+ Killed)**

**Figure 2a.  Kleck Table 1 [*Duncan* Supplemental Declaration]**

Table 1 – Prevalence of LCM Use in All Mass Shootings, 2013-2021

| Year | Mass Shootings | LCM-involved Mass Shootings |
|------|----------------|------------------------------|
| 2013 | 25 | 2 |
| 2014 | 20 | 0 |
| 2015 | 26 | 4 |
| 2016 | 25 | 4 |
| 2017 | 24 | 4 |
| 2018 | 22 | 3 |
| 2019 | 31 | 4 |
| 2020 | 21 | 0 |
| 2021 | 28 | 5 |
| 2013-2021 | 222 | 26 |

**Figure 2b.  Kleck Table 1 [*Duncan* Supplemental Declaration]**

Table 1.    The Share of Mass Shootings in Which LCMs Were Used, 2014-2022

| Year | Total Mass Shootings | LCM-involved Mass Shootings |
|------|----------------------|------------------------------|
| 2014 | 16 | 0 |
| 2015 | 21 | 4 |
| 2016 | 25 | 4 |
| 2017 | 18 | 4 |
| 2018 | 15 | 3 |
| 2019 | 30 | 4 |
| 2020 | 19 | 0 |
| 2021 | 22 | 5 |
| 2022 | 35 | 5 |
| 2014-2022 | 201 | 29 |

9

17.     Nevertheless, whether one examines the three distinct data sets that I reviewed in my Supplemental Report, the full GVA data set, or the GVA subset that Kleck identified in his present Rebuttal Report—five different data sets in all—the outcome is the same.  All five data sets, including the two GVA data sets plotted in this Sur-Rebuttal, support my conclusion that mass shooting violence is on the rise (*see* Figure 1).

### III.  ASSAULT WEAPONS ARE ALMOST NEVER USED BY PRIVATE CITIZENS IN SELF-DEFENSE DURING ACTIVE SHOOTINGS

18.     *Kleck Rebuttal Opinion #3:* The use of assault weapons to stop mass shootings is irrelevant to the debate about the merits of restrictions on assault weapons.

19.     As established in my Supplemental Report, "assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings."[24]  Kleck does not dispute this fact.  Instead, he considers it "irrelevant."[25]  Particularly, Kleck argues that the use of assault weapons to stop mass shootings is not "an important issue" because the instances where private citizens used assault weapons in self-defense during an attempted mass shooting "are just too small for the issue to be important."[26]  While this is Kleck's unsubstantiated personal opinion, the fact remains that assault weapons are rarely used to stop active shootings and are, instead, used much more frequently in high-fatality mass shootings and mass public shootings.

---

[24] Klarevas Supplemental Report, para. 27.
[25] Kleck Rebuttal Report, para. 53.
[26] *Ibid.*

Def. Exhibit 55
Page 001956

## IV. AR- AND AK-PLATFORM ASSAULT RIFLES ARE USED IN MASS SHOOTINGS AT RATES THAT ARE SUBSTANTIALLY GREATER THAN THE RATES AT WHICH THESE ASSAULT RIFLES CIRCULATE IN THE CIVILIAN FIREARM STOCK

20.    *Kleck Rebuttal Opinion #4:* There does not appear to be a greater preference for using assault weapons among mass shooters than among noncriminal gun owners.

21.    In a strawman argument, Kleck accuses me of making "an assertion of a greater preference for *using AWs* among mass shooters than among noncriminal gun owners."[27]  I do not claim that assault weapons are *used* by mass shooters with greater frequency than they are *used* by noncriminal gun owners.  I never advanced such a view for a simple reason: with one exception, I am unaware of any data on the frequency with which noncriminal gun owners have actually used assault weapons.  Indeed, Kleck provides no such data in his Rebuttal Report.  The only data of which I am aware on the frequency with which assault weapons have been actually used is the data that I just discussed in the previous section on defensive gun uses (DGUs) during active shooter incidents.  As I documented in my Supplemental Report, according to official FBI reports, only 15 (3.7%) of all 406 active shooter incidents between 2000 and 2021 involved a private citizen intervening with a personal firearm, and, of these 15 DGU incidents, only 1 (6.7%) involved an assault weapon.  In other words, of the 406 active shooter incidents, only 1 (0.2%) involved a private citizen intervening with an assault weapon.[28]

22.    Again, Kleck is not disputing the accuracy of the FBI data on civilian DGUs in active shootings.  Moreover, he does not provide any evidence that contradicts my finding that the use of assault weapons, as a share of all firearms used, in both high-fatality mass shootings and mass public shootings, has increased

---

[27] *Ibid.*, para. 54; emphasis added.
[28] Klarevas Supplemental Report, para. 26.

Def. Exhibit 55
Page 001957

in the last 50 years.  Nor does he offer any evidence that contradicts my finding that assault weapons have been used in at least half of all high-fatality mass shootings and mass public shootings in the past 5 years.[29]  Kleck is instead arguing that I provide "no basis for an assertion of a greater preference for *using AWs* among mass shooters than among noncriminal gun owners."[30]  But as just discussed, I never advanced such an assertion in my Supplemental Report.[31]  What I did claim is the following:

> If assault weapons were used in proportion to the percentage of modern sporting rifles [MSRs] in circulation, approximately 5% of all mass shootings would involve assault weapons.  However, … civilian ownership rates and mass-shooter use rates are not similar.  Indeed, the difference is approximately ten-fold, with the rate at which assault weapons are now used to commit mass murder far outpacing the rate at which [MSRs] circulate amongst civilians in the United States.[32]

## V. THE USE OF ASSAULT WEAPONS IN MASS SHOOTINGS RESULTS, ON AVERAGE, IN SUBSTANTIALLY MORE DEATHS

23.    *Kleck Rebuttal Opinion #5:* It is not established that the use of assault weapons causes an increase in the casualty counts of mass shootings.

---

[29] *Ibid.*, Figs. 5-6.

[30] Kleck Rebuttal Report, para. 54; emphasis added.

[31] Kleck also offers a confusing and tortured strawman argument accusing me of making a "suggested assertion that the rise in double-digit mass shootings corresponded in time to the rising popularity or availability of *semi-auto guns.*" Kleck Rebuttal Report, para. 59; emphasis added.  I never discussed semiautomatic firearms as a class of firearms at any point in my Supplemental Report.  Indeed, the word "semiautomatic" is never used in my Supplemental Report.

[32] Klarevas Supplemental Report, para. 15.  Kleck criticizes my comparison of assault weapons used by mass shooters with MSRs in civilian circulation.  Kleck Rebuttal Report, para. 56.  Perhaps there are MSRs that might be exempt from California's statutory definition of assault weapons.  However, if there are exempt MSRs, Kleck does not identify any.  As such, he provides no evidence to support a change in my conclusions pertaining to the percentage of MSRs as a share of all firearms in civilian circulation.

Def. Exhibit 55
Page 001958

24.     Kleck concedes that "Klarevas accurately notes the higher casualty counts in mass shootings committed with AWs."[33]  Yet, Kleck surmises that it is not the weaponry that is the "cause" of these higher death tolls, but rather some other factor.[34]  According to Kleck, the "association" between the use of assault weapons in mass shootings and increased fatalities *may be entirely due* to the common effect of the *lethality of offender intentions* on both the number of people the offender shoots and the choice of using a gun type or magazine perceived (accurately or not) to be especially useful for hurting large numbers of people."[35] As the phrase "may be entirely due" suggests, Kleck is engaging in speculation. Perhaps Kleck's analysis might be better served by answering the question hidden in his hypothesis: Why do mass shooters believe that assault weapons are "especially useful for hurting large numbers of people"?[36]

25.     Kleck is suggesting that lethal intentions ("the lethality of offender intentions"), as opposed to the firearms used, are what really "cause" people to die in mass shootings.  If this sounds familiar, it is because it is another way of saying, 'guns don't kill people, people kill people.'  But as any well-read student of criminology and security studies knows, acts of violence involve intentions *and* capabilities.  And capabilities are central to our causal understanding of murder. This is why the autopsy reports of firearm-homicide victims identify the cause of death as "gunshot wound," as opposed to "lethality of offender intention."[37]

26.     After engaging in this exercise, Kleck shifts his approach and states that "[t]here is in fact no sound scientific basis for the claim that there are features

---

[33] Kleck Rebuttal Report, para. 59.
[34] *Ibid.*
[35] *Ibid.*; emphasis added.
[36] *Ibid.*
[37] *See*, for example, Vernard Irvine Adams, *Guidelines for Reports by Autopsy Pathologists* (2008).

13

[of] AWs that actually cause more deaths in mass shootings."[38]  In particular, Kleck states, "there is no credible evidence that the kinds of firearms banned by California as AWs are any more accurate, lethal, or rapid-firing than their unbanned semi-automatic counterparts."[39]  In essence, Kleck singles out three tests for gauging the lethality of assault weapons—and, not surprisingly, none of them are direct measures of offender intentions.

27.    Interestingly, Kleck does not offer any authority that assesses the impact of an instrument of violence using precision, ballistics, or firing efficiency. That I am aware, Kleck is neither a firearms expert nor a ballistics expert.  But assuming *arguendo* that these are helpful indices, Kleck's testimony conflicts with testimony of plaintiffs' rebuttal expert, Mark Hanish.  In discussing AR-15 rifles, Hanish notes, "Most of these rifles were designed with a pistol grip due to the overall architecture of the rifle.  The pistol grip provides for proper ergonomics allowing a person to hold, aim, and manipulate the rifle *efficiently and accurately*. The rifles are more comfortable to shoot, facilitating greater accuracy and control."[40]  Hanish claims that the features of certain assault weapons improve accuracy in certain circumstances.  And by being "more comfortable to shoot," it is even possible that some active shooters might be able to fire their weapons more effectively in a rapid-fire manner.  Hanish appears to address two of Kleck's three criteria: accuracy and rapid-firing capability.  But what about the criterion that Kleck addresses in greater length than the other two?  What about bullet wound damage?

28.    In discussing the ballistics of assault weapons, specifically the AR-15 rifle, Kleck writes:

[38] Kleck Rebuttal Report, para. 60.  It appears that there is a typographical error in Kleck's sentence and that he meant to write "features of AWs."

[39] *Ibid*.

[40] Expert Witness Rebuttal Report of Mark Hanish, *Rupp v. Bonta*, Case No.: 8:17-cv-00746-JLS-JDE (C.D. Cal.), February 3, 2023, para 12; emphasis added.

Def. Exhibit 55
Page 001960

Klarevas provides no evidence that an average round fired from an AW is more likely to inflict a fatal wound than a round fired from other guns (nor am I aware of any such evidence). In fact, the most common ammunition used in so-called "assault rifles" are .223 caliber and .556 [sic.] millimeter rounds—both very narrow bullets that create correspondingly narrow wound cavities in the victim. Consequently, *such rounds are less likely to cause the victim's death* than the ammunition used in civilian-style hunting rifles.[41]

29.    Again, Kleck is not a ballistics expert. And in my Supplemental Report, I established that the use of assault weapons in mass shootings resulted in higher average death tolls when compared to mass shootings that did not involve assault weapons.[42] Moreover, Kleck acknowledges that I "accurately" noted this relationship.[43] However, it is true that I did not devote any attention to the wound patterns and damage caused by assault rifle cartridges, especially ammunition designed for use in AR-15s. I did not perform such an analysis because I am not trained as a forensic pathologist. Nor am I a firearms engineer. And from the nature of Kleck's assertion that .223-caliber and 5.56mm rounds are relatively less lethal, it appears that Kleck is mistaken. On the issue of how AR-15 rounds impact the human body, it is perhaps best to defer to Eugene Stoner, the creator of the AR-15, who, in Congressional testimony, explained the rationale for why he designed his rifles to use lighter ammunition:

There is the advantage that a small or light bullet has over a heavy one when it comes to wound ballistics. . . . What it amounts to is the fact that bullets are stabilized to fly through the air, and not through water, or a body, which is approximately the same density as the water. And they are stable as long as they are in the air. When they hit something, they immediately go unstable. . . . If you are talking about .30-caliber, this might remain stable through a human body. . . . While a little bullet, being it has a low mass, it senses an instability situation faster and reacts much faster. . . . This is what makes *a little bullet pay off so much in wound ballistics.*[44]

---

[41] Kleck Rebuttal Report, para. 60; emphasis added. Kleck wrote ".556 millimeter rounds." This, too, appears to be a typographical error. I believe he meant to write "5.56 millimeter rounds."

[42] Klarevas Supplemental Report, paras. 16-17.

[43] Kleck Rebuttal Report, para. 59.

[44] Quoted in James Fallows, "Why the AR-15 Is So Lethal," *The Atlantic*,

Def. Exhibit 55
Page 001961

30.    The above testimony was delivered by Stoner before a House Armed Services subcommittee reviewing the use of AR-platform rifles by infantry soldiers.[45]  In the years since, such rifles have also become recognized for their use by mass shooters.

## VI.    MASS SHOOTING VIOLENCE INCREASED SUBSTANTIALLY AFTER THE FEDERAL ASSAULT WEAPONS BAN EXPIRED IN 2004

31.    *Kleck Rebuttal Opinion #6:* Prior research that I have published does not provide any serious evidence that bans on large-capacity magazines reduce the incidence of mass shootings.

32.    In one sentence in my Supplemental Report, I noted in passing that, "after the [Federal] Assault Weapons Ban expired in 2004, mass shooting violence increased substantially."[46]  In support of this claim, I provided five sources.[47]  One of those sources was a peer-reviewed article that I co-authored in a high-impact journal in the field of health and medicine.  The article was cited for the limited purpose that it listed high-fatality mass shooting incidents that took place during and after the federal ban, with the number of such incidents occurring with far greater frequency after the ban than during it.  Even though I did not state this explicitly in my Supplemental Report, the article I co-authored found that, during the ten-year time-period of the federal ban, there were 12 high-fatality mass

November 7, 2017, *available at* https://www.theatlantic.com/politics/archive/2017/11/why-the-ar-15-is-so-lethal/545162 (last accessed February 21, 2023); emphasis added.

[45] Stoner's explanation was provided in response to the following comment, made by the Subcommittee Chairperson Rep. Richard Ichord (D-MO): "One Army boy told me that he had shot a Vietcong near the eye with an M-14 [which uses a substantially heavier bullet] and the bullet did not make too large a hole on exit, but he shot a Vietcong under similar circumstances in the same place with an M-16 [which is an automatic version of the AR-15] and his whole head was reduced to pulp.  This would not appear to make sense.  You have greater velocity but the bullet is lighter."  Quoted in *ibid*.

[46] Klarevas Supplemental Report, para. 22.

[47] *Ibid*., note 10.

16

shootings (amounting to an annual average of 1.2 high-fatality mass shootings per year).  In the first 13 calendar years following the expiration of the Federal Assault Weapons Ban (2005-2017), there were 47 such incidents (amounting to an annual average of 3.6 high-fatality mass shootings per year).[48]  In other words, after the ban expired, the average annual number of high-fatality mass shootings in the United States tripled in comparison to the decade that the federal ban was in effect.[49]

33.    Kleck does not dispute this claim.  Instead, Kleck devotes three full pages of his Rebuttal Report to attacking my published study on LCM bans.  Kleck's focus on this particular study is misplaced because California's statutes regulating LCMs are not being challenged in the present case, and they are not a subject of my Supplemental Report.[50]  This section of Kleck's Rebuttal Report does not appear to be relevant to the present case, and, in any event, Kleck does not

[48] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 20, 2023).

[49] Extending the time parameters out through the end of 2022, in order to capture every full calendar year since the Federal Assault Weapons Ban expired in 2004, would document that there have been 72 high-fatality mass shootings in the 18 years since the ban expired, resulting in an annual average of 4.0 incidents per year.  This is yet another indicator that the frequency of high-fatality mass shootings continues to rise.  *See*, Klarevas Supplemental Report, Exhibit B.

[50] Kleck Rebuttal Report, para. 64.  It is worth noting that, in addition to my co-authored study of LCM bans, I cited four additional sources in support of the claim that the frequency of mass shootings increased substantially after the Federal Assault Weapons Ban expired, including a peer-reviewed article co-authored by two scholars—Lori Ann Post and Maryann Mason—that Kleck called "amateurs." Klarevas Supplemental Report, para. 22, note 10.  At no point in his Rebuttal Report did Kleck raise any concerns about these four other sources.  Furthermore, ridiculing scholars who lauded our research—and who have published peer-reviewed-journal research on the effect of the federal assault weapons ban—as "amateurs" is ad hominem criticism that does not address the substance of their findings.

Def. Exhibit 55
Page 001963

dispute that the frequency of mass shootings increased after expiration of the Federal Assault Weapons Ban.

## VII. MASS SHOOTINGS RESULTING IN DOUBLE-DIGIT FATALITIES ARE POST-WORLD WAR II PHENOMENA IN AMERICAN HISTORY

34.    *Kleck Rebuttal Opinion #7:* There does not appear to be any reliable evidence that double-digit mass shootings are limited to the post-World War II era.

35.    In my Supplemental Report, I discussed my review of American newspapers in an effort to identify mass shootings that resulted in 10 or more victims being shot to death.  As a result of my search of the Newspaper Archive, going as far back as 1776, I was unable to identify any double-digit-fatality mass shootings occurring in the United States prior to 1949.  Mass shootings resulting in 10 or more victims being shot to death appear to be a modern, post-World War II phenomena.[51]

36.    In his Rebuttal Report, Kleck criticizes my use of a historical newspaper repository to identify such extreme acts of gun violence.  Specifically, he writes, "The problem with this source is that the number of newspaper stories about mass shooters would increase as newspaper coverage of the nation's events increased, even if the number of mass shootings remained constant."[52]  This comment fails to tell us why Kleck believes, let alone how Kleck confirmed, that newspaper repositories covering a period of history that goes back to at least the founding of the United States would omit reporting on mass shootings.  Because Kleck does not point to any known incident of mass murder that was not included in my survey due to the absence of media coverage, his critique of my reliance on newspaper repositories is unfounded speculation.

---

[51] Klarevas Supplemental Report, paras. 19-23.
[52] Kleck Rebuttal Report, para. 68.

Def. Exhibit 55
Page 001964

37.     Kleck also takes issue with my exclusion of incidents of "large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity."[53]  Kleck opines:

> This limitation conveniently eliminates mass killings of Native Americans by members of the U.S. cavalry (combat violence), employer-initiated violence by state militias against strikers (violence initiated by authorities acting in their official capacity), and white mob violence aimed at African Americans such as the 1863 draft riots in New York City, among other mass killings.  The exclusions thereby create the false impression that there were no mass shootings prior to WWII.[54]

38.     Kleck goes on to state that "[t]he historical reality is that there were many mass shootings in the U.S. long before either AWs or LCMs were available."[55]  If we include combat violence and mob violence, then Kleck is correct that there were indeed "many" mass shootings that occurred in the United States prior to World War II.  For example, in the Battle of Antietem during the American Civil War, it is estimated that 3,650 soldiers were killed in a single day, many of the casualties the result of gunshot wounds.[56]

39.     However, a mass shooting, as conceptualized by scholars and analysts, is a form of intentional criminal assault involving a firearm.[57]  As a criminologist, Kleck knows this.  In fact, one of the authoritative books on the topic, *Mass Murder in the United States: A History*, was written by Grant Duwe, who Kleck helped supervise when Duwe was a graduate student.[58]  Duwe, in his book (which is an adaptation of his dissertation), explains why excluding collective violence is

---

[53] *Ibid.*, para. 69.

[54] *Ibid*.

[55] *Ibid*.

[56] National Park Service, "Antietam: Casualties," *available at* https://www.nps.gov/anti/learn/historyculture/casualties.htm (last accessed February 20, 2023).

[57] *See*, Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

[58] Grant Duwe, *Mass Murder in the United States: A History* (2007), at 2.

Def. Exhibit 55
Page 001965

1    appropriate: "The definition of mass murder used here also does not include riots,

2    lynchings, and other *instances of collective violence*.  I excluded these cases

3    because it is often difficult to disentangle the victims from the offenders."[59]  The

4    exclusion of such acts of violence is standard practice among scholars of multiple-

5    victim criminal violence.

6        40.    Kleck does not cite Duwe's book, which excludes acts of large-scale,

7    inter-group violence.  Nor does he cite the Rebuttal Report of Clayton Cramer,

8    which makes very similar exclusions.[60]  Instead, Kleck relies on a book by Hugh

9    Graham and Ted Gurr, published in 1969, to support his assertion that shootings

10    resulting from combat or mob violence are considered mass shootings.[61]  The

11    Graham and Gurr book is largely focused on political violence (especially civil

12    strife and war).  As such, it is not an authoritative source on the parameters of mass

13    shootings.  In the few instances where the book did discuss mass shootings, it is

14    clear that Graham and Gurr treated mass murder (including mass shootings) as

15    distinct from large-scale, inter-group violence.  Furthermore, Graham and Gurr are

16    of the view that killing sprees lack a foundation in American history.  In particular,

17    after referencing "the chilling mass slaughtering sprees of Charles Whitman in

18    Austin, Texas, and Richard Speck in Chicago," Graham and Gurr remark, "Whether

19    the current spate of public murder is an endemic symptom of a new social malaise

20    is a crucial question that history cannot yet answer, other than to observe that

21    *precedents in our past are minimal*."[62]  As noted in my Supplemental Report, prior

22    to the shooting rampage of Charles Whitman in Austin in 1966, the only known

23    mass shooting resulting in 10 or more casualties occurred in Camden, New Jersey,

24    ───────────────

25        [59] *Ibid*., at 15; emphasis added.

26        [60] Expert Witness Rebuttal Report of Clayton Cramer, *Rupp v. Bonta*, Case No.: 8:17-cv-00746-JLS-JDE (C.D. Cal.), February 3, 2023, at 20-22.

27        [61] Hugh Davis Graham and Ted Robert Gurr, eds., *Violence in America: Historical and Comparative Perspectives* (1969).

28        [62] *Ibid*., at 623; emphasis added.

Def. Exhibit 55
Page 001966

in 1949. Graham and Gurr do not identify any double-digit-fatality mass shootings that occurred prior to the 1949 Camden shooting spree that are consistent with the definitional parameters employed by Duwe or myself. For that matter, neither does Kleck.

### CONCLUSION

In my Supplemental Report, I offered the following five findings:

1. *In terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide.*[63] Kleck has provided no credible evidence that contradicts this factual claim. In fact, with regard to one of the three data sets I reviewed, Kleck acknowledges that the data points confirm that mass shootings are on the rise.

2. *Mass shootings involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons.*[64] Kleck has provided no credible evidence that contradicts this factual claim. In fact, Kleck agrees that I have "accurately" noted this relationship between the use of assault weapons in mass shootings and larger average death tolls.

3. *Mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of large-capacity magazines and assault weapons.*[65] Kleck has provided no credible evidence that contradicts this factual claim.

4. *Assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings.*[66] Kleck has provided no credible evidence that contradicts this factual claim.

5. *Jurisdictions that restrict the possession of assault weapons experience fewer mass shooting incidents and fatalities, per capita, than jurisdictions that do*

---

[63] Klarevas Supplemental Report, para. 12.

[64] *Ibid*.

[65] *Ibid*.

[66] *Ibid*.

21

*not restrict assault weapons.*[67]  Kleck has provided no credible evidence that contradicts this factual claim.

Based on these five findings, I opined that "restrictions on assault weapons have the potential to save lives by reducing the frequency and lethality of mass shootings."[68] I continue to stand by the findings and opinions in my Supplemental Report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2023, at Nassau County, New York.

Louis Klarevas

_____

[67] *Ibid.*
[68] *Ibid.*

22