# EXHIBIT 58

Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
State Bar No. 261579
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*in his official capacity*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | 8:17-cv-00746-JLS-JDE<br><br>**SUPPLEMENTAL SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF RANDOLPH ROTH**<br><br>Courtroom:   8A<br>Judge:        The Honorable Josephine L. Staton<br><br>Action Filed:  April 24, 2017 |

---

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California. Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as the defendant in this case.

1

Def. Exhibit 58
Page 002068

### SUPPLEMENTAL SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF RANDOLPH ROTH

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1. I am a College of Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University. I previously submitted a supplemental expert report and declaration dated January 6, 2023, in the above-captioned case. My professional qualifications are set forth in that Supplemental Expert Report and Declaration.[2]

2. I have been asked by the Office of the Attorney General of California to respond to Clayton Cramer's rebuttal report, dated February 3, 2023. I will respond point by point.

3. This supplemental sur-rebuttal expert report and declaration is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in it.

**A.    On the extent of firearms ownership in the early republic.**

4. Cramer's attempts to establish that firearms ownership was more ubiquitous than the 50 to 60 percent ownership cited in my declaration are not well supported.[3] Cramer does not cite the study that is the gold standard, on which my declaration is based: Alice Hanson Jones' sophisticated and mathematically rigorous clustered random sample of state and county probate records in 1774-

---

[2] Since my Supplemental Expert Report in this matter, I have been retained as an expert witness in the follow cases, in addition to those listed in my Supplemental Expert Report: *Association Of New Jersey Rifle and Pistol Clubs v. Platkin*, No. 3:18-cv-10507 (D.N.J.); *Cheeseman v. Platkin*, No. 7-:22-cv-04360 (D.N.J.); *Ellman v. Platkin*, No. 3:22-cv-04397 (D.N.J.); *Oregon Firearms Federation, et al. v. Brown and Roseblum*, No. 2:22-cv-01815-IM (D.OR.); *National Association for Gun Rights v. Brown*, No 22-cv-00404-DKW-RT (D.HI.); and *National Association for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D.CT.).

[3] Clayton Cramer, Supplemental Rebuttal Report, 1-5; and see Randolph Roth Supp. Report, ¶ 15 & n. 9.

Def. Exhibit 58
Page 002069

1775.[4] Jones stratified her sample to ensure that poorer residents, whose estates were less likely to go through probate, were weighted to reflect their representation in the population. Her data show, as we might anticipate, that firearms ownership was not distributed randomly. Male heads of households were more likely to own firearms than female heads of households, and the wealthy more likely than the poor. Also, firearms ownership was most common among household heads in the Southern colonies, where fears of slave rebellion were most intense, and in New England, where the inhabitants had been in a nearly perpetual state of war from 1689 through 1760 with the French and their native allies over control of northern New England and the Maritimes. Firearms ownership was lowest in the Middle Colonies, where Quakers and German pietists comprised a substantial minority of the population.

Percent who owned guns

| | |
|---|---|
| Males | 52% |
| Females | 18% |
| | |
| Wealthiest fifth | 76% |
| Middle three-fifths | 54% |
| | |
| Poorest fifth | 32% |
| | |
| New England | 50% |
| Middle colonies | 41% |
| Southern colonies | 69% |

---

[4] Alice Hanson Jones, *Wealth of a Nation to Be: The American Colonies on the Eve of the Revolution* (New York: Columbia University Press, 1980); Jones, *American Colonial Wealth: Documents and Methods*, 3 v. (New York: Arno Press, 1977); Jones, "Estimating Wealth of the Living from a Probate Sample," *Journal of Interdisciplinary History* 13 (1982): 273-300; and Randolph Roth, "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* 35 (2007): 166-168.

Def. Exhibit 58
Page 002070

5.      Firearms historian Kevin Sweeney reached similar conclusions as Jones. Sweeney, like Jones, studied statistics at the graduate level and has a keen understanding of the complexity of interpreting sources from the past. He examined 4,777 probated estates from 1633 through 1800 and widened the range of our knowledge of firearms ownership to the entire colonial and Revolutionary period.[5] He discovered, like Jones, that firearms ownership was common, but far from universal as Cramer claims from his limited, unsystematic research. Sweeney found that firearms ownership held fairly steady from the 1630s down to the eve of the Revolution, and he confirmed the regional differences that Jones found. Firearms ownership was highest in the South and lowest in Pennsylvania and New Jersey.

% probated estates
with firearms, 1770-1775

| | |
|---|---|
| New England | 51 |
| New York | 49 |
| Pennsylvania / New Jersey | 38 |
| Chesapeake | 63 |
| South Carolina | 71 |

6.      Sweeney also found differences in firearms ownership by wealth, 1740-1750.

Wealthy

| | |
|---|---|
| £250+ | 67 |

Middling

| | |
|---|---|
| £100-249 | 58 |
| £50-99 | 54 |

---

[5] Kevin Sweeney, "Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 54-71.

4

Def. Exhibit 58
Page 002071

Lower

|       |    |
|-------|----|
| £25-49 | 46 |
| £10-24 | 41 |

Poor

|      |    |
|------|----|
| £0-9 | 26 |

7.      There are uncertainties in our profession's estimates of firearms ownership, as there are in any scholarly endeavor. Scholars have reflected thoughtfully on the reasons why probate records might lead us to understate or overstate the proportion of households that owned a working gun. But our knowledge of firearms ownership in the colonial and revolutionary period is well-informed, critical, and statistically sophisticated, thanks to Jones and Sweeney. That is why our profession believes the figure of 50 to 60 percent of all households is right. That is not gun ubiquity. But it is certainly not "gun scarcity," a phrase that misstates our profession's understanding of gun ownership in early America.

8.      Cramer attempts to question my findings with respect to firearms ownership by falsely associating it with the widely discredited research of Michael Bellesiles on the same issue.[6] My declaration does not rely on Bellesiles' research or even reach the same general conclusions about the incident of firearms ownership. Cramer does not mention my essay in the special issue of the *William and Mary Quarterly* that, together with the essay he cites from that issue by Gloria Main, debunked the false claim by Michael Bellesiles, *Arming America*, that gun ownership was scarce in early America.[7] I was at the forefront in our profession in calling Bellesiles to account because I knew from my work and the work of my

---

[6] Clayton Cramer, Supplemental Rebuttal Report, 1.

[7] Randolph Roth, "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly*, 3rd series, 59 (2002): 223-240.

5

colleagues that gun ownership was *not* scarce in early America, going back to John Hope Franklin's classic *The Militant South*.[8] I discussed the work of Alice Hanson Jones in my *William and Mary Quarterly* essay, which notes every statistic from Jones' study that I included in my original declaration and have included in this supplementary declaration.[9] Gloria Main also discussed Jones' study in the essay that Cramer cites.[10]

## B. On the limitations of muzzle loading firearms as weapons for committing mass murder.

9.      Cramer acknowledges the most important conclusion of my declaration: that a single individual could not kill or wound a large number of persons in a matter of minutes or seconds with a single-shot, muzzle loading firearm.[11] The mass murder that he cites from Madison County, Indiana, in 1824 proves that point: it required seven men equipped with muzzle-loaders to kill three unsuspecting Native men whom they had lured to the scene on false pretenses. In the slaughter that ensued, with firearms and other weapons, the seven men were together able to butcher ten Native women and children.

10.      But Cramer's claim that axes, clubs, and knives can kill or wound are effective tools for committing mass murder is misleading.[12] The Native man who went on a rampage with an axe at a trading post in Wethersfield, Connecticut, in 1686 could kill only two adults and wound another before he was stopped. The two club-wielding robbers in Washington, Connecticut, in 1780, managed to kill only two adults. The other three victims were children. The husband who attacked his

---

[8] John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: The Belknap Press of Harvard University Press, 1956).

[9] Roth, "Guns, Gun Culture, and Homicide," 226-227.

[10] Gloria Main, "Many Things Forgotten: The Use of Probate Records in Arming America," *William and Mary Quarterly*, 3rd series, 59 (2002): 213n3.

[11] Clayton Cramer, Supplemental Rebuttal Report, 4.

[12] Clayton Cramer, Supplemental Rebuttal Report, 4-6.

Def. Exhibit 58
Page 002073

family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife. His other eight victims were his children. And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. His other 7 victims were his children. Cramer's evidence does not show that edged and blunt weapons are effective tools for committing mass murder. It shows instead that infants and children are not capable of defending themselves against attacks by adults.[13] That conclusion is consistent with the extensive literature in contemporary criminology that shows that young children are killed in the overwhelming majority of cases with weapons other than firearms, because adults can kill children so easily with physical force or everyday household objects.[14]

11.    Recent events also demonstrate the ineffectiveness of edged weapons for committing mass murder as compared to firearms. In our own time, terrorists have tried on a number of occasions to commit mass murder in the United States and Europe with an edged weapon, but they have *never* been able to kill a large number of people before they were restrained or killed. Consider, for instance, the terrorist attack at Ohio State University in November 2016, in which a terrorist, a suicidal Somali undergraduate who was failing all of his courses, rammed his car into a crowd of pedestrians and attacked everyone within his reach with a butcher knife.[15] He wounded five people, but he failed to kill anyone, because students and staff fought, fled, and dialed 911. Campus Police Officer Alan Horjuko rushed to the scene, jumped out of his patrol car, and shot the individual dead within a

---

[13] For an excellent and rigorously researched study of familicides in the early republic, and of the use of weapons other than firearms to kill large numbers of children, see Daniel A. Cohen, "Homicidal Compulsion and the Conditions of Freedom: The Social and Psychological Origins of Familicide in America's Early Republic." *Journal of Social History* 28 (1995): 725-764.

[14] See Richard M. Hough and Kimberly D. McCorkle, *American Homicide* (Los Angeles: Sage, 2017), 94-96, and the references cited there.

[15] New York Times, November 28, 2016.
https://www.nytimes.com/2016/11/28/us/active-shooter-ohio-state-university.html

Def. Exhibit 58
Page 002074

minute. Had that terrorist been armed with a semiautomatic firearm with an extended magazine (as has occurred in other terrorist attacks on U.S. soil), many more Buckeyes would have been at risk of being killed or wounded, and Officer Horjuko would have been in mortal danger when he pulled up. But because that individual was armed only with a knife, Officer Horjuko, the lone officer on the scene, had time to get out of his car, pull his weapon, assess the situation, order the attacker to halt, and open fire, reluctantly, from a safe distance when he refused to comply.

12.    We can see the same dynamic in the terrorist attack in Times Square on New Year's Eve, 2022. Another terrorist traveled from Maine to New York City "to kill people and carry out jihad" with a knife, but he failed to kill anyone, and he was subdued almost instantly by the three police officers he wounded.[16] Simply put, incidents in which large numbers of adults are killed with an edged weapon are vanishingly rare.[17]

13.    Cramer accepts my conclusion that homicide was rare in the early national era in settled areas in the North and Mountain South, and he does not rebut my conclusions about the pattern of weapon use in early America, which shows why muzzle-loading firearms were not commonly used in interpersonal homicides. Because they were kept unloaded in most households, and because it took time to load them, impulsive homicides, like family and household homicides, were almost never committed with a firearm—always less than 10 to 15 percent. Impulsive

---

[16] New York Times, January 10, 2023. https://www.nytimes.com/2023/01/10/nyregion/trevor-bickford-federal-terror-charges.html

[17] One example would be the stabbings committed against residents of the James Smith Cree Nation and of Weldon, Saskatchewan, Canada, on September 4, 2022, by two brothers. They killed ten adults and wounded eighteen others at thirteen separate locations, so they never confronted more than a handful of victims at any one time during their attacks. https://en.wikipedia.org/wiki/2022_Saskatchewan_stabbings

Def. Exhibit 58
Page 002075

homicides with muzzle-loading firearms occurred almost exclusively when people were armed for another purpose, such as hunting or militia training. And that is why firearms use in homicides outside the household rose and fell with the homicide rate in the colonial and early national period. When and where the homicide rate was high, people were more likely to anticipate gunfights and go about armed with loaded firearms.[18] When and where the homicide rate was low, few people carried loaded firearms to defend themselves against a potential assault by another person.[19]

14.     Cramer states that New England's homicide rate was low in the early national era because of the region's "religious values."[20] My colleagues and I have discovered, however, that the homicide rate was high in New England in the early and mid-seventeenth century, when Puritans held sway, and disastrous in the 1630s, when the homicide rate was 120 per 100,000 persons per year.[21] And homicide rates soared in slave South in the years after the Revolution, despite the depth of religious belief and commitment among people in the slave South, both black and white.[22]

---

[18] When homicide rates were high, states regulated the weapons used in those crimes. Most impulsive homicides and opportunistic crimes during this period were committed with concealable weapons, like pistols, folding knives, dirks, and Bowie knives, which were regulated at that time.

[19] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

[20] Clayton Cramer, Supplemental Rebuttal Report, 4.

[21] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 37-60.

[22] For example, Donald G. Mathews, *Religion in the Old South* (Chicago: University of Chicago Press, 1977); and Albert J. Raboteau, *Slave Religion: The "Invisible Institution" in the Antebellum South* (New York: Oxford University Press, 1978).

Def. Exhibit 58
Page 002076

15.    Cramer's discussion of early firearms technology does not, I believe, contradict the fact that muzzle-loading weapons had limitations as weapons for committing murder, especially mass murder by a lone individual. I have never claimed that muzzle loading weapons were never kept loaded, especially on the frontier. They could not, however, be kept loaded for an extended period of time, and if they were loaded, they had to be stored in the driest place in the house to prevent corrosion. That is consistent with the findings of my research on homicides: that muzzle-loading firearms were seldom used impulsively in homicides, especially in the household, and regularly used by colonists who, with loaded guns, anticipating conflict or with homicidal intent, killed Native Americans, runaway slaves, or political adversaries.

### C.    California's gun laws.

16.    Cramer's claim that racism has been the fundamental and enduring motivation for California's firearms laws is unsupported. Ownership and open carry of firearms was *never* denied to any resident of California on the basis of race, ethnicity, or citizenship status prior to 1923, and *never* denied to a citizen after the 1923 law was passed. There is no question that some of our nation's firearms regulations, especially from the colonial era through the Civil War, sought to disarm citizens because of their race or ethnicity. It is important, however, to place California's first firearms laws in their proper historical context: the 1853 law which increased the penalty for carrying firearms with hostile intent, the 1855 law which increased the penalty for brandishing a firearm in a threatening manner, and the 1863 law which banned the carrying of concealed weapons altogether. Those laws were not aimed at a particular racial or ethnic group. They represented a step-by-step effort by the legislature to address the state's high rate of violent crime—crimes that were committed overwhelmingly by Californians of European ancestry.

17.    First, the 1849 constitutional convention. California's constitutional convention declined to enact an unrestricted right to the private use, ownership, or

10

possession of firearms, just as Congress did on September 25, 1789, when it adopted what would become the Second Amendment. California's convention did so—as the delegate who spoke about the need to regulate concealed weapons acknowledged—because the delegates believed that private use of firearms had to be regulated at times by statute. The same debate took place at the time the Second Amendment was adopted, as Saul Cornell discovered, with the same result. There were powerful voices in 1789, including Thomas Jefferson, who advocated for an unrestricted private right, but they were outvoted in Congress and in the ratifying legislatures because of concerns not only about the right of free black citizens to use and own firearms, but about mundane matters such as hunting laws. And those laws were soon followed in the early republic by state-level bans on the carrying of concealed weapons. The right to bear arms in military service in a well-regulated militia, organized and governed by the state, was not to be infringed. But private use, ownership, and possession were subject to reasonable statutory limitations if the people and their representatives deemed limitations necessary.[23] California's constitutional convention followed suit, and as Cramer acknowledges, there was no mention during the debate over firearms in California's constitutional convention of race, nor any mention of disarming people of color.

18.    Second, the 1853 law against carrying weapons with intent to assault. California's legislature did not mention race in the law it passed in 1853 to enhance the sentence for any person who carried a firearm, knife, bludgeon, or any other weapon with the intent to assault another person. The penalty was up to three months in prison and a hundred dollar fine.[24]

---

[23] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70.

[24] S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of

Def. Exhibit 58
Page 002078

19.   Third, the 1855 law against brandishing weapons. California's legislature did not mention race in the law it passed in 1855 to enhance the sentence for any person who drew a deadly weapon, including a gun or pistol, "in a rude, angry and threatening manner, not in necessary self-defense," against another person or persons. The penalty was up to six months in prison and a five hundred dollar fine.[25]

_____

Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States (1853), 663-664. https://firearmslaw.duke.edu/laws/s-garfielde-compiled-laws-of-the-state-of-california-containing-all-the-acts-of-the-legislature-of-a-public-and-general-nature-now-in-force-passed-at-the-sessions-of-1850-51-52-53-to-which-are-p/. "Compiled Laws of California, § 127. If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months."

[25] William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; . . . Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. (1861), 334. "Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties."

Def. Exhibit 58
Page 002079

20.    Fourth, the 1863 law against carrying concealed weapons. Cramer quotes a senator from Nevada County, from a debate in 1856, who wanted to disarm Hispanics. But Cramer acknowledges that race and ethnicity were not on the minds of legislators when they banned concealed weapons in 1863, using language similar to the concealed carry laws in other states.[26]

21.    The legislature's desperation to do something about violence, including gun violence, is not surprising, not simply because California's homicide rate was at least 65 per 100,000 adults per year in the nine counties studied to date, but because of the high rate of violence by and among Californians of European ancestry. As the table below shows (based on the research of Eric Monkkonen, Clare McKanna, and Kevin Mullen),[27] the intra-racial homicide rate of European

---

[26] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions* (1868). "An Act to Prohibit the Carrying of Concealed Weapons. § 1. Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time." https://firearmslaw.duke.edu/laws/theodore-henry-hittell-the-general-laws-of-the-state-of-california-from-1850-to-1864-inclusive-being-a-compilation-of-all-acts-of-a-general-nature-now-in-force-with-full-references-to-repealed-ac/

[27] Eric Monkkonen, "Los Angeles Homicides, 1830-2001 [computer file]" (Los Angeles: University of California at Angele, 2005); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); and Kevin J. Mullen, *Dangerous Strangers: Minority Newcomers and Criminal Violence in the Urban West, 1850-2000* (New

---

13

Americans—37 per 100,000 adults per year—was lower only than the intra-racial homicide rate of Hispanic Americans—72 per 100,000. And when it came to interracial homicides, people of color came nowhere close to killing European Americans at the rates at which European Americans killed people of color: 13 per 100,000 per year versus 0 for Asian Americans, 30 versus 0 for African Americans, 24 versus 1 for Native Americans, and 27 versus 5 for Hispanic Americans. And European Americans were least likely, along with African Americans, to be murdered by an unknown assailant.[28]

Intra-racial and Interracial Homicide Rates among Unrelated Adults in California, 1849-1865 per 100,000 persons ages 16 and older per year

| | Assailants | | | | | | |
|---|---|---|---|---|---|---|---|
| | Asian | B | H | NA | W | Unknown Race | % Interracial |
| Victims | | | | | | | |
| Asian | 26 | 0 | 7 | 2 | 13 | 12 | .56 |
| Black | 0 | 31 | 8 | 4 | 30 | 8 | .61 |
| Hispanic | 1 | 1 | 72 | 7 | 54 | 27 | .55 |
| Native American | 0 | 0 | 17 | 25 | 8 | 24 | .66 |
| Non-Hispanic White | 0 | 0 | 5 | 1 | 37 | 8 | .28 |

22.     It should be noted that guns were used in at least half of California homicides.[29] The weight of evidence, including the quotations from contemporary

York: Palgrave Macmillan, 2005). Their data are available at https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states. *See also* John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016), whose data are available on the same site; and Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 183-184.

[28] Randolph Roth, *American Homicide Supplemental Volume: American Homicides*, Table 33, available at https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-American-Homicides-5-2010.pdf

[29] Randolph Roth, *American Homicide Supplemental Volume: Weapons*,

14

1    newspapers that Cramer cites in his essay on the subject[30] and that I included in my

2    Supplemental Expert Report, suggests that the California legislature was concerned

3    with all gun violence, not just gun violence by people of color.

4        23.    And finally, the laws of 1917 and 1923. The state of the art in our

5    profession for studying conceal carry laws and licensing laws is to examine not

6    only their language, which had to be race neutral after the passage of the Fourteenth

7    Amendment, but how they were enforced, in the way that Brennan Rivas does in

8    her model studies of firearms laws in the South after the Civil War. Rivas has

9    shown, surprisingly, that conceal carry laws were enforced in the South against

10   both blacks and whites, even after white supremacists regained control at the end of

11   Reconstruction.[31] We must remember that in many rural counties in California in

12   the early twentieth century, wealthy and middle-class Hispanics retained

13   considerable political power and influence within their communities, which might

14   have blunted the effort to deny Hispanics wholesale the licenses they needed to

15   carry concealed weapons. And that was all the more true in the mid-nineteenth

16   century in rural counties in southern California and throughout the Southwest,

17   where Hispanic residents often formed the majority and Hispanic elites fought

18

19   _____

     Tables W58 to W64, available at https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-
20   Weapons-10-2009.pdf

21       [30] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's
     Concealed Weapon Permit Law," Social Science Research Network, posted August
     12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).
22
         [31] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating
23   Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation:
     Texas Christian University, 2019), available at
24   https://repository.tcu.edu/handle/116099117/26778; Rivas, Enforcement of Public
     Carry Restrictions: Texas as a Case Study," UC Davis Law Review 55 (2021):
25   2603-2624; and Rivas, "The Problem with Assumptions: Reassessing the Historical
     Gun Policies of Arkansas and Tennessee," Second Thoughts, Duke Center for
26   Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-
     with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-
27   tennessee/

28

Def. Exhibit 58
Page 002082

1  bravely to stave off efforts to dispossess them of their land, homes, and rights. The

2  battle for local control was intense, but it is hard to believe that the conceal carry

3  law of 1863 was enforced in a discriminatory way when and where Hispanics and

4  their Anglo allies controlled the courts and the sheriff's office.[32]

5      24.    There is abundant evidence that the vast majority of the firearms laws,

6  from the Founding Era to the present, were enacted to stem real increases in

7  violence in our society, and were enforced, although with a degree of bias, against

8  whites as well as people of color.

9      **D.    Mass murder.**

10     25.    Cramer's claim that a mass murder is an assault over twenty-four

11  hours in multiple locations in which at least two persons are killed (and in which at

12  least one more person is killed or wounded) is misleading. In my Supplemental

13  Expert Report, I followed the definition of the Violence Project[33] (which follows

14  the FBI definition of at least four persons killed besides the offender), because my

15  purpose was to focus on the types of homicides at issue in this case—the homicides

16  which have led concerned voters and political leaders in California and in other

17  states, counties, and municipalities to ban extended ammunition magazines and

18  certain classes of semiautomatic rifles. These are shootings that take place in public

19  _____

20  [32] See, for example, the new book by my Ph.D. student and fellow California

21  native Michael Alarid, who is an Associate Professor of History at the University of
   Nevada-Las Vegas. Michael J. Alarid, *Hispano Bastion: New Mexican Power in the
   Age of Manifest Destiny, 1837-1860* (Albuquerque: University of New Mexico

22  Press, 2022). See also Faragher, *Eternity Street*; and Roth, *American Homicide*,
   365-368.

23  [33] The Violence Project defines a mass shooting as "a multiple homicide

24  incident in which four or more victims are murdered with firearms—not including
   the offender(s)—within one event, and at least some of the murders occurred in a

25  public location or locations in close geographical proximity (e.g., a workplace,
   school, restaurant, or other public settings), and the murders are not attributable to

26  any other underlying criminal activity or commonplace circumstance (armed
   robbery, criminal competition, insurance fraud, argument, or romantic triangle)."

27  https://www.theviolenceproject.org/mass-shooter-database/, accessed October 4,

28  2022.

Def. Exhibit 58
Page 002083

1    settings, in which one or two individuals can kill or wound dozens of people in a

2    matter of minutes or seconds: the slaughter of school children and teachers in

3    Newtown and Uvalde, of worshippers in Buffalo or Charleston, and of shoppers in

4    El Paso, not to mention the massacres that have occurred in Sacramento, San

5    Bernardino, and elsewhere in California. Americans want to feel safe in public, in

6    school, and at work. That is why my declaration focuses on mass homicides of

7    public concern.

8         26.    The public is also horrified today when they learn of mass violence in

9    the past. That is why our national reckoning in 2021 with the Tulsa Massacre was

10   so difficult for so many Americans, as was our reckoning with the Draft Riots of

11   1863, in which draft resisters and Confederate sympathizers killed, maimed, or

12   terrorized African Americans, orphans, Union soldiers, and supporters of the Union

13   cause for several days. That is why my Supplemental Expert Report focused on

14   those kinds of mass murders in the past.

15        27.    When we turn from the Secret Service's definition of mass murder to

16   the Violence Project's definition, the destructive power of certain modern firearms

17   technologies is clear. Yes, a hit-and-run killer, like the one who killed three

18   students and critically injured five others at Michigan State, can empty a ten-round

19   clip in classroom building, run away to the Student Union, empty another ten-round

20   clip, and run away again.[34] The law at issue in this case could not stop him. But the

21   law in this case can limit the ability of a lone gunman or pair of gunmen to obtain

22   easily AR-platform rifles used to kill or wound far more people in minutes or

23   seconds at a holiday parade, an outdoor concert, or a packed night club. An angry

24   loner could not commit mass murder on that scale with the technologies of the

25

26

27        [34] New York Times, February 14, 2023.
     https://www.nytimes.com/2023/02/14/us/michigan-state-university-
28   shooting.html?searchResultPosition=8

Def. Exhibit 58
Page 002084

seventeenth, eighteenth, or nineteenth century. That loner would need accomplices, and lots of them.

28.    It is up to the voters and public officials to decide whether to pass such laws and the courts to determine their constitutionality. Such laws address a real danger and will deter such crimes, if not prevent them altogether. Cramer's list of attacks in which three or more people were killed or wounded over a space of twenty-four hours proves that our nation has a homicide problem, but it does not address the threat that certain kinds of modern firearms technologies pose in the hands of an angry, embittered individual who declares war on our society.

**E.    Motivation.**

29.    Cramer's unsystematic research on multiple murders is also misleading when it comes to understanding the motives and mental states of today's mass murderers. He neglects the work of every scholar and journalist who has written thoughtfully about the problem after engaging in systematic research, most notably James Alan Fox and Jack Levin, the preeminent authorities in the field.[35] The motives Cramer cites, such as greed or jealousy, are not particular to mass killers; they are common human emotions. Likewise, the mental states he describes, such as intoxication, depression, or schizophrenia, are experienced by millions of Americans every day. What sets mass murderers apart? Why are they, as lone individuals or as partners with another lone individual, ready to declare war against their classmates, coworkers, or society? And why is it so hard to prevent them from killing?

---

[35] James Alan Fox and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder* (Thousand Oaks: Sage, 2012); and Jack Levin and James Alan Fox, *Mass Murder: America's Growing Menace* (New York: Plenum Press, 1985). For an outstanding investigation by a journalist into the complexities of a particular mass murder, see Dave Cullen, *Columbine* (New York: Twelve, 2009).

Def. Exhibit 58
Page 002085

30.     Consider, for example, the superb scholarship of Kathleen Newman, who studied school shooters in *Rampage*.[36] The fundamental problem, according to Newman, is the way that students who contemplate mass murder perceive themselves as *marginal*, even if they have not been bullied or abused by their classmates. They feel *socially isolated*: a feeling that can be all the more intense, according to Newman, in close knit rural or suburban communities, where it can be difficult for people to find peers who share their feelings or interests. Newman grants that psychosocial problems can "magnify" the students' feelings of marginality and isolation. But what moves school shooters to action are *cultural scripts* that are readily available in the media, especially social media. The scripts offer alienated individuals a way to "solve" their problems and assert their masculinity through mass violence. And once they embrace those scripts, the pressure to act grows more and more intense, especially if they share their plans with a confidante or on social media. Incentives to act also increase, according to Newman, because mass violence offers isolated young males a way to send a message, assert their masculinity, gain fame, and attack the adult power structure and adolescent social hierarchy that they feel has betrayed them.

31.     Newman offers an excellent list of warning signs that students and teachers should look for. But none of the students who Newman studied were on the verge of expulsion, imprisonment, or compulsory commitment to a mental institution. They could not have been taken out of school or forced into treatment. And what distinguished them was not their feelings, but the *extremity* of their feelings—feelings that nearly every adolescent feels at one time or another. That is why most would-be school shooters, like most adult mass killers, fly under the radar. They are hard to distinguish from their peers. However, Newman does cite

---

[36] Katherine S. Newman, *Rampage: The Social Roots of School Shootings* (New York: Perseus, 2004), especially 229-270.

Def. Exhibit 58
Page 002086

1    one more important precursor of mass murders in schools that does distinguish

2    some young men: access to a firearm.

3    **F.    Mental health.**

4    32.    Cramer's claim that mental illness is the fundamental cause of mass

5    murder and that access to mental health services will solve the problem is also

6    misleading. First, people who are mentally ill are no more likely to commit violent

7    assaults than people who are not mentally ill. There are, as Janet Colaizzi has

8    found, specific kinds of mental illness that can predispose a person to violence: for

9    example, acute schizophrenia, if it leads to hallucinations, hearing voices, and

10   paranoia.[37] It appears that the mass murderers in Aurora, Colorado, and in Tucson,

11   Arizona, suffered from such an illness.[38] But the vast majority of Americans who

12   suffer from schizophrenia are under treatment; and it is impossible in a free society

13   to force people with potentially dangerous forms of schizophrenia to take their

14   medications or to commit them to mental institutions against their will, if they have

15   yet to commit serious acts of violence. Our criminal justice system can intervene

16   only when it is too late.

17   33.    Second, criminologists have explored as a matter of urgency the

18   relationship between violence and mental illness. But they have done so not by

19   looking at mental illness in isolation, as Cramer does, but in the context of other

20   factors that may lead to violence, to determine if mental illness is truly an important

21   factor. For example, in the research that my colleagues and I conducted recently on

22   the relationship at the county level between homicide and the opioid epidemic for

23   European Americans, 1999–2015, we looked at suicide as a proxy for severe

---

25   [37] Janet S. Colaizzi, *Homicidal Insanity, 1800-1985* (Tuscaloosa: University
26   of Alabama Press, 2002); and Colaizzi, "Predicting Dangerousness: Psychiatric
     Ideas in the United States, 1800-1983" (Ph.D. dissertation: Ohio State University,
27   1983).
     [38] See https://en.wikipedia.org/wiki/2012_Aurora,_Colorado_shooting and
28   https://en.wikipedia.org/wiki/2011_Tucson_shooting.

Def. Exhibit 58
Page 002087

depression. We found that homicides were strongly correlated with suicides with firearms (r = .64), because such suicides are highly correlated with firearms ownership, as measured by the Cook Index of Firearms Ownership, a well-validated measure that looks at the percentage of suicides committed with a firearm (r = .79). Having a firearm in the home elevates the risk of suicide dramatically, because suicide attempts with firearms are far more lethal than suicide attempts by other means, except for falls from heights. But when we looked at the relationship between homicides and suicides without firearms—a measure of severe depression that is not confounded by the level of firearms ownership—the bivariate relationship was insignificant (r = .03). When we looked at all of the variables in our database together, it was firearms ownership, not suicides, that elevated the risk of homicide.[39]

34.     We discovered, however, following the work of Case and Deaton on "deaths of despair,"[40] that emotions such as anger, worry, pain, stress, and sadness, as self-reported in the national Gallup-Healthways survey, were a significant contextual factor in elevating European American homicide rates at the county level. And as we know from studies of individuals who commit mass murders, such as Newman's study of school shooters, what they have most in common is not severe mental illness, but feelings, such as anger, hatred, and bitterness: sometimes toward coworkers or classmates; sometimes toward people of particular ethnicities, faiths, genders, or political persuasions; and sometimes toward people who simply appear to enjoy the love, happiness, success, respect, and sense of community that mass murderers feel they have been unjustly deprived of.[41]

---

[39] Richard Rosenfeld, Randolph Roth, and Joel Wallman, "The Opioid Epidemic and Homicide in the United States, *Journal of Research in Crime and Delinquency* 58 (2021): 1-46.

[40] Anne Case and Angus Deaton, *Deaths of Despair and the Future of Capitalism* (Princeton: Princeton University Press, 2020).

[41] For an excellent summation by criminologists of the ways in which

Def. Exhibit 58
Page 002088

### G.    Technology.

35.    It is impossible in our free society to ensure that everyone feels loved, respected, and successful, especially because so many people in our society whom we might consider successful do not feel that way, because their ambitions are unrealistic. It is also impossible to prevent people from resenting others who are successful and from blaming others for their personal failures. And it is impossible to require that people learn from failures so they can do better in the future, or come to grips with personal losses or setbacks, which is hard even for those of us who would never harm another person.

36.    That is why many citizens, criminologists, and policymakers seek to limit access to technologies that give angry, alienated individuals the power to kill on a massive scale—planes, fertilizer, explosives, and even trucks (rental companies are now asked by state and local law enforcement agencies to keep track of suspicious rental patterns that may indicate that a person is intent on doing harm).[42] Accidental deaths have declined dramatically in the United States since 1950, but the primary cause has not been changes in personal behavior. It has been bans on unsafe products, such as dangerous toys or cars not equipped with air bags and seat belts.[43]

---

despair, personal setbacks, depression, and grievances work together to drive a person to mass murder, see Jillian Peterson and James Densley, "We Profiled the 'Signs of Crisis' in 50 Years of Mass Shooting. This is What We Found," *New York Times*, January 26, 2023. https://www.nytimes.com/interactive/2023/01/26/opinion/us-mass-shootings-despair.html

[42] See, for example, "NYPD Warned Truck Rental Companies of 'Suspicious Indicators,'" Yahoo News, November 1, 2017, https://www.yahoo.com/news/nypd-visited-truck-rental-companies-234200765.html; and "Potential Indicators of Suspicious Activities Related to Rental Trucks," Florida Safe, Florida Department of Law Enforcement, http://www.fdle.state.fl.us/s4/Home/Documents/Tripwire-Related-to-Rental-Trucks.aspx.

[43] See, for example, John C. Burnham, "Why Did the Infants and Toddlers Die? Shifts in Americans' Ideas of Responsibility for Accidents—From Blaming Mom to Engineering," *Journal of Social History* 29 (1995): 817-837; Burnham,

Def. Exhibit 58
Page 002089

37.    Voters and public officials who support bans on extended magazines and on certain classes of semiautomatic rifles have never sought to disarm Americans. They have sought to keep unsafe products—in this case, products designed for the sole purpose of killing and wounding the maximum number of people possible in the shortest amount of time—off the market. These types of safety measures are appropriate in addressing premeditated crimes, like mass shootings and terrorist attacks, by reducing the accessibility and ease of acquiring those dangerous products.[44]

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2023 at Columbus, Ohio.

*Randolph Roth*

Randolph Roth

---

*Accident Prone: A History of Technology, Psychology, and Misfits of the Machine Age* (Chicago: University of Chicago Press, 2009); and Patricia G. Schnitzer, M. Denise Dowd, Robin L. Kruse, and Barbara A. Morrongiello, "Supervision and Risk of Unintentional Injury in Young Children," *Injury Prevention* 21 (2015): e63-e70.

[44] As discussed in my Supplemental Expert Report, restrictions on the carrying of certain concealable weapons, such as dirks and Bowie knives, sought to address their use in opportunistic crimes that were occurring at alarming rates during the early national period. Restricting the carrying of dangerous products and weapons used in premeditated crimes today would not be effective in protecting the public from those crimes.

23

Def. Exhibit 58
Page 002090