**EXHIBIT 59**

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  State Bar No. 261579
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7  Telephone:  (415) 510-3479
   Fax:  (415) 703-1234
8  E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity* [1]

10          IN THE UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                  WESTERN DIVISION

13

14

15  **STEVEN RUPP; STEVEN**            8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**                 **SUPPLEMENTAL EXPERT**
    **CHRISTOPHER SEIFERT;**           **REPORT AND DECLARATION**
17  **ALFONSO VALENCIA; TROY**         **OF ROBERT SPITZER**
    **WILLIS; and CALIFORNIA RIFLE**
18  **& PISTOL ASSOCIATION,**
    **INCORPORATED,**
19
                          Plaintiffs,  Courtroom:    8A
20                                     Judge:    The Honorable Josephine
                                                 L. Staton
21          **v.**

22  **ROB BONTA, in his official capacity**   Action Filed:  April 24, 2017
    **as Attorney General of the State of**
23  **California; and DOES 1-10,**

24                          Defendants.

25

26  ───────────────────

27      [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
    Attorney General of the State of California. Pursuant to Federal Rule of Civil
28  Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
    the defendant in this case.

                              1

**SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF
ROBERT SPITZER**

I, Robert Spitzer, declare under penalty of perjury that the following is true and correct:

1.     I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report on the history of firearms restrictions enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices, and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.  This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

**PROFESSIONAL QUALIFICATIONS**

2.     I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for thirty years.  I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached as **Exhibit A** to this Report.

3.     I have been studying and writing about gun policy for over thirty years.  My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across*

Def. Exhibit 59
Page 002093

1  *America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford

2  University Press, 2023), both deal extensively with the study of historical gun laws.

3  I am frequently interviewed and quoted in the national and international media on

4  gun-related matters.  For over twenty years, I have been a member of the National

5  Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun

6  Violence).

7        4.    I have provided written testimony as an expert witness in *Worman v.*

8  *Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of

9  Massachusetts' restrictions on assault weapons, in *Miller v. Bonta*, No. 3:19-cv-

10  01537-BEN-JLB, which concerns the constitutionality of California's restrictions

11  on assault weapons, in *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB, which

12  concerns the constitutionality of California's restrictions on large-capacity

13  magazines, and in *Fouts v. Bonta*, No. 3:19-cv-01662-BEN-JLB, which concerns

14  the constitutionality of California's restrictions on billy clubs.  I have co-authored

15  amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals,

16  Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. Al.,* U.S.

17  Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court,

18  561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh

19  Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois

20  Supreme Court, No. 08 CR 12069 (2012).

21        5.    I have also presented written testimony to the U.S. Congress on "The

22  Second Amendment: A Source of Individual Rights?" submitted to the Judiciary

23  Committee, Subcommittee on the Constitution, Federalism, and Property Rights,

24  U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand

25  Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee

26  on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington,

27  D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun

28  Silencers," submitted to Committee on Natural Resources, Subcommittee on

Def. Exhibit 59
Page 002094

Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

6.    I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

**OPINIONS**

**I.    INTRODUCTION**

7.    The current controversy surrounding legislative efforts to restrict semi-automatic assault weapons and large capacity magazines would seem to be a purely contemporary matter, responding to the modern phenomenon of mass shootings. The effort to restrict such weapons was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others.  Later that year, California enacted the first assault weapons ban in the country.  Five years later, Congress enacted a limited ten year ban.[2]  As of this writing, eight states plus the District of Columbia have similar bans in place.[3]  These jurisdictions represent approximately 89 million people, or approximately 26.8% of the U.S. population.[4]

---

[2] Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25-26, 205-11.

[3] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14-15.  The nine American jurisdictions with assault weapons bans are:  California, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, and New York.  Notably, the U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware recently enacted its assault weapons and large-capacity magazine restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[4] See U.S. Census, National Population Totals and Components of Change:

Twelve states plus the District of Columbia restrict large capacity magazines (LCMs).[5] These jurisdictions represent more than 103 million individuals, or approximately 31.2% of the U.S. population.[6] And in 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions.[7]

8.     These recent efforts to restrict assault weapons and LCMs are simply the latest chapter in a centuries-long effort to protect the public from harm and to dampen weapons-related criminality. The pattern of criminal violence and concerns for public safety leading to weapons restrictions is not new; in fact, it can be traced back to the Nation's beginnings. While the particular weapons technologies and public safety threats have changed over time, governmental responses to the dangers posed by certain weapons have remained constant. Current restrictions on assault weapons and detachable ammunition magazines are

---

2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates). The total population in these jurisdictions is estimated to be 88,976,315 out of a U.S. total of 331,501,080.

[5] Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30. The thirteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, New York, Rhode Island, Vermont, and Washington. With two exceptions, all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law, and Hawaii's restrictions apply to only handguns.

[6] U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates). The total population in these jurisdictions is estimated to be 103,503,256 out of a U.S. total of 331,501,080.

[7] H.R. 1808, 117th Cong. (2022).

historically grounded.  They are part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries.

## II.    REGULATORY HISTORY OF FULLY AUTOMATIC AND SEMI-AUTOMATIC FIREARMS (EARLY TWENTIETH CENTURY)

9.    A clear example of this historical pattern is provided by early twentieth-century restrictions related to fully automatic firearms.  While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[8] it and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatlin gun's size and weight.  Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.  The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I, and to devastating effect, where tripod-mounted machine guns on the battlefield, like the Maxim, which initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[9]

---

[8] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and the Spanish-American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[9] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

6

Def. Exhibit 59
Page 002097

10.     Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the Tommy gun.  Though it was developed for use in World War I, it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[10]  The Tommy gun was initially unregulated after World War I and made available for civilian purchase, typically with either a 20-30 round stick magazine or a 100-round drum magazine.  (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[11])  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[12] though sales in the early 1920s were sluggish.  By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[13]  Before the early 1920s, these weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society.  When they did begin to circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s.  Another automatic weapon developed for World War I

[10] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[11] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149-52.

[12] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[13] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 203.

Def. Exhibit 59
Page 002098

was the Browning Automatic Rifle (BAR).  It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up to 650 rounds per minute.  The BAR first appeared on the battlefield in 1918.[14]  It, too, made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[15]  Like contemporary assault weapons and their use in mass shootings, guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[16]

A.    **State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century**

11.    In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws; eight of these laws were passed in 1927 alone (see Exhibits B and D).  These state (and eventually federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national

---

[14] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?"  *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[15] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[16] Chris McNab, *Firearms and American Law Enforcement Deadly Force* (NY: Osprey Publishing, 2009), 97-98.

8

organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law."[17]  (Today, the organization is known as the Uniform Law Commission.)  In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms."  In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[18]  In 1930, it issued a model firearms act focusing on "guns of the pistol type."  In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type."  The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun-the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[19]

12.    Congress enacted a machine gun ban for the District of Columbia in 1932 which included as a machine gun "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[20]  The National Rifle Association endorsed DC's ban, stating "it is our desire [that] this legislation be

---

[17] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

[18] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928).

[19] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[20] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45 ; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

9

enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[21]  In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the association I represent is absolutely favorable to reasonable legislation.  We are responsible for the uniform firearms act. . . . in the District of Columbia.  It is on the books now."[22]

13.    In 1934, Congress enacted the National Firearms Act, which imposed a series of strict (and effective[23]) requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun.  The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities.  Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[24]  The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun could go through a 100-round drum magazine in four seconds.  Later versions fired 600 to 700 rounds per minute."[25]

---

[21] S. Rep. No. 72-575, at 5-6 (1932).

[22] "Hearings Before the Committee on Ways and Means," 36.

[23] Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed. (NY: Oxford University Press, 2020), 13; Spitzer, *The Politics of Gun Control*, 195-96. According to the ATF's national registry of machine guns, 726,951 are registered with the government as of 2020.  Such weapons are rarely used in crimes.  Firearms Commerce in the United States Annual Statistical Update 2020, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15, https://www.atf.gov/file/149886/download.

[24] 48 Stat. 1236.

[25] Moss, "From Gangland to the Battlefield."

Def. Exhibit 59
Page 002101

14.     In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[26]

As one member of the committee observed, "The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as [John] Dillinger and others."[27]

15.     To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms, as it defined restricted machine guns this way: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[28] The final version of the bill limited restrictions to fully automatic firearms. Contemporary assault weapons that fire semi-automatically, like AR-platform rifles, are excluded from the National Firearms Act.

---

[26] "Hearings Before the Committee on Ways and Means," 4.  The version of the bill that appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

[27] "Hearings Before the Committee on Ways and Means," 42.

[28] Ibid., 52.

11

Def. Exhibit 59
Page 002102

16.    In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period, at least seven states plus the District of Columbia, and as many as eleven states, enacted laws restricting semi-automatic weapons (see Exhibit B).[29]  The reason for restricting semi-automatic firearms is not hard to discern.  With the exception of the District of Columbia's restrictions on semi-automatic weapons, these restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[30]

17.    As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time.  By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Again, the lesson is the same: once these technologies began to spread in civil society, regulatory efforts proliferated.

---

[29] See also Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68-71. The language of the restrictions in Illinois, Louisiana, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[30] Spitzer, *The Gun Dilemma*, 32-33.  In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns."  While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

Def. Exhibit 59
Page 002103

### B.    State Regulation of Ammunition Feeding Devices

18.    Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired.  As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

19.    Magazine firing limits were imposed in three categories of state laws (see Table 1 below):  eleven states plus the District of Columbia regulating semi-automatic and fully automatic weapons (California, District of Columbia, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[31]); eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices

---

[31] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.  Two of these states enacted early laws focused on such weapons' use in hunting.  New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading."  1920 N.J. Laws 67, ch. 31, Section 9.  North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917.  1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

Def. Exhibit 59
Page 002104

(Illinois, Louisiana, Minnesota, New Jersey, North Dakota, Oregon, Pennsylvania, Texas, South Carolina, Vermont, and Wisconsin[32]); and four states restricted all guns that could receive any type of ammo feeding mechanism or round feeding device and fire them continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington State)[33].

/ / /

/ / /

---

[32] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[33] 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; 1933 Wash. Sess. Laws 335.

Def. Exhibit 59
Page 002105

1

## TABLE 1

2

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[34]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

19    See Exhibit D for statutory text.

20          20.    A 1927 California law, for example, prohibited the possession

21      of any "machine gun," where that term was defined to include:

22      all firearms known as machine rifles, machine guns or submachine
        guns capable of discharging automatically and continuously loaded

23      ammunition of any caliber *in which the ammunition is fed to such*

24

25          [34] Including the District of Columbia.  Note that California, Minnesota, and
New Jersey appear twice in this table.  The dataset from which this information is

26    drawn ended in 1934, so it does not include any states that might have enacted
similar restrictions after 1934.  See Duke Law Center for Firearms Law,

27    "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

28

Def. Exhibit 59
Page 002106

1
2

> *gun from or by means of clips, disks, drums, belts or other*
> *separable mechanical device.*[35]

3  The other three states in this category (Hawaii, Missouri, Washington[36]) utilized

4  this same description.  In all, at least twenty-three states enacted twenty-six gun

5  restrictions based on the regulation of ammunition magazines or similar feeding

6  devices, and/or round capacity (see Table 1).  The original version of the legislation

7  that became the National Firearms Act of 1934, as noted earlier, included this

8  definition of machine gun that encompassed both semi-automatic and fully

9  automatic firearms: "The term 'machine gun' means any weapon designed to shoot

10 automatically or semiautomatically 12 or more shots without reloading."[37]  (This

11 text was derived from the law enacted by Congress for the District of Columbia in

12 1932, which also stipulated a 12 round limit, as noted previously.[38]  The final

13 version of the 1934 bill was limited to fully automatic firearms only and did not

14 include any limitation by number of rounds fired.)  Regulations concerning

15 removable magazines and magazine capacity were in fact common as early as the

16 1920s—the period of time when these weapons and devices began to make their

17 way into civilian life and also contributed to violence and criminality—as these

18 regulations were adopted by nearly half of all states, representing approximately

19 58% of the American population at that time.[39]

20
21           [35] 1927 Cal. Stat. 938 (emphasis added).

22           [36] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws
335.

23           [37] "National Firearms Act," Hearings Before the Committee on Ways and
24 Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and
25 16, 1934 (Washington, D.C.: GPO, 1934), 52.

           [38] Ibid., 45.
26
27           [39] U.S. Census, Historical Population Change Data (1910-1920) (using 1920
census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-
28 text.html.

Def. Exhibit 59
Page 002107

1
2
3

**C.    Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices in the Early Twentieth Century**

4    21.    The lesson from this sequence of events early in the twentieth century

5    demonstrates that changes in gun policy followed a series of steps that respond to

6    developments in firearms technologies and their use in crime, each dependent on

7    the previous step.  *First*, a new gun or gun technology is invented.  *Second*, it may

8    then be patented, though the patenting of a design or idea by no means assures that

9    it will proceed beyond this point.  *Third*, it may then be developed with a focus on

10    military applications and supplying military needs, not directly for civilian

11    acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or

12    be adapted to, civilian markets and use.  *Finally*, if such weapons then circulate

13    sufficiently in society to pose a safety, violence, or criminological problem or

14    threat, calls for government regulation or restriction then may lead to gun

15    policy/law changes.  New gun laws are not enacted when firearm technologies are

16    invented or conceived.  They are enacted when those technologies circulate

17    sufficiently in society to spill over into criminal or other harmful use, presenting

18    public safety concerns that governments attempt to address through their police and

19    policy-making powers.

20    22.    This lesson is significant because some argue that the absence of

21    government gun regulations in history—at the time of the invention of various

22    weapons or weapons developments—means that regulations now are unjustifiable,

23    or have no historical basis.  For example, David Kopel argues that "[m]agazines of

24    more than ten rounds are older than the United States."[40]  Drawing on examples like

25    a firearm "created around 1580" capable of firing sixteen "'superposed' loads"

26    ―――――――――――――

27    [40] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 851.

28

Def. Exhibit 59
Page 002108

(with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[41] Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[42]  Therefore, by Kopel's reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[43]  More to the point, Kopel's claim that ammunition magazines holding "more than ten rounds" were "very commonly possessed in the United States since 1862" and were "owned by many millions of law-abiding Americans" dating back to the "mid-nineteenth century"[44] is simply false, as this Declaration demonstrates.

23.    Kopel's and similar arguments[45] fail for two sets of reasons.  First, as explained in the following section, this sort of narrative misrepresents the availability and capabilities of these early weapons.  Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy.  As one gun history expert

---

[41]Ibid., 852-54.

[42] Ibid., 849.

[43] Ibid., 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[44] Ibid., 871. Kopel insists "that [10-round] magazines" have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half" (871-72). This claim is both false and unverified by his article.

[45] Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB (S.D. Cal.), filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

18

1    noted, "the guns of 1830 were essentially what they had been in 1430: single metal

2    tubes or barrels stuffed with combustible powder and projectiles" where "after

3    every shot, the shooter had to carry out a minimum of three steps: pour powder into

4    the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on

5    its way."[46]  The firearms and firearm feeding devices regulated in the early

6    twentieth century represented a dramatically different type of firearm, capable of

7    reliable, rapid fire utilizing interchangeable ammunition feeding devices.

8           **D.      The History of Pre-Twentieth Century Firearms Technologies**

9           24.    As researchers and experts of gun history have noted, experimental

10   multi-shot guns existed in the eighteenth century (with multi-shot experimental

11   designs dating back as much as two centuries earlier).  Kopel's example of a

12   firearm from the late 1500s that could fire up to sixteen rounds is drawn from a

13   book titled, *Firearms Curiosa*.  But this book's very title indicates why this

14   narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is

15   something that is rare or unusual.  As the book's author, James Winant says, his

16   book is about "oddity guns" and "peculiar guns."[47]  That is, they were anything but

17   common, ordinary, or found in general circulation.  Winant's description of the

18   sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine

19   Roman candle charges, a second pull will release the wheel on the rear lock and set

20   off six more such charges, and finally a third pull will fire the one remaining

21   shot."[48]  A "Roman candle charge" was defined by Winant as one where "the

22   operator had no control of the interval between shots; he could not stop the firing

23

24

25          [46] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed
America* (NY: Scribner, 2021), 3-4.

26          [47] James Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

27          [48] Ibid., 168.

28

Def. Exhibit 59
Page 002110

once he had started it."[49]  In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited.  Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[50]

25.    An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the early twentieth century or modern era).  The patent drawing of this weapon shows it sitting on a tripod on the ground.[51]  It was not a held-held weapon.  In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[52]  It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun.  It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated machine guns."  Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service.  A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[53] although there are claims to the contrary.  A contemporaneous poet, commenting on 'Puckle's Machine Company', wrote 'Fear

---

[49] Ibid., 166.

[50] Ibid., 166.

[51] Ibid., 220.

[52] Ibid., 219.

[53] Ellis, *The Social History of the Machine Gun,* 13.

Def. Exhibit 59
Page 002111

not, my friends, this terrible machine. They're only wounded who have shares therein.'"[54] This weapon "never advanced beyond the prototype stage."[55]

26.    In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense. As this account confirms, it was likely never even manufactured beyond perhaps a prototype. It was a failed effort, even though later gun inventors learned from its failure.

27.    Kopel also cites the example of the Jennings multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading.[56] Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[57] Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[58]

28.    Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed for crack shots in the Austrian army that was capable of

---

[54] Winant, *Firearms Curiosa*, 219-21. See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[55] Rasenberger, *Revolver*, 3.

[56] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[57] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

[58] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

Def. Exhibit 59
Page 002112

1  firing up to 20 rounds.  One of these was taken along on the Lewis and Clark

2  expedition of 1804-1806.[59]  But these guns were a rarity, as they were extremely

3  expensive, fragile, and complex, and few were made—no more than about 1,500.[60]

4  In fact, the rifles never caught on as they proved to be impractical on the battlefield,

5  and even more so for civilian use.  To wit: "Leather gaskets needed to be constantly

6  maintained and swelled with water to sustain pressure.  Once empty the reservoirs

7  required a significant effort and 1500 strokes to restore full power.  A supply wagon

8  was subsequently outfitted with a mounted pump to readily supply soldiers but this

9  negated one of the key features—mobility.  The rudimentary fabrication methods of

10  the day engineered weak threading on the reservoir neck and this was the ultimate

11  downfall of the weapon.  The reservoirs were delicate in the field and if the riveted

12  brazed welds parted the weapon was rendered into an awkward club as a last

13  resort."[61]  It was pulled from military service by 1815.[62]

14

15

16

17  [59] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.  The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered.  Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed.  See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

18

19

20

21

22

23  [60] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

24

25  [61] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

26

27  [62] Markowitz, "The Girandoni Air Rifle."

28

Def. Exhibit 59
Page 002113

29.    To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[63]  The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations.  But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[64]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[65] dubbed "radical defects" by Winchester himself.[66]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[67]

30.    Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[68]  Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[69]  The true semi-automatic weapon did not become

---

[63] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, No. 3:19-cv-1537-BEN-JLB, 6 (Plaintiffs' Trial Exhibit 2).

[64] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

[65] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[66] Quoted in Haag, *The Gunning of America,* 56.

[67] Haag, *The Gunning of America*, 60.

[68] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial Exhibit 2).

[69] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*,

Def. Exhibit 59
Page 002114

feasible and available until the beginning of the twentieth century, and the primary market was the military.[70]

31.    The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver.  The reason: pepperboxes were "heavy, lumpy, and impractical."[71]  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[72]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[73]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[74] although it took decades for this and similar revolvers to catch on.

32.    Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun

---

May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[70] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

[71] Rasenberger, *Revolver*, 54.

[72] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[73] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154.  By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison."  Winant, *Pepperbox Firearms,* 32.

[74] Rasenberger, *Revolver*, 401.

Def. Exhibit 59
Page 002115

repeaters appeared late in the Civil War.[75]  Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[76]

33.    As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s.  Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[77]  Even then, Colt could not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public.  The government, in fact, dismissed such firearms as mere "novelties."[78]  After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[79]  The government also rejected the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s.  The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[80]  And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the

---

[75] Kopel, "The history of magazines holding 11 or more rounds"; Kennett and Anderson, *The Gun in America*, 112-13.

[76] Snow and Drew, *From Lexington to Desert Storm*, 90.  As Civil War historian James M. McPherson noted, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."  *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

[77] Rasenberger, *Revolver*, 3-5, 401.

[78] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

[79] Rasenberger, *Revolver*, 136.

[80] Ibid., 390.

Def. Exhibit 59
Page 002139

Civil War] remained a single shot pistol."[81]  It took the Colt's use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar firearms into society.[82]

34.     While inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the way for Winchester's dominance.[83]  The Winchester rifle could fire up to fifteen rounds without reloading.  Yet the widely known Winchester 1873, "was designed for sale to the Government as a military arm."[84]  A gun whose legendary status wildly outdistanced its actual production and impact, it was nevertheless an important firearm in the late nineteenth century, although this "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its celebrity biography backdated its diffusion and even its popularity."[85]  In fact, the slogan stating that the Winchester "won the West" was invented by a Winchester executive as a marketing ploy in 1919.[86]  Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action rifle that required the shooter to manipulate a lever in a forward-and-back motion before each shot.  And when the gun was emptied, it had to be manually reloaded, one round at a time.[87]  The Winchester Model 1905, then called a "self-loading" rifle, was a true semi-

---

[81] Kennett and Anderson, *The Gun in America*, 91.

[82] Haag, *The Gunning of America,* 34-37, 46-64.  As Haag said, "the Civil War saved" the gun industrialists (65).

[83] Haag, *The Gunning of America*, 96.

[84] Koller, *The Fireside Book of Guns*, 112.

[85] Haag, *The Gunning of America,* 179.

[86] Ibid., 353.

[87] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

26

automatic firearm.  It could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000 of the guns were made.  Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute.[88]

35.    With all this, the Winchester was by no means universally embraced by long gun users.  Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[89]  According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[90]

36.    The rise in the circulation of multi-shot handguns in society was accompanied by the rapid spread of concealed carry restrictions (see Exhibits B-E), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[91]  By the end of the nineteenth century, virtually

---

[88] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[89] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[90] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.

[91] Dickinson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012).

27

every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[92]  It was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern.

37.    As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments.  As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

38.    First, a new gun or gun technology must be invented.  Second, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination.  As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[93]  And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[94]  Third, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications.  Military weaponry is developed without consideration of potential civilian use and the

---

[92] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[93] Winant, *Firearms Curiosa*, 36.

[94] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

Def. Exhibit 59
Page 002119

consequences of dissemination in the civilian market.[95]  Fourth, some military-designed weapons may then spill over into, or be adapted to, civilian markets and use.  Fifth, if such weapons then circulate sufficiently to pose a public safety or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons*.[96]

39.    Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation.  It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission because no such regulation was enacted around the time of Benjamin Franklin's experiments with electricity in the mid-eighteenth century.  The fact that inventors worked on new firearm designs and modifications tells us nothing about the consequences of such designs for society and public policy.  And the existence of such designs does not equal general availability, much less societal circulation and use of these weapons.  Other weapons subject to government restriction in our history further illustrate these principles.

---

[95] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular, the Bowie knife and various clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War.  Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[96] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4-7.

Def. Exhibit 59
Page 002120

## III. HISTORICAL HARDWARE RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS IN THE EIGHTEENTH AND NINETEENTH CENTURIES

40.    Similar to government regulation of certain types of firearms and ammunition feeding devices in the early twentieth century, which occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal use, government regulation of other weapons typically followed a version of this trajectory around the time of the ratification of the Fourteenth Amendment in the 1860s and even earlier.

### A.    Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives

41. The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[97]  Bowie died at the Alamo in 1836.

42. The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms—with or without guards, with differently shaped blades," they eventually became more standardized as "a large

---

[97] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77).  David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827."  David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, Nov. 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/.  Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional."

Def. Exhibit 59
Page 002121

knife with a cross guard and a blade with a clipped point."[98]  The distinctive traits of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which includes pictures of nearly one hundred such knives made between 1835 and 1890.[99]  The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo), and the knife's distinctive features, encouraged its proliferation,[100] referred to by one historian as "the craze for the knives."[101]  As was true of other knives with long, thin blades,[102] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[103]  Indeed, such knives were known as "fighting knives"[104] that were "intended for combat."[105]  In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[106]  In 1834, for example, a grand jury in Jasper County, Georgia deplored

43. The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact

---

[98] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/.

[99] Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[100] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[101] Davis, *Three Roads to the Alamo*, 583.

[102] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[103] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

[104] Roth, *American Homicide*, 218.

[105] Flayderman, *The Bowie Knife*, 59.

[106] Roth, *American Homicide*, 218.

Def. Exhibit 59
Page 002122

1    being so armed they frequently insult others with impunity, or if resistance is made

2    the pistol dirk or club is immediately resorted to, hence we so often hear of the

3    stabbing shooting & murdering so many of our citizens.[107]

4

5        44. Homicide rates increased in the South in the early nineteenth century, as

6    did laws restricting concealed weapons carrying.  Dueling also persisted during this

7    time, even as the practice was widely deplored by religious and other groups, in

8    newspapers, by anti-dueling societies and political leaders.[108]  Bowie knife writer

9    Norm Flayderman provides abundant and prolific evidence of the early criminal use

10   of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper

11   and other accounts, and providing references to literally hundreds of additional

12   articles and accounts attesting to the widespread use of Bowie knives in fights,

13   duels, brawls and other criminal activities.[109]  Flayderman concludes that, as early

14   as 1836, "most of the American public was well aware of the Bowie knife."[110]

15   (Very much like contemporary assault weapons,[111] the Bowie knife's notorious

16   reputation also, if perversely, fanned its sale and acquisition.[112])  All this

17   contributed to widespread enactment of laws prohibiting dueling in the states.[113]  In

18

19

20   ───────────────

     [107] Quoted in Roth, *American Homicide*, 218–19.

21   [108] Baugh, *Rendezvous at the Alamo*, 51.

     [109] Flayderman, *The Bowie Knife*, 25–64; 495–502.

22   [110] Ibid., 43.

23   [111] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David
     Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,*
24   March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-
     fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American*
25   *Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

26   [112] Flayderman, *The Bowie Knife*, 46.

     [113] A search for the word "duel" in the Duke Center for Firearms Law
27   database of old gun laws yields 35 results.  See
     https://firearmslaw.duke.edu/repository/search-the-repository/.

28

Def. Exhibit 59
Page 002123

1    1839, Congress passed a measure barring dueling in the District of Columbia.[114]

2    Both pistols and knives were prominently used in such affairs.[115]

3        45. In the 1840 case of *Aymette v. State,* the Supreme Court of Tennessee

4    upheld the conviction of William Aymette for wearing a Bowie knife concealed

5    under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if

6    any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or

7    weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas

8    toothpick, under his clothes, or keep the same concealed about his person such

9    person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be

10   fined in a sum not less than two hundred dollars, and shall be imprisoned in the

11   county jail not less than three months and not more than six months."[116]  In its

12   decision, the court concluded that the prohibition against wearing the named

13   weapons was well justified in that they "are usually employed in private broils, and

14   which are efficient only in the hands of the robber and the assassin."[117]  The court

15   continued, "The Legislature, therefore, have a right to prohibit the wearing or

16   keeping weapons dangerous to the peace and safety of the citizens. . . ."[118]  Further,

17   the court added that the state law existed "to preserve the public peace, and protect

18   our citizens from the terror which a wanton and unusual exhibition of arms might

19   produce, or their lives from being endangered by desperadoes with concealed

20   arms. . . ."[119]

21

22

23   [114] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

24   [115] Roth, *American Homicide*, 180–83, 210–17.

25   [116] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).  This case was cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

26   [117] Ibid., 156.

27   [118] Ibid., 157.

28   [119] Ibid.

Def. Exhibit 59
Page 002124

46. Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge.  In the case of *Haynes v. Tennessee* (1844),[120] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade.  (At the trial, witnesses disagreed as to the proper name for the knife in question.)  He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[121]  On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[122]  The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[123] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[124] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?"  Their answer: "the judge and jury who try the case."[125]  As the author of a book on Bowie knives

---

[120] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).
[121] *Haynes v. Tennessee*, 122.
[122] *Haynes v. Tennessee*, 122.
[123] *Haynes v. Tennessee*, 123.
[124] *Haynes v. Tennessee*, 122.
[125] *Haynes v. Tennessee*, 123.

Def. Exhibit 59
Page 002125

1  noted, "the fact that the term 'bowie knife' had never been precisely defined did not

2  help his [Haynes's] case."[126]

3        47. David Kopel argues that, in addition to *Aymette*, two other state court

4  cases are relevant to the legal status of Bowie knives,[127] *Nunn v. State* (1846)[128] and

5  *Cockrum v. State* (1859) (oddly, he does not include the *Haynes* case in his list).[129]

6  *Nunn*, however, involved a man who was prosecuted for carrying a pistol

7  (apparently openly, not concealed), not a knife.  A vagary in the state law

8  criminalized concealed carry of various named weapons, including pistols and

9  Bowie knives, whereas a different provision allowed for open carrying of named

10  weapons, including Bowie knives, but failed to include pistols on that list.  Noting

11  the "great vagueness" in the statute's wording, the court reversed the man's

12  conviction and affirmed the constitutionality of open carry "for the important end to

13  be attained: the rearing up and qualifying a well-regulated militia, so vitally

14  necessary to the security of a free State."  The court also upheld the

15  constitutionality of the concealed carry restrictions.  It did not single out or offer

16  any specific comment on Bowie knives, beyond noting in passing that the Georgia

17  law in question was enacted "to guard and protect the citizens of the State against

18  the unwarrantable and too prevalent use of *deadly weapons*"[130] which obviously

19  included Bowie knives.

20

21

22  _____

[126] Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 43.

23  [127] Kopel does mention *Haynes* briefly.  Kopel, "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20,

24  2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/; Kopel, "Bowie knife statutes 1837-1899," *The*

25  *Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/.

26  [128] *Nunn v. State*, 1 Ga. 243 (1846), https://cite.case.law/ga/1/243/.

27  [129] *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm.

28  [130] *Nunn v. State*, 246. Italics in original.

48. The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[131]  Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such. . . ."[132] The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions.[133]  It described Bowie knives as "an exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use."[134]

49. All three cases underscore the courts' recognition of the dangerous nature of Bowie knives not only by their characterizations of them, but by the fact that they are permissibly treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.

50. The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[135]  In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[136]

---

[131] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

[132] *Cockrum v. State,* 394.

[133] *Cockrum v. State*, 404. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibits C and E. Kopel, "Bowie knife statutes 1837-1899."

[134] *Cockrum v. State*, 403–04.

[135] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[136] A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law. See Exhibit E.

Def. Exhibit 59
Page 002127

From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives: a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibits C and E) totaling 49 states plus the District of Columbia.[137]  Several states banned the possession of Bowie knives outright, and others imposed taxes on the ability for individuals to acquire or possess them (see Exhibit H).  The desirability and utility of concealed-carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

51. States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit H).

52.    The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century and the American states, no less than the national government. State governments did not

---

[137] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibits C and E.

Def. Exhibit 59
Page 002128

yet possess the powers, tools, or resources to enact, much less implement, any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today relay for law enforcement, the police, barely existed (in the way we think of it today) in the early nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came in to being in a handful of large cities before the Civil War.[138] Second, the chief remedy enacted by the states to address the problem of knife fighting was far more feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that anti-carry laws bundled them together.

### B.    Historical Restrictions on Clubs and Other Blunt Weapons

53.    A very similar and analogous set of hardware restrictions was enacted regarding clubs and other blunt weapons.  See Exhibits C and E.  Nearly all were anti-carry laws, which also generally included pistols and knives.  As the table in Exhibit C shows, at least six distinct types of clubs and blunt objects were regulated in the United States.  Notably, every single state in the nation (except for New Hampshire) had laws restricting one or more types of clubs.

54.    Among the six types of clubs regulated under state laws in the United States, at least 15 states barred bludgeon carrying.  A bludgeon is a short stick with

---

[138] Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020,  https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

a thickened or weighted end used as a weapon.[139]  The earliest state anti-bludgeon

law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in

the early 1900s (as with each of these chronological categories, the state law total

exceeds the total number of states because some states enacted the same or similar

laws in multiple centuries).

55.    A billy (sometimes spelled billie) club is a heavy, hand-held rigid

club,[140] usually made of wood, plastic, or metal,[141] that is traditionally carried by

police, often called a nightstick or baton.[142]  As noted similarly in this Court's prior

ruling in this case, "[a]lthough the word 'baton' is not included in the statutory

language, it has long been held that the statute encompasses a variety of

bludgeoning instruments."[143]  Escobar cites an early reference to the billy club in an

1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police

armed with batons,"[144] a synonym for a billy club.  As this reference suggests,

police have long adopted the billy club, or similar striking implements, as part of

their on-duty weaponry.  At least 17 states had anti-billy club laws, totaling 46

laws; the earliest law appears to have been enacted in Kansas in 1862,[145] followed

---

[139] Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/bludgeon.

[140] Some versions were made to have some flexibility to increase their striking power.  *See* Escobar, *Saps, Blackjacks and Slungshots* at 118-19.

[141] Merriam Webster, *available at* https://www.merriam-webster.com/dictionary/billy%20club.  Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. Escobar, *Saps, Blackjacks and Slungshots* at 118.  One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." "Local Intelligence," *Delaware Republican*, June 15, 1857, *available at* https://bit.ly/3V9nVO7.

[142] Escobar, *Saps, Blackjacks and Slungshots* at 2, 69-70, 105, 113-30.

[143] *Fouts v. Bonta,* 561 F.Supp.3d 941, 944 (2021).

[144] Escobar, *Saps, Blackjacks and Slungshots* at 105.

[145] C. B. Pierce, "Charter and Ordinances of the City of Leavenworth, with an Appendix" at 45, image 45 (1863) available at *The Making of Modern Law:*

39

1   by a New York law in 1866.[146]  Fourteen states enacted such laws in the 1800s; 12

2   states did so in the early 1900s.

3       56.    At least 14 states barred the carrying of "clubs" more generically,

4   without specifying the type.  The oldest anti-club law was enacted in 1664; seven

5   states enacted these laws in the 1600s-1700s, six states in the 1800s, and two in the

6   early 1900s.

7       57.    Anti-slingshot laws were enacted by 43 states, with 71 laws enacted in

8   the 1800s and 12 in the 1900s.  A slungshot (or slung shot), also referred to as "a

9   type of blackjack,"[147] is a hand-held weapon for striking that has a piece of metal or

10  stone at one end attached to a flexible strap or handle that was developed roughly in

11  the 1840s (the first "known use" of slungshot was 1842[148]).  By one account,

12  "[s]lungshots were widely used by criminals and street gang members in the 19th

13  Century.  They had the advantage of being easy to make, silent, and very effective,

14  particularly against an unsuspecting opponent.  This gave them a dubious

15  reputation, similar to that carried by switchblade knives in the 1950s, and they were

16  outlawed in many jurisdictions.  The use as a criminal weapon continued at least up

17  until the early 1920s."[149]  Robert Escobar concurs that slungshots and blackjacks

18  "were a regular part of criminal weaponry. . . and gangsters could be merciless in

19  their use."[150]

20

21  _____

22  *Primary Sources*, 1862.

23      [146] Montgomery Hunt Throop, "The Revised Statutes of the State of New York" at 2512 (Vol. 3, 1882); N.Y. L. 1866, ch. 716.

24      [147] Escobar, *Saps, Blackjacks and Slungshots* at 228.

25      [148] Merriam Webster, *available at* https://www.merriam-webster.com/dictionary/slungshot.  Escobar agrees with this rough date.  See *Saps, Blackjacks and Slungshots* at 67.

26      [149] "Slungshot," *available at* https://military-history.fandom.com/wiki/Slungshot.

27      [150] Escobar, *Saps, Blackjacks and Slungshots* at 86.

28

40

58.    In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot.  In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[151]

59.    These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements.  These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

60.    Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[152] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was 1866, with 10 states enacted such laws—7 in the 1800s and 7 in the early 1900s.  Only 4 states did not have any

---

[151] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon. Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon.  Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, *available at* https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[152] Ferris Law: Dangerous Weapons in Nevada, *available at* https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/.  *See also* Escobar, *Saps, Blackjacks and Slungshots* at 20-22.  Escobar dates the earliest reference to sandbags as weapons to the 1600s (*id.*, at 22).

Def. Exhibit 59
Page 002132

prohibitions in any of these six categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons. One state, New Hampshire, may not have enacted such a law during this time but did at some point.[153]

61.    California has its own record of restricting or prohibiting clubs and similar blunt objects, including billy clubs, used in fights and attacks. As early as 1849, the law incorporating the city of San Francisco said that: "[I]f any person shall have upon him any pistol, gun, knife, dirk, *bludgeon*, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months."[154] An 1853 California state law criminalized the carrying of a bludgeon (among other named weapons) "with intent to assault any person. . . ."[155] An 1864 law criminalized the carrying or wearing of a "slungshot, or other dangerous or deadly weapon concealed. . . ."[156] A similar law was enacted

_____

[153] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons. Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state." In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives. *Compare* N.H. Rev. Stat. § 159:16, *with* 2010 New Hampshire Laws Ch. 67 (H.B. 1665).

[154] 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 (italics added).

[155] S. Garfielde, *Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53* at 663-64 (Benicia, CA: S. Garfielde 1853).

[156] Theodore Henry Hittell, "The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon" at 261, image 272 (1868) available at *The Making of Modern Law: Primary Sources*, 1864, § 1.

Def. Exhibit 59
Page 002133

for the city of Los Angeles in 1878,[157] and for the city of Fresno in 1896.[158]  A 1917 state law penalized anyone who "attempts to use, or who with intent to use the same unlawfully against another, carries or possesses . . . any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, [or] sandbag. . . ."[159] A 1923 law said that "every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles"[160] shall have committed a felony.

## C.    Historical Restrictions on Pistol Carrying

62.    Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great fear and quarrels."[161]  Massachusetts followed in 1750.  In the late 1700s, North Carolina and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun carrying spread, 43 states joined the list; 3 more did so in the early 1900s (see Exhibit B).  The eighteenth century laws generally restricted more general carrying of firearms, usually if done in crowded places, or in groups of armed people.  The laws of the nineteenth century forward generally restricted concealed weapons carrying.  Among the earliest laws criminalizing the carrying of concealed weapons

---

[157] William. M. Caswell, "Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles" at 85, image 83 (1878) available at *The Making of Modern Law: Primary Sources*, 1878.

[158] L. W. Moultrie, "Charter and Ordinances of the City of Fresno" at 30, image 28 (1896) available at *The Making of Modern Law: Primary Sources*; Ordinances of the City of Fresno, § 8.

[159] 1917 Cal. Sess. Laws 221-225.

[160] 1923 Cal. Stat. 695.

[161] The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881).

43

was that of Louisiana in 1813.  Concealed carry laws normally targeted pistols as well as the types of knives and various types of clubs discussed here (see Exhibit E for text of most such laws).

### D.    Historical Restrictions on Trap Guns

63.    Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner need not be present.  Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire when tripped.[162]  This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[163]

64.    Also sometimes referred to as "infernal machines,"[164] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders.  Unlike the other weapons restrictions examined here, opinion was more divided on

---

[162] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[163] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

[164] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

Def. Exhibit 59
Page 002135

the relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[165] though the weight of opinion seemed mostly against such devices.[166] Those who set gun traps typically did so to defend their places of business, properties, or possessions. This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino." After the verdict the man continued to be held under $2,000 bail.[167]

65.    Inevitably, however, the traps sometimes wound up hurting or killing innocents, even including the person who set the trap. For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[168]

66.    In all, at least 16 states had anti-trap gun laws (see Exhibits B and F). The earliest such law encountered was the 1771 New Jersey law (above). Nine

---

[165] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window. A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

[166] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted. As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[167] . "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF. See Exhibit G.

[168] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk. See Exhibit G.

Def. Exhibit 59
Page 002136

1    laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that
2    enacted multiple laws across the centuries).

3                                    **CONCLUSION**

4          67.    What does the law say, and what should the law be, regarding the
5    regulation of firearms and other harmful or dangerous weapons and accessories, in
6    the light of the Supreme Court's ruling in the *Bruen* decision?  Given the
7    importance of history, especially, though not limited to, the founding era and the
8    Reconstruction era, the lesson is abundantly clear.  Firearms and other dangerous
9    weapons were subject to remarkably strict, consistent, and wide-ranging regulation
10   throughout our history when they entered society, proliferated, and resulted in
11   violence, harm, or contributed to criminality.  This historical record from the 1600s
12   through the early twentieth century, as seen in the examples examined here, is even
13   more remarkable given that the United States was an evolving and developing
14   nation-state that could not claim to have reached maturity until the twentieth
15   century.  The historical record summarized here makes clear that contemporary
16   restrictions among the states pertaining to assault weapons and large capacity
17   ammunition magazines are merely the latest iteration of a centuries-long tradition of
18   weapons regulations and restrictions.  Gun ownership is as old as the country.  But
19   so are gun and other dangerous weapons laws, which have adapted to changes in
20   threats to public safety.

21

22         I declare under penalty of perjury that the foregoing is true and correct.
23   Executed on January 6, 2023 at Cortland, New York.

24

25                                    _____
26                                          Robert Spitzer
27

28

                                           46

Def. Exhibit 59
Page 002137

# EXHIBIT A

September 2022

## Curriculum Vitae

## Robert J. Spitzer

## Distinguished Service Professor, Emeritus
## SUNY Cortland

Address:    5333 Center St.
            Alexandria, VA  23188
            (607) 423-1781
            Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
            https://sites.google.com/site/robertspitzercortland/


Education:   A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
             M.A. Cornell University, 1978.
             Ph.D. Cornell University, 1980.


Positions Held:

        Department Chair, SUNY Cortland, 2008-2020.
        Interim Department Chair, SUNY Cortland, 2004-2005.
        Distinguished Service Professor, SUNY Cortland, 1997.
        Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
             1990, 1992-2017.
        Professor, SUNY Cortland, 1989 to 1997.
        Continuing Appointment, SUNY Cortland, 1986.
        Associate Professor, SUNY Cortland, 1984 to 1989.
        Department Chair, SUNY Cortland, 1983 to 1989.
        Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
             1986, 1988.
        Copy Editor, Administrative Science Quarterly, 1982 to 1983.
        Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
        Assistant Professor, SUNY Cortland, 1979 to 1984.
        Instructor, Cornell University, 1979.
        Instructor, Eisenhower College, 1978-1979.
        Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
        Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

1

<u>Honors</u>:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

<u>Who's Who in the World</u>, 1996.

<u>Dictionary of International Biography</u>, 1995.

<u>Who's Who in the East</u>, 1995-96; 1997-98

<u>Ex officio</u> member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

<u>Men of Achievement</u> (1986)

<u>Contemporary Authors</u>, vol. 112 (1985) and subsequent updates.

<u>International Authors and Writers Who's Who</u>, 1985-present.

<u>International Who's Who in Education</u>, Winter 1985-86.

Herbert H. Lehman Graduate Fellowship, 1975-79.

<u>Who's Who Among Students in American Universities and Colleges</u>, 1974-75.

Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

2

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

4

<u>Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning</u> (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

<u>We the People: Essentials Edition</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

<u>Gun Control: A Documentary and Reference Guide</u> (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

<u>The Gun Debate: An Encyclopedia of Gun Rights and Gun Control</u>, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

<u>Guns across America: Reconciling Gun Rules and Rights</u> (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

<u>The Gun Dilemma: How History Is Against Expanded Gun Rights</u> (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, <u>Series on American Constitutionalism</u>, SUNY Press, 1996-present. Books include:
 Daniel Hoffman, <u>Our Elusive Constitution,</u> (1997)
 Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment,</u> (1999)
 Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture,</u> (1999)
 Robert Spitzer, ed., <u>Politics and Constitutionalism,</u> (2000)
 Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
 Ian Brodie, <u>Friends of the Court</u> (2002)
 Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)
 Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

5

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).

Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).

Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).

Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).

Clyde H. Ray, John Marshall's Constitutionalism (2019).

Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).

6

Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)


Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.


<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.: SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO: Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA: University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.: Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York: Garland Pub., 1991): American Labor Party, Benjamin Bubar,

7

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY: Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York: Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

9

Def. Exhibit 59
Page 002147

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul

10

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New

11

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian

Def. Exhibit 59
Page 002150

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," <u>New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society</u>, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," <u>The Conversation on Gun Control</u> (Baltimore: Johns Hopkins University Press, 2023, forthcoming).


<u>Articles</u>:

"Jamestown:  Anatomy of an All-American City," <u>Sunday Buffalo Courier Express Magazine</u>, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, <u>The Journal of Politics</u>, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," <u>Presidential Studies Quarterly</u>, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," <u>Presidential Studies Quarterly</u>, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," <u>National Civic Review</u>, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," <u>Party Line</u>, 17 (September 1984).

"Shooting Down Gun Myths," <u>America</u>, June 8, 1985, pp. 468-69.  Reprinted in: the <u>Des Moines Register</u>, October 24, 1985; <u>Criminal Justice</u>, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); <u>U.S. News and World Report</u> educational study unit on Gun Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985):

13

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

14

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

15

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," <u>The Regulatory Review</u>, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," <u>Law and Contemporary Problems</u> 83, 3(2020): 231-55.

"Federalism Run Amok: The Second Amendment Sanctuary Movement," *Publius,* forthcoming.


<u>Op-Ed Articles</u>

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," <u>Des Moines Register</u>, October 24, 1985.

"Gun Control and Pressure Politics," <u>Syracuse Post-Standard</u>, November 30, 1985.

"Pocket Vetoes and Abuse of Power," <u>Rochester Times Union</u>, January 7, 1987.

"But for One Vote, a Different Nation," <u>Rochester Times Union</u>, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

17

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18, 2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>, June 18, 2004.

"Clearing the Air," <u>Syracuse Post-Standard</u>, August 4, 2004.

"Why Gun Ban Died Quietly," <u>San Jose Mercury News</u>, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," <u>Christian Science Monitor</u>, August 18, 2005. Also

18

published in the <u>Deseret News</u>, <u>Sacramento Bee</u>, the <u>Fresno Bee</u>, the <u>Modesto Bee</u>, the <u>Ithaca Journal</u>, the <u>Johnstown Breeze</u>, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," <u>Syracuse Post-Standard</u>, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" <u>Syracuse Post-Standard</u>, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," <u>Los Angeles Times</u>, January 8, 2008. Reprinted in the <u>St. Louis Post-Dispatch</u>, <u>St. Paul Pioneer Press</u>, <u>Wilmington Star News</u> (NC), <u>News and Observer</u> (NC), <u>The Morning Call</u> (Pa.), <u>Contra Costa Times</u> (CA), the <u>Sun News</u> (FL), <u>The Vindicator</u>, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, <u>Cleveland Plain Dealer</u>, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," <u>Cortland Standard</u>, May 27, 2009.

"A Better Way to Run Our Elections," <u>Syracuse Post Standard</u>, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

19

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post
(www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post
(www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post
(www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com),
posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5,
2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January
16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington
Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

20

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

21

Def. Exhibit 59
Page 002159

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,*

22

January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

23

Def. Exhibit 59
Page 002161

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,*

24

August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

25

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

26

Def. Exhibit 59
Page 002164

Testimony, Briefs, and Reports:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the

27

department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u>, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

28

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

Papers and Presentations (not including those given on the Cortland campus):

29

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free

Def. Exhibit 59
Page 002168

Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit,

31

the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

32

Def. Exhibit 59
Page 002170

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes: The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

33

Def. Exhibit 59
Page 002171

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

34

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

35

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

36

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

Def. Exhibit 59
Page 002175

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?"
Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins
County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action,
Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference
on "The Second Amendment: Its Meaning and Implications in Modern America,"
Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15,
2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and
Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke
University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller
Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol
Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University
Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association,
Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5,
2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

Def. Exhibit 59
Page 002176

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science

39

Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

40

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

41

Def. Exhibit 59
Page 002179

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.


Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative

42

Def. Exhibit 59
Page 002180

Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers: Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions: Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective,

43

Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by
Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese,
for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review,
August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring
2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies
Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins,
Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson,
Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H.
Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G.
Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein,
Perspectives, Spring 2004.

45

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The

Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the

47

Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National
Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain,
France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on
WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events
conducted by five academics from area colleges.


Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group),
    APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.


Teaching Areas:

American Government:  courses taught include Introduction to American Government,
    The Legislative Process, Political Parties and Social Movements, The American
    Presidency, Media and Politics, Gun Control Politics and Policy, State and Local
    Government, Abortion Politics, Elections and American Politics, Media and War,
    internships in Washington, D.C., Albany, and Cortland County, Seminars on the
    Decline of Parties and Third Parties, American Institutions, Current Develop-
    ments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Introduction to Public Policy, Gun Policy.
    Areas of interest include policy theory, policy formation and decisionmaking, and
    policy implementation.


Teaching-Related Awards:

Three-time recipient of the SUNY Cortland Student Government Association
Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for
"Outstanding Service to Students."  (The only faculty member ever to win this award
more than once.)

48

Def. Exhibit 59
Page 002186

Other Professional Activities

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

49

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, <u>American Political Science Review</u>, <u>PS</u>, <u>Comparative Politics</u>, <u>American Journal of Political Science</u>, <u>Policy Studies Journal</u>, <u>Policy Studies Review</u>, <u>Political Science Quarterly</u>, the <u>Journal of Politics</u>, <u>Western Political Quarterly</u>, <u>Polity</u>, <u>Social Science Quarterly</u>, <u>Political Behavior</u>, <u>American Politics Quarterly</u>, <u>Political Communication</u>, <u>Legislative Studies Quarterly</u>, <u>Government and Policy</u>, <u>Congress and the Presidency</u>, <u>Social Science Journal</u>, <u>Journal of Policy History</u>, <u>Political Research Quarterly</u>, <u>Presidential Studies Quarterly</u>, <u>Politics and Policy</u>, and the National Science Foundation.


<u>Selected Community Service</u>

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010 Project, 1996.

Def. Exhibit 59
Page 002188

# EXHIBIT B

Def. Exhibit 59
Page 002189

EXHIBIT B

FIREARM HARDWARE RESTRICTIONS TABLE
(YEARS OF ENACTMENT)[1]

| STATE[2] | TRAP GUNS[3] | CONCEALED CARRY[4] | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | | | |
| Alaska | | 1896 | | | |
| Arizona | | 1889 | | | |
| Arkansas | | 1820,1837 | | | |
| California | | 1850, 1864 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | |
| Connecticut | | 1890, 1923 | | | |
| Delaware | | 1852 | 1931 | | |
| District of Columbia | | 1857, 1871 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1913[5], 1933 | | |
| Georgia | | 1837 | | | |
| Hawaii | | 1913 | 1933 | | 1933 |
| Idaho | | 1909 | | | |

---

[1] Further research may yield additional laws regulating firearm hardware.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

[3] Sometimes trap guns were also referred to as "infernal machines."

[4] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[5] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

1

| Illinois | | 1881 | 1931 | 1931[†] | 1931 |
| Indiana | | 1820 | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | 1927 | | |
| Kansas | | 1901 | 1933 | | |
| Kentucky | | 1812, 1813 | | | |
| Louisiana | | 1813 | 1932 | 1932[†] | 1932 |
| Maine | | 1840 | | | |
| Maryland | 1910 | 1872 | 1927 | | |
| Massachusetts | | 1751 | 1927 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | 1933 | 1933 | 1933 |
| Mississippi | | 1878 | | | |
| Missouri | 1891[6] | 1873 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | |
| Nebraska | | 1881 | 1929 | | |
| Nevada | | 1881, 1925 | | | |
| New Hampshire | 1915 | | | | |
| New Jersey | 1771 | 1686 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | |
| New York | 1870[7] | 1891 | 1931, 1933 | | |

---

[6] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

[7] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured

2

Def. Exhibit 59
Page 002191

| | | | | | |
|---|---|---|---|---|---|
| North Carolina | | 1792 | | | 1917 |
| North Dakota | 1891, 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | | | |
| Oregon | 1925 | 1853 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1934 | 1934† | 1934 |
| South Dakota | 1909 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | | | |
| Texas | | 1870 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | | | |
| Vermont | 1884, 1912 | 1895, 1897 | 1923 | | 1923 |
| Virginia | | 1794, 1838 | 1934 | 1934 | 1934 |
| Washington | 1909 | 1881 | 1933 | | 1933 |
| West Virginia | | 1870 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1933 | | |
| Total Laws | 16 | 50 | 31 | 8–11 | 23 |

SOURCE:  Duke Law, Duke Center for Firearms Law, Repository of Historical Gun Laws,
https://firearmslaw.duke.edu/repository/search-the-repository/

†Ambiguous law that could apply to semi-automatic in addition to automatic firearms.

---

Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

3

Def. Exhibit 59
Page 002192

# EXHIBIT C

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)

| State[1] | Bowie Knives | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/ Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896† | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871, 1875 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890† | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881† | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,†1838 ,1847,1868 ,1893† | | 1888 | | 1868, 1888 | | 1887 | |

---

[1] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

Def. Exhibit 59
Page 002194

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864†1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884† | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836† | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838,1878 | |
| Missouri | 1871,1897, 1917, 1923 | | 1871, 1897, 1923 | 1818 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

2

Def. Exhibit 59
Page 002195

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905[†] | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852[†]1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911[†] | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915[†] | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885[†] | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903[†] | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

3

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1892,1895† | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870,1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883, 1896 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884,1890 1899,1925 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

4

Def. Exhibit 59
Page 002197

# EXHIBIT D

EXHIBIT D

MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

## CALIFORNIA:

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

1

Def. Exhibit 59
Page 002199

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## DELAWARE:

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

## DISTRICT OF COLUMBIA:

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

2

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

Def. Exhibit 59
Page 002202

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

Def. Exhibit 59
Page 002203

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,
machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,
or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

6

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## FLORIDA:

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

Def. Exhibit 59
Page 002205

## HAWAII:

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And
Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation
shall own, possess, sell, offer for sale or transport any firearm of the kind
commonly known as a machine gun or any shell cartridge or bomb containing or
capable of emitting tear gas or any other noxious gas. Provided, however, that
nothing in this Act contained shall prohibit the sale to, purchase by, or possession
of such firearms by any city and county, county, territorial or federal officer where
such firearms are required for professional use in the discharge of his duties, nor to
the transportation of such firearms for or on behalf of police departments and
members thereof, sheriffs, or the military or naval forces of this Territory or of the
United States and "Provided, further that nothing in this Act shall prohibit police
departments and members thereof, sheriffs, or the military or naval forces of the
territory or of the United States from possessing or transporting such shells,
cartridges or bombs for professional use in the discharge of their duties. "The term
'shell, cartridge or bomb', as used in this Act shall be construed to apply to and
include all shells, cartridges, or bombs capable of being discharged or exploded
through or by the use of percussion caps, fuses, electricity, or otherwise, when such
discharge or explosion will cause or permit the release or emission of tear gases.
The term 'machine gun' as used in this Act shall be construed to apply to and
include machine rifles, machine guns and submachine guns capable of
automatically and continuously discharging loaded ammunition of any caliber in
which the ammunition is fed to such guns from or by means of clips, disks, drums,
belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of
Firearms and Ammunition, § 2.
Definitions. "Firearm" as used in this Act means any weapon, the operating force
of which is an explosive. This definition includes pistols, revolvers, rifles,
shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs,
cannon and sub-machine guns. The specific mention herein of certain weapons
does not exclude from the definition other weapons operated by explosives.
"Crime of violence" as used in this Act means any of the following crimes,
namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those
certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol"
or "revolver" as used in this Act, means and includes any firearm of any shape
whatsoever with barrel less than twelve inches in length and capable of discharging
loaded ammunition or any noxious gas. "'Person" as used in this Act includes

Def. Exhibit 59
Page 002206

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

9

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

## INDIANA:

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit
Crime While Armed with Deadly Weapon, ch.55, § 1.
Be it enacted by the general assembly of the State of Indiana, That any person who
being over sixteen years of age, commits or attempts to commit either the crime of
rape, robbery, bank robbery, petit larceny or grand larceny while armed with a
pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous
or deadly weapon, or while any other person present and aiding or assisting in
committing or attempting ot commit either of said crimes is armed with any of said
weapons, shall be guilty of a seperate felony in addition to the crimes above named
and upon conviction shall be imprisoned for a determinate period of not less than
ten years nor more than twenty years . . . .

## IOWA:

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine
Guns. . . ., §§ 1-2.
§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its
possession or under his or its control any machine gun which is capable of being
fired from the shoulder or hip of a person, and by the recoil of such gun.
§ 2. No person, firm, partnership, or corporation shall do any act with the intent to
enable any other person, firm, partnership, or corporation to obtain possession of
such gun.

## KANSAS:

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms
Making the Transportation or Possession Thereof Ulawful in Certain Cases,
Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating
to the Ownership and Registration of Certain Firearms, and Providing Penalties for
the Violation of this Act, ch. 62, §§ 1-3.
§ 1. That is shall be unlawful for any person, firm, or corporation other than a
sheriff or other peace officer or any military unit of the state or of the United States
or any common carrier for hire, to transport or have in his possession or under his
control a firearm known as a machine rifle, machine gun, or submachine gun:
Provided, That banks, trust companies or other institutions or corporations subject
to unusual hazard from robbery or holdup, may secure permits form the sheriff of
the county in which they are located for one or more of their employees to have
such firearms: Provided further, That museums, American Legions posts, and other

11

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

12

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

Def. Exhibit 59
Page 002211

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling,
Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess
any machine gun or firearm which can be fired more than sixteen times without
reloading, or any muffler, silencer or device for deadening or muffling the sound of
a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot,
billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a
violation of this section shall be guilty of a felony and shall be punished by a fine
not exceeding one thousand dollars or imprisonment in the state prison not more
than five years, or by both such fine and imprisonment in the discretion of the
court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling,
Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess
any machine gun or firearm which can be fired more than sixteen times without
reloading or any muffler, silencer, or device for deadening or muffling the sound of
a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy,
metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device,
weapon, cartridge, container, or contrivance designed or equipped for or capable of
ejecting any gas which will either temporarily or permanently disable, incapacitate,
injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell,
Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a
Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the
magazine of which is capable of holding more than twelve cartridges, shall be a
machine gun within the provisions of the Act. (b) Any firearm capable of
automatically reloading after each shot is fired, whether firing singly by separate
trigger pressure or firing continuously by continuous trigger pressure; which said
firearm shall have been changed, altered or modified to increase the magazine from
the original design as manufactured by the manufacturers thereof, or by the
addition thereto of extra and/or longer grips or stocks to accommodate such extra
capacity, or by the addition, modification and/or attachment thereto of any other
device capable of increasing the magazine capacity thereof, shall be a machine gun

14

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

Def. Exhibit 59
Page 002213

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW YORK:

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

Def. Exhibit 59
Page 002216

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

## NORTH CAROLINA:

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

## NORTH DAKOTA:

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO:

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

Def. Exhibit 59
Page 002219

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

Def. Exhibit 59
Page 002220

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.
§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

23

Def. Exhibit 59
Page 002221

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.
§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.
§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as
follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or
similar weapon with overall less than twenty-six inches, but shall not include any
pistol without a magazine or any pistol or revolver designed for the use of blank
cartridges only. "machine gun" shall include any weapon which shoots
automatically and any weapon which shoots more than twelve shots semi-
automatically without reloading. "Firearm shall include any machine gun or pistol.
. . "Crime of violence" shall mean and include any of the following crimes or any
attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem,
assault or battery involving grave bodily injury, robbery, burglary, and breaking
and entering. "sell" shall include let or hire, give, lend and transfer, and the word
"purchase" shall include hire, accept and borrow, and the expression "purchasing"
shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of
violence shall purchase own, carry or have in his possession or under his control
any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns:
§§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State
of South Carolina: For the purposes of this Act the word "machine gun" applies to
and includes all firearms commonly known as machine rifles, machine guns and
sub-machine guns of any caliber whatsoever, capable of automatically discharging
more than eight cartridges successively without reloading, in which the
ammunition is fed to such gun from or by means of clips, disks, belts or other
separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or
persons in any manner to transport from one place to another in this State, or from
any railroad company, or express company, or other common carrier, or any
officer, agent or employee of any of them, or any other person acting in their
behalf knowingly to ship or to transport form one place to another in this State in
any manner or by any means whatsoever, except as hereinafter provided, any
firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for
any person to store, keep, possess, or have in possession, or permit another to store,

Def. Exhibit 59
Page 002224

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permitted by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

27

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

Def. Exhibit 59
Page 002226

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**TEXAS:**

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

Def. Exhibit 59
Page 002227

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**<u>VIRGINIA:</u>**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

Def. Exhibit 59
Page 002228

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

Def. Exhibit 59
Page 002229

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## <u>WEST VIRGINIA:</u>

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.
(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

32

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

33

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

34

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.
No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## WYOMING:

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.
§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.
§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

Def. Exhibit 59
Page 002233

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

36

Def. Exhibit 59
Page 002234

# EXHIBIT E

Def. Exhibit 59
Page 002235

EXHIBIT E

DANGEROUS WEAPONS LAWS

## ALABAMA

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama
in General Assembly convened, That if any person carrying any knife or weapon,
known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or
weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw
[sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,
by reason of which he dies, it shall be adjudged murder, and the offender shall
suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise
disposed of in this State, the person selling, giving or disposing of the same, shall
pay a tax of one hundred dollars, to be paid into the county Treasury; and if any
person so selling, giving or disposing of such weapon, shall fail to give in the same
to his list of taxable property, he shall be subject to the pains and penalties of
perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons
Secretly, § 1
That if any person shall carry concealed about his person any species of fire arms,
or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk,
or any other deadly weapon, the person so offending shall, on conviction thereof,
before any court having competent jurisdiction, pay a fine not less than fifty, nor
more than five hundred dollars, to be assessed by the jury trying the case; and be
imprisoned for a term not exceeding three months, at the discretion of the Judge of
said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.
Everyone who shall hereafter carry concealed about his person, a bowie knife, or
knife or instrument of the like kind or description, by whatever name called, dirk
or any other deadly weapon, pistol or any species of firearms, or air gun, unless
such person shall be threatened with, or have good cause to apprehend an attack, or
be travelling, or setting out on a journey, shall on conviction, be fined not less than
fifty nor more than three hundred dollars: It shall devolve on the person setting up
the excuse here allowed for carrying concealed weapons, to make it out by proof,

1

to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.
Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

2

the General and Permanent Acts of the Session of 1876-7 have been Incorporated
Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary
Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In
an indictment for carrying concealed weapons, it is sufficient to charge that the
defendant "carried concealed about his person a pistol, or other description of fire-
arms," or "a bowie-knife, or other knife or instrument of the like kind or
description," without averring the want of a legal excuse on his part; and the
excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of
the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of
the Supreme Court of the State upon the Construction of the Statutes; and in Which
the General and Permanent Acts of the Session of 1876-7 have been Incorporated
Page 901, Image 917 (1877) available at The Making of Modern Law: Primary
Sources.
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending,
pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells,
gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife,
or other knife of like kind or description, must on conviction, be fined not less than
fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of
the Supreme Court of the State upon the Construction of the Statutes; and in Which
the General and Permenent Acts of the Session of 1876-7 have been Incorporated
Page 883, Image 899 (1877) available at The Making of Modern Law: Primary
Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles
and slung-shots. – Any person who carries, concealed about his person, brass
knuckles, slung-shot, or other weapon of like kind or description, shall, on
conviction thereof, be fined not less than twenty, nor more than two hundred
dollars, and may also, at the discretion of the court trying the case, be imprisoned
in the county jail, or sentenced to hard labor for the county, for a term not
exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any
person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be
fined not less than five hundred dollars, nor more than one thousand dollars, and be
imprisoned in the penitentiary not less than two years.

3

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.

§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.


William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.


## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.

That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Def. Exhibit 59
Page 002239

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The
District Of Alaska And To Provide A Code Of Criminal Procedure For Said
District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any
manner whatever, any revolver, pistol, or other firearm, or knife (other than an
ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any
instrument by the use of which injury could be inflicted upon the person or
property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the
Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is
Prefixed the Constitution of the United States, the Mining Law of the United
States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96,
Image 102 (1871) available at The Making of Modern Law: Primary Sources,
1867.
An Act to prevent the improper use of deadly weapons, and the indiscriminate use
of fire arms in the towns and villages of the territory. § 1. That any person in this
Territory, having, carrying or procuring from another person, any dirk, dirk knife,
bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two
or more persons, draw or exhibit any of said deadly weapons in a rude, angry or
threatening manner, not in necessary self defense, or who shall, in any manner,
unlawfully use the same in any fight or quarrel, the person or persons so offending,
upon conviction thereof in any criminal court in any county of this Territory, shall
be fined in any sum not less than one hundred nor more than five hundred dollars,
or imprisonment in the county jail not less than one nor more than six months, in
the discretion of the court, or both such fine and imprisonment, together with the
cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses
Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall
carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger,
slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of
knife manufactured or sold for purposes of offense or defense, he shall be punished
by a fine of not less than twenty-five nor more than one hundred dollars; and in
addition thereto, shall forfeit to the County in which his is convicted, the weapon
or weapons so carried.

5

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.

It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.

§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.

§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

6

Def. Exhibit 59
Page 002241

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).
Race and Slavery Based | Arkansas | 1835
§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

7

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or
any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal
knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and
upon conviction thereof, in the county in which said offense shall have been
committed, shall be fined in any sum not less than twenty-give nor more than one
hundred dollars, to be recovered by presentment or indictment in the Circuit Court,
or before any Justice of the Peace of the county wherein such offense shall have
been committed; Provided, That nothing herein contained shall be so construed as
to prohibit any person wearing or carrying any weapon aforesaid on his own
premises, or to prohibit persons traveling through the country, carrying such
weapons while on a journey with their baggage, or to prohibit any officer of the
law wearing or carrying such weapons when engaged in the discharge of his
official duties, or any person summoned by any such officer to assist in the
execution of any legal process, or any private person legally authorized to execute
any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap.
XCVI (96), § 1-2.
That any person who shall wear or carry, in any manner whatever, as a weapon,
any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks,
razor, or any pistol of any kind whatever, except such pistols as are used in the
army or navy of the United States, shall be guilty of a misdemeanor. . . . Any
person, excepting such officers or persons on a journey, and on his premises, as are
mentioned in section one of this act, who shall wear or carry any such pistol as i[s]
used in the army or navy of the United States, in any manner except uncovered,
and in his hand, shall be guilty of a misdemeanor.

## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other
offensive weapon, with intent to assault any person, every such person, on
conviction, shall be fined not more than one hundred dollars or imprisoned in the
county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of
the Legislature of a Public and General Nature, Now in Force, Passed at the
Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of
Independence, the Constitutions of the United States and of California, the Treaty

8

of Queretaro, and the Naturalization Laws of the United States Page 663-664,
Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt,
or other instrument or tool, with intent feloniously to break and enter into any
dwelling house, store, shop, warehouse, or other building containing valuable
property, or shall be found in any of the aforesaid buildings with intent to steal any
money, goods, and chattels, every person so offending shall, on conviction thereof,
be imprisoned in the county jail not more than two years; and if any person shall
have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon,
with intent to assault any person, every such person, on conviction, shall be fined
not more than one hundred dollars or imprisoned in the county jail not more than
three months.

Def. Exhibit 59
Page 002244

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a
General Character Which were in Force on the First Day of January, 1858; Also,
the Declaration of Independence, Constitution of the United States, Articles of
Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress
Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions,
Both of the Supreme Court of the United States and of California, to Which are
Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands,
Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law:
Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying
or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-
cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more
persons, draw or exhibit any of said deadly weapons in a rude, angry and
threatening manner, not in necessary self-defense, or who shall, in any manner,
unlawfully use the same, in any fight or quarrel, the person or persons so
offending, upon conviction thereof in any criminal court in any county of this state,
shall be fined in any sum not less than one hundred, nor more than five hundred
dollars, or imprisonment in the county jail not less than one nor more than six
months, at the discretion of the court, or both such fine and imprisonment, together
with the costs of prosecution; which said costs shall, in all cases be computed and
collected in the same manner as costs in civil cases. . . provided, nevertheless, that
no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to
answer under the provisions of this act, for drawing or exhibiting any of the
weapons herein-before mentioned, while in the lawful discharge of his or their
duties. . .


Theodore Henry Hittell, The General Laws of the State of California, from 1850 to
1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in
Force, with Full References to Repealed Acts, Special and Local Legislation, and
Statutory Constructions of the Supreme Court. To Which are Prefixed the
Declaration of Independence, Constitution of the United States, Treaty of
Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the
State of California, Act of Admission, and United States Naturalization Laws, with
Notes of California Decisions Thereon Page 261, Image 272 (1868) available at
The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864
An Act to Prohibit the Carrying of Concealed Weapons, § 1.
Every person not being peace-officer, provost-marshal, enrolling-officer, or officer
acting under the laws of the United States in the department of the provost-marshal
of this State, State and Federal assessors, collectors of taxes and licenses while in

Def. Exhibit 59
Page 002245

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

Def. Exhibit 59
Page 002246

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.
Carrying Weapons | California | 1917
§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person
Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923
§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.
§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

12

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

13

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. Good Order and Decency § 192.

Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

14

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

15

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).

Carrying Weapons | | 1871

Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

16

Def. Exhibit 59
Page 002251

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

Def. Exhibit 59
Page 002252

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

Def. Exhibit 59
Page 002253

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

19

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand jurors [sic] of their respective districts at each term of the court.
Passed 5th February 1838.—Approved 10th Feb. 1838.
https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]
Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the

20

Def. Exhibit 59
Page 002255

public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.
§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.
§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum

21

not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or

Def. Exhibit 59
Page 002257

imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more

23

than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

24

Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or
her, any pick-lock, crow, key, bit, or other instrument or tool, with intent
feloniously to break and enter into any dwelling house, store, warehouse, shop or
other building containing valuable property, or shall be found in any of the
aforesaid buildings with intent to steal any goods and chattels, every such person
so offending, shall, on conviction, be deemed a vagrant, and punished by
confinement in the penitentiary, for any term not exceeding two years. And if any
person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive
weapon, with intent to assault any person, every such person, on conviction, shall
be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding
three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874.
Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other
General Statutes of the State, in Force on the First Day of July, 1874 Page 360,
Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously
disturbs the peace and quiet of any neighborhood or family, by loud or unusual
noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling,
challenging to fight or fighting, or whoever shall carry concealed weapons, or in a
threatening manner display any pistol, knife, slungshot, brass, steel or iron
knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park
[Illinois] Together with Its Charter and General Laws Affecting Municipal
Corporations; Special Ordinances and Charters under Which Corporations Have
Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court
Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64
(1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or
concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-
knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by
written permission of the Captain of Police.

25

Def. Exhibit 59
Page 002260

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody

Def. Exhibit 59
Page 002261

of any negro or mulatto, may be seized by any person and upon due proof thereof
made before any justice of the peace of the district where such seizure shall be,
shall by his order be forfeited to the seizor, for his use and moreover every such
offender shall have and receive by order of such justice any number of loashes not
exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering
With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone,
stick, clubs, or any other substance whatever at or against any locomotive, or car,
or train of cars containing persons on any railroad in this State, shall be deemed
guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous
Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every
person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife,
dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who
shall carry or wear any such weapon openly, with the intent or avowed purpose of
injuring his fellow man, shall, upon conviction thereof, be fined in any sum not
exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing
Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot,
or any other deadly or dangerous weapon upon any other person he shall be
deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in
any sum not less than one nor more than five hundred dollars, to which may be
added imprisonment in the county jail not to exceed six months; That the
provisions of this act shall not apply to persons drawing or threatening to use such
dangerous or deadly weapons in defense of his person or property, or in defense of
those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana
Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image
388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or
mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a
stone, stick, club, or other substance whatever, at or against any stage-coach,

27

locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that

28

this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.


## **KANSAS**

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Def. Exhibit 59
Page 002264

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence
Page 149, Image 157 (1866) available at The Making of Modern Law: Primary
Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or
partially concealed, upon his person, any pistol, bowie knife or other deadly
weapon, shall, on conviction, be fined not less than one nor more than ten dollars;
Provided, This section shall not apply to peace officers of the city or state. The
carrying of a weapon in a holster, exposed to full view, shall not be deemed a
concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the
United State of Kansas, Together with the Organic Act of the Territory of Kansas,
the Treaty Ceding the Territory of Louisiana to the United States, and the Act
Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868)
available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate
business, any person under the influence of intoxicating drink, and any person who
has ever borne arms against the government of the United States, who shall be
found within the limits of this state, carrying on his person a pistol, bowie-knife,
dirk or other deadly weapon, shall be subject to arrest upon the charge of
misdemeanor, and upon conviction shall be fined in a sum not exceeding one
hundred dollars, or by imprisonment in the county jail not exceeding three months,
or both, at the discretion of the court.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities
of the Second Class: Also a Complete List of the Officers of Salina During its
Organization as a Town and City of the Second and Third Class Page 99, Image
100 (1879) available at The Making of Modern Law: Primary Sources. 1879
Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly
Weapons, § 1. That it shall be unlawful for any person to carry on or about his
person any pistol, bowie knife, dirk, or other deadly or dangerous weapon,
anywhere within the limits of the city of Salina, save and except as hereinafter
provided. § 2. This ordinance shall not apply to cases when any person carrying
any weapon above mentioned is engaged in the pursuit of any lawful business,
calling or employment and the circumstances in which such person is placed at the
time aforesaid, are such as to justify a prudent man in carrying such weapon, for
the defense of his person, property or family, nor to cases where any person shall
carry such weapon openly in his hands, for the purpose of sale, barter, or for
repairing the same, or for use in any lawful occupation requiring the use of the
same. § 3. Any person violating any of the provisions of this ordinance shall, upon

30

conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and

31

Def. Exhibit 59
Page 002266

Standing Rules of the City Council Page 162, Image 157 (1887) available at The
Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon
in a hostile manner, or shall make any demonstration or threat of using such
weapon on or against any person; or any person who shall carry or have on his or
her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-
shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city,
shall be fined not less than five dollars, nor more than one hundred dollars:
Provided, that this ordinance shall not be so construed as to prohibit officers of the
law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by
Authority of a Resolution Adopted by the City Council April 24, 1899, under the
Direction of Judiciary Committee and City Attorney, and Formally Authorized by
Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern
Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2.
Any person who shall in the city of Wichita carry unconcealed, any fire-arms,
slungshot, sheath or dirk knife, or any other weapon, which when used is likely to
produce death or great bodily harm, shall upon conviction, be fined not less than
one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3.
Any person who shall, in the city of Wichita, use or carry concealed or
unconcealed, any bean snapper or like articles shall upon conviction be fined in
any sum not less than one dollar nor more than twenty-five dollars. Carrying
Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita,
carry concealed about his person any fire-arm, slung shot, sheath or dirk knife,
brass knuckles, or any weapon, which when used is likely to produce death or great
bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred
dollars.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry
any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive
but all and every gun, weapon and ammunition found in the possession or custody
of any negro, mulatto or Indian may be seized by any person and upon due proof
thereof made before any justice of the peace of the county where such seizure shall
be shall by his order, be forfeited to the seizor for his own use, and moreover every

32

Def. Exhibit 59
Page 002267

such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act E ntitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813
Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148
Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more

Def. Exhibit 59
Page 002268

than one thousand dollars, or imprisonment in the parish prison at the discretion of
the court, not to exceed three months, and that it shall be the duty of the Judges of
the District Courts in this State to charge the Grand Jury, specially as to this
section.
https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&
q1=Bowie


1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the
Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other
dangerous weapon, concealed or unconcealed, on any day of election during the
hours the polls are open, or on any day of registration or revision of registration,
within a distance of one-half mile of any place of registration or revision of
registration; any person violating the provisions of this section shall be deemed
guilty of a misdemeanor; and on conviction shall be punished by a fine of not less
than one hundred dollars, and imprisonment in the parish jail not less than one
month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of
the people to keep and bear arms shall not be abridged. This shall not prevent the
passage of laws to punish those who carry weapons concealed.

34

Def. Exhibit 59
Page 002269

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil
Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.),
Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the
Massachusetts Assembly: That from & after the publication of this act, if any
persons, to the number of twelve, or more, being armed with clubs or other
weapons; or if any number of persons, consisting of thirty, or more, shall be
unlawfully, routously, riotously or tumultuously assembled, any Justice of the
Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation
[asking them to disperse, and if they do not disperse within one hour, the officer is]
... empowered, to require the aid of a sufficient number of persons in arms ... and if
any such person or persons [assembled illegally] shall be killed or wounded, by
reason of his or their resisting the persons endeavoring to disperse or seize them,
the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be
indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which
are Prefixed the Constitutions of the United States and of the State of Maine, and
to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an
Appendix Page 709, Image 725 (1847) available at The Making of Modern Law:
Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive
and dangerous weapon, without a reasonable cause to fear an assault on himself, or
any of his family or property, may, on the complaint of any person having cause to
fear an injury or breach of the peace, be required to find sureties for keeping the
peace for a term, not exceeding one year, with the right of appeal as before
provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive
and dangerous weapon, without reasonable cause to fear an assault or other injury
or violence to his person, or to his family or property, he may, on complaint of any
person having resonable cause to fear an injury or breach of the peace, be required
to find sureties for keeping the peace, for a term not exceeding six months, with the
right of appealing as before provided.

35

Def. Exhibit 59
Page 002270

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

Def. Exhibit 59
Page 002271

Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court

37

of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886
Concealed Weapons, § 30.
Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1.
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

Def. Exhibit 59
Page 002273

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## MASSACHUSETTS

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be

39

Def. Exhibit 59
Page 002274

killed or hurt by reason of their resisting . . . officers and their assistants shall be
indemnified and held guiltless.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide
For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192,
§ 1, 2.
All musket barrels and pistol barrels, manufactured within this Commonwealth,
shall, before the same shall be sold, and before the same shall be stocked, be
proved by the person appointed according to the provisions of an act . . . ; § 2 That
if any person of persons, from and after the passing of this act, shall manufacture,
within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall
knowingly purchase any musket or pistol, without having the barrels first proved
according to the provisions of the first section of this act, marked and stamped
according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts,
Passed November 4, 1835; to Which are Subjoined, an Act in Amendment
Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein,
Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the
United States and of the Commonwealth of Massachusetts Page 750, Image 764
(1836) available at The Making of Modern Law: Primary Sources.
Of Proceedings to Prevent the Commission of Crimes, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive
and dangerous weapon, without reasonable cause to fear an assault or other injury,
or violence to his person, or to his family or property, he may, on complaint of any
person having reasonable cause to fear an injury, or breach of the peace, be
required to find sureties for keeping the peace, for a term not exceeding six
months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap.
164 (1873) § 10.
Whoever when arrested upon a warrant of a magistrate issued against him for an
alleged offense against the laws of this state, and whoever when arrested by a
sheriff, deputy sheriff , constable, police officer, or watchman, while committing a
criminal offense against the laws of this state, or a breach or disturbance of the
public peace, is armed with, or has on his person, slung shot, metallic knuckles,
bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164
(1873) § 11.

40

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15: . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

41

Def. Exhibit 59
Page 002276

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling,
Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess
any machine gun or firearm which can be fired more than sixteen times without
reloading, or any muffler, silencer or device for deadening or muffling the sound of
a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot,
billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a
violation of this section shall be guilty of a felony and shall be punished by a fine
not exceeding one thousand dollars or imprisonment in the state prison not more
than five years, or by both such fine and imprisonment in the discretion of the
court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling,
Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess
any machine gun or firearm which can be fired more than sixteen times without
reloading or any muffler, silencer, or device for deadening or muffling the sound of
a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy,
metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device,
weapon, cartridge, container, or contrivance designed or equipped for or capable of
ejecting any gas which will either temporarily or permanently disable, incapacitate,
injure or harm any person with whom it comes in contact.

## **MINNESOTA**

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the
State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the
Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884)
available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.
It shall be unlawful for any person, within the limits of the city of St. Paul, to carry
or wear under his clothes, or concealed about his person, any pistol or pistols, dirk,
dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal,
bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2.
Any such weapons or weapons, duly adjudged by the municipal court of said city
to have been worn or carried by any person, in violation of the first section of this
ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be
so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of

42

Def. Exhibit 59
Page 002277

said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## **MISSISSIPPI**

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

Def. Exhibit 59
Page 002278

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper

44

Def. Exhibit 59
Page 002279

county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.
That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

Def. Exhibit 59
Page 002280

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"

§ 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Def. Exhibit 59
Page 002281

Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about
his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles
of lead, dirk, dagger, or any knife resembling a bowie knife, or any other
dangerous or deadly weapon within the corporate limits of the city of Omaha. Any
person guilty of a violation of this section shall, on conviction, be fined not
exceeding one hundred ($100) dollars for each and every offense; nothing in this
section, however, shall be so construed as to prevent the United States Marshals
and their deputies, sheriffs and their deputies, regular or special police officers of
the city, from carrying or wearing such weapons as may be deemed necessary in
the proper discharge of their duties. Provided, however, If it shall be proved from
the testimony on the trial of any such case, that the accused was, at the time of
carrying any weapon as aforesaid, engaged in the pursuit of lawful business,
calling or employment and the circumstances in which he was placed at the time
aforesaid were such as to justify a prudent man in carrying the weapon or weapons
aforesaid, for the defense of his person, property or family, the accused shall be
acquitted.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of
the Second Class) Embracing all Ordinances of General Interest in Force July 15,
1897, together with the Laws of the State of Missouri of a General Nature
Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515
(1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or
about his person, or be found having upon or about his person concealed, any
pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass
or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie
knife, or any other dangerous or deadly weapon, shall be deemed guilty of a
misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly
weapon of any kind or description, or shall go into any church or place where
people have assembled for religious worship, or into any school room or place
where people are assembled for educational, political, literary or social purposes,
or to any election precinct on any election day, or into any court room during the
sitting of court, or into any other public assemblage of persons met for any lawful

47

purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol,

Def. Exhibit 59
Page 002283

bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.

If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

49

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The
Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or
other offensive weapon with intent to assault any person, every such person, on
conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County,
Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law:
Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and
Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it
shall be, and it is hereby declared to be unlawful for any person to carry, openly or
concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk,
sword cane, billy slung shot, brass or other metallic knuckles, or any other
dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb;
Provided, that nothing herein contained shall prevent the carrying of such weapon
by a civil or military officer, or by a soldier in the discharge of his duty, nor by any
other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska,
Embracing All Ordinances of a General Nature in Force April 1, 1890, Together
with the Charter for Metropolitan Cities, the Constitution of the United States and
the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at
The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about
his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles
of lead, dirk, dagger, or any knife resembling a bowie knife, or any other
dangerous or deadly weapon within the corporate limits of the city of Omaha. Any
person guilty of a violation of this section shall, on conviction, be fined not
exceeding one hundred ($100) dollars for each and every offense; nothing in this
section, however, shall be so construed as to prevent the United States Marshals
and their deputies, sheriffs and their deputies, regular or special police officers of
the city, from carrying or wearing such weapons as may be deemed necessary in
the proper discharge of their duties. Provided, however, If it shall be proved from

50

the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not

51

less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## NEW JERSEY

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to

52

be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2. And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources, 1799.
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2. And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be

Def. Exhibit 59
Page 002288

found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.
That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

Def. Exhibit 59
Page 002289

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Def. Exhibit 59
Page 002290

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

56

Def. Exhibit 59
Page 002291

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the
Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page
304, Image 350 (1877) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having
upon them implements for house-breaking, or offensive weapons, or are found in
or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-
houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as
places of public resort or assemblage), with intent to commit theft, misdemeanors
or other offences; and although their evil purposes are thereby manifested, the
power of the justices of the peace to demand of them sureties for their good
behavior hath not been of sufficient effect to prevent them from carrying their evil
purposes into execution; if any person shall be apprehended, having upon him or
her any picklock, key, crow, jack, bit or other implement with an intent to break
and enter into any building: or shall have upon him or her any pistol, hanger,
cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or
shall be found in or near any dwelling house, warehouse, stable, barn, coach-house,
smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to
any house, or in any place of public resort or assemblage for business, worship,
amusement, or other lawful purposes with intent to steal any goods or chattels, then
he or she shall be deemed and adjudged a disorderly person.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the
Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or
dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a
blade of five inches in length or over concealed in or about his clothes or person,
shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable
by a fine not exceeding two hundred dollars or imprisonment at hard labor, not
exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the
Punishment of Crimes," ch. 321, § 1.
Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey |
1927
No pawnbroker shall hereafter sell or have in his possession for sale or to loan or
give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or
other instrument of any kind known as a blackjack, slungshot, billy, sandclub,
sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or

57

other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## <u>NEW MEXICO</u>

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.
That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.
§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

Def. Exhibit 59
Page 002293

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

59

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1881

Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.

Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a

Def. Exhibit 59
Page 002295

term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any

Def. Exhibit 59
Page 002296

instrument or weapon of the kind usually known as slunghsot, billy, sand-club or
metal knuckes, or who, in any city or incorporated village in this state, without the
written consent of the police magistrate, sells or gives any pisol or other firearm, to
any person under the age of eighteen years or without a like consent sells or gives
away any air-gun, or spring-gun, or other instrument or weapon in which the
propelling force is a spring or air to any person under ht age of twelve years, or
who sells or gives away any instrument or weapon commonly known as a toy
pistol, in or upon which any loaded or blank cartridges are used or may be used, to
any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and
Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible |
New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896.
Making and disposing of dangerous weapons. A person who manufactures, or
causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes
of any instrument or weapon of the kind usually known as a blackjack, slungshot,
billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person
who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or
any airgun, spring-gun or other instrument or weapon in which the propelling force
is a spring or air or any instrument or weapon commonly known as a toy pistol or
in or upon which any loaded or blank cartridges are used, or may be used, or any
loaded or blank cartridges or ammunition therefor, to any person under the age of
sixteen years, is guilty of a misdemeanor.

62

Def. Exhibit 59
Page 002297

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

63

## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.
Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.
The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

64

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## NORTH DAKOTA

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

Def. Exhibit 59
Page 002300

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be

66

fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec.
§ 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## OKLAHOMA

1890 Okla. Laws 495, art. 47

Def. Exhibit 59
Page 002302

Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

68

Def. Exhibit 59
Page 002303

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety,
§§ 18-19.
§ 18. Every person who manufactures or causes to be manufactured, or sells or
offers or keeps for sale, or gives or disposes of any instrument or weapon of the
kind usually known as slung shot, or of any similar kind is guilty of a
misdemeanor.
§ 19. Every person who carries upon his person, whether concealed or not or uses
or attempts to use against another, any instrument or weapon of the kind usually
known as slung shot, or of any similar kind, is guilty of a felony.


General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image
33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or
bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor,
slung shot, sand bag, or a knife with a blade over three inches long, with a spring
handle, as a weapon.


Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by
the First Legislative Assembly of the Territory) Page 495-496, Image 511-512
(1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry
concealed on or about his person, saddle, or saddle bags, any pistol, revolver,
bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any
other kind of knife or instrument manufactured or sold for the purpose of defense
except as in this article provided.
§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon
or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy,
metal knuckles, or any other offensive or defensive weapon, except as in this
article provided.
§ 4. Public officers while in the discharge of their duties or while going from their
homes to their place of duty, or returning therefrom, shall be permitted to carry
arms, but at no other time and under no other circumstances: Provided, however
That if any public officer be found carrying such arms while under the influence of
intoxicating drinks, he shall be deemed guilty of a violation of this article as
though he were a private person.

69

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.

It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## **OREGON**

70

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.

Def. Exhibit 59
Page 002306

Carrying Weapons | Oregon | 1917

§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law.

Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one

Def. Exhibit 59
Page 002307

year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Pennsylvania | 1897
An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.
No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## RHODE ISLAND

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.
No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.
Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893
§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

73

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Rhode Island | 1896
Offences Against Public Policy, §§ 23, 24, 26.
§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.
§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .
§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908
§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the

74

blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.
§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.

Def. Exhibit 59
Page 002310

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

## **TENNESSEE**

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.

That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.

76

That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.
Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.
It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

77

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869 Elections.

§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other

78

public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

79

A Digest of the General Statute Laws of the State of Texas: to Which Are
Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas:
Williamson S. Oldham & George W. White, comp., 1859)
Texas, Chapter 3, Act of August 28, 1856
Art. 493. If any person shall assault another with intent to murder, he shall be
punished by confinement in the Penitentiary, not less than two years, nor more than
seven years. If the assault be made with a bowie-knife, or dagger, the punishment
shall be doubled. Page 520
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538
&q1=bowie%20knife
Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances
which would otherwise render the homicide a case of manslaughter, the killing
shall nevertheless be deemed murder, and punished accordingly. [emphasis in
original] Page 534
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552
&q1=bowie%20knife

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly
Weapons.
§ 1. Be it enacted by the Legislature of the State of Texas, That any person
carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk,
dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other
kind of knife manufactured or sold for the purposes of offense or defense, unless
he had reasonable grounds for fearing an unlawful attack on his person, and that
such ground of attack shall be immediate and pressing; or unless having or
carrying the same on or about his person for the lawful defense of the State, as a
militiaman in actual service, or as a peace officer or policeman, shall be guilty of a
misdemeanor, and on conviction thereof shall, for the first offense, be punished by
fine of not less then than twenty-five nor more than one hundred dollars, and shall
forfeit to the county the weapon or weapons so found on or about his person; and
for every subsequent offense may, in addition to such fine and forfeiture, be
imprisoned in the county jail for a term not exceeding sixty days; and in every case
of fine under this section the fined imposed and collected shall go into the treasury
of the county in which they may have been imposed; provided, that this section
shall not be so contrued as to prohibit any person from keeping or bearing arms on
his or her own premises, or at his or her own place of business, nor to prohibit
sheriffs or other revenue officers, and other civil officers, from keeping or bearing
arms while engaged in the discharge of their official duties, nor to prohibit persons
traveling in the State from keeping or carrying arms with their baggage; provided

Def. Exhibit 59
Page 002315

further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)
Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.
Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.
Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk,

81

dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

82

## UTAH

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14. Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slingshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[1]

## VERMONT

No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.
Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.
Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.
Approved November 19, 1892.
https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislatur e/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+an d+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie

---

[1] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

Def. Exhibit 59
Page 002318

+knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA9
5&printsec=frontcover

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the
owner or occupant of the premises, and except in the performance of some duty
required by law, shall discharge any gun, pistol, or other fire arm loaded with ball
or shot, or with powder only, or firecrackers, serpent, or other preparation whereof
gunpowder or other explosive substance is an ingredient, or which consists wholly
of the same, nor shall make any bonfire in or upon any street, lane, common or
public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass
knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any
weapon concealed on his person without permission of the mayor or chief of police
in writing.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-
280/99640/20190514123503867_Charles%20Appendix.pdf.

Def. Exhibit 59
Page 002319

## VIRGINIA

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | Virginia | 1792

[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.

§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

1847 Va. Laws 127, c. 14, § 16.

85

If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.
Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Virginia | 1887
Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## WASHINGTON

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall

86

Def. Exhibit 59
Page 002321

on conviction thereof, be imprisoned in the county jail not exceeding one year, and
be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and
Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two
or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall,
on conviction thereof, be imprisoned in the county jail not exceeding one year, and
be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and
Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two
or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall
on conviction thereof, be imprisoned in the county jail not exceeding one year and
be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy,
ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed
guilty of a misdemeanor, and, upon conviction, shall be fined not more than one
hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6,
§ 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder,
dynamite, nitro-glycerine, or other combustibles, and to provide or license
magazines for the same, and to prevent by all possible and proper means, danger or
risk of injury or damages by fire arising from carelessness, negligence or otherwise
. . . to regulate and prohibit the carrying of deadly weapons in a concealed manner;
to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and
detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington,
Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956,

Def. Exhibit 59
Page 002322

Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary
Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to
cause terror to the people passing, exhibit or flourish, in the streets of an
incorporated city or unincorporated town, any dangerous weapon, shall be deemed
guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in
any sum not exceeding twenty-five dollars. Justices of the peace shall have
exclusive original jurisdiction of all offenses arising under the last two preceding
sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6,
§ 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a
concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms,
fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334,
Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and
Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All
persons (except police officers and other persons whose duty it is to execute
process or warrants or make arrests) who shall carry upon his person any concealed
weapon consisting of a revolver, pistol or other fire arms or any knife (other than
an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or
any instrument by the use of which injury could be inflicted upon the person or
property of any other person.

Def. Exhibit 59
Page 002323

Rose M. Denny, The Municipal Code of the City of Spokane, Washington.
Comprising the Ordinances of the City (Excepting Ordinances Establishing Street
Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896)
available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed
Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed
weapon, consisting of either a revolver, pistol or other fire-arms, or any knife
(other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal
knuckles, or any instrument by the use of which injury could be inflicted upon the
person or property of any other person, shall be deemed guilty of a misdemeanor,
and upon conviction thereof shall be fined not less than twenty dollars, nor more
than one hundred dollars and costs of prosecution, and be imprisoned until such
fine and costs are paid; provided, that this section shall not apply to police officers
and other persons whose duty is to execute process or warrants or make arrests, or
persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of
Washington: Showing All Statutes in Force, Including the Session Laws of 1897
Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of
Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of
either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary
pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any
instrument by the use of which injury could be inflicted upon the person or
property of any other person, shall be deemed guilty of a misdemeanor, and upon
conviction thereof shall be fined not less than twenty dollars nor more than one
hundred dollars, or imprisonment in the county jail not more than thirty days, or by
both fine and imprisonment, in the discretion of the court: Provided, That this
section shall not apply to police officers and other persons whose duty it is to
execute process or warrants or make arrests.

Def. Exhibit 59
Page 002324

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

90

Def. Exhibit 59
Page 002325

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

Def. Exhibit 59
Page 002326

## WISCONSIN

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.
If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.
SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.
To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

Def. Exhibit 59
Page 002327

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

## **WYOMING**

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.
If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Wyoming | 1893
Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.
It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city

93

jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/

94

Def. Exhibit 59
Page 002329

# EXHIBIT F

EXHIBIT F

TRAP GUN RESTRICTIONS[1]

## MARYLAND:

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the
birds or animals named in Section 12, 13, 14 and 14A of this Act, or any
insectivorous birds (excepting English sparrows), in Allegany County on Sunday,
or on election days, and it shall be prima facie evidence of a violation of this Act if
any person is found in the fields or woods with on a gun on Sunday or on election
days, or to hunt or kill in any trap or destroy any of the birds . . .

## MICHIGAN:

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other
Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by
the firing or explosion of gunpowder or any other explosive, and shall leave or
permit the same to be left, except in the immediate presence of some competent
person, he shall be deemed to have committed a misdemeanor; and the killing of
any person by the firing of a gun or device so set shall be deemed to be
manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any
trap or device operating by the firing or explosion of gunpowder or any other
explosive, and shall leave or permit the same to be left, except in the immediate
presence of some competent person, shall be guilty of a misdemeanor, punishable
by imprisonment in the county jail not more than one year, or by a fine of not more
than five hundred dollars, and the killing of any person by the firing of a gun or
device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

Def. Exhibit 59
Page 002331

**MINNESOTA:**

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891: "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

2

**NEW HAMPSHIRE:**

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

**NEW JERSEY:**

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

**NEW YORK:**

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870: "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . . A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

3

Def. Exhibit 59
Page 002333

person, the jury censured Agostino. He will not be released, however, but will be held under $2,000 bail."[3]

## NORTH DAKOTA:

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

## OREGON:

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.


**RHODE ISLAND:**

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

**SOUTH CAROLINA:**

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

## SOUTH DAKOTA:

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

## UTAH:

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

6

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.  Dangerous or Unusual Weapons | Utah | 1901
§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.
§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.
§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

## VERMONT:

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

Def. Exhibit 59
Page 002337

personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.


## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

Def. Exhibit 59
Page 002338

**WISCONSIN:**

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.

Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

Def. Exhibit 59
Page 002339

# EXHIBIT G

The Buffalo Commercial (Buffalo, New York) · Tue, Nov 1, 1870 · Page 4
https://www.newspapers.com/image/264632378
Downloaded on Aug 8, 2022



gentleman will now be brought to a summary conclusion.

## THE MAN TRAP.

**Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.**

*From the N. Y. Standard, Oct. 20th.*

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning. AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO'S gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JOSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $3,000 bail.

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry
https://www.newspapers.com/image/513456592

The South Bend Tribune (South Bend, Indiana) · Wed, Feb 11, 1891 · Page 3

Downloaded on Aug 8, 2022



**Shot by a Trap-Gun.**

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyright © 2022 Newspapers.com. All Rights Reserved.


Newspapers™

Def. Exhibit 59
Page 002342

# EXHIBIT H

## EXHIBIT H: BOWIE KNIFE LAWS BY TYPE[1]

| STATE | No Concealed Carry | No Carry | Greater Criminal Penalty | Tax/Punish for Sale | Tax Owner-ship | No Sale to Barred Groups[2] | No brandish |
|---|---|---|---|---|---|---|---|
| Alabama | 1839,1841 1876,1879 | | 1837 | 1837,1897 | 1837,1867 | 1876 | |
| Alaska | | | | | | | |
| Arizona | 1893,1901 | 1889 | | | | | |
| Arkansas | 1875 | 1881 | 1871 | | | | |
| California | 1896 | | | | | 1896 | 1855,1858 |
| Colorado | 1862,1877 | 1881 | | | | | |
| Connecticut | | | | | | | |
| Delaware | | | | | | | |
| District of Columbia | 1871 | | | | | | |
| Florida | | | | 1838[3] | | | |
| Georgia | 1837[4],1873 | | | 1837[5] | | 1860 | |
| Hawaii | | 1852,1913 | | | | | |
| Idaho | 1909 | 1879 | | | | | |
| Illinois | 1876,1881 1883 | | | | | 1881 | |
| Indiana | | 1859 | | | | | |
| Iowa | 1882,1887 1900 | | | | | | |
| Kansas | 1862,1863 1887 | | | | | 1883 | |
| Kentucky | | | | | | 1859 | |

---

[1] Table excludes laws that punish carry/use of "knives" or "sharp or dangerous weapons" but do not mention Bowie knives by name.

[2] Barred groups included Native Americans/Indians, African Americans/Enslaved, minors.

[3] 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838). See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

[4] A Compilation of the Penal Code of the State of George with the Forms of Bills of Indictment Necessary in Prosecutions Under It and the Rules of Practice, pp. 210-211, https://dlg.galileo.usg.edu/georgiabooks/pdfs/gb0439.pdf.

[5] *Ibid.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Louisiana | 1855 | 1870 | | | | | |
| Maine | | | | | | | |
| Maryland | 1872,1884 1886,1890 | | | | | | |
| Massachusetts | | | | | | | |
| Michigan | 1891 | | | | | | |
| Minnesota | 1884 | | | | | | |
| Mississippi | 1878,1896[6] | | 1837,1838 | | 1841[7] | | 1840 |
| Missouri | 1871,1883 1890,1897 | 1917,1923 | | | | | |
| Montana | 1864 | | 1879 | | | | |
| Nebraska | 1890,1899 | 1872 | | | | | |
| Nevada | | | 1873 | | | | |
| New Hampshire | | | | | | | |
| New Jersey | | | | | | | |
| New Mexico | 1859,1887 | | | | | | |
| New York | | 1885 | | | | | |
| North Carolina | 1879 | | | | 1856,1858 | 1846[8] | |
| North Dakota | | | | | | | |
| Ohio | 1859,1880 | | | | | | |
| Oklahoma | 1890,1903 | 1890,1891 | | | | | |
| Oregon | | | | | | | |
| Pennsylvania | 1897 | | | | | | |
| Rhode Island | 1893,1896 1908 | | | | | | |
| South Carolina | | | | | | 1923 | |
| South Dakota | | | | | | | |
| Tennessee | 1838,1863 | 1869,1881 | 1838,1856 | 1838,1867 | | 1856,1867 | |

[6] 1896 Miss. L. chap. 104, pp. 109-10. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/.

[7] 1841 Miss. Chap. 1, p. 52. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/.

[8] 1846 N.C. L. chap. 42. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/.

Def. Exhibit 59
Page 002345

|  | 1867 | 1893 |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Texas |  | 1871 |  |  |  | 1897 |  |
| Utah |  | 1877 |  |  |  |  |  |
| Vermont |  |  |  |  |  |  |  |
| Virginia | 1838,1867 1887 |  | 1838 |  |  |  |  |
| Washington |  |  |  |  |  |  | 1854,1859 1869 |
| West Virginia | 1870 | 1882,1891 1925 |  |  |  |  |  |
| Wisconsin | 1883 |  |  |  |  |  |  |
| Wyoming |  |  |  |  |  |  | 1884 |

Source:  https://firearmslaw.duke.edu/repository/search-the-repository/ unless otherwise noted.

Def. Exhibit 59
Page 002346