# EXHIBIT 64

Def. Exhibit 64

Page 002487

Rob Bonta
Attorney General of California
P. Patty Li
Supervising Deputy Attorney General
Anna Ferrari
Deputy Attorney General
State Bar No. 261579
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3479
 Fax:  (415) 703-1234
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*in his official capacity*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | 8:17-cv-00746-JLS-JDE<br><br>**SUPPLEMENTAL SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF MICHAEL VORENBERG**<br><br>Courtroom:   8A<br>Judge:          The Honorable Josephine L. Staton<br><br>Action Filed:  April 24, 2017 |

---

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California. Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as the defendant in this case.

1

Def. Exhibit 64
Page 002488

**SUPPLEMENTAL SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF MICHAEL VORENBERG**

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1.    I offer the following report as a sur-rebuttal report and declaration ("Sur-Rebuttal") to the rebuttal report of Ashley Hlebinsky dated February 3, 2023 in this case.  My background and qualifications already have been detailed in my supplemental expert report and declaration dated January 6, 2023, in this case.

2.    This Sur-Rebuttal is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in it.

## I.    SUMMARY OF SUR-REBUTTAL

3.    In her rebuttal, Ashley Hlebinsky has offered no evidence to counter the arguments and conclusions that I made in my report.  Her statement does include some assertions that run counter to my report, but as detailed below, these assertions are based on poor methodology or factual error. Indeed, the Hlebinsky rebuttal as a whole employs methods that do not comport with widely accepted professional standards or practices in the field of historical research.

## II.    A NOTE ON TERMINOLOGY: "THE SECOND FOUNDING"

4.    Hlebinsky regularly uses the phrase "The Second Founding" to describe the period of U.S. history immediately following the Civil War.  By contrast, my report usually refers to this period as "Reconstruction" or "post-Civil War Reconstruction."  (Vorenberg report, ¶ 11, pages 5-6.)  Among historians such as myself who specialize in the Civil War and Reconstruction, the use of "The Second Founding" to describe the period in question is unusual but not unheard of. Indeed, Eric Foner, the leading historical expert on Reconstruction and the author of the seminal book on the period, has recently published a book titled *The Second Founding*, which examines the constitutional amendments adopted during

Reconstruction (the 13th, 14th, and 15th amendments).[2]  For the purposes of my report and now again for my Sur-Rebuttal, I use Reconstruction in favor of "The Second Founding" because of the conventions of the discipline, but I accept "The Second Founding" as a legitimate descriptor of the period.  For the purposes of this Sur-Rebuttal, then, "Reconstruction" and "The Second Founding" should be regarded as synonymous.

### III.  THE HLEBINSKY REBUTTAL AND FIREARMS HISTORY EXPERTISE

5.     Hlebinsky identifies herself as a "firearms historian" (Hlebinsky rebuttal, ¶ 1, page 2, line 1.)  Yet her rebuttal contains errors regarding firearms history that are recognizable to even a generalist historian of the United States.  For example, she writes that "it is unfair to assume that a person until recently would make a clear distinction between capacities under and over ten rounds and is historically arbitrary, particularly for the time frames being discussed." (Hlebinsky rebuttal, ¶ 18, page 12, lines 15-17.)  "Ten rounds" may seem an abstract number, but in the context of Reconstruction, the difference was meaningful.  In the abstract, a repeating rifle holding fourteen rounds should fire those rounds in twice the time that it takes a repeating rifle holding seven rounds to fire its load.  But this abstract principle does not bear out when applied to Reconstruction-era firearms.  A Spencer rifle held seven rounds.[3]  To fire fourteen rounds, the user of the Spencer had to load the rifle with seven rounds, fire all the rounds, reload with another set of seven rounds, and fire the load again.  Between each round fired, the user had to take three actions: cock the hammer at the top of the barrel backwards; move the lever at

---

[2] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (rev. ed., New York: HarperCollins, 2014); Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (New York: W. W. Norton, 2019).

[3] Hlebinsky notes that, in a sentence about the number of rounds in Sharps and Spencer rifles, I misstated the number of rounds in each. (Hlebinsky rebuttal, page 5, note 2.)  This information does not change my ultimate conclusion that Henrys and Winchesters were the only guns produced in significant numbers during the Reconstruction period that held ten or more rounds.

Def. Exhibit 64
Page 002490

the bottom of the barrel forwards; and move the same lever backwards.  By
contrast, the user of a Henry rifle simply had to load fourteen rounds into the
chamber below the barrel of the gun and fire off the whole load.  Between each
shot, the user only had two motions to perform: move the lever at the bottom of
barrel forward, then move it backward.  Thus, in the case of a Spencer vs. a Henry,
the speed of firing a large number of rounds was not simply inversely proportional
to the number of rounds fired.  More to the point: the firearm in this era that held
more than ten rounds (the Henry or Winchester) could shoot a disproportionately
larger number of rounds per minute than the firearm that held fewer than ten rounds
(the Spencer).  With the Winchester '66, the speed of delivering high volumes of
rounds became even greater, as reloading could be done by feeding rounds into the
"gate" at the side of the breech rather than waiting for all rounds to be expelled
before reloading, as was the case with the Henry and the Spencer.

6.      Another statement regarding firearms in the Hlebinsky rebuttal that
strikes even a generalist as odd is the following:

> Rifling, the boring out of the inside of a barrel with spiral lands and
> grooves to spin a projectile, thus making it more accurate, was
> developed at the turn of the sixteenth century and appeared
> predominantly in civilian arms, with a few military exceptions from
> the American Revolution, until just before the turn of the twentieth
> century when military tactics finally caught up to the technology.

(Hlebinsky rebuttal, ¶ 12, page 8, lines 19-24.)  The implication of this statement is
that the U.S. military did not use rifled barrels in significant numbers until the late
1800s.  Yet rifled weapons such as the Springfield were by far the most common
types of firearms used by U.S. and Confederate military personnel by the end of the
Civil War (1865), roughly thirty years before the point when, according to
Hlebinsky, the U.S. military adopted rifled technology in a widespread way.

7.      I will note one final controversial statement about firearms history in
the Hlebinsky rebuttal that is problematic even to the generalist historian:

4

> There has always been an ebb and flow of civilian and military firearms for centuries, some with clearer lines than others. However, the assertion that historically a gun could be completely understood as only for war in a time when there was such interchangeability, is presentist at best.

(Hlebinsky rebuttal, ¶ 16, page 12, lines 3-6.)  It may indeed be historically inaccurate to suggest that a certain gun was used "only for war."  But it is equally inaccurate to suggest that all guns were fully interchangeable between military and civilian use.  As my report noted, Winchesters were owned by civilians only in small numbers, while most of the owners were armies (non-U.S. armies in particular) and U.S. law enforcement organizations.  (Vorenberg report, ¶ 7, page 4, lines 3-9.)  There was no significant "blurring" of the line between government ownership and civilian ownership when it came to Winchesters.  The same was true of Spencer repeating rifles, incidentally.  During the Civil War, Spencers were sold to the U.S. army and, to a lesser extent, the Confederate army; they had no meaningful civilian market.  When the Civil War ended, U.S. soldiers were allowed to buy their Spencers, and roughly 10,000 did so.  But the company that made Spencers did not then market their weapons to civilians; it marketed them only to armies.  Eventually, this company was acquired by the Winchester company, which sold all the surplus Spencers in its inventory to foreign armies rather than attempting to sell them to civilians.[4]  It is not ahistorical or presentist to say that, circa 1868 (the date of the ratification of the Fourteenth Amendment), Henrys and Winchesters, as well as lower-capacity repeating rifles like Spencers, were primarily—and nearly exclusively—for non-civilian use.

## IV.  HLEBINSKY'S USE, NON-USE, AND MISUSE OF HISTORICAL SOURCES

8.     Historians are expected to be adept at finding and appropriately using materials from the past.  This skill requires recognizing that some historical sources

---

[4] Joseph G. Bilby, *A Revolution in Arms: A History of the First Repeating Rifles* (Yardley, Penn.: Westholme, 2006), 195-204.

5

Def. Exhibit 64
Page 002492

1   are more reliable than others.  It also requires reading sources critically.  Rather

2   than accepting any source purporting to be "history" as accurate, historians are

3   expected to interrogate sources for errors, biases, and decontextualization (that is,

4   presenting a fact or series of facts outside of the relevant contexts that give the facts

5   their correct historical meaning).  Repeatedly in her rebuttal, Hlebinsky is

6   inattentive to the basic standards of source use in historical research.

7                  **A.     Use of Unreliable Sources**

8          9.      Hlebinsky writes that the Cody Firearms Museum (CFM), where she

9   spent most of her professional career, is "the only accredited firearms museum in

10  the United States."  (Hlebinsky rebuttal, ¶ 4, page 3, lines 9-10.)  Her use of the

11  word "accredited" indicates that she accepts the principle that there are standards in

12  the practice of history, or at least in the way that history is displayed to the public.

13         10.     Before moving onto the issue of whether Hlebinsky's work meets the

14  standards of historical practice, I note that the CFM is not technically the only

15  accredited firearms museum in the United States.  Although Hlebinsky does not

16  identify the organization that "accredited" the CFM, almost certainly it is the

17  American Alliance of Museums (AAM), as this is the only commonly known

18  organization in the U.S. that accredits museums.  The AAM has accredited the

19  Buffalo Bill Center of the West, of which the CFM is a component institution.  If

20  by this definition the CFM is accredited, then other firearms museums that are

21  components of larger, accredited institutions must be considered accredited.  One

22  such museum is the Smithsonian Institution's National Firearms Collection, which

23  is a component of the accredited National Museum of American History.

24  Hlebinsky knows of the Smithsonian's National Firearms Collection, as she worked

25  there early in her career.  (Hlebinsky rebuttal, ¶ 3, page 3, lines 7-8.)  Yet she

26  inexplicably excludes the Collection from the category of "accredited firearms

27  museums," even though it meets the same standard of accreditation as the CFM.

28

11.    The point about accreditation relates to the larger problem in Hlebinsky's rebuttal of imprecision in general and faulty source use in particular. The statement about accreditation made by Hlebinsky implies that she believes that evidence from non-accredited museums is of a lesser or negligible value than evidence from an accredited museum.  That being the case, how can Hlebinsky account for her decision to use evidence from the NRA National Firearms Museum, a firearms museum that is not accredited by the AAM?

12.    The NRA National Firearms Museum is the main source for Hlebinsky's claim that in Boston around the year 1756, "a Cookson-type twelve-shot repeater was made by gunmaker John Shaw."  (Hlebinsky rebuttal, ¶ 20, page 14, lines 6-7.)  Hlebinsky's own standards, indicated by her emphasis on museum accreditation, should have led her to seek confirmation of information provided by this unaccredited source.  The information about the "Cookson-type twelve-shot repeater" provided by the NRA National Firearms Museum is used by Hlebinsky to make the argument that repeating firearms were common at the time of the founding of the United States.  Yet other, more reliable sources question the authenticity of the gun in question and the validity of using the gun to make the claim about the commonality of repeaters at the time of the founding.[5]  To bolster her problematic claim about the "Cookson," Hlebinsky also cites, in the same footnote containing the NRA National Firearms Museum source, a blog containing a video from the NRA Firearms Museum that shows a person holding and describing the "Cookson."  The narrator in the video makes statements that actually contradict Hlebinsky's contention about the commonality of repeaters at the time of the founding.  He says of the period when the gun was made: "this was in the day when a single-shot muzzle-loader was basically all you had."  He then says that a

---

[5] See, for example, David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms and Armour*, 19 (June 2022), 43-63, esp. 51-61.

Def. Exhibit 64
Page 002494

gun such as the one he displays, a breech-loading gun that could fire twelve shots before being re-loaded, was "an unusual gun."[6]

13.    Another example of Hlebinsky's use of inferior sources is found in her discussion of the "Belton repeating fusil."  (Hlebinsky rebuttal, ¶ 20, page 14, lines 7-16.)  According to Hlebinsky, Joseph Belton, the supposed maker of the supposed gun, successfully persuaded Benjamin Franklin to lobby George Washington, then General of the Continental Army, to buy Belton's guns.  Washington agreed to order one hundred of them but then canceled the order because they were too expensive.  The source that Hlebinsky gives for this information includes a website that tells the history roughly as Hlebinsky has told it.[7]  However, this history is faulty.  Franklin's letter to Washington does not recommend a firearm designed by Belton but rather a riverine submarine designed by him.  Another website cited by Hlebinsky—in the same footnote containing the erroneous website—contains a copy of the actual letter by Franklin to Washington indicating that Belton's pet project is a submarine, not a gun.[8]  Thus, in one footnote, Hlebinsky has cited a website containing a letter that she does not appear to have read (the one from Franklin to Washington), along with a website that she *has* read but has not verified.  The gun in question, along with the identity of Joseph Belton, are questionable, complex matters, but instead of trying to understand and verify these matters through acceptable historical research, Hlebinsky has simply surfed the web

---

[6] http://firearmshistory.blogspot.com/2014/02/the-cookson-repeater.html (accessed Feb. 20, 2023).  The video displayed at the blog may be found here: https://youtu.be/cs4vjq6sW40 (accessed Feb. 20, 2023).

[7] https://www.rockislandauction.com/riac-blog/assault-weapons-before-the-second-amendment#:~:text=The%20Belton%20%22Roman%20candle%22%20fusil%20is%20the%20first,a%2chained%20charge%20much%20like%20a%Roman%candle (accessed Feb. 20, 2023).

[8] https://founders.archives.gov/documents/Washington/03-05-02-0311 (accessed Feb. 20, 2023).

Def. Exhibit 64
Page 002495

for information, and has not even done that well.  Exemplary, extensive historical research into Belton and the "Belton repeating fusil" has been conducted by Robert Held, whose conclusions are at odds with Hlebinsky's, but Hlebinsky has not bothered to consult this work—or at least gives no evidence of having done so.  If she had consulted it, she would have learned that almost certainly, Belton had never produced a single repeating rifle of the sort that he vainly hoped would be purchased by the Continental Congress.[9]

## B.    Non-Use of Sources

14.    The non-use of Robert Held's work on Belton firearms is only one example of Hlebinsky's failure to use obvious historical sources for information.  Her most glaring non-use of sources is evident in her discussion of the production and distribution of Henry and Winchester rifles in the Reconstruction era.  The most valuable sources regarding production and distribution of these firearms are the serial number ledger books of the Winchester Repeating Arms Company.  The Cody Firearms Museum (CFM) possesses only those ledger books for the post-1875 period—that is, the period that begins *after* the crucial era termed the "Second Founding Era" by Hlebinsky.

15.    Fortunately, prior to the Company records being transferred to the CFM, they were carefully examined by John E. Parsons, sometime in the early 1950s.  Parsons, with the help of the curator of the company's records of the time, had access to information from the serial number ledger books in the pre-1875 period.  This information covered the Henry Rifle and the various models of the Winchester.[10]  For my report, the Parsons research was the primary basis of my claims involving production and distribution numbers. (Vorenberg report, page 16, note 17; ibid., page 29, note 29.)  Since writing that report, I have conducted further

[9] Robert Held, *The Belton Systems,1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 36-39.

[10] John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 102-7.

9

research into production and distribution numbers, using in particular studies
produced by Herbert G. Houze.  Among Houze's publications is a book published
in 1994 which was commissioned by the Olin Corporation, then the owner of the
Winchester company; this book largely confirms the numbers published by Parsons
forty years earlier.[11]  None of the works by Parsons or Houze was used by
Hlebinsky in her rebuttal.  It is evident that she has not consulted the works; she
may not even be aware of them.  Had she consulted them, she would have been able
to provide relevant information for the pre-1875 period, and she would not have
made the specious claim that "primary source evidence of foreign contracts are not
well documented and in some cases, questionable."  (Hlebinsky rebuttal, ¶ 25, page
19, lines 10-11.)  In fact, both Parsons and Houze provide reproductions of
selections of primary-source foreign contracts.  Parsons even provides an Appendix
containing transcriptions of contracts made by the Winchester company with the
Ottoman Empire in 1870; these were the most lucrative company contracts of the
Reconstruction era.[12]

    16.    Serial number information in the Hlebinsky rebuttal is drawn from two
scanty websites and from the serial number ledger records at the CFM, which, as
noted above, cover only the period after 1875.  (Hlebinsky rebuttal, page 19, note
36.)  Hlebinsky objects that my analysis of the numbers of Winchesters produced
and distributed "have not originated in a study of the records" at the CFM.
(Hlebinsky rebuttal, page 19, note 39.)  It is true that I have not examined first-hand
the serial number ledger records located at the CFM, but it is also true, as I have
explained, that these original records are not useful for the pre-1875 period, and that

---

[11] Herbert G. Houze, *Winchester Repeating Arms Company: Its History and Development from 1865 to 1981* (Iola, Wisc.: Krause, 1994).  See also, H. G. Houze, "A Reevaluation of the Henry and Model 1866 Serial Numbering," *Man at Arms*, 13 (July/August 1991), 10-17.

[12] Parsons, *The First Winchester*, 155-69.

Def. Exhibit 64
Page 002497

1  the work by John E. Parsons that I relied on was in many ways a better source of

2  information than the records as they exist now in the CFM.

3      17.    For all that Hlebinsky emphasizes the importance of the serial number

4  ledger records at the CFM, it is not clear that she has studied them closely.  She

5  writes that the Winchester records provide "pertinent information" about "when and

6  where" specific models "left the factory."  (Hlebinsky rebuttal, page 19, note 39.)

7  This statement implies that the records at the CFM tell us the destination of

8  shipments of Winchesters.  In fact, as is explained in the scholarship of John E.

9  Parsons, the Winchester company serial number ledger records, with only a few

10  exceptions, do not divulge the destinations of shipments.  Each entry contains the

11  number of guns shipped, the date shipped, and an order number.  No information is

12  regularly given in the ledgers as to the destination of the shipments.  The original

13  order books may have contained this information, but the order books have not

14  been preserved.[13]

15      18.    Hlebinsky rightly notes that not all Winchesters produced during the

16  Reconstruction were shipped to foreign governments, but she woefully

17  underestimates the fraction of sales to foreign governments, saying that these sales

18  were only 1/3 of total sales.  (Hlebinsky rebuttal, ¶ 25, page 19, line 6.)  That

19  fraction is based on production numbers covering the period 1875-1900, but the

20  relevant period here—what Hlebinsky calls "The Second Founding"—is 1865-

21  1875.  As my report indicated, in the 1865-1875 period, most of the Winchesters

22  sold went to foreign armies.  (Vorenberg report, ¶ 26-28, pages 14-16.)

23      19.    For Winchesters that were produced but not sold to foreign armies, we

24  cannot assume that they were sold domestically.  Yet Hlebinsky's rebuttal suggests

25  that many if not most of these guns were sold domestically and ended up in the

26  hands of American civilians.  She implies that the number of civilian-held

27

28          [13] Parsons, *The First Winchester*, 104-5.

11

Def. Exhibit 64
Page 002498

Winchesters in the post-Civil War South was higher than I suggest, arguing that I am being "misleading" in inferring that the Winchesters used by the Louisiana and South Carolina militias represented most of the Winchesters in the South during Reconstruction. (Hlebinsky rebuttal, page 19, note 39.)  Later in the rebuttal—and here she distorts the total number of Winchesters in the Reconstruction-era U.S. by including those produced in the 1890s—she writes, "With millions [of Winchesters] produced during this time frame, it begs the question of where those guns went since it wasn't military service."  (Hlebinsky rebuttal, ¶ 27, page 21, lines 14-15.)  It is incorrect to assume that all Winchesters produced were necessarily sold or distributed.  For example, it is clear that the Winchester company kept hundreds of firearms warehoused at any given moment.  That strategy made good business sense, as a foreign order might have to be fulfilled quickly.  Evidence for warehousing of Winchesters comes from Houze's research.  In 1867, for example, the company reported an inventory valuing $72,447.74.  That inventory would have included not only Winchester rifles and carbines but other types of firearms as well as ammunition and accessories.  A conservative estimate of the value of the inventory represented by Winchesters might be $50,000 (roughly two-thirds of the inventory).  Winchesters were priced between $40 and $50 at the time, so the total number of Winchesters warehoused might have been about just over 1,000.[14]  Of course, the number of warehoused Winchesters could have been much greater than that.  Again, I mention the warehousing issue only to emphasize the point that we cannot assume that Winchesters not sold to foreign armies were necessarily sold domestically and ended up in civilian hands.

20.    The best research available on sales of Winchesters indicates that sales to American civilians were negligible prior to 1868, the year of the adoption of the

---

[14] See Houze, *Winchester Repeating Arms Company*, 63-64, for the 1867 financial statement and an 1867 broadside providing prices of goods.

Def. Exhibit 64
Page 002499

Fourteenth Amendment.  According to Houze, concerted efforts to market

Winchesters to American civilians began only in January 1869.[15]

21.    Obviously, the information provided by Parsons in the 1950s and

Houze in the 1990s is essential to any historical analysis that examines numbers of

Henrys and Winchesters produced and distributed, yet Hlebinsky has not used these

works.

### C.    Misuse of Sources

22.    With the sources that she *has* consulted, Hlebinsky often misrepresents

or distorts their content.  There are many examples of misuse of sources in the

Hlebinsky rebuttal, but I will note only a few.

23.    In writing of "repeaters" at the time of "the ratification of the Second

Amendment," Hlebinsky mentions a "fourteen-barrel double Nock volley gun-style

rifle."  (Hlebinsky rebuttal, ¶ 21, page 15, lines, 9-10.)  The source provided for this

weapon is a YouTube video created by Ian McCollum, who Hlebinsky identifies as

"one of the foremost authorities on firearms technology in the United States."

(Hlebinsky rebuttal, page 15, note 25.)  Yet the video cited displays a gun that was

not made at the time of the ratification of the Second Amendment but rather in the

early 1800s.  Also, the gun was made in London, another reason why Americans at

the time of the ratification of the Second Amendment would not have known about

it.  (Hlebinsky rebuttal, page 16, note 27.)

24.    In another part of the rebuttal, Hlebinsky distorts the content of an

entry in *Flayderman's Guide to Antique American Firearms*, an important source

for firearms collectors.  She uses the guide to claim that the Evans Repeating Rifle

was a competitive model to the Winchester in the period between 1873 and 1879.

12,200 models of the rifle were made in this period, Hlebinsky reports.  (Hlebinsky

---

[15] Houze, *Winchester Repeating Arms Company*, 360.  Houze reports that the
marketing efforts in 1869 and 1870 were successful—demand exceeded supply—
but after 1870 domestic sales flattened.

Def. Exhibit 64
Page 002500

rebuttal, ¶ 30, page 23, 20-24.)  This information is technically accurate.  However, almost all of the Evans rifles in question (10,000 of the 12,200, according to *Flayderman's Guide*) were produced in the period 1877-79—that is, in the period *after* "The Second Founding," the era that Hlebinsky's rebuttal statement ostensibly covers.[16]

25.    Later in the rebuttal statement, Hlebinsky claims that "government disarmament" was the cause of the infamous massacre of Lakota at Wounded Knee in 1890; the source she cites for this claim is a reputable historical monograph, Robert M. Utley's *The Last Days of the Sioux Nation*.  (Hlebinsky rebuttal, ¶ 50, page 35, line 7.)  Yet Utley's account of the massacre makes it clear that "government disarmament" of the Lakota was not the intention of the U.S. government.  Rather, the government sought to stop the "Ghost Dance," mistakenly believing that the ceremony was prefatory to an insurgency.  On December 29, 1890, the day of the massacre, the Lakota were not concerned about disarmament; they mistakenly believed that Colonel James Forsyth's troops meant to murder them all.  Forsyth's commander, Brigadier General John R. Brooke, was alone responsible for the order to disarm a band of Lakota that day.  The order was not part of a general policy of "government disarmament."  When Forsyth carried out his commander's order, his actions led to the inadvertent firing of a gun that was being seized, which in turn set off the massacre.[17]  In calling the episode an example of "government disarmament," Hlebinsky has misused Utley's book.

## V.    HLEBINSKY'S FALSE HISTORICAL NARRATIVES

26.    A historian can be forgiven for the occasional factual error or minor misrepresentation of a source, but it is unacceptable for historians to create false

---

[16] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, (9th ed., Appleton, Wisc.: Gun Digest Books, 2019), 694-95.

[17] Robert M. Utley, *The Last Days of the Sioux Nation* (2nd ed., New Haven, Conn.: Yale University Press, 2004), 146-47, 204-13.

Def. Exhibit 64
Page 002501

narratives that purport to be authentic histories. Hlebinsky's rebuttal is filled with such false historical narratives.

27.    One false narrative given by Hlebinsky, which is the narrative countered most directly and repeatedly in my initial report and this Sur-Rebuttal, is that repeating firearms were generally common and also commonly held by civilians during the Reconstruction era. Yet Winchester repeating rifles, the only type of high-capacity firearms produced in the era, did not begin to proliferate in large numbers until the 1890s. Hlebinsky uses the "hundreds of thousands" of Winchesters produced in the last decade of the nineteenth century to create a false narrative that a similar proliferation took place twenty to thirty years earlier. (Hlebinsky rebuttal, page 19, note 39.)

28.    Another such false narrative is that repeating firearms were common at the time of creation of the Second Amendment (1791). (Hlebinsky rebuttal, ¶ 19-22, pages 12-17.) In my report, I challenged certain elements of this narrative. (Vorenberg report, ¶ 16-18, pages 8-9.) I challenge other elements above, in my discussions of Hlebinsky's use of evidence relating to the Cookson/Hill and Belton "repeaters." In a declaration and deposition for a separate, related federal case, Hlebinsky herself has contradicted the narrative of Second Amendment-era "repeaters" that she provides in her rebuttal in the current case.[18]

29.    Other instances of false narratives abound in the Hlebinsky rebuttal, but for the sake of brevity I will mention only two more.

30.    Hlebinsky offers a version of events concerning the Kansas Territory in 1856 that is unrecognizable as legitimate history. In her version, pro-slavery

---

[18] Declaration of Ashley Hlebinsky, *Oregon Firearms Federation v. Brown*, Case No. 2:22-cv-01815-IM (D. Or. Jan. 6, 2023) (ECF No. 72), para. 22: Hlebinsky stating that the examples of "repeaters" that she gives were "one-off examples"; that they were "unsuccessful by modern and/or historic standards"; that perhaps fewer than ten such "repeaters" existed at the time of the founding of the United States.

1    settlers sacked the city of Lawrence, Kansas in order to disarm "Free Soilers" who

2    were armed with Sharps rifles.  In response, Senator Charles Sumner of

3    Massachusetts defended gun rights in a speech attacking South Carolina Senator A.

4    P. Butler, who had advocated disarmament for antislavery settlers in Kansas.

5    Butler's response, it appears in Hlebinsky's account, was to beat Sumner with a

6    cane on the floor of the Senate.  Hlebinsky does not say that Butler himself caned

7    Sumner, but that is the implication of her statement that Sumner's speech

8    "culminated in violence against Sumner, who was beaten with a cane on the Senate

9    floor for advocating against disarmament."  (Hlebinsky rebuttal, ¶ 49, page 35, lines

10   5-6.)

11       31.    This history told by Hlebinsky is deeply flawed.  The leader of the

12   forces that attacked Lawrence on May 21, 1856 did indeed demand that all

13   residents of the town give up their arms.  But attempted disarmament was only one

14   part of their action that day.  Even after they were given a cannon by a leader of the

15   Free Soilers—a gesture of disarmament—the attackers burned down the main hotel

16   of the town as well as other buildings, and they destroyed the printing presses used

17   by antislavery pamphleteers and newspapermen.  All of these actions, one should

18   note, occurred after, not before, Sumner's famous speech of May 19-20, 1856.

19   Thus, in contrast to Hlebinsky's account, the decision by Sumner to deliver the

20   speech, as well as the content of that speech, could not have had anything to do

21   with the sack of Lawrence that followed.

22       32.    Also, quite contrary to the implication of Hlebinsky's account, Sumner

23   was not a supporter of gun rights.  Like most abolitionists, he advocated non-

24   violent methods.  He gave the speech in question only after being convinced by

25   agents of the New England Emigrant Aid company that it had not provided guns to

26   antislavery settlers in Kansas (this was a lie, but Sumner believed it).  In his speech,

27   Sumner did not defend gun rights in general but only the possession of a "rifle" by

28   "the pioneer."  That is, Sumner thought it was reasonable that Americans entering

16

lawless places might carry guns for self-defense.[19]  The passage quoted by
Hlebinsky occupies only about 1% of the total text of this very long speech, the
purpose of which was to denounce supporters of slavery in general and to prohibit
slavery from the territory of Kansas in particular.  Sumner's speech called for a
peaceful prohibition of slavery in Kansas by legislation.  He contrasted this
peaceful approach to the violent methods of pro-slavery militants in or near Kansas,
who the year before had tried and failed to seize Lawrence with an illegitimate,
"shot-gun militia."[20]  It is true that Senator Butler had denounced the smuggling of
Sharps rifles to antislavery settlers in Kansas and had suggested that the owners of
the guns might be arrested (he further quipped that Sumner should be drafted to
head the *posse comitatus* that would make the arrests).[21]  This statement was indeed
seized upon by Sumner, as Hlebinsky writes.  Sumner used the statement as
evidence of the derision of the Constitution by Butler and all other proslavery
advocates.  Sumner's only real purpose, in other words, was to denounce slavery's
defenders, not to champion the Second Amendment.  Hlebinsky has taken
Sumner's statement out of its historical context, something a historian should
always avoid.

33.    In suggesting that it was Sumner's comments on the Second
Amendment that provoked the attack on him, Hlebinsky has further distorted the
historical record.  Sumner was attacked for two major reasons: his longstanding
position against slavery; and his use of personal insults against Butler during his
speech of May 19-20, 1856 (the insults occur in a different part of the speech than

---

[19] Sumner's attitude regarding gun rights for "the pioneer" corresponds to
what I wrote in my report about American attitudes toward gun possession in areas
considered lawless, such as the mid-19th century West.  See Vorenberg report, ¶ 53,
page 30, lines 14-18.

[20] Charles Sumner, *The Kansas Question* (Cincinnati: George S. Blanchard,
1856), 10-11.

[21] Sumner, *The Kansas Question*, 22.

1  the part quoted by Hlebinsky).  The actual caning of Sumner was done not by

2  Butler, who was in South Carolina at the time, but by Butler's cousin, Preston

3  Brooks, a U.S. Representative.[22]

4       34.    Another egregious example of a false narrative in Hlebinsky's rebuttal

5  appears in her characterization of Ida B. Wells and Wells's allies in the anti-

6  lynching cause as gun-rights advocates.  In this narrative, Hlebinsky makes out

7  Wells and another anti-lynching activist, James R. Mitchell, Jr., to be, first and

8  foremost, defenders of gun-owning rights for Black Americans.  (Hlebinsky

9  rebuttal, ¶ 50, pages 35-36.)  As part of this narrative, Hlebinsky provides a

10  quotation from one of Wells's most famous publications, *Southern Horrors* (1892):

11  "a Winchester rifle should have a place of honor in every black home, and it should

12  be used for the protection which the law refuses to give."  It is worth noting that the

13  quotation in question, as well as the anti-lynching movement in general, took place

14  more than twenty years after the ratification of the Fourteenth Amendment and ten

15  years after the end of Reconstruction.  As has been stated earlier in this Sur-

16  Rebuttal, and also has been documented by Hlebinsky herself, by the 1890s, when

17  Wells wrote *Southern Horrors*, Winchesters had begun to proliferate in numbers far

18  greater than they had existed during Reconstruction.  The time period invoked by

19  Hlebinsky (the 1890s) thus makes the events described irrelevant to the question of

20  the state of high-capacity guns and gun laws circa 1868.

21       35.    Hlebinsky's use of the Wells statement also represents a distortion of

22  history.  The top priority for Wells and her allies was the passage of state and

23  federal anti-lynching laws.  Such laws, not gun ownership or anti-gun restrictions,

24  were their avowed cause.[23]  That is why the quotation given by Hlebinsky ends

25       [22] Manisha Sinha, *The Slave's Cause: A History of Abolition* (New Haven,
Conn.: Yale University Press, 2016), 546-48; David Herbert Donald, *Charles
26  Sumner and the Coming of the Civil War* (New York: Alfred A. Knopf, 1960), 278-
95.
27

28       [23] Nell Irvin Painter, *Standing at Armageddon: The United States, 1877-1919*

Def. Exhibit 64
Page 002505

1  with the phrase: ". . . which the law refuses to give."  Blacks in the United States in

2  the 1890s had the same gun-owning rights as Whites, and, as Hlebinsky notes,

3  Blacks were able to use those rights to purchase guns, including Winchesters.  Yet

4  these facts had no bearing on the fight by Wells and her allies for anti-lynching

5  laws, a fight that continued well beyond the 1890s.  (Not until 2022 was a federal

6  anti-lynching law adopted: the Emmett Till Anti-Lynching Act.)  It was only

7  because legislators by the 1890s had failed to adopt anti-lynching legislation, and

8  because the lynching of Black Americans occurred at unprecedented rates in the

9  late 1800s, that Wells and some of her allies suggested that Blacks might purchase

10  guns for self-defense.  Had these Black American leaders witnessed the passage of

11  the legislation they sought, and had that legislation been enforced, then their

12  statements about guns for self-defense would have been unnecessary, and almost

13  certainly they would not have made them.  For Hlebinsky to turn this episode, a

14  story of heroic though failed activism on behalf of legislation to combat white

15  terror, into a history of gun-rights activism, is a crass distortion of the historical

16  record.

17      36.    Had Hlebinsky used standard sources for historical research, such as

18  articles and monographs written by historians, or even college-level American

19  history textbooks, she might have avoided producing these faulty narratives.

20  Instead, her major source for American history, at least for the episodes involving

21  Charles Sumner and Ida B. Wells, is a firearms law textbook written not by

22  historians but by attorneys.  To the extent that these authors are interested in

23  history, it is only to cherry-pick incidents and words from history that support their

24  position in favor of broad gun rights.[24]  That Hlebinsky used this volume as her

25  (New York: W. W. Norton, 1987), 223-24.

26  [24] Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory
Wallace, and Donald Kilmer, *Firearms Law and the Second Amendment:*

27  *Regulation, Rights, and Policy* (3rd ed., New York: Wolters Kluwer, 2022).

28  Hlebinsky cites this volume more than she cites any other source: see Hlebinsky

Def. Exhibit 64
Page 002506

1  main source, rather than using a balanced, more objective history, represents a

2  disregard for the practice of history as well as indifference toward historical

3  accuracy.

4  ## VI.    CONCLUSION

5      37.    In a concurring opinion in the 2010 U.S. Supreme Court case

6  *McDonald v. Chicago*, Justice Antonin Scalia wrote that historical analysis can

7  require "making nuanced judgments about which evidence to consult and how to

8  interpret it." (561 U.S. 742, 803-804 (2010).)  In the 2022 U.S. Supreme Court

9  case *New York State Rifle and Pistol Association Inc. v. Bruen*, the majority opinion

10  authored by Justice Clarence Thomas quoted Scalia's words approvingly.  (142 S.

11  Ct. 2111, 2130 (2022).)  The standards of historical analysis that the authors of

12  these opinions called for have not been met in the rebuttal offered by Ashley

13  Hlebinsky.  The result is a deeply flawed piece of writing by Hlebinsky that should

14  not be accepted as legitimate historical analysis and that fails to controvert or

15  disprove my opinions about the existence, usage, and regulation of high-capacity

16  firearms during Reconstruction.

17

18      I declare under penalty of perjury that the foregoing is true and correct.

19      Executed on February 24, 2023 at Providence, Rhode Island.

20

21      _____

22      Michael Vorenberg

23

24  purports to consider "arms laws in their broader social context" and to present
   material "in conjunction with the culture, technology, and politics of their times"
25  (xxxi), but the selective use of historical evidence in favor of broad gun rights is
   evident throughout the volume.  The final paragraph of the hard-copy edition of the
26  volume here cited contains the following statements: "governments . . . present
   perhaps the greatest threat to liberty"; and "in the most dire circumstances, the
27  armed populace is the last line of defense for legitimate government that respects
28  human rights" (1292).

Def. Exhibit 64
Page 002507