1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   CHRISTINA R.B. LÓPEZ
4  Deputy Attorneys General
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 510-3479
    Fax:  (415) 703-1234
8   E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity as Attorney General of the*
   *State of California*
10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                      WESTERN DIVISION

14

15  **STEVEN RUPP; STEVEN**          Case No. 8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**               **DEFENDANT'S OPPOSITION TO**
    **CHRISTOPHER SEIFERT;**         **PLAINTIFFS' MOTION FOR**
17  **ALFONSO VALENCIA; TROY**       **SUMMARY JUDGMENT**
    **WILLIS; and CALIFORNIA RIFLE**
18  **& PISTOL ASSOCIATION,**        **[Dkt. 150]**
    **INCORPORATED,**
19                                   Date:      July 28, 2023
                      Plaintiffs,    Time:      10:30 a.m.
20                                   Courtroom: 8A
                                     Judge:     Hon. Josephine L. Staton
21         **v.**                    Trial Date: None set
                                     Action Filed: April 24, 2017
22  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
23  **California; and DOES 1-10,**

24                    Defendants.

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction..................................................................................................1

Argument .....................................................................................................2

I.     Plaintiffs Fail to Establish that the AWCA Regulates "Arms" Covered by the Plain Text of the Second Amendment......................4

    A.     Plaintiffs Bear the Burden of Showing that the Items Regulated by the AWCA Are "Arms" in Common Use for Self-Defense...........................................................................4

    B.     The Accessories and Parts Regulated by Section 30515 Are Not "Arms" or Necessary to Operate Any Arm for Self-Defense ......................................................................7

    C.     Plaintiffs Fail to Show that "Assault Weapons" Are in "Common Use" for Self-Defense ............................................9

        1.     The AWCA Regulates Rifles and Accessories that Are Like the M16 and Most Useful in Military Service ........................................................................10

        2.     Plaintiffs Fail to Show that the Regulated Weapons Configurations Are Commonly Used or Suitable for Self-Defense .............................................12

            a.     Numbers Are Not Enough. ...............................12

            b.     Plaintiffs' Numbers Are Unreliable and Unpersuasive. ...................................................13

    D.     The Cases Cited by Plaintiffs Do Not Establish that Assault Weapons Are Protected by the Second Amendment.......................................................................20

II.     The AWCA's Restrictions on Certain Particularly Dangerous Rifle Configurations Are Consistent with the Nation's Tradition of Firearms Regulation ..........................................................22

    A.     A More Nuanced Approach Is Required ................................24

        1.     Dramatic Technological Change....................................24

        2.     Unprecedented Societal Concern ..................................27

    B.     The AWCA Is Consistent with the Nation's Tradition of Weapons Regulation.................................................................29

Conclusion ................................................................................................31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bevis v. City of Naperville, Ill.*
   __ F. Supp. 3d __, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ................ 17, 29

*Caetano v. Massachusetts*
   577 U.S. 411 (2016) ....................................................................................... 19

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
   __ F. Supp. 3d __, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ................ *passim*

*Duncan v. Bonta*
   19 F.4th 1087 (9th Cir. 2021) ...................................................................... 6, 10

*Duncan v. Bonta*
   49 F.4th 1228 (9th Cir. 2022) ........................................................................ 6, 7

*Hanson v. District of Columbia*
   __ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023).............. 6, 25, 27

*Hartford v. Ferguson*
   __ F. Supp. 3d __, 2023 WL 3836230 (W.D. Wash. June 6, 2023) .......... *passim*

*Heller v. District of Columbia*
   670 F.3d 1244 (D.C. Cir. 2021) .................................................................. *passim*

*Herrera v. Raoul*
   2023 WL 3074799 (N.D. Ill. Apr. 25, 2023)............................................... 27, 29

*Hollis v. Lunch*
   827 F.3d 436 (5th Cir. 2016) ........................................................................... 20

*Kolbe v. Hogan*
   813 F.3d 160 (4th Cir. 2016) ........................................................................... 20

*Konigsberg v. State Bar of California*
   366 U.S. 36 (1961) ........................................................................................ 3, 4

*Luis v. United States*
   578 U.S. 5 (2016) ............................................................................................. 8

# TABLE OF AUTHORITIES
## (continued)

Page

*Miller v. Bonta*
542 F. Supp. 3d 1009 (S.D. Cal. 2021) .......................................................20, 21

*Miller v. Bonta*
2022 WL 3095986 (9th Cir. Aug. 1, 2022)..................................................20, 21

*Miller v. Garland*
2023 WL 3692841 (E.D. Va. May 26, 2023) ...................................................... 8

*Murphy v. Collier*
468 F. Supp. 3d 872 (S.D. Tex. 2020)............................................................... 11

*New York State Rifle & Pistol Ass'n v. Bruen*
142 S. Ct. 2111 (2022) .............................................................................. *passim*

*New York State Rifle & Pistol Ass'n v. Cuomo*
804 F.3d 242 (2d Cir. 2015) ............................................................................. 20

*Ocean State Tactical, LLC v. State of Rhode Island*
2022 WL 17721175 (D.R.I. Dec. 14, 2022)..........................................5, 26, 27

*Or. Firearms Fed'n v. Kotek*
2023 WL 3687404 (D. Or. May 26, 2023)..................................................*passim*

*Staples v. United States*
511 U.S. 600 (1994) ......................................................................................... 22

*Smith v. Hedgpeth*
706 F.3d 1099 (9th Cir. 2013) .......................................................................... 11

*United States v. Alaniz*
__ F.4th __, 2023 WL 3961124 (9th Cir. June 13, 2023) ..........................*passim*

*United States v. Benitez*
2018 WL 6591917 (D. Idaho) ........................................................................... 20

*United States v. Reyna*
2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) .................................................. 5

*United States v. Saleem*
__ F. Supp. 3d __, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023)....................... 8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Salerno*
  481 U.S. 739 (1987) ............................................................................... 7

*United States v. Simien*
  __ F. Supp. 3d __, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023)........ 15, 17, 20

**STATUTES**

Assault Weapons Control Act ...........................................................*passim*

California Penal Code
  § 30515 .................................................................................... 7, 11
  § 30515(a)............................................................................... 7, 8, 9, 22
  § 30515(a)(1) ................................................................................ 8, 9
  § 30515(e)..................................................................................... 6

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  First Amendment ........................................................................ 3, 4
  Second Amendment.................................................................*passim*
  Fourteenth Amendment ................................................................ 27

**OTHER AUTHORITIES**

AAPOR, Code of Professional Ethics and Practices (2020) ................................ 14

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and
  Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ............................................ 25, 26

Liz Mineo, *Stopping Toxic Flow of Guns from U.S. to Mexico*, Harvard
  Gazette, Feb. 18, 2022 ...................................................................... 17

**INTRODUCTION**

Plaintiffs' motion for summary judgment should be denied because the challenged provisions of California's Assault Weapons Control Act ("AWCA") comport with the Second Amendment, as demonstrated by Defendant's cross-motion for summary judgment.  *See* Def.'s Mem. of P. &. A. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), Dkt. 149-1.  The AWCA is constitutional at both the textual and historical stages of the standard announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  Plaintiffs have failed to show that the plain text of the Second Amendment covers the weapons, accessories, and parts regulated by the AWCA, including that they are in "common use" for self-defense.  To minimize their burden, Plaintiffs attempt to shoehorn the common-use inquiry into the second, historical stage of the *Bruen* analysis, but the Ninth Circuit has foreclosed that strategy:  the textual inquiry includes an examination of "whether the weapon at issue is "'in common use'" today for self-defense.'"  *United States v. Alaniz*, __ F.4th __, 2023 WL 3961124, at *3 (9th Cir. June 13, 2023) (quoting *Bruen*, 142 S. Ct. at 2134).

Even if the Court proceeds to the historical stage of the *Bruen* standard, Defendant has amply demonstrated that the AWCA is consistent with the Nation's tradition of firearms regulation.  Defendant has catalogued hundreds of historical laws that evince a pattern of government regulation targeting particularly dangerous weapons, *see* App. 1 (Dkt. 149-3)—from Bowie knives, dirks, billies, and trap guns in the 18th and 19th centuries to semiautomatic and automatic weapons in the 20th century—after those weapons became "widely popular with civilians" and "associated with criminal use."  *Hartford v. Ferguson*, __ F. Supp. 3d __, 2023 WL 3836230, at *5 (W.D. Wash. June 6, 2023).[1]  The AWCA is consistent with that

---

[1] *Hartford* became the seventh post-*Bruen* case to reject a preliminary injunction motion to enjoin restrictions on assault weapons or large-capacity magazines.  *See* Def.'s Mem. at 8 & n.8.  In one of those cases, *Oregon Firearms*

pattern.  As with those laws, the AWCA imposes a comparably "slight" burden on the right to armed self-defense, and that minimal burden is comparably justified by "public safety concerns regarding weapons considered to be extremely dangerous." *Id.* at *6.  Throughout American history, governments have retained substantial latitude in enacting restrictions on weapons deemed to pose significant dangers to the public, provided that law-abiding citizens retained access to other arms for effective self-defense.  As former U.S. Solicitor General Paul Clement acknowledged during oral argument in *Heller*, the right to keep and bear arms has "always coexisted with reasonable regulations of firearms."  PX-47 at 39.[2]

Because the AWCA is constitutional under *Bruen*, the Court should deny Plaintiffs' motion for summary judgment.[3]

# ARGUMENT

Plaintiffs' motion for summary judgment should be denied.  Under *Bruen*, the Court must first determine whether the "the Second Amendment's plain text covers an individual's conduct," 142 S. Ct. at 2130, including "whether the weapon at issue is '"in common use" today for self-defense,'" *Alaniz*, 2023 WL 3961124, at *3 (quoting *Bruen*, 142 S. Ct. 2134).  If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by

---

*Federation*, the district court recently denied the plaintiffs' motion for summary judgment on their Second Amendment challenge to Oregon's large-capacity magazine restrictions.  *Or. Firearms Fed'n v. Kotek* (*Oregon Firearms*), 2023 WL 3687404 (D. Or. May 26, 2023).  The government did not move for summary judgment on that claim, and the district court held a trial on the merits from June 5–8.  *See Oregon Firearms*, No. 2:22-cv-01815 (D. Or. Jun. 5–8, 2023), Dkts. 240, 242–244.  A decision in that case is forthcoming.

[2] Exhibits annexed to the Declaration of Sean A. Brady in Support of Plaintiffs' Motion for Summary Judgment are cited with the prefix "PX" followed by the exhibit number, so that PX-1 refers to Plaintiffs' Exhibit 1.

[3] Plaintiffs do not seek summary judgment on their non-Second Amendment claims.  Defendant is entitled to judgment on those claims.  *See* Def.'s Mem. at 3 n.5.

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  Plaintiffs agree that *Bruen* requires a two-stage inquiry focused on text and history.  Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem.") at 9, 23, Dkt. 150-1.  But their motion is premised on several mischaracterizations of how the *Bruen* standard operates and should apply in this case.

Under the text-and-history standard, Plaintiffs bear the burden of showing that the instruments regulated by the challenged AWCA provisions—semiautomatic rifles configured with certain parts and accessories—are not only bearable "Arms," but also in common use today for self-defense.  They have failed to do so.  And even if Plaintiffs could show that the regulated items are *presumptively* protected by the text of the Second Amendment, *Bruen* then requires a historical analysis to determine whether the AWCA is constitutional.  Defendant has shown that the challenged AWCA provisions are consistent with the Nation's history of firearms regulation.  The historical analysis in *Heller* and *Bruen* is not dispositive.  Unlike those cases, a more nuanced approach is required because the AWCA addresses dramatic technological change (semiautomatic firearms) and an unprecedented societal concern (mass shootings).  Plaintiffs' arguments do not undermine the historical record Defendant has presented, which shows that assault weapon restrictions do not violate the Second Amendment—as at least four district courts have held on a similar historical record to the one presented here.

Plaintiffs incorrectly argue that the Second Amendment requires "unqualified deference" to the purported preferences of American gun owners.  Pls.' Mem. at 18; *see also id.* at 9, 19, 23.  *Bruen* described the Second Amendment as an "unqualified command," quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961).  *Bruen*, 142 S. Ct. at 2126.  But *Konigsberg* itself rejected the "literal reading" of constitutional commands that Plaintiffs urge here.  366 U.S. at 49.  The *Konigsberg* Court indicated that an absolutist view of the First

3

Amendment "cannot be reconciled" with the myriad exceptions to that right, and
explained that such absolutism should also not apply to "the equally unqualified
command of the Second Amendment." *Id.* at 49 n.10.  As with the First
Amendment, the Second Amendment is "not unlimited"—it does not confer "a
right to keep and carry any weapon whatsoever in any manner whatsoever and for
whatever purpose." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626).

Based on the record compiled by the parties here, the AWCA does not violate
the Second Amendment at either stage of the *Bruen* inquiry.  Thus, Defendant (and
not Plaintiffs) is entitled to judgment as a matter of law.

## I.  PLAINTIFFS FAIL TO ESTABLISH THAT THE AWCA REGULATES "ARMS" COVERED BY THE PLAIN TEXT OF THE SECOND AMENDMENT

Plaintiffs fail to satisfy their burden at *Bruen*'s textual stage, as they have not
shown that the instruments regulated by the challenged AWCA provisions are
covered by the plain text of the Second Amendment.  Here, the textual inquiry
centers on the word "Arms."  U.S. Const. amend. II.  The AWCA does not regulate
any protected "Arms" because (1) it regulates specific parts and accessories that are
not themselves "Arms" or necessary to operate any "Arm" for self-defense, and
(2) rifles with those parts and accessories are not "in common use" for self-defense.
Def.'s Mem. at 10–19.

### A.  Plaintiffs Bear the Burden of Showing that the Items Regulated by the AWCA Are "Arms" in Common Use for Self-Defense

Plaintiffs bear a threshold burden of demonstrating that the conduct of
acquiring, keeping, and possessing instruments deemed "assault weapons" under
the challenged AWCA provisions is covered by the plain text of the Second
Amendment.  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592);
*Hartford*, 2023 WL 3836230, at *2 (explaining that, if the Second Amendment's
plain text covers the plaintiffs' proposed conduct, "the burden *shifts* to proponents
of the law [or the government] to justify the challenged law" (emphasis added));

Def.'s Mem. at 9 (citing additional cases).  To satisfy their burden, Plaintiffs must show that the instruments regulated by the AWCA are bearable arms *and* that those arms are in "common use" for self-defense.  Only then must Defendant show that the challenged AWCA provisions are consistent with the Nation's tradition of firearms regulation.  It is not Defendant's burden, as Plaintiffs claim, to prove a negative—i.e., that the regulated semiautomatic rifles are *not* in common use.  *See* Pls.' Mem. at 20.

Plaintiffs try to minimize their burden at the textual stage by claiming that they need only establish that the regulated instruments are weapons, relocating the "common use" inquiry to the historical stage of the analysis.  *See Pls.' Mem.* at 14 (referring to a "*historical* 'common use' test"); *id.* at 18 (claiming that "whether an arm is 'dangerous and unusual' is a *historical* question, not a textual one"); *id.* at 17 (claiming that whether a weapon is in "common use at the time" "is *not* a textual question").  This is incorrect.  Plaintiffs cannot satisfy their burden at the textual stage simply by alleging that they wish to possess a weapon; otherwise, all cases challenging firearms restrictions would "promptly and automatically proceed[]" to the historical stage of the *Bruen* analysis.  *United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022).  Plaintiffs' argument also ignores *Bruen*, which performed the "common use" analysis not at the historical stage, but when confirming that the "Second Amendment's plain text presumptively guarantees" the conduct in which the plaintiffs wished to engage.  *Bruen*, 142 S. Ct. at 2134 (noting that no party disputed that "handguns are weapons 'in common use' today for self-defense" in the plain-text analysis).

Since *Bruen*, nearly all district courts examining restrictions on assault weapons and large-capacity magazines have required plaintiffs to show that "the conduct at issue is covered by the plain text of the Second Amendment—which includes finding that the weapon in question is 'in common use today for self-defense.'"  *Oregon Firearms*, 2023 WL 3687404, at *2; *see also Ocean State*

*Tactical, LLC v. State of Rhode Island* (*Ocean State*), 2022 WL 17721175, at *15
(D.R.I. Dec. 14, 2022) (concluding that the plaintiffs failed to establish "a link
between [large-capacity magazines] and the use of firearms for self-defense" at the
textual stage); *Hanson v. District of Columbia*, __ F. Supp. 3d __, 2023 WL
3019777, at *7–8 (D.D.C. Apr. 20, 2023) (concluding that large-capacity
magazines are not covered by the text of the Second Amendment because they are
not suitable or frequently used for self-defense).  The Ninth Circuit recently
endorsed this approach, explaining that *Bruen*'s "threshold inquiry" requires courts
to examine, *inter alia*, "whether the weapon at issue is '"in common use" today for
self-defense.'"  *Alaniz*, 2023 WL 3961124, at *3 (quoting *Bruen*, 142 S. Ct. at
2134–35) (emphasis added).  This Court thus must conduct the "common use"
analysis at the textual stage of the *Bruen* standard, where Plaintiffs bear the burden
of persuasion.

Notably, Plaintiffs bear their threshold burden with respect to *each* definition
of an "assault weapon" that they challenge.  *See* Cal. Penal Code § 30515(e) ("The
provisions of this section are severable.  If any provision of this section or its
application is held invalid, that invalidity shall not affect other provisions or
applications that can be given effect without the invalid provision or application.").
Thus, evidence that certain rifles subject to the AWCA may be in common use for
self-defense would not suffice to show that other regulated rifles are presumptively
protected by the Second Amendment.  *See, e.g.*, *Del. State Sportsmen's Ass'n v.
Del. Dep't of Safety & Homeland Sec.* (*DSSA*), __ F. Supp. 3d __, 2023 WL
2655150, at *5–7 (D. Del. Mar. 27, 2023) (concluding that "some—but not all—of
the regulated assault weapons" are in "common use" at the textual stage of the
inquiry).  And, importantly, if Plaintiffs fail to satisfy their burden as to *all* of the
definitions of an "assault weapon" challenged here, their claims—which are
characterized as a "facial[] challenge," *e.g.*, Pls.' Mem. at 6—necessarily fail.  *See
Duncan v. Bonta*, 19 F.4th 1087, 1111 (9th Cir. 2021) (noting that plaintiffs

1   asserting a facial claim "must demonstrate that 'no set of circumstances exists

2   under which the [law] would be valid" (quoting *United States v. Salerno*, 481 U.S.

3   739, 745 (1987))), *cert. granted and judgment vacated*, 142 S. Ct. 2895 (June 30,

4   2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).[4]

5        Plaintiffs have not shown that the challenged AWCA provisions implicate

6   conduct protected by the plain text of the Second Amendment, thereby failing to

7   satisfy their burden at the first stage of the *Bruen* analysis.

8        **B.    The Accessories and Parts Regulated by Section 30515 Are Not
            "Arms" or Necessary to Operate Any Arm for Self-Defense**
9

10       Contrary to Plaintiffs' claims, the challenged provisions of California Penal

11  Code section 30515 ("Section 30515") do not "Ban[] Rifles."  Pls.' Mem. at 7.  To

12  the contrary, Section 30515(a) permits the acquisition and possession of

13  semiautomatic, centerfire rifles that do not meet the statutory definition of an

14  "assault weapon," including a variety of California-compliant AR-platform rifles.

15  *See* Pls.' Mem. at 11 (suggesting the AWCA bans rifles "just for having features").

16  In practical operation, Section 30515(a) merely restricts the use of certain parts or

17  accessories with certain semiautomatic rifles, leaving Plaintiffs free to acquire rifles

18  that lack those parts or accessories.  A semiautomatic, centerfire rifle with a fixed

19  10-round magazine does not qualify as an "assault weapon" under Section 30515

20  unless equipped with a listed part or accessory.

21       Plaintiffs' own evidence confirms that the combat-oriented parts and

22  accessories enumerated in Section 30515(a)—including pistol grips that stabilize a

23  semiautomatic rifle in rapid fire or flash suppressors that can conceal the location of

24  a shooter in low-light conditions—are not themselves "[w]eapons of offence, or

25  armour of defence."  Pls.' Mem. at 12–13 (quoting 1773 edition of Samuel

26

27        [4] Defendant cites to cases abrogated on other grounds by *Bruen* or vacated

28  after *Bruen* for their persuasive value.

Johnson's dictionary definition of "arms").  The instruments listed in Section 30515(a)(1) are available separately on the aftermarket and can be attached or removed from a rifle without rendering the firearm inoperable.  *See* Pls.' Stmt. of Uncontroverted Facts & Conclusions of Law ("Pls.' SUF") 38 (pistol grips), 48 (adjustable stocks), 54 (flash suppressors); PX-44 (pistol grips); PX-45 (adjustable stocks); PX-46 (muzzle devices and flash suppressors); PX-59 ("[The AR-platform] design also allows it to be accessorized.  A civilian can buy aftermarket sights, vertical forward grips, lighting systems, night-vision devices, laser-targeting devices, muzzle brake/flash hiders, bipods, and more . . . .").  As Plaintiffs acknowledge, "[p]istol grips are not dangerous per se," Pls.' SUF 43—they are dangerous only when affixed to a firearm, and particularly when attached to a semiautomatic rifle to enable more effective rapid fire.  Similarly, one of Plaintiffs' witnesses, Stephen Helsley, characterized flash suppressors as "rifle *accessories* or 'do-dads.'"  PX-3 at 11 (emphasis added).  The items listed in Section 30515(a) are like silencers, which courts have held are not bearable "Arms."  Def.'s Mem. at 11; *United States v. Saleem*, __ F. Supp. 3d __, 2023 WL 2334417, at *9 (W.D.N.C. Mar. 2, 2023).  Such "accessories or attachments" are not "Arms" and "do not generally implicate the Second Amendment."  *Miller v. Garland*, 2023 WL 3692841, at *10 (E.D. Va. May 26, 2023) (holding that a "stabilizing brace" is not protected because it "cannot cause harm on its own, is not useful independent of its attachment to a firearm, and a firearm remains an effective weapon without a brace").

Nor do Plaintiffs demonstrate that any of the regulated parts and accessories are necessary to operate any rifle for self-defense, such that they could be protected by an ancillary right not provided by the plain text of the Second Amendment.  Plaintiffs argue that conduct beyond the mere keeping and bearing of arms, like possessing bullets, may be protected as "closely related acts necessary to the[] exercise" of Second Amendment rights.  Pls.' Mem. at 11–12 (quoting *Luis v.*

1   *United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring)); *accord* Def.'s

2   Mem. at 11.  But Plaintiffs do not argue that any of the parts and accessories

3   regulated by Section 30515(a)(1) are *necessary* to operate a semiautomatic,

4   centerfire rifle for self-defense.  There can be no reasonable dispute that they are

5   not.  Def.'s SUF 38–60.  Plaintiffs have thus not met their burden of persuasion on

6   this ground.  Because Section 30515(a) regulates parts and accessories that are

7   neither "Arms" or necessary to operate any firearm for self-defense, it does not

8   regulate protected "Arms."  The Court should reject Plaintiffs' challenge to the

9   definitions of an "assault weapon" in Section 30515(a).

10        **C.    Plaintiffs Fail to Show that "Assault Weapons" Are in
                  "Common Use" for Self-Defense**

11

12        Plaintiffs fail to show that the challenged AWCA provisions burden the

13   keeping and bearing of "Arms"—namely, weapons in "common use" for self-

14   defense.  Rather than argue that the items regulated by the AWCA are frequently

15   used in lawful self-defense, or even suitable for that purpose, Plaintiffs' claims

16   largely rest on the purported *number* of certain AR- and AK-platform rifles owned

17   in America, and on the purported reasons why Americans *claim* to own them,

18   according to unreliable and irrelevant industry estimates and surveys.  *See* Pls.'

19   Mem. at 20.  Plaintiffs' evidence does not meet their burden.

20        Plaintiffs fail to demonstrate that the weapons configurations regulated by the

21   AWCA are in common use for self-defense.  Though Plaintiffs admit that "self-

22   defense is central to the Second Amendment," they claim that *any* lawful purpose

23   may be protected by the Second Amendment, including recreation, target shooting,

24   and hunting.  Pls.' Mem. at 22; Pls.' SUF 31–33.  The Supreme Court, however,

25   has "tethered its 'common use' analysis to self-defense."  *DSSA*, 2023 WL

26   2655150, at *4.  *Bruen* referenced self-defense 49 times, without once mentioning

27   any other purpose (like hunting, target shooting, or recreation) in reference to

28   "common use."  And—quoting *Bruen*—the Ninth Circuit recently described the test

1   as "'in common use' today *for self-defense*." *Alaniz*, 2023 WL 3961124, at *3

2   (emphasis added).  Extending Second Amendment protection to weapons

3   commonly used for recreational or other hobby-related purposes—which could

4   conceivably be any firearm, including fully automatic firearms or other exceedingly

5   dangerous weapons—would swallow the rule requiring the use to be tied to self-

6   defense.

7       Plaintiffs' evidence does not demonstrate that weapons regulated by the

8   AWCA are in common use *for self-defense*.  Indeed, because the regulated weapons

9   are "like" the M16 rifle, Plaintiffs cannot make that requisite showing.

10          **1.    The AWCA Regulates Rifles and Accessories that Are Like**
            **the M16 and Most Useful in Military Service**
11

12      The parties generally agree on the mechanical similarities between M16 rifles

13   and AR-platform rifles.  The only relevant difference is that the M16 is a select-fire

14   rifle capable of semiautomatic, automatic, or burst fire (capable of firing a certain

15   number of rounds with each pull of the trigger) while AR-platform rifles are, unless

16   modified, capable of only semiautomatic fire.  *See* Pls.' SUF 71.  As this Court

17   previously held, that is a "distinction without a difference."  Dkt. 108 ("Order")

18   at 12.  Plaintiffs claim that this Court previously misread *Heller* as creating a

19   "dispositive test," and that this reasoning has since been rejected by *Bruen*.  Pls.'

20   Mem. at 13.  Not so.  This Court simply viewed the M16 rifle as an "example" of a

21   weapon that falls outside the protective scope of the Second Amendment and

22   properly analogized the rifles regulated by the AWCA, including AR-platform

23   rifles, to that example.  Order at 11.  An en banc panel of the Ninth Circuit viewed

24   this reasoning as having "significant merit" before *Bruen*, *see Duncan*, 19 F.4th at

25   1102, and nothing in *Bruen* "decide[d] anything about the kinds of weapons that

26

27

28

1  people may possess," *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).[5]  This

2  Court's prior analysis remains valid post-*Bruen*.

3      Plaintiffs contend that semiautomatic weapons cannot be "most useful in

4  military service" unless the weapon is used by an actual military.  Pls.' Mem. at 16.

5  But Plaintiffs elevate form over function.  Even if military-issued rifles are select-

6  fire, soldiers rarely if ever *use* automatic fire in battle.  PX-52.1 (Tucker Dep. Tr.)

7  at 64–65; Def.'s Mem. at 17.  Colonel Tucker explained that the features listed in

8  Section 30515, including pistol grips and adjustable stocks, are most useful in

9  military operations, even when the M16 or M4 is fired rapidly in semiautomatic

10  mode.  PX-52.2 (Tucker Cont'd. Dep. Tr.) at 174, 182; DX-62 (Tucker Suppl. Sur-

11  Rebuttal Rpt.) ¶ 18.  He also explained that AR-platform rifles without those

12  features would not be "viable for military use," PX-52.2 at 183:11–184:22,

13  confirming that the AWCA is focused on parts and accessories most useful in

14  military service.

15      This Court should readopt its prior reasoning that semiautomatic rifles

16  regulated by the challenged AWCA provisions are not protected by the Second

17  Amendment because they are "like" the M16 and most useful for military service.

18  As such, they cannot be in common use by civilians for lawful self-defense to

19  qualify as protected "Arms' under the Second Amendment.

20

21

22

23      [5] Plaintiffs argue that the author of the *Heller* majority opinion, Justice
24  Scalia, did not think that AR-platform rifles could be banned, based on his dissent
from a denial of certiorari in an assault weapons case. Pls.' Mem. at 14–15.
25  However, "it is axiomatic that the statements of a single Supreme Court justice do
not create binding precedent." *Murphy v. Collier*, 468 F. Supp. 3d 872, 878 (S.D.
26  Tex. 2020); *cf. Smith v. Hedgpeth*, 706 F.3d 1099, 1105 (9th Cir. 2013) (noting that
27  statements by Justice Scalia in a plurality opinion, without the assent of at least five
judges, "are not a binding declaration of the Court").
28

**2.   Plaintiffs Fail to Show that the Regulated Weapons Configurations Are Commonly Used or Suitable for Self-Defense**

**a.   Numbers Are Not Enough.**

Plaintiffs claim that some but not all of the rifles regulated by the AWCA are in common use based on the number of weapons owned.  *See* Pls. Mem. at 20. That is not (and cannot be) enough.  *See* Def.'s Mem. at 18–19.  Plaintiffs must also demonstrate that those weapons are *actually used and suitable* for self-defense to show that they are in common *use* for that purpose.  *Id.*  Otherwise, machine guns, flamethrowers, and any yet-to-be-invented weapon could gain Second Amendment protection simply by being sold in sufficient numbers.  *Id.* at 19.[6]  But this conflicts with the common use discussions in *Heller* and *Bruen*.  The Court should reject Plaintiffs' popularity test.

Plaintiffs offer no evidence on the frequency at which the weapons configurations regulated by the AWCA are actually used in self-defense.  Nor do they explain how the regulated accessories and parts—which contribute to more effective rapid fire and killing potential—are suitable to lawful self-defense. Although not his burden, as Defendant has demonstrated, the regulated weapons and accessories are rarely used in self-defense and are most suitable for combat (not self-defense).  Def.'s Mem. at 17–19.

---

[6] Plaintiffs apparently endorse this proposition.  During the appellate oral argument before this case was remanded, Plaintiffs' counsel suggested that flamethrowers could become protected by the Second Amendment if restrictions on them were lifted.  *See Rupp v. Bonta*, 19-56004 (9th Cir. Oct. 8, 2020), Oral Argument Recording at 17:13–17:22, 21:04–21:27, https://tinyurl.com/2bn3me79. Similarly, Plaintiffs suggest that restrictions on machine guns might be unconstitutional if enough people were allowed to acquire them:  "The M-16 was merely an example of a *military* weapon that might be banned consistent with the Second Amendment, despite the militia clause, *assuming* it is not in common use by law-abiding citizens."  Pls.' Mem. at 14 (second emphasis added).

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | **b.   Plaintiffs' Numbers Are Unreliable and Unpersuasive.**                |

Even if Plaintiffs could show that rifles with combat-oriented accessories regulated by the AWCA are commonly possessed by law-abiding citizens, that would be insufficient to meet their burden of establishing that they are in common *use* for self-defense.  But Plaintiffs' evidence from a few surveys and industry production estimates—showing that assault weapons represent a small fraction of America's gun stock, that assault weapon ownership has become increasingly concentrated, and that self-defense is not the primary factor driving sales—does not even demonstrate that the rifles regulated under the AWCA are commonly possessed for self-defense.  A close examination of Plaintiffs' evidence reveals that this "evidence" is of limited relevance, is unreliable, and fails to support Plaintiffs' insufficient assertion that the regulated rifles are commonly possessed.

*English*.  Plaintiffs rely on a 2021 survey conducted by one of their pre-remand expert witnesses, William English, who conducted a survey of 16,708 gun owners about gun ownership and uses.  Pls.' Mem. at 4; PX-49 at 1.  Plaintiffs do not submit the underlying survey results.  Rather, Plaintiffs submit a 2022 paper authored by English and posted on the Social Science Research Network, which reports select information about the survey results.  PX-49.  After remand, during supplemental expert discovery, Plaintiffs did not serve a supplemental expert report from English (as they did with two of their other witnesses who submitted expert reports in the prior proceedings, J. Buford Boone III and Gary Kleck), which could have provided insight into the 2021 firearms survey.  Instead, Plaintiffs attempt to introduce English's 2022 paper through a supplemental export report of a new witness, Mark Hanish, a firearms sales executive.  PX-53.  Hanish, however, has no knowledge of the veracity of what English has written about the firearms survey, let alone the reliability of the underlying survey data, which has not been subject to peer review, and he did not rely on any information related to the survey that is not

1  publicly available.  *See* DX-88 at 3038–43 (Hanish Dep. Tr. at 54–59, *Oregon*
2  *Firearms* (D. Or. Jan. 13, 2023)).[7]

3       There are many reasons to view the 2021 firearms survey with skepticism.
4  First, beyond the limited information revealed in English's 2022 paper, English did
5  not disclose critical information about his survey—e.g., the survey questions,
6  measurement tools, methodology for generating and recruiting samples, method of
7  data collection, and sources of funding—falling far short of the professional
8  standards of the American Association for Public Opinion Research (AAPOR).  *See*
9  DX-90 at 3066–69 (AAPOR, Code of Professional Ethics and Practices, at 4–6
10 (2020)), *available at* https://tinyurl.com/mr3c4rxs.  Based on the information
11 provided by English, it is impossible for researchers—and attorneys and judges—to
12 confirm whether the survey questions were leading or primed respondents to
13 provide certain responses.  As Plaintiffs' other expert witness, Gary Kleck, has
14 testified, English's 2021 firearms survey is not reliable.  *See* DX-91 at 3078–79
15 (Kleck Dep. Tr. at 76–77, *Oregon Firearms* (D. Or. Jan. 25, 2023)).

16      Second, English's 2022 paper estimates that as many as 44 million "AR-15 or
17 similarly styled rifle[s]" *have been owned* by approximately 24.6 million people."
18 PX-49 at 2.  The wording of the survey is important:  it apparently asked
19 respondents whether they have *ever* owned such a rifle, not whether they currently
20 own one.  PX-49 at 2.  This makes the survey an unreliable indicator of how many
21 such weapons are currently owned, which would be relevant to whether they are
22 "'in common use' *today* for self-defense."  *Alaniz*, 2023 WL 3961124, at *3
23 (emphasis added).  This 44-million figure represents a dramatic jump from
24 English's previous 15-million estimate just six years earlier, which he provided
25 with his pre-remand expert report.  Pls.' Mem. at 4 (citing PX-2 at 2–6).  The

26  ───────────────
27       [7] During supplemental discovery, Defendant requested the underlying survey
results but was informed that Hanish did not have access to any non-public
28 information about the survey.  DX–89 at 3059.

estimate is also double the 24-million estimate promoted by the National Shooting
Sports Foundation, Inc. (NSSF), discussed below.  *See* PX-50; Pls.' Mem. at 4.
Tellingly, Plaintiffs do not even reference the 44-million estimate in their brief,
despite relying on other parts of English's 2022 paper.  English's estimate raises
significant questions about the reliability of the 2021 firearms survey as a whole.

Third, English's estimate is over- and under-inclusive.  His survey apparently
asked gun owners about rifles "that have been modified . . . to be compliant with
local law," PX-49 at 33—firearms not regulated by assault weapons laws and thus
irrelevant to the common use inquiry here.  The estimate could also include rifles
issued by law enforcement agencies to "current and former law enforcement
officers who may be represented in the survey."  *Id.* at 19.  The use of certain
weapons by law enforcement, security, or military personnel is not relevant to
whether those weapons are commonly used by civilians *for self-defense*.  *See
Heller*, 554 U.S. at 624–25; *United States v. Simien*, __ F. Supp. 3d __, 2023 WL
1980487, at *9 (W.D. Tex. Feb. 10, 2023) (considering the number of "*civilian*-
owned machineguns" in concluding that machine guns are not in common use).
English's estimate is also under-inclusive, as it does not account for *non*-AR-15-
style rifles that are regulated by the AWCA, about which Plaintiffs offer no
evidence at all.

Finally, English's paper about the 2021 firearms survey, even if accurate,
indicates that ownership of AR-15-style rifles is highly concentrated.  *See* Def.'s
SUF 63 (discussing concentration of gun ownership).  In calculating ownership
rates of those rifles, English disregarded responses from 0.3% of respondents who
stated that they owned 100 or more such rifles—at least 7,380,000 such rifles if
English is correct that 24.6 million people have owned one.  PX-49 at 33.  Another
1.3% of AR-15-style rifle owners claimed to have owned between 10 and 99 such
rifles, yielding an additional 3,200,000 AR-15-style rifles (on the low end).  Thus,
according to English's most conservative estimates, approximately 11 million AR-

15-style rifles have been concentrated in the hands of just 1.6% of owners of such weapons.

In addition to these concerns with English's estimates, the firearms survey does not demonstrate that AR-15-style rifles are commonly possessed for self-defense purposes. The 2021 firearms survey purports to show that 61.9% of respondents claimed to own an AR-15-style rifle for home defense and 34.6% for defense outside the home. Pls.' Mem. at 22 (citing PX-49 at 33). But Plaintiffs neglect to mention that the top reason mentioned for owning such a weapon was recreational target shooting at 66%. PX-49 at 33; *see* Order at 16 ("Plaintiffs' own evidence shows that while individuals may sometimes purchase assault rifles for self-defense, it is not the primary purpose for doing so.").

*NSSF.* Plaintiffs also rely heavily on industry estimates publicized by NSSF. PX-50 at 1. NSSF holds itself out as "*The* Firearm Industry Trade Association," "advocating for the industry and its business and jobs" and "work[ing] in defense of the firearm and ammunition industry at all levels and before all branches of government." NSSF.org (emphasis added), https://tinyurl.com/2p4ed44f; DX-51 (Busse Suppl. Sur-Rebuttal Rpt.) ¶ 24. NSSF has claimed that 24 million "modern sporting rifles"—a phrase coined by NSSF to refer to "AR-15 and AK-style rifles"—are purportedly in circulation in the United States. PX-50 at 1.

Despite this claim, the NSSF estimate does not demonstrate that AR-15 or AK-style rifles are commonly owned for self-defense. *See* PX-17 at 2 ("Scholars who have researched American gun ownership treat the [NSSF's] estimates with some skepticism."). First, NSSF extrapolates from domestic production and importation figures of those weapons. PX-50 at 1. But those figures do not reflect how many are actually *owned* by law-abiding citizens, let alone how many are owned for the purpose of self-defense.

Second, NSSF's estimate includes firearms in the possession of domestic law enforcement and security agencies, firearms retailers (as *unsold* stock), and

prohibited persons (who acquired, but are not authorized to possess, them).  *See*
DX-54 (Klarevas Suppl. Rpt.) ¶ 15 n.6.[8]  These numbers do not reflect how many
firearms are possessed by law-abiding civilians for self-defense.  The estimate also
likely includes firearms that have been produced or imported, but subsequently
*illegally* trafficked to other countries, including Mexico.  *See* Liz Mineo, *Stopping
Toxic Flow of Guns from U.S. to Mexico*, Harvard Gazette, Feb. 18, 2022 ("Every
year, half a million weapons enter Mexico illegally from the U.S., and many of
them are military-style weapons that end up in the hands of drug cartels and other
violent criminals . . . ."), https://tinyurl.com/mr43uwx7.  Thus, NSSF's estimate
necessarily includes rifles that do not remain in the United States and are, thus,
irrelevant to the inquiry here.

Third, as with English's 2021 firearms survey, the NSSF estimate is both over-
and under-inclusive.  It is over-inclusive because it includes AR- and AK-platform
rifles that may comply with the AWCA and other states' assault weapon
restrictions, thus counting rifles that are not regulated by the AWCA.  And even if
accurate, the estimate is limited to "AR-15- and AK-47-platform rifles" and
provides no evidence as to other rifles produced or imported that may also qualify
as "assault weapons" under the AWCA.

Fourth, the NSSF figures confirm that AR-15- and AK-47-platform rifles
comprise a small sliver of firearms in circulation in the United States—just 5% of
all firearms.  *See* Klarevas Suppl. Rpt. ¶ 15; Def.'s Mem. at 18; *Bevis v. City of
Naperville, Ill.*, __ F. Supp. 3d __, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17,
2023) (noting that "only 5 percent of firearms are assault weapons," which are
owned by "less than 2 percent of all Americans").  The numbers would necessarily

---

[8] As noted previously, the number of weapons possessed by law enforcement
and security personnel for official duties is irrelevant to whether those weapons are
in common use by law-abiding civilians for self-defense.  *See Heller*, 554 U.S. at
624–25; *Simien*, 2023 WL 1980487, at *9.

be even smaller for AR-15- and AK-47-platform rifles *with combat-oriented features* and semiautomatic rifles that are not AR-15- or AK-style rifles. NSSF has also identified a "trend" in the concentration of ownership of AR- and AK-platform rifles: the average number of such rifles owned per-owner increased from 2.6 in 2010, to 3.1 in 2013, and to 3.8 in 2022—a 46% rise in concentration in just 12 years. DX-92 at 3093 (2022 NSSF Rpt. at 12); PX-23. In 2010, 21% of owners of AR- or AK-platform rifles owned four or more such weapons, which jumped to 27% in 2013, PX-23 at 13, and spiked to 41% in 2022, DX-92 at 3093 (2022 NSSF Rpt. at 12)—nearly one-half of all owners of AR-15s and AK-47s own four or more such rifles. During the same period, the number of owners of such rifles who own only one fell: 40% owned one in 2010, which fell to 35% in 2013, and just 24% in 2022. *Id.* at 3093 (2022 NSSF Rpt. at 12). According to NSSF's data, AR- and AK-platform rifles are owned by an increasingly concentrated group of individuals.

Fifth, the NSSF chart of domestic production of AR-15- and AK-47-platform rifles from 1990 to 2020 demonstrates that those weapons were not produced in significant numbers until 2009 (when President Barack Obama assumed office) and again in 2012 (when the mass shooting at Sandy Hook Elementary occurred in Newtown, Connecticut). *See* PX-50 at 2; Busse Suppl. Sur-Rebuttal Rpt. ¶ 25. If anything, NSSF's estimates show that the popularity of AR- and AK-platform rifles is a relatively recent phenomenon.

Finally, NSSF reports that self-defense is not the primary reason for owning an AR- or AK-platform rifle: "Recreational target shooting was rated as the most important reason for owning [an AR- or AK-platform rifle]." DX-92 at 3099 (2022 NSSF Rpt. at 18); *see* Order at 16.

*Washington Post.* Plaintiffs cite a Washington Post article concerning a poll of 399 "AR-15-style" rifle owners. Pls.' Mem. at 5; PX-51. According to the article, just 6% of Americans own an "AR-15-style rifle," including 20% of gun owners. PX-51 at 5. When asked to describe the main reasons why they own such

a rifle, the category of self-defense, home-defense, and family-defense was the top

response given for owning such a weapon, but the percentage was only 33%.  *Id.*

at 1.  When asked about certain reasons for owning an AR-15-style rifle, prompted

by the survey questions, the three top reasons were "Protect self, family and

property" (91%), "It is fun to shoot" (90%), and target shooting (90%).  *Id.* at 6.

Additionally, 74% reported owning an AR-15 "[i]n case law and order breaks

down."  *Id.*  These questions did not delineate actual use from self-reported reasons

for ownership, and thus do not indicate that AR-15-style rifles are in common use

for self-defense, let alone that other rifles not polled about that may qualify as

"assault weapons" under the AWCA are in common use for self-defense.

*Caetano Concurrence*.  Finally, Plaintiffs attempt to compare the number of

AR-platform rifles in circulation with the number of stun guns owned in the United

States, relying on Justice Alito's concurring opinion in *Caetano v. Massachusetts*,

577 U.S. 411, 420 (2016), to claim that stun guns are in "common use" simply

because 200,000 stun guns are owned in America.  Pls.' Mem. at 20.  Plaintiffs

misread Justice Alito's concurrence, which—in any event—was joined by only one

other justice and is not binding precedent.  In addition to the number of stun guns

owned, the concurrence noted that stun guns are "accepted as a legitimate means of

self-defense across the country."  *DSSA*, 2023 WL 2655150, at *5 n.8 (quoting

*Caetano*, 577 U.S. at 420 (Alito, J., concurring)).  Plaintiffs have not made a similar

showing that assault weapons have been accepted by society as legitimate self-

defense weapons.  To the contrary, AR-platform rifles were heavily regulated for a

decade under the federal assault weapons ban, DX-27, and are currently regulated

by 11 states, including the District of Columbia, representing more than one quarter

of the U.S. population, Def.'s SUF 115.

Moreover, 200,000 cannot be a benchmark for when a weapon becomes a

protected "Arm."  There are between 176,000 and 700,000 legal civilian-owned

machine guns in the United States.  *See* DX-93 at 3180 (ATF Statistical Update at

16); DX-94 at 3193 (FOIA Response); *see Hollis v. Lunch*, 827 F.3d 436, 449 (5th Cir. 2016) (noting that there were "175,977 pre-1986 civilian-owned machineguns in existence"); *Simien*, 2023 WL 1980487, at *9 (noting "the number of civilian-owned machineguns has increased to about 740,000"). Despite these numbers, the Supreme Court has indicated that machine guns may be banned consistent with the Second Amendment. *See Heller*, 554 U.S. at 627.

### D.   The Cases Cited by Plaintiffs Do Not Establish that Assault Weapons Are Protected by the Second Amendment

Plaintiffs rely on several decisions to argue that rifles regulated by the AWCA are protected by the Second Amendment. None is persuasive on this point.

Plaintiffs cite several pre-*Bruen* cases involving assault weapon restrictions, including *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2021), and *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), to claim that assault weapons are protected by the Second Amendment. *See* Pls.' Mem. at 21–22. But those cases *assumed without deciding* that the regulated instruments were protected before upholding the challenged laws under intermediate scrutiny. *See Oregon Firearms*, 2022 WL 17454829, at *10. And Plaintiffs cite an opinion that was vacated by an en banc panel of the Fourth Circuit, which held that assault weapons are *not* protected by the Second Amendment. Pls.' Mem. at 21 (citing *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc)).[9]

Plaintiffs also rely on *Miller v. Bonta*, in which the district court viewed AR-platform rifles as "presumptively lawful to own," but only after assigning "the

---

[9] Plaintiffs also cite the district court's opinion in *United States v. Benitez*, which noted that "AR-15s are commonly owned throughout Idaho," 2018 WL 6591917, at *3 (D. Idaho), but that was not a Second Amendment case, and it said nothing about whether AR-15s are in "common use" in the United States. Pls.' Mem. at 21.

burden in the first instance" to the government to prove that "they are uncommon
and dangerous."  542 F. Supp. 3d 1009, 1029 (S.D. Cal. 2021), *vacated and
remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022).  Similarly, despite finding
that "there is very little evidence regarding the commonality of AK-47 type rifles,
or semiautomatic shotguns, or 'assault pistols,'" the court held that they too were
presumptively protected because the government failed to show that those weapons
were *not* in common use.  *Id.*  In assigning the threshold burden to the government,
the district court's common-use analysis is inconsistent with *Bruen*.  *See supra*
Section I.A at 4–6.  And to the extent the court held that assault weapons are
suitable for self-defense (and militia service), that conclusion was based on the
same insufficient production estimates that Plaintiffs offer in this case, as well as
just seven newspaper accounts of AR-platform rifles reportedly being used in self-
defense shootings.  *Id.* at 1033–34.

Plaintiffs also cite two post-*Bruen* district court decisions involving assault
weapon restrictions.  Pls.' Mem. at 21–22.  The district court's unpublished order in
*Rocky Mountain Gun Owners v. Town of Superior*, issuing a temporary restraining
order to enjoin a municipal assault weapon ordinance, was entered "without hearing
from Defendants."  TRO at 10, No. 22-cv-01685 (D. Colo. Jul. 22, 2022), Dkt. 18.
The case was subsequently voluntarily dismissed.  *Id.*, Dkt. 53.  And in *DSSA*, the
district court determined that *some* of the "assault long guns" regulated by
Delaware's assault weapons law are in common use at the textual stage of the
*Bruen* inquiry before holding that such regulation is consistent with the Nation's
historical tradition.  2023 WL 2655150, at *5–6.  But the *DSSA* court's common-
use analysis was based on the popularity test that this Court should reject as well as
the unreliable 2021 firearms survey and NSSF production estimates.  *See supra*
Section I.C.2 at 12–18.  Even under the popularity test, the court determined that
the plaintiffs failed to show that "copycat weapons," including semiautomatic,
centerfire rifles that can accept a detachable magazine and have one or more of five

21

listed features (like "assault weapons" defined under Section 30515(a) of the AWCA), are "'in common use' for lawful purposes."  2023 WL 2655150, at *2, 7.

Finally, as they did pre-remand, Plaintiffs again rely on the opinion in *United States v. Staples*, 511 U.S. 600 (1994), but that opinion does not support Plaintiffs' argument that AR-platform rifles are in common use for self-defense.  To the contrary, as this Court has previously observed, that opinion found the similarities between the AR-15 and automatic M16 to be insufficient to establish mens rea to support a criminal conviction—a holding that is "irrelevant to the question presented here:  whether semiautomatic rifles are within the scope of the Second Amendment."  Order at 13 n.7.[10]

In sum, none of the cases Plaintiffs rely upon to establish common use actually do so.  Plaintiffs have failed to show that each of the regulated weapons is commonly used or suitable for self-defense.  Accordingly, they have failed to satisfy their burden at the threshold stage of the *Bruen* analysis.

## II.   THE AWCA'S RESTRICTIONS ON CERTAIN PARTICULARLY DANGEROUS RIFLE CONFIGURATIONS ARE CONSISTENT WITH THE NATION'S TRADITION OF FIREARMS REGULATION

Even if the plain text of the Second Amendment covers the acquisition and possession of the rifle configurations listed in the AWCA, Defendant has more than shown that the challenged AWCA provisions are consistent with the Nation's historical tradition of firearms regulation.  Plaintiffs wrongly argue this Court may dispense with any historical analysis if it finds that the Second Amendment's text covers their proposed conduct, claiming that this entire case ends at the "common

---

[10] Plaintiffs emphasize that *Staples* was authored by the same justice that wrote the *Bruen* majority opinion. Pls.' Mem. at 15.  Plaintiffs similarly highlight comments made in various concurring or dissenting opinions by other justices (and a former judge) who joined the *Bruen* majority opinion. *Id.* at 14–15.  Whatever these justices may have said about assault weapon restrictions in other cases, their comments are not binding or predictive of how a majority of the Court may rule in a future case. *See supra* n.6.

1  use" inquiry.  *See* Pls.' Mem. at 8 (stating that the "only material fact" is whether

2  the AWCA regulates rifles "typically possessed" for lawful purposes).  Plaintiffs

3  are wrong.  While a finding that the regulated weapons are *not* in common use

4  would end the inquiry at the textual stage, a contrary finding would merely give rise

5  to a *presumption* that the challenged law is unconstitutional, giving the government

6  the opportunity to justify the law by showing that it is consistent with the Nation's

7  history of firearms regulation.  *Alaniz*, 2023 WL 3961124, at *3 (explaining that

8  "*Bruen* step one" considers "whether the weapon at issue is 'in common use' today

9  for self-defense" and, "[i]f the first step is satisfied, [the court] proceed[s] to *Bruen*

10  step two"); *DSSA*, 2023 WL 2655150, at *8 (rejecting the argument that a finding

11  of "common use" "is the end of the matter"); *Oregon Firearms*, 2023 WL 3687404,

12  at *2–3 (same).  Thus, even if the Court finds (or assumes) that instruments

13  regulated by the AWCA are covered by the text of the Second Amendment, it must

14  move to the historical stage of the *Bruen* inquiry.

15       Plaintiffs also argue that, even if the Court proceeds to the historical stage,

16  there is nothing to analyze.  According to Plaintiffs, *Heller* and *Bruen* "eliminated

17  the need for further historical scrutiny" because those cases have already conducted

18  the historical analysis.  Pls.' Mem. at 16.  Again, Plaintiffs are wrong.  The

19  historical analysis in *Heller* and *Bruen* was "fairly straightforward," as the Supreme

20  Court determined that the challenged regulations addressed "a general societal

21  problem that has persisted since the 18th century."  *Bruen*, 142 S. Ct. at 2131; *id.*

22  (noting that "*Heller* itself exemplifies this kind of straightforward historical

23  inquiry").  This case, by contrast, requires a "more nuanced" analysis of the

24  historical record because the AWCA addresses "unprecedented societal concerns or

25  dramatic technological changes."  *Id.* at 2132; *see* Def.'s Mem. at 20–23

26  (explaining why a "more nuanced approach" is required).  The Supreme Court has

27

28

not yet conducted a historical analysis of assault weapon restrictions, which require a "more nuanced" analysis.[11]

Here, Defendant has presented hundreds of historical laws enacted throughout American history that reflect a national tradition of firearms regulation, the vast majority of which were not considered in *Heller* or *Bruen*. *See* App. 1. Regardless of how the Supreme Court examined historical laws in those cases, the Supreme Court has instructed that Second Amendment cases be adjudicated according to "the principle of party presentation." *Bruen*, 142 S. Ct. at 2130 n.6. This Court should examine the historical record assembled by the parties in *this* case, which confirms that the AWCA is consistent with the history of firearms regulation.

### A.   A More Nuanced Approach Is Required

This case requires "a more nuanced" analogical approach to the historical analysis because the AWCA addresses *both* "unprecedented societal concerns" and "dramatic technological changes." Def.'s Mem. at 2 (citation omitted).

### 1.   Dramatic Technological Change

The semiautomatic rifles equipped with combat-oriented parts and accessories that are regulated by the challenged AWCA provisions represent a dramatic technological change from the firearms technologies widely available at the founding or during Reconstruction. *See* Def.'s Mem. at 21–22; *DSSA*, 2023 WL 2655150, at *10 ("It was only after World War I when semi-automatic and fully automatic long guns 'began to circulate appreciably in society.'" (citation omitted)). Plaintiffs admit as much by contending that "semiautomatic, centerfire rifles with detachable (not 'fixed') magazines have been widely available to the public *for over a century*"—i.e., according to Plaintiffs themselves, since the early 20th century. Pls.' Mem. at 26 (emphasis added). Such rifles "allow a shooter to fire as

---

[11] Even if this case were "straightforward" (it is not), *Bruen* did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2127 (Alito, J., concurring).

1    fast as they can pull the trigger, unlike previous guns." *Hartford*, 2023 WL

2    3836230, at *5.  The AR-15, in particular, was not invented until the late 1950s (as

3    a fully automatic military weapon), and "the growth in ownership of semiautomatic

4    assault weapons proliferated in the late 2000s." *Id.*  And the parts and accessories

5    regulated under the AWCA, like a pistol grip affixed to a rifle, were not used

6    prevalently with rifles until the 20th century.  *See, e.g.*, PX-3 at 7 ("Since the first

7    government-made military muskets/rifles were produced at a U.S. armory in 1795,

8    until WWI, virtually all had 'straight hand' (no pistol grip) stocks.").

9        Plaintiffs claim that the firearms technologies regulated by the AWCA have

10   been in existence since the founding, citing a recent blog post by David Kopel (who

11   was not designated as an expert) and the expert rebuttal report of Ashley Hlebinsky.

12   Kopel acknowledges that "[n]o one in 1791 or 1815 could have foreseen all the

13   firearms innovations in the 19th century."  PX-64 at 4.  But while Plaintiffs suggest

14   that there is "nothing *dramatically* novel" about the technology regulated by the

15   AWCA, Pls.' Mem. at 26, it would be "misleading and grossly exaggerate the state

16   of affairs at the Founding" to suggest that the Founding Fathers could have

17   envisioned semiautomatic, centerfire firearms regulated by the AWCA, *Hanson*,

18   2023 WL 3019777, at *13 (criticizing Kopel's "'heavy lifting' research" (citation

19   omitted)).

20       Notably, Kopel refers to Colonel Trevor Dupuy's Theoretical Lethality Index

21   ("TLI") in arguing that the founders were aware that the lethality of firearms

22   technology increased dramatically from the 17th to the 18th century, because the

23   TLI doubled from 19 (for 17th-century muskets) to 43 (for 18th century flintlocks).

24   PX-64 at 2 (citing Trevor Dupuy, The Evolution of Weapons and War 92 (1984)).

25   But Kopel neglects to mention the "quantum jump" in lethality that began in the

26   19th century.  DX-95 at 3207 (Darrell A.H. Miller & Jennifer Tucker, *Common,*

27   *Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2507 (2022)) (cited in

28   Def.'s Mem. at 22 n.15).  The TLI of firearms that predominated during the Civil

War, like rifles capable of firing Minie ball conoidal bullets, jumped to 102 in the mid-19th century, and bolt-action Springfield rifle equipped with ammunition magazines had a TLI of 495 in the early 20th century—a 2,500% increase from the TLI of founding-era firearms.  DX-95 at 3208 (Miller & Tucker, *supra*, at 2508).  The TLI of *semiautomatic* firearms, especially AR-platform rifles with combat-oriented accessories developed in the mid-19th century, would be even higher.  There is no reason to expect that the founders could have anticipated such dramatic advances in lethality.

Plaintiffs' reliance on Ashley Hlebinsky's research is also misplaced.  Hlebinsky is "very active in the [NSSF]" and has published articles in "niche magazines" for firearms enthusiasts.  *Ocean State*, 2022 WL 17721175, at *7.  In comparison with Defendant's expert historians, Hlebinsky is not a "traditional neutral academic[]."  *Id.* (discounting Hlebinsky's historical testimony because she has not "engaged in relevant *neutral* scholarly research").[12]  Hlebinsky's rebuttal report discusses numerous historical firearms that she claims are precursors to the rifles regulated by the AWCA, but she has testified that her firearms research did not examine the "prevalence" of repeater firearms among civilians during the founding and that some of the firearms she mentioned were "one-offs."  DX-96 at 3228–30 (Hlebinsky Dep. Tr. at 131–33, *Oregon Firearms* (D. Or. Jan. 20, 2023)); *see also id.* at 3222–23 (Hlebinsky Dep. Tr. at 45-46) (testifying that she was not aware of a specific example of a repeater that was commercially available in the United States during the ratification of the Second Amendment).  And contrary to Plaintiffs' claims, *see* Pls.' Mem. at 26 & nn.12–13, Professor Vorenberg has testified that repeater rifles were not widely owned by civilians in the United States

---

[12] Hlebinsky is also married to one of Plaintiffs' other new expert witnesses, Mark Hanish, a firearms sales executive.  DX-96 at 3225 (Hlebinsky Dep. Tr. at 93, *Oregon Firearms*, No. 3:22-cv-01815 (D. Or. Jan. 20, 2023)).  As such, she has a financial interest in Hanish's substantial investments in the firearms industry.  *Id.*

1   during Reconstruction, when the Fourteenth Amendment was ratified.  DX-63

2   (Vorenberg Suppl. Rpt.) ¶¶ 21–24; *Ocean State*, 2023 WL 17721175, at *8 (noting

3   Vorenberg's "impressive" credentials and scholarly work).[13]

4        There can be no genuine dispute that the technologies regulated by the AWCA

5   represent dramatic technological change from those widely available in 1791 and

6   1868, as numerous courts have held on similar records as the one Defendant has

7   presented.  *See, e.g.*, *Hartford*, 2023 WL 3836230, at *5; *Herrera v. Raoul*, 2023

8   WL 3074799, at *7 (N.D. Ill. Apr. 25, 2023); *DSSA*, 2023 WL 2655150, at *10–11.

9   The Court should engage in a more nuanced historical analysis here.

10        **2.    Unprecedented Societal Concern**

11        The AWCA also addresses the modern public-safety threat posed by mass

12   shootings, which were not prevalent in 1791 or 1868.  Plaintiffs argue that this case

13   cannot involve an "unprecedented societal concern" because the firearm

14   technologies regulated by the AWCA have purportedly "been around and widely

15   available for so long without regulation."  Pls.' Mem. at 27.  This argument is based

16   on a false premise because, as discussed, the technologies regulated by the AWCA

17   *did not* circulate widely until the 20th century.  *See supra* Section II.A.1 at 24–27.

18   And Plaintiffs' claim that semiautomatic rifles "were almost never targeted for

19   regulation," Pls.' Mem. at 26, is belied by the fact that at least 11 jurisdictions

20   regulated the manufacture, sale, and possession of semiautomatic firearms capable

21   of firing a certain number of rounds without reloading, as well as numerous other

22   states that similarly regulated machine guns, *see* Def.'s Mem. at 27; *Hanson*, 2023

23   WL 301977, at *15 (finding "a widespread tradition dating back to the 1920s and

24

25        [13] The fact that the federal government sells certain surplus semiautomatic
26   rifles—most of which Plaintiffs acknowledge lack the accessories subject to the
    AWCA—has no bearing on whether AR-platform rifles and other rifles regulated
27   by the AWCA reflect dramatic technological change from technologies widely
    available in 1791 or 1868.  *See* Pls.' Mem. at 26.
28

1   1930s of regulating high-capacity weapons that could fire rapidly without

2   reloading").  In any event, whether governments decided to regulate semiautomatic

3   firearms has nothing to do with whether mass shootings involving those weapons is

4   an unprecedented public-safety concern.

5          There can be no genuine dispute that mass shootings by individual

6   perpetrators did not occur in 1791 or 1868.[14]  Most mass murder in the United

7   States before the 20th century involved groups of people due to technological

8   constraints, and the first double-digit mass shooting by an individual was

9   committed in 1949.  Def.'s Mem. at 22.  Just as the Ninth Circuit held in *Alaniz* that

10   the problem of drug trafficking is a "largely modern crime," despite other

11   "founding-era smuggling crimes," 2023 WL 3961124, at *4, the problem of mass

12   shootings is a modern public-safety threat, notwithstanding other forms of violence

13   that may have existed at the founding.  The contemporary problem of mass

14   shootings is nothing like the "general societal problem" addressed in both *Heller*

15   and *Bruen*—handgun violence, primarily in urban areas—that has "persisted since

16   the 18th century."  *Bruen*, 142 S. Ct. at 2131.  If any problem could simply be

17   reframed in general terms, as Plaintiffs' attempt by suggesting that the AWCA

18

19   _____

20          [14] One of Plaintiffs' experts, Clayton Cramer, claims that individuals
committed "mass murder" throughout American history without firearms, including
21   cases of familicide and arson, but uses an unusually low threshold of fatalities (just
two deaths) to qualify as "mass murder."  PX-56 at 20; DX-58 (Roth Suppl.
22   Rebuttal Rpt.) ¶ 25.  In *Oregon Firearms*, Cramer testified that he knows of no
"scholarly authorities that would define mass murder using two or three dead," that
23   his data was "clearly wrong," and that a court "might [be] reluctant to accept the
data . . . as presented."  DX-97 at 3244–45, 3247–51, 3253 (Cramer Dep. Tr. at
24   46–47, 87–91, 106, *Oregon Firearms*, No. 2:22-cv-01815 (D. Or. Jan. 19, 2023)).
Cramer did not correct his data before Plaintiffs served his supplemental expert
25   report in this case.  *Compare* PX-56 at 32, *with* DX-98 at 3275 (Cramer Decl. at 20,
*Oregon Firearms*, (D. Or. Dec. 19, 2022)).  Tellingly, Plaintiffs do not discuss
26   these opinions in their motion.

27

28

1   addresses criminal misuse of firearms, *see* Pls.' Mem. at 27, it is unclear what

2   firearm-related concerns could qualify as "unprecedented" under *Bruen*.

3        This Court should follow the other district courts that have held that the

4   problem of mass shootings is an unprecedented societal concern, triggering a more

5   nuanced historical analysis. *See, e.g.*, *Hartford*, 2023 WL 3836230, at *5; *Herrera*,

6   2023 WL 3074799, at *7.

7   **B.    The AWCA Is Consistent with the Nation's Tradition of**
        **Weapons Regulation**

8

9        Plaintiffs attempt to limit the relevant historical tradition, wrongly claiming

10   that "the only historical tradition that the Supreme Court has recognized as

11   justifying bans on types of firearm [sic] is that of regulating 'dangerous and unusual

12   weapons.'"  Pls.' Mem. at 23.  That tradition concerned regulations on the manner

13   of public carry, like the crime of affray and the Statute of Northampton, not

14   regulations on the kinds of weapons that may be possessed.  *See Bruen*, 142 S. Ct.

15   at 2145 (discussing common-law offense of affray, in which the defendant armed

16   himself with "dangerous and unusual weapons, in such a manner as will naturally

17   cause terror to the people" (citation omitted)).  None of the laws regulating the

18   carrying of "dangerous and unusual weapons" employed a conjunctive test like the

19   one advanced by Plaintiffs—requiring the government to demonstrate that any

20   regulated weapon be both "dangerous" and "unusual."[15]  Given its historical use, it

21   is more likely that "dangerous and unusual" referred to the circumstances in which

22   certain weapons were carried, or was a hendiadys—a single phrase, like "cruel and

23   unusual" in the Eight Amendment—referring to unusually dangerous weapons.

24   DX-52 (Cornell Suppl. Rpt.) ¶ 9 n.10; *see Bevis*, 2023 WL 2077392, at *12

25

26        [15] In describing the regulation of "dangerous and unusual weapons," the
    Supreme Court cited Blackstone, which in turn referred to "dangerous *or* unusual

27   weapons."  *Heller*, 554 U.S. at 627 (citing 4 Blackstone 148–49 (1769) (emphasis

28   added)).

(describing pattern of states regulating "particularly dangerous weapons from the 18th century through the late 19th and early 20th centuries").

Defendant has identified hundreds of relevantly similar analogues throughout English and American history, which imposed comparably minimal burdens on self-defense that were comparably justified by public-safety interests.  App. 1. Many of the analogues were enacted during the founding or Reconstruction, when dangerous weapons laws proliferated in response to rising homicide rates.[16]  These laws reflect a "historical pattern" of regulating weapons after they became "widely popular with civilians" and "associated with criminal use."  *Hartford*, 2023 WL 3836230, at *5; *see also DSSA*, 2023 WL 2655150, at *11–12 (noting that Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society").

The Ninth Circuit's recent opinion in *Alaniz* is instructive.  *Alaniz* considered historical analogues that criminalized the possession of a firearm while committing certain offenses, like burglary and robbery, which necessarily involved the carrying of firearms *in public*.  2023 WL 3961124, at *5.  Those analogues were relevantly similar to a sentence enhancement for possessing firearms *inside the home*, even though the defendant argued that the firearms were kept in his home "for lawful purposes, such as hunting, and not in connection with his drug crimes."  *Id.* at *1–2. Similarly, the tradition of prohibiting the possession of certain uniquely dangerous weapons, including trap guns inside the home and concealable weapons outside the home, imposed a comparable burden on the right to armed self-defense as the AWCA that was comparably justified by public-safety interests.  *See* Def.'s Mem. at 23–31.

_____

[16] Contrary to Plaintiffs' claim, Pls.' Mem. at 25, laws enacted in pre-founding England and early-20th-century America are also relevant because they do not contradict founding- and Reconstruction-era analogues.  *See DSSA*, 2023 WL 2655150, at *12; Def.'s Mem. at 24, 28.

1    In accordance with the growing weight of authority upholding assault weapon

2    and large-capacity magazine restrictions on a similar historical record, this Court

3    should hold that the AWCA is consistent with the Nation's tradition of firearms

4    regulation.

5                                    **CONCLUSION**

6        For these reasons, the Court should deny Plaintiffs' motion for summary

7    judgment.

8    Dated:  June 23, 2023                    Respectfully submitted,

9                                             ROB BONTA
                                             Attorney General of California
10                                            P. PATTY LI
                                             Supervising Deputy Attorney
11                                            General
                                             ANNA FERRARI
12                                            CHRISTINA R.B. LÓPEZ
                                             Deputy Attorneys General
13

14                                            */s/ John D. Echeverria*

15

16                                            JOHN D. ECHEVERRIA
                                             Deputy Attorney General
17                                            *Attorneys for Defendant Rob Bonta,
                                             in his official capacity as Attorney
18                                            General of the State of California*

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Rob Bonta, in his official capacity as Attorney General of California, certifies that this brief contains 9,999 words, which complies with the word limit set by court order dated May 16, 2023. *See* Dkt. 148 at 2.

Dated:  June 23, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney
General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General


*/s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,
in his official capacity as Attorney
General of the State of California*