ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as Attorney General of the*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | Case No. 8:17-cv-00746-JLS-JDE<br><br>**DEFENDANT'S STATEMENT OF GENUINE DISPUTES OF FACT**<br><br>Date:          July 28, 2023<br>Time:          10:30 a.m.<br>Courtroom:  8A<br>Judge:         Hon. Josephine L. Staton<br>Trial Date:   None set<br>Action Filed: April 24, 2017 |

1

In accordance with Local Rule 56-2 and this Court's procedures, Defendant Rob Bonta, in his official capacity as the Attorney General of the State of California ("Defendant"), submits the following Statement of Genuine Disputes of Fact in support of his Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n"), filed concurrently herewith.

Defendant notes objections to evidence cited in support of Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment ("Plaintiffs' SUF") (Dkt. 150-2).  While Defendant disputes certain facts contained in Plaintiffs' SUF, resolution of these factual disputes does not require trial.

| | Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law | Defendant's Genuine Disputes of Material Fact and Objections |
|---|---|---|
| 1 | Individual plaintiffs are residents of the State of California, save for Plaintiff Rupp, who now lives outside of California but regularly visits the state.  (Willis Decl. ¶ 1; Dember Decl. ¶ 1; Martin Decl. ¶ 1; Rupp Decl. ¶ 1; Valencia Decl. ¶ 1; Johnson Decl. ¶ 1; Seifert Decl. ¶ 1.) | Undisputed for purposes of summary judgment. |
| 2 | Individual plaintiffs are law-abiding and are not prohibited from owning firearms under the laws of the United States or the State of California.  (Willis Decl. ¶ 2; Dember Decl. ¶ 2; Martin Decl. ¶ 2; Rupp Decl. ¶ 2; Valencia Decl. ¶ 2; Johnson Decl. ¶ 2; Seifert Decl. ¶ 2.) | Undisputed for purposes of summary judgment. |
| 3 | All individual plaintiffs have never been found by any law enforcement agency, any court, or any other government agency | Undisputed for purposes of summary judgment. |

| | | |
|---|---|---|
| | to be irresponsible, unsafe, or negligent with firearms in any manner. (Willis Decl. ¶ 2; Dember Decl. ¶ 2; Martin Decl. ¶ 2; Rupp Decl. ¶ 2; Valencia Decl. ¶ 2; Johnson Decl. ¶ 2; Seifert Decl. ¶ 2.) | |
| 4 | Plaintiff Troy Willis is a retired reserve officer for the Indio Police Department. (Willis Decl. ¶ 2.) | Undisputed for purposes of summary judgment. |
| 5 | Plaintiffs Willis and Seifert each lawfully own a semiautomatic, centerfire rifle with a detachable magazine equipped with one or more prohibited features under the AWCA. (Willis Decl. ¶ 3; Seifert Decl. ¶ 3.) | Undisputed for purposes of summary judgment. |
| 6 | Plaintiff Dennis Martin lawfully owns a semiautomatic, centerfire rifle with a non-fixed magazine that he registered with the California Department of Justice as an "assault weapon." (Martin Decl. ¶ 3. ) | Undisputed for purposes of summary judgment. |
| 7 | Plaintiff Martin is prohibited under the AWCA and its related regulations from replacing his firearm's "bullet button" with a standard magazine release, and but for these restrictions would immediately do so. (Martin Decl. ¶ 4.) | Undisputed for purposes of summary judgment. |
| 8 | Plaintiffs Willis, Martin, and Seifert are each prohibited under the AWCA from engaging in certain activities with their registered "assault weapons" that are otherwise lawful with any other firearm not classified as an | Undisputed for purposes of summary judgment. |

| | | | |
|---|---|---|---|
| | | "assault weapon," and but for these restrictions Plaintiffs Willis, Martin, . . ., and . . . [sic] would engage in such activities. (Willis Decl. ¶ 5; Martin Decl. ¶ 5; Seifert Decl. ¶ 4.) | |
| | 9 | Plaintiff Steven Rupp owns a semiautomatic, centerfire rifle with a non-fixed magazine that he was forced to modify to ensure it was no longer considered an "assault weapon" and therefore lawful to possess in the State of California. (Rupp Decl. ¶ 3.) | Disputed.  Plaintiff Rupp could have registered a firearm that would qualify as an "assault weapon" to continue possessing it without modification.  *See* Cal. Penal Code § 30900 (permitting registration of semiautomatic, centerfire rifles within certain registration windows). |
| | 10 | Plaintiffs Rupp and Seifert each lawfully own a frame or "lower receiver" of a firearm that they wish to assemble into fully functioning semiautomatic, centerfire rifles with a detachable magazine and either a pistol grip, flash suppressor, or adjustable stock, or in a configuration that has an overall length of less than 30 inches but more than 26 inches.  (Seifert Decl. ¶ 5; Rupp Decl. ¶ 4.) | Undisputed for purposes of summary judgment. |
| | 11 | Plaintiffs Rupp and Seifert are concerned that if multiple intruders attack them while at home, they will be required to immediately reassemble their firearm into such a configuration to effectively protect themselves and others in their home.  (Rupp Decl. ¶ 6; Seifert Decl. ¶ 7.) | Undisputed for purposes of summary judgment. |
| | 12 | Plaintiffs Rupp and Seifert believe that not being able to immediately assemble their | Undisputed for purposes of summary judgment. |

4

| | | | |
|---|---|---|---|
| | | frames or "lower receivers" into such a configuration will impact their ability to effectively defend themselves and others in their home. (Rupp Decl. ¶ 7; Seifert Decl. ¶ 8.) | |
| | 13 | Plaintiffs Alfonso Valencia, Steven Dember, and Cheryl Johnson each would like to acquire a semiautomatic, centerfire rifle with a detachable magazine having one or more of the features that is prohibited by the AWCA to keep in their home for self-defense and other lawful purposes, including hunting, training, and recreation. (Valencia Decl. ¶ 3; Johnson Decl. ¶ 3; Dember Decl. ¶ 3.) | Undisputed for purposes of summary judgment. |
| | 14 | Individual Plaintiffs will be continuously and irreparably harmed by the ongoing deprivation of their individual, fundamental right to possess and use commonly possessed firearms for lawful purposes, including in-home self-defense, without risking criminal prosecution. (Willis Decl. ¶ 6; Martin Decl. ¶ 6; Rupp Decl. ¶ 8; Seifert Decl. ¶ 9.) | Disputed. *See* Dkt. 108 at 15 (noting that individuals subject to the AWCA "remain free to choose any weapon that is *not* restricted by the AWCA or another state law" (citation omitted)); *see also, e.g.,* *Bevis v. City of Naperville, Ill.*, __ F. Supp. 3d __, 2023 WL 2077392, at *16–17 (N.D. Ill. Feb. 17, 2023) (finding no irreparable harm in challenge to assault weapon restrictions); *Herrera v. Raoul*, 2023 WL 3074799, at *11–13 (N.D. Ill. Apr. 25, 2023) (same); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, __ F. Supp. 3d __, 2023 WL 2655150, at *13–14 (D. Del. Mar. 27, 2023) (same); *Hartford v. Ferguson*, __ F. Supp. 3d __, 2023 WL 3836230, |

| | | | |
|---|---|---|---|
| | | | at *6 (W.D. Wash. June 6, 2023) (same).<br><br>Objections: 1) Conclusion of law; and 2) Improper legal testimony of a lay witness. *See* Fed. R. Evid. 701(b). |
| | 15 | Individual Plaintiffs would like to acquire new semiautomatic, centerfire rifles with a detachable magazine, having one or more of the features that is prohibited by the AWCA, and were it not for the AWCA and fear of prosecution for violating it, would do so.  (Willis Decl. ¶ 7; Dember Decl. ¶¶ 3-4; Martin Decl. ¶ 7; Rupp Decl. ¶ 9; Valencia Decl. ¶¶ 3-4; Johnson Decl. ¶¶ 3-4; Seifert Decl. ¶ 10.) | Undisputed for purposes of summary judgment. |
| | 16 | Individual Plaintiffs who lawfully own "assault weapons" or firearms they were forced to modify in accordance with the AWCA acquired their firearm for use in their home for self-defense and other lawful purposes such as hunting, training, and recreation. (Willis Decl. ¶ 4; Rupp Decl. ¶ 5; Seifert Decl. ¶ 6; Jones Decl. ¶ 4[1].) | Disputed.  Individual Plaintiffs could have registered a firearm that would qualify as an "assault weapon" to continue possessing it without modification. *See* Cal. Penal Code § 30900 (permitting registration of semiautomatic, centerfire rifles within certain registration windows). |
| | 17 | Richard Minnich is the Executive Director for Plaintiff California Rifle & Pistol Association, Incorporated ("CRPA"). (Minnich Decl. ¶ 1.) | Undisputed for purposes of summary judgment. |
| | 18 | Plaintiff CRPA is a non-profit membership and donor-supported | Undisputed for purposes of summary judgment. |

---

[1] No Jones Declaration was filed with this motion.

| | | | |
|---|---|---|---|
| | | organization classified under IRC section 501(c)(4) and incorporated under the laws of California with its headquarters in Fullerton, California. (Minnich Decl. ¶ 1.) | |
| | 19 | Founded in 1875, CRPA seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. (Minnich Decl. ¶ 2.) | Undisputed for purposes of summary judgment. |
| | 20 | Plaintiff CRPA Works [sic] to preserve the constitutional and statutory rights of gun ownership, including the right to self-defense, the right to hunt, and the right to keep and bear arms. (Minnich Decl. ¶ 2.) | Undisputed for purposes of summary judgment. |
| | 21 | Plaintiff CRPA is dedicated to promoting the shooting sports, providing education, training, and organized competition for adult and junior shooters. (Minnich Decl. ¶ 2.) | Undisputed for purposes of summary judgment. |
| | 22 | Plaintiff CRPA's members include law enforcement officers, prosecutors, professionals, firearms experts, and members of the public.  (Minnich Decl. ¶ 2.) | Undisputed for purposes of summary judgment. |
| | 23 | Plaintiff CRPA works to preserve the constitutional rights of all law-abiding individuals, including the fundamental right to keep and bear commonly owned firearms for the core lawful purpose of self-defense. (Minnich Decl. ¶ 3.) | Undisputed for purposes of summary judgment. |
| | 24 | Plaintiff CRPA has members who own semiautomatic, centerfire rifles with non-fixed | Disputed.  Registration was not required for weapons that do not have a fixed magazine and none of |

| | | | |
|---|---|---|---|
| | | magazines that were forced to register their firearm as an "assault weapon" with the California Department of Justice before July 1, 2018.  (Minnich Decl. ¶ 4.) | the features listed in Penal Code section 30515.  *See* Cal. Penal Code § 30515(a). |
| | 25 | Plaintiff CRPA has members who are prohibited under the AWCA and its related regulations from replacing their firearm's "bullet button" with a standard magazine release, and but for those restrictions would do so.  (Minnich Decl. ¶ 4.) | Undisputed for purposes of summary judgment. |
| | 26 | Plaintiff CRPA also has members who lawfully own semiautomatic, centerfire rifles with detachable magazines with one or more prohibited features under the AWCA, or firearms specifically identified by their make and model as "assault weapons" under the AWCA. (Minnich Decl. ¶ 5.) | Undisputed for purposes of summary judgment. |
| | 27 | Plaintiff CRPA has members who lawfully own firearms classified as "assault weapons" who are prohibited under the AWCA and related regulations from engaging in certain activities that are otherwise lawful with any other firearm not classified as an "assault weapon," and but for those restrictions would engage in such activities with their firearms.  (Minnich Decl. ¶ 6.) | Undisputed for purposes of summary judgment. |
| | 28 | Plaintiff CRPA has members who, but for the AWCA and its related regulations, would | Disputed.  *See* Dkt. 108 at 15 (noting that individuals subject to the AWCA "remain free to choose |

8

| | | | |
|---|---|---|---|
| | | acquire, transfer, and/or possess firearms classified as "assault weapons," and are continuously and irreparably harmed by the ongoing deprivation of their individual, fundamental right to possess and use commonly possessed firearms for lawful purposes, including in-home self-defense, without risking criminal prosecution. (Minnich Decl. ¶ 7.) | any weapon that is *not* restricted by the AWCA or another state law" (citation omitted)); *see, e.g., Bevis*, 2023 WL 2077392, at *16–17; *Herrera*, 2023 WL 3074799, at *11–13; *Del. State Sportsmen's Ass'n*, 2023 WL 2655150, at *13–14; *Hartford*, 2023 WL 3836230 at *6.<br><br>Objections: 1) Conclusion of law; and 2) Improper legal testimony of a lay witness. *See* Fed. R. Evid. 701(b). |
| | 29 | Millions of rifles that are prohibited by the AWCA are in the hands of the American people. (Brady Decl., Ex. 2 [Expert Report W. English]; Ex. 7 [Depo. Tr. B. Graham] at 21:13-21, 25:9-15, 28:3-6; Exs. 11-25; Ex. 8 [DOJ Resp. to Seifert's Reqs. for Admission, Set One] at 4; Ex. 10 [DOJ Second Suppl. Resp. to Willis Interrogs., Set One] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 | Disputed. The cited evidence is not reliable, according to Plaintiffs' own experts and evidence. (DX-91[2] (Kleck Dep. Tr. at 76–77, *Oregon Firearms Federation, Inc. v. Brown*, No. 2:22-cv-01815 (D. Or. Jan. 25, 2023)) (explaining why he "do[es]n't think you can rely on" the 2021 National Firearms Survey underlying PX-49[3]); PX-17 at 2 ("Scholars who have researched American gun ownership treat the industry's estimates with some skepticism."). |

[2] Citations to Defendant's exhibits are prefaced with "DX," so that DX-1 refers to Defendant's Exhibit 1. DX-1 through DX-45 were annexed to the Declaration of Peter H. Chang in Support of Defendant's Motion for Summary Judgment (Dkt. 76); DX-46 was annexed to the Supplemental Declaration of Peter H. Chang in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 90); DX-47 through DX-87 were annexed to the Declaration of John D. Echeverria in Support of Defendant's Motion for Summary Judgment (Dkt. 151); and DX-88 through DX-99 were annexed to the concurrently filed Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

[3] Citations to Plaintiffs' exhibits are prefaced with "PX" and refer to exhibits annexed to the Declaration of Sean A. Brady (Dkt. 150-12–150-28).

| | | [Washington Post Survey on AR-15 ownership]; Ex. 53 [Expert Report M. Hanish] at 6; Ex. 58.) | Proposed statement is not supported by cited evidence. *See, e.g.*, PX-53 (Hanish Rebuttal Rpt.) at 6 (no mention of number of rifles subject to the AWCA owned); PX-7 (Graham Dep. Tr.) at 21:18-24 (testifying that the "most common two groups" of firearms at Northern California gun shows are "a semiautomatic handgun or probably an AR platform of some kind," which Graham clarified "might just be a lower receiver sitting there" that would not be prohibited under the AWCA); *id.* at 25:9-15 (agreeing that prior to the AWCA amendment to include bullet-button rifles, AR-15 platform rifles were "prevalent" at gun stores that Graham frequented); *id.* at 28:3-6 (agreeing that prior to Senate Bill 880 Graham would see AR platform rifles at gun stores "frequently").<br><br>Plaintiffs' estimate improperly includes rifles acquired by law enforcement, rifles possessed by prohibited persons, rifles illegally exported, and rifles that are not subject to the AWCA. *See* PX-17 at 2 ("An important note:  The NSSF report includes weapons produced for law enforcement."); PX-50 at 1 (noting only that NSSF estimate excludes rifles "that were produced and exported or imported and later exported"); PX-49 at 33 ("You can include any rifles of this style that have been modified or moved to be compliant with local law." (quoting survey question)); *id.* (no indication |

| | | | |
|---|---|---|---|
| | | | that respondents were screened to exclude prohibited persons from participating in the survey); *see also* Def.'s Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Opp'n") at 14.<br><br>*See also* DX-99 at 3311 (Glover Decl., *Miller v. Bonta*, No. 19-cv-1537-BEN-JLB (S.D. Cal. Dec. 15, 2020)) at 895 (approximately 165,804 rifles were registered as "assault weapons" in California as of December 3, 2020); DX-7 (Donohue Rebuttal Rpt.) at 252–53, ¶¶ 17–18 (ownership rate of rifles registered as "assault weapons" in California is less than 0.5%); DX-1 at 8 (Donohue Rpt. ¶ 22); PX-17 at 2 ("Americans only started buying assault weapons in large numbers after the federal assault weapon ban expired in 2004.  That year there were only about 100,000 made by American manufacturers.").<br><br>Objections:  (1) Speculative expert testimony of William English; (2) Undisclosed data; (3) Unreliable survey methods and results; and (4) Speculative expert testimony of Mark Hanish.  *See* Fed. R. Evid. 702; Def.'s Opp'n at 14. |
| 30 | Americans typically choose rifles prohibited by the AWCA for self-defense.<br><br>(Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5; Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. | Disputed.  Proposed statement is not supported by cited evidence.  *See, e.g.*, PX-1 (Boone Rpt.) at 5 (does not state that rifles that qualify as assault weapons under the AWCA are typically chosen by law-abiding citizens for self-defense); PX-53 (Hanish Rebuttal Rpt.) at 8 (same); |

| | | |
|---|---|---|
| | Helsley] at 11-12; Exs. 28-29; 35-37; Ex. 59 [Minter Book Excerpts] at 46-47; Ex. 53 [Expert Report M. Hanish] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership].) | PX-59 at 46–47 (same); PX-2 (English Rpt.) at 4 (acknowledging that "[r]ecreational target shooting was the most prevalent reason cited for owning a ['modern sporting rifle']"); PX-3 (Helsley Rpt.) at 11–12 (does not state that rifles that qualify as assault weapons under the AWCA are typically chosen by law-abiding citizens for self-defense); PX-50 at 1 (stating that "this particular style of rifle [AR-15 and AK-style] is the top choice for law-abiding citizens for hunting, recreational shooting *and* self-defense" (emphasis added)); *see also* Def.'s Opp'n at 16, 18–19.

The cited evidence improperly includes rifles possessed by prohibited persons and rifles that are not subject to the AWCA. PX-50 at 1 (noting only that NSSF excludes rifles "that were produced and exported or imported and later exported"); PX-49 at 33 ("You can include any rifles of this style that have been modified or moved to be compliant with local law." (quoting survey question)); *id.* (no indication that respondents were screened to exclude prohibited persons from participating in the survey); *see also* Def.'s Opp'n at 15, 17.

Plaintiffs' evidence suggests that Americans primarily choose AR-style rifles for reasons other than self-defense, and choose firearms other than AR-style rifles for self-defense. PX-21 (2017 NSSF |

| | | | |
|---|---|---|---|
| | | | Report) at 10 (noting that 30% of AR-platform rifles were sold in 2016 for "personal-protection purposes," compared to 47.1% for "target/informal shooting" and 59.5% of handguns for "personal-protection purposes"); PX-49 at 34 (showing "[r]ecreational target shooting" as primary reason survey respondents reported owning AR-15-style rifles); *see also* Def.'s Opp'n at 16, 18–19.<br><br>Objections:  Same objections noted in response to Item No. 29, *supra*. |
| 31 | Americans typically choose rifles prohibited by the AWCA for hunting.<br><br>(Brady Decl., Ex. 2 [Expert Report of W. English] at 4, 7; Ex. 3 [Expert Report of S. Helsley] at 11-12; Ex. 30-33; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership].) | | Disputed.  Proposed statement is not supported by cited evidence.  PX-51 at 1, 6 (noting that only 12% of respondents affirmatively listed "[h]unting" as a "main reason[ they] own an AR-15-style rifle," and that number increased to only 18% when hunting was suggested as a possible response); PX-2 (English Rpt.) at 4 (noting that hunting was one of several "[a]dditional reasons" cited by survey participants for owning a "modern sporting rifle"); PX-3 (Helsley Rpt.) at 11 (does not state that rifles that qualify as assault weapons under the AWCA are typically chosen by law-abiding citizens for hunting but rather states that an owner of an AR-platform rifle *can* configure the weapon "as a 7lb rifle for hunting in steep difficult terrain"); *id.* at 12 (noting merely that "AR-platform rifles serve a variety of functions," including hunting); PX-30 |

(BrentonUSA.com Post) (providing "5 Reasons to Hunt with an AR15" but not indicating that Americans typically use an AR-15 for hunting); PX-32 (NRAblog.com Post) at 2 (asking readers to "consider the many factors that make the AR-15, and its bigger brother the AR-10, ideal for deer hunting" but not indicating that Americans typically use such weapons for hunting); PX-50 at 1 (stating that "this particular style of rifle [AR-15 and AK-style] is the top choice for law-abiding citizens for hunting, recreational shooting *and* self-defense" (emphasis added)).

Plaintiffs' evidence shows traditional (non-assault) rifles are typically chosen for hunting.  PX-21 (2017 NSSF Report) at 10 (noting that 22.9% of AR-style rifles were sold in 2016 for hunting purposes, compared to 68.3% of "[t]raditional rifles" for hunting purposes); PX-22 (2016 NSSF Report) at ix–x ("Handguns and traditional rifles top the list" of firearms used in target or sport shooting, and traditional rifles and shotguns "top the list" for hunting); PX-31 (Guns.com Post) at 1 ("AR-15s . . . have long been a symbol of the tactical world, but black rifles are *slowly* creeping their way past military and law enforcement applications and into the world of hunting." (emphasis added)); *id.* at 3 (quoting Army veteran, "Because of

[the AR-15's] military inception, it has been seen as an under powered, military application rifle only.  Not until recently, with the popularity of the newer [ammunition] rounds have people started to consider it as a viable option for hunting applications."); *see also* DX-21 at 1019 (1998 ATF Rpt. at 28) ("[W]hile these rifles are used for hunting medium and larger game, as well as for shooting varmints, the evidence was not persuasive that there was widespread use for hunting.  We did not find any evidence that the ability to a large capacity military magazine serves any hunting purpose.  Traditional hunting rifles have much smaller magazine capabilities.  Furthermore, the mere fact that the [Large Capacity Military Magazine] rifles are used for hunting does not mean that they are particularly suitable for hunting or meet the test for importation [based on sporting suitability]."); DX-22 at 1054 (1989 ATF Rpt. at 12) (concluding that "the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes").

Plaintiffs' evidence suggests that Americans primarily choose AR-style rifles for reasons other than hunting.  PX-21 (2017 NSSF Report) at 10 (noting that only 22.9% of AR-style rifles were sold in 2016 for "hunting purposes,"

| | | | |
|---|---|---|---|
| | | | compared to 47.1% for "target/informal shooting"); PX-49 at 34 (showing "[r]ecreational target shooting" as primary reason survey respondents reported owning AR-15-style rifles); PX-30 (BrentonUSA.com Post) at 2 (stating that only "27 percent of hunters surveyed have used an AR-15 in pursuit of game," and of those, "nearly 60 percent state they have used the platform to hunt large game").<br><br>The cited evidence improperly includes rifles possessed by prohibited persons and rifles that are not subject to the AWCA.  PX-50 at 1 (noting only that NSSF excludes rifles "that were produced and exported or imported and later exported"); PX-49 at 33 ("You can include any rifles of this style that have been modified or moved to be compliant with local law." (quoting survey question)); *id.* (no indication that respondents were screened to exclude prohibited persons from participating in the survey); *see also* Def.'s Opp'n at 15, 17.<br><br>Objections:  Same objections noted in response to Item No. 29, *supra.* |
| 32 | Americans typically choose rifles prohibited by the AWCA for competition.<br><br>(Brady Decl., Ex. 2 [Expert Report of W. English] at 4; Ex. 3 Expert Report of S. Helsley] at 6; | | Disputed.  Proposed statement is not supported by cited evidence.  PX-51 at 1 (noting that only 15% of respondents affirmatively listed "Target shooting/Take to range/Competition" as a "main reason[ they] own an AR-15-style |

| | | Ex. 22; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership].) | rifle"); PX-2 (English Rpt.) at 4 (noting that "competitive shooting sports" was one of several "[a]dditional reasons" cited by survey participants for owning a "modern sporting rifle"); PX-3 (Helsley Rpt.) at 11 (does not state that rifles that qualify as assault weapons under the AWCA are typically chosen by law-abiding citizens for competition and, rather, speculates that an owner of an AR-platform rifle can configure the weapon "as a 12lb single-shot rifle for 1000-yard target competition"); PX-22 (2016 NSSF Report) (does not distinguish competitive target shooting from recreational target or sport shooting activities); *id.* at ix ("Handguns and traditional rifles top the list" of firearms used in target or sport shooting and hunting); PX-49 at 34 (stating that only 32.1% of respondents indicated "[c]ompetitive sports shooting" as "a reason for ownership" of an AR-15); PX-50 at 1 (stating that "this particular style of rifle [AR-15 and AK-style] is the top choice for law-abiding citizens for hunting, recreational shooting and self-defense" without mention of competitive shooting).

The cited evidence improperly includes rifles possessed by prohibited persons and rifles that are not subject to the AWCA.  PX-50 at 1 (noting only that NSSF excludes rifles "that were produced and exported or imported and later |

| | | | |
|---|---|---|---|
| | | | exported"); PX-49 at 33 ("You can include any rifles of this style that have been modified or moved to be compliant with local law." (quoting survey question)); *id.* (no indication that respondents were screened to exclude prohibited persons from participating in the survey); *see also* Def.'s Opp'n at 15, 17.<br><br>Objections:  Same objections noted in response to Item No. 29, *supra*. |
| | 33 | Americans typically choose rifles prohibited by the AWCA for target shooting.<br><br>(Brady Decl., Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Ex. 22; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership].) | Disputed.  Proposed statement is not supported by cited evidence.  PX-2 (English Rpt.) at 4 (noting that "[r]ecreational target shooting" and "competitive shooting sports" were "[a]dditional reasons" cited by survey participants for owning a "modern sporting rifle"); PX-3 (Helsley Rpt.) at 11 (does not state that rifles that qualify as assault weapons under the AWCA are typically chosen by law-abiding citizens for target shooting and, rather, speculates that an owner of an AR-platform rifle can configure the weapon "as a 12lb single-shot rifle for 1000-yard target competition"); PX-22 (2016 NSSF Report) at ix ("Handguns and traditional rifles top the list" of firearms used in target or sport shooting, and traditional rifles and shotguns "top the list" for hunting); *id.* at iii (noting a 14% drop in the number of participants who used a "modern sporting rifle" for target shooting from 2014 to 2016); PX-50 at 1 (stating that "this particular |

| | | |
|---|---|---|
| | | style of rifle [AR-15 and AK-style] is the top choice for law-abiding citizens for hunting, recreational shooting *and* self-defense" (emphasis added)); PX-51 at 1 (noting that only 15% of respondents affirmatively listed "Target shooting/Take to range/Competition" as a "main reason[ they] own an AR-15-style rifle").<br><br>The cited evidence improperly includes rifles possessed by prohibited persons and rifles that are not subject to the AWCA. PX-50 at 1 (noting only that NSSF excludes rifles "that were produced and exported or imported and later exported"); PX-49 at 33 ("You can include any rifles of this style that have been modified or moved to be compliant with local law." (quoting survey question)); *id.* (no indication that respondents were screened to exclude prohibited persons from participating in the survey); *see also* Def.'s Opp'n at 15, 17.<br><br>Objections: Same objections noted in response to Item No. 29, *supra*. |
| 34 | The American public has had access to and has commonly owned semi-automatic, centerfire rifles with detachable magazines for more than a century.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 3-6.) | Disputed. Proposed statement is not supported by cited evidence. PX-3 (Helsley Rpt.) at 5 (discussing the availability of M1 carbines in the "early 1960s, [when] they became widely available both on the surplus market and through the [Director of Civilian Marksmanship]"); *id.* at 6 (discussing "second wave of surplus |

rifle imports" in the late 1980s, which included a "new important player": the SKS, a "semiautomatic rifle with a *fixed ten round magazine*" (emphasis added)).

Proposed statement is contradicted by Plaintiffs' expert. DX-16 (Helsley Dep. Tr.) at 825:20–826:12 (testifying that AR platform rifles became commonly possessed by civilians around the early 1980s); *id.* at 827:3-13 (testifying that semiautomatic rifles with centerfire firing mechanisms became commonly possessed by civilians around 1960).

AR-platform rifles rose in popularity only in the early 21st century, particularly after 2008. *See* DX-51 at 1723 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 22) (noting that although "[t]he original patent for the gas operating system central to the AR-15 being rapidly fired with minimal recoil expired in 1977" and "[f]rom that point forward, there could have been a large-scale, immediate, and legal proliferation of direct copies of these rifles and other high capacity semi-automatic guns into the United States commercial market," that "did not happen, at least not until nearly two decades later"); DX-72 (noting that "the AR-15's rise to dominance *over the past two decades* was sparked by a dramatic reversal in strategy by the country's biggest gun companies to invest in a

| | | | |
|---|---|---|---|
| | | | product that many in the industry saw as anathema to their culture and traditions" (emphasis added)); PX-50 at 2 (showing production of AR-platform rifles spiking in 2009 and 2012). |
| | 35 | The AR-15 has been available to the American public since at least 1959.<br><br>(Brady Decl., Ex. 2 [Expert Report of W. English] at 3; Ex. 3 [Expert Report of S. Helsley] at 6.) | Undisputed. |
| | 36 | The popularity of AR-15 type rifles has increased since its inception.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 11-12.) | Undisputed but incomplete. AR-platform rifles rose in popularity only in the early 21st century, particularly after 2008. *See* DX-51 at 1723 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 22) (noting that although "[t]he original patent for the gas operating system central to the AR-15 being rapidly fired with minimal recoil expired in 1977" and "[f]rom that point forward, there could have been a large-scale, immediate, and legal proliferation of direct copies of these rifles and other high capacity semi-automatic guns into the United States commercial market," that "did not happen, at least not until nearly two decades later"); DX-72 (noting that "the AR-15's rise to dominance *over the past two decades* was sparked by a dramatic reversal in strategy by the country's biggest gun companies to invest in a product that many in the industry saw as anathema to their culture and |

| | | |
|---|---|---|
| | | traditions" (emphasis added)); PX-50 at 2 (showing production of AR-platform rifles spiking in 2009 and 2012). |
| | **Pistol Grips** | |
| 37 | Rifles commonly come standard with a pistol grip.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7; [Expert Report of W. English] at 3.) | Undisputed. |
| 38 | Pistol grips for rifles are commonly available aftermarket.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 11; Ex. 44.) | Undisputed. |
| 39 | Pistol grips do not affect a rifle's rate of fire.<br><br>(Brady Decl.; Ex. 3 [Expert Report of S. Helsley] at 7-9.) | Disputed.  Pistol grips can affect a rifle's effective rate of fire when fired rapidly.  DX-50 at 1688 (Busse Suppl. Rpt. ¶ 13) ("A pistol grip is a feature incorporated into some firearm stocks that allows the shooter to control and aim the rifle *during periods of rapid fire*, such as situations encountered during military firefights." (emphasis added)); DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 16) ("Absent any pistol grip, a semi-automatic rifle would be difficult to operate *when fired rapidly . . . .*" (emphasis added)); DX-3 at 137–38 (Mersereau Rpt. ¶ 9) ("Pistol grips and thumbhole stocks provide the combatant with more control of the rifle and thus more accuracy *during rapid fire. . . .* This allows the shooter to not only be more accurate |

but also *increases the speed with which rounds can be fired*." (emphases added)); DX-2 at 126 (Graham Rpt. ¶ 26) ("Pistol grip that protrudes beneath the action of the weapon, thumbhole stock, and forward pistol grip . . . . provide increased ergonomics, which can enhance more accurate *rapid shooting*." (emphasis added)).

Proposed statement is contradicted by Plaintiffs' expert.  DX-16 (Helsley Dep. Tr.) at 835:20–836:4 ("Q. Is it possible that for somebody with less experience than you, that the features may have something to do with the rifles rate of fire, particularly the rifle's effective [as opposed to cyclic] rate of fire?  A. Is it possible?  Everything's possible."); *id.* at 843:13-844:15 (testifying that, in general, a protruding pistol grip could be more effective in stabilizing a weapon during rapid fire than other types of pistol grips); *id.* at 848:8-12 (Q. "[I]f there's a monster man grip, could that affect detrimentally the effective rate of fire for that firearm?  A. I would say yes."); PX-3 (Helsley Rpt.) at 8 ("An AR type rifle can still be fired without a pistol grip installed, but would leave the user's hand in a non-optimal and less safe position to operate the rifle.  For example, the 'MonsterMan' style grip . . . is not prohibited by California law.").

| 40 | *[SUF 40 intentionally left blank.]* | |

| 41 | Pistol grips do not affect a rifle's capacity to accept ammunition.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7-9.) | Undisputed. |
|---|---|---|
| 42 | Pistol grips do not affect the power of the projectile a rifle discharge [sic].<br><br>(Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5-7; Ex. 3 [Expert Report of S. Helsley at 7-9.) | Undisputed. |
| 43 | Pistol grips are not dangerous per se.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 6-9.) | Disputed.  Pistol grips unattached to a firearm are not dangerous per se, but pistol grips enhance the effectiveness of rapid semiautomatic fire.  *See* DX-61 at 2394–95 (Tucker Suppl. Rpt. ¶ 16) ("Absent any pistol grip, a semi-automatic rifle would be difficult to operate when fired rapidly . . . [T]he pistol grip . . . increase[s] the killing efficiency of automatic rifles and [is a] necessit[y] in sustained combat operations of weeks or months when firing a rifle rapidly."); DX-50 at 1688 (Busse Suppl. Rpt. ¶ 13) ("A pistol grip is a feature incorporated into some firearm stocks that allows the shooter to control and aim the rifle during periods of rapid fire, such as situations encountered during military firefights."); DX-3 at 137–38 (Mersereau Rpt. ¶ 9) ("Pistol grips and thumbhole stocks provide the combatant with more control of the rifle and thus more accuracy during rapid fire. . . . This |

allows the shooter to not only be more accurate but also increases the speed with which rounds can be fired."); DX-2 at 126 (Graham Rpt. ¶ 26) ("Pistol grip that protrudes beneath the action of the weapon, thumbhole stock, and forward pistol grip . . . . provide increased ergonomics, which can enhance more accurate rapid shooting.").

Proposed statement is contradicted by Plaintiffs' expert.  DX-16 (Helsley Dep. Tr.) at 835:20–836:4 ("Q. Is it possible that for somebody with less experience than you, that the features may have something to do with the rifles rate of fire, particularly the rifle's effective [as opposed to cyclic] rate of fire?  A. Is it possible?  Everything's possible."); *id.* at 843:13–844:15 (testifying that, in general, a protruding pistol grip could be more effective in stabilizing a weapon during rapid fire than other types of pistol grips); *id.* at 848:8-12 (Q. "[I]f there's a monster man grip, could that affect detrimentally the effective rate of fire for that firearm?  A. I would say yes."); PX-3 (Helsley Rpt.) at 8 ("An AR type rifle can still be fired without a pistol grip installed, but would leave the user's hand in a non-optimal and less safe position to operate the rifle.  For example, the 'MonsterMan' style grip . . . is not prohibited by California law.").

| | | | |
|---|---|---|---|
| 44 | The purpose of a pistol grip is to position the "trigger finger" for optimum trigger control and help absorb recoil.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7.) | Undisputed but incomplete.  Pistol grips enhance the effectiveness of rapid semiautomatic fire.  *See* DX-61 at 2394–95 (Tucker Suppl. Rpt. ¶ 16) ("Absent any pistol grip, a semi-automatic rifle would be difficult to operate *when fired rapidly* . . . [T]he pistol grip . . . increase[s] the killing efficiency of automatic rifles and [is a] necessit[y] in sustained combat operations of weeks or months *when firing a rifle rapidly*." (emphases added)); DX-50 at 1688 (Busse Suppl. Rpt. ¶ 13) ("A pistol grip is a feature incorporated into some firearm stocks that allows the shooter to control and aim the rifle *during periods of rapid fire*, such as situations encountered during military firefights." (emphasis added)); DX-3 at 137–38 (Mersereau Rpt. ¶ 9) ("Pistol grips and thumbhole stocks provide the combatant with more control of the rifle and thus more accuracy *during rapid fire*." (emphasis added)); DX-2 at 126 (Graham Rpt. ¶ 26) ("Pistol grip that protrudes beneath the action of the weapon, thumbhole stock, and forward pistol grip . . . . provide increased ergonomics, which can enhance more accurate *rapid shooting*." (emphasis added)). | |
| 45 | Pistol grips allow a rifle to be used with one hand.<br><br>(Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 12.) | Disputed.  Plaintiffs' evidence shows most rifles may be used with one hand, regardless of a pistol grip. PX-28 (American Rifleman Article) at 6 ("Most general purpose rifles | |

| | | will work perfectly when fired with only one hand.").<br><br>Evidence shows that pistol grips that protrude conspicuously beneath the action of a rifle can enable one-handed rifle fire in combat. *See* DX-22 at 1048 (1989 ATF Rpt. at 6) (noting that while a "well-defined pistol grip that protrudes conspicuously beneath the action of the weapon . . . . can be an aid in one-handed firing of the weapon in a combat situation," "the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions"). |
| 46 | Pistol grips can accommodate a disabled person.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9.) | Disputed. Plaintiffs' evidence shows most rifles may be used with one hand. PX-28 (American Rifleman Article) at 6 ("Most general purpose rifles will work perfectly when fired with only one hand.").<br><br>Objection: Speculative testimony of an expert witness. Fed. R. Evid. 702. |
| | **Adjustable Stocks** | |
| 47 | Rifles commonly come standard with an adjustable stock.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; [Expert Report of W. English] at 3.) | Disputed. Proposed statement is contradicted by Plaintiffs' expert. PX-3 (Helsley Rpt.) at 9 ("Most mass-produced rifles and shotguns are equipped with a stock that will fit the 'average' user—whoever that is. Some firearms come with |

| | | |
|---|---|---|
| | | factory stocks that are designed to allow the user to adjust the [length of pull].”); PX-2 (English Rpt.) at 3 (stating that “Modern Sporting Rifles” “virtually always are equipped with a vertical pistol grip and often have a flash suppressor and/or an adjustable stock”). Fixed rifle stocks are widely available.  DX-50 at 1689 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 25) (“Original rifles on which the current existing and newly manufactured AR-15s are based and that were accepted by hundreds of thousands of military officers as their weapon of choice for decades, did not incorporate a folding stock . . . .  Further, there are still non-folding stock options available today and all are sold and advertised as fully functioning options for semiautomatic rifles.”). Objection:  Plaintiffs’ expert witness, English, is not qualified to testify on assault weapon features. Fed. R. Evid. 702. |
| 48 | Adjustable stocks for rifles are commonly available aftermarket. (Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9; Ex. 45.) | Undisputed. |
| 49 | A “telescoping stock” allows the user of the rifle to adjust the length of a rifle a couple of inches as conditions dictate and | Disputed.  DX-2 at 126 (Graham Rpt. ¶ 27) (“Folding or telescoping stock and a rifle with overall length under 30 inches aid in the concealability of the weapon.”); *id.* |

| | | | |
|---|---|---|---|
| | | has no material effect on the concealability of the rifle.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 7 [Depo. Tr. B. Graham] at 81:2-19.) | at 124 (Graham Rpt. ¶ 21); DX- 3 at 138 (Mersereau Rpt. ¶ 10) ("By collapsing the stock, the rifle becomes more concealable . . . .").<br><br>Proposed statement is not supported by cited evidence. *See* PX-7 (Graham Dep. Tr.) at 81:2-19 (no reference to concealability). |
| | 50 | The purpose of a telescoping stock is to allow the user of a rifle to make it a comfortable length for that user's body type or as conditions dictate.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; [Depo. Tr. B. Graham] at 94:1-4; 95:19-21.) | Disputed.  DX-22 at 1048 (1989 ATF Rpt. at 6) ("The main advantage of [a folding or telescoping stock] is portability, especially for airborne troops."); DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 18) (stating that folding stocks are "designed for military personnel, whose primary weapon is vehicle or air-mounted (tank, Bradly, Apache), who may be required to escape from a mangled vehicle, or who may need to abandon a destroyed weapon system and need a substitute weapon for offensive combat"); PX-52.2 (Tucker Dep. Tr.) at 178:15–179:5 ("[T]he purpose of a telescoping stock is to give those Marines who are in . . . a larger weapon system . . .[, i]f their weapon system, which is that vehicle or that aircraft, is hit and is no longer functioning, then the telescoping stock on the M4 . . . allows it to be stored kind of out of the way inside of a tank, where there's not a whole lot of room, and it allows it to be removed from a damaged tank much easier . . . ."); *id.* at 182:2-12 (noting that "it's important that people that are |

| | | | |
|---|---|---|---|
| | | | purchasing weapons purchase weapons that they can fire given their length of pull without having to make adjustments to the weapon"); *id.* at 182:14-20 (noting that "length of pull" does not change "depending on what you're wearing"); DX-2 at 124 (Graham Rpt. ¶ 21). |
| | 51 | People of different body sizes may need different length stocks to properly hold a rifle.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9; Ex. 6 [Depo. Tr. M. Mersereau] at 37:2-11; [Depo. Tr. B. Graham] at 95:19-21.) | Undisputed. |
| | 52 | What clothing a person is wearing may affect what length stock that person needs to properly hold a rifle.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9; [Depo. Tr. B. Graham] at 94:1-4.) | Disputed.  PX-52.2 (Tucker Dep. Tr.) at 182:14-20 (noting that "length of pull" does not change "depending on what you're wearing" because the angle of the elbow can be adjusted). |
| | | **Flash Suppressors** | |
| | 53 | Rifles commonly come standard with a flash suppressor.<br><br>(Brady Decl., Ex. 2 [Expert Report of W. English] at 3; Ex. 3 [Expert Report of S. Helsley] at 10-11.) | Disputed.  Proposed statement is not supported by cited evidence.  PX-3 (Helsley Rpt.) at 10–11 (does not state that rifles commonly come standard with a flash suppressor); PX-2 (English Rpt.) at 3 (stating that "Modern Sporting Rifle[s]" "virtually always are equipped with a vertical pistol grip and often have a flash suppressor and/or an adjustable stock"). |
| | 54 | Flash suppressors for rifles are commonly available aftermarket. | Undisputed. |

30

| | | | |
|---|---|---|---|
| | | (Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 11; Ex. 46.) | |
| | 55 | Flash suppressors do not hide the flash from those in the direct line of fire, but rather from the shooter.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 5 [Expert Report of B. Graham] at 22, 28; Ex. 6 [Depo. Tr. M. Mersereau] at 56:14-18; Ex. 7 [Depo. Tr. B. Graham] at 103:15-20.) | Disputed.  DX-22 at 1049 (1989 ATF Rpt. at 7) (noting that a flash suppressor "disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night"); PX-25 at 8 (indicating that the flash suppressor "[r]educes the flash from the barrel of the weapon, allowing the shooter to remain concealed when shooting at night"); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17) ("A flash suppressor also disguises the origin of fire and avoid detection by enemy forces . . . ."); DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20) ("The purpose of the flash suppressor is to reduce combat signature by cooling and dispersing burning gases.  This makes it more difficult for the enemy to pinpoint a rifleman's location, especially in low light conditions."); DX-16 (Helsley Dep. Tr.) at 863:7-15 ("Q. So a flash suppressor could help a shooter remain concealed from the periphery in low light conditions when operating a firearm with a flash suppressor?  A. Yes."); *see also* PX-7 (Graham Dep. Tr.) at 104:9-19 (testifying that a flash suppressor "may" make the muzzle flash less visible to "people being shot at" "[d]epending on your angle to the shooter"). |

| 56 | Flash suppressors only have an effect in low-light conditions.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 6 [Depo. Tr. M. Mersereau] at 56:3-6; [Depo. Tr. B. Graham] at 103:21-24.) | Disputed.  Proposed statement is not supported by cited evidence.  PX-7 (Graham Dep. Tr.) at 103:21-24 ("Q. So is . . . the effect of a flash suppressor only relevant in low light conditions?  A. I would say it's *most* relevant . . . ." (emphasis added)); PX-6 (Mersereau Dep. Tr.) at 56:5–6 ("*I don't know* how effective it would be in daylight." (emphasis added)).<br><br>*See also* DX-22 at 1049 (1989 ATF Rpt. at 7) (noting that a flash suppressor "disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, *especially* at night" (emphasis added)); DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20) ("This makes it more difficult for the enemy to pinpoint a rifleman's location, *especially* in low light conditions." (emphasis added)). |

|  | **Features Generally** |  |
|---|---|---|
| 57 | None of the features is inherently dangerous.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 6; Ex. 7 [Depo. Tr. B. Graham] at 108:2-16.) | Disputed.  The accessories listed in California Penal Code section 30515(a) unattached to a firearm are not dangerous per se, but they can enhance the effectiveness of rapid semiautomatic fire with, and the concealability of, semiautomatic rifles.  *See* response to Item No. 43, *supra*; DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 18) ("A folding stock causes weapon instability.").<br><br>Proposed statement is not supported by cited evidence.  PX-7 (Graham Dep. Tr.) at 108:2-16 (no mention of inherent danger of any of the features). |
| 58 | None of the features becomes inherently dangerous when used in conjunction with any of the other features.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 6; Ex. 7 [Depo. Tr. B. Graham] at 108:2-16.) | Disputed.  The accessories listed in California Penal Code section 30515(a) can enhance the effectiveness of rapid semiautomatic fire with, and the concealability of, semiautomatic rifles.  *See* response to Item No. 43, *supra*; DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 18) ("A folding stock causes weapon instability.").<br><br>Proposed statement is not supported by cited evidence.  PX-7 (Graham Dep. Tr.) at 108:2-16 (no mention of inherent danger of any of the features, alone or in combination). |
| 59 | The features increase accuracy of the rifle.<br><br>(Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 8-12; Ex. 3 [Expert Report of S. | Undisputed but incomplete.  The accessories listed in California Penal Code section 30515(a) can affect a rifle's effective rate of fire when fired rapidly.  *See, e.g.*, response to Item No. 39, *supra*. |

| | | | |
|---|---|---|---|
| | | Helsley] at 6-11, 12; Ex. 4 [Expert Report of M. Mersereau] at 8-11; Ex. 5 [Expert Report of B. Graham] at 19, 22, 26, 28; [Depo. Tr. B. Graham] at 119-123; 124:1-6.) | |
| | 60 | The features increase user control of the rifle.<br><br>Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 8-12; Ex. 3 [Expert Report of S. Helsley] at 6-11, 12; Ex. 4 [Expert Report of M. Mersereau] at 8-11; Ex. 5 [Expert Report of B. Graham] at 19, 22, 26, 28; Ex. 6 [Depo. Tr. M. Mersereau] at 36:7-37:11; Ex. 7 [Depo. Tr. B. Graham] at 107:6-14, 108:2-16; [Depo. Tr. B. Graham] at 119-123; 124:1-6.) | Undisputed but incomplete.  The accessories listed in California Penal Code section 30515(a) can affect a rifle's effective rate of fire when fired rapidly.  *See, e.g.*, response to Item No. 39, *supra*. |
| | 61 | The State's designated expert witness, Blake Graham, opined that the features increase accuracy and the user's control of the rifle.<br><br>(Brady Decl., Ex. 3 [Expert Report of B. Graham] at 19, 22, 26, 28; Ex. 7 [Depo. Tr. B. Graham] at 107:6-14, 108:2-16; [Depo. Tr. B. Graham] at 119-123; 124:1-6.) | Undisputed. |
| | 62 | The State's designated expert witness, Michael Mersereau, opined that features increase accuracy and the user's control of the rifle. | Undisputed. |

| | | | |
|---|---|---|---|
| | | (Brady Decl., Ex. 4 [Expert Report of M. Mersereau] at 8-11; Ex. 6 [Depo. Tr. M. Mersereau] at 36:7-37:11.) | |
| | | **"Assault Weapon" Laws** | |
| | 63 | California's Assault Weapon Control Act was adopted in 1989 and was the first "assault weapon" law in the country.<br><br>(Assemb. B. 357, 1989-1990 Reg. Sess. (Cal. 1989); Brady Decl., Ex. 48.) | Undisputed. |
| | 64 | The federal "assault weapon" law took effect in 1994.<br><br>(Req. Jud. Ntc., ¶ 8, Ex. 8.) | Undisputed. |
| | 65 | Congress allowed the federal "assault weapon" law to expire in 2004.<br><br>(Req. Jud. Ntc., ¶ 8, Ex. 8.) | Undisputed. |
| | 66 | Federal law does not currently restrict "assault weapons."<br><br>(Req. Jud. Ntc., ¶ 8, Ex. 8.) | Disputed.  Federal law imposes generally applicable firearms restrictions that would apply to firearms defined as "assault weapons" under the AWCA. *See, e.g.*, 18 U.S.C. § 922. |
| | 67 | Currently, other than California, there are nine states in the country with an "assault weapon" law, plus the District of Columbia.<br><br>(Req. Jud. Ntc., Exs. 1-11.) | Undisputed. |
| | 68 | Every "assault weapon" law in the country other than California's was originally | Undisputed. |

| | | |
|---|---|---|
| | | adopted in the 1990s or later, including three just passed in the last year.<br><br>(Req. Jud. Ntc., Exs. 1-7 (Conn. Gen. Stat. §§53-202a – 53-202k (first enacted in 1993); D.C. Code Ann. §§7-2501.01(3A), 7-2502.02 (a)(6) (enacted in 2008); Haw. Rev. Stat. Ann. §§ 134-1, 134-8 (first enacted in 1992); Md. Code Ann., Crim. Law §§ 4-301, 4-303 (first enacted in 2002); N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-3 (first enacted in 1999); N.Y. Penal Law §§ 265.00(22), 265.02(7) (first enacted in 1998); Del. Code Ann. tit. 11, § 1466 (first enacted 2022); 720 Ill. Comp. Stat. Ann. 5/24-1.9 (first enacted in 2023); Wash. Rev. Code Ann. § 9.41.010 (first enacted in 2023)).) | |
| 69 | The United States government, through the Director of Civilian Marksmanship, used to operate a program that would sell semiautomatic, centerfire rifles with detachable magazines directly to the public, including some rifles that would be considered "assault weapons" under the AWCA.<br><br>(Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 5; Exs. 16, 42, 43.) | Undisputed. |
| 70 | Nationally, in 2019, only about 2.6% of murders (364 out of 13,927) were confirmed to have | Disputed.  Proposed statement is not supported by cited evidence.  *See* FBI, 2019 Crime in the United |

| | | | |
|---|---|---|---|
| | | been committed with any type of rifle, which is below murders using knives (1,476), blunt objects (397), and "hands, fists, and feet" (600), and way below murders using handguns (6,368).<br><br>(Brady Decl. Ex. 60 [FBI Crime Data].) | States, https://tinyurl.com/bdhw6yes (confirming that PX-60 contains data only for "the homicides for which the FBI received weapons data in 2019"—not for all murders, nationally). |
| | 71 | All US soldiers and marines who carry assault rifles are armed with assault rifles that have automatic capability, and not only semiautomatic capability.<br><br>(Brady Decl., Ex. 52 [Depo. Col. Tucker] at 68:11-15.) | Undisputed but incomplete. *See* PX-52.1 (Tucker Dep. Tr.) at 64:14–66:4 ("Q. During your career in the Marine Corps, to your knowledge, . . . did the United States Marine Corps ever issue to its personnel semiautomatic-only AR-15s?  A. No, but there was some very strict tactical guidance given that you were not to use full automatic in Iraq or Afghanistan. Q. And why were those instructions provided? . . . . A. [T]he primary restriction was it's not a capability that we need on this weapon system.  We don't use it.  It's not . . . a good employment of the system.").<br><br>*See also* DX-51 at 1723 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 20) ("'[S]emi-automatic' mode is the mode that is most often deployed in battle to efficiently target and kill because it allows targeting of specific human targets with repeated accurate shots rather than inaccurate, indiscriminate 'spray.' It is my experience that respected Special Forces trainers therefore teach that 'semi-auto' is the |

| | | | preferred and most lethal setting in most wartime scenarios."). |
|---|---|---|---|
| 72 | No military anywhere in the world (with the possible exception of Israel) employs semiautomatic-only rifles like the ones that the AWCA bans for infantry. (Brady Decl., Ex. 52 [Depo. Col. Tucker] at 69:7-12.) | Undisputed. |

Dated:  June 23, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General


*/s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*