C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Matthew D. Cubeiro – SBN 291519
mcubeiro@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN RUPP, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ROB BONTA, in his official capacity as Attorney General of the State of California, <br><br> Defendant. | Case No.: 8:17-cv-00746-JLS-JDE <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date:  July 28, 2023 <br> Hearing Time: 10:30 a.m. <br> Judge:  Josephine L. Staton <br> Courtroom:  8A <br><br> [Filed concurrently with Plaintiff's Disagreements with Defendant's Survey of Relevant Statutes; Declaration of Sean A. Brady; and Response to Defendant's Statement of Uncontroverted Facts and Conclusions of Law] |

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

I.      Introduction........................................................................................1

II.     Argument .............................................................................................1

        A.      The Second Amendment's Plain Text Covers the Banned
                Rifles........................................................................................2

                1.      The Banned Rifles are "Arms" under the Second
                        Amendment ..................................................................2

                2.      The State's comparison of Banned Rifles to M-16s
                        is irrelevant....................................................................3

                3.      Section 30515(a)'s features-based "assault weapon" definition
                        regulates Arms, not just "accessories.".........................6

        B.      *Heller* and *Bruen* Confirm that History Does Not Condone Banning
                Arms Like the Banned Rifles that Are in Common Use.......................8

        C.      The State Cannot Meet Its Burden to Show that the Banned Rifles Are
                "Dangerous and Unusual" Weapons Unprotected by the Second
                Amendment Because They Are Undeniably in "Common Use" for
                Lawful Purposes ....................................................................9

        D.      No Historical Firearms Regulation Justifies the AWCA's
                Rifle Ban.................................................................................13

                1.      A "more nuanced approach" is inappropriate here....................13

        E.      Relevant History Does Not Support the AWCA's Ban on Commonly
                Owned Rifles ...........................................................................16

                1.      Nineteenth Century Laws Regulating "Dangerous and Unusual
                        Weapons" Are Not "Relevantly Similar" to the State's Modern
                        Ban on Firearms in Common Use for Lawful Purposes............17

                2.      The State's Reliance on 20th Century Machine Gun Laws Is
                        Unpersuasive and Factually Wrong ...........................................22

III.    Conclusion .........................................................................................24

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Antonyuk v. Hochul,*
No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965,
(N.D.N.Y. Oct. 6, 2022) .................................................................. 16, 22

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
910 F.3d 106 (3d Cir. 2018) ...................................................... 11

*Boland v. Bonta,* No. SACV2201421CJCADSX, 2023 WL 2588565
(C.D. Cal. Mar. 20, 2023) ........................................................ 17, 18

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) .............................................. 8, 9, 10, 11, 20

*Del. State Sportsmen's Ass'.n, Inc. v. Del. Dep't of Safety & Homeland*
*Sec.,* No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, (D. Del.
Mar. 27, 2023) ........................................................................ 10

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................... passim

*Duncan v. Becerra,*
970 F.3d 1133 (9th Cir. 2020) ............................................. 17, 24

*Duncan v. Bonta,*
19 F.4th 1087 (9th Cir. 2021) .................................................. 21

*Espinoza v. Montana,* ____ U.S. __,
140 S. Ct. 2246 (2020) .............................................................. 23

*Firearms Pol'y Coal., Inc. v. McCraw,*
No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834, (N.D. Tex. Aug.
25, 2022) ................................................................................. 23

*Friedman v. City of Highland Park,*
577 U.S. 1039 (2015) ................................................................ 5

*Funk v. United States,*
290 U.S. 371 (1933) ................................................................ 22

*Fyock v. City of Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ................................................... 12

*Heller v. District of Columbia,*
399 U.S. App. D.C. 314 (2011) ................................................ 20

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) ............................................... 10

*Kolbe v. Hogan,*
813 F.3d 160 (4th Cir. 2016) ................................................... 10

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961) ................................................................. 2

*Maloney v. Singas*,
    351 F. Supp. 3d 222 (E.D.N.Y. 2018) ........................................ 10

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ............................................................... 9

*Miller v. Bonta*,
    542 F. Supp. 3d 1009 (S.D. Cal. 2021) ................................. 10, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................... passim

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .................................................... 10

*People v. Webb*,
    131 N.E.3d 93 (Ill. 2019) ....................................................... 10

*Ramirez v. Commonwealth*,
    94 N.E.3d 809 (Mass. 2018) .................................................... 10

*Rocky Mt. Gun Owners v. Town of Superior, Colo.*,
    22-cv-01685 (July 22, 2022) ............................................... 8, 10

*United States v. Benitez*,
    No. 17-cr-00348, 2018 U.S. Dist. LEXIS 211398 (D. Idaho Dec.
    14, 2018) ............................................................................ 10

*United States v. Nutter*,
    No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038 (S.D. W. Va.
    Aug. 29, 2022) ..................................................................... 23

**Statutes**

1927 Mich. Pub. Acts 887, § 3 ...................................................... 23

1927 R.I. Pub. Laws 256 § 1 ........................................................ 23

1927 R.I. Pub. Laws 256 § 3 ........................................................ 23

1933 Ohio Laws 189, §§ 12819 ....................................................... 23

1959 Mich. Pub. Acts 249 ............................................................ 23

1959 Mich. Pub. Acts 250 ............................................................ 23

1959 R.I. Acts & Resolves 260 ...................................................... 23

1959 R.I. Acts & Resolves 263 ...................................................... 23

1972 Ohio Laws 1866 ................................................................ 24

1972 Ohio Laws 1963 ................................................................ 24

iv

2013-2014 Leg., H.R. 234 (Ohio) ...................................................................24

26 U.S.C. §§ 5801-72 .....................................................................................24

47 Stat. 650, § 1 (1932) ..................................................................................24

47 Stat. 650, § 14 (1932) ................................................................................24

48 Stat. 1236 (1934) .......................................................................................24

Cal. Penal Code § 30510 ...................................................................................6

Cal. Penal Code § 30515 ...........................................................................6, 7, 8

**Other Authorities**

California Attorney General's Assault Weapons Identification Guide (2001):
    https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/aws-guide.pdf
    (last visited June 23, 2023) ........................................................................6

Chuck Willis & Robert A. Sadowski, *The Illustrated History of Guns*
    256 (2017) ..................................................................................................14

David Kopel, Reason Magazine, *The Founders were well aware of
    continuing advances in arms technology*, available at
    https://rb.gy/k23pf (last accessed May 26, 2023) .....................................14

David Kopel, *Bowie Knife Statutes 1837-1899*,
    Volokh Conspiracy (Nov. 20, 2022), https://bit.ly/3yZYzZx .......................19

David Kopel, *How Powerful Are AR Rifles? About the Same as
    Other Rifles*, Volokh Conspiracy (Feb. 27, 2023, 2:37 PM),
    https://reason.com/volokh/ 2023/02/27/how-powerful-are-ar-rifles/ .............21

Emily Guskin, et al., Wash. Post, *Why Do Americans Own AR-15s?*
    (May 22, 2023) (available at bit.ly/3G0vbG9) .................................................9

F. Schauer & B. Spellman, *Analogy, Expertise, and Experience*,
    84 U. Chi. L. Rev. 249, 254 (2017) .............................................................16

Henry, *Henry History*, https://www.henryusa.com/about-us/henry-
    history/ (last visited May 26, 2023) .............................................................14

Jeff Zimba, *The Evolution of the Black Rifle: 20 Years of Upgrades,
    Options, and Accessories* 10 (2014) ...........................................................15

*National Shooting Sports Foundation, Inc., Commonly Owned: NSSF
    Announces Over 24 Million MSRs in Circulation* (July 20, 2022)
    ("NSSF"), https://bit.ly/3QBXiyv (last visited May 22, 2023) ...................9

Remington, *Model 8 Autoloading Centerfire Rifle, available at*
    https://web.archive.org/web/20130520070354/http://remington.co
    m/products/archived/centerfire/autoloading/model-8.aspx (last
    visited May 26, 2023) ...............................................................................15

Stephen P. Halbrook, *America's Rifle, The Case for the AR-15* (2022)...................15

v

Thomas Wetmore, Commissioner, The Charter and Ordinances of the
    City of Boston: Together with the Acts of the Legislature Relating
    to the City at 142-143 (1834), *available at The Making of Modern Law:
    Primary Sources* (An Act ... Prudent Storage of Gun Powder within
    the Town of Boston .......................................................................... 18

William English, Ph.D*., 2021 National Firearms Survey: Updated
    Analysis Including Types of Firearms Owned* (May 13, 2022),
    https://bit.ly/3yPfoHw (last visited May 22, 2023) ......................................... 9

TABLE OF CONTENTS

## I.     INTRODUCTION

> *Bruen*'s embrace of the text-and-history test provides clear
> guideposts for how the constitutionality of these types of
> bans must now be assessed. In short, there is zero historical
> support from the Founding—or even the Reconstruction
> era—for banning commonly possessed arms; under the
> *Bruen* test, that is the end of the matter.[1]

That should indeed be the end of the matter. But California refuses to respect

the fundamental right to keep and bear arms, and rages against the confines that

*Bruen*'s text-and-history test places on government. The State knows there are no

"well-established and representative analogues" for banning the rifles owned by

millions of Americans for lawful purposes, including self-defense, that California

hyperbolically labels "assault weapons." The State, facing a Second Amendment that

has at long last been restored and will now be much more difficult to infringe,

essentially asks this Court to contort *Bruen* beyond recognition to uphold its ban.

This Court should not oblige but should deny the State's motion.

## II.    ARGUMENT

The Supreme Court's recent *Bruen* decision established a clear framework that

courts must follow when analyzing *any* Second Amendment challenge. After

expressly disclaiming "intermediate scrutiny" that involves "interest balancing" as

not what "the Constitution demands here," *New York State Rifle & Pistol Ass'n, Inc.

v. Bruen,* 142 S. Ct. 2111, 2118 (2022), the *Bruen* Court articulated the correct test as

follows:

> When the Second Amendment's plain text covers an
> individual's conduct, the Constitution presumptively protects
> that conduct. The government must then justify its regulation by
> demonstrating that it is consistent with the Nation's historical
> tradition of firearm regulation. Only then may a court conclude
> that the individual's conduct falls outside the Second
> Amendment's 'unqualified command.

---

[1] Mark W. Smith, *NYSRPA v. Bruen*: A Supreme Court Victory for the Right to Keep
and Bear Arms—and a Strong Rebuke to "Inferior Courts", 24 Harvard J. L. & Pub.
Policy Per Curiam 8 (2022).

1

1   *Id.* at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).

2        Because the Banned Rifles are "Arms" within the Amendment's text, the

3   AWCA's ban on them is "presumptively" unconstitutional. To rebut that

4   presumption, the State would need to show that there is a historical tradition of

5   banning such rifles. That it cannot do. *Heller* teaches us that there is no tradition of

6   banning arms unless they are "dangerous and unusual." 554 U.S. at 625-27. Because

7   the Banned Rifles are owned by the millions for lawful purposes, they definitionally

8   do not fall within that category. *Heller*, 554 U.S. at 582, 624-25. No further analysis

9   is thus necessary or required. But even if the State were to perform a historical

10  analysis, even under *Bruen*'s "more nuanced approach," it would quickly become

11  obvious that the State still cannot meet its burden under any standard because there

12  simply is no tradition of banning arms commonly owned for lawful purposes;

13  particularly just for having features that increase their accuracy and control. The

14  Court should thus deny the State's motion.

15      **A.**    **The Second Amendment's Plain Text Covers the Banned Rifles**

16          **1.**    **The Banned Rifles are "Arms" under the Second Amendment**

17  *Bruen* instructs courts to first determine whether the Second Amendment's

18  "plain text covers" the conduct at issue. *Bruen*, 142 S. Ct. at 2126. Here, California

19  bans certain rifles. The only relevant question is thus whether those Banned Rifles

20  constitute "Arms" under the Amendment. They clearly do. Whether something is an

21  "Arm" depends *entirely* on whether it is "a[] thing that a man wears for his defence,

22  or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S.

23  at 625. That the Banned Rifles meet that definition is undeniable.

24       Nevertheless, with history not on its side and thus hoping to avoid *Bruen*'s

25  historical test, the State makes strained, desperate arguments for why the AWCA's

26  rifle ban does not deserve Second Amendment scrutiny in the first place. Specifically,

27  the State argues that that the Amendment's text does not cover the Banned Rifles

28  because they "are not 'Arms' *in common use for self-defense*." MSJ at 12 (emphasis

added). The qualifier that an item must be "in common use for self-defense" is found nowhere in the Amendment's text nor in any authority. It is thus irrelevant in deciding whether an item is an "Arm."

To be sure, a ban on "Arms" *not* "in common use" *may* be "consistent with the Nation's historical tradition of firearm regulation" and thus survive *Bruen*'s *historical* inquiry. *Bruen*, 142 S. Ct. at 2143. But that is irrelevant in determining whether an item is an "Arm" within the Amendment's *text* that is deserving of that historical inquiry. Indeed, its text reaches *all* arms, dangerous, unusual, or otherwise because we begin from the premise that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). In sum, whether an item is an "Arm" is a separate question from whether it has been historically restricted, and the State errs by conflating the inquiries.

The State is also wrong that Plaintiffs shoulder the burden of establishing that the Amendment's text covers the Banned Rifles. Because the Banned Rifles are undeniably bearable arms, the Supreme Court has already established that they prima facie meet the definition of "Arms." *Heller*, 554 U.S. at 582. And any burden of Plaintiffs is thus met.

### 2.    The State's comparison of Banned Rifles to M-16s is irrelevant.

The State also argues that the Second Amendment's text excludes the Banned Rifles because they are supposedly "like the M-16 and are most useful in military service" and thus cannot be "in common use" for lawful purposes. MSJ at 12. Why that would exclude them from the definition of "Arms" the State, again, does not explain. In any event, the Supreme Court did not identify the M16 rifle "and the like" as weapons that "may be banned," as the State claims. *Id.* at 13.

Indeed, that section of *Heller* was engaged not in identifying another limit on the word "arms," but in analyzing the *historical* limitations of the right. And in the

3

MEMORANDUM OF POINTS AND AUTHORITIES

1  paragraph immediately preceding its reference to "M-16 rifles and the like," the

2  Court had identified the historical dividing line between protected and unprotected

3  arms: arms "in common use" are protected, while "dangerous and unusual weapons"

4  are not. *Id.* at 985. This is a historical test and one that the Banned Rifles easily

5  satisfy, as Plaintiffs discuss below. *Bruen* confirms that the *Heller* Court was not

6  adding a limitation to its textual interpretation of the word "arms" by clarifying that

7  *every* Second Amendment case must proceed first by analyzing the text of the

8  Amendment and then by examining our nation's history of firearm regulation, which,

9  in challenges to a ban on a type of firearm, requires determining whether the specific

10 arm is "dangerous and unusual." *Bruen*, 142 S. Ct. at 2127-28.

11      *Heller*'s reference to "M-16 rifles and the like" was not intended to exempt

12 from Second Amendment protection any firearm that could be likened to an M-16

13 rifle in some unspecified way. Rather, as this Court correctly observed in its previous

14 ruling on this matter, *Heller*'s mention of the M-16 was in the context of "justify[ing]

15 the fact that some dangerous and unusual weapons *that are most useful in military*

16 *service*—such as the M-16—can be banned despite the prefatory clause's ostensible

17 mandate that the right to bear arms be connected to a well-regulated militia . . .."

18 *Rupp*, 401 F. Supp. 3d at 986 (emphasis added). In other words, the *Heller* Court was

19 anticipating the objection that application of its *historical* "common use" test—which

20 could permit the government to ban some firearms like fully automatic machine guns

21 *even though* they are used by the military—is out of step with the Amendment's

22 stated purpose to preserve the militia. 554 U.S. at 267. The M-16 was merely an

23 example of a *military* weapon the banning of which *might* be consistent with the

24 Second Amendment, despite the militia clause, *assuming* it is not in common use.

25      In any event, while some, but not all, Banned Rifles share various

26 characteristics with the M-16 rifle, including appearance, none is "like" the M-16 in

27 the way relevant to *Heller*'s discussion of it. The context of *Heller*'s "M-16"

28 reference was a discussion of "dangerous and unusual" arms that are "most useful in

MEMORANDUM OF POINTS AND AUTHORITIES

military service." 554 U.S. at 627. To be sure, as this Court also correctly observed in its previous ruling, *Heller* did not "create a test whereby *any* weapon that is 'most useful in military service' is outside the scope of the Second Amendment." *Rupp*, 401 F. Supp. at 986 (emphasis added). But it was discussing *only* dangerous and unusual weapons that happen to be used in the military. Reason dictates that to be considered "most useful in military service," a weapon must at least be in use by an actual military. Yet, the State's own expert could not identify a single military anywhere in the world (with the *possible* exception of Israel) that employs the Banned Rifles. SUF Nos. 186-187. That should be the end of this inquiry, even if the "like" M-16 was a test—and it is not. Tellingly, *Heller*'s author, did not share the interpretation of his opinion that Banned Rifles are so "like" the M-16 that they lack Second Amendment protection. *See Friedman v. City of Highland Park*, 577 U.S. 1039, 1039 (2015) (Thomas, J., and Scalia, J., dissenting from the denial of certiorari).

Finally, but perhaps most importantly, even assuming everything the State says about what makes the "AR-15" so "like" the M-16 is true (and it is not), it is all irrelevant because Plaintiffs are not challenging the "AR-15 Control Act." They challenge the "Assault Weapon Control Act." That Act bans *every* semiautomatic rifle, shooting *any* type of centerfire ammunition, merely for having control and accuracy enhancing features. Ironically, under the AWCA it is perfectly legal to possess an AR-15 rifle with attributes that the State complains about, as long as it does not have the Enumerated Features. That is because other than the Enumerated Features, the AWCA does not regulate *any* of the attributes that the State lists as making the AR-15 comparable to an M-16: barrel twist, ammunition type, muzzle velocity, etc. MSJ at 14-15.[2] For that reason, the State's entire discussion of injuries

---

[2] The main "expert" the State relies on for these claims, Colonel Tucker, is not credible. While no one can deny his service to his country, he is not a ballistics expert, and his outlandish claims in this regard have already been widely discredited, including by people he admits have superior knowledge to him in the field of firearms. *See* Brady Decl., Ex. 54 (Expert Report of J. B. Boone); Brady Decl., Ex. 66 (Kopel article on power of AR rifles); Brady Decl., Ex. 65 ("*Here Are All The Problems With California's Expert Witness Testimony In Gun Ban Case*").

that "AR-15 rounds" supposedly make are wholly irrelevant, as the State does not even seek to restrict those rounds, just certain features of some (not all) of the rifles that shoot them. *Id*. Other than barrel length, which the AWCA does not regulate, the wound made does not depend on the rifle, but rather the ammunition used. Brady Decl., Ex 1, at 5. And some Banned Rifles do not even have the Enumerated Features. For example, the State fails to explain how the SKS with a detachable magazine is "like" the M-16 when it is made of wood, has no "pistol grip" (as defined in the AWCA), adjustable stock, or flash suppressor.[3] Cal. Penal Code § 30510; Cal. Code Regs. tit. 11, §§ 5495-5499. In sum, the State's comparison of the AR-15 to the M-16 is a strawman focusing on features of the AR-15 that the AWCA does not even regulate and are thus wholly irrelevant to this case.

### 3. Section 30515(a)'s features-based "assault weapon" definition regulates Arms, not just "accessories."

The State additionally argues that the features-based "assault weapon" definition found in Section 30515(a) does not regulate "arms" but merely arms' "accessories" which have no Second Amendment protection. MSJ at 10. That argument is specious. As its name indicates, the Assault *Weapon* Control Act regulates weapons, not "accessories." Indeed, the AWCA does not prevent the acquisition or possession of pistol grips, flash suppressors, adjustable stocks, or detachable magazines, nor their inclusion on all rifles; e.g., a rimfire or lever-action rifle. Instead, the AWCA expressly bans "semiautomatic, centerfire *rifles*" configured with any of those features. Cal. Penal Code § 30515(a)(1)(A)-(F).

Before adopting the features-based definition that the State claims regulates "accessories" only, the AWCA originally banned dozens of semiautomatic rifles by including their make and model on a list. Cal. Penal Code § 30510; Cal. Code Regs.

---

[3] An image of this SKS can be seen on page 39 of the following PDF, which is the California Attorney General's Assault Weapons Identification Guide (2001): https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/aws-guide.pdf (last visited June 23, 2023).

MEMORANDUM OF POINTS AND AUTHORITIES

tit. 11, §§ 5495-5499. The State does not extend its "accessory" argument to that list, likely because those rifles are "assault weapons" regardless of whether their configuration includes the so-called "accessories." *Id.* Critically, the State itself describes the reason that the Legislature subsequently adopted its "alternative" features-based "assault weapon" definition as "address[ing] the proliferation of 'copycat' *weapons* that were 'substantially similar to *weapons* on the prohibited list but differ[ent] in some insignificant way, perhaps only the name of the *weapon*, thereby defeating the intent of the ban.'" MSJ at 5 (emphasis added). In other words, Section 30515(a) was not intended to target any particular features per se, but to close a perceived "loophole" to the AWCA that failed to restrict particular *weapons*.

Footnote 10 of its brief shows the logical folly of the State's argument. It suggests that barrels and stocks are not protected, or at least not ones of a particularly short length. MSJ at 11. But that necessarily means that barrels of a longer length must be protected. So are barrels/stocks of one length protected "arms" and another not? What informs that analysis? The answer is: nothing. That is because the State invented the "necessary"-to-the-functioning-of-the-arm test to qualify for Second Amendment protection. There is simply no authority supporting it.

In any event, we are not talking about trivial parts or accessories here. The features listed in Section 30515(a) are designed to improve a rifle's function (accuracy and control). SUF Nos. 159, 175-177. That is precisely the reason the State seeks to restrict regular citizens from having them. SUF No. 44. It cannot be that the Second Amendment is neutral on firearm progression of this nature. Otherwise, government could leave its citizens only with antiquated, relatively ineffective arms, like muskets. After all, other than a barrel, chamber, firing mechanism, and a trigger, nothing is really "necessary" to make a firearm function. But the Supreme Court has already rejected the notion that modern firearm developments are unprotected in holding that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the*

7

1   *founding.*" *Heller*, 554 U.S. at 582; accord *Caetano*, 577 U.S. at 411; *see also Bruen*,

2   142 S. Ct. at 2132, (emphasis added). This Court should thus reject the State's

3   suggestion that Section 30515(a) of the AWCA does not restrict arms.

4

5         **B.**    ***Heller* and *Bruen* Confirm that History Does Not Condone Banning
         Arms Like the Banned Rifles that Are in Common Use**

6         Because the Banned Rifles are "arms" under the Second Amendment's plain

7   text, the AWCA's banning them is "presumptively" unconstitutional and the State

8   thus bears the burden of proving its ban on their acquisition and possession is

9   "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142

10  S. Ct. at 2126. In other contexts, applying this test could require research into this

11  Nation's history of firearm regulation. That exercise is unnecessary here, however,

12  because between *Bruen* and *Heller*, the Supreme Court has already established the

13  contours of the relevant historical tradition: bearable arms cannot be banned unless

14  doing so would fit into the "historical tradition of prohibiting the carrying of

15  'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627).

16  And a law, by definition, will not fit into that tradition if it bans "the possession and

17  use of weapons that are 'in common use at the time.'" *Id.* at 2128 (quoting *Heller*,

18  554 U.S. at 627).

19        The State claims that the "common use" inquiry is a textual one, not a

20  historical one. MSJ at 12, n. 11. But that is not so. In *Heller*, the Court's discussion of

21  "dangerous and unusual" firearms (i.e., those arms that are *not* in "common use") was

22  part of its analysis of the history of recognized limitations on Second Amendment

23  rights, and the Supreme Court specifically noted that it was an exception to the

24  Second Amendment's broad scope that was "fairly supported by . . . *historical*

25  tradition." 554 U.S. at 627, (emphasis added). *Bruen* quoted this same language from

26  *Heller* to explain that the *Heller* Court was "rel[ying] on the *historical* understanding

27  of the Amendment to demark the limits on the exercise of that right." 142 S. Ct. at

28  2128, (emphasis added); *see also* TRO at 10, *Rocky Mt. Gun Owners v. Town of*

8

1   *Superior, Colo.*, 22-cv-01685 (July 22, 2022), ECF No. 18.

2       In sum, *Bruen* and *Heller* confirmed that whether an arm is "dangerous and

3 unusual" is a *historical* question, not a textual one. The State thus bears the burden of

4 fitting the AWCA's rifle restrictions into a historical paradigm. *See Bruen*, 142 S. Ct.

5 at 2126. Because the Supreme Court has already decided that there is no tradition of

6 prohibiting arms in "common use," this case reduces to the following,

7 straightforward inquiry: can the State prove that the Banned Rifles are not "in

8 common use today"? *Bruen*, 142 S.Ct. at 2132, 2143. Because the State cannot, the

9 AWCA's ban on those rifles is unconstitutional and its motion must fail.

10
11
12     **C.**    **The State Cannot Meet Its Burden to Show that the Banned Rifles
Are "Dangerous and Unusual" Weapons Unprotected by the Second
Amendment Because They Are Undeniably in "Common Use" for
Lawful Purposes**

13       The Supreme Court has made clear that "the Second Amendment protects the

14 possession and use of weapons that are 'in common use.'" *Bruen*, 142 S.Ct. at 2128

15 (quoting *Heller*, 554 U.S. at 627); see *Caetano v. Massachusetts*, 577 U.S. 411, 412

16 (2016) (per curiam) (invalidating stun gun ban); *McDonald v. City of Chicago*, 561

17 U.S. 742 (2010) (incorporating Second Amendment). This means that arms that are

18 "typically possessed by law-abiding citizens for lawful purposes" are protected.

19 *Heller*, 554 U.S. at 582, 624-25. Though not their burden, Plaintiffs provide

20 substantial evidence showing that the Banned Rifles are among the most popular

21 firearms with Americans, owned by the many millions, with some estimates as high

22 as 24 million. SUF Nos. 144-151; Brady Decl., Ex. 2 at 2-6; William English, Ph.D.*,*

23 *2021 National Firearms Survey: Updated Analysis Including Types of Firearms*

24 *Owned* at 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw (last visited May 22, 2023)*;*

25 *National Shooting Sports Foundation, Inc., Commonly Owned: NSSF Announces*

26 *Over 24 Million MSRs in Circulation* (July 20, 2022) ("NSSF"),

27 https://bit.ly/3QBXiyv (last visited May 22, 2023)); Emily Guskin, et al., Wash. Post,

28 *Why Do Americans Own AR-15s?* (May 22, 2023) (available at bit.ly/3G0vbG9).

1    That indisputable fact comfortably qualifies Banned Rifles as being in

2  "common use." To put it in perspective, stun guns "are widely owned and accepted as

3  a legitimate means of self-defense across the country," based on evidence that just

4  "hundreds of thousands of Tasers and stun guns have been sold to private citizens."

5  *Caetano*, 577 U.S. at 420 (2016) (Alito, J., concurring). Because "stun guns are

6  'arms' within the protection of the Second Amendment," a Massachusetts law barring

7  "civilians from possessing or carrying stun guns, even in their home, is inconsistent

8  with the Second Amendment and is therefore unconstitutional." *Ramirez v.*

9  *Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018).[4] *See also Maloney v. Singas*, 351

10 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (the "at least 64,890 metal and wood

11 nunchaku" are in common use). If the 200,000 stun guns *in the country* are in

12 "common use" and thus protected, certainly the millions of Banned Rifles in

13 circulation are too. It is no wonder then that numerous courts have found that the

14 Banned Rifles are in "common use." *See*, e.g., *Heller v. District of Columbia,* 670

15 F.3d 1244, 1261 (D.C. Cir. 2011); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804

16 F.3d 242, 255 (2d Cir. 2015); TRO at 9-10, *Rocky Mt. Gun Owners*, No. 22-cv-

17 01685; *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1020 (S.D. Cal. 2021), *vacated and*

18 *remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *Kolbe v. Hogan*, 813 F.3d 160,

19 174 (4th Cir. 2016) rev'd, 849 F.3d 114 (4th Cir. 2017) (en banc); *U.S v. Benitez*, No.

20 17-cr-00348, 2018 U.S. Dist. LEXIS 211398, at *6 (D. Idaho Dec. 14, 2018); *Del.*

21 *State Sportsmen's Ass'.n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 22-951-

22 RGA, 2023 U.S. Dist. LEXIS 51322, at *14 (D. Del. Mar. 27, 2023).

23    The State makes a meager attempt to dispute that the Banned Rifles are

24 commonly owned. It all but concedes that they are owned in large numbers but

25 argues that is not relevant because the amount owned supposedly does not translate

26

27    [4] "Any attempt by the state to rebut the prima facie presumption of Second
Amendment protection afforded stun guns and tasers on the grounds that the weapons

28 are uncommon or not typically possessed by law-abiding citizens for lawful purposes
would be futile." *People v. Webb*, 131 N.E.3d 93, 96 (Ill. 2019).

MEMORANDUM OF POINTS AND AUTHORITIES

1  into common ownership. MSJ at 18. The State is wrong. The number of a particular

2  arm in circulation among civilians is the "relevant statistic" for determining

3  "common use." *Caetano,* 577 U.S. at 420 (Alito, J., concurring); *see also Ass'n of*

4  *N.J. Rifle & Pistol Clubs*, *Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018),

5  *abrogated by Bruen* (finding an "arm" is commonly owned because "[t]he record

6  shows that millions . . . are owned").

7       The State contends that cannot be the case because "[i]t would not make sense

8  if M16s could someday be protected if longstanding restrictions on their possession

9  and sale were lifted and more M16s were sold to civilians." MSJ at 19. But *Bruen*

10  tells us that it makes perfect sense. Contemplating an almost identical scenario to the

11  one posed by the State, it explained that:

> Regardless, even if respondents' reading of these colonial statutes were correct,
> it would still do little to support restrictions on the public carry of handguns
> *today*. At most, respondents can show that colonial legislatures sometimes
> prohibited the carrying of 'dangerous and unusual weapons'—a fact we
> already acknowledged in *Heller*. See 554 U.S. at 627, 128 S.Ct. 2783. Drawing
> from this historical tradition, we explained there that the Second Amendment
> protects only the carrying of weapons that are those 'in common use at the
> time,' as opposed to those that 'are highly unusual in society at large.' *Ibid.*
> (internal quotation marks omitted). Whatever the likelihood that handguns
> were considered 'dangerous and unusual' during the colonial period, they are
> indisputably in 'common use' for self-defense today. They are, in fact, 'the
> quintessential self-defense weapon.' *Id.*, at 629, 128 S.Ct. 2783. Thus, even if
> these colonial laws prohibited the carrying of handguns because they were
> considered 'dangerous and unusual weapons' in the 1690s, they provide no
> justification for laws restricting the public carry of weapons that are
> unquestionably in common use today.

*Bruen*, 142 S. Ct. at 2143. If the American public chooses an arm for legitimate

purposes, that arm is protected. Government does not have veto power.

       Unable to rebut the overwhelming evidence that the Banned Rifles are

common, the State retreats to yet another specious argument. The State claims that to

be protected, arms must not only be commonly possessed, but also be "commonly

used [and] suitable for lawful self-defense . . .." MSJ at 17. But "Second Amendment

11

rights do not depend on how often the [particular arms] are *used*. Indeed, the standard is whether the prohibited [arms] are 'typically *possessed* by law-abiding citizens *for lawful purposes*,' not whether the[y] . . . are often *used* for self-defense." *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d. 1267, 1276 (N.D. Cal. 2014), aff'd, 779 F.3d 991 (9th Cir. 2015) (quoting *Heller*, 554 U.S. at 625), (emphasis added). It is enough that they are commonly *possessed* for self-defense and other lawful purposes. They need not meet some arbitrary threshold of use or usefulness that the State has not identified. Otherwise, the State could ban virtually any firearm, as self-defense *use* is fortunately relatively rare and the State could just declare any arm unsuitable for self-defense on a whim, as it does here.

As for the State's belief that the Banned Rifles are unsuitable for self-defense, MSJ at 2, it is not only unsupported by evidence but is irrelevant. Whatever politicians might think citizens "need" for effective self-defense is beside the point. That the American people *possess* Banned Rifles for self-defense and other lawful purposes in significant numbers cannot be seriously disputed. SUF Nos. 144-151. That choice is entitled to "unqualified deference." *Bruen*, 142 S. Ct. at 2131; *see also Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").[5]

In short, it cannot be seriously disputed that the Banned Rifles are typically possessed for lawful purposes and are in no way "dangerous and unusual" weapons. They are among the most popular firearms in the country and are used for various lawful purposes. Under *Heller* and *Bruen*, no further historical inquiry is necessary; the AWCA's ban on commonly owned rifles is unconstitutional. Indeed, *Heller* teaches us that there is no relevant historical tradition of banning arms unless they are "dangerous and unusual." 554 U.S. at 625-27.

---

[5] Even if it were relevant, Plaintiffs have provided the unrebutted testimony of a former FBI firearms instructor who says the Banned Rifles are exceptionally useful for self-defense. Brady Decl., Ex. 54, at 17.

MEMORANDUM OF POINTS AND AUTHORITIES

### D.    No Historical Firearms Regulation Justifies the AWCA's Rifle Ban

At the very least, the State must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. The State comes nowhere near meeting this burden—*because it cannot*.

To meets is burden, government must generally produce evidence of historical laws that are "distinctly similar" to the modern law being challenged. *Id*. at 2131. When a modern law addresses "unprecedented societal concerns or dramatic technological changes," however, *Bruen* allows "a more nuanced approach" to the historical inquiry. *Id*. at 2132. Effectively conceding that it cannot meet its burden under *Bruen*'s strict-historical test, the State pleads that it should be permitted to justify the AWCA's rifle ban under *Bruen*'s "more nuanced approach," which allows "reasoning by analogy" to show that the modern law is "relevantly similar" to a "well-established and representative historical analogue." *Bruen*, 142 S. Ct at 2131. The AWCA's rifle ban does not qualify for this more lenient approach. But, even if it did, the State still fails to meet is burden here.

### 1.    A "more nuanced approach" is inappropriate here

First, the AWCA does not address any "*unprecedented* societal concern." The State asserts that mass shootings with modern weapons by a single individual are a new concern. MSJ at 22. Of course, every societal problem can *seem* unprecedented if one whittles it down to such specific criteria. Even assuming it is fair to so strictly define the relevant concern, unfortunately, there is nothing new about such atrocities. Indeed, the State's own expert witness tells of an 1869 mass shooting in Florida. Vorenberg Supp. Rpt. ¶ 96. A single shooter "fired 'thirteen or fourteen shots in rapid succession,' killing and wounding many of the party." *Id.* It was reported that the assailant had likely used a Henry rifle" because of the speed and volume of the shots fired." *Id*. Even assuming mass shootings by an individual are now more prevalent and have higher casualties, the concern is thus not "*unprecedented*" as it must be.

MEMORANDUM OF POINTS AND AUTHORITIES

What's more, the same argument could be made about handguns.[6] In fact, "according to a recent study, handguns were the most used type of firearm in mass shootings (32.99% of mass shootings); rifles were used in only 8.25% of mass shootings." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1048 (S.D. Cal. 2021). Yet as *Heller* makes clear, handguns prevalent use to commit mass murder is not grounds to ban law-abiding citizens from possessing them for lawful purposes, including self-defense. *See* 554 U.S. at 624-645. The same is true for the commonly owned Banned Rifles. Also, this is simply the same argument the State made before *Bruen* just dressed up as a novel issue.[7] The Court should ignore.

Second, there is nothing *dramatically* novel about the technology of these condemned rifles. The Founding Fathers were aware of—and coveted—multi-shot rifles with detachable magazines. *Id.*, Ex. 3 at 3-4. And they were aware of the technological advances being made with firearms. David Kopel, Reason Magazine, *The Founders were well aware of continuing advances in arms technology*, available at https://rb.gy/k23pf (last accessed May 26, 2023). Repeating rifles able to fire over a dozen rounds rapidly have been commercially available since around the Civil War days. Brady Decl., Ex. 57, at 18-22 (Hlebinsky report).[8] And semiautomatic, centerfire rifles with detachable (not "fixed") magazines have been widely available to the public for over a century. SUF No. 149; Chuck Willis & Robert A. Sadowski,

---

[6] For example, the tragic Virginia Tech shooting remains our third-worst mass shooting, with 32 murdered victims and another 17 who were injured. The perpetrator used only handguns. https://www.axios.com/2017/12/15/deadliest-mass-shootings-modern-us-history (last visited June 23, 2023).

[7] In its effort to smuggle back in forbidden interest-balancing arguments, the State makes a series of incorrect assertions regarding the commonality of mass shootings. Page limitations rule out a full response. Suffice it to say that being killed in a mass shooting is "less than...the risk of being killed by a bolt of lightning". Brady Decl. iso Plaintiffs' MSJ, Ex. 55, pp. 20-21. Further, both the State's supporting expert reports on this subject are suspect. Lucy Allen's report is "both subjective and unsupported by any evidence pertaining to legislative intent behind enactment of California's ban on LCMs and assault weapons." *Id.* at 3. Likewise, Louis Klarevas "makes extraordinary claims about the magnitude of the effect of mass shootings on the safety of Americans." *Id.* at 20.

[8] *See also*, Henry, *Henry History*, https://www.henryusa.com/about-us/henry-history/ (last visited May 26, 2023).

14

1  *The Illustrated History of Guns* 256 (2017); *see also Heller II*, 670 F.3d at 1287

2  (Kavanaugh, J., dissenting); Stephen P. Halbrook, *America's Rifle, The Case for the*

3  *AR-15* at 145-148 (2022).[9]

4        Yet, these rifles were almost never targeted for regulation. To the contrary, the

5  federal government, through the Director of Civilian Marksmanship—which was

6  later replaced by the quasi-privatized Civilian Marksmanship Program in 1996 and is

7  still in operation today—has sold these rifles directly to the public by the hundreds of

8  thousands. SUF No. 184; *see also* Halbrook, *supra*, at 198. The only difference

9  between those and the Banned Rifles is the former mostly lacked the Banned

10 Features—although, some had folding stocks and would be banned under the

11 AWCA. Brady Decl., Ex. 3 at 5; Ex. 43.

12       Features like pistol grips and adjustable stocks have also been around for

13 centuries. Brady Decl., Ex. 3, at 3-11 (Helsley report); Ex. 57, at 27-29 (Hlebinsky

14 report). The AR-15 platform rifle, which possesses the Enumerated Features, has

15 been available to the American public for over 60 years. SUF No. 150; *see also* Jeff

16 Zimba, *The Evolution of the Black Rifle: 20 Years of Upgrades, Options, and*

17 *Accessories* 10 (2014). It was reviewed in a 1959 issue of *The American Rifleman*,

18 one of the most widely circulated firearm magazines. *Id.*, Ex. 3 at 6, Ex. 2 at 3. The

19 Banned Rifles thus simply cannot be described as "*dramatic* technological changes"

20 but merely the progression of very old technology. What's more, the notion that

21 firearm technology that has been around and widely available for so long without

22 regulation all of a sudden raises some "*unprecedented* societal concern" is untenable.

23       In sum, because the Banned Rifles simply do not constitute "dramatic

24 technological changes" nor raise any "*unprecedented* societal concern," the AWCA

25 is not entitled to *Bruen*'s more lenient analogical approach.

26

27 _____

28     [9] *See also* Remington, *Model 8 Autoloading Centerfire Rifle*, *available at*
https://web.archive.org/web/20130520070354/http://remington.com/products/archive
d/centerfire/autoloading/model-8.aspx (last visited May 26, 2023).

MEMORANDUM OF POINTS AND AUTHORITIES

1

2

### E.   Relevant History Does Not Support the AWCA's Ban on Commonly Owned Rifles

3   The State has not shown that it should be allowed to proceed to some "more

4   nuanced approach" to analogical inquiry under *Bruen*. But even if it had, that is not a

5   "get out of the *Bruen* free" card. The State must still present an enduring American

6   tradition of genuine analogues that are "relevantly similar" to the modern restrictions

7   it seeks to defend. 142 S. Ct. at 2122. The *Bruen* Court pointed toward at least two

8   metrics: how and why the regulations" govern facially protected conduct. *Id.* at 2133.

9   All the State's proposed analogues ignore one or both of these metrics.

10   When looking at the "how," this Court should ask whether the challenged

11   modern law and the proposed historical analogue impose a similar *type* of restriction,

12   not just a similarly *severe* one.[10] When looking at the "why," this Court should

13   consider whether the law is "comparably justified," mindful that historical laws

14   enacted for one purpose cannot be used as a pretext to justify a modern law that was

15   enacted for different reasons. *Id*. In short, "a historical statute cannot earn the title

16   'analogue' if it is clearly more distinguishable than it is similar to the thing to which

17   it is compared." *Antonyuk v. Hochul*, No. 22-0986, 2022 U.S. Dist. LEXIS 182965, at

18   *20 (N.D.N.Y. Oct. 6, 2022). As discussed below, this is the sort of strained

19   comparison-making on which all of the State's proposed historical analogues rely. In

20   banning the sale and possession of common arms, the AWCA is without a single

21   valid analogue. It violates the Second Amendment.

22

23

24

---

25   [10] The Court highlighted the importance of clarity when engaged in "analogical

26   reasoning" when it observed that "'[e]verything is similar in infinite ways to everything else,' [Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 711, 774 (1993)], one needs 'some metric enabling the analogizer to assess which

27   similarities are important and which are not,' F. Schauer & B. Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green

28   truck and a green hat are relevantly similar if one's metric is "things that are green." [*Id.*] They are not relevantly similar if the applicable metric is 'things you can wear.'"

16

1         **1.**     **Nineteenth Century Laws Regulating "Dangerous and**

2                   **Unusual Weapons" Are Not "Relevantly Similar" to the**

                    **State's Modern Ban on Firearms in Common Use for Lawful**

3                   **Purposes**

4         The State does not cite a *single law* from the Founding Era to the 19th century

5    that banned *possession* of commonly owned firearms as the AWCA does. Nor could

6    it—no such laws existed, despite the technological leap that occurred during this

7    period.[11] Even still, the State trots out several marginally relevant laws that it claims

8    provide sufficient historical support to save its modern ban on common

9    semiautomatic rifles. They do not.

10         While page limitations prevent a comprehensive response to every law the

11    State cites in its appendix (a responsive appendix with Plaintiffs' objections has been

12    submitted), several demonstrative examples reveal what is wrong with all the State's

13    proposed analogues. First, the 1686 New Jersey law[12] (as well as similar laws enacted

14    between 1750 and 1799) regulated *carrying* "dangerous and unusual" weapons in

15    public, but not *all* possession like the AWCA does. "The differences between how

16    and why these laws burden a law-abiding citizen's right to armed self-defense is

17    evident." *Boland v. Bonta,* No. SACV2201421CJCADSX, 2023 WL 2588565, at \*7

18    ――――――――――

19         [11] Using a lever action, arms like the Henry repeater allowed users to fire as
fast as they could operate the lever and pull the trigger—a rate of 28 rounds per

20    minute for the Henry, even when accounting for reloading time. Nicholas J. Johnson,
et al., *Firearms Law and the Second Amendment* 403 (2d ed. 2018). This was

21    obviously a dramatic technological leap over the single-shot firearms that came
before. By the end of the Civil War, "repeating, cartridge-fed firearms" were

22    ubiquitous yet never regulated or banned. *Duncan v. Becerra,* 970 F.3d 1133, 1148
(9th Cir. 2020). These "[r]epeating rifles could fire 18 rounds in half as many

23    seconds." *Id.* Contrary to the State's gaslighting claims that these sorts of rifles were
not popular, the Library of Congress refers to Winchester's Model 1873 as the "gun

24    that won the west." Library of Congress, *American Firearms and Their Makers: A
Research Guide,* https://tinyurl.com/27dpmbbb (last visited June 21, 2023).

25    California apparently thought Winchester so significant, that its Office of Historic
Preservation has labeled the Winchester House a historic site in Santa Clara. Office

26    of Historic Preservation – Santa Clara, https://ohp.parks.ca.gov/?page_id=21522 (last
visited June 21, 2023).

27         [7] First, this law is too old to be an appropriate analogue. *Bruen* cautions that
not all history is equal in evaluating traditions: "The Second Amendment was

28    adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either
date may not illuminate the scope of the right if linguistic or legal conventions
changed in the intervening years." 142 S. Ct at 2136.

1  (C.D. Cal. Mar. 20, 2023). A restriction on a particular use of an item is categorically

2  different than a complete ban of that item.

3      Some laws the State presents are very obviously not even close to relevantly

4  similar. For example, the State introduces several regulations on gunpowder storage.

5  Survey Nos.341-350. But those laws were enacted, as one of the State's experts

6  admits,[13] Cornell Suppl. Rpt. ¶ 36, to prevent unintended discharge, and catastrophic

7  explosions and fires in town limits or near a powder house.[14] Such laws were

8  necessary because of the highly combustible and unstable nature of loose gunpowder,

9  which is not a modern concern. They were not enacted to combat crime, in general,

10  or mass killings, more specifically. And, more importantly, they regulated only the

11  *manner* of storing gunpowder; they did not prohibit the possession or use of any

12  common arm. As *Heller* explained in the context of D.C.'s handgun ban, "[n]othing

13  about th[e]se fire-safety laws undermines our analysis; they do not remotely burden

14  the right of self-defense as much as an absolute ban on" protected arms. *Id.* The

15  Supreme Court has thus already deemed powder-storage laws to be dissimilar laws

16  focused on fire prevention. *See also Boland,* 2023 WL 2588565, at *8 (explaining

17  that gunpowder storage laws are inapposite because "[t]he main goal of gunpowder

18  storage laws was to prevent fire"); *Renna v. Bonta*, No. 20-CV-2190-DMS-DEB,

19  2023 WL 2846937, at *13 (S.D. Cal. Apr. 3, 2023) ("Those laws regulated the

20  storage of gunpowder and loaded firearms with gun powder for fire-safety reasons,

---

21  [13] Dr. Cornell was even more explicit in other recent litigation regarding
22  another California gun law. As Judge Carney in the Central District explained by
   citing to Dr. Cornell's declaration: "But the goals of gunpowder storage laws and the
23  means used to achieve those goals are very different from those of the UHA's CLI
   and MDM requirements. The main goal of the gunpowder storage laws was to
24  prevent fire." *Boland v. Bonta*, No. SACV2201421CJCADSX, 2023 WL 2588565, at
   *8 (C.D. Cal. Mar. 20, 2023) (citing Cornell Decl. ¶ 43 ["Every aspect of the
25  manufacture, sale, and storage of gun powder was regulated due to the substance's
   dangerous potential to detonate if exposed to fire or heat."].)
26     [14] *See, e.g.*, Thomas Wetmore, Commissioner, The Charter and Ordinances of
   the City of Boston: Together with the Acts of the Legislature Relating to the City at
27  142-143 (1834), *available at The Making of Modern Law: Primary Sources* (An Act
   ... Prudent Storage of Gun Powder within the Town of Boston. Whereas the
28  depositing of loaded arms in the houses of the town of Boston, . . . is dangerous . . .
   when a fire happens to break out in said town").

18

MEMORANDUM OF POINTS AND AUTHORITIES

1    not gun-operation safety reasons.").

2          Trap gun restrictions are similarly irrelevant. "Trap guns" were indiscriminate

3    devices rigged to fire without the presence of a person. Spitzer Suppl. Rpt. ¶¶ 63-66.

4    They could be triggered by any unsuspecting animal or person that happened to walk

5    by. The State claims that the existence of laws restricting the use of "trap guns" in

6    early America provides relevant historical support for its gun ban. MSJ at 24-25. But

7    like early gunpowder restrictions, these laws, by and large, did not ban any class of

8    arms. Rather, they regulated the *manner* of using them. That is, they banned setting a

9    loaded, unattended gun to prevent unintended discharges. To be sure, just about any

10   gun restriction can be described as necessary to promote public safety or protect life.

11   But "trap gun" restrictions were necessary because setting loaded, unattended guns to

12   discharge automatically imposes an incredibly specific threat to life that is entirely

13   unrelated to violent crime.

14         Next, the State focuses on the restrictions on Bowie knives and similar blades

15   that proliferated in the 1800s. MSJ at 23. These laws, by and large, regulated only the

16   manner of carrying such arms, while four laws taxed their sale, three taxed their

17   ownership, ten restricted sale *only* to certain groups, and four punished only

18   brandishing. Though the State tries to avoid drawing attention to the omission, it is

19   glaringly obvious that "[a]t the end of the 19th century, no state prohibited possession

20   of Bowie knives." David Kopel, *Bowie Knife Statutes 1837-1899*, Volokh Conspiracy

21   (Nov. 20, 2022), https://bit.ly/3yZYzZx. *See also Harrel* Pls.' Reply 8-9. What's

22   more, historical restrictions on Bowie knives and similar blades were far fewer than

23   the number of handgun-carry bans that the *Bruen* Court found insufficient to justify

24   New York's modern carry ban. *Id.*

25         The State's proposed analogues concerning concealable pistols fare just as

26   poorly. Again, the historical prohibitions the State relies on apply to *concealed carry*

27   of pistols, not mere possession. A handful of restrictions on the manner of carrying

28   arms in public is no way similar to a total ban on their acquisition and possession. So

MEMORANDUM OF POINTS AND AUTHORITIES

1   they are not "relevantly similar" under *Bruen*. 142 S. Ct. at 2122.

2       In attempting to make its case for the laws it cites as being "relevantly similar"

3   analogues that justify its modern ban, the State claims that "like the AWCA, they did

4   not restrict weapons that are well suited to self-defense and left available alternative

5   weapons to be used for lawful self-defense"[15] and that "[t]he slight burden of the

6   AWCA stands in stark contrast with the law at issue in *Bruen*, which made it

7   "virtually impossible" for most 'law-abiding people to carry a gun outside the home

8   for self-defense.'"MSJ at 28-29 (quoting *Bruen*, 142 S. Ct. at 2159 (Alito, J.,

9   concurring)). This argument fails for three reasons.

10      First, when the State claims that the "burden" on the right is minimal because

11  the restricted arms are not necessary for self-defense and can be justified by some

12  governmental interest, it is simply engaged in interest-balancing *disguised* as a

13  history-based argument, which *Bruen* expressly forbids. *See* 142 S. Ct. at 2133 n.7.

14  And it dismisses *Heller*'s instruction that "[t]he right to bear other weapons is 'no

15  answer' to a ban on the possession of protected arms." *Caetano*, 577 U.S. at 421

16  (Alito, J., concurring) (paraphrasing *Heller*, 554 U.S. at 629).

17      Second, the State's claim that the AWCA is "relevantly similar" to the

18  "dangerous and unusual weapons" regulations of the 17th, 18th, and 19th centuries is

19  deeply rooted in the same flawed analysis of the district court in *Bevis v. Naperville*,

20  2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (denial of preliminary injunction), which

21  the State has cited throughout its brief. There, the court held that "assault weapons . .

22  . fall under" the category of "dangerous *or* unusual" weapons that were, historically,

23  subject to some level of regulation. *Bevis,* 2023 WL 2077392, at *10-14 (emphasis

24

25  ───────────────
    [15] The Second Amendment does not only apply to self-defense, but all lawful
26  purposes. While self-defense is central to the Second Amendment, "the [Supreme
    Court] also said the Second Amendment protects the right to keep and bear arms for
27  other 'lawful purposes,' such as hunting." *Heller v. District of Columbia*, 399 U.S.
    App. D.C. 314, 330 (2011) (citing *District of Columbia v. Heller*, 554 U.S. 570, 630
28  (2008)). Target shooting, hunting, and competition shooting are all lawful uses of the
    banned arms. If it were otherwise, the State could constitutionally ban even bolt-
    action hunting rifles, as those are not frequently used for self-defense.

MEMORANDUM OF POINTS AND AUTHORITIES

added). But the *Bevis* preliminary injunction order rests on highly dubious legal and factual findings.[16] Perhaps most importantly, the opinion "begins with the *fundamentally wrong* criterion that being particularly 'dangerous,' alone, justifies banning a type of firearm." Halbrook, *Judicial Salvo*, *supra* note 11 (emphasis added). In fact, it practically rewrites the *Heller* test for what arms come within the Constitution's grasp. While it *may* be true that there is some "historical tradition" of excluding "'dangerous *and* unusual' weapons," from the Amendment's protection, *Duncan v. Bonta*, 19 F.4th 1087, 1148 (9th Cir. 2021) (quoting *Heller*, 554 U.S. at 627), the Supreme Court does not speak in terms of "dangerous [*or*] unusual" weapons—no matter how many times the *Bevis* court suggested it does.

And third, the State's pre-20th century laws are not "similar" to the Act because not one of them banned the mere possession of arms in common use by law-abiding citizens (like the AWCA does). Instead, they focused on regulating just the *carry* of certain arms, a fact the State readily concedes. MSJ at 30. The State dismisses these differences by arguing that "the Supreme Court has already settled this question, explaining that the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons'—a tradition reflected by many of the surveyed dangerous weapons laws…'fairly support[s]' limitations 'on the right to keep and [not just] carry' weapons". MSJ at 30. But the State crucially omits that the Supreme Court prefaced that remark by explaining that the sort of weapons "in common use at the time" were not subject to this historical tradition. *Heller*, 554 U.S. at 627. Only "dangerous and unusual" weapons can thus be restricted through this analogy, not firearms commonly owned for a variety of lawful purposes.

---

[16] *See* Stephen Halbrook, *Second Amendment Roundup: An Opening Judicial Salvo in Defense of Illinois' New Rifle Ban*, Volokh Conspiracy (Mar. 13, 2023), https://reason.com/volokh/2023/03/13/second-amendment-roundup-an-opening-judicial-salvo-in-defense-of-illinois-new-rifle-ban/ (discussing the legal errors of the *Bevis* order); David Kopel, *How Powerful Are AR Rifles? About the Same as Other Rifles*, Volokh Conspiracy (Feb. 27, 2023, 2:37 PM), https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles/ (explaining in detail the *Bevis* decision's countless erroneous claims about the purportedly "exceptional danger" that "assault weapons" pose).

MEMORANDUM OF POINTS AND AUTHORITIES

Again, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20. Historical laws that banned just the carry of certain arms[17] are clearly more distinguishable than they are similar to the State's flat ban on the sale and possession of some of the most popular arms in the country. The State invokes *Bruen*'s admonition that its holding does not impose a "regulatory straightjacket." *Bruen*, 142 S. Ct. 2111 at 2133. But with its shoddy proposed analogues that bear no meaningful similarity in neither "how" nor "why" the regulations operated, the State demands a "regulatory blank check." *Id*. This Court should not sign it.

### 2. The State's Reliance on 20th Century Machine Gun Laws Is Unpersuasive and Factually Wrong

*Bruen* gave little weight to laws that long pre-dated the founding, finding them only relevant where evidence shows that they survived to become the laws of the Founders. 142 S. Ct at 2136 (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)). The Court considered 20th-century history even *less* important, relegating its discussion of the laws of the period to a mere footnote. *Id.* at 2154, n.28. Declining even to consider such evidence, the Court explained that, like laws of the late-19th-century, 20th-century evidence "does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*." *Id.* (emphasis added). This does not mean the State can rely on any law from the mid-to-late-19th or 20th centuries as long as it does not *conflict* with an 18th-century law. Rather, the State may only rely on laws enacted after 1868 when they *confirm* our understanding of the text and 1791 tradition. The *Bruen* analysis supports this reading. To be sure, *Bruen* left open the possibility of using 1800s sources. But when the *Bruen* Court discussed those laws, it was "as mere confirmation of what the Court thought already had been

---

[17] None of which applied to rifles. Indeed, the State cited *no laws* that restricted the sale or possession of popular repeating rifles in the 19th century.

MEMORANDUM OF POINTS AND AUTHORITIES

1  established." 142 S. Ct. at 2137; *see also* 142 S. Ct. at 2163 (Barrett, J., concurring)

2  ("[T]oday's decision should not be understood to endorse freewheeling reliance on

3  historical practice from the mid-to-late 19th century to establish the original meaning

4  of the Bill of Rights.").[18] And, based on *Bruen*'s guidance, early post-*Bruen* decisions

5  rebuked calls to rely on evidence of 20th-century laws. *See, e.g.*, *United States v.*

6  *Nutter*, No. 21-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W.Va. Aug. 29,

7  2022) (laws originating in the 20th century cannot justify a law *unless similar laws*

8  *existed at the founding*); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-1245, 2022

9  U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (22 state laws adopted in

10 the 20th century was insufficient historical justification for a ban on firearms

11 purchases for those under the age of 21).

12     Still, the State submits a collection of "anti-machine-gun laws" adopted in 32

13 states between 1925 and 1934 and the 1934 National Firearms Act "severely

14 restricting" machine guns as justifying the AWCA's banning of *semiautomatic* rifles.

15 MSJ at 27. But the prevalence of machine gun restrictions contrasted with the dearth

16 of *semiautomatic* restrictions at that time, when semiautomatics had been available

17 for decades before, does the exact opposite. It confirms the tradition of treating the

18 two differently, restricting machine guns but not semiautomatics. The State claims

19 that "at least 11 states, including the District of Columbia" also had restrictions on

20 semiautomatics. *Id*. But most of those laws appear to have been targeting machine

21 guns whose clumsy definitions unintentionally included some semiautomatics. Of

22 note, all but one was repealed within decades. *Heller II*, 670 F.3d 1244 at 1250.[19]

23

24     [18] There is other recent precedent supporting Plaintiffs' interpretation of the Court's use of 19th and 20th century evidence. *See, e.g.*, *Espinoza v. Montana*, U.S. ___, 140 S. Ct. 2246 (2020) (reviewing 30 state statutes from the second half of the 19th century, the Court held that "[s]uch a development, of course, cannot by itself establish an early American tradition ... such evidence may reinforce an early practice *but cannot create one*.") (emphasis added).

25

26

27     [19] *See* 1927 Mich. Pub. Acts 887, § 3 (prohibiting firearms able to be "fired sixteen times without reloading"), repealed via 1959 Mich. Pub. Acts 249, 250; 1927 R.I. Pub. Laws 256 §§ 1, 3 (prohibiting firearms "which shoot[] more than twelve shots semi-automatically"), repealed via 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§ 12819-3, -4 (prohibiting "any

28

23

1   That is hardly a long-standing tradition of prohibitions on the type of popular rifles
2   that California bans.
3           If any of the State's cited 20th-century laws actually restricted possession of
4   *semiautomatic* firearms (as opposed to mistakenly equating automatic and
5   semiautomatic firearms),[20] these outlier laws would contradict this country's long
6   history of *not* banning classes of arms in common use for lawful purposes. The 20th-
7   century semiautomatic restrictions the State cites thus contradict the relevant
8   historical tradition rather than reaffirm it. Under *Bruen*, that makes them entirely
9   irrelevant to the analysis.

10  **III.   CONCLUSION**

11          For the foregoing reasons, this Court should deny the State's motion for
12  summary judgment as a matter of law.

13

14  Dated: June 23, 2023                        **MICHEL & ASSOCIATES, P.C.**

15                                              */s/ Sean A. Brady*
16                                              Sean A. Brady, Attorneys for Plaintiffs

17

18

19

20

21

22

23  firearm which shoots more than eighteen shots semi-automatically"), repealed via
    1972 Ohio Laws 1866, 1963 (setting 32-round limit); see also 2013-2014 Leg., H.R.
24  234 (Ohio) (fully repealing magazine ban); 47 Stat. 650, §§ 1, 14 (1932) (D.C. law
    prohibiting "any firearm which shoots … semiautomatically more than twelve shots
25  without reloading"), repealed via 48 Stat. 1236 (1934), currently codified as amended
    at 26 U.S.C. §§ 5801-72.
26          [20] *Compare* MSJ at 27:26-28 (claiming that "At least 11 states, including the
    District of Columbia, also enacted restrictions on the manufacture, sale, and
27  possession of *semiautomatic* firearms capable of firing a certain minimum number of
    rounds without reloading"), with the appeals panel ruling in *Duncan*, 970 F.3d at
28  1150 & n.10 (holding that only three states and D.C. restricted even just the firing
    *capacity* of semiautomatics).

## CERTIFICATE OF SERVICE
### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Rupp, et al. v. Bonta*
Case No.: 8:17-cv-00746-JLS-JDE

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Anna Ferrari
Deputy Attorney General
Email: anna.ferrari@doj.ca.gov
Christina R.B. Lopez
Email: christina.lopez@doj.ca.gov
John D. Echeverria
Email: john.echeverria@doj.ca.gov
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 23, 2023.

Christina Castron