C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Matthew D. Cubeiro – SBN 291519
mcubeiro@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN RUPP, et al., | Case No.: 8:17-cv-00746-JLS-JDE |
| Plaintiffs, | **PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | Hearing Date:  July 28, 2023<br>Hearing Time:  10:30 a.m.<br>Judge:  Josephine L. Staton<br>Courtroom:  8A |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| 1 | In 1957, the U.S. Army requested Armalite, a small arms manufacturer, to produce a lightweight, high-velocity rifle that could operate in both semi- automatic and full- automatic modes, with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." | DX-1 at 29 (Donohue Rpt. ¶ 68). | Undisputed. |
| 2 | According to one of the designers of the AR-15, the rifle was engineered to generate "maximum wound effect." | DX-1 at 30 (Donohue Rpt. ¶ 73). | Undisputed that one of the designers said this, but Plaintiffs do not concede the statement's accuracy. |
| 3 | After field testing in combat operations in Vietnam, the Advanced Research Projects Agency ("ARPA") noted that the "lethality of the AR-15 and its reliability record were particularly impressive." | DX-1 at 29 (Donohue Rpt. ¶ 69); DX-65 at 2523 (ARPA Study at 8). | Undisputed that ARPA noted this, but Plaintiffs do not concede the statement's accuracy. |
| 4 | ARPA found that all casualties inflicted by the AR-15 in combat were fatal, including hits to only extremities. | DX-1 at 29–30 (Donohue Rpt. ¶¶ 69–70); DX-65 at 2530 (ARPA Study, Annex A at 5). | Undisputed that ARPA noted this, but Plaintiffs do not concede the statement's accuracy. |
| 5 | ARPA found that the AR-15 was "superior in virtually all respects" to other military small arms, like the Thompson submachinegun and | DX-65 at 2512 (ARPA Study, Cover Memo (Aug. 20, 1962)). | Undisputed that ARPA noted this, but Plaintiffs do not concede the statement's accuracy. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | Browning Automatic Rifle. | | |
| 6 | Armalite sold the patent and trademark rights to Colt in 1959. During the Vietnam War, the AR-15 was approved for use by U.S. armed forces, after which its name was changed to the M16. Thereafter, the AR-15 was the name used for the semiautomatic rifle sold to civilians. After Colt's patent expired in 1977, other manufacturers began to produce their own versions of the AR-15 under different names. | DX-70 at 2839 (Alex Horton et al., *Decades of Marketing Reinvented the AR-15 into a Top-Selling Firearm,* Wash. Post., Mar. 27, 2023, at 2); DX-72 at 2878–79 (Todd Frankel et al., *How the AR-15 Became a Powerful Political, Cultural Symbol in America,* Wash. Post, Mar. 27, 2023, at 4–5); DX-79 at 2938–39 (Chris Linville, AR-15 vs M4: *Exploring Key Differences & Similarities,* GunsAmericaDigest. com, May 18, 2023). | Undisputed, except that the M16 is capable of more than just semiautomatic fire, which the AR-15 is limited to. |
| 7 | An automatic weapon is capable of firing repeatedly as long as the trigger is depressed, until ammunition is exhausted or the weapon malfunctions. Burst fire is automatic fire that fires a fixed number of shots (e.g., 3 shots) with each pull of the trigger. | DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-50 at 1686–87 (Busse Suppl. Rpt. ¶ 11); DX-16 at 749 (Helsley Dep. Tr. at 44). | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | A semiautomatic weapon is capable of firing a single shot with each pull of the trigger. A select-fire weapon is capable of firing in automatic (or burst) mode or in semiautomatic mode. | | |
| 8 | The M4 is a shorter, carbine variant of the M16. It is a select-fire weapon. | DX-61 at 2391 (Tucker Suppl. Rpt.) ¶ 4 n.2. | Undisputed. |
| 9 | In a 1989 report, the Bureau of Alcohol Tobacco & Firearms ("ATF") described features such as folding and telescoping stocks, pistol grips, and flash suppressors as "military features and characteristics . . . carried over to the semiautomatic versions of the original military rifle." | DX-22 at 1048–49 (1989 ATF Rpt. at 6–7). | Undisputed that the report said that, but Plaintiffs do not concede the statement's accuracy.<br><br>Such features increase the control and accuracy of the firearm, making it useful for self-defense.<br><br>Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 8-12; Ex. 3 [Expert Report of S. Helsley] at 6-11, 12; Ex. 4 [Expert Report of M. Mersereau] at 8-11; Ex. 5 [Expert Report of B. Graham] at 19, 22, 26, 28; Ex. 6 [Depo. Tr. M. Mersereau] at 36:7-37:11; Ex. 7 [Depo. Tr. B. Graham] at 107:6-14, 108:2-16; [Depo. Tr. B. Graham] at 119-123; 124:1-6. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | | | That's why they are widely chosen by Americans for self-defense use.<br><br>Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5; Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Exs. 28-29; 35-37; Ex. 59 [Minter Book Excerpts] at 46-47; Ex. 53 [Expert Report M. Hanish] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. |
| 10 | According to the 1989 ATF Report, large-capacity magazines "are indicative of military firearms," and the fact "[t]hat a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle." | DX-22 at 1048 (1989 ATF Rpt. at 6). | Objection to inclusion: Magazine capacity is not at issue in this case. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| 11 | In a 1998 study, ATF examined semiautomatic assault rifles with a "military configuration," which incorporated physical features such as the ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, and flash suppressors. The 1998 study referred to rifles capable of accepting detachable ammunition magazines as "large capacity military magazine rifles." | DX-21 at 992–93 (1998 ATF Rpt. at 1). | Objection to inclusion: Magazine capacity is not at issue in this case. |
| 12 | The AR-15 is the civilian version of the military's M16. | DX-2 at 121–22 (Graham Rpt. ¶ 15); DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). | Undisputed. |
| 13 | The difference between the M16 and the AR-15 is that the M16 is a select-fire rifle that allows the shooter to fire in either automatic or semiautomatic mode, while the AR-15 fires only in semiautomatic mode (unless modified). | DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13). | Undisputed. |
| 14 | AR-platform rifles are generally chambered in similar caliber rounds as the M16 and M4 (generally, .223 for AR-platform rifles and 5.56 NATO for M16 rifles). | DX-62 at 2408 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 7); DX-2 at 128 (Graham Rpt. ¶ 34); DX-10 at 320 (Graham Dep. Tr. | Undisputed, except that while this is generally true, AR-platform rifles come in a great variety of calibers, ranging from handgun calibers all the way to hunting |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | | at 130); DX-42 at 1533 (2013 NSSF Rpt. at 7). | rounds much larger than just .223 or 5.56. |
| 15 | AK-platform rifles are generally chambered in 7.62 rounds, which is almost twice as large as a .223 round. | DX-87 at 3023 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, June 21, 2017, at 3). | Undisputed. |
| 16 | Rounds used with AR-platform rifles and the M16 and M4 contain projectiles fired at high velocity and, when the projectiles penetrate the human body, they tumble through flesh, tissue, and bone, causing significant injury. | DX-72 at 2878 (Todd C. Frankel et al., *How the AR-15 Became a Powerful Political, Culture Symbol in America*, Wash. Post, Mar. 27, 2023, at 4); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-4 at 146–47 (Colwell Rpt. at 3–4); DX-38 at 1505 (Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. of Acute Disease 178, 180 (2014)); DX-68 at 2823 (Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage*, Wash. Post, Mar. 27, 2023). | Disputed. The correct term is "yaw", and it is common for projectiles of various calibers to experience that. But "tumble" is misleading because it is rare for a projectile to "actually make a complete revolution of point forward - base forward – point forward in tissue simulant or animal tissue." Further, "civilian AR users can and often do choose AR ammunition that is specifically designed *not* to tumble."<br><br>Brady Decl., Ex. 54 [Expert Report of J. B. Boone] at 10; Brady Decl., Ex. 66 [Kopel article on power of AR rifles]. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| 17 | When a bullet enters a victim's body, it results in permanent and temporary cavitation.  A permanent cavity "is the tissue that is actually crushed or destroyed by the projectile's interaction with it."  A temporary cavity is caused by tissue being stretched away from the permanent cavity. | DX-14 at 504–05 (Boone Dep. Tr. at 57–58); DX-38 at 1505 (Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. of Acute Disease 178, 180 (2014)); DX-44 at 1541 (2014 FBI Training Mem. at 4). | Undisputed. |
| 18 | The temporary cavity, if one is created, by a handgun wound is typically not as injurious to the tissue as the temporary cavity typically caused from a rifle wound, and can be more easily treated by a physician. | DX-44 at 1541 (2014 FBI Training Mem. at 4); DX-4 at 146–47 (Colwell Rpt. at 3–4). | Undisputed, except that it should be noted this applies to all rifle rounds, including those commonly used in hunting, which are much more powerful than the relatively weak .223 and 5.56 rounds often used by AR platform rifles, which are "on the lower end of terminal performance potential of the vast calibers available in centerfire rifles."  Brady Decl., Ex. 54 [Expert Report of J. B. Boone] at 10. |
| 19 | Rifle rounds, such as .223 or 5.56 NATO, will penetrate soft body armor designed to stop common handgun rounds. | DX-14 at 551–52 (Boone Dep. Tr. at 123–24); DX-11 at 370 (Mersereau Dep. Tr. at 94). | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|---------------------|---------------------|---------------------|
| 20 | AR-platform rifles have a similar muzzle velocity as the M16 and M4— more than 3,000 feet per second. | DX-57 at 2031 (Roth Suppl. Rpt. ¶ 49); DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). | This depends entirely on the caliber the rifle is chambered for- again, such rifles are often chambered for handgun rounds, and the State's law does not restrict rifles based on what rounds they shoot but rather what features they have. But to the extent the State is referring to .223 and 5.56, with the exception of certain types of slower moving rounds, undisputed. |
| 21 | The muzzle velocity of an AR- platform rifle and an M16 or M4 is three times the velocity of a typical handgun. | DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11); DX-85 at 2987 (Mem. from Rep. Carolyn B. Maloney to Members of the H.R. Comm. on Oversight & Reform, July 27, 2022, at 3). | This depends entirely on the caliber the rifle is chambered for- again, such rifles are often chambered for handgun rounds, and the State's law does not restrict rifles based on what rounds they shoot but rather what features they have. But to the extent the State is referring to .223 and 5.56, with the exception of certain types of slower moving rounds, undisputed. |
| 22 | A projectile fired by firearm imparts kinetic energy on a target equal to one half the | DX-87 at 3022 (Alex Yablon, *The Simple Physics that Makes Some Bullets* | Undisputed. |

9

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | projectile's mass multiplied by the square of its velocity. | *Deadlier than Others*, The Trace, June 21, 2017, at 2). | |
| 23 | A semiautomatic weapon can be converted to automatic fire by installing certain parts, such as bump stocks or multiburst trigger activators. | DX-27 at 1095 (P.L. 103-489 at 18); DX-57 at 2033 (Roth Suppl. Rpt. ¶ 52); DX-51 at 1728 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 28). | These parts do not "convert" a rifle to automatic fire, instead, they simulate automatic fire. The trigger is still being pulled each time.<br><br>Brady Decl., Ex. 67 [New York Times article on Bump Stocks]. |
| 24 | According to a Congressional report, semiautomatic firearms can be "virtually indistinguishable in practical effect from machineguns." | DX-27 at 1095 (P.L. 103-489 at 18). | Undisputed that a Congressional report may have stated this, but Plaintiffs do dispute the accuracy of that report. |
| 25 | U.S. soldiers are instructed to fire M16s and M4s in semiautomatic mode to improve accuracy and lethality in rapid fire and conserve ammunition. | DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-57 at 2032 (Roth Suppl. Rpt. ¶ 49); DX- 19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4- Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8). | Undisputed. |
| 26 | When fired semiautomatically, AR-platform rifles and M16s have an effective maximum rate of fire of 45 rounds per minute, which is referred to as | DX-62 at 2411 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 22); DX- 19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4- Series | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | "rapid semiautomatic fire." Rapid semiautomatic fire is a combat tactic. | Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC- 3-22 (May 2016) at 8-6). | |
| 27 | Automatic or burst fire is inherently less accurate than semiautomatic fire. | DX-19 at 911 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-12); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC-3-22 (May 2016) at 8-6); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13). | Undisputed. |
| 28 | In 1989, a semiautomatic AK-47 rifle was used to kill 5 schoolchildren and injure 32 others at an elementary school in Stockton, California. | DX-2 at 129 (Graham Rpt. at ¶ 40(a)). | Undisputed. |
| 29 | In 1989, California enacted the Assault Weapons Control Act ("AWCA"), finding that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state" and that the restricted assault weapons have "a high | Cal. Penal Code § 30505(a). | Undisputed that this was a finding, but Plaintiffs do not concede the accuracy of the finding. |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | rate of fire and capacity for firepower." | | |
| 30 | The AWCA defines a rifle as an "assault weapon" if it is listed in California Penal Code section 30510(a) or if it is a semiautomatic centerfire rifle that lacks a fixed ammunition magazine and has one of certain accessories, parts, or configurations enumerated in California Penal Code section 30515(a).  The definitions in Section 30515(a) do not apply to rifles that are not semiautomatic, that are rimfire, or that have a fixed ammunition magazine. | Cal. Penal Code §§ 30510(a), 30515(a). | Undisputed. |
| 31 | Rifles restricted by the AWCA possess many of the same features, like pistol grips and adjustable stocks, as the M16 and M4. | DX-61 at 2393–94 (Tucker Suppl. Rpt. ¶ 14). | Undisputed. |
| 32 | Generally, rifles listed in California Penal Code section 30510(a) have one or more of the accessories or parts enumerated in California Penal Code section 30515(a)(1). | DX-2 at 122 (Graham Rpt. ¶ 15); DX-11 at 348 (Mersereau Dep. Tr. at 31). | Undisputed. |
| 33 | AR-platform rifles capable of accepting detachable magazines take 3 to 5 seconds less to | DX-10 at 331–33 (Graham Dep. Tr. at 188–90). | Undisputed that fixed magazine generally take longer to reload, but the exact time |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|---------------------|--------------------|--------------------|
| | reload than the same rifle with a fixed magazine. | | varies based on the type of fixed magazine. |
| 34 | Centerfire cartridges have the primer located in the center of the base of the case, in contrast with rimfire cartridges that contain the primer on the rim of the cartridge. | DX-50 at 1686 (Busse Suppl. Rpt. ¶ 11). | Undisputed. |
| 35 | Centerfire ammunition is more powerful than rimfire ammunition. | DX-50 at 1686–87 (Busse Suppl. Rpt. ¶ 11); DX-16 at 753–54 (Helsley Dep. Tr. at 48–49); DX-2 at 123 (Graham Rpt. ¶ 18). | This is generally true, but some rimfire ammunition is more powerful than some centerfire ammunition. |
| 36 | A rifle's capability of accepting detachable magazines allows a shooter to rapidly change magazines and continue firing. | DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15). | Undisputed. |
| 37 | During combat, detachable magazines provide a rifleman with the capability to fire 120 rounds semiautomatically in three minutes at a sustained rate of 45 rounds per minute. | DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15). | Undisputed. |
| 38 | A pistol grip that protrudes conspicuously beneath the action of the rifle allows for a pistol style grasp in which the web of the trigger hand (between the thumb and | Cal. Code Regs. tit. 11, § 5471(z); DX-2 at 123 (Graham Rpt. ¶ 19); DX-50 at 1687–88 (Busse Suppl. Rpt. ¶ 13). | Undisputed. |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
|  | index finger) can be placed below the top of the exposed portion of the trigger while firing. |  |  |
| 39 | A protruding pistol grip helps to stabilize a semiautomatic or automatic rifle and enhance lethality during rapid fire. | DX-50 at 1687–90 (Busse Suppl. Rpt. ¶¶ 13, 18); DX-2 at 126 (Graham Rpt. ¶ 26); DX-61 at 2394–95 (Tucker Suppl. Rpt. ¶ 16); DX-22 at 1048 (1989 ATF Rpt. at 6); DX-3 at 137–38 (Mersereau Rpt. ¶ 9). | Undisputed, except that it allows for the same benefit in a self-defense situation, which is part of the reason why so many Americans choose these rifles for self-defense in addition to other lawful purposes. |
| 40 | An assault rifle with a pistol grip would allow a shooter to shoot more accurately and reload faster. | DX-3 at 137–38 (Mersereau Rpt. ¶ 9). | Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5; Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Exs. 28-29; 35-37; Ex. 59 [Minter Book Excerpts] at 46-47; Ex. 53 [Expert Report M. Hanish] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. |
| 41 | According to a 1989 ATF Report, a pistol grip beneath the action of the rifle can also "be an aid in | DX-22 at 1048 (1989 ATF Report at 6). | Undisputed, but this is also why it is an aid to disabled shooters. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | one-handed firing of the weapon in a combat situation." | | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9. |
| 42 | A pistol grip is not necessary to operate a rifle, including for self-defense. | DX-50 at 1688 (Busse Suppl. Rpt. ¶ 13). | Undisputed, but many popular rifles are designed for pistol grips, and *Bruen* doesn't test for what is "necessary". |
| 43 | A thumbhole stock enables the shooter to place the thumb of the trigger hand through the stock while firing, mimicking the ergonomics of a pistol grip. | Cal. Code Regs. tit. 11, § 5471(qq); DX-2 at 123 (Graham Rpt. ¶ 20); DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). | Undisputed. |
| 44 | A thumbhole stock allows a shooter to insert a thumb through the stock, mimicking the effects of a pistol grip and assisting a shooter in rifle control during periods of rapid fire. | DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). | Undisputed. |
| 45 | A thumbhole stock is not necessary to operate a rifle, including for self-defense. | DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). | Undisputed, but *Bruen* doesn't test for what is "necessary". |
| 46 | A forward pistol grip "allows for a pistol style grasp forward of the trigger." | Cal. Code Regs. tit. 11, § 5471(t); DX-2 at 125 (Graham Rpt. ¶ 23); DX-50 at 1689–90 (Busse Suppl. Rpt. ¶ 18). | Undisputed. |
| 47 | A forward pistol grip on a rifle was a feature of early machineguns; it can help insulate the non-trigger hand from heat during rapid fire | DX-16 at 774 (Helsley Dep. Tr. at 79); DX-50 at 1689–90 (Busse Suppl. Rpt. ¶ 18); DX-61 at 2395 | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | and stabilize a rifle during rapid fire. | (Tucker Suppl. Rpt. ¶ 17). | |
| 48 | A folding or telescoping stock is attached to the receiver, which can change the overall length of the rifle. | Cal. Code Regs. tit. 11, §§ 5471(*ll*), (*oo*), (nn); DX-2 at 124 (Graham Rpt. ¶ 21); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 15). | Undisputed. |
| 49 | According to a 1989 ATF Report, the "predominant advantage" of a folding or telescoping stock "is for military purposes, and it is normally not found on the traditional sporting rifle." | DX-22 at 1048 (1989 ATF Report at 6). | Undisputed that the report may have stated that, but it isn't accurate in 2023. Rifles commonly come standard with an adjustable stock.<br><br>Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; [Expert Report of W. English] at 3. |
| 50 | A folding or telescoping stock renders the rifle more concealable. | DX-2 at 124, 126 (Graham Rpt. ¶¶ 21, 27). | Undisputed. |
| 51 | A folding or telescoping stock can make a rifle less stable when firing, if not properly locked in place. | DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 18). | Undisputed. |
| 52 | A rifle does not need a folding or telescoping stock to operate, including for self-defense. | DX-50 at 1689 (Busse Suppl. Rpt. ¶ 15). | Undisputed, but *Bruen* doesn't test for what is "needed". |
| 53 | A flash suppressor is any device attached to the end of the barrel that reduces or redirects muzzle flash, including any device identified as a "flash hider." | Cal. Code Regs. tit. 11, § 5471(r); DX-2 at 125 (Graham Rpt. ¶ 22); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17). | Undisputed, but "flash hider" is a misnomer. Flash suppressors do not hide the flash from those in the direct line of fire, but rather from the shooter. |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | | | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 5 [Expert Report of B. Graham] at 22, 28; Ex. 6 [Depo. Tr. M. Mersereau] at 56:14-18; Ex. 7 [Depo. Tr. B. Graham] at 103:15-20. |
| 54 | Flash suppressors can be affixed to the muzzle of a rifle to reduce the flash emitted upon firing, which can aid a shooter in low-light conditions to maintain more effective fire. | DX-2 at 125 (Graham Rpt. ¶ 22); DX-3 at 138 (Mersereau Rpt. ¶ 11); DX-22 at 1049 (1989 ATF Report at 7). | Undisputed. |
| 55 | A flash suppressor can reduce muzzle climb during rapid fire. | DX-22 at 1049 (1989 ATF Report at 7). | Flash suppressors do not reduce muzzle climb, compensators do.<br><br>Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7-8; Brady Decl., Ex 68 [Recoil Magazine article]. |
| 56 | A flash suppressor can help conceal the location of a shooter, especially in low-light conditions. | DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25); DX-22 at 1049 (1989 ATF Report at 7). | No, this is a myth. "A major misconception is that a flash suppressor will hide the flash from the target you are shooting."<br><br>Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7-8; Brady Decl., Ex 68 [Recoil |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | | | Magazine article]. |
| 57 | A flash suppressor facilitates night combat operations by mitigating the effects of muzzle flash on night vision goggles. | DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25). | Undisputed. |
| 58 | A flash suppressor is not necessary to operate a firearm, including for self-defense. | DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17). | Undisputed, but *Bruen* doesn't test for what is "necessary". |
| 59 | A semiautomatic centerfire rifle under 30 inches in length is more concealable than the same rifle that is 30 inches or longer. | DX-2 at 126 (Graham Rpt. ¶ 27); DX-50 at 1691 (Busse Suppl. Rpt. ¶ 21). | Undisputed. |
| 60 | Generally, the only way to reduce the overall length of a rifle is to use shorter barrels or shorter or collapsible stocks (or both).  Neither a shortened barrel nor a shorter or collapsible stock is necessary to operate a rifle, including for self-defense. | DX-50 at 1691 (Busse Suppl. Rpt. ¶ 21). | Undisputed. |
| 61 | Manufacturers of rifles restricted by the AWCA have marketed the rifles to civilians based on their military features and military design. | DX-51 at 1720–35 (Busse Suppl. Sur-Rebuttal Rpt. ¶¶ 17–37); DX-32 at 1277 (Violence Policy Ctr., The Militarization of the U.S. Civilian Firearms Market 1 (2011)); DX-35 at 1459 (Guns | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|----------------------|---------------------|---------------------|
| | | & Ammo (July 1981) at 48); *e.g.*, DX-24 at 1071 (Colt AR15A4 Advertisement); DX-25 at 1072 (About Colt Rifles); DX-85 at 2986, 2994–97 (Mem. from Rep. Carolyn B. Maloney to Members of the H.R. Comm. on Oversight & Reform, July 27, 2022, at 2, 10–13). | |
| 62 | AWCA-compliant semiautomatic rifles, including AR-platform rifles, are available for purchase and possession in California. | DX-50 at 1688–89, 1694–708 (Busse Suppl. Rpt. ¶¶ 13–15 & Ex. A); DX-16 at 740–41 (Helsley Dep. Tr. at 21–22); DX-2 at 126 (Graham Rpt. ¶ 30). | Undisputed. |
| 63 | Gun ownership in the United States is becoming more concentrated. | DX-1 at 6–9 (Donohue Rpt. ¶¶ 18–26). | This is false, gun ownership is diversifying.

Brady Decl., Ex. 49 [English 2021 Report] at 2, 9; Brady Decl., Ex 69 [Economist article]. |
| 64 | AR- and AK-platform rifles comprise approximately 5% of all firearms in circulation in America; this estimate likely includes rifles in the | DX-54 at 1852 (Klarevas Suppl. Rpt. ¶ 15). | The percentage in circulation is uncertain, however, 30.2% of gun owners, about 24.6 million people, have owned an |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | possession of domestic law enforcement agencies. | | AR-15 or similar styled rifle.<br><br>Brady Decl., Ex. 49 [English 2021 Report] at 33. |
| 65 | AR-platform and similar semiautomatic rifles did not sell in substantial numbers until the late 2000s and particularly after the 2012 shooting at Sandy Hook Elementary in Newtown, Connecticut. | DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). | This depends entirely on the definition of "substantial numbers". Mr. Busse's report indicates that millions of AR-platform rifles had been sold by the year 2000, which is enough to confer protection based on the precedent of *Caetano*.<br><br>Busse Suppl. Rpt. ¶ 11. |
| 66 | As of 2013, 66 percent of AR- or AK- rifles owners owned two or more such rifles, and such owners owned on average 3.1 AR- or AK-platform rifles. | DX-42 at 1532–33 (2013 NSSF Rpt. at 6–7). | Undisputed. |
| 67 | As of 2013, over 30 percent of AR- or AK- platform rifle owners owned three or more such rifles, and over one quarter of owners reported having four or more such rifles. | DX-42 at 1535 (2013 NSSF Rpt. at 13). | Undisputed. |
| 68 | As of 2013, approximately 99% of owners of an AR- or AK-platform rifle also owned a firearm that was | DX-42 at 1532 (2013 NSSF Rpt. at 6). | Undisputed. |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | not an AR- or AK-platform rifle. | | |
| 69 | An analysis of incidents reported in the NRA Armed Citizens database compiled from January 2011 through May 2017 reveals that it is rare for individuals to defend themselves using more than ten rounds; on average, only 2.2 shots were fired by defenders. No shots were fired in 20.9% of incidents. | DX-47 at 1566–67 (Allen Suppl. Rpt. ¶ 13). | Undisputed that that is what the analysis concluded, but Plaintiffs do not concede the analysis is scientific.<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 3. |
| 70 | An analysis of published news stories revealed a similar number of average shots per incident of self-defense (i.e., 2.34). No shots were fired in 11.6% of incidents. In 97.3% of the incidents, the defender fired five or fewer shots. | DX-47 at 1572–73 (Allen Suppl. Rpt. ¶ 20). | Undisputed that that is what the analysis concluded, but Plaintiffs do not concede the analysis is scientific.<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 3. |
| 71 | An analysis of the Heritage Foundation's database on defensive gun uses in the United States revealed that approximately 2 to 4 percent of all defensive gun uses involved any type of rifle. | DX-47 at 1576–77 (Allen Suppl. Rpt. ¶ 28). | Undisputed that that is what the analysis concluded, but Plaintiffs do not concede the analysis is scientific.<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 3. |
| 72 | A greater number of fatalities and injuries that occur in a mass shooting | DX-15 at 728 (Kleck Dep. Tr. at 263); DX-47 at 1582–83, 1585 (Allen Suppl. | Undisputed that there is a correlation, but Plaintiffs do not concede that |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | is correlated with the use of an assault weapon. | Rpt. ¶¶ 34–37, 42); DX-54 at 1853–56 (Klaravas Suppl. Rpt. ¶¶ 16–18 & tbls. 3 & 4); DX-57 at 2034–35 (Roth Suppl. Rpt. ¶ 54 & fig. 1). | correlation proves so-called "assault weapons" caused the greater number of fatalities.<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 26. |
| 73 | During the period in which the federal assault weapons ban was in effect, the use of banned assault weapons in crimes was reduced. | DX-15 at 662–63 (Kleck Dep. Tr. at 153–54); DX-53 at 1802 (Donohue Suppl. Rpt. ¶ 23). | A U.S. Department of Justice-funded evaluation found that there was "no discernible reduction in the lethality or injuriousness of gun violence during" the period when the ban was in effect.<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 17. |
| 74 | The AWCA is more comprehensive than the federal assault weapons ban because, unlike the federal ban's two- feature test, the AWCA restricts centerfire rifles capable of accepting a detachable magazine if it has one of the listed features. | DX-15 at 610 (Kleck Dep. Tr. at 70). | Undisputed. |
| 75 | An analysis of mass shootings reveals that states that prohibited assault weapons experienced fewer mass shootings and fewer | DX-54 at 1866–69 (Klaravas Suppl. Rpt. ¶ 37 & tbls. 6 & 7). | It's unclear why the State believes that features bans can reduce mass shootings, a crime which can be |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | fatalities in such shootings. | | committed with any modern gun, and furthermore, Klarevas fails to establish that the use of "assault weapons" causes an increase in the casualty counts of mass shootings.<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 25. |
| 76 | An analysis of mass shooting data from 1982–2019 reveals a statistically significant relationship between assault weapon restrictions and reductions in mass shooting deaths and injuries. | DX-53 at 1805–06 (Donohue Suppl. Rpt. ¶¶ 28–30 & tbl. 1). | Undisputed that there is a correlation, but Plaintiffs do not concede that correlation proves so-called "assault weapons" caused the greater number of fatalities. "All the other control variables showed no statistically significant association with either the number of incidents or number of deaths and thus were not confounders."<br><br>Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 27. |
| 77 | Between January 1, 1998 and December 31, 2001, at least 41 of the 211 law enforcement officers slain in the line of duty were killed with assault | DX-31 at 1249 (Violence Policy Ctr., Officer Down 5 (2003)). | Undisputed, except this depends on the definition of "assault weapons". Plaintiffs will assume the State refers to "assault |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | weapons. | | weapons" under the California definition. |
| 78 | Excluding inter-group violence, such as mob violence, riots, and battles, shooting incidents involving ten or more fatalities did not occur before 1949, and the number of double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban. | DX-54 at 1857–60 (Klarevas Suppl. Rpt. ¶¶ 19–22 & tbl. 5). | It's too definitive to say such an incident never occurred, but Plaintiffs do not dispute they were less common, as arson and explosives were far more common for large-scale mass murder prior to 1949.<br><br>Brady Decl., Ex. 56 [Cramer Rebuttal Report]. |
| 79 | Over one half of the 35 deadliest mass shootings in the last 100 years occurred in the last decade. | DX-86 at 3010 (The Violence Project, Key Findings). | Undisputed. |
| 80 | An increasing percentage of mass shootings has involved the use of assault weapons, including 52% of mass shootings involving six or more fatalities and 50% of mass public shootings involving four or more fatalities during the past five years. | DX-54 at 1849–50 (Klarevas Suppl. Rpt. ¶ 14 & figs. 5 & 6); DX-86 at 3011 (The Violence Project, Key Findings). | Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |
| 81 | In the seven deadliest acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, six involved the use of assault weapons (five involved an AR-platform | DX-54 at 1853 (Klarevas Suppl. Rpt. ¶ 16 & tbl. 2). | Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | rifle and one involved an AK-platform rifle). | | |
| 82 | As fatality thresholds increase in high-fatality mass shootings involving six- or-more fatalities and mass public shootings involving four-or-more fatalities in a public place, the share of such incidents involving assault weapons also increases. | DX-54 at 1853–54 (Klarevas Suppl. Rpt. ¶ 16 & figs. 9 & 10). | Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |
| 83 | AR-platform rifles are disproportionately used in mass shootings relative to the percentage of such weapons in circulation in America relative to the overall U.S. gun stock. | DX-54 at 1852 (Klarevas Suppl. Rpt. ¶ 15). | This is incorrect, the overwhelming majority of mass shootings involve handguns (77.2%).<br><br>Brady Decl., Ex. 70 [National Institute for Justice article]. |
| 84 | In the past two years, the United States has experienced numerous, devastating mass shootings with assault weapons, including rifles regulated by the AWCA, including the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed); the November 20, 2022 shooting in a Colorado | DX-53 at 1799 (Donohue Suppl. Rpt. ¶ 16); DX-80 at 2948 (Jack Healy et al., *At Least 5 Dead and 25 Injured in Gunman's Rampage at an L.G.B.T.Q. Club in Colorado*, N.Y. Times, Nov. 20, 2022); DX-81 at 2956 (Jeremy White & K.K. Rebecca Lai, *What We Know About the Gun Used* | Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|----------------------|---------------------|----------------------|
|  | Springs nightclub in which five people were killed and 17 wounded; the January 2023 shooting at a dance studio in Monterey Park, California that killed 11 and wounded nine others; the March 2023 shooting at the elementary school in Nashville that killed six, including three 9-year-old children; the April 10, 2023 shooting at a Louisville bank that killed five; and the May 6, 2023 shooting at a shopping center in Allen, Texas that killed 8 and wounded 7 others. | *in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023); DX-82 at 2966 (Adeel Hassan & Emily Cochrane, *What We Know About the Nashville School Shooting*, N.Y. Times, May 20, 2023); DX-83 at 2971 (Kevin Williams et al., *Gunman Who Killed Five in Louisville Left Note and Bought Rifle Legally*, N.Y. Times, Apr. 11, 2023); DX-84 at 2977 (J. David Goodman et al., *After Mass Killings in Texas, Frustration but No Action on Guns*, N.Y. Times, May 7, 2023). |  |
| 85 | From the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations limited the ability of a single person to commit mass murder. | DX-57 at 2025 (Roth Suppl. Rpt. ¶ 41); DX-58 at 2083 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 25). | Individual mass murder is neither particularly modern nor dependent on technological advances.<br><br>Brady Decl., Ex. 56 [Cramer Rebuttal Report], at 25. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| 86 | The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. | DX-59 at 2099–103 (Spitzer Suppl. Rpt. ¶¶ 11–17); DX-57 at 2027 (Roth Suppl. Rpt. ¶ 44). | Individuals inflicted plenty of harm in earlier eras by using arson and explosives, often with the result of dozens of murdered victims.<br><br>Brady Decl., Ex. 56 [Cramer Rebuttal Report], at 33-42. |
| 87 | Historically, the term "Arms" referred to weapons such as "swords, knives, rifles, and pistols," and did not include "accoutrements," like "ammunition containers, flints, scabbards, holsters," or "parts of weapons." | DX-49 at 1641 (Baron Suppl. Rpt. ¶ 8). | The Supreme Court has defined "arms" to mean ""any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." That may not include a holster, but it does include "parts of weapons".<br><br>*D.C. v. Heller*, 554 U.S. 570, 581 (2008) |
| 88 | It was time-consuming to load a gun in the late 18th and early 19th century. | DX-52 at 1753 (Cornell Suppl. Rpt. ¶ 27); DX-59 at 2110–13 (Spitzer Suppl. Rpt. ¶¶ 24–28). | Undisputed. |
| 89 | Repeater firearms (capable of holding several rounds in a magazine or revolving cylinder and firing successive shots) were "extraordinarily rare" in the 18th century. | DX-60 at 2363 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶ 22). | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| 90 | There is no evidence that many early repeating firearms were commercially available during the 18th century. | DX-60 at 2363–77 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶¶ 23–45). | Undisputed. |
| 91 | In 1800, it "was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder" that repeaters required. | DX-60 at 2378 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶ 47). | Undisputed. |
| 92 | The historical record is replete with reference to faultiness of repeaters manufactured before and during the founding. | DX-60 at 2366, 2371, 2378 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶¶ 26, 36, 47). | Undisputed. |
| 93 | 19th century repeaters, like the Henry and Winchester rifles, were understood during the era of Reconstruction to be weapons of war or anti-insurrection, not weapons of individual self-defense. | DX-63 at 2419 (Vorenberg Suppl. Rpt. ¶ 7). | False, they were popular among civilians for their sporting use. Oliver Winchester referred to it as "one of [the company's] best sporting guns" in a letter, dating 1871, to prominent gunmaker R.S. Lawrence.

Brady Decl., Ex. 57 [Hlebinsky Rebuttal Report], at 19, citing Oliver F. Winchester's letter to R.S. Lawrence, dated 10 February 1871. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|---------------------|---------------------|---------------------|
|  |  |  | McCracken Research Library, MS20, Box 51, Folder 6. |
| 94 | The lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm, were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War. | DX-63 at 2425–27 (Vorenberg Suppl. Rpt. ¶¶ 20–21, 24). | The Winchester rifle wasn't available during the civil war, so of course it wasn't adopted for that war. As for the Henry Rifle, most of those rifles made were sold to soldiers directly, not to the military. According to the US National Parks Service, "The company made about 14,000 of the rifles between 1860 and 1866, but the U.S. Ordnance Department purchased only about 1,731 or the rifles. However, many soldiers acquired their own Henrys, which were popular in Missouri, Kentucky, Illinois, and Indiana. One Confederate soldier is rumored to have said, "It's a rifle you could load on Sunday and shoot all week long." 

Brady Decl., Ex. 71 [National Parks Service article]. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| 95 | Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians. | DX-63 at 2429–30 (Vorenberg Suppl. Rpt. ¶ 27). | This is completely false such that it borders on gaslighting. The rifles were so common that Colonel Custer's Cavalry was defeated by Native Americans with as many as 150 or more repeating rifles, all of which would have had to have been stolen as Native Americans had no gun factories.

Between 1861 and 1877, a total of 164,466 Henry and all models of Winchester were made, with only approximately 56,000 going to foreign governments. Because the US military didn't adopt them, it follows that most were sold to civilians.

The Library of Congress calls the iconic 1873 Winchester the "gun that won the west".

Brady Decl., Ex. 71 [Popular Mechanics article]; Ex. 57 [Hlebinsky Rebuttal Report], at 19; Ex. 73 [Library of Congress |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | | | article]. |
| 96 | By the time the Fourteenth Amendment was ratified, the commercial viability of the Winchester Model 1866 was due "almost entirely to sales to foreign armies," not to Americans. | DX-63 at 2444 (Vorenberg Suppl. Rpt. ¶ 50). | Between 1861 and 1877, a total of 164,466 Henry and all models of Winchester were made, with only approximately 56,000 going to foreign governments. Because the US military didn't adopt them, it follows that most were sold to civilians.<br><br>Brady Decl., Ex. 57 [Hlebinsky Rebuttal Report], at 19. |
| 97 | In the 18th and 19th centuries, laws required gunpowder to be stored on the top floor of a building and permitted government officials to remove it when necessary to prevent explosions and to transfer the powder to the public magazine. | DX-52 at 1759–60 (Cornell Suppl. Rpt. ¶¶ 35–37). | Undisputed. |
| 98 | During the colonial period, states began to enact restrictions on "trap guns," laws that proliferated in the 19th century. | DX-59 at 2135, 2136–37, 2190–92, 2331–39 (Spitzer Suppl. Rpt. ¶¶ 63, 66 & Exs. B & F). | Undisputed. |
| 99 | A trap gun was a firearm that was configured in a way to fire remotely (without the user operating the firearm), typically by rigging the | DX-59 at 2135 (Spitzer Suppl. Rpt. ¶ 63). | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|----------------------|---------------------|----------------------|
| | firearm to be fired by a string or wire when tripped. | | |
| 100 | Trap guns were used to protect personal or commercial property. | DX-59 at 2136 (Spitzer Suppl. Rpt. ¶ 64). | Undisputed. |
| 101 | As homicide rates increased in the South in the early 1800s, states began restricting the carrying of certain concealable weapons. | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶¶ 23–24); DX-59 at 2123–24 (Spitzer Suppl. Rpt. ¶ 44); DX-56 at 1975–76 (Rivas Suppl. Rpt. ¶ 14). | Undisputed. |
| 102 | These concealed weapons laws targeted the specific types of weapons that were commonly used in the murders and serious assaults that caused an alarming rise in homicides at the time. | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶ 24). | Undisputed. |
| 103 | From 1813 to the Mexican War, in 1846, numerous states and territories also restricted the concealed carrying of particular weapons. These concealed weapons laws were intended to specifically address the rise in murders and assaults throughout the South at that time. | DX-57 at 2012 (Roth Suppl. Rpt. ¶ 26); DX-59 at 2122–23 (Spitzer Suppl. Rpt. ¶¶ 42–43). | Undisputed. |
| 104 | Class and racial tensions led to a dramatic increase in the number of deadly quarrels, property disputes, duels, and | DX-57 at 2010–12 (Roth Suppl. Rpt. ¶¶ 23–26). | Undisputed. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|----------------------|---------------------|---------------------|
|  | interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. |  |  |
| 105 | During the 19th century, states enacted a range of laws restricting the carrying of blunt weapons: 12 states restricted "bludgeons"; 14 states restricted "billies"; 43 states restricted "slungshots"; six states restricted "sandbags"; and 13 states broadly restricted any concealed weapon. | DX-59 at 2121–34, 2194–97 (Spitzer Suppl. Rpt. ¶¶ 42–61 & Ex. C). | Undisputed. |
| 106 | During the 19th century, including around the time that the Fourteenth Amendment was ratified, 49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives." | DX-59 at 2128, 2194–97 (Spitzer Suppl. Rpt. ¶ 50 & Ex. C). | Undisputed, but these were almost entirely carry restrictions, not mere possession restrictions. |
| 107 | Many state laws enacted during the 19th century also included revolvers and pistols in their lists of proscribed weapons. | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶¶ 24–25). | Some did, but multiple state-level courts ruled such laws unconstitutional to the extent they applied to the open carry of common pistols. |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|-----|---------------------|---------------------|---------------------|
| | | | *See Andrews*, 50 Tenn. 165; *Wilson*, 33 Ark. 557; and *Nunn*, 1 Ga. 243. |
| 108 | These laws aimed to curb the general use of concealable weapons in opportunistic crimes and assaults that exacerbated rising homicide rates in the South and its borderlands. | DX-57 at 2010–11 (Roth Suppl. Rpt. ¶ 24); DX-58 at 2090 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 37 n.44). | Undisputed. |
| 109 | State constitutions adopted during Reconstruction expressly linked the right to keep and bear arms to the state's authority to regulate arms: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe." | DX-52 at 1764–69 (Cornell Suppl. Rpt. ¶¶ 43–51). | Undisputed, but such regulations of the era almost never prohibited the possession or sale of common firearms. |
| 110 | During this period, the federal government regulated access to particularly dangerous weapons, including the Henry and Winchester lever-action repeating rifles that began to circulate in the postbellum period, and along with state militias | DX-63 at 2419–20, 2425–26, 2450–51 (Vorenberg Suppl. Rpt. ¶¶ 8–9, 21–22, 63–64. | The State has pointed to no federal law governing such rifles, because there were none. |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | sought to prevent access to those weapons to insurrectionary groups and Native Americans. | | |
| 111 | Notably, when semiautomatic and automatic weapons began to circulate more widely in society and appear more frequently in crime in the 1920s, states began to regulate semiautomatic and automatic weapons capable of firing a certain number of rounds successively and weapons capable of receiving ammunition from feeding devices. | DX-59 at 2098–107 (Spitzer Suppl. Rpt. ¶¶ 10–20 & tbl. 1). | Undisputed as to automatic weapons, but semiautomatic firearms were not banned by any state, and even the laws the State cited were all repealed, save for DC's. |
| 112 | In 1923, the National Conference of Commissioners on Uniform State Laws (now, the Uniform Law Commission) issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi- automatically without reloading." | DX-59 at 2100 (Spitzer Suppl. Rpt. ¶ 11). | Undisputed. |
| 113 | Eleven states enacted restrictions on semiautomatic or fully automatic firearms capable of firing a certain number of rounds without reloading; eight states | DX-59 at 2103–06 (Spitzer Suppl. Rpt. ¶¶ 16, 19 & tbl. 1). | Undisputed as to automatic weapons, but semiautomatic firearms were not banned by any state, and even the laws the State cited were all |

| No. | Uncontroverted Facts | Supporting Evidence | Plaintiff's Response |
|---|---|---|---|
| | regulated fully automatic weapons, defined as a firearm capable of firing a certain number of rounds without reloading or accepting an ammunition feeding device; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner, including a 1927 California law. | | repealed, save for DC's. |
| 114 | These early 20th century firearm regulations followed the same regulatory pattern of state and federal restrictions on large-capacity magazines in the late 20th century after the rise in mass shootings. | DX-59 at 2097–98 (Spitzer Suppl. Rpt. ¶¶ 9–10). | Objection to inclusion: Magazine capacity is not at issue in this case. |
| 115 | As of May 26, 2023, eleven jurisdictions representing more than one quarter of the U.S. population, restrict assault weapons: California, Connecticut, Delaware, the District of Columbia, Hawaii (assault pistols only), Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington. | DX-59 at 2095 (Spitzer Suppl. Rpt. ¶ 7 & n.3); DX-54 at 1865 (Klarevas Suppl. Rpt. ¶ 35); H.B. 5471, 103d Gen. Assemb. (Ill. 2023); Substitute H.B. 1240, 68th Legis. (Wash. 2023). | Undisputed, though the definition of "assault weapon" varies in each. |

**PLAINTIFFS' STATEMENT OF FACTS**

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|--|
| 116 | Individual plaintiffs are residents of the State of California, save for Plaintiff Rupp, who now lives outside of California but regularly visits the state. | Willis Decl. ¶ 1; Dember Decl. ¶ 1; Martin Decl. ¶ 1; Rupp Decl. ¶ 1; Valencia Decl. ¶ 1; Johnson Decl. ¶ 1; Seifert Decl. ¶ 1. | |
| 117 | Individual plaintiffs are law-abiding and are not prohibited from owning firearms under the laws of the United States or the State of California. | Willis Decl. ¶ 2; Dember Decl. ¶ 2;Martin Decl. ¶ 2; Rupp Decl. ¶ 2; Valencia Decl. ¶ 2; Johnson Decl. ¶ 2; Seifert Decl. ¶ 2. | |
| 118 | All individual plaintiffs have never been found by any law enforcement agency, any court, or any other government agency to be irresponsible, unsafe, or negligent with firearms in any manner. | Willis Decl. ¶ 2; Dember Decl. ¶ 2; Martin Decl. ¶ 2; Rupp Decl. ¶ 2; Valencia Decl. ¶ 2; Johnson Decl. ¶ 2; Seifert Decl. ¶ 2. | |
| 119 | Plaintiff Troy Willis is a retired reserve officer for the Indio Police Department. | Willis Decl. ¶ 2. | |
| 120 | Plaintiffs Willis and Seifert each lawfully own a semiautomatic, centerfire rifle with a detachable magazine equipped with one or more prohibited features under the AWCA. | Willis Decl. ¶ 3; Seifert Decl. ¶ 3. | |
| 121 | Plaintiff Dennis Martin lawfully owns a semiautomatic, centerfire rifle with a non-fixed | Martin Decl. ¶ 3. | |

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| | magazine that he registered with the California Department of Justice as an "assault weapon." | | |
| 122 | Plaintiff Martin is prohibited under the AWCA and its related regulations from replacing his firearm's "bullet button" with a standard magazine release, and but for these restrictions would immediately do so. | Martin Decl. ¶ 4. | |
| 123 | Plaintiffs Willis, Martin, and Seifert are each prohibited under the AWCA from engaging in certain activities with their registered "assault weapons" that are otherwise lawful with any other firearm not classified as an "assault weapon," and but for these restrictions Plaintiffs Willis, Martin, . . ., and . . . would engage in such activities. | Willis Decl. ¶ 5; Martin Decl. ¶ 5; Seifert Decl. ¶ 4. | |
| 124 | Plaintiff Steven Rupp owns a semiautomatic, centerfire rifle with a non-fixed magazine that he was forced to modify to ensure it was no longer considered an "assault weapon" and therefore lawful to possess in the | Rupp Decl. ¶ 3. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| | State of California. | | |
| 125 | Plaintiffs Rupp and Seifert each lawfully own a frame or "lower receiver" of a firearm that they wish to assemble into fully functioning semiautomatic, centerfire rifles with a detachable magazine and either a pistol grip, flash suppressor, or adjustable stock, or in a configuration that has an overall length of less than 30 inches but more than 26 inches. | Seifert Decl. ¶ 5; Rupp Decl. ¶ 4. | |
| 126 | Plaintiffs Rupp and Seifert are concerned that if multiple intruders attack them while at home, they will be required to immediately reassemble their firearm into such a configuration to effectively protect themselves and others in their home. | Rupp Decl. ¶ 6; Seifert Decl. ¶ 7. | |
| 127 | Plaintiffs Rupp and Seifert believe that not being able to immediately assemble their frames or "lower receivers" into such a configuration will impact their ability to effectively defend themselves and others in their home. | Rupp Decl. ¶ 7; Seifert Decl. ¶ 8. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| 128 | Plaintiffs Alfonso Valencia, Steven Dember, and Cheryl Johnson each would like to acquire a semiautomatic, centerfire rifle with a detachable magazine having one or more of the features that is prohibited by the AWCA to keep in their home for self-defense and other lawful purposes, including hunting, training, and recreation. | Valencia Decl. ¶ 3; Johnson Decl. ¶ 3; Dember Decl. ¶ 3. | |
| 129 | Individual Plaintiffs will be continuously and irreparably harmed by the ongoing deprivation of their individual, fundamental right to possess and use commonly possessed firearms for lawful purposes, including in-home self-defense, without risking criminal prosecution. | Willis Decl. ¶ 6; Martin Decl. ¶ 6; Rupp Decl. ¶ 8; Seifert Decl. ¶ 9. | |
| 130 | Individual Plaintiffs would like to acquire new semiautomatic, centerfire rifles with a detachable magazine, having one or more of the features that is prohibited by the AWCA, and were it not for the AWCA and fear of prosecution for violating it, would do so. | Willis Decl. ¶ 7; Dember Decl. ¶¶ 3-4; Martin Decl. ¶ 7; Rupp Decl. ¶ 9; Valencia Decl. ¶¶ 3-4; Johnson Decl. ¶¶ 3-4; Seifert Decl. ¶ 10. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| 131 | Individual Plaintiffs who lawfully own "assault weapons" or firearms they were forced to modify in accordance with the AWCA acquired their firearm for use in their home for self-defense and other lawful purposes such as hunting, training, and recreation. | Willis Decl. ¶ 4; Rupp Decl. ¶ 5; Seifert Decl. ¶ 6; Jones Decl. ¶ 4. | |
| 132 | Richard Minnich is the Executive Director for Plaintiff California Rifle & Pistol Association, Incorporated ("CRPA") | Minnich Decl. ¶ 1. | |
| 133 | Plaintiff CRPA is a non-profit membership and donor-supported organization classified under IRC section 501(c)(4) and incorporated under the laws of California with its headquarters in Fullerton, California. | Minnich Decl. ¶ 1. | |
| 134 | Founded in 1875, CRPA seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. | Minnich Decl. ¶ 2. | |
| 135 | Plaintiff CRPA Works to preserve the constitutional and statutory rights of gun ownership, including the right to self-defense, the right to hunt, and the right | Minnich Decl. ¶ 2. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| | to keep and bear arms. | | |
| 136 | Plaintiff CRPA is dedicated to promoting the shooting sports, providing education, training, and organized competition for adult and junior shooters. | Minnich Decl. ¶ 2. | |
| 137 | Plaintiff CRPA's members include law enforcement officers, prosecutors, professionals, firearms experts, and members of the public. | Minnich Decl. ¶ 2. | |
| 138 | Plaintiff CRPA works to preserve the constitutional rights of all law-abiding individuals, including the fundamental right to keep and bear commonly owned firearms for the core lawful purpose of self-defense. | Minnich Decl. ¶ 3. | |
| 139 | Plaintiff CRPA has members who own semiautomatic, centerfire rifles with non-fixed magazines that were forced to register their firearm as an "assault weapon" with the California Department of Justice before July 1, 2018. | Minnich Decl. ¶ 4. | |
| 140 | Plaintiff CRPA has members who are prohibited under the | Minnich Decl. ¶ 4. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
|  | AWCA and its related regulations from replacing their firearm's "bullet button" with a standard magazine release, and but for those restrictions would do so. | | |
| 141 | Plaintiff CRPA also has members who lawfully own semiautomatic, centerfire rifles with detachable magazines with one or more prohibited features under the AWCA, or firearms specifically identified by their make and model as "assault weapons" under the AWCA. | Minnich Decl. ¶ 5. | |
| 142 | Plaintiff CRPA has members who lawfully own firearms classified as "assault weapons" who are prohibited under the AWCA and related regulations from engaging in certain activities that are otherwise lawful with any other firearm not classified as an "assault weapon," and but for those restrictions would engage in such activities with their firearms. | Minnich Decl. ¶ 6. | |
| 143 | Plaintiff CRPA has members who, but for the AWCA and its related regulations, would | Minnich Decl. ¶ 7. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| | acquire, transfer, and/or possess firearms classified as "assault weapons," and are continuously and irreparably harmed by the ongoing deprivation of their individual, fundamental right to possess and use commonly possessed firearms for lawful purposes, including in-home self-defense, without risking criminal prosecution. | | |
| 144 | Millions of rifles that are prohibited by the AWCA are in the hands of the American people. | Brady Decl., Ex. 2 [Expert Report W. English]; Ex. 7 [Depo. Tr. B. Graham] at 21:13-21, 25:9-15, 28:3-6; Exs. 11-25; Ex. 8 [DOJ Resp. to Seifert's Reqs. for Admission, Set One] at 4; Ex. 10 [DOJ Second Suppl. Resp. to Willis Interrogs., Set One] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]; Ex. 53 [Expert Report M. Hanish] at 6; Ex. 58. | |
| 145 | Americans typically choose rifles prohibited by the AWCA for self-defense. | Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5; Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Exs. 28-29; 35-37; Ex. 59 [Minter Book | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| | | Excerpts] at 46-47; Ex. 53 [Expert Report M. Hanish] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. | |
| 146 | Americans typically choose rifles prohibited by the AWCA for hunting. | Brady Decl., Ex. 2 [Expert Report of W. English] at 4, 7; Ex. 3 [Expert Report of S. Helsley] at 11-12; Ex. 30-33; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. | |
| 147 | Americans typically choose rifles prohibited by the AWCA for competition. | Brady Decl., Ex. 2 [Expert Report of W. English] at 4; Ex. 3 Expert Report of S. Helsley] at 6; Ex. 22; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| 148 | Americans typically choose rifles prohibited by the AWCA for target shooting. | Brady Decl., Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Ex. 22; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. | |
| 149 | The American public has had access to and has commonly owned semi-automatic, centerfire rifles with detachable magazines for more than a century. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 3-6. | |
| 150 | The AR-15 has been available to the American public since at least 1959. | Brady Decl., Ex. 2 [Expert Report of W. English] at 3; Ex. 3 [Expert Report of S. Helsley] at 6. | |
| 151 | The popularity of AR-15 type rifles has increased since its inception. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 11-12. | |
| | **Pistol Grips** | | |
| 152 | Rifles commonly come standard with a pistol grip. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7; [Expert Report of W. English] at 3. | |
| 153 | Pistol grips for rifles are commonly available aftermarket. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 11; Ex. | |

46

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|---|---|---|---|
| | | 44. | |
| 154 | Pistol grips do not affect a rifle's rate of fire. | Brady Decl.; Ex. 3 [Expert Report of S. Helsley] at 7-9. | |
| 155 | [*SUF 40 intentionally left blank.*] | | |
| 156 | Pistol grips do not affect a rifle's capacity to accept ammunition. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7-9. | |
| 157 | Pistol grips do not affect the power of the projectile a rifle discharge. | Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5-7; Ex. 3 [Expert Report of S. Helsley] at 7-9. | |
| 158 | Pistol grips are not dangerous per se. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 6-9. | |
| 159 | The purpose of a pistol grip is to position the "trigger finger" for optimum trigger control and help absorb recoil. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7. | |
| 160 | Pistol grips allow a rifle to be used with one hand. | Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 12. | |
| 161 | Pistol grips can accommodate a disabled person. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9. | |
| | **Adjustable Stocks** | | |
| 162 | Rifles commonly come standard with an adjustable stock. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; [Expert Report of W. English] at 3. | |
| 163 | Adjustable stocks for rifles are commonly available aftermarket. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9; Ex. 45. | |

47
STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| 164 | A "telescoping stock" allows the user of the rifle to adjust the length of a rifle a couple of inches as conditions dictate and has no material effect on the concealability of the rifle. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 7 [Depo. Tr. B. Graham] at 81:2-19. | |
| 165 | The purpose of a telescoping stock is to allow the user of a rifle to make it a comfortable length for that user's body type or as conditions dictate. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; [Depo. Tr. B. Graham] at 94:1-4; 95:19-21. | |
| 166 | People of different body sizes may need different length stocks to properly hold a rifle. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9; Ex. 6 [Depo. Tr. M. Mersereau] at 37:2-11; [Depo. Tr. B. Graham] at 95:19-21. | |
| 167 | What clothing a person is wearing may affect what length stock that person needs to properly hold a rifle. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9; [Depo. Tr. B. Graham] at 94:1-4. | |
| | **Flash Suppressors** | | |
| 168 | Rifles commonly come standard with a flash suppressor. | Brady Decl., Ex. 2 [Expert Report of W. English] at 3; Ex. 3 [Expert Report of S. Helsley] at 10-11. | |
| 169 | Flash suppressors for rifles are commonly available aftermarket. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 11; Ex. 46. | |

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| 170 | Flash suppressors do not hide the flash from those in the direct line of fire, but rather from the shooter. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 5 [Expert Report of B. Graham] at 22, 28; Ex. 6 [Depo. Tr. M. Mersereau at 56:14-18; Ex. 7 [Depo. Tr. B. Graham] at 103:15-20. | |
| 171 | Flash suppressors only have an effect in low-light conditions. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 6 [Depo. Tr. M. Mersereau] at 56:3-6; [Depo. Tr. B. Graham] at 103:21-24. | |
| | **Features Generally** | | |
| 172 | None of the features is inherently dangerous. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 6; Ex. 7 [Depo. Tr. B. Graham] at 108:2-16. | |
| 173 | None of the features becomes inherently dangerous when used in conjunction with any of the other features. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 6; Ex. 7 [Depo. Tr. B. Graham] at 108:2-16. | |
| 174 | The features increase accuracy of the rifle. | Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 8-12; Ex. 3 [Expert Report of S. Helsley] at 6-11, 12; Ex. 4 [Expert Report of M. | |

STMT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| | | Mersereau] at 8-11; Ex. 5 [Expert Report of B. Graham] at 19, 22, 26, 28; [Depo. Tr. B. Graham] at 119-123; 124:1-6. | |
| 175 | The features increase user control of the rifle. | Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 8-12; Ex. 3 [Expert Report of S. Helsley] at 6-11, 12; Ex. 4 [Expert Report of M. Mersereau] at 8-11; Ex. 5 [Expert Report of B. Graham] at 19, 22, 26, 28; Ex. 6 [Depo. Tr. M. Mersereau at 36:7-37:11; Ex. 7 [Depo. Tr. B. Graham] at 107:6-14, 108:2-16; [Depo. Tr. B. Graham] at 119-123; 124:1-6. | |
| 176 | The State's designated expert witness, Blake Graham, opined that the features increase accuracy and the user's control of the rifle. | Brady Decl., Ex. 3 [Expert Report of B. Graham] at 19, 22, 26, 28; Ex. 7 [Depo. Tr. B. Graham] at 107:6-14, 108:2-16; [Depo. Tr. B. Graham] at 119-123; 124:1-6. | |
| 177 | The State's designated expert witness, Michael Mersereau, opined that features increase accuracy and the user's control of | Brady Decl., Ex. 4 [Expert Report of M. Mersereau] at 8-11; Ex. 6 [Depo. Tr. M. Mersereau] at 36:7- | |

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| | the rifle. | 37:11. | |
| | **"Assault Weapon" Laws** | | |
| 178 | California's Assault Weapon Control Act was adopted in 1989 and was the first "assault weapon" law in the country. | Assemb. B. 357, 1989-1990 Reg. Sess. (Cal. 1989); Brady Decl., Ex. 48. | |
| 179 | The federal "assault weapon" law took effect in 1994. | Req. Jud. Ntc., ¶ 8, Ex. 8. | |
| 180 | Congress allowed the federal "assault weapon" law to expire in 2004. | Req. Jud. Ntc., ¶ 8, Ex. 8. | |
| 181 | Federal law does not currently restrict "assault weapons." | Req. Jud. Ntc., ¶ 8, Ex. 8. | |
| 182 | Currently, other than California, there are nine states in the country with an "assault weapon" law, plus the District of Columbia. | Req. Jud. Ntc., Exs. 1-11. | |
| 183 | Every "assault weapon" law in the country other than California's was originally adopted in the 1990s or later, including three just passed in the last year. | Req. Jud. Ntc., Exs. 1-7 (Conn. Gen. Stat. §§53-202a – 53-202k (first enacted in 1993); D.C. Code Ann. §§7-2501.01(3A), 7-2502.02 (a)(6) (enacted in 2008); Haw. Rev. Stat. Ann. §§ 134-1, 134-8 (first enacted in 1992); Md. Code Ann., Crim. Law §§ 4-301, 4-303 (first enacted in 2002); N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-3 (first enacted in 1999); N.Y. Penal Law §§ 265.00(22), | |

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|---------------------|---------------------|---|
| | | 265.02(7) (first enacted in 1998); Del. Code Ann. tit. 11, § 1466 (first enacted 2022); 720 Ill. Comp. Stat. Ann. 5/24-1.9 (first enacted in 2023); Wash. Rev. Code Ann. § 9.41.010 (first enacted in 2023)). | |
| 184 | The United States government, through the Director of Civilian Marksmanship, used to operate a program that would sell semiautomatic, centerfire rifles with detachable magazines directly to the public, including some rifles that would be considered "assault weapons" under the AWCA. | Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 5; Exs. 16, 42, 43. | |
| 185 | Nationally, in 2019, only about 2.6% of murders (364 out of 13,927) were confirmed to have been committed with *any* type of rifle, which is below murders using knives (1,476), blunt objects (397), and "hands, fists, and feet" (600), and way below murders using handguns (6,368). | Brady Decl. Ex. 60 [FBI Crime Data]. | |
| 186 | All US soldiers and marines who carry assault rifles are armed with assault rifles that have automatic capability, and | Brady Decl., Ex. 52 [Depo. Col. Tucker] at 68:11-15. | |

| No. | Uncontroverted Facts | Supporting Evidence | |
|-----|----------------------|---------------------|---|
| | not only semiautomatic capability. | | |
| 187 | No military anywhere in the world (with the *possible* exception of Israel) employs semiautomatic-only rifles like the ones that the AWCA bans for infantry. | Brady Decl., Ex. 52 [Depo. Col. Tucker] at 69:7-12. | |

Dated: June 23, 2023                    **MICHEL & ASSOCIATES, P.C.**

                                        */s/ Sean A. Brady*
                                        Sean A. Brady
                                        Attorneys for Plaintiffs

1
2

# CERTIFICATE OF SERVICE
## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

3
4

Case Name: *Rupp, et al. v. Bonta*
Case No.: 8:17-cv-00746-JLS-JDE

5

IT IS HEREBY CERTIFIED THAT:

6
7
8

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

9

     I am not a party to the above-entitled action. I have caused service of:

10
11

**PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

12
13

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

14
15
16
17
18
19

Anna Ferrari
Deputy Attorney General
Email: anna.ferrari@doj.ca.gov
Christina R.B. Lopez
Email: christina.lopez@doj.ca.gov
John D. Echeverria
Email: john.echeverria@doj.ca.gov
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

20

     I declare under penalty of perjury that the foregoing is true and correct.

21

Executed June 23, 2023.

22
23

Christina Castron

24
25
26
27
28

CERTIFICATE OF SERVICE