C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Matthew D. Cubeiro – SBN 291519
mcubeiro@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| STEVEN RUPP, et al., | Case No.: 8:17-cv-00746-JLS-JDE |
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, | Hearing Date:  July 28, 2023<br>Hearing Time:  10:30 a.m.<br>Judge:  Josephine L. Staton<br>Courtroom:  8A |
| Defendant. | |

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................ ii

Table of Authorities ......................................................................................... iii

Argument ............................................................................................................ 1

   I. The Banned Rifles Are "Arms" Within the Second Amendment's Text ....... 1

     A. The AWCA Regulates Rifles, Not Accessories ................................. 2

     B. Whether An Arm Is in Common Use for Self-Defense or Otherwise Is Irrelevant Under *Bruen*'s Textual Question ......................................... 3

     C. The Banned Rifles Are in "Common Use" for lawful Purposes, Including Self-Defense .............................................................................. 5

     D. Plaintiffs Need Not Prove That the Banned Rifles Are *Actually Used* and *Suitable* for Self-Defense ....................................................... 12

     E. The State's comparison of Banned Rifles to M-16s is not only inconsistent with its claim that the AWCA does not restrict arms, but is also irrelevant ..................................................................................... 14

   II.   The State Cannot Meet Its Burden Under Bruen's Historical Inquiry ... 16

     A. No Historical Firearms Regulation Justifies the AWCA's Rifle Ban ...................................................................................................... 17

     B. This is not a case where a "more nuanced approach" is appropriate. ......................................................................................... 19

        i. The Banned Rifles are not dramatic technological changes ..... 19

        ii. Mass shootings are not unprecedented societal concerns ........ 20

Conclusion ....................................................................................................... 20

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Caetano v. Massachusetts,*
    577 U.S. 411, 411 (2016) ................................................................... 1, 10, 11, 19

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dept. of Safety & Homeland Sec.,*
    2023 U.S. Dist. LEXIS 51322 ..................................................................... 8

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................... passim

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) ..................................................................... 14

*Fyock v. Sunnyvale,*
    25 F. Supp. 3d 1267 (N.D. Cal. 2013) ..................................................................... 8

*Heller v. District of Columbia,*
    670 F.3d 1244, (2011) ..................................................................... 7

*Miller v. Bonta,*
    542 F. Supp. 3d 1009 (S.D. Cal. 2021) ..................................................................... 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    -- U.S. --,142 S. Ct. 2111 (2022) ....................................................................... passim

*Rupp v. Becerra,*
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ..................................................................... 15

*United States v. Alaniz,__
    __ F.4th __, 2023 WL 3961124, (9th Cir. June 13, 2023) ................................. 5, 13

*United States v. Miller,*
    307 U.S. 174 (2008) ..................................................................... 7

*United States v. Reyna,*
    2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................................................................... 3

**Statutes**

Cal. Penal Code § 30510 ..................................................................... 2

Cal. Penal Code § 30515 ..................................................................... 2, 3

**Other Authorities**

David Kopel, *Bowie Knife Statutes 1837-1899*, Volokh Conspiracy (Nov. 20, 2022),
    https://bit.ly/3yZYzZx ..................................................................... 18

Nat'l Shooting Sports Found., Inc., *NSSF Report 2021 Edition, Firearms Retailer Survey Report,* at 9 (2021), https://bit.ly/3gWhI8E ........................................... 6, 9

iii

Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3QBXiyv)............. 5

Senate Budget Subcommittee #5 May 4th, 2017, Hearing @ 21:45, *available at* https://www.senate.ca.gov/media/senate-budget-subcommittee-2- ................ 12

William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw ......... 5

iv

TABLE OF CONTENTS

**ARGUMENT**

There are only two main questions courts must answer when evaluating a Second Amendment challenge: (1) does the Amendment's text cover the conduct restricted by the regulation; and (2) if so, can the government "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, -- U.S. --,142 S. Ct. 2111, 2129-30 (2022). The answer to the first question here is undeniably yes; the Banned Rifles are "arms." The answer to the second question is no; there is no enduring historical tradition of banning arms like the Banned Rifles that are in "common use" by millions of "law-abiding people for lawful purposes." *Id.* at 2143; *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). This case is that simple. Knowing that it cannot prevail otherwise, the State muddies the analytical waters by shifting burdens to Plaintiffs that are not theirs or inventing conditions on Second Amendment protection that neither *Bruen* nor *Heller* sanctions. The Court should reject the State's misguidance and grant Plaintiffs' motion.

**I.      The Banned Rifles Are "Arms" Within the Second Amendment's Text**

The *Heller* Court explained that "[t]he 18th-century meaning is no different from the meaning today. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* at 581. It also pointed to the 1773 edition of Samuel Johnson's dictionary, which defined "arms" as " '[w]eapons of offence, or armour of defence.' " *Id.*

> [*Heller*'s] reference to "arms" does not apply "only [to] those arms in existence in the 18th century." "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."

*Bruen*, 142 S. Ct. at 2132 (citations omitted); *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016); *Heller*, 554 U.S. at 582. In sum, because the Supreme Court has thrice expressly stated that the Second Amendment extends to *all* bearable arms,

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

1  which rifles undeniably are, acquiring and possessing the rifles that the AWCA bans

2  is thus necessarily conduct covered by the Amendment's text.

3      The State seeks to avoid this clear mandate two ways. First, it argues that the

4  AWCA does not regulate arms at all, but merely accessories of arms that are

5  "unnecessary" to the arm's function and thus not protected. Opp'n 7-9. Second, the

6  State (apparently) argues that what the Supreme Court meant by "*all* instruments that

7  constitute bearable arms" was only arms that are in "'common use' for self-defense."

8  *Id.* at 9. This Court should reject both arguments.[1]

9          **A.    The AWCA Regulates Rifles, Not Accessories**

10     As its name suggests, the Assault *Weapon* Control Act regulates weapons, not

11 "accessories." Indeed, the AWCA expressly bans "semiautomatic, centerfire *rifles*"

12 configured with certain features, but not the features themselves. Cal. Penal Code §

13 30515(a)(1)(A)-(F). The State concedes this. Opp'n 8. That the AWCA allows *some*

14 "semiautomatic, centerfire rifles" that do not have those features, does not change

15 that it targets *rifles*. Indeed, the State itself describes the reason that the Legislature

16 adopted its features-based "assault weapon" definition on top of its make and model

17 list of rifles,[2] as "address[ing] the proliferation of 'copycat' *weapons* that were

18 'substantially similar to *weapons* on the prohibited list but differ[ent] in some

19 insignificant way, perhaps only the name of the *weapon*, thereby defeating the intent

20 of the *ban*.'" State's Mot. 5 (emphasis added). California thus expressly intended to

21 target rifles by using a feature-based definition. The State's claim otherwise is

22 disingenuous revisionist history.

23     What's more, the State's purported "necessary" test for an item to be covered

24 by the Second Amendment's text finds no support in any authority, Supreme Court or

25

26 _____
     [1] The State does not dispute that acquisition of arms that are protected by the
Second Amendment is within the Amendments' text. If the Court rules that the
27 Banned Rifles are "arms" within the text, then the State has conceded that the
AWCA's restriction on their acquisition is protected conduct.
28     [2] *See* Cal. Penal Code § 30510 (former Cal. Penal Code § 12276) (listing
"assault weapons" by make and model).

2

otherwise. Opp'n 8-9. For good reason. It would allow government to ban essentially all arms beyond rudimentary barrels with triggers.

While not "necessary" for operating the Banned Rifles, the Banned Features are designed to increase the rifles' accuracy and control, as the State concedes. State's Mot. 14. The State does not explain why the Second Amendment would have nothing to say about government banning such innovation. This Court should thus reject the State's suggestion that Section 30515(a) of the AWCA does not restrict arms.[3]

### B.   Whether An Arm Is in Common Use for Self-Defense or Otherwise Is Irrelevant Under *Bruen*'s Textual Question

As Plaintiffs' moving papers explain, *Bruen* and *Heller* confirmed that whether an arm is "dangerous and unusual," and thus *not* in "common use," is a historical question, not a textual one. Mot. 16-18. According to the State, that cannot be so because it would mean that every case challenging a firearm restriction would automatically proceed to the historical stage of the *Bruen* analysis. Opp'n at 5, quoting *United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022). The State further objects that Plaintiffs' argument supposedly "ignores *Bruen*, which performed the 'common use analysis not at the historical stage, but when confirming that the 'Second Amendment's plain text presumptively guarantees' the conduct in which the plaintiffs wished to engage." *Id*. But it is the State that ignores *Bruen* on both scores.

First, again, *Bruen* and *Heller* tell us that the Second Amendment extends prima facie to *all* bearable arms. *Bruen*, 142 S. Ct. at 2132. That *does* mean that any restriction on such arms automatically warrants historical review under *Bruen*. It *does not*, of course, mean that every restriction will be found invalid; only that it warrants scrutiny. Just like any restriction on speech warrants review to determine whether it is valid under the First Amendment. *See id*. at 2130.

---

[3] This argument does not apply to the AWCA's list of rifles that are banned regardless of their features. *See* Cal. Penal Code § 30510.

3

1   The State's second claim that *Bruen* performed the "common use" analysis at

2   the textual stage likewise ignores *Bruen*'s detailed description of the proper Second

3   Amendment analysis. The *Bruen* Court explained that:

4   In *Heller*, we began with a "textual analysis" focused on the

5   "'normal and ordinary'" meaning of the Second Amendment's language. 554 U.S. at 576-77, 578, 128 S. Ct. 2783. That analysis

6   suggested that the Amendment's operative clause—"the right of the people to keep and bear Arms shall not be infringed"—

7   "guarantee[s] the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the

8   militia.

9   142 S. Ct. at 2127. In other words, the *Heller* Court gleaned that there is an individual

10   right to possess and carry weapons unrelated to service in a militia from the

11   Amendment's pure text. But that interpretation of the *text* is only half of the story.

12   Otherwise, there could be *no* restrictions on possessing or carrying weapons, which

13   we know is not the case.

14   Indeed, "[*f*]*rom there*, we assessed whether our initial conclusion was

15   'confirmed by the historical background of the Second Amendment.' *Id*., (emphasis

16   added). "After holding that the Second Amendment protected an individual right to

17   armed self-defense, we also relied on the *historical understanding of the Amendment*

18   *to demark the limits on the exercise of that right*. We noted that, '[l]ike most rights,

19   the right secured by the Second Amendment is not unlimited.'" *Bruen*, at 2128,

20   (emphasis added). "We assessed the lawfulness of that handgun ban by scrutinizing

21   whether it comported with *history and tradition*." *Id*. After all of that, the *Bruen*

22   Court explained that "we use *history* to determine which modern 'arms' are *protected*

23   by the Second Amendment . . . ." *Id*. at 2132 (emphasis added). In other words, the

24   textual question is solely concerned with whether keeping or bearing *any* "arm" is

25   restricted and the historical question is concerned with whether that restriction is

26   acceptable according to historical tradition.

27   The State relies heavily on a recent Ninth Circuit opinion describing the textual

28   inquiry as requiring a determination of "whether the weapon at issue is 'in common

4

use' today for self-defense.' " *United States v. Alaniz*, __ F.4th __, 2023 WL 3961124, at *3 (9th Cir. June 13, 2023). But *Alaniz* should not be read as the Ninth Circuit's definitive view of the textual analysis. Indeed, that case did not even consider what types of firearms are covered by the Second Amendment. It was a challenge to a conviction by a felon in possession of a firearm and only summarily described *Bruen* in one short paragraph and the assumed, without deciding, that the textual question was met. *Id*.

In any event, even assuming that State is correct, or at least that this Court is bound by the Ninth Circuit's supposed holding in *Alaniz* that "common use" is a textual question, Plaintiffs easily satisfy that burden. Plaintiffs have shown not only that the Banned Rifles are commonly owned for self-defense but also suitable for that purpose. For this reason, the State's insistence that it is Plaintiffs' burden to prove that an arm is covered by the Amendment's text, which, frankly, is unclear, is much ado about nothing.

### C.    The Banned Rifles Are in "Common Use" for lawful Purposes, Including Self-Defense

Ultimately, whether "common use" is a textual or historical question under *Bruen*, or whether the burden belongs to Plaintiffs or the State, is immaterial. For there is little room for serious argument that the Banned Rifles are in common use for lawful purposes. Indeed, Plaintiffs have clearly established that the Banned Rifles are typically owned and possessed for self-defense and other lawful purposes.

For instance, Plaintiffs provided evidence from experts and industry leaders showing that millions of Americans own millions of AR-15s or similar modern rifles. Mot. 4 (citing Pls.' SUF No. 29).[4] They presented evidence that a whopping 92.9% of firearm retailers surveyed sell AR-15s and similar firearms and that, more

---

[4] Citing, e.g., William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw; National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3QBXiyv).

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

1   importantly, they are the most popular long-guns they sell. *Id.* (citing Brady Decl.,

2   Ex. 2 at 4, Ex. 21). They cited findings that AR-15-style rifles make up 20% of all

3   firearms sold in recent years. Nat'l Shooting Sports Found., Inc., *NSSF Report 2021*

4   *Edition, Firearms Retailer Survey Report,* at 9 (2021), https://bit.ly/3gWhI8E. And

5   they presented various reports proving that Americans typically choose the Banned

6   Rifles for lawful purposes, including self-defense, hunting, competition, and target

7   shooting. Mot. 22 (citing Pls.' SUF Nos. 30-33). All this tracks the opinions of Mark

8   Hanish and Stephen Helsley. *Id.* at 5 (quoting Brady Decl., Ex. 3 at 12, Ex. 53 at 6)).

9        The State, for its part, offers little evidence of its own to dispute Plaintiffs'

10   figures. This is hardly surprising considering that the State conceded that it does not

11   know how many of the Banned Rifles are in circulation. Brady Decl., Ex. 8 at 4

12   ("REQUEST FOR ADMISSION NO. 2: Admit YOU do not know how many

13   ASSAULT WEAPONS are possessed in the United States. RESPONSE TO

14   REQUEST FOR ADMISSION NO. 2: Admitted.").[5] So the State tries to conceal its

15   inadequate evidentiary record of "common use," pivoting instead to throwing darts at

16   Plaintiffs' reports— apparently picked according to the State's ability to erect a

17   strawman argument and then knock it down. *See* Opp'n 13-20. Because, as Plaintiffs

18   have shown, it is the State's burden to prove an arm is "dangerous and unusual," the

19   State necessarily loses with this defensive posture. But even assuming it is Plaintiffs'

20   burden to show "common use," the State's criticisms are unavailing.

21        First, the State repeatedly tries to brush aside Plaintiffs' overwhelming

22   evidence that Americans routinely select the Banned Rifles for lawful purposes. It

23   does so by claiming "that *self-defense* is not the *primary* reason for owning the

24   Banned Rifles," Opp'n 18 (emphasis added), because a higher percentage of gun

25   owners report they select the Banned Rifles for "recreational shooting." *Id.* at 16

26

27        [5] The State also conceded that it could not even estimate the approximate
     number of them based on the information then available to it. Brady Decl., Ex. 10 at

28   8 [DOJ 2d Suppl. Resp. to Willis Interrogs., Set 1]. If new information ever came to
     the State's attention, the State never supplemented that response.

6

1  (claiming that English's estimate "does not demonstrate that AR-15-style rifles are

2  commonly possessed for self-defense" because the "top reason" is recreational target

3  shooting); *id.* at 18 (observing that NSSF reports that recreational target shooting was

4  rated as the "most important" reason people own the Banned Rifles); *id.* at 18-19

5  (similar)). The argument is borderline frivolous.

6       To begin with, the position improperly limits the Second Amendment's scope

7  to arms "in common use for *self-defense*." *Id.* 13 (emphasis added). Even though self-

8  defense is central to the Second Amendment, that is not all the Second Amendment

9  protects. On the contrary, *Heller* speaks of the arms protected as those "'in common

10 use at the time' for lawful *purposes, **like** self-defense*," *id.* at 624-25 (discussing

11 *United States v. Miller*, 307 U.S. 174, 179 (2008)) (double emphasis added). *See also*

12 *Heller*, 670 F.3d 1244, 1260 (2011) ("[T]he [Supreme Court] also said the Second

13 Amendment protects the right to keep and bear arms for other 'lawful purposes,' such

14 as hunting."). So, contrary to the State's made-up premise that only possession for

15 self-defense controls, courts are to consider what the People choose to own for lawful

16 purposes, including *but not limited to* self-defense. And Plaintiffs' evidence shows

17 what many courts have already held: That millions of Americans typically choose to

18 own the Banned Rifles for self-defense—and a various other lawful purposes. Mot.

19 21-22 (collecting cases).

20      Even if the Court were confined to considering only "common use for self-

21 defense," the State's criticisms of Plaintiffs' survey evidence still miss the mark. For

22 example, the State argues that English's 2021 firearms survey "does not demonstrate

23 that AR-15-style rifles are commonly possessed for self-defense purposes," Opp'n

24 16, even though the State recognizes in the next breath that the study shows "that

25 61.9% of respondents claimed to own an AR-15-style rifle for home defense and

26 34.6% for defense outside the home," *id.* (citing Mot. 22; Brady Decl. Ex. 49 at 33).

27 According to the State, these numbers—showing that a solid majority of Americans

28 surveyed say they own the Banned Rifles for self-defense—are somehow invalid

because 66% also reporting using them for the lawful purpose of target shooting. *Id.*
Nowhere does *Heller* or *Bruen* suggest that an arm is protected only if self-defense is
the "top" or "primary" reason law-abiding citizens choose to own it. It is enough that
they are "typically possessed" or in "common use" for self-defense, a benchmark that
a 61.9% majority clearly meets.

In response to Plaintiffs' citation to *Why Do Americans Own AR-15s?*, a recent
Washington Post article reporting on a poll of owners of AR-15-style firearms, the
State pushes its borderline-frivolous argument out of bounds. Opp'n 18-19 (citing
Mot. 5; Brady Decl., Ex. 51). The State concedes that the survey found that "the top
response given for owning such a weapon," was "self-defense, home-defense, and
family-defense," *id.* at 19, and that 91% of respondents claimed they own AR-15-
style rifles to "[p]rotect self, family and property," *id.* But then the State suggests that
none of this matters because the poll "did not delineate actual use from self-reported
reasons for ownership, and thus do[es] not indicate that AR-15-style rifles are in
common use for self-defense." *Id.* Again, the State relies on a test it fabricated out of
whole cloth.

As the Northern District held in *Fyock v. Sunnyvale*, 25 F. Supp. 3d 1267
(N.D. Cal. 2013), "Second Amendment rights do not depend on how often the [arms
at issue] are used. Indeed, the standard is whether the prohibited [arms at issue] are
'typically *possessed* by law-abiding citizens for lawful purposes,' not whether [they]
are often *used* for self-defense." 25 F. Supp. 3d at 1276 (quoting *Heller*, 554 U.S. at
625) (emphasis added); *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dept.*,
2023 U.S. Dist. LEXIS 51322, at *17 ("I do not think it matters, for the purposes of
this analysis, that assault weapons are seldom fired in self-defense. What matters is
that they are commonly owned for the purpose of self-defense."). Plaintiffs need not
show that the number of defensive uses of the Banned Rifles meets some threshold
the State has not identified. It is enough that they are typically possessed for lawful
purposes. And naturally, evidence of "self-reported reasons for ownership," Opp'n

8

19, is the best evidence available for why individual gun owners choose to possess the arms they do.

Beyond the State's criticisms that Plaintiffs' evidence fails standards it invented without the support of Supreme Court precedent, the State also tries to cast doubt on the reliability or relevance of just three surveys Plaintiffs presented to establish "common use." The State spends most of this argument disputing a 2022 report by Professor William English reporting on the results of a 2021 survey of gun owners–a curious choice considering that Plaintiffs cite the 2022 report just twice[6] and only to show that his more recent work builds on and confirms what his earlier work found (that millions of Americans own millions of the Banned Rifles). Mot. 4 (discussing English's 2018 expert report (Brady Decl., Ex. 2), and the 2022 report (*id.*, Ex. 49)). The State did not here rebut the numbers English presented in his 2018 expert report. *See* Opp'n 13-16. Nor has it proffered its own evidence disputing that Americans own the Banned Rifles by the millions.

Even still, the State asks the Court to view the 2022 report with "skepticism" because, the State complains, the published report did not lay out the survey's full methodology. Opp'n 14. But the results reported largely reflect what English concluded in his 2018 expert report and what both the NSSF survey and the Washington Post survey proved—that tens of millions of Americans own the Banned Rifles. Brady Decl., Ex. 50, Ex. 51.

The State next tries to cast doubt on the 2022 report's estimate that up to 44 million AR-15-type rifles "*have been owned* by approximately 24.6 million people," Opp'n 14 (quoting Brady Decl., Ex. 49 at 2), a finding that Plaintiffs do not and need not rely on to prove that the Banned Rifles are in common use. But both the English

---

[6] And regrettably, the second cite to the 2022 report appears to have been an error. Plaintiffs' motion cites the 2022 report to show that the Banned Rifles make up 20% of all firearms sales in recent years. Mot. 4. But the report does not mention the percentage of sales. The correct citation is Nat'l Shooting Sports Found., Inc., *NSSF Report 2021 Edition, Firearms Retailer Survey Report*, at 9 (2021), https://bit.ly/3gWhI8E.

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

report and Plaintiffs' moving papers are clear about the limitations of this number. Contrary to the State's attempt to characterize English's report as muddling the fact that the survey does not ask about the number of AR-15-type rifles currently owned, English explains that respondents were asked if they had *ever* owned an AR-15 or similarly styled rifle. Brady Decl., Ex. 49 at 33. He also warns the reader that the 44 million estimate is an upper limit on current ownership, recognizing that many may have been resold. *Id.* The estimate thus in no way contradicts NSSF's calculations that there are about 24 million such firearms currently in circulation. Nor could it represent a "dramatic jump," Opp'n 14, from his 2018 expert report conclusion that Americans currently possess upwards of 15 million AR-15-style rifles, Brady Decl., Ex. 2 at 2-6–for it is not making a similar claim.

That said, because survey respondents were everyday gun owners, it does provide some probative evidence that many of the millions of ARs in circulation are owned by civilians and are not, as the State assumes, largely owned by police departments or security agencies, or held as unsold stock by firearm retailers. Opp'n 15, 16-17. All the State provides is speculation that the numbers include these arms and that they make up a substantial enough percentage of the millions of such arms in the United States to overcome Plaintiffs' evidence that law-abiding Americans typically possess them for lawful purposes. But even if English's survey results were reduced by two-thirds, they would still show that many millions of Americans own the Banned Rifles for lawful purposes. And recall, the Supreme Court said that stun guns were protected arms at a time when only about 200,000 existed. *Caetano*, 577 U.S. at 412.[7] The Banned Rifles clear that bar many times over.

The State also complains that the English survey is underinclusive because it does not account for non-AR-15 style rifles that are regulated by the AWCA. Opp'n

---

[7] Separately, the State complains that Plaintiffs rely on a concurrence for this claim. Opp'n 19-20. That is inaccurate. While the concurrence cited the 200,000-stun-guns-in circulation statistic that Massachusetts accepted as true, *Caetano*, 577 U.S. at 420 (Alito, J., concurring), the Supreme Court unanimously ruled that stun guns are protected arms, *id.* at 411 (majority op.).

10

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

15. On that count, Plaintiffs agree; the AWCA affects millions more firearms than just the AR-15 used as an example.

The State makes similar complaints about Plaintiffs' other cited surveys, including the NSSF survey, which it derides as "industry estimates." Opp'n 16. Yet the State's own expert relied on the NSSF survey and did not question its accuracy. *See* Busse Rebuttal Report at 12-15 (citing NSSF data and describing the "proliferation" of the Banned Rifles). As before, the State tries to slice and dice the data to make the number of rifles in circulation appear smaller than it is, arguing that, from 1990 to 2009, few AR-15s were produced. Opp'n 18. But what the State describes as insignificant were 288,000 rifles produced in 1993, 232,000 in 1999, and over 300,000 a year by 2003. Again, 200,000 *total* stun guns were enough to get Second Amendment protection in *Caetano*. 577 U.S. at 420. Certainly, that number produced *annually* is enough to bring the Banned Rifles under the protective umbrella of the Second Amendment.

In response, the State argues that 200,000 is not an appropriate benchmark because there are at least 176,000 legally owned machine guns in the United States. Opp'n 19. But machine guns are arms because they are "[w]eapons of offence" that "a man…takes into his hands." *Heller*, 554 U.S. at 581. And because they are bearable arms, restrictions on them, at minimum, implicate the plain text of the Second Amendment. *If* banning machine guns is constitutional, that is because restricting them meets the historical analysis, not because they are not common enough. *Id*. at 627. In any event, even if this Court holds that 200,000 is not "common" despite *Caetano*, Plaintiffs have shown that *many millions* of the Banned Rifles are commonly owned by Americans for lawful purposes, including self-defense. There is thus little room to argue that they are not protected.

Finally, the State says that "Plaintiffs claim that some but not all of the rifles regulated by the AWCA are in common use based on the number of weapons owned." Opp'n 12. That is not correct. Plaintiffs' position is that, with possibly some

exceptions, *all* semiautomatic, centerfire rifles with detachable magazines, are in common use, which includes *all* Banned Rifles but *especially* those targeted by the AWCA for their accuracy and control-enhancing features because they are the most popular. The figures Plaintiffs provided apply to rifles with the Banned Features, including, but not exclusively, AR and AK variants. Brady Decl., Ex. 2 at 2-6, SUF No. 29. *Heller* did not require proof that each specific handgun model(s) the plaintiffs sought were in common use. It was enough that handguns as a category are in common use. *Heller*, 554 U.S. at 629. Otherwise, the government could ban all firearms and force people to prove that their particular firearm is common enough. There is simply no binding precedent that suggests that is the proper approach. On the contrary, it would require judges to make decisions as to each firearm model. That is unreasonable and untenable.

In sum, the State's claim that the Banned Rifles are not commonly owned is simply not a serious one. The State itself estimated that there would be over one million new registrations of newly defined "assault weapon" rifles in California alone in 2016.[8] And that is despite more than two decades of its artificially restricting the market for such rifles with its previous iterations of "assault weapon" definitions, as the original AWCA was adopted in 1989.

### D. Plaintiffs Need Not Prove That the Banned Rifles Are *Actually Used* and *Suitable* for Self-Defense

Another ploy by the State to avoid historical review is its claim that "Plaintiffs must also demonstrate that [the Banned Rifles] are *actually used and suitable* for self-defense to show that they are in common *use* for that purpose." Opp'n 12. Tellingly, the State cites no authority to support that proposition, let alone binding authority. *See id.* at 18-19 (citing some pre-*Bruen* appellate opinions and district

---

[8] *See* Senate Budget Subcommittee #5 May 4th, 2017, Hearing @ 21:45, *available at* https://www.senate.ca.gov/media/senate-budget-subcommittee-2-20170504/video (where the California Department of Justice testified that it anticipated between 1-1.5 million "assault weapon" registrations after the enactment of Senate Bill No. 880).

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

court opinions referring to "use" of arms being relevant but none suggesting that actual use in self-defense situations must be proven). Neither *Heller* nor *Bruen* mentions such standards. Nor does *Alaniz*, which only mentions arms "in common use for self-defense." *United States v. Alaniz*, 2023 WL 3961124, at *3.

In any event, the State itself confirms that the Banned Rifles are both used in self-defense and thus, by definition, suitable for it: "the regulated weapons and accessories are *rarely* used in self-defense and are *most suitable* for combat (not self-defense)." *Id.* at 12. Rare use is still use, and the State fails to explain why an arm that is *most* suitable for combat cannot still be suitable for self-defense when it is used—even if only rarely—for that purpose. But the State layers on yet another artificial barrier to Plaintiffs' access to the Second Amendment. According to the State, actual use is still insufficient, it must be sufficiently frequent use. *Id*. It is true that "Plaintiffs offer no evidence on the frequency at which the weapons configurations regulated by the AWCA are actually used in self-defense." *Id*. But the State offers no authority for why Plaintiffs would need to. Indeed, the plaintiffs in *Heller* were not required to show frequency of handgun use in self-defense. It was enough that the American people chose them for that purpose, "whatever the reason." *Heller*, 554 U.S. at 629. What's more, the State tellingly once again offers no metric for what would be a sufficient frequency of use to satisfy its invented test. That alone should doom it.

As for the State's claim that Plaintiffs have not explained how the Banned Rifles or their Banned Features are suitable for self-defense, that is false. Opp'n 12. Although it is not their burden to do so, Plaintiffs have provided evidence from experts and accounts of self-defense use with Banned Rifles to show that they are indeed suitable for self-defense. Brady Decl., Ex. 3 at 4, 11, 12; Ex. 53 at 7-9; Ex. 61 at 8-9. The most prominent example is testimony from a former FBI instructor who has conducted studies comparing handguns and rifles that would be Banned Rifles, which the ATF relied on to conclude such a rifle can be the "weapon of choice" in

13

terms of avoiding over-penetration and thus harm to innocent bystanders. Brady Decl., Ex 61 at 8. The State, on the other hand, has offered no qualified expert to rebut that evidence. Nor does it even address it.

### E.   The State's comparison of Banned Rifles to M-16s is not only inconsistent with its claim that the AWCA does not restrict arms, but is also irrelevant

Apparently forgetting that it had just argued in a preceding section of its brief that the AWCA does not ban arms but merely accessories, Opp'n 7, the State urges this Court to accept that the Banned Rifles fall outside of the Second Amendment's protection because they are "like" the M-16, in part, based on those accessories. Opp'n 10. But the State revealed the incoherency in this argument when it implied that the Banned Rifles are lawfully available without those features. State's MSJ 10 (citing *Duncan v. Bonta*, 19 F.4th 1087, 1108 (9th Cir. 2021) *cert. granted and judgment vacated*, 142 S. Ct. 2895 (June 30, 2022), *vacated and remanded*, 49 F.4th 1228).

Aside from that incoherency, this argument is based on a flawed reading of *Heller*'s M-16 reference. The State entirely dodges Plaintiffs' detailed analysis in their motion of why that is. Mot. 13-16. For example, the State does not explain why Plaintiffs are wrong that the "section of *Heller* [referencing the M-16] was engaged not in identifying another limit on the word 'arms,' but in analyzing the historical limitations of the right." *Id.* at 13. Nor does it dispute that "in the paragraph immediately preceding its reference to 'M-16 rifles and the like,' the Court had identified the historical dividing line between protected and unprotected arms: arms 'in common use' are protected, while 'dangerous and unusual weapons' are not." *Id.* Nor does it dispute that "*Heller*'s mention of the M-16 was in the context of 'justify[ing] the fact that some dangerous and unusual weapons that are most useful in military service—such as the M-16—can be banned despite the prefatory clause's ostensible mandate that the right to bear arms be connected to a well-regulated militia...,'" as this Court found. *Id.* at 14 (quoting *Rupp v. Becerra*, 401 F. Supp. 3d

14

978, 986 (C.D. Cal. 2019)).

In sum, the State does not meaningfully address the context of *Heller*'s M-16 reference as explained by Plaintiffs. Instead, the State chooses to stay at a *superficial* level to avoid having to address the true nature of that passage. At bottom, as Plaintiffs explained, even if the M-16 was doomed by *Heller*, it was because it was an example of a *military* arm, not because it had any particular feature(s) such that other arms somehow "like" it could be banned. Mot. 13-16. Setting out a vague standard "and the like" that would control specific facts not at issue is simply not what the Supreme Court does. The State's only response is that this Court should just blindly rule how it previously did, despite now having Plaintiffs' more comprehensive briefing of the issue showing why that was an error. The Court should refuse that invitation.

Indeed, we know that *Heller*'s author does not agree with that reading of *his* opinion. Incredibly, the State poopoos Justice Scalia's express rejection of a law almost identical to the AWCA's rifle ban, reasoning that "statements of a single Supreme Court justice do not create binding precedent." Opp'n 11 n.5. But Plaintiffs do not cite Justice Scalia's dissent as binding precedent. Rather, they cite it to show that it conflicts with the State's interpretation of *his* opinion. How it can justify reading an opinion in a way that has been expressly rejected by its author, the State does not explain. That is because there is no explanation. These statements were not just from a single Justice, but two Justices (Thomas and Scalia). And between the two, they authored *Bruen*, *Heller*, and *Staples*. To disregard their official views on this subject is indefensible.

The State also asserts that "Plaintiffs elevate form over function" by "contend[ing] that semiautomatic weapons cannot be 'most useful in military service' unless the weapon is used by an actual military." Mot. 16. That is not so. What Plaintiffs contend is that the discussion about M-16s was in the context of military arms. That is an indisputable fact. *See Heller*, 554 U.S. at 627. Indeed, this Court

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

agreed with that reading. *Rupp*, 401 F. Supp. 3d at 986. Their point is that if an arm is not used in any military, it cannot be considered a military arm in this context. It is the State that puts form over function. Just because the Banned Rifles share *some* aspects with a military arm, the fact that *no* Banned Rifles are used by any military, despite having those features, proves Plaintiffs' point. Colonel Tucker's opinion that the Banned Rifles are "most useful" for military purposes because they have the Banned Features is irrelevant not only because that is not a standard to disqualify arms from Second Amendment protection, but also because he admits that he is not an expert in any other field other than military use to make a comparison for appropriate uses. Brady Decl., Ex. 52-2 at 192 (admitting he isn't a self-defense expert). It also is irrelevant as to the AWCA's ban on rifles that do not have the Banned Features. *See* Cal. Penal Code § 30510.

This Court should thus reject the State's superficial explanation of *Heller*'s M-16 reference.

## II.    The State Cannot Meet Its Burden Under Bruen's Historical Inquiry

As explained above, Plaintiffs dispute much of the State's purported analysis and application of *Bruen* and *Heller*. But the biggest folly of the State's argument that Plaintiffs must prove that the Banned Rifles are in "common use for self-defense" as part of the textual question under *Bruen* is that it necessarily means that the State can ban firearms even if they meet that standard. Indeed, the State expressly says as much. Opp'n 22-23. That is fatal. The State simply cannot show a historical tradition of completely banning the acquisition and possession of arms that are in "common use for self-defense." Indeed, *Heller* forbids it. *Heller*, 554 U.S. at 629.

Yet, the State hangs its historical hat on the premise that government can ban "particularly dangerous weapons." Opp'n 1. Tellingly, the State does not identify any parameter(s) on government in establishing what constitutes a sufficiently "dangerous" weapon such that it can be constitutionally banned. According to the State, apparently, if government declares an arm to be "dangerous" then that is the

end of the analysis. That makes no sense for a provision designed to protect a right *against* government infringement. If government could ban any arm merely by labeling it "dangerous" then the Second Amendment's protections would be meaningless. The State's argument is thus pure interest-balancing of the sort *Bruen* expressly rejected. *Bruen*, 142 S. Ct. at 2131.

Indeed, the *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute that. It just found it irrelevant to whether they are constitutionally protected, as that question does not turn on whether arms are misused by criminals. It turns on whether law-abiding citizens own and use them for lawful purposes. So it was enough that handguns—the overwhelming majority of which today are semiautomatic—are typically possessed for *lawful* purposes. *See id*. at 624-25 (majority op.). What was true in *Heller* is no less true here given the millions of Americans who own Banned Rifles.

For this reason, the State's appeal to this Court to adopt the more "nuanced approach" described in *Bruen* is pointless. There is no analogy that the State could offer to justify the AWCA's rifle ban.

### A. No Historical Firearms Regulation Justifies the AWCA's Rifle Ban

In any event, even if the Court agreed that a "more nuanced approach" is appropriate here, the supposed "hundreds of historical laws enacted throughout American history that reflect a national tradition of firearms regulation" that the State has offered as "analogies," Opp'n at 30, fall far short from proving a "well-established and representative" analogue that is "relevantly similar" to the AWCA's wholesale ban on rifles owned by millions of Americans for lawful purposes. *Bruen*, 142 S. Ct. at 2131-32. The State provides little analysis of those laws in its opposition brief. To the extent the State is incorporating its analysis of them from its motion, Plaintiffs direct the Court to their opposition addressing those laws.

The State does identify Bowie Knife regulations as an analogy. But the State neglects to point out that those regulations largely regulated only the manner of carrying such arms, taxed them, or restricted their sale to certain (mostly race-based) groups. *See*, e.g., Plaintiffs' Disagreement re Defendant's Survey, Dkt. No. 154-1, No. 54 (1847 North Carolina law prohibiting "any slave" from having bowie knives and other weapons). What's more, "[a]t the end of the 19th century, no state prohibited *possession* of Bowie knives." David Kopel, *Bowie Knife Statutes 1837-1899*, Volokh Conspiracy (Nov. 20, 2022), https://bit.ly/3yZYzZx, (emphasis added). What's more, historical restrictions on Bowie knives and similar blades were far fewer than the number of handgun-carry bans that the *Bruen* Court found insufficient to justify New York's modern carry ban. *Id.*

The State's comparison of the AWCA's rifle ban to "trap guns" is even less availing, if that is even possible. "Trap guns" are not a particular type of gun but rather a *manner* of setting any gun to fire indiscriminately should someone enter a particular location. Spitzer Suppl. Rpt. ¶¶ 63-66. They are thus the antithesis of the Banned Rifles, which California targets because they can be *intentionally* used effectively. Opp'n 28.

The State purports to identify a tradition of semiautomatic restrictions. State's Mot 27-29. But, setting aside that those restrictions are of dubious analytical value due to being from the twentieth century, *Bruen*, 142 S. Ct. at 2154 n. 28, they support no such tradition. The State quibbles with "Plaintiffs' claim that semiautomatic rifles 'were almost never targeted for regulation,'" by pointing to "at least 11 jurisdictions" that "regulated" (whatever that means) them. 27:18-19. But the State does not address, let alone, dispute Plaintiffs' observations that "[m]ost of those laws appear to have been targeting machine guns whose clumsy definitions unintentionally included some semiautomatics" and that "all but one were repealed within decades." Mot. 24. That is hardly a long-standing tradition of prohibitions on the type of popular rifles

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

1  that California bans; particularly when the AWCA was the first similar law adopted
2  several decades later.

3        The State's reliance on machine gun restrictions does not support the State's
4  case either. In fact, it does the opposite. The relative prevalence of machine gun
5  restrictions contrasted with the dearth of semiautomatic restrictions at that time, when
6  semiautomatics had been available for decades before, if anything, confirms the
7  tradition of treating the two differently, restricting machine guns but not
8  semiautomatics.

9        **B.      This is not a case where a "more nuanced approach" is appropriate.**
10        To be sure, Plaintiffs' explanation above for why the State cannot meet
11  *Bruen*'s "more nuanced approach" does not mean that approach is appropriate here. It
12  is not. The AWCA does not address any "dramatic technological change" nor any
13  "unprecedented societal concern." *Bruen*, 142 S. Ct. at 2132.

14        **i.      The Banned Rifles are not dramatic technological changes**
15        Of note, the State curiously all of a sudden changes the focus of its argument
16  that the AWCA only regulates certain *accessories*, to it regulating semiautomatic
17  *firearms*. Opp'n at 24. The inconsistency is just one more revelation that the State's
18  defense of the AWCA's rifle ban is a charade. In any event, the Banned Rifles do not
19  constitute some *dramatic* technological change that justifies a more nuanced
20  approach. The State essentially argues that because semiautomatic, centerfire rifles
21  with detachable magazines were not in existence at the Founding they must be
22  considered dramatically new technology. The inquiry is not that rigid. Otherwise, the
23  Supreme Court would not have reiterated that the Second Amendment extends prima
24  facie, even to *modern weapons*. *Caetano*, 577 U.S. at 411. Plaintiffs have provided
25  ample evidence showing that the precursor technology of rapid-fire, magazine fed
26  arms were known to the Founders and that modern rifles were thus not outside of
27  their comprehension. Mot. 26. In that context, the State cannot claim that the Banned
28

Rifles constitute a "*dramatic* technological change" from its well-known predecessors.

### ii.   Mass shootings are not unprecedented societal concerns

While horrific, mass shootings are unfortunately not *unprecedented*. Indeed, the State's own expert witness tells of an 1869 mass shooting in Florida. Vorenberg Supp. Rpt. ¶ 96. What's more, it is a societal concern that implicates handguns more so than Banned Rifles. The State does not dispute that handguns are often used in mass shootings. State's Mot 22. And, "according to a recent study, handguns were the most used type of firearm in mass shootings (32.99% of mass shootings); rifles were used in only 8.25% of mass shootings." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1048 (S.D. Cal. 2021). The State does not explain why the Supreme Court would hold that handguns cannot be banned, despite their prevalence in mass shootings, but that the Banned Rifles could be for that same reason.

The State must, therefore, satisfy *Bruen*'s historical standard. To meet its burden thereunder, the State must produce evidence of historical laws that are "distinctly similar" to the modern law being challenged. *Bruen*, 142 S. Ct. at at 2131. That it cannot do. Indeed, it does not even attempt to do so. The State laid all of its chips on the "more nuanced approach" and, as explained above, fell short.

### CONCLUSION

For the foregoing reasons and those in their motion and related documents, the Court should grant Plaintiffs' motion for summary judgment.

Dated: July 14, 2023                    **MICHEL & ASSOCIATES, P.C.**


                                        */s/ Sean A. Brady*
                                        Sean A. Brady
                                        Attorneys for Plaintiffs

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MSJ

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,997 words, which complies with the word limit set by the Court's Order Setting Hearing and Briefing Schedule on Motions for Summary Judgment and Continuing Pretrial Deadlines, dated May 16, 2023.

Dated: July 14, 2023                                    */s/ Sean A. Brady*
                                                                       Sean A. Brady

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

Case Name: *Rupp, et al. v. Bonta*
Case No.: 8:17-cv-00746-JLS-JDE

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Xavier Becerra
Attorney General of California
Anna Ferrari
Deputy Attorney General
Email: anna.ferrari@doj.ca.gov
Christina R.B. Lopez
Email: christina.lopez@doj.ca.gov
John D. Echeverria
Email: john.echeverria@doj.ca.gov
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 14, 2023.

*Laura Palmerin*
Laura Palmerin