Rob Bonta
Attorney General of California
R. Matthew Wise
Supervising Deputy Attorney General
Anna Ferrari
Christina R.B. López
Deputy Attorneys General
John D. Echeverria
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as Attorney General of the*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**<br><br>                                    Plaintiffs,<br><br>            **v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>                            Defendants. | Case No. 8:17-cv-00746-JLS-JDE<br><br>**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          July 28, 2023<br>Time:          10:30 a.m.<br>Courtroom:  8A<br>Judge:         Hon. Josephine L. Staton<br>Trial Date:   None set<br>Action Filed: April 24, 2017 |

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................ 1

Argument ............................................................................................................... 2

I. Plaintiffs Cannot Show that the AWCA Regulates "Arms" Protected by the Plain Text of the Second Amendment ...................... 3

    A. Section 30515(a) Regulates Firearm Accessories and Parts that Are Neither "Arms" Nor Necessary to Operate a Rifle for Lawful Self-Defense ................................................... 4

    B. Semiautomatic Rifles Regulated by the AWCA Do Not Qualify as Protected "Arms" Because They Are Not in Common Use for Self-Defense ................................................... 6

        1. The AWCA Regulates Semiautomatic Rifle Models and Configurations that Are Like the M16 and Are Most Useful in Military Service ...................................... 7

        2. Plaintiffs' Evidence Does Not Show that the Regulated Rifle Models and Configurations Are in Common Use for Lawful Self-Defense .......................... 11

II. The AWCA Is Consistent with the Nation's Tradition of Regulating Particularly Dangerous Weapons ..................................... 14

    A. A More Nuanced Analogical Approach Is Required .............. 14

    B. The AWCA Is Relevantly Similar to Historical Analogues Targeting Specific Weapons to Protect the Public .................. 16

Conclusion ......................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

CASES

*Bevis v. City of Naperville, Ill.*
    __ F. Supp. 3d __, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) .............. 1, 13, 18

*Clark v. Cmty. for Creative Non-Violence*
    468 U.S. 288 (1984) ................................................................................... 3

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
    __ F. Supp. 3d __, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ......... 1, 14, 17, 18

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ...........................................................................*passim*

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021) ........................................................ 8, 16, 20

*Friedman v. City of Highland Park, Ill.*
    784 F.3d 406 (7th Cir. 2015) ................................................................. 7

*Hanson v. District of Columbia*
    __ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023)..................*passim*

*Hartford v. Ferguson*
    __ F. Supp. 3d __, 2023 WL 3836230 (W.D. Wash. June 6, 2023) ............*passim*

*Herrera v. Raoul*
    2023 WL 3074799 (N.D. Ill. Apr. 25, 2023)....................................... 1, 14, 17, 19

*Kennedy v. Bremerton Sch. Dist.*
    142 S. Ct. 2407 (2021) ....................................................................... 3

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) ......................................................... 7, 20

*Luis v. United States*
    578 U.S. 5 (2016) ................................................................................. 5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    142 S. Ct. 2111 (2022) ......................................................................*passim*

ii

# TABLE OF AUTHORITIES
## (continued)

Page

*Ocean State Tactical, LLC v. Rhode Island*
        __ F. Supp. 3d __, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ........................... 1

*Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*)
        __ F. Supp. 3d __, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ................. 1, 14, 17

*United States v. Alaniz*
        69 F.4th 1124 (9th Cir. 2023) ........................................................................... 4, 7

**STATUTES**

Assault Weapons Control Act ...................................................................*passim*

California Penal Code
        § 30515 ................................................................................................ 2, 4, 5
        § 30515(a) ..............................................................................................*passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution
        First Amendment ........................................................................................... 3
        Second Amendment.................................................................................*passim*
        Fourteenth Amendment ................................................................................ 2

**OTHER AUTHORITIES**

1ShotTV, AR-15 vs. Meat & Bone, YouTube.com,
        https://tinyurl.com/ynwba5af.................................................................... 10

Fort Benning, Doctrine Supplement, ATP 3-21.8,
        https://tinyurl.com/2v6z2zwp .................................................................. 10

**INTRODUCTION**

This Court should grant Defendant's Motion for Summary Judgment because the Assault Weapons Control Act ("AWCA") is constitutional under the text-and-history standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).[1]  Plaintiffs' opposition to Defendant's motion ("Pls.' Opp'n") repeats their distorted interpretation of *Bruen* that this Court should reject. And Plaintiffs fail to engage meaningfully with the many district court decisions upholding assault weapon restrictions like the AWCA on a similar historical record.[2]  Consistent with the growing weight of authority, this Court should uphold the challenged AWCA provisions at both the textual and historical stages of the *Bruen* inquiry.

---

[1] Defendant incorporates by reference his Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Def.'s Mem.") (Dkt. 149-1) and his Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n") (Dkt. 153).

[2] *See Bevis v. City of Naperville, Ill.*, __ F. Supp. 3d __, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023); *Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), __ F. Supp. 3d __, 2023 WL 2655150 (D. Del. Mar. 27, 2023); *Hartford v. Ferguson*, __ F. Supp. 3d __, 2023 WL 3836230 (W.D. Wash. June 6, 2023); *see also Hanson v. District of Columbia*, __ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) (upholding large-capacity magazine restrictions); *Ocean State Tactical, LLC v. Rhode Island*, __ F. Supp. 3d __, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) (same); *Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*), __ F. Supp. 3d __, 2022 WL 17454829 (D. Or. Dec. 6, 2022) (same).

On July 14, 2023, the district court in *Oregon Firearms* issued detailed post-trial findings of fact and conclusions of law, upholding Oregon's restrictions on large-capacity magazines at both stages of the *Bruen* analysis.  That order is annexed as DX-100 to the accompanying Declaration of John D. Echeverria in Support of Defendant's Reply.  DX-101 through DX-105 are also annexed to that declaration as additional exhibits.

# ARGUMENT

The AWCA passes constitutional muster under *Bruen*.  At the textual stage, Plaintiffs have failed to show that the plain text of the Second Amendment covers the acquisition and possession of semiautomatic rifles with combat-oriented features.  The accessories and parts regulated under California Penal Code section 30515 ("Section 30515"), like flash suppressors and telescoping stocks, are not bearable "Arms" or necessary to use with any rifle for self-defense.  And if the Court considers the fully configured firearms that qualify as "assault weapons" under the AWCA, Plaintiffs have not shown that those rifles are "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134.  They are not.  Instead, those weapons are "like" military-grade M16 rifles that fall outside the protective scope of the Second Amendment's terms.  Dkt. 108 ("Order") at 10 (citing *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).

Even if the plain text of the Second Amendment covers Plaintiffs' proposed course of conduct, the AWCA's restrictions are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  Plaintiffs have failed to rebut the commonsense conclusion—reached by numerous other district courts considering challenges to assault weapon restrictions—that a "more nuanced approach" is needed because the AWCA addresses "unprecedented societal concerns" (mass shootings) and "dramatic technological changes" (semiautomatic, centerfire rifles). *Bruen*, 142 S. Ct. at 2132.  It is difficult to imagine a more appropriate case for relaxing *Bruen*'s historical standard.  Under a more nuanced approach, Defendant has amply shown that the AWCA's restrictions on certain semiautomatic firearms configured with tactical features are relevantly similar, in terms of burden and justification, to laws enacted throughout American history (including around the ratification of the Second and Fourteenth Amendments) restricting particular dangerous weapons.

Plaintiffs have failed to identify any triable issue of fact going to the constitutionality of the AWCA.  Accordingly, this Court should enter judgment for Defendant.

## I.    PLAINTIFFS CANNOT SHOW THAT THE AWCA REGULATES "ARMS" PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT

Plaintiffs have failed to meet their threshold burden of demonstrating that the plain text of the Second Amendment covers the acquisition and possession of rifles configured as "assault weapons" under the AWCA.  Plaintiffs continue to claim that they do not "shoulder [any] burden of establishing that the [Second] Amendment's text covers" the items regulated by the AWCA.  Pls.' Opp'n at 3.  But that is their burden, Def.'s Opp'n at 4–7, consistent "with how [the Supreme Court] protect[s] other constitutional rights," *Bruen*, 142 S. Ct. at 2130.  For example, in free speech cases under the First Amendment, the government bears the burden of justifying its actions only "[w]hen the Government restricts *speech*."  *Id.* at 2130 (emphasis added).  Plaintiffs asserting free speech claims are "oblig[ed]" to "demonstrate that the First Amendment even applies" to the "assertedly expressive conduct" in which they wish to engage.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  Similarly, when scrutinizing free exercise claims, courts first ask whether the plaintiff has shown that the government "has burdened [a] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2021).  "Should a plaintiff make a showing like that," the burden then shifts to the government to justify its action.  *Id.* at 2422.

At *Bruen*'s textual stage, Plaintiffs must show, among other elements, that the items regulated by the challenged AWCA provisions qualify as "Arms" under the Second Amendment.  Unpacking the term "Arms," as it was originally understood when ratified, Plaintiffs must establish:  (1) that each regulated instrument is "bearable" (not fixed or mounted, like a cannon), *Heller*, 554 U.S. at 582; (2) that

1    each instrument is a "weapon[]" (not an accessory or accoutrement), *id.*; and

2    (3) that "the weapon at issue is '"in common use" today for self-defense,'" *United*

3    *States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (citation omitted).[3]   Although

4    the items regulated by the challenged AWCA provisions are "bearable," they do not

5    qualify as "Arms" protected by the Second Amendment.

6
7
   **A.**    **Section 30515(a) Regulates Firearm Accessories and Parts that Are Neither "Arms" Nor Necessary to Operate a Rifle for Lawful Self-Defense**

8    Plaintiffs' challenge to the features-based definitions of an "assault weapon"

9    in Section 30515(a) fails because the particular items that qualify certain

10    semiautomatic rifles as "assault weapons," including pistol grips, flash suppressors,

11    and telescoping stocks, are not themselves weapons; they are, like silencers and

12    bump stocks, firearm accessories. *See* Def.'s Mem. at 10–12; Def.'s Opp'n at 7–9.

13    Plaintiffs do not try to argue that the regulated items are "Arms." *See* Pls.' Opp'n

14    at 6–8.  Much of Plaintiffs' own evidence confirms that they are not.  Def.'s Opp'n

15    at 8.  Instead, Plaintiffs argue that Section 30515 regulates "Arms" simply because

16    the overall statute is named the "Assault *Weapons* Control Act" and the features-

17    based definition was enacted to address a regulatory loophole in the original

18    AWCA, which defined "assault weapons" by make-and-model. *Id.* at 6–7.

19    Plaintiffs elevate form over function.  In practical operation, Section 30515 does

20    not trigger the AWCA's restrictions on any semiautomatic, centerfire rifle without a

21    fixed magazine, unless it is equipped with one or more of the enumerated

22    accessories or parts.  It is the presence of one or more of those items that makes the

23

24
25
26
27
   [3] Plaintiffs claim that even if they bear the burden at the textual stage of the *Bruen* analysis (which they do), "the Supreme Court has already established that [assault weapons] prima facie meet the definition of 'Arms.'" Pls.' Opp'n at 3. *Bruen* established no such thing.  *Bruen* did not decide "anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).

28

underlying weapon regulable as an "assault weapon."  Though the AWCA does not ban the accessories or parts themselves, and instead regulates only certain uses of them under Section 30515, Pls.' Opp'n at 6, that does not transform those items into "Arms" covered by the plain text of the Second Amendment.  And the AWCA's use of the defined term "assault weapon"[4] for regulatory convenience does not mean that all of the provisions of Section 30515 necessarily regulate weapons.

Plaintiffs have not even attempted to show that the regulated accessories and parts are necessary to operate a semiautomatic rifle for self-defense.[5]  They are not. Def.'s Statement of Undisputed Facts & Conclusions of Law ("Def.'s SUF") 38–60.  The listed parts and accessories were designed for military use in combat. Def.'s SUF 9.  Pistol grips and thumbhole stocks enhance the accuracy, control, and effective rate of fire of a rifle in the context of sustained, semiautomatic *rapid fire*—a combat tactic.  DX-51 at 1722, ¶ 18 (explaining "why AR-15 and AK-47 platform weapons remain the assault weapon of choice for military operations . . . where repeated, high volume and accurate offensive shooting is desired").  This is undisputed.  Pls.' Resp. to Def.'s SUF 39.  Plaintiffs have not shown that sustained

---

[4] Plaintiffs suggest that the term "assault weapon" is a "hyperbolic[] label[]." Pls.' Opp'n at 1.  This phrase originated in the industry's own marketing of semiautomatic rifles to civilians.  DX-51 at 1720–21, ¶ 17 ("The firearms industry openly referred to [the AR-15] and all similar weapons as 'assault weapons' and 'assault rifles' as late as 2008 . . . ."); DX-35 at 1457 (describing "[t]he New Breed of Assault Rifle").

[5] While Plaintiffs have acknowledged that "constitutional rights 'implicitly protect those closely related acts *necessary* to their exercise,'" Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. at 11–12 (quoting *Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring)) (emphasis added), they claim that "[t]here is simply no authority supporting" the proposition that an accessory must be necessary to a firearm's operation for lawful self-defense to be protected by the Second Amendment.  Pls.' Opp'n at 7.  Defendant cited such authority in support of his motion.  *See* Def.'s Mem. at 11.

1  rapid fire is typically needed for lawful self-defense.  If anything, the evidence

2  shows that relatively few shots are actually used in self-defense, and rifles of any

3  type—let alone semiautomatic rifles with the regulated features—are rarely used in

4  self-defense.  Def.'s SUF 69–71.  Moreover, folding or telescoping stocks and flash

5  suppressors enhance the concealability of the weapon or the shooter.  Def.'s SUF

6  50, 56, 59.[6]  Plaintiffs do not explain why such concealability is necessary for

7  lawful self-defense.  Californians are free to acquire and possess semiautomatic,

8  centerfire rifles, including AR-platform rifles, without any of the listed parts and

9  accessories, which can be used for self-defense.  Retailers of California-compliant

10 accessories and parts attest that they are "great functioning options."  DX-50 at

11 1697 (Busse Suppl. Rpt., Ex. A).

12      *Bruen* refocuses the threshold analysis on the "plain text" of the Second

13 Amendment's operative clause, as informed by the original public meaning of that

14 text at the time of ratification.  *Bruen*, 142 S. Ct. at 2126, 2129, 2134–35

15 (repeatedly emphasizing the "plain text").  Because the items regulated by the

16 "assault weapon" definitions in Section 30515(a) are not "Arms" covered by the

17 plain text, Plaintiffs' challenge to those provisions fails as a matter of law.

18      **B.   Semiautomatic Rifles Regulated by the AWCA Do Not Qualify
19            as Protected "Arms" Because They Are Not in Common Use for
             Self-Defense**

20      Plaintiffs' challenge to the AWCA's restrictions on certain semiautomatic

21 rifles also fails. Those rifles do not qualify as "Arms" under the Second

22 Amendment because they are not in common use today for self-defense.  *See* Def.'s

23 Mem. at 12–19; Def.'s Opp'n at 9–22.  The term "Arms" does not extend to "any

24 weapon whatsoever."  *Bruen*, 142, S. Ct. at 2128 (citation omitted).  It encompasses

25 

─────────────

26      [6] Even if flash suppressors do not "hide the flash from those in the direct line
of fire," Pls.' Resp. to Def.'s SUF 53, they can make the flash less visible to the
27 target and, critically, to individuals in the periphery, Def.'s Statement of Genuine
Disputes of Fact 55.
28

only weapons that are "'in common use' today for self-defense." *Id.* at 2134
(citation omitted).  Plaintiffs claim that this "qualifier" "is found nowhere . . . in any
authority."  Pls.' Opp'n at 3.  Yet it was recognized in *Heller*, *Bruen*, and numerous
cases since.  Def.'s Mem. at 12; *e.g.*, *Alaniz*, 69 F.4th at 1128.  Although the
weapons in common use for self-defense in the 18th century were the same
weapons typically brought to muster in the militia, "modern developments have
limited the degree of fit between the prefatory clause and the protected right."
*Heller*, 554 U.S. at 627.  "The term ['Arms'] was applied, then as now, to weapons
that were not specifically designed for military use and were not employed in a
military capacity." *Id.* at 581.  Thus, weapons "like" automatic M16 rifles that are
"most useful in military service" do not fall under the term "Arms" and "may be
banned." *Id.* at 627; *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 408
(7th Cir. 2015).

Plaintiffs have not shown that each of the rifle models and configurations
regulated under the AWCA is in common use for self-defense.  To the contrary, the
regulated weapons are like M16 rifles and are not commonly used or even suitable
for lawful self-defense.

### 1.   The AWCA Regulates Semiautomatic Rifle Models and Configurations that Are Like the M16 and Are Most Useful in Military Service

This Court previously held that the regulated rifles are sufficiently similar to
the M16 to fall outside the scope of the Second Amendment, Order at 10, and other
courts have adopted similar reasoning before and after *Bruen*, *see, e.g.*, *Kolbe v.
Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (en banc), *abrogated on other grounds
by Bruen*, 142 S. Ct at 2126; *Hanson*, 2023 WL 3019777, at *8 ("'Most' is a
superlative.  A weapon may have *some* useful purposes in both civilian and military
contexts, but if it is *most* useful in military service, it is not protected by the Second
Amendment.").  While Plaintiffs attempt to rewrite *Heller*, Pls.' Opp'n at 13, *Heller*
explained that weapons "like" the M16 may be banned.  *See* Def.'s Mem. at 12–13;

Def.'s Opp'n at 10–11.  An en banc panel of the Ninth Circuit previously viewed this type of analogy as having "significant merit," *Duncan v. Bonta*, 19 F.4th 1087, 1102 (9th Cir. 2021)—an observation that Plaintiffs disregard, even though that portion of the court's analysis was unaffected by *Bruen*.  The Court's prior analysis should be readopted.  The record developed since remand only further supports that holding.

Even though the M16 is a "*military* weapon," Pls.' Opp'n at 4, semiautomatic rifles regulated by the AWCA share material similarities with the M16.  Order at 12.  The latter are select-fire weapons, but automatic fire is rarely used by soldiers in combat because it makes the weapon less effective in hitting targets.  Def.'s Mem. at 17; DX-51 at 1722–23, ¶ 20.  Plaintiffs note that the AWCA does not regulate all aspects of semiautomatic rifles that are similar to M16s and M4s, such as the gas operating system and .223/5.56 caliber ammunition, but the law targets specific attributes that enhance the effectiveness of those weapons in combat, exacerbating the dangers posed by them.  Colonel (Ret.) Craig Tucker, former commander of the 7th Marine Regiment, explained that an M16 without the parts and accessories regulated by the AWCA would not be useful in combat.  PX-52.1 at 183.[7]

Plaintiffs also suggest that even if AR-platform rifles are like the M16, the AWCA regulates other rifles that do not share the same features.  Pls.' Opp'n at 5 ("Plaintiffs are not challenging the 'AR-15 Control Act'").  Plaintiffs hold out the SKS carbine as an example.  *Id.* at 6.  This does not help their case.  The vast majority of Plaintiffs' evidence concerns AR-platform rifles; there is little, if any,

---

[7] The absence of those features also makes AR-platform rifles less effective in active shootings, as demonstrated by the attempted gun massacre in Poway, California involving a California-compliant AR-platform rifle.  In that incident, the shooter was unable to reload after expending his first magazine.  *See* DX-101; DX-102 at 3456–58; DX-103.

evidence regarding other rifles regulated by the AWCA.  And although the SKS
does not have the accessories and parts listed in Section 30515(a), it also is
functionally similar to the M16.  The SKS is a Soviet-made semiautomatic rifle
chambered in 7.62, the same caliber commonly used with the AK-47, was a
forerunner to the select-fire AK-47, and was widely used during the Vietnam War.
DX-104 at 3467.  Like the other rifles regulated by the AWCA, the SKS is like the
M16 and is most suitable for military service, not self-defense.

Col. Tucker described the similarities of the AR-platform and M16/M4
weapons systems and their utility in combat.  Plaintiffs claim that Col. Tucker's
testimony is not credible because he is not a ballistics expert. Pls.' Opp'n at 5 n.2.
They also claim that Col. Tucker's views are "outlandish," based on opinions of
their ballistics expert, J. Buford Boone, a blog post by David Kopel (PX-66), and an
article posted on the Federalist describing the views of three soldiers disagreeing
with Col. Tucker's opinions (PX-65).  Hyperbole aside, none of these sources
undermines the reliability of Col. Tucker's account.  Boone's testimony largely
aligns with Col. Tucker's.  *See, e.g.*, DX-62 at 2408, ¶ 7.  Aside from Boone, none
of the other sources were designated as expert witnesses to rebut Col. Tucker's
opinions in accordance with the post-remand discovery schedule, Dkt. 131 at 2,
subject to examination by counsel and potential rebuttal by Col. Tucker.  And
unlike Col. Tucker's testimony, their statements are unsworn.

In any event, the Federalist article does not undermine the reliability of Col.
Tucker's opinions.[8]  The article includes multiple levels of hearsay, factual
inaccuracies, and inflammatory rhetoric revealing a transparent bias against firearm
restrictions (e.g., referring to "anti-gun activists").  PX-65 at 3.[9]  Moreover, the

---

[8] The Kopel blog post includes many of the same points as the Federalist
article.  PX-66.  Kopel's points are similarly unpersuasive, and his "'heavy lifting'
research" has been criticized.  *Hanson*, 2023 WL 3019777, at *13.

[9] The author also focuses on minor details in Col. Tucker's initial report.

1    selected comments of the author's "Marine Corps veteran friends," *id.* at 4, do not

2    discredit Col. Tucker's accounts of his combat experience or his opinions.  Col.

3    Tucker witnessed catastrophic injuries caused by 5.56 and 7.62 rounds fired from

4    rifles similar to the AR-15 and AK-47, consistent with field observations of .223

5    rounds fired from the AR-15 during the Vietnam War.  Def.'s Mem. at 14–15;

6    PX-52.1 (Tucker Dep. Tr.) at 47–48.[10]  Col. Tucker's testimony provides additional

7    support for this Court's prior holding that the regulated weapons are like the M16.

8       The firearms industry itself has embraced the similarities between AR-

9    platform rifles and their military counterparts.  Ryan Busse, a former firearms

10   industry executive, explained how competition in the industry has led to the

11   proliferation of accessories available for AR-platform rifles, allowing civilians "to

12   outfit rifles in a manner more lethal than rifles carried by the military—and in ways

13   unnecessary for self-defense."  DX-51 at 1728–29, ¶ 28.  Manufacturers of AR-

14   platform rifles marketed them to young men, "equating the necessity of owning

15   military weapons with proving masculinity" and encouraging customers to "buy

16   and deploy the same weaponry . . . as elite Special Forces units of the U.S.

---

According to the author, Col. Tucker claimed the M4 is designed to use .223 Remington, PX-65 at 4, but Col. Tucker explained that he used .223 and 5.56 interchangeably.  PX-52.1 at 72.  Plaintiffs' witnesses do the same.  PX-1 (Boone Rpt.) at 12; PX-2 (English Rpt.) at 3; PX-3 (Helsley Rpt.) at 11.  The author also claims that the military combat load is different from the one described by Col. Tucker, PX-65 at 4, but combat load varies depending on the commander's assessment of mission needs.  *See* Fort Benning, Doctrine Supplement, ATP 3-21.8, https://tinyurl.com/2v6z2zwp ("A combat load is determined by the mission leader and consists of only what is necessary to fight and survive immediate combat operations.").

[10] Some branches of the U.S. military are transitioning to a larger cartridge, *see* PX-65 at 9, but that does not undermine Col. Tucker's opinions about .223/5.56 cartridges.  Despite being intermediate-caliber rounds, their devastating effects have been widely documented.  *See* Def.'s Mem. at 15; *see also, e.g.*, 1ShotTV, AR-15 vs. Meat & Bone, YouTube.com, at 5:35–6:55, https://tinyurl.com/ynwba5af (demonstrating devastating exit damage of a single .223 hollow-point round).

military." *Id.* at 1730–31, ¶ 30.  For example, Daniel Defense advertised a semiautomatic AR-platform rifle with the slogan "Use What They Use" above the image of a rifleman.  *Id.* at 1731, ¶ 32.  A version of that rifle was later used in the Uvalde shooting.  *Id.* at 1732.  Although the industry has recently tried to re-brand AR-platform rifles as "modern sporting rifles" to make them more socially acceptable, *id.* at 1726-27, ¶ 25, the industry's own marketing further confirms the similarities between the rifles regulated by the AWCA and their military counterparts.

Because the regulated rifles are not in common use for self-defense to qualify as protected "Arms," but rather are combat weapons similar to the M16, Plaintiffs' challenge to the AWCA thus fails as a matter of law.

### 2.   Plaintiffs' Evidence Does Not Show that the Regulated Rifle Models and Configurations Are in Common Use for Lawful Self-Defense

Setting aside the similarities between the rifles regulated by the AWCA and rifles that fall outside the scope of the Second Amendment, Plaintiffs have not presented sufficient evidence to show that the regulated weapons are in common use today for self-defense.  Again, Plaintiffs try to foist the burden on Defendant to "prove that the [regulated instruments] are *not* 'in common use today.'"  Pls.' Opp'n at 9 (emphasis added).[11]  But it is Plaintiffs' affirmative burden to show that they are.  Def.'s Opp'n at 5; DX-100 at 3324 n.4.  Plaintiffs also try to reduce common use to a counting game untethered from any actual use in (or suitability for) self-defense.  A weapon must be in common use for self-defense to qualify as a protected "Arm."  Def.'s Opp'n at 9–10; DX-100 at 3378.  A sporting or hobby-

---

[11] Plaintiffs again argue that Defendant must show that the rifles regulated by the AWCA are both dangerous and unusual today, which they claim is a "*historical* question."  Pls.' Opp'n at 9.  It is not.  Plaintiffs cite no binding authority or historical tradition requiring a government to establish that a weapon is both "dangerous and unusual" prior to regulating its possession.  *See* Def.'s Opp'n at 29.

related exception to the common-use requirement would swallow the rule and render superfluous the Supreme Court's repeated references to self-defense.[12]

Plaintiffs again rely on a popularity test for "common use" that is illogical and should be rejected. Def.'s Opp'n at 12. They double down on their view that M16s might be protected by the Second Amendment if restrictions on them were lifted, contending that "*Bruen* tells us that it makes perfect sense." Pls.' Opp'n at 11. But that would make no sense; it would be circular, contradict *Heller*'s clear directive that the M16 and similar weapons may be banned, and potentially extend Second Amendment protection to uniquely dangerous weapons that have yet to be invented if the government does not immediately regulate them. *See* Def.'s Mem. at 19. That is not how governments have regulated firearms throughout American history. *See Hartford*, 2023 WL 3836230, at *5; DX-59 at 2108, ¶ 21. In support of their argument that M16s could someday be protected even if "dangerous and unusual" today, Plaintiffs include a block quote from *Bruen* observing that, "[w]hatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' today." Pls.' Opp'n at 11. The handgun became a weapon in common use today for self-defense due to improvements in reliability, the frequent use of handguns in self-defense, and the

_____

[12] The Supreme Court has not held that hunting is a lawful purpose for which a firearm may be in common use. Even so, many long guns that are suitable for hunting may also be suitable for self-defense, including hunting rifles and shotguns. In any event, Plaintiffs' own evidence undermines any claim that rifles regulated by the AWCA are well-suited to hunting. *See, e.g.*, PX-66 at 5 (discussing an "ongoing debate" about whether .223 ammunition is effective for hunting deer or larger game); PX-31 at 1 ("AR-15s have long been a symbol of the tactical world, but black rifles are *slowly* creeping their way past military and law enforcement applications and into the world of hunting." (emphasis added)). And even if AR- and AK-platform rifles were suitable for hunting, the accessories and parts regulated by Section 30515(a) that qualify them as "assault weapons" make them more effective in sustained rapid fire and more concealable, which would not enhance their suitability for hunting.

1    "reasons that a citizen may prefer a handgun for home defense." *Heller*, 554 U.S.

2    at 629.  Plaintiffs present no evidence that M16 or AR-platform rifles could

3    similarly become suitable or commonly used in self-defense in the future, and they

4    are certainly not today.

5         Defendant has already discussed at length the problems with Plaintiffs'

6    reliance on surveys and industry estimates.  *See* Def.'s Opp'n at 13–19.  At most,

7    Plaintiffs' evidence shows that some of the weapons regulated by the AWCA—in

8    particular, AR-platform rifles—comprise just 5% of all firearms in the United

9    States and are owned by just 2% of all Americans.  *Bevis*, 2023 WL 2077392, at

10   *16; Def.'s Opp'n at 17–18.  That evidence falls far short of showing that those

11   weapons are in common use for the purpose of self-defense—and says nothing

12   about the other rifles regulated under the AWCA.  *See id.* at 13–20.  Plaintiffs offer

13   a passing reference to the purported suitability of rifles regulated by the AWCA for

14   self-defense, claiming that testimony of their ballistics expert that the rifles are

15   "exceptionally useful for self-defense" is "unrebutted."  Pls.' Opp'n at 12 n.5

16   (citing PX-54 at 17).  That is incorrect.  The evidence shows that rifles of any type

17   are rarely used for self-defense, Def.'s Mem. at 17; if they were exceptionally

18   suitable for lawful self-defense, one would expect them to be used more frequently

19   in defensive gun uses.  The evidence also shows that relatively few shots are fired

20   when any gun is used in self-defense.  Def.'s SUF 69–70.  Col. Tucker specifically

21   rebutted Boone's testimony, explaining that the regulated parts and accessories

22   "enhance the lethality of both semiautomatic and automatic rifles" and that "they

23   are most appropriate for combat applications when used in conjunction with those

24   types of weapons systems."  DX-62 at 2407, ¶ 2.

25        Because the rifles regulated by the AWCA are not typically possessed by law-

26   abiding citizens and are not frequently used or well-suited to lawful self-defense,

27   Plaintiffs cannot satisfy their burden of showing that they are in common use for

28   self-defense.  Thus, they are not protected "Arms" under the Second Amendment.

## II.   THE AWCA IS CONSISTENT WITH THE NATION'S TRADITION OF REGULATING PARTICULARLY DANGEROUS WEAPONS

Even if the Court were to find (or assume) that the Second Amendment's text covers the acquisition and possession of the rifles regulated under the AWCA, the Court must proceed to the historical stage of the *Bruen* analysis to determine whether Defendant has rebutted any presumption of unconstitutionality.  Def.'s Opp'n at 22–23.  Defendant has satisfied that burden.  The AWCA is part of a long tradition of regulating uniquely dangerous weapons—a tradition reflected in the hundreds of state and local restrictions on weapons deemed by the government to pose unacceptable dangers to the public.  *See* Def.'s Mem. at 19–31; Def.'s Opp'n at 22–31; App. 1.  Contrary to Plaintiffs' claims, *Heller* and *Bruen* have not resolved the historical analysis here.  Unlike those cases, a "more nuanced" analysis of the history is required because the AWCA addresses "unprecedented societal concerns [and] dramatic technological changes."  *Bruen*, 142 S. Ct. at 2132.[13]

### A.   A More Nuanced Analogical Approach Is Required

Plaintiffs' argument that a more nuanced historical analysis is not warranted here strains credulity.  Plaintiffs ignore the reasoning of the numerous district court opinions holding that restrictions on semiautomatic firearms technologies address both unprecedented societal concerns and dramatic technological change.  Def.'s Mem. at 20–23; *see Hartford*, 2023 WL 3836230, at *5; *Herrera*, 2023 WL 3074799, at *7; *DSSA*, 2023 WL 2655150, at *10–11; *see also Oregon Firearms*, 2022 WL 1745829, at *12–14; *Hanson*, 2023 WL 3019777, at *12–14; DX-100 at 3390–96.  This Court should similarly hold that a more nuanced approach is called for in this case.

---

[13] Plaintiffs claim that if this case were "straightforward" (which it is not), Defendant's analogues would not suffice.  Pls.' Opp'n at 13.  Even in straightforward cases, however, courts still must necessarily engage in a nuanced—though *less* nuanced—analysis of the historical record.  *See Bruen*, 142 S. Ct. at 2132.

First, the AWCA addresses the unprecedented societal concern of mass shootings.  In disputing this point, Plaintiffs argue that any societal problem can seem unprecedented, Pls.' Opp'n at 13, but the converse is also true:  any societal problem can be reframed at a higher level of generality, like "gun violence," as Plaintiffs attempt to do here.[14]  If that were the case, it is difficult to imagine what societal concern could qualify as "unprecedented" under *Bruen*.  The record here shows that assault weapons, particularly AR-platform rifles, are used frequently in mass shootings and correlate with significantly more deaths and injuries in such incidents.  DX-47 at 1582-83, ¶¶ 35–37.  In response, Plaintiffs cherry-pick one "recent" study, now a decade old, finding that rifles were used in less than 10% of mass shootings.  Pls.' Opp'n at 14.  Those findings are belied by more recent evidence showing that mass shootings are a modern (and worsening) problem and that assault weapons, particularly AR-platform rifles capable of accepting detachable large-capacity magazines, are exacerbating that problem.[15]

Second, the AWCA regulates firearms technologies that did not circulate widely (or even exist) in 1791 or 1868, as Plaintiffs tacitly admit.  *See* Pls.' Opp'n at 15 (conceding that "[t]he AR-15 platform rifle . . . has been available to the American public for over 60 years").  Though Plaintiffs claim that semiautomatic rifles with tactical accessories are not sufficiently novel, *id.* at 14, Defendant has

---

[14] Plaintiffs claim that mass shootings are not unprecedented because Professor Vorenberg referenced a *single* shooting in 1868 that likely involved a Henry repeater.  Pls.' Opp'n at 13.  Professor Vorenberg did not identify how many were killed in that incident.  DX-63 at 2467, ¶ 96.  The cited source, however, reported that two people were killed by a single bullet, which would not qualify as a mass shooting under any definition.  DX-105 at 3486.

[15] The State's concern with this problem is not an effort to "smuggle back in forbidden interest-balancing."  Pls.' Opp'n at 14 n.7.  The Supreme Court requires a more nuanced approach when the challenged law addresses unprecedented societal concerns, requiring the State to explain what those concerns are and why they are unprecedented.

shown that the lethality of these weapons far exceeds the lethality of arms in common use—or even military use—in 1791 or 1868.  Def.'s Mem. at 22 n.15; Def.'s Opp'n at 25–26.  Plaintiffs do not dispute that repeaters were "extraordinarily rare" at the founding.  Pls.' Resp. to Def.'s SUF 89.  Though they claim that Winchester and Henry repeaters were common in the late 19th century, those lever-action rifles were slower to fire and reload than semiautomatics, and Plaintiffs do not rebut Professor Vorenberg's research showing that they were rarely possessed by civilians.  Def.'s Mem. at 26.  Instead, Plaintiffs repeat the trope that the Winchester "won the west," Pls.' Opp'n at 17 n.11, which was a marketing ploy popularized by Winchester in 1919.  DX-59 at 2117, ¶ 34.[16]  It cannot reasonably be disputed that semiautomatic rifles regulated by the AWCA are dramatically more advanced than the firearms technologies widely available in 1791 and 1868.  Under Plaintiffs' reasoning, it is unclear what advances in firearms technology could qualify as sufficiently "dramatic" to warrant a more nuanced approach under *Bruen*.

The Court should hold that a more nuanced approach is required.

### B.    The AWCA Is Relevantly Similar to Historical Analogues Targeting Specific Weapons to Protect the Public

Defendant has identified hundreds of relevantly similar laws regulating specific weapons throughout American history that demonstrate a robust tradition of restricting possession of particular dangerous weapons.  Although they attempt to minimize the import of these laws, Plaintiffs do not meaningfully dispute the historical record presented here.  *See* Pls.' Resp. to Def.'s SUF 98–108.  And they do not address the reasoning of the numerous district court decisions holding that assault weapon and large-capacity magazine restrictions are consistent with history

---

[16] Plaintiffs also cite the vacated panel opinion in *Duncan*, Pls.' Opp'n at 17 n.11, which did not consider the evidence presented in this case concerning the stringent regulation of repeater rifles during Reconstruction by the military.

and tradition on a similar record.  *See Hartford*, 2023 WL 3836230, at *3–6; *DSSA*,
2023 WL 2655150, at *11–13; *Herrera*, 2023 WL 3074799, at *6–7; *see also*
*Oregon Firearms*, 2023 WL 17454829, at *13–14; *Hanson*, 2023 WL 3019777, at
*15–17; DX-100 at 3396–411.  The analogues identified by Defendant are
"relevantly similar" in terms of "how and why the regulations burden a law-abiding
citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133.

   *Dangerous Weapons Laws.*  The dangerous weapons laws enacted before the
founding and through the 19th century enumerated specific weapons that could not
be possessed in public, or carried concealed, and some laws imposed taxes on their
sale to reduce their prevalence in society.  These analogues imposed a comparably
modest burden on the "right to armed self-defense" by leaving other weapons
available to exercise that right. *Bruen*, 142 S. Ct. at 2133.  For example, the 1686
New Jersey law [5][17] prohibited the "private[]" carrying of certain "unusual or
unlawful weapons," like skeins, stilettos, and dirks, while leaving available other
arms for self-defense. *Bruen*, 142 S. Ct. at 2143 (noting that the 1686 law "did not
apply to all pistols, let alone all firearms").  This law was similar to numerous
restrictions on the public carry of dirks, Bowie knives, and other specified weapons
that even Plaintiffs admit "proliferated in the 1800s." Pls.' Opp'n at 19; Def.'s
Mem. at 25–27.[18]  As with those laws, the AWCA minimally burdens the right to
armed self-defense.  Order at 15–16.  The burden is further reduced because the
AWCA does not "ban" all semiautomatic rifles. *E.g.*, Pls.' Opp'n at 12.  Rather,

_____

[17] Numbers in brackets refer to the numbers assigned to the laws and
authorities listed in Appendix 1, filed in support of Defendant's motion.
Dkt. 149-3.

[18] Also, notably, an 1837 Alabama law imposed a prohibitive tax of $100 on
any person selling, giving, or disposing of a Bowie knife or an Arkansas toothpick,
and a Tennessee law also enacted that year prohibited the sale of those weapons
outright [36, 41].

Section 30515(a) regulates the manner in which certain semiautomatic rifles may be configured, *see supra* Section I.A at pp. 4–6, which is relevant to assessing the law's burden at the historical stage of the *Bruen* analysis.[19]  The AWCA targets specific weapons configurations that are not suitable to self-defense and are used disproportionately in mass shootings.  These laws were also comparably justified by public-safety concerns regarding their use in certain forms of crime and violence.  Pls.' Resp. to Def.'s SUF 108.

States imposed restrictions on possessing particular weapons in public to address opportunistic crimes prevalent at the time, even though those weapons could have been useful in self-defense.  For example, in the 19th century, "many Southerners began carrying the [Bowie] knife in public because it offered a better chance to stop an assailant than the more cumbersome guns of the era, which were unreliable and inaccurate," and the Bowie knife grew "popular in fights and duels over the single-shot pistols."  *Bevis*, 2023 WL 2077392, at *10; *DSSA*, 2023 WL 2655150, at *12 (noting that the Bowie knife "proliferated in civil society").  But that did not stop government efforts to regulate them.  *Hartford*, 2023 WL 3836230, at *4.

Plaintiffs attempt to distinguish these dangerous weapons laws by arguing that they did not "ban[] possession" of the weapons, and instead banned the public carry or concealed carry of them.  Pls.' Opp'n at 17 (emphasis omitted).  According to Plaintiffs, historical analogues must "impose a similar *type* of restriction, not just a similarly *severe* one," to be comparable.  *Id.* at 16.  But that is not what *Bruen* says.  In assessing the "how" of a historical regulation, especially under a more nuanced approach, the laws need not regulate conduct in the same manner, provided the burden on the right to armed self-defense is comparable.  Def.'s Mem. at 30.  The

_____

[19] This is not impermissible "interest-balancing."  Pls.' Opp'n at 20.  *Bruen* expressly requires the Court to assess the burden of the AWCA on the right to armed self-defense.

Supreme Court has already settled this point in stating that historical prohibitions

on "the carrying" of certain weapons "fairly support[]" limitations "on the right to

*keep* and carry" those same weapons. *Heller*, 554 U.S. at 626–27 (emphasis

added).[20]  In the 18th and 19th centuries, bans on the possession of blunt objects

and edged weapons inside the home would have "made little sense for fledgling

state and municipal governments," "[g]iven the ease with which an individual could

fashion a blunt object" and the fact that "a knife is a very simple thing

technologically."  DX-100 at 3400, 3403 (finding Dr. Spitzer's testimony

"persuasive").  Such is not the case with modern assault weapon restrictions.[21]

Thus, historical restrictions on public carry can (and do) provide sufficient

analogues for modern restrictions on the possession of assault weapons.  *See*

*Herrera*, 2023 WL 3074799, at *7 (rejecting the argument that the historical

analogues "concern[ed] public carry" and not "defense of the home" because the

analogues need not be "identical"); *Hartford*, 2023 WL 3836230, at *6 ("*Bruen*

does not require that the historical regulation be the exact same; it is not a

'historical straight jacket.'" (citation omitted)).

  *Trap Gun Laws*.  Plaintiffs are wrong that governments never banned the

possession of dangerous weapons.  Governments prohibited the setting of trap guns,

such as New Jersey's 1771 law [10].  Def.'s Mem. at 24–25.[22]  Individuals were

---

  [20] The Supreme Court did not "preface[]" this remark by explaining that
weapons "in common use" were not subject to "the historical tradition of
prohibiting the carrying of 'dangerous and unusual weapons.'"  Pls.' Opp'n at 21.
The Court showed that traditions restricted to the manner of public carry can "fairly
support[]" limitations on the types of weapons that may be kept in the home.
*Heller*, 554 U.S. at 627.

  [21] In addition, 18th and 19th century restrictions on dirks and Bowie knives
addressed opportunistic crimes committed in public, while the AWCA addresses
premeditated mass shootings, requiring restrictions on sale and possession (not just
carry).  DX-58 at 2090 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 37 & n.44).

  [22] To the extent these laws regulated the "*manner* of using [trap guns]," Pls.

free to possess a firearm in the home, but they could not configure it with certain
features to fire remotely.  While trap gun laws generally sought to prevent
unintended injuries, DX-59 at 2136, ¶ 65, rifles regulated by the AWCA also
threaten the safety of innocent bystanders, even when used for self-defense.  *See
Kolbe*, 849 F.3d at 127 (assault weapons "pose a heightened risk to civilians in that
'rounds from assault weapons have the ability to easily penetrate most materials
used in standard home construction, car doors, and similar materials.'" (citation
omitted)).[23]

*Machine Gun Laws.*  Finally, the early 20th-century restrictions on machine
guns provide further evidence of the tradition relied upon here.  These laws are
relevant to the analysis because they are consistent with the historical tradition of
regulating particularly dangerous weapons once they circulate widely in society and
pose public-safety risks.  Plaintiffs wrongly argue, without any evidence, that the
laws "unintentionally included some semiautomatics" based on "clumsy
definitions."  Pls.' Opp'n at 23.[24]  According to their terms, however, many of the
laws did regulate semiautomatic firearms.  Unlike *Bruen*, in which the 20th-century
analogues contradicted earlier evidence, these 20th-century laws are helpful in
understanding how governments responded to the proliferation of automatic and
semiautomatic weapons—through possession restrictions—and thus have special
relevance here.  *See Hanson*, 2023 WL 3019777, at *15–17 (focusing exclusively

at 19, the AWCA similarly regulates the manner of using certain semiautomatic,
centerfire rifles, by prohibiting certain configurations that threaten public safety.

[23] Plaintiffs acknowledge that "just about any gun restriction can be described
as necessary to promote public safety or protect life."  Pls.' Opp'n at 19.  That is the
reason why many gun-safety laws are enacted, demonstrating that the focus of the
*Bruen* historical analysis is on "how" the laws being compared burden the right to
armed self-defense.

[24] Plaintiffs also dispute Defendant's contention that eleven states restricted
semiautomatic weapons because the vacated *Duncan* opinion counted only three,
Pls.' Opp'n at 24, but that case involved a different record.

on the 20th-century machine gun laws and noting that they "do not contradict any earlier evidence").  Plaintiffs note that these laws remained in place *for decades* without repeal (or invalidation by the courts), and that the District of Columbia's law remains in effect.  Pls.' Opp'n at 23 n.19.  Notably, that law was "passed by Congress (a nationwide body) and drew heavily from the Uniform Act (a model law)." *Hanson*, 2023 WL 3019777, at *17.

The AWCA's restrictions on semiautomatic rifles defined as "assault weapons" are consistent with the Nation's tradition of firearms regulation, including the "how" and "why" of relevantly similar analogues.  Thus, the AWCA does not violate the Second Amendment as a matter of law.

## CONCLUSION

The Court should grant Defendant's motion for summary judgment and enter summary judgment in favor of Defendant.

Dated:  July 14, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General


*/s/ John D. Echeverria*


JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as Attorney*
*General of the State of California*

1

## CERTIFICATE OF COMPLIANCE

2   The undersigned, counsel of record for Defendant Rob Bonta, in his official

3 capacity as Attorney General of California, certifies that this brief contains 6,998

4 words, which complies with the word limit set by court order dated May 16, 2023.

5 *See* Dkt. 148 at 2.

6 Dated:  July 14, 2023      Respectfully submitted,

7               ROB BONTA
               Attorney General of California

8               R. MATTHEW WISE
               Supervising Deputy Attorney General

9               ANNA FERRARI
               CHRISTINA R.B. LÓPEZ

10              Deputy Attorneys General

11

12              */s/ John D. Echeverria*

13              JOHN D. ECHEVERRIA
              Deputy Attorney General

14              *Attorneys for Defendant Rob Bonta,*

15              *in his official capacity as Attorney*
              *General of the State of California*

16

17

18

19

20

21

22

23

24

25

26

27

28