ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3479
Fax: (415) 703-1234
E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

**STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**

Plaintiffs,

**v.**

**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**

Defendants.

Case No. 8:17-cv-00746-JLS-JDE

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES**

Date: July 28, 2023
Time: 10:30 a.m.
Courtroom: 8A
Judge: Hon. Josephine L. Staton
Trial Date: None set
Action Filed: April 24, 2017

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES**

| Defendant's Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response to Cited Facts and Supporting Evidence[1] |
|---|---|
| 1. In 1957, the U.S. Army requested Armalite, a small arms manufacturer, to produce a lightweight, high-velocity rifle that could operate in both semi-automatic and full-automatic modes, with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards."<br><br>*Evidence*: DX-1 at 29 (Donohue Rpt. ¶ 68).[2] | 1. Undisputed. |
| 2. According to one of the designers of the AR-15, the rifle was engineered to generate "maximum wound effect."<br><br>*Evidence*: DX-1 at 30 (Donohue Rpt. ¶ 73). | 2. Undisputed that one of the designers said this, but Plaintiffs do not concede the statement's accuracy. |

[1] In addition to responding to Defendant's Statement of Undisputed Facts and Conclusions of Law, Plaintiffs repeated their statement of purportedly uncontroverted facts. *See* Dkt. 154-2 at 37–53. Defendant responded to those facts in his Statement of Genuine Disputes of Fact. *See* Dkt. 153-1.

[2] Citations to Defendant's exhibits are prefaced with "DX," so that DX-1 refers to Defendant's Exhibit 1. DX-1 through DX-45 were annexed to the Declaration of Peter H. Chang in Support of Defendant's Motion for Summary Judgment (Dkt. 76); DX-46 was annexed to the Supplemental Declaration of Peter H. Chang in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 90); DX-47 through DX-87 were annexed to the Declaration of John D. Echeverria in Support of Defendant's Motion for Summary Judgment (Dkt. 151), and DX-88 through DX-99 were annexed to the Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 153-2–153-14). Citations to Plaintiffs' exhibits in Defendant's responses are prefaced with "PX." PX-1 through PX-64 were annexed to the Declaration of Sean A. Brady in Support of Plaintiffs' Motion for Summary Judgment (Dkt. 150-12–150-28) and PX-65 through PX-73 were annexed to the Declaration of Sean A. Brady in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Dkt. 154-3–154-12).

| | |
|---|---|
| 3. After field testing in combat operations in Vietnam, the Advanced Research Projects Agency ("ARPA") noted that the "lethality of the AR-15 and its reliability record were particularly impressive."<br><br>*Evidence*: DX-1 at 29 (Donohue Rpt. ¶ 69); DX-65 at 2523 (ARPA Study at 8). | 3. Undisputed that ARPA noted this, but Plaintiffs do not concede the statement's accuracy. |
| 4. ARPA found that all casualties inflicted by the AR-15 in combat were fatal, including hits to only extremities.<br><br>*Evidence*: DX-1 at 29–30 (Donohue Rpt. ¶¶ 69–70); DX-65 at 2530 (ARPA Study, Annex A at 5). | 4. Undisputed that ARPA noted this, but Plaintiffs do not concede the statement's accuracy. |
| 5. ARPA found that the AR-15 was "superior in virtually all respects" to other military small arms, like the Thompson submachinegun and Browning Automatic Rifle.<br><br>*Evidence*: DX-65 at 2512 (ARPA Study, Cover Memo (Aug. 20, 1962)). | 5. Undisputed that ARPA noted this, but Plaintiffs do not concede the statement's accuracy. |
| 6. Armalite sold the patent and trademark rights to Colt in 1959. During the Vietnam War, the AR-15 was approved for use by U.S. armed forces, after which its name was changed to the M16. Thereafter, the AR-15 was the name used for the semiautomatic rifle sold to civilians. After Colt's patent expired in 1977, other manufacturers began to produce their own versions of the AR-15 under different names.<br><br>*Evidence*: DX-70 at 2839 (Alex Horton et al., *Decades of Marketing Reinvented the AR-15 into a Top-Selling Firearm*, Wash. Post., Mar. 27, 2023, at 2); DX-72 at 2878–79 (Todd Frankel et al., *How the AR-* | 6. Undisputed, except that the M16 is capable of more than just semiautomatic fire, which the AR-15 is limited to. |

| | |
|---|---|
| *15 Became a Powerful Political, Cultural Symbol in America*, Wash. Post, Mar. 27, 2023, at 4–5); DX-79 at 2938–39 (Chris Linville, *AR-15 vs M4: Exploring Key Differences & Similarities*, GunsAmericaDigest.com, May 18, 2023). | |
| 7. An automatic weapon is capable of firing repeatedly as long as the trigger is depressed, until ammunition is exhausted or the weapon malfunctions. Burst fire is automatic fire that fires a fixed number of shots (e.g., 3 shots) with each pull of the trigger. A semiautomatic weapon is capable of firing a single shot with each pull of the trigger. A select-fire weapon is capable of firing in automatic (or burst) mode or in semiautomatic mode.<br><br>*Evidence*: DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-50 at 1686–87 (Busse Suppl. Rpt. ¶ 11); DX-16 at 749 (Helsley Dep. Tr. at 44). | 7. Undisputed. |
| 8. The M4 is a shorter, carbine variant of the M16. It is a select-fire weapon.<br><br>*Evidence*: DX-61 at 2391 (Tucker Suppl. Rpt.) ¶ 4 n.2. | 8. Undisputed. |
| 9. In a 1989 report, the Bureau of Alcohol Tobacco & Firearms ("ATF") described features such as folding and telescoping stocks, pistol grips, and flash suppressors as "military features and characteristics . . . carried over to the semiautomatic versions of the original military rifle."<br><br>*Evidence*: DX-22 at 1048–49 (1989 ATF Rpt. at 6–7). | 9. Undisputed that the report said that, but Plaintiffs do not concede the statement's accuracy.<br><br>Such features increase the control and accuracy of the firearm, making it useful for self-defense.<br><br>*Evidence*: Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 8-12; Ex. 3 [Expert Report of S. Helsley] at 6-11, 12; Ex. 4 [Expert Report of M. Mersereau] at 8-11; |

| | |
|---|---|
| | Ex. 5 [Expert Report of B. Graham] at 19, 22, 26, 28; Ex. 6 [Depo. Tr. M. Mersereau] at 36:7-37:11; Ex. 7 [Depo. Tr. B. Graham] at 107:6-14, 108:2-16; [Depo. Tr. B. Graham] at 119-123; 124:1-6.<br><br>That's why they are widely chosen by Americans for self-defense use.<br><br>*Evidence*: Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5; Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Exs. 28-29; 35-37; Ex. 59 [Minter Book Excerpts] at 46-47; Ex. 53 [Expert Report M. Hanish] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. |
| 9. Defendant's Response:<br><br>The accessories and parts discussed in the 1989 ATF Report, DX-22 at 1048–49, enhance the effectiveness of sustained rapid semiautomatic and automatic fire, which is not consistent with lawful self-defense.<br><br>*Evidence*: DX-50 at 1687–90 (Busse Suppl. Rpt. ¶¶ 13–18); DX-61 at 2394–95 (Tucker Suppl. Rpt. ¶¶ 16–18); DX-62 at 2410, 2412—13 (Tucker Suppl. Sur-Rebuttal Rpt. ¶¶ 12, 24–25, 28). | |
| 10. According to the 1989 ATF Report, large-capacity magazines "are indicative of military firearms," and the fact "[t]hat a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle." | 10. Objection to inclusion: Magazine capacity is not at issue in this case. |

| | |
|---|---|
| *Evidence*: DX-22 at 1048 (1989 ATF Rpt. at 6). | |
| 10. Defendant's Response:<br><br>Rifles regulated under the challenged AWCA provisions are capable of accepting detachable large-capacity magazines, enhancing their lethality and dangers to the public.<br><br>*Evidence*: DX-54 at 1914–15 (Klarevas Suppl. Rpt., Ex. F at 1754–55); DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15); Cal. Penal Code § 30515(a)(1). | |
| 11. In a 1998 study, ATF examined semiautomatic assault rifles with a "military configuration," which incorporated physical features such as the ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, and flash suppressors. The 1998 study referred to rifles capable of accepting detachable ammunition magazines as "large capacity military magazine rifles."<br><br>*Evidence*: DX-21 at 992–93 (1998 ATF Rpt. at 1). | 11. Objection to inclusion: Magazine capacity is not at issue in this case. |
| 11. Defendant's Response:<br><br>Rifles regulated under the challenged AWCA provisions are capable of accepting detachable large-capacity magazines, enhancing their lethality and dangers to the public.<br><br>*Evidence*: DX-54 at 1914–15 (Klarevas Suppl. Rpt., Ex. F at 1754–55); Cal. Penal Code § 30515(a)(1). | |
| 12. The AR-15 is the civilian version of the military's M16.<br><br>*Evidence*: DX-2 at 121–22 (Graham Rpt. ¶ 15); DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). | 12. Undisputed. |
| 13. The difference between the M16 and the AR-15 is that the M16 is a select-fire | 13. Undisputed. |

| | |
|---|---|
| rifle that allows the shooter to fire in either automatic or semiautomatic mode, while the AR-15 fires only in semiautomatic mode (unless modified).<br><br>*Evidence*: DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13). | |
| 14. AR-platform rifles are generally chambered in similar caliber rounds as the M16 and M4 (generally, .223 for AR-platform rifles and 5.56 NATO for M16 rifles).<br><br>*Evidence*: DX-62 at 2408 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 7); DX-2 at 128 (Graham Rpt. ¶ 34); DX-10 at 320 (Graham Dep. Tr. at 130); DX-42 at 1533 (2013 NSSF Rpt. at 7). | 14. Undisputed, except that while this is generally true, AR-platform rifles come in a great variety of calibers, ranging from handgun calibers all the way to hunting rounds much larger than just .223 or 5.56. |
| 15. AK-platform rifles are generally chambered in 7.62 rounds, which is almost twice as large as a .223 round.<br><br>*Evidence*: DX-87 at 3023 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, June 21, 2017, at 3). | 15. Undisputed. |
| 16. Rounds used with AR-platform rifles and the M16 and M4 contain projectiles fired at high velocity and, when the projectiles penetrate the human body, they tumble through flesh, tissue, and bone, causing significant injury.<br><br>*Evidence*: DX-72 at 2878 (Todd C. Frankel et al., *How the AR-15 Became a Powerful Political, Culture Symbol in America*, Wash. Post, Mar. 27, 2023, at 4); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-4 at 146–47 (Colwell Rpt. at 3–4); DX-38 at | 16. Disputed. The correct term is “yaw”, and it is common for projectiles of various calibers to experience that. But “tumble” is misleading because it is rare for a projectile to “actually make a complete revolution of point forward - base forward – point forward in tissue simulant or animal tissue.” Further, “civilian AR users can and often do choose AR ammunition that is specifically designed *not* to tumble.” |

| | |
|---|---|
| 1505 (Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. of Acute Disease 178, 180 (2014)); DX-68 at 2823 (Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage*, Wash. Post, Mar. 27, 2023). | *Evidence*: Brady Decl., Ex. 54 [Expert Report of J. B. Boone] at 10; Brady Decl., Ex. 66 [Kopel article on power of AR rifles]. |
| 16. Defendant's Response:<br><br>"Tumble" and "yaw" refer to different types of rotational forces on a traveling projectile. "Yaw" refers to when the nose of the projectile moves, variously, above or below the line of flight. "Tumble" refers to motion around the projectile's center of mass. Upon impact, a tumbling round does not take a linear path, and it is possible for such a round to complete a rotation. Plaintiffs cite no evidence that "civilian AR users can and often do choose AR ammunition that is specifically designed *not* to tumble." If Plaintiffs are referring to hollow-point rounds, the fragmentation of the projectile upon impact can exacerbate damage.<br><br>*Evidence*: DX-68 at 2823–25 (Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage*, Wash. Post, Mar. 27, 2023); DX-87 at 3022, 3025 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, Jun 21, 2017); DX-62 at 2408 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 7); PX-52.1 (Tucker Dep. Tr. at 89:13–93:6); *see also, e.g.*, 1ShotTV, AR-15 vs. Meat & Bone, YouTube.com, at 5:35–6:55, https://tinyurl.com/ynwba5af (demonstrating devastating exit damage of a single .223 hollow-point round). | |
| 17. When a bullet enters a victim's body, it results in permanent and temporary cavitation. A permanent cavity "is the tissue that is actually crushed or destroyed by the projectile's interaction with it." A temporary cavity is caused by tissue being stretched away from the permanent cavity.<br><br>*Evidence*: DX-14 at 504–05 (Boone Dep. Tr. at 57–58); DX-38 at 1505 (Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. of Acute Disease 178, 180 | 17. Undisputed. |

| | |
|---|---|
| (2014)); DX-44 at 1541 (2014 FBI Training Mem. at 4). | |
| 18. The temporary cavity, if one is created, by a handgun wound is typically not as injurious to the tissue as the temporary cavity typically caused from a rifle wound, and can be more easily treated by a physician.<br><br>*Evidence*: DX-44 at 1541 (2014 FBI Training Mem. at 4); DX-4 at 146–47 (Colwell Rpt. at 3–4). | 18. Undisputed, except that it should be noted this applies to all rifle rounds, including those commonly used in hunting, which are much more powerful than the relatively weak .223 and 5.56 rounds often used by AR platform rifles, which are "on the lower end of terminal performance potential of the vast calibers available in centerfire rifles."<br><br>*Evidence*: Brady Decl., Ex. 54 [Expert Report of J. B. Boone] at 10. |
| 18. Defendant's Response:<br><br>Plaintiffs do not cite evidence demonstrating a dispute as to whether a rifle round creates a more injurious temporary cavity than a handgun round. The amount of energy transferred from a bullet to a target depends on muzzle velocity as well as mass, and the rounds used by semiautomatic rifles are capable of reaching higher velocities than similarly-sized rounds in hunting rifles.<br><br>*Evidence*: DX-68 at 2825–26 (Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage*, Wash. Post, Mar. 27, 2023); DX-69 at 3022 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, Jun 21, 2017). | |
| 19. Rifle rounds, such as .223 or 5.56 NATO, will penetrate soft body armor designed to stop common handgun rounds.<br><br>*Evidence*: DX-14 at 551–52 (Boone Dep. Tr. at 123–24); DX-11 at 370 (Mersereau Dep. Tr. at 94). | 19. Undisputed. |
| 20. AR-platform rifles have a similar muzzle velocity as the M16 and M4—more than 3,000 feet per second. | 20. This depends entirely on the caliber the rifle is chambered for- again, such rifles are often chambered for handgun rounds, |

| | |
|---|---|
| *Evidence*: DX-57 at 2031 (Roth Suppl. Rpt. ¶ 49); DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). | and the State's law does not restrict rifles based on what rounds they shoot but rather what features they have. But to the extent the State is referring to .223 and 5.56, with the exception of certain types of slower moving rounds, undisputed. |
| 21. The muzzle velocity of an AR-platform rifle and an M16 or M4 is three times the velocity of a typical handgun.<br><br>*Evidence*: DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11); DX-85 at 2987 (Mem. from Rep. Carolyn B. Maloney to Members of the H.R. Comm. on Oversight & Reform, July 27, 2022, at 3). | 21. This depends entirely on the caliber the rifle is chambered for-again, such rifles are often chambered for handgun rounds, and the State's law does not restrict rifles based on what rounds they shoot but rather what features they have. But to the extent the State is referring to .223 and 5.56, with the exception of certain types of slower moving rounds, undisputed. |
| 22. A projectile fired by firearm imparts kinetic energy on a target equal to one half the projectile's mass multiplied by the square of its velocity.<br><br>*Evidence*: DX-87 at 3022 (Alex Yablon, *The Simple Physics that Makes Some Bullets Deadlier than Others*, The Trace, June 21, 2017, at 2). | 22. Undisputed. |
| 23. A semiautomatic weapon can be converted to automatic fire by installing certain parts, such as bump stocks or multiburst trigger activators.<br><br>*Evidence*: DX-27 at 1095 (P.L. 103-489 at 18); DX-57 at 2033 (Roth Suppl. Rpt. ¶ 52); DX-51 at 1728 (Busse Suppl. Sur-Rebuttal Rpt. ¶ 28). | 23. These parts do not "convert" a rifle to automatic fire, instead, they simulate automatic fire. The trigger is still being pulled each time.<br><br>*Evidence*: Brady Decl., Ex. 67 [New York Times article on Bump Stocks]. |
| 23. Defendant's Response:<br><br>Plaintiffs' evidence addresses only bump stocks. Bump stocks activate the trigger while "the shooter holds his or her trigger finger in place." | |

| | |
|---|---|
| *Evidence*: PX-67 (*What Is a Bump Stock and How Does It Work?*, N.Y. Times, Mar. 28, 2019). | |
| 24. According to a Congressional report, semiautomatic firearms can be "virtually indistinguishable in practical effect from machineguns."<br><br>*Evidence*: DX-27 at 1095 (P.L. 103-489 at 18). | 24. Undisputed that a Congressional report may have stated this, but Plaintiffs do dispute the accuracy of that report. |
| 24. Defendant's Response:<br><br>Plaintiffs cite no evidence to dispute this fact. | |
| 25. U.S. soldiers are instructed to fire M16s and M4s in semiautomatic mode to improve accuracy and lethality in rapid fire and conserve ammunition.<br><br>*Evidence*: DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13); DX-57 at 2032 (Roth Suppl. Rpt. ¶ 49); DX-19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8). | 25. Undisputed. |
| 26. When fired semiautomatically, AR-platform rifles and M16s have an effective maximum rate of fire of 45 rounds per minute, which is referred to as "rapid semiautomatic fire." Rapid semiautomatic fire is a combat tactic.<br><br>*Evidence*: DX-62 at 2411 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 22); DX-19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC-3-22 (May 2016) at 8–6). | 26. Undisputed. |
| 27. Automatic or burst fire is inherently less accurate than semiautomatic fire. | 27. Undisputed. |

| | |
|---|---|
| *Evidence*: DX-19 at 911 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-12); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC-3-22 (May 2016) at 8–6); DX-61 at 2393 (Tucker Suppl. Rpt. ¶ 13). | |
| 28. In 1989, a semiautomatic AK-47 rifle was used to kill 5 schoolchildren and injure 32 others at an elementary school in Stockton, California.<br><br>*Evidence*: DX-2 at 129 (Graham Rpt. at ¶ 40(a)). | 28. Undisputed. |
| 29. In 1989, California enacted the Assault Weapons Control Act ("AWCA"), finding that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state" and that the restricted assault weapons have "a high rate of fire and capacity for firepower."<br><br>*Evidence*: Cal. Penal Code § 30505(a). | 29. Undisputed that this was a finding, but Plaintiffs do not concede the accuracy of the finding. |
| 29. Defendant's Response:<br><br>Plaintiffs cite no evidence to dispute this fact. | |
| 30. The AWCA defines a rifle as an "assault weapon" if it is listed in California Penal Code section 30510(a) or if it is a semiautomatic centerfire rifle that lacks a fixed ammunition magazine and has one of certain accessories, parts, or configurations enumerated in California Penal Code section 30515(a). The definitions in Section 30515(a) do not apply to rifles that are not semiautomatic, that are rimfire, or that have a fixed ammunition magazine.<br><br>*Evidence*: Cal. Penal Code §§ 30510(a), | 30. Undisputed. |

| | |
|---|---|
| 30515(a). | |
| 31. Rifles restricted by the AWCA possess many of the same features, like pistol grips and adjustable stocks, as the M16 and M4.<br><br>*Evidence*: DX-61 at 2393–94 (Tucker Suppl. Rpt. ¶ 14). | 31. Undisputed. |
| 32. Generally, rifles listed in California Penal Code section 30510(a) have one or more of the accessories or parts enumerated in California Penal Code section 30515(a)(1).<br><br>*Evidence*: DX-2 at 122 (Graham Rpt. ¶ 15); DX-11 at 348 (Mersereau Dep. Tr. at 31). | 32. Undisputed. |
| 33. AR-platform rifles capable of accepting detachable magazines take 3 to 5 seconds less to reload than the same rifle with a fixed magazine.<br><br>*Evidence*: DX-10 at 331–33 (Graham Dep. Tr. at 188–90). | 33. Undisputed that fixed magazine generally take longer to reload, but the exact time varies based on the type of fixed magazine. |
| 34. Centerfire cartridges have the primer located in the center of the base of the case, in contrast with rimfire cartridges that contain the primer on the rim of the cartridge.<br><br>*Evidence*: DX-50 at 1686 (Busse Suppl. Rpt. ¶ 11). | 34. Undisputed. |
| 35. Centerfire ammunition is more powerful than rimfire ammunition.<br><br>*Evidence*: DX-50 at 1686–87 (Busse Suppl. Rpt. ¶ 11); DX-16 at 753–54 (Helsley Dep. Tr. at 48–49); DX-2 at 123 (Graham Rpt. ¶ 18). | 35. This is generally true, but some rimfire ammunition is more powerful than some centerfire ammunition. |

| | |
|---|---|
| 35. Defendant's Response:<br><br>Plaintiffs cite no evidence to dispute this fact. | |
| 36. A rifle's capability of accepting detachable magazines allows a shooter to rapidly change magazines and continue firing.<br><br>*Evidence*: DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15). | 36. Undisputed. |
| 37. During combat, detachable magazines provide a rifleman with the capability to fire 120 rounds semiautomatically in three minutes at a sustained rate of 45 rounds per minute.<br><br>*Evidence*: DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15). | 37. Undisputed. |
| 38. A pistol grip that protrudes conspicuously beneath the action of the rifle allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.<br><br>*Evidence*: Cal. Code Regs. tit. 11, § 5471(z); DX-2 at 123 (Graham Rpt. ¶ 19); DX-50 at 1687–88 (Busse Suppl. Rpt. ¶ 13). | 38. Undisputed. |
| 39. A protruding pistol grip helps to stabilize a semiautomatic or automatic rifle and enhance lethality during rapid fire.<br><br>*Evidence*: DX-50 at 1687–90 (Busse Suppl. Rpt. ¶¶ 13, 18); DX-2 at 126 (Graham Rpt. ¶ 26); DX-61 at 2394–95 (Tucker Suppl. Rpt. ¶ 16); DX-22 at 1048 (1989 ATF Rpt. at 6); DX-3 at 137–38 (Mersereau Rpt. ¶ 9). | 39. Undisputed, except that it allows for the same benefit in a self-defense situation, which is part of the reason why so many Americans choose these rifles for self-defense in addition to other lawful purposes. |

| | |
|---|---|
| 39. Defendant's Response:<br><br>Plaintiffs cite no evidence to dispute this fact. A high rate of semiautomatic fire is a combat tactic and is unnecessary in lawful self-defense. In one analysis of 736 instances of defensive gun use, the defender fired 2.2 shots on average.<br><br>*Evidence*: DX-47 at 1566 (Allen Suppl. Rpt. ¶ 12); DX-62 at 2411 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 22); DX-19 at 907 (U.S. Army, Rifle Marksmanship M16-/M4-Series Weapons Manual, FM 3-22.9 (Aug. 2008) at 7-8); DX-66 at 2708 (U.S. Army, Rifle & Carbine Manual, TC-3-22 (May 2016) at 8–6). | |
| 40. An assault rifle with a pistol grip would allow a shooter to shoot more accurately and reload faster.<br><br>*Evidence*: DX-3 at 137–38 (Mersereau Rpt. ¶ 9). | 40. *Evidence*: Brady Decl., Ex. 1 [Expert Report of J. B. Boone] at 5; Ex. 2 [Expert Report of W. English] at 4; Ex. 3 [Expert Report of S. Helsley] at 11-12; Exs. 28-29; 35-37; Ex. 59 [Minter Book Excerpts] at 46-47; Ex. 53 [Expert Report M. Hanish] at 8; Ex. 49 [English 2021 Report] at 2, 33-34; Ex. 50 [NSSF Report on Rifles in Circulation]; Ex. 51 [Washington Post Survey on AR-15 ownership]. |
| 40. Defendant's Response:<br><br>Plaintiffs do not respond to this fact. Nearly all of the evidence in Plaintiffs' string cite does not concern the function and purpose of a pistol grip, and the evidence that does affirms the fact.<br><br>*Evidence*: PX-53 (Hanish Suppl. Rebuttal Rpt.) at 8, ¶ 12. | |
| 41. According to a 1989 ATF Report, a pistol grip beneath the action of the rifle can also "be an aid in one-handed firing of the weapon in a combat situation."<br><br>*Evidence*: DX-22 at 1048 (1989 ATF Report at 6). | 41. Undisputed, but this is also why it is an aid to disabled shooters.<br><br>*Evidence*: Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 9. |
| 42. A pistol grip is not necessary to operate a rifle, including for self-defense.<br><br>*Evidence*: DX-50 at 1688 (Busse Suppl. | 42. Undisputed, but many popular rifles are designed for pistol grips, and *Bruen* doesn't test for what is "necessary". |

| | |
|---|---|
| Rpt. ¶ 13). | |
| 42. Defendant's Response:<br><br>Plaintiffs cite no evidence of a factual dispute. | |
| 43. A thumbhole stock enables the shooter to place the thumb of the trigger hand through the stock while firing, mimicking the ergonomics of a pistol grip.<br><br>*Evidence*: Cal. Code Regs. tit. 11, § 5471(qq); DX-2 at 123 (Graham Rpt. ¶ 20); DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). | 43. Undisputed. |
| 44. A thumbhole stock allows a shooter to insert a thumb through the stock, mimicking the effects of a pistol grip and assisting a shooter in rifle control during periods of rapid fire.<br><br>*Evidence*: DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). | 44. Undisputed. |
| 45. A thumbhole stock is not necessary to operate a rifle, including for self-defense.<br><br>*Evidence*: DX-50 at 1688 (Busse Suppl. Rpt. ¶ 14). | 45. Undisputed, but *Bruen* doesn't test for what is "necessary". |
| 45. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. | |
| 46. A forward pistol grip "allows for a pistol style grasp forward of the trigger."<br><br>*Evidence*: Cal. Code Regs. tit. 11, § 5471(t); DX-2 at 125 (Graham Rpt. ¶ 23); DX-50 at 1689–90 (Busse Suppl. Rpt. ¶ 18). | 46. Undisputed. |
| 47. A forward pistol grip on a rifle was a feature of early machineguns; it can help insulate the non-trigger hand from heat during rapid fire and stabilize a rifle during | 47. Undisputed. |

| | |
|---|---|
| rapid fire.<br><br>*Evidence*: DX-16 at 774 (Helsley Dep. Tr. at 79); DX-50 at 1689–90 (Busse Suppl. Rpt. ¶ 18); DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 17). | |
| 48. A folding or telescoping stock is attached to the receiver, which can change the overall length of the rifle.<br><br>*Evidence*: Cal. Code Regs. tit. 11, §§ 5471(*ll*), (*oo*), (nn); DX-2 at 124 (Graham Rpt. ¶ 21); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 15). | 48. Undisputed. |
| 49. According to a 1989 ATF Report, the "predominant advantage" of a folding or telescoping stock "is for military purposes, and it is normally not found on the traditional sporting rifle."<br><br>*Evidence*: DX-22 at 1048 (1989 ATF Report at 6). | 49. Undisputed that the report may have stated that, but it isn't accurate in 2023. Rifles commonly come standard with an adjustable stock.<br><br>*Evidence*: Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; [Expert Report of W. English] at 3. |
| 49. Defendant's Response:<br><br>Plaintiffs appear to be citing to PX-2 and PX-3. Plaintiffs do not cite evidence demonstrating a factual dispute. Whether certain semiautomatic rifles that would qualify as "assault weapons" under the AWCA "commonly come standard with an adjustable stock," that does not mean that the same is true of rifles, generally, or traditional sporting rifles. | |
| 50. A folding or telescoping stock renders the rifle more concealable.<br><br>*Evidence*: DX-2 at 124, 126 (Graham Rpt. ¶¶ 21, 27). | 50. Undisputed. |
| 51. A folding or telescoping stock can make a rifle less stable when firing, if not properly locked in place. | 51. Undisputed. |

| | |
|---|---|
| *Evidence*: DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 18). | |
| 52. A rifle does not need a folding or telescoping stock to operate, including for self-defense.<br><br>*Evidence*: DX-50 at 1689 (Busse Suppl. Rpt. ¶ 15). | 52. Undisputed, but *Bruen* doesn't test for what is "needed". |
| 52. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. | |
| 53. A flash suppressor is any device attached to the end of the barrel that reduces or redirects muzzle flash, including any device identified as a "flash hider."<br><br>*Evidence*: Cal. Code Regs. tit. 11, § 5471(r); DX-2 at 125 (Graham Rpt. ¶ 22); DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17). | 53. Undisputed, but "flash hider" is a misnomer. Flash suppressors do not hide the flash from those in the direct line of fire, but rather from the shooter.<br><br>*Evidence*: Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 10; Ex. 5 [Expert Report of B. Graham] at 22, 28; Ex. 6 [Depo. Tr. M. Mersereau] at 56:14-18; Ex. 7 [Depo. Tr. B. Graham] at 103:15-20. |
| 54. Flash suppressors can be affixed to the muzzle of a rifle to reduce the flash emitted upon firing, which can aid a shooter in low-light conditions to maintain more effective fire.<br><br>*Evidence*: DX-2 at 125 (Graham Rpt. ¶ 22); DX-3 at 138 (Mersereau Rpt. ¶ 11); DX-22 at 1049 (1989 ATF Report at 7). | 54. Undisputed. |
| 55. A flash suppressor can reduce muzzle climb during rapid fire.<br><br>*Evidence*: DX-22 at 1049 (1989 ATF Report at 7). | 55. Flash suppressors do not reduce muzzle climb, compensators do.<br><br>*Evidence*: Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7-8; Brady Decl., Ex 68 [Recoil |

| | |
|---|---|
| | Magazine article]. |
| 55. Defendant's Response:<br><br>Some muzzle devices offer a combined reduction in flash signature and muzzle rise. Even a "standard" flash suppressor "does offer some of the qualities of a compensator."<br><br>*Evidence*: PX-68 at 3 (Dennis Ideue, *Flash Suppressors*, *Muzzle Brakes & Compensators – Just the Tip of the Barrel*, Recoil); DX-22 at 1049 (1989 ATF Report at 7). | |
| 56. A flash suppressor can help conceal the location of a shooter, especially in low-light conditions.<br><br>*Evidence*: DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25); DX-22 at 1049 (1989 ATF Report at 7). | 56. No, this is a myth. "A major misconception is that a flash suppressor will hide the flash from the target you are shooting."<br><br>*Evidence*: Brady Decl., Ex. 3 [Expert Report of S. Helsley] at 7-8; Brady Decl., Ex 68 [Recoil Magazine article]. |
| 56. Defendant's Response:<br><br>A flash suppressor will reduce the overall flash signature compared to a barrel without one, including from the perspective of the target—particularly if the target is wearing night vision goggles designed to magnify contrasting light. Plaintiffs do not dispute that a flash suppressor facilitates night combat operations by mitigating the effects of muzzle flash on night vision goggles. *See infra* No. 57.<br><br>*Evidence*: DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25); DX-22 at 1049 (1989 ATF Report at 7). | |
| 57. A flash suppressor facilitates night combat operations by mitigating the effects of muzzle flash on night vision goggles.<br><br>*Evidence*: DX-61 at 2395 (Tucker Suppl. Rpt. ¶ 20); DX-62 at 2412 (Tucker Suppl. Sur-Rebuttal Rpt. ¶ 25). | 57. Undisputed. |
| 58. A flash suppressor is not necessary to operate a firearm, including for self-defense. | 58. Undisputed, but *Bruen* doesn't test for what is "necessary". |

| | |
|---|---|
| *Evidence*: DX-50 at 1689 (Busse Suppl. Rpt. ¶ 17). | |
| 58. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. | |
| 59. A semiautomatic centerfire rifle under 30 inches in length is more concealable than the same rifle that is 30 inches or longer.<br><br>*Evidence*: DX-2 at 126 (Graham Rpt. ¶ 27); DX-50 at 1691 (Busse Suppl. Rpt. ¶ 21). | 59. Undisputed. |
| 60. Generally, the only way to reduce the overall length of a rifle is to use shorter barrels or shorter or collapsible stocks (or both). Neither a shortened barrel nor a shorter or collapsible stock is necessary to operate a rifle, including for self-defense.<br><br>*Evidence*: DX-50 at 1691 (Busse Suppl. Rpt. ¶ 21). | 60. Undisputed. |
| 61. Manufacturers of rifles restricted by the AWCA have marketed the rifles to civilians based on their military features and military design.<br><br>*Evidence*: DX-51 at 1720–35 (Busse Suppl. Sur-Rebuttal Rpt. ¶¶ 17–37); DX-32 at 1277 (Violence Policy Ctr., The Militarization of the U.S. Civilian Firearms Market 1 (2011)); DX-35 at 1459 (Guns & Ammo (July 1981) at 48); *e.g.*, DX-24 at 1071 (Colt AR15A4 Advertisement); DX-25 at 1072 (About Colt Rifles); DX-85 at 2986, 2994–97 (Mem. from Rep. Carolyn B. Maloney to Members of the H.R. Comm. on Oversight & Reform, July 27, 2022, at 2, 10–13). | 61. Undisputed. |
| 62. AWCA-compliant semiautomatic rifles, | 62. Undisputed. |

| | |
|---|---|
| including AR-platform rifles, are available for purchase and possession in California.<br><br>*Evidence*: DX-50 at 1688–89, 1694–708 (Busse Suppl. Rpt. ¶¶ 13–15 & Ex. A); DX-16 at 740–41 (Helsley Dep. Tr. at 21–22); DX-2 at 126 (Graham Rpt. ¶ 30). | |
| 63. Gun ownership in the United States is becoming more concentrated.<br><br>*Evidence*: DX-1 at 6–9 (Donohue Rpt. ¶¶ 18–26). | 63. This is false, gun ownership is diversifying.<br><br>*Evidence*: Brady Decl., Ex. 49 [English 2021 Report] at 2, 9; Brady Decl., Ex 69 [Economist article]. |
| 63. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. "Concentrated" ownership does not refer to demographic data, but rather to the overall share of households owning a firearm. That figure has declined in recent decades, and the share of the total number of firearms owned by the largest-owning households has increased in recent decades.<br><br>*Evidence*: DX-1 at 6–9 (Donohue Rpt. ¶¶ 18–26). | |
| 64. AR- and AK-platform rifles comprise approximately 5% of all firearms in circulation in America; this estimate likely includes rifles in the possession of domestic law enforcement agencies.<br><br>*Evidence*: DX-54 at 1852 (Klarevas Suppl. Rpt. ¶ 15). | 64. The percentage in circulation is uncertain, however, 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similar styled rifle.<br><br>*Evidence*: Brady Decl., Ex. 49 [English 2021 Report] at 33. |
| 64. Defendant's Response:<br><br>Plaintiffs do not dispute the estimate that approximately 5% of all firearms in circulation in the United States are AR- or AK-platform rifles. Plaintiffs concede that the precise share is uncertain.<br><br>*Objections*: (1) Speculative expert testimony of William English; (2) Undisclosed data; and (3) Unreliable survey methods and results. *See* Fed. R. Evid. 702; Def's Opp'n at 14. | |

| | |
|---|---|
| 65. AR-platform and similar semiautomatic rifles did not sell in substantial numbers until the late 2000s and particularly after the 2012 shooting at Sandy Hook Elementary in Newtown, Connecticut.<br><br>*Evidence*: DX-50 at 1687 (Busse Suppl. Rpt. ¶ 11). | 65. This depends entirely on the definition of "substantial numbers". Mr. Busse's report indicates that millions of AR-platform rifles had been sold by the year 2000, which is enough to confer protection based on the precedent of *Caetano*.<br><br>*Evidence*: Busse Suppl. Rpt. ¶ 11. |
| 65. Defendant's Response:<br><br>Plaintiffs cite no factual evidence that the cited sales numbers are less than substantial and do not dispute that sales increased dramatically following the Sandy Hook shooting in 2012. | |
| 66. As of 2013, 66 percent of AR- or AK-rifles owners owned two or more such rifles, and such owners owned on average 3.1 AR- or AK-platform rifles.<br><br>*Evidence*: DX-42 at 1532–33 (2013 NSSF Rpt. at 6–7). | 66. Undisputed. |
| 67. As of 2013, over 30 percent of AR- or AK-platform rifle owners owned three or more such rifles, and over one quarter of owners reported having four or more such rifles.<br><br>*Evidence*: DX-42 at 1535 (2013 NSSF Rpt. at 13). | 67. Undisputed. |
| 68. As of 2013, approximately 99% of owners of an AR- or AK-platform rifle also owned a firearm that was not an AR- or AK-platform rifle.<br><br>*Evidence*: DX-42 at 1532 (2013 NSSF Rpt. at 6). | 68. Undisputed. |
| 69. An analysis of incidents reported in the NRA Armed Citizens database compiled from January 2011 through May 2017 | 69. Undisputed that that is what the analysis concluded, but Plaintiffs do not concede the analysis is |

| | |
|---|---|
| reveals that it is rare for individuals to defend themselves using more than ten rounds; on average, only 2.2 shots were fired by defenders. No shots were fired in 20.9% of incidents.<br><br>*Evidence*: DX-47 at 1566–67 (Allen Suppl. Rpt. ¶ 13). | scientific.<br><br>*Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 3. |
| 69. Defendant's Response:<br><br>Plaintiffs cite no factual evidence demonstrating that the analysis of the NRA Armed Citizens database is not representative. The data from the NRA Armed Citizens database is consistent with data from other sources analyzed using a systematic, scientific process. Plaintiffs appear to be referencing PX-55, not PX-49.<br><br>*Evidence*: DX-48 at 1627 (Allen Suppl. Sur-Rebuttal Rpt. ¶ 29); DX-47 at 1568–74 (Allen Suppl. Rpt. ¶¶ 15–22). | |
| 70. An analysis of published news stories revealed a similar number of average shots per incident of self-defense (i.e., 2.34). No shots were fired in 11.6% of incidents. In 97.3% of the incidents, the defender fired five or fewer shots.<br><br>*Evidence*: DX-47 at 1572–73 (Allen Suppl. Rpt. ¶ 20). | 70. Undisputed that that is what the analysis concluded, but Plaintiffs do not concede the analysis is scientific.<br><br>*Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 3. |
| 70. Defendant's Response:<br><br>Plaintiffs cite no factual evidence demonstrating that the analysis of published news articles is not "scientific." Plaintiffs appear to be referencing PX-55, not PX-49.<br><br>*Evidence*: DX-48 at 1627–28 (Allen Suppl. Sur-Rebuttal Rpt. ¶¶ 29–30); DX-47 at 1568–74 (Allen Suppl. Rpt. ¶¶ 15–22). | |
| 71. An analysis of the Heritage Foundation's database on defensive gun uses in the United States revealed that approximately 2 to 4 percent of all | 71. Undisputed that that is what the analysis concluded, but Plaintiffs do not concede the analysis is scientific. |

| | |
|---|---|
| defensive gun uses involved any type of rifle.<br><br>*Evidence*: DX-47 at 1576–77 (Allen Suppl. Rpt. ¶ 28). | *Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 3. |
| 71. Defendant's Response:<br><br>Plaintiffs cite no factual evidence demonstrating that the analysis of defensive gun use data is not "scientific." Plaintiffs appear to be referencing PX-55, not PX-49.<br><br>*Evidence*: DX-48 at 1627–28 (Allen Suppl. Sur-Rebuttal Rpt. ¶¶ 29–30); DX-47 at 1568–74 (Allen Suppl. Rpt. ¶¶ 15–22). | |
| 72. A greater number of fatalities and injuries that occur in a mass shooting is correlated with the use of an assault weapon.<br><br>*Evidence*: DX-15 at 728 (Kleck Dep. Tr. at 263); DX-47 at 1582–83, 1585 (Allen Suppl. Rpt. ¶¶ 34–37, 42); DX-54 at 1853–56 (Klarevas Suppl. Rpt. ¶¶ 16–18 & tbls. 3 & 4); DX-57 at 2034–35 (Roth Suppl. Rpt. ¶ 54 & fig. 1). | 72. Undisputed that there is a correlation, but Plaintiffs do not concede that correlation proves so-called "assault weapons" caused the greater number of fatalities.<br><br>*Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 26. |
| 72. Defendant's Response:<br><br>Plaintiffs do not dispute the existence of a correlation. Plaintiffs appear to be referencing PX-55, not PX-49. | |
| 73. During the period in which the federal assault weapons ban was in effect, the use of banned assault weapons in crimes was reduced.<br><br>*Evidence*: DX-15 at 662–63 (Kleck Dep. Tr. at 153–54); DX-53 at 1802 (Donohue Suppl. Rpt. ¶ 23). | 73. A U.S. Department of Justice-funded evaluation found that there was "no discernible reduction in the lethality or injuriousness of gun violence during" the period when the ban was in effect.<br><br>*Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 17. |

| | |
|---|---|
| 73. Defendant's Response:<br><br>Plaintiffs' cited evidence does not support this assertion. The 2004 study of the federal assault weapons ban, commissioned by the National Institute of Justice, could not "clearly credit the ban with any of the nation's recent drop in gun violence," but explained that "the ban's exception of millions of pre-ban [assault weapons] and [large-capacity magazines] ensured that the effects of the law would occur only gradually" and that the "effects are still unfolding and may not be fully felt for several years into the future." PX-25 at 2–3. Thus, the report cautioned, "It is Premature to Make Definitive Assessments of the Ban's Impact on Gun Crime." *Id.* at 2. Whatever its effect on overall gun violence, more recent research has found that the federal assault weapons ban was effective in reducing the use of the regulated weapons in public mass shootings and fatalities from public mass shootings, which increased sharply after the ban expired in 2004. Plaintiffs appear to be referencing PX-55, not PX-49.<br><br>*Evidence*: DX-15 at 662–63 (Kleck Dep. Tr. at 153–54); DX-53 at 1802–03 (Donohue Suppl. Rpt. ¶¶ 23–24); DX-55 at 1962–64 (Klarevas Suppl. Sur-Rebuttal Rpt. ¶¶ 31–33). | |
| 74. The AWCA is more comprehensive than the federal assault weapons ban because, unlike the federal ban's two-feature test, the AWCA restricts centerfire rifles capable of accepting a detachable magazine if it has one of the listed features.<br><br>*Evidence*: DX-15 at 610 (Kleck Dep. Tr. at 70). | 74. Undisputed. |
| 75. An analysis of mass shootings reveals that states that prohibited assault weapons experienced fewer mass shootings and fewer fatalities in such shootings.<br><br>*Evidence*: DX-54 at 1866–69 (Klarevas Suppl. Rpt. ¶ 37 & tbls. 6 & 7). | 75. It's unclear why the State believes that features bans can reduce mass shootings, a crime which can be committed with any modern gun, and furthermore, Klarevas fails to establish that the use of "assault weapons" causes an increase in the casualty counts of mass shootings.<br><br>*Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 25. |

| | |
|---|---|
| 75. Defendant's Response:<br><br>Plaintiffs' evidence is in accordance with the fact that mass shootings involving assault weapons tend to involve larger numbers of fatalities and injuries. More precise evidence of a causal relationship cannot be obtained due to ethical and practical restrictions on the controlled experimentation. Plaintiffs appear to be referencing PX-55, not PX-49.<br><br>*Evidence*: PX-55 (Kleck Rebuttal Rpt.) ¶ 40; DX-48 at 1625–26 (Allen Suppl. Sur-Rebuttal Rpt. ¶¶ 12–16). | |
| 76. An analysis of mass shooting data from 1982–2019 reveals a statistically significant relationship between assault weapon restrictions and reductions in mass shooting deaths and injuries.<br><br>*Evidence*: DX-53 at 1805–06 (Donohue Suppl. Rpt. ¶¶ 28–30 & tbl. 1). | 76. Undisputed that there is a correlation, but Plaintiffs do not concede that correlation proves so-called "assault weapons" caused the greater number of fatalities. "All the other control variables showed no statistically significant association with either the number of incidents or number of deaths and thus were not confounders."<br><br>*Evidence*: Brady Decl., Ex. 49 [Kleck Rebuttal Report] at 27. |
| 76. Defendant's Response:<br><br>Plaintiffs do not dispute the existence of a correlation. Plaintiffs' evidence is in accordance with the fact that mass shootings involving assault weapons tend to involve larger numbers of fatalities. More precise evidence of a causal relationship cannot be obtained due to ethical and practical restrictions on the controlled experimentation. Plaintiffs appear to be referencing PX-55, not PX-49.<br><br>*Evidence*: PX-55 (Kleck Rebuttal Rpt.) ¶ 40; DX-48 at 1625–26 (Allen Suppl. Sur-Rebuttal Rpt. ¶¶ 12–16). | |
| 77. Between January 1, 1998 and December 31, 2001, at least 41 of the 211 law enforcement officers slain in the line of duty were killed with assault weapons.<br><br>*Evidence*: DX-31 at 1249 (Violence Policy | 77. Undisputed, except this depends on the definition of "assault weapons". Plaintiffs will assume the State refers to "assault weapons" under the California definition. |

| | |
|---|---|
| Ctr., Officer Down 5 (2003)). | |
| 78. Excluding inter-group violence, such as mob violence, riots, and battles, shooting incidents involving ten or more fatalities did not occur before 1949, and the number of double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban.<br><br>*Evidence*: DX-54 at 1857–60 (Klarevas Suppl. Rpt. ¶¶ 19–22 & tbl. 5). | 78. It's too definitive to say such an incident never occurred, but Plaintiffs do not dispute they were less common, as arson and explosives were far more common for large-scale mass murder prior to 1949.<br><br>*Evidence*: Brady Decl., Ex. 56 [Cramer Rebuttal Report]. |
| 78. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. | |
| 79. Over one half of the 35 deadliest mass shootings in the last 100 years occurred in the last decade.<br><br>*Evidence*: DX-86 at 3010 (The Violence Project, Key Findings). | 79. Undisputed. |
| 80. An increasing percentage of mass shootings has involved the use of assault weapons, including 52% of mass shootings involving six or more fatalities and 50% of mass public shootings involving four or more fatalities during the past five years.<br><br>*Evidence*: DX-54 at 1849–50 (Klarevas Suppl. Rpt. ¶ 14 & figs. 5 & 6); DX-86 at 3011 (The Violence Project, Key Findings). | 80. Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |
| 80. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. Whether an assault weapon was used was determined based on the federal assault weapons ban, state law in the jurisdiction where the shooting occurred, or judicial order or declaration.<br><br>*Evidence*: DX-54 at 1896, 1902 (Klarevas Suppl. Rpt., Exs. B & C). | |

| | |
|---|---|
| 81. In the seven deadliest acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, six involved the use of assault weapons (five involved an AR-platform rifle and one involved an AK-platform rifle).<br><br>*Evidence*: DX-54 at 1853 (Klarevas Suppl. Rpt. ¶ 16 & tbl. 2). | 81. Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |
| 81. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. Whether an assault weapon was used was determined based on the federal assault weapons ban, state law in the jurisdiction where the shooting occurred, or judicial order or declaration.<br><br>*Evidence*: DX-54 at 1896, 1902 (Klarevas Suppl. Rpt., Exs. B & C) | |
| 82. As fatality thresholds increase in high-fatality mass shootings involving six-or-more fatalities and mass public shootings involving four-or-more fatalities in a public place, the share of such incidents involving assault weapons also increases.<br><br>*Evidence*: DX-54 at 1853–54 (Klarevas Suppl. Rpt. ¶ 16 & figs. 9 & 10). | 82. Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |
| 82. Defendant's Response:<br><br>Plaintiffs cite no evidence demonstrating a factual dispute. Whether an assault weapon was used was determined based on the federal assault weapons ban, state law in the jurisdiction where the shooting occurred, or judicial order or declaration.<br><br>*Evidence*: DX-54 at 1896, 1902 (Klarevas Suppl. Rpt., Exs. B & C). | |
| 83. AR-platform rifles are disproportionately used in mass shootings relative to the percentage of such weapons in circulation in America relative to the | 83. This is incorrect, the overwhelming majority of mass shootings involve handguns (77.2%). |

| | |
|---|---|
| overall U.S. gun stock. | *Evidence*: Brady Decl., Ex. 70 [National Institute for Justice article]. |
| 83. Defendant's Response:<br><br>Plaintiffs' evidence confirms this fact. If 25.1% of mass shootings involved assault rifles, that is disproportionate to the share of assault rifles in circulation, which is roughly 5%.<br><br>*Evidence*: PX-70 at 4 (Nat'l Inst. of Justice, *Public Mass Shootings: Database Amasses Details of a Half Century of U.S. Mass Shootings with Firearms, Generating Psychosocial Histories*, Feb. 3, 2022); DX-54 at 1852 (Klarevas Suppl. Rpt. ¶ 15 & n.6). | |
| 84. In the past two years, the United States has experienced numerous, devastating mass shootings with assault weapons, including rifles regulated by the AWCA, including the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed); the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded; the January 2023 shooting at a dance studio in Monterey Park, California that killed 11 and wounded nine others; the March 2023 shooting at the elementary school in Nashville that killed six, including three 9-year-old children; the April 10, 2023 shooting at a Louisville bank that killed five; and the May 6, 2023 shooting at a shopping center in Allen, Texas that killed 8 and wounded 7 others.<br><br>*Evidence*: DX-53 at 1799 (Donohue Suppl. Rpt. ¶ 16); DX-80 at 2948 (Jack Healy et al., *At Least 5 Dead and 25 Injured in* | 84. Again, this depends entirely on the definition of "assault weapon". What may be such a firearm in one state, isn't in another. |

| | |
|---|---|
| *Gunman's Rampage at an L.G.B.T.Q. Club in Colorado*, N.Y. Times, Nov. 20, 2022); DX-81 at 2956 (Jeremy White & K.K. Rebecca Lai, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023); DX-82 at 2966 (Adeel Hassan & Emily Cochrane, *What We Know About the Nashville School Shooting*, N.Y. Times, May 20, 2023); DX-83 at 2971 (Kevin Williams et al., *Gunman Who Killed Five in Louisville Left Note and Bought Rifle Legally*, N.Y. Times, Apr. 11, 2023); DX-84 at 2977 (J. David Goodman et al., *After Mass Killings in Texas, Frustration but No Action on Guns*, N.Y. Times, May 7, 2023). | |
| 84. Defendant's Response:<br><br>Plaintiffs do not dispute that the weapons used in these shootings are restricted under the AWCA. | |
| 85. From the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations limited the ability of a single person to commit mass murder.<br><br>*Evidence*: DX-57 at 2025 (Roth Suppl. Rpt. ¶ 41); DX-58 at 2083 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 25). | 85. Individual mass murder is neither particularly modern nor dependent on technological advances.<br><br>*Evidence*: Brady Decl., Ex. 56 [Cramer Rebuttal Report], at 25. |
| 85. Defendant's Response:<br><br>Plaintiffs' evidence of historic "mass murders" supposedly perpetrated by individuals employs a much broader definition (two people killed within a 24-hour span) than the widely-used FBI definition, includes non-public events such as intrafamilial violence, and often contains insufficient detail to determine whether the murder was carried out by an individual or a group. Moreover, Cramer has testified that the dataset underlying his opinions was "clearly wrong." Def.'s Opp'n at 28 n.14. | |

<table>
<tr><td colspan="2">Evidence: DX-58 at 2083 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 25); PX-56 (Cramer Rebuttal Rpt.) at 20, 33–43; DX-97 at 3244–45, 3247–51, 3253 (Cramer Dep. Tr. at 46–47, 87–91, 106, Oregon Firearms Fed'n v. Kotek, No. 2:22-cv-01815 (D. Or. Jan. 19, 2023)).<br><br>Objection: Unreliable research methods and results. See Fed. R. Evid. 702.</td></tr>
<tr><td>86. The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies.<br><br>Evidence: DX-59 at 2099–103 (Spitzer Suppl. Rpt. ¶¶ 11–17); DX-57 at 2027 (Roth Suppl. Rpt. ¶ 44).</td><td>86. Individuals inflicted plenty of harm in earlier eras by using arson and explosives, often with the result of dozens of murdered victims.<br><br>Evidence: Brady Decl., Ex. 56 [Cramer Rebuttal Report], at 33-42.</td></tr>
<tr><td colspan="2">86. Defendant's Response:<br><br>Plaintiffs do not dispute that semiautomatic and automatic firearms technologies substantially increased the amount of carnage that could be inflicted with firearms. Moreover, Cramer has testified that the dataset underlying his opinions was "clearly wrong." Def.'s Opp'n at 28 n.14.<br><br>Evidence: DX-97 at 3244–45, 3247–51, 3253 (Cramer Dep. Tr. at 46–47, 87–91, 106, Oregon Firearms Fed'n v. Kotek, No. 2:22-cv-01815 (D. Or. Jan. 19, 2023)).<br><br>Objection: Unreliable research methods and results. See Fed. R. Evid. 702</td></tr>
<tr><td>87. Historically, the term "Arms" referred to weapons such as "swords, knives, rifles, and pistols," and did not include "accoutrements," like "ammunition containers, flints, scabbards, holsters," or "parts of weapons."<br><br>Evidence: DX-49 at 1641 (Baron Suppl. Rpt. ¶ 8).</td><td>87. The Supreme Court has defined "arms" to mean ""'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." That may not include a holster, but it does include "parts of weapons".<br><br>Evidence: D.C. v. Heller, 554 U.S. 570, 581 (2008).</td></tr>
</table>

| | |
|---|---|
| 87. Defendant's Response:<br><br>Plaintiffs do not cite to evidence of a factual dispute. The historical dictionary definitions of "Arms" cited in *District of Columbia v. Heller* do not reflect that an individual part of a weapon or other "accoutrement" was understood to be an "arm."<br><br>*Evidence*: DX-49 at 1641 (Baron Suppl. Rpt. ¶ 8); *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). | |
| 88. It was time-consuming to load a gun in the late 18th and early 19th century.<br><br>*Evidence*: DX-52 at 1753 (Cornell Suppl. Rpt. ¶ 27); DX-59 at 2110–13 (Spitzer Suppl. Rpt. ¶¶ 24–28). | 88. Undisputed. |
| 89. Repeater firearms (capable of holding several rounds in a magazine or revolving cylinder and firing successive shots) were "extraordinarily rare" in the 18th century.<br><br>*Evidence*: DX-60 at 2363 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶ 22). | 89. Undisputed. |
| 90. There is no evidence that many early repeating firearms were commercially available during the 18th century.<br><br>*Evidence*: DX-60 at 2363–77 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶¶ 23–45). | 90. Undisputed. |
| 91. In 1800, it "was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder" that repeaters required.<br><br>*Evidence*: DX-60 at 2378 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶ 47). | 91. Undisputed. |
| 92. The historical record is replete with reference to faultiness of repeaters | 92. Undisputed. |

| | |
|---|---|
| manufactured before and during the founding.<br><br>*Evidence*: DX-60 at 2366, 2371, 2378 (Sweeney Suppl. Sur-Rebuttal Rpt. ¶¶ 26, 36, 47). | |
| 93. 19th century repeaters, like the Henry and Winchester rifles, were understood during the era of Reconstruction to be weapons of war or anti-insurrection, not weapons of individual self-defense.<br><br>*Evidence*: DX-63 at 2419 (Vorenberg Suppl. Rpt. ¶ 7). | 93. False, they were popular among civilians for their sporting use. Oliver Winchester referred to it as "one of [the company's] best sporting guns" in a letter, dating 1871, to prominent gunmaker R.S. Lawrence.<br><br>*Evidence*: Brady Decl., Ex. 57 [Hlebinsky Rebuttal Report], at 19, citing Oliver F. Winchester's letter to R.S. Lawrence, dated 10 February 1871. McCracken Research Library, MS20, Box 51, Folder 6. |
| 93. Defendant's Response:<br><br>Repeating rifles were not widely available to civilians during the Reconstruction era and could not have been popular among civilians for sporting use. Oliver Winchester's characterization of the Winchester rifle does not establish that it was widely circulated or popular among civilians.<br><br>*Evidence*: DX-64 at 2502 (Vorenberg Suppl. Sur-Rebuttal Rpt. ¶ 27). | |
| 94. The lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm, were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War. | 94. The Winchester rifle wasn't available during the civil war, so of course it wasn't adopted for that war. As for the Henry Rifle, most of those rifles made were sold to soldiers directly, not to the military. According to the US National Parks Service, "The company made about 14,000 of the rifles between 1860 and 1866, but the U.S. Ordnance Department |

| | |
|---|---|
| *Evidence*: DX-63 at 2425–27 (Vorenberg Suppl. Rpt. ¶¶ 20–21, 24). | purchased only about 1,731 or the rifles. However, many soldiers acquired their own Henrys, which were popular in Missouri, Kentucky, Illinois, and Indiana. One Confederate soldier is rumored to have said, "It's a rifle you could load on Sunday and shoot all week long."<br><br>*Evidence*: Brady Decl., Ex. 71 [National Parks Service article]. |
| 94. Defendant's Response:<br><br>About 8,500 Henry rifles were purchased by soldiers returning from the Civil War. This figure is relatively small as compared with the 107,000 Spencer single-shot rifles ordered by the U.S. Army during the Civil War.<br><br>*Evidence*: DX-63 at 2426–28 (Vorenberg Suppl. Rpt. ¶ 24). | |
| 95. Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians.<br><br>*Evidence*: DX-63 at 2429–30 (Vorenberg Suppl. Rpt. ¶ 27). | 95. This is completely false such that it borders on gaslighting. The rifles were so common that Colonel Custer's Cavalry was defeated by Native Americans with as many as 150 or more repeating rifles, all of which would have had to have been stolen as Native Americans had no gun factories.<br><br>Between 1861 and 1877, a total of 164,466 Henry and all models of Winchester were made, with only approximately 56,000 going to foreign governments. Because the US military didn't adopt them, it follows that most were sold to civilians. |

| | |
|---|---|
| | The Library of Congress calls the iconic 1873 Winchester the "gun that won the west".<br><br>*Evidence*: Brady Decl., Ex. 71 [Popular Mechanics article]; Ex. 57 [Hlebinsky Rebuttal Report], at 19; Ex. 73 [Library of Congress article]. |
| 95. Defendant's Response:<br><br>Plaintiffs identify one documented instance of possession by civilians, which does not establish a factual dispute. Plaintiffs' conclusion that civilians possessed over 100,000 repeating rifles does not follow. The Winchester company's serial number ledger records, with few exceptions, do not divulge the destinations of shipments. One researcher identified particular likely shipments to foreign governments totaling 56,000 firearms, but this figure does not purport to be exhaustive. Even with a more complete estimate, it does not follow that all manufactured rifles would have been sold to civilians in the same time period if not sold to foreign governments. For example, some may have been warehoused.<br><br>*Evidence*: DX-63 at 2450 (Vorenberg Suppl. Rpt. ¶ 62); DX-64 at 2498–500 (Vorenberg Suppl. Sur-Rebuttal Rpt. ¶¶ 17–21). | |
| 96. By the time the Fourteenth Amendment was ratified, the commercial viability of the Winchester Model 1866 was due "almost entirely to sales to foreign armies," not to Americans.<br><br>*Evidence*: DX-63 at 2444 (Vorenberg Suppl. Rpt. ¶ 50). | 96. Between 1861 and 1877, a total of 164,466 Henry and all models of Winchester were made, with only approximately 56,000 going to foreign governments. Because the US military didn't adopt them, it follows that most were sold to civilians.<br><br>*Evidence*: Brady Decl., Ex. 57 [Hlebinsky Rebuttal Report], at 19. |
| 96. Defendant's Response:<br><br>The Winchester company's serial number ledger records, with few exceptions, do not divulge the destinations of shipments. One researcher identified particular likely shipments to foreign governments totaling 56,000 firearms, but this figure does not purport to be exhaustive. Even with a more | |

| | |
|---|---|
| complete estimate, it does not follow that all manufactured rifles would have been sold to civilians in the same time period if not sold to foreign governments. For example, some may have been warehoused.<br><br>*Evidence*: DX-64 at 2498–500 (Vorenberg Suppl. Sur-Rebuttal Rpt. ¶¶ 17–21). | |
| 97. In the 18th and 19th centuries, laws required gunpowder to be stored on the top floor of a building and permitted government officials to remove it when necessary to prevent explosions and to transfer the powder to the public magazine.<br><br>*Evidence*: DX-52 at 1759–60 (Cornell Suppl. Rpt. ¶¶ 35–37). | 97. Undisputed. |
| 98. During the colonial period, states began to enact restrictions on "trap guns," laws that proliferated in the 19th century.<br><br>*Evidence*: DX-59 at 2135, 2136–37, 2190–92, 2331–39 (Spitzer Suppl. Rpt. ¶¶ 63, 66 & Exs. B & F). | 98. Undisputed. |
| 99. A trap gun was a firearm that was configured in a way to fire remotely (without the user operating the firearm), typically by rigging the firearm to be fired by a string or wire when tripped.<br><br>*Evidence*: DX-59 at 2135 (Spitzer Suppl. Rpt. ¶ 63). | 99. Undisputed. |
| 100. Trap guns were used to protect personal or commercial property.<br><br>*Evidence*: DX-59 at 2136 (Spitzer Suppl. Rpt. ¶ 64). | 100. Undisputed. |
| 101. As homicide rates increased in the South in the early 1800s, states began restricting the carrying of certain concealable weapons. | 101. Undisputed. |

| | |
|---|---|
| *Evidence*: DX-57 at 2010–11 (Roth Suppl. Rpt. ¶¶ 23–24); DX-59 at 2123–24 (Spitzer Suppl. Rpt. ¶ 44); DX-56 at 1975–76 (Rivas Suppl. Rpt. ¶ 14). | |
| 102. These concealed weapons laws targeted the specific types of weapons that were commonly used in the murders and serious assaults that caused an alarming rise in homicides at the time.<br><br>*Evidence*: DX-57 at 2010–11 (Roth Suppl. Rpt. ¶ 24). | 102. Undisputed. |
| 103. From 1813 to the Mexican War, in 1846, numerous states and territories also restricted the concealed carrying of particular weapons. These concealed weapons laws were intended to specifically address the rise in murders and assaults throughout the South at that time.<br><br>*Evidence*: DX-57 at 2012 (Roth Suppl. Rpt. ¶ 26); DX-59 at 2122–23 (Spitzer Suppl. Rpt. ¶¶ 42–43). | 103. Undisputed. |
| 104. Class and racial tensions led to a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.<br><br>*Evidence*: DX-57 at 2010–12 (Roth Suppl. Rpt. ¶¶ 23–26). | 104. Undisputed. |
| 105. During the 19th century, states enacted a range of laws restricting the carrying of blunt weapons: 12 states restricted "bludgeons"; 14 states restricted "billies"; 43 states restricted "slungshots"; | 105. Undisputed. |

| | |
|---|---|
| six states restricted "sandbags"; and 13 states broadly restricted any concealed weapon.<br><br>*Evidence*: DX-59 at 2121–34, 2194–97 (Spitzer Suppl. Rpt. ¶¶ 42–61 & Ex. C). | |
| 106. During the 19th century, including around the time that the Fourteenth Amendment was ratified, 49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives."<br><br>*Evidence*: DX-59 at 2128, 2194–97 (Spitzer Suppl. Rpt. ¶ 50 & Ex. C). | 106. Undisputed, but these were almost entirely carry restrictions, not mere possession restrictions. |
| 107. Many state laws enacted during the 19th century also included revolvers and pistols in their lists of proscribed weapons.<br><br>*Evidence*: DX-57 at 2010–11 (Roth Suppl. Rpt. ¶¶ 24–25). | 107. Some did, but multiple state-level courts ruled such laws unconstitutional to the extent they applied to the open carry of common pistols.<br><br>*Evidence*: *See Andrews*, 50 Tenn. 165; *Wilson*, 33 Ark. 557; and *Nunn*, 1 Ga. 243. |
| 107. Defendant's Response:<br><br>*Andrews* struck down a Tennessee carry provision to the extent its prohibition on pistols encompassed revolvers used by the military. Following *Andrews*, Tennessee enacted a similar restriction excepting Army and Navy pistols. Similarly, following *Wilson*, Arkansas enacted a 1881 prohibition on the carry of pistols (excepting Army and Navy pistols) which was upheld as constitutional. Following *Nunn*, Georgia enacted an 1870 prohibition on the open carry of pistols and revolvers in public gatherings which was upheld as constitutional; in any event, *Nunn* was never intended to hold that [individuals] had some inherent right to keep and carry arms or weapons of every description." *Hertz v. Bennett*, 294 Ga. 62, 68 (2013) (quotation marks and citation omitted).<br><br>*Evidence*: Def.'s App. 1 at 27, 40–41, 42; DX-56 at 1977–78 (Rivas Suppl. Rpt. ¶ 16). | |

| | |
|---|---|
| 108. These laws aimed to curb the general use of concealable weapons in opportunistic crimes and assaults that exacerbated rising homicide rates in the South and its borderlands.<br><br>*Evidence*: DX-57 at 2010–11 (Roth Suppl. Rpt. ¶ 24); DX-58 at 2090 (Roth Suppl. Sur-Rebuttal Rpt. ¶ 37 n.44). | 108. Undisputed. |
| 109. State constitutions adopted during Reconstruction expressly linked the right to keep and bear arms to the state's authority to regulate arms: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."<br><br>*Evidence*: DX-52 at 1764–69 (Cornell Suppl. Rpt. ¶¶ 43–51). | 109. Undisputed, but such regulations of the era almost never prohibited the possession or sale of common firearms. |
| 109. Defendant's Response:<br><br>18th and 19th century regulations did regulate the sale and possession of weapons, including Bowie knives and trap guns. *See, e.g.*, App. 1 at 2 (1763–1775 N.J. Laws 346, ch. 539, § 10); *id.* at 9 (1837 Ala. Laws 7, No. 11, §§ 1, 2). | |
| 110. During this period, the federal government regulated access to particularly dangerous weapons, including the Henry and Winchester lever-action repeating rifles that began to circulate in the postbellum period, and along with state militias sought to prevent access to those weapons to insurrectionary groups and Native Americans.<br><br>*Evidence*: DX-63 at 2419–20, 2425–26, 2450–51 (Vorenberg Suppl. Rpt. ¶¶ 8–9, 21–22, 63–64. | 110. The State has pointed to no federal law governing such rifles, because there were none. |
| 110. Defendant's Response: | |

| | |
|---|---|
| The federal government regulated access to particularly dangerous weapons, including the Henry and Winchester lever-action repeating rifles, by means other than statute, including through the policies and practices of the U.S. army and its auxiliary or allied units, the direct seizure of weapons shipments, and the arrest of traders who sold repeating rifles to native tribes.<br><br>*Evidence*: DX-63 at 2419–20, 2450–51 (Vorenberg Suppl. Rpt. ¶¶ 8–9, 63–64). | |
| 111. Notably, when semiautomatic and automatic weapons began to circulate more widely in society and appear more frequently in crime in the 1920s, states began to regulate semiautomatic and automatic weapons capable of firing a certain number of rounds successively and weapons capable of receiving ammunition from feeding devices.<br><br>*Evidence*: DX-59 at 2098–107 (Spitzer Suppl. Rpt. ¶¶ 10–20 & tbl. 1). | 111. Undisputed as to automatic weapons, but semiautomatic firearms were not banned by any state, and even the laws the State cited were all repealed, save for DC's. |
| 111. Defendant's Response:<br><br>Many state machine guns laws applied to semiautomatic firearms by their terms.<br><br>*Evidence*: DX-59 at 2098–107, 2199–234 (Spitzer Suppl. Rpt. ¶¶ 10–20 & tbl. 1, Ex. D). | |
| 112. In 1923, the National Conference of Commissioners on Uniform State Laws (now, the Uniform Law Commission) issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."<br><br>*Evidence*: DX-59 at 2100 (Spitzer Suppl. Rpt. ¶ 11). | 112. Undisputed. |
| 113. Eleven states enacted restrictions on semiautomatic or fully automatic firearms capable of firing a certain number of | 113. Undisputed as to automatic weapons, but semiautomatic firearms were not banned by any |

| | |
|---|---|
| rounds without reloading; eight states regulated fully automatic weapons, defined as a firearm capable of firing a certain number of rounds without reloading or accepting an ammunition feeding device; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner, including a 1927 California law.<br><br>*Evidence*: DX-59 at 2103–06 (Spitzer Suppl. Rpt. ¶¶ 16, 19 & tbl. 1). | state, and even the laws the State cited were all repealed, save for DC's. |
| 113. Defendant's Reponses:<br><br>Many state machine guns laws applied to semiautomatic firearms by their terms.<br><br>*Evidence*: DX-59 at 2098–107, 2199–234 (Spitzer Suppl. Rpt. ¶¶ 10–20 & tbl. 1, Ex. D). | |
| 114. These early 20th century firearm regulations followed the same regulatory pattern of state and federal restrictions on large-capacity magazines in the late 20th century after the rise in mass shootings.<br><br>*Evidence*: DX-59 at 2097–98 (Spitzer Suppl. Rpt. ¶¶ 9–10). | 114. Objection to inclusion: Magazine capacity is not at issue in this case. |
| 114. Defendant's Response:<br><br>Plaintiffs do not cite evidence demonstrating any factual dispute. Rifles regulated under the challenged AWCA provisions are capable of accepting detachable large-capacity magazines, enhancing their lethality and dangers to the public.<br><br>*Evidence*: DX-54 at 1914–15 (Klarevas Suppl. Rpt., Ex. F at 1754–55); DX-61 at 2394 (Tucker Suppl. Rpt. ¶ 15); Cal. Penal Code § 30515(a)(1). | |
| 115. As of May 26, 2023, eleven jurisdictions representing more than one quarter of the U.S. population, restrict assault weapons: California, Connecticut, Delaware, the District of Columbia, Hawaii | 115. Undisputed, though the definition of "assault weapon" varies in each. |

| | |
|---|---|
| (assault pistols only), Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington.<br><br>*Evidence*: DX-59 at 2095 (Spitzer Suppl. Rpt. ¶ 7 & n.3); DX-54 at 1865 (Klarevas Suppl. Rpt. ¶ 35); H.B. 5471, 103d Gen. Assemb. (Ill. 2023); Substitute H.B. 1240, 68th Legis. (Wash. 2023). | |
| 115. Defendant's Response:<br><br>Nine of the eleven jurisdictions—all but Hawaii and New York—ban assault weapons by reference to specific models. Ten—all but New Jersey—have a features-based component. The restrictions do not differ meaningfully based on their definition of assault weapon.<br><br>*Evidence*: DX-59 at 2095 (Spitzer Suppl. Rpt. ¶ 7 & n.3 (citing Giffords Law Center, Assault Weapons, https://tinyurl.com/2p95t8du)). | |

Dated: July 14, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
ANNA FERRARI
CHRISTINA R.B. LÓPEZ
Deputy Attorneys General

*/s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*