1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   STEVEN RUPP, STEVEN DEMBER,              CASE NO. 8:17-cv-00746-JLS-JDE
     CHERYL JOHNSON, MICHAEL JONES,
12   CHRISTOPHER SIEFERT, ALFONSO
13   VALENCIA, TROY WILLIS, and               **ORDER GRANTING ATTORNEY**
     CALIFORNIA RIFLE & PISTOL               **GENERAL'S MOTION FOR**
14   ASSOCIATION,                            **SUMMARY JUDGMENT (Doc. 149)**
15                                            **AND DENYING PLAINTIFFS'**
                    Plaintiffs,              **MOTION FOR SUMMARY**
16                                            **JUDGMENT (Doc. 150)**
17      v.

18
     ROB BONTA, in his official capacity as
19   Attorney General of the State of California
20
                    Defendant.
21

22

23

24

25

26

27

28

Before the Court are cross-motions for summary judgment. Plaintiffs filed a motion for summary judgment, contending that several provisions of California's Assault Weapons Control Act ("AWCA") are facially unconstitutional as a matter of law. (Pls.' Mot., Doc. 150; Pls.' Mem., Doc. 150-1.) The Attorney General filed a motion for summary judgment of his own, arguing that Plaintiffs' facial challenge fails as a matter of law. (Def.'s Mot., Doc. 149; Def.'s Mem., Doc. 149-1.) Each party filed an opposition and reply. (Def.'s Opp., Doc. 153; Pls.' Opp., Doc. 154; Pls.' Reply, Doc. 155; Def.'s Reply, Doc. 156.) Having considered the parties' briefs and held oral argument, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS the Attorney General's motion for summary judgment for the reasons stated below.

## I.    BACKGROUND

### A.    Factual Background

This long-running lawsuit concerns the AWCA, a California law that makes it unlawful to manufacture, possess, sell, transfer, or import assault weapons into the state without a permit. Cal. Penal Code §§ 30600, 30605. The law was originally passed in 1989, after a shooter used an AK-47 to kill five schoolchildren and injure 32 others at an elementary school in Stockton, California. (Def.'s Response to Pls.' Statement of Genuine Disputes of Fact ("Def.'s SOF") ¶¶ 28–29, Doc. 156-1.)

The AWCA defines assault weapons in two different ways. In California Penal Code § 30510, the AWCA lists specific makes and models of firearms that qualify as assault weapons. In § 30515—added to the AWCA by amendment in 1999 and updated in subsequent years—the AWCA lists certain firearm features that, in combination, make a firearm an assault weapon. Under this section, a semiautomatic, centerfire rifle is an assault weapon if it does not have a fixed magazine and has one of the following features: a pistol grip that protrudes conspicuously beneath the action of the weapon; a forward pistol grip; a thumbhole stock; a folding or telescoping stock; a grenade or flare launcher; or a flash suppressor. Cal. Penal Code § 30515(a)(1)(A)–(F). These features are defined by regulation as follows:

2

- A pistol grip that protrudes conspicuously beneath the action of the weapon is one that "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing."  Cal. Code Regs. Tit. 11, § 5471(z).

- A forward pistol grip is "a grip that allows for a pistol style grasp forward of the trigger." *Id.* § 5471(t).

- A thumbhole stock is "a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing." *Id.* § 5471(qq).

- A grenade launcher is "a device capable of launching a grenade" and a flare launcher is "a device used to launch signal flares." *Id.* §§ 5471(q), (v).

- A flash suppressor is "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." *Id.* § 5471(r).

- A telescoping stock is one that "is shortened or lengthened by allowing one section to telescope into another portion." *Id.* § 5471(oo).

- A folding stock is one that "is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm." *Id.* § 5471(nn).

Further, per § 30515(a)(3), a semiautomatic, centerfire rifle that is less than 30 inches in overall length is an "assault weapon," and "[f]olding and telescoping stocks shall be collapsed prior to measurement."  *See* Cal. Code Regs. Tit. 11, § 5471(x).

The law permits those who lawfully possessed assault weapons prior to the enactment of the AWCA to retain those weapons, assuming they were properly registered; this exemption also extends to firearms that were possessed prior to the features-based amendments that brought those firearms within the law's restrictions.  Cal. Penal Code § 30900.  These previously registered assault weapons can be possessed at home, at shooting ranges, at shooting clubs, at firearm exhibitions, and pursuant to special-use

3

permits for which individuals can apply.  *Id.* §§ 30945, 31000.  The AWCA provides for several other exceptions as well.  For example, the manufacture, sale, and possession restrictions do not apply to state or federal law enforcement, military or naval forces, and several other government entities.  *Id.* § 30625.

Notwithstanding these exceptions, Plaintiffs characterize the AWCA's regulation of certain makes, models, and styles of assault rifles as a ban on those rifles.  (*See* Pls.' Mem. at 4.)  This ban is the focus of Plaintiffs' constitutional challenge.  Several individual Plaintiffs lawfully own assault rifles that they acquired prior to the enactment of the AWCA or its amendments; these Plaintiffs assert that, but for the AWCA, they would engage in certain shooting activities or adjust their weapons' componentry.  (Def.'s Statement of Genuine Disputes of Fact ("Pls.' SOF") ¶¶ 5–8, Doc. 153-1.)[1]  Other individual Plaintiffs own the frame for an assault rifle they would assemble but for the AWCA.  (*Id.* ¶ 10.)  And other individual Plaintiffs would like to acquire an AWCA-prohibited assault rifle.  (*Id.* ¶ 13.)  Finally, Plaintiff California Rifle & Pistol Association is a non-profit organization that advocates for laws promoting gun ownership and has members who are similarly situated to the individual Plaintiffs.  (*Id.* ¶¶ 17–28.)

## B.    Procedural History

Plaintiffs invoke their Second Amendment rights and bring a facial challenge to the AWCA's restrictions on rifles.  (Pls.' Mem. at 6.)  Plaintiffs facially challenge both the make-and-model restrictions of § 30510 and the firearm-features restrictions of § 30515, though Plaintiffs do not challenge the prohibitions on rifles with grenade or flare launchers.  (*Id.* at 2 n.3.)  Because this case focuses on the provisions of the AWCA that pertain to

---

[1] Plaintiffs did not file a response to the Attorney General's statement of genuine disputes of fact, as required by Local Rule 56-3; here, the Court cites the Attorney General's statement of genuine disputes of fact, which is a response to Plaintiffs' statement of uncontroverted facts.  The Court references this as Plaintiffs' statement of facts throughout because it contains all of Plaintiffs' assertions and any disputes that the Attorney General raises.  Meanwhile, the Attorney General's response to Plaintiff's statement of genuine disputes of fact (cited *supra*), represents the complete statement of facts from the Attorney General, along with Plaintiffs' noted disputes and the Attorney General's replies and is treated as the Defendant's statement of facts throughout.

1  rifles, the Court uses the phrase "assault rifles" to refer to the weapons that are banned by

2  the AWCA.

3      The Court previously upheld the AWCA in its entirety.  *See Rupp v. Becerra*, 401

4  F. Supp. 3d 978 (C.D. Cal. 2019).  The Court concluded that "semiautomatic assault rifles

5  are essentially indistinguishable from M-16s, which [*District of Columbia v. Heller*, 554

6  U.S. 570 (2008)] noted could be banned pursuant to longstanding prohibitions on dangerous

7  and unusual weapons."  *Rupp*, 401 F. Supp. 3d at 986.  As a result, the Court decided that

8  the restricted assault rifles were not protected by the Second Amendment.  *Id.* at 988.  In the

9  alternative, the Court applied intermediate scrutiny to the AWCA and concluded that "there

10  is a reasonable fit between the AWCA and California's public safety interests."  *Id.* at 990.

11      The Court's decision was appealed to the Ninth Circuit and while the appeal was

12  pending, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*,

13  597 U.S. 1 (2022).  Acknowledging that *Bruen* significantly altered the analysis required

14  under the Second Amendment, the Ninth Circuit vacated this Court's previous decision and

15  remanded for reconsideration in light of *Bruen*.  *See Rupp v. Bonta*, 2022 WL 2382319 (9th

16  Cir. 2022).  After remand, the Court reopened discovery to allow the parties to develop the

17  historical record required by *Bruen*.  (*See* Order re: Revised Rule 26(f) Report, Doc. 129;

18  Revised Scheduling Order, Doc. 131; Order Modifying Discovery Deadlines, Doc. 134.)

19      Using the additional time allotted to discovery, both parties obtained supplemental

20  reports and rebuttal reports from their retained experts. [2]  The Attorney General also

21  compiled a seven-volume, 1170-page compendium of historical laws—listing laws from

22

23

---

24  [2] Plaintiffs filed motions to exclude the expert reports or portions of the reports of five of the Attorney General's experts—Ryan Busse, Saul Cornell, John J. Donohue, Louis Klarevas, and

25  Lucy Allen.  (Pls.' Motions to Exclude Witness Testimony, Docs. 137, 138, 139, 140, and 141.) The Attorney General opposed, and Plaintiffs replied.  (Def.'s Opp. to Motions to Exclude Witness

26  Testimony, Doc. 144; Pls.' Reply ISO Excluding Witness Testimony, Doc. 145.)  The Court denied the motions but indicated that, in deciding the cross-motions for summary judgment, it would

27  "determine whether the five experts' challenged testimony is helpful and how much weight, if any, to give that testimony."  (Order re: MILs / *Daubert* Mots., Doc. 146.)  Where necessary to the

28  Court's analysis, the Court addresses in this Order the arguments raised in Plaintiffs' motions.

1383 to 1934 that he contends are analogous to the AWCA. (Def.'s Compendium of Laws, Docs. 152–152-6.) In response, Plaintiffs provided a 153-page chart, explaining why they believe each law in the Attorney General's compendium is insufficient to sustain the AWCA. (Pls.' Disagreements re: Def.'s Compendium, Doc. 154-1.) Relying on this newly obtained evidence, as well as evidence that was in the record when the Court previously made its summary judgment decision, the parties have once again filed cross-motions for summary judgment, each side arguing that this Court can decide the question of the AWCA's facial constitutionality as a matter of law.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A dispute is "material" if its resolution would "affect the outcome of the suit under the governing law." *Id.* at 248. And a dispute is "genuine" if the nonmoving party presents "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see* Fed. R. Civ. P 56(c)(1) (a party disputing a factual assertion "must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited [by the other party] do not establish" the assertion).

"When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified.")).

1  Further, the Court "must consider each party's evidence, regardless under which motion the

2  evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

3    **B.    Facial Challenges**

4    "A facial challenge is an attack on a law itself as opposed to a particular

5  application." *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) (quotation

6  omitted).  "Such challenges are considered the most difficult to mount successfully," *id.*,

7  and are "generally disfavored," *Spirit of Aloha Temple v. County of Maui*, 49 F.4th 1180,

8  1188 (9th Cir. 2022).  To prevail on a facial challenge, a plaintiff must establish that a law

9  is "unconstitutional in *all* of its applications." *Willis*, 943 F.3d at 886 (emphasis added).

10  **III.    SECOND AMENDMENT LEGAL BACKGROUND**

11    The Second Amendment provides: "A well regulated Militia, being necessary to the

12  security of a free State, the right of the people to keep and bear Arms, shall not be

13  infringed." U.S. Const. amend. II.  To understand the contours of this right, the Court will

14  chart its development through three major Supreme Court cases and two Ninth Circuit

15  decisions.  Parsing this case law helps address the central questions raised by the parties'

16  cross-motions for summary judgment: Which types of weapons are protected by the Second

17  Amendment and, assuming a weapon is protected, how can the possession, manufacture,

18  sale, and use of that weapon be regulated?

19    **A.    *Heller* and *McDonald***

20    The Supreme Court characterized *District of Columbia v. Heller*, 554 U.S. 570

21  (2008) as its "first in-depth examination of the Second Amendment." *Id.* at 635.  In

22  defining the right "to keep and bear Arms," the Court looked primarily to the Second

23  Amendment's "text and history." *Id.* at 595.  Based on text and history, *Heller* held that the

24  Second Amendment protects an "*individual* right" to "keep and bear arms" that is not

25  dependent on "militia service" but is instead linked to "the inherent right of self-defense."

26  *Id.* at 605, 628 (emphasis added).  *Heller* also explained that "keep" and "bear" each have

27  independent meaning.  "Keep . . . arms" means to "have weapons," while "bear arms"

28  means "to carry[] [weapons] for a particular purpose—confrontation." *Id.* at 583–84.

7

1    Though the Second Amendment extends beyond the home (*i.e.*, the right to "carry" arms),

2    the "need for defense of self, family, and property is most acute" in "the home" (*i.e.*, the

3    right to "keep" arms). *Id.* at 628.

4    The Court then confirmed that this understanding of the Second Amendment

5    discerned from text and history was consistent with a trio of its precedents that had

6    considered but not conducted "thorough examination[s]" of the Second Amendment right.

7    *Id.* at 619–26. For the questions raised in this case, the most important of these precedents

8    is *United States v. Miller*, 307 U.S. 174 (1939), and specifically *Heller*'s incorporation of

9    *Miller*'s limitation regarding "the *type of weapon[s]* . . . eligible for Second Amendment

10   protection." *Heller*, 554 U.S. at 621–25. Indeed, *Heller* emphasized that the individual

11   right conferred by the Second Amendment is "not unlimited, just as the First Amendment's

12   right of free speech [is] not." *Id.* at 595; *see also id.* at 626 ("Like most rights, the right

13   secured by the Second Amendment is not unlimited.").

14   To illustrate the limitations on the Second Amendment right, *Heller* listed several

15   "presumptively lawful regulatory measures" that are not "cast into doubt" by its decision:

16   "prohibitions on the possession of firearms by felons and the mentally ill, . . . laws

17   forbidding the carrying of firearms in sensitive places such as schools and government

18   buildings, [and] laws imposing conditions and qualifications on the commercial sale of

19   arms." *Id.* at 626–27 & n.26. After this list, *Heller* "recognize[d] another important

20   limitation on the right to keep and carry arms," which is that "the sorts of weapons

21   protected [are] those 'in common use at the time.'" *Id.* at 627 (quoting *Miller*, 307 U.S. at

22   179).

23   *Heller* derived this limitation from two sources. The *Heller* Court determined that

24   this limitation "is fairly supported by the historical tradition of prohibiting the carrying of

25   'dangerous and unusual weapons.'" *Id.* (quoting treatises and cases). And it found this

26   limitation to be supported by the Court's prior decision in *Miller*. As *Heller* explained,

27   *Miller*'s "basis for saying the Second Amendment did not apply" to the sawed-off shotgun

28   involved in that case was that "the *type of weapon at issue* was not eligible for Second

Amendment protection." *Heller*, 554 U.S. at 622 (citing *Miller*, 307 U.S. at 178).  Relying on *Miller*, the Court concluded that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625.  The Court noted that "if weapons that are most useful in military service—M-16 rifles and the like—may be banned," then some may object that "the Second Amendment right is completely detached from the prefatory clause" regarding the need for a well-regulated militia. *Id.* at 627.  In response, the Court acknowledged that developments in weapons technology may "have limited the degree of fit between the prefatory clause and the protected right," suggesting that the individual right to bear arms for self-defense does not extend to the kinds of military-grade weaponry that would be necessary to resist a modern-day standing army. *Id.* at 627–28.

Having provided the above overview of the Second Amendment right, the *Heller* Court "turn[ed] . . . to the [Washington, D.C.] law at issue," which "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628–29.  Because handguns are "the quintessential self-defense weapon" that are "overwhelmingly chosen by American society for that lawful purpose" and because the home is where "the need for defense of self, family, and property is most acute," the Court struck down the law as violating the Second Amendment. *Id.*  In doing so, the Court did not decide what level of scrutiny applied, because the sweeping ban at issue failed "any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 629.

Next, the Supreme Court held in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) that the "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment" against the states. *Id.* at 750.

**B.     Lower Courts' Two-Step Framework**

Following *Heller* and *McDonald*, the majority of Courts of Appeal "coalesced around a 'two-step' framework for analyzing Second Amendment challenges." *Bruen*, 597

U.S. at 18–19 & n.4 (collecting cases).  The Ninth Circuit articulated that two-step framework as follows:

> First, we ask if the challenged law affects conduct that is protected by the Second Amendment.  We base that determination on the "historical understanding of the scope of the right." We are to inquire whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood. . . .

> If the challenged restriction burdens conduct protected by the Second Amendment—either because "the regulation is neither outside the historical scope of the Second Amendment, nor presumptively lawful"—we move to the second step of the analysis and determine the appropriate level of scrutiny. We have understood *Heller* to require one of three levels of scrutiny: If a regulation "amounts to a destruction of the Second Amendment right," it is unconstitutional under any level of scrutiny; a law that "implicates the core of the Second Amendment right and severely burdens that right" receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny.

*Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc) (cleaned up), *judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated in part by Bruen*, 597 U.S. 1 (2022).

### C.   *Bruen*'s Text-And-History Approach

In *Bruen*, the Supreme Court abrogated the Courts of Appeals' approach and replaced it with a new two-step test, which focuses on text and history at both steps:

> [T]he standard for applying the Second Amendment is as follows: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (describing the above as a "two-step test").

*Bruen*'s first question concerns the scope of the Second Amendment's protections. *Bruen* emphasized that the analysis at this step was established in *Heller* and "demands a test rooted in the Second Amendment's text, as informed by history."  *Bruen*, 597 U.S. at

19.  Illustrating this approach, *Bruen* determined with "little difficulty" that the plain text of the Second Amendment covered the conduct before it: carrying a handgun in public for self-defense.  *Id.* at 31–33.  Examining each of the Amendment's "textual elements," the Court concluded that the plaintiffs are "ordinary, law-abiding, adult citizens" (*i.e.*, are part of "the people"); that "handguns are weapons 'in common use' today for self-defense" (*i.e.*, are Second Amendment "arms"); and that "bear . . . arms" in the Second Amendment protects public carry.  *Id.* (citations omitted).

*Bruen*'s second question asks whether a challenged law is "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 28.  This inquiry often requires courts to "reason[] by analogy."  *Id.*  "[W]hether a historical regulation is a proper analogue" for a challenged law "requires a determination of whether the two regulations are 'relevantly similar.'"  *Id.* at 28–29 (citation omitted).  Two important metrics "render regulations relevantly similar" under *Bruen*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 29; *see also id.* ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry."  (quoting *McDonald*, 561 U.S. at 767)).

*Bruen* also emphasized that analogical reasoning "is neither a regulatory straightjacket nor a regulatory blank check."  *Id.* at 30.  While a law cannot be upheld just because it "remotely resembles a historical analogue," analogical reasoning "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.* (quotation omitted).  As a result, "a modern-day regulation" may survive constitutional scrutiny even if it "is not a dead ringer for historical precursors."  *Id.*

Moreover, because "not all history is created equal" when "it comes to interpreting the Constitution," *Bruen* provided several "interpretive principles" for sorting through the historical record in a given case.  *Id.* at 34, 39.  The Court identified five historical periods, each with varying levels of probative value, into which it sorted the available regulatory evidence: "(1) medieval to early modern England; (2) the American Colonies and the early

11

1  Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-nineteenth and

2  early-twentieth centuries." *Id.* at 34.  *Bruen* also highlighted other interpretive principles,

3  such as how to treat discriminatory laws, laws that applied to territories rather than states,

4  and how many laws are sufficient to establish a regulatory tradition.  *Id.* at 67–70.

5       Finally, while the above interpretive principles govern the typical case, *Bruen*

6  contemplated that "cases implicating unprecedented societal concerns or dramatic

7  technological changes may require a more nuanced approach." *Id.* at 27.  After all, "the

8  regulatory challenges posed by firearms today are not always the same as those that

9  preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*

10      **D.   Ninth Circuit Case Law and Post-*Bruen* Decisions**

11      In addition to *Bruen*, this Court must adhere to Ninth Circuit precedent, including all

12  pre-*Bruen* decisions that are not "clearly irreconcilable with the reasoning or theory" of

13  *Bruen*.  *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).  Though *Bruen*

14  clearly displaced the Ninth Circuit's prior application of the various tiers of scrutiny at step

15  two of its now-abrogated framework, *Bruen* described the analysis that occurred at step one

16  of that framework as "broadly consistent" with the test *Heller* laid out and *Bruen* made

17  "more explicit." *Bruen*, 597 U.S. at 19, 31.  In pre-*Bruen* decisions, the Ninth Circuit held

18  at step one which types of weapons are protected by the Second Amendment's text and

19  history.  Given that *Bruen* labeled the analysis that led to these holdings as "broadly

20  consistent" with its text-and-history approach, the Court cannot conclude that these

21  holdings are "clearly irreconcilable" with *Bruen*.

22      Of particular relevance here, the Ninth Circuit held that weapons are "outside the

23  scope of the Second Amendment" if they are "'dangerous and unusual.'" *Fyock v.

24  Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (quoting *Heller*, 554 U.S. at 627), *abrogated

25  on other grounds by Bruen*, 597 U.S. 1.  To determine whether a weapon is dangerous and

26  unusual, the Ninth Circuit instructed district courts to "consider whether the weapon has

27  uniquely dangerous propensities and whether the weapon is commonly possessed by law-

28  abiding citizens for lawful purposes." *Id.*  Furthermore, "[r]egulation of a weapon not

12

typically possessed by law-abiding citizens for lawful purposes does not implicate the Second Amendment." *Id.*[3]

After *Bruen*, the Ninth Circuit applied *Bruen*'s new framework in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023). In *Alaniz*, the Ninth Circuit concluded that whether a weapon is protected by the Second Amendment is part of "*Bruen* step one." *Alaniz*, 69 F.4th at 1128 (citations omitted). *Alaniz* added that, for a weapon to be protected by the Second Amendment, it must be "in common use today for self-defense." *Id.* (quotation omitted). This test is closely related to *Fyock*'s "dangerous and unusual" test—if a weapon is in common use today for self-defense, then it cannot be unusual as *Fyock* defines the term. *See Fyock*, 779 F.3d at 997. *Alaniz* further explained that "[i]f the first step is satisfied, we proceed to *Bruen* step two, at which the 'government must then justify its regulation.'" *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 24).

As *Alaniz* acknowledges, *Bruen* expressly placed the burden at the second step on the government to identify historical analogues; but neither *Bruen* nor *Alaniz* specified who bears the burden of proving that a weapon is protected by the Second Amendment at the step-one, plain-text stage. But analogizing the Second Amendment to the First Amendment (as *Heller* and *Bruen* often did) suggests that the plaintiff bears the burden at step one. *See, e.g., Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) ("[A] plaintiff bears

---

[3] Other circuits interpreted this same language from *Heller* to impose slightly different versions of this test for determining whether a weapon is protected by the Second Amendment. For example, the Second Circuit held that "[t]he Second Amendment protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254–55 (2d Cir. 2015) (quoting *Heller*, 554 U.S. at 625, 627). The Fourth Circuit held that "weapons that are most useful in military service" are not protected by the Second Amendment. *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc). Both cases were overturned on other grounds by *Bruen*. Since *Bruen*, other courts have further refined this test, taking note that *Bruen* emphasizes the Second Amendment's protection of the right to self-defense. *See Bruen*, 597 U.S. at 17. Accordingly, the Seventh Circuit recently explained that "the definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose, as we have said several times, is at its core the right to individual self-defense." *Bevis v. City of Naperville*, 85 F.4th 1175, 1193 (7th Cir. 2023).

certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses.  If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law.").  Moreover, consistent with this analogy, several out-of-circuit courts in post-*Bruen* decisions have expressly placed the step-one burden on the plaintiff.[4]  Because *Alaniz* expressly asks at step one whether a weapon is in common use today for self-defense, logic suggests this placement means the plaintiff bears the burden of making that showing.[5]

---

[4] *Hartford v. Ferguson*, 2023 WL 3836230, *3 (W.D. Wa. 2023) (assuming "that Plaintiffs can produce evidence in support of *Bruen*'s first requirement" and then shifting the burden to government at step two); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 593 (D. Del. 2023) ("*DSSA*") ("Plaintiffs have shown" that some of the challenged weapons were in common use, and then shifting the burden to the government at step two); *Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027, at *5 (D. Or. July 14, 2023) ("First, a plaintiff challenging a firearm regulation must show the plain text of the Second Amendment covers the conduct regulated by the challenged law.").  One Court of Appeal decision also placed the step-one burden on the plaintiff.  But that decision concerned the issuance of a preliminary injunction, and, unlike *Hartford* and *DSSA*, it is not entirely clear whether the court placed the burden on the plaintiff as part of the *Bruen* framework or simply under the likelihood-of-success requirement for obtaining a preliminary injunction.  *See Bevis*, 85 F.4th at 1194.

[5] A recently vacated Ninth Circuit panel opinion rejected the argument that *Bruen*'s first, plain-text step includes an inquiry into whether a weapon is in common use or dangerous and unusual.  *See Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023), *vacated for reh'g en banc*, 93 F.4th 1150 (9th Cir. 2024).  Instead, *Teter* held that the Second Amendment extends "to all instruments that constitute bearable arms."  *Id.* (quoting *Heller*, 554 U.S. at 582).  Therefore, according to *Teter*, the contention that a weapon is dangerous and unusual "is a contention as to which [the defendant] bears the burden of proof in the second prong of the *Bruen* analysis."  *Id.* at 950.  This approach was in direct tension with *Fyock*, which expressly holds that dangerous and unusual weapons are wholly unprotected by the Second Amendment.  *See Fyock*, 779 F.3d at 997.  It also directly contradicted *Alaniz* in situating the dangerous-and-unusual inquiry in the second part of the *Bruen* test.  And it was out of step with most courts that have considered the issue.  *See Bevis*, 85 F.4th 1175, 1193 (interpreting *Heller* to define "bearable Arms" as "weapons in common use for a lawful purpose," namely self-defense); *DSSA*, 664 F. Supp. 3d at 591 ("[T]he Second Amendment extends only to bearable arms that are in common use for self-defense today." (quotation omitted)); *Or. Firearms*, 2023 WL 4541027 at *5 ("To determine whether the conduct at issue is covered by the plain text of the Second Amendment, a court must determine whether the weapon in question is a bearable arm that is in common use today for self-defense." (quotation omitted)); *Nat'l Ass'n for Gun Rights v. Lamont*, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) ("*NAGR*") ("Plaintiffs must bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding

(footnote continued)

# IV.  **ANALYSIS**

Applying the *Bruen* test in a manner consistent with *Fyock* and *Alaniz*, the Court asks, at *Bruen*'s first step, whether assault rifles are dangerous and unusual, with the burden on Plaintiffs to make a showing that would bring them within the ambit of Second Amendment protection.  As discussed in detail below, the Court concludes that Plaintiffs have not shown that the assault rifles at issue fall within the Second Amendment's plain text.  (*Infra* part IV.A.)

Under binding circuit precedent, the Court could end its analysis there.  But the law in this area is in flux.[6]  So, in an abundance of caution, the Court proceeds to *Bruen*'s second step.  At that step, the Court examines historical analogues for the AWCA and concludes that the Attorney General has met his burden of showing that the AWCA is consistent with the United States' historical tradition of regulating weapons.  Examination of that tradition provides two alternative grounds on which to uphold the AWCA.  (*Infra* parts IV.B–C.)

First, the Court concludes that ratification of the Fourteenth Amendment is the operative period from which to discern the public understanding of the Second Amendment, and that there is an on-all-fours tradition dating back to that period of banning

---

citizens, and that the purposes for which the firearms are typically possessed are lawful ones."); *United States v. Avila*, 672 F. Supp. 3d 1137, 1143 (D. Colo. 2023) ("Arms as used in the Second Amendment is limited to those in common use at the time." (quotation omitted)).

[6] The Ninth Circuit is scheduled to hear two related cases en banc.  In *Duncan v. Bonta*, to be argued on March 19, 2024, an en banc panel will decide whether California's ban on large-capacity magazines is unconstitutional.  83 F.4th 803, 805 (9th Cir. 2023).  In *Teter v. Lopez*, an en banc panel will reconsider whether Hawaii's ban on butterfly knives is unconstitutional.  93 F.4th 1150 (9th Cir. 2024.)  Both cases will require the Ninth Circuit to decide whether the arms at issue are protected by the Second Amendment and may result in the Ninth Circuit further refining the test for making that determination under *Bruen*'s framework.  Furthermore, in *Miller v. Bonta*, a court in the Southern District of California considered a Second Amendment challenge to the same provisions of the AWCA that are challenged here and deemed the provisions unconstitutional. 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023).  That decision was stayed after the case was appealed; the Ninth Circuit already heard argument but is holding its opinion in abeyance pending the outcome of *Duncan*.  *See Miller v. Bonta*, Case No. 23-2979, Dkt. No. 61 (9th Cir. Jan. 26, 2024).  A Ninth Circuit decision in any of these cases could substantially affect Second Amendment jurisprudence in the Circuit.

15

1    the possession of dangerous-and-unusual weapons.  (*Infra* parts IV.B.)  Second, in the

2    alternative, if Reconstruction-and-onward practice is not sufficient to establish a cognizable

3    tradition where that tradition was not widespread at the Founding, then the AWCA should

4    be sustained under "the more nuanced approach" that *Bruen* contemplated for "cases

5    implicating unprecedented societal concerns or dramatic technological changes."  (*Infra*

6    part IV.C.)

7    ## A.    Whether Assault Rifles are Dangerous and Unusual

8            The first question is whether assault rifles are protected by the Second Amendment.

9    If assault rifles are in common use today for self-defense, then the weapons are within the

10   Second Amendment's scope.  *See Alaniz*, 69 F.4th at 1128.  But if assault rifles are

11   dangerous and unusual, they are not protected.  *See Fyock*, 779 F.3d at 997.[7]  Whether a

12   weapon is dangerous and unusual is a two-part test—with dangerous and unusual each

13   bearing independent meaning.  *Id.*

14           Though these two tests—"in common use for self-defense" and "dangerous and

15   unusual"—are phrased differently, the Court emphasizes how closely related they are.  That

16   is because the right to self-defense is the core right protected by the Second Amendment.

17   *Heller* described "the inherent right of self-defense" as "central to the Second Amendment"

18   and similarly referred to self-defense as "the core lawful purpose" behind the Second

19   Amendment's enactment.  554 U.S. at 628, 630.  Similarly, when briefly conducting a

20   _____

21           [7] The Attorney General also argues that, even assuming assault rifles are protected arms, the

22   features-based provision of the AWCA—California Penal Code § 30515—falls outside the plain
     text of the Second Amendment because that portion of the AWCA regulates only features, *not*

23   "Arms."  (Def.'s Mem. at 10–12.)  The Court can quickly dispose of this argument.  While this
     portion of the AWCA defines "assault weapon" with reference to features, it indisputably regulates

24   arms.  To the question of whether it is lawful to possess, for example, a semiautomatic, centerfire
     rifle with a thumbhole stock (one of the relevant features), the answer is: no.  If the Court were to

25   accept the Attorney General's argument, then the government could always sidestep Second
     Amendment scrutiny by framing a statute to regulate an arm's component parts, instead of its

26   whole.  And to the extent the Attorney General argues that the breadth of its argument can be
     cabined because AWCA-regulated features are not "*necessary* to operate any 'Arm' for self

27   defense" (Def.'s Mem. at 11 (emphasis added)), that argument invites the intermediate scrutiny that

28   *Bruen* expressly abrogated.

common-use analysis, *Bruen* stated that no "party dispute[s] that handguns are weapons 'in common use' today for *self-defense*." 597 U.S. at 32.  In line with *Heller* and *Bruen*, the Court concludes that the inquiry as to whether a weapon is dangerous and unusual must be tethered to self-defense, not lawful purposes generically.  *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 591–92 (D. Or. 2023) ("*DSSA*") (indicating that its "sense" is that a self-defense-tethered inquiry is "correct," before declining to decide because it was not outcome determinative).

Here, there is no genuine dispute as to a material fact on either the dangerous prong or the unusual prong.  Therefore, the Court determines that, on the record before it, assault rifles are dangerous and unusual as a matter of law.[8]

### 1.   Dangerous

The "dangerous" prong of the *Fyock* test asks whether the "propensities" of the weapon at issue pose an "increased danger."  *Fyock*, 779 F.3d at 997–98.  When applying this test, the Court also takes account of two guideposts that the Supreme Court and Ninth Circuit have provided.  At one end, the Supreme Court has held that handguns are "the quintessential self-defense weapon" and are "indisputably" *not* dangerous and unusual.  *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. 629).  At the other end, the Supreme Court identified "M-16 rifles and the like" as examples of dangerous and unusual weapons that "may be banned."  *Heller*, 554 U.S. at 627.  Moreover, the Ninth Circuit has held that fully automatic machine guns are dangerous and unusual—noting that their rapid-fire ability increases the risk of mass-casualty events by allowing "a shooter to kill dozens of people within a matter of seconds."  *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1.  Thus, the Court must determine whether the semiautomatic assault rifles at issue here pose such an "increased danger" beyond that

---

[8] Though the Court previously stated that an analogy to the First Amendment suggests that Plaintiffs bear the burden at *Bruen* step one, the Court ultimately need not decide that question. Even placing the burden on the Attorney General, he has carried his burden of showing that there is no genuine dispute that assault weapons are dangerous and unusual.

inherent in handguns that they can be regulated in a manner similar to fully automatic machine guns. Conducting that inquiry, the Court concludes that there is no genuine dispute of material fact that assault rifles are "dangerous." Indeed, Plaintiffs do not dispute the vast majority of the Attorney General's evidence relevant to that inquiry.

### a. *Undisputed Evidence*

As an initial matter, there is no dispute that the AR-15, the prototypical assault rifle, is substantially similar to the M-16, which *Heller* suggested "may be banned." *Heller*, 554 U.S. at 627. It is undisputed that "[t]he AR-15 is the civilian version of the military's M[-]16." (Def.'s SOF ¶ 12.) The parties agree that the two weapons "are generally chambered in similar rounds"; "have a similar muzzle velocity"; and, when the M-16 is fired in semiautomatic mode, have the same effective maximum rate of fire. (*Id.* ¶¶ 14, 20, 26.) It is further undisputed that the only material difference between the AR-15 and the M-16 is that the M-16 "allows the shooter to fire in either automatic or semiautomatic mode, while the AR-15 fires only in semiautomatic mode (unless modified)." (*Id.* ¶ 13.) But mitigating that difference, it is undisputed that bump stocks and multi-burst trigger activators allow semiautomatic weapons to, at a minimum, simulate fully automatic fire. (*Id.* ¶ 23.) And use of M-16s in automatic mode does not appear to be common; it is undisputed that U.S. soldiers—a significant portion of the lawful users of machine guns—"are instructed to fire M[-]16s . . . in semiautomatic mode to improve accuracy and lethality in rapid fire and conserve ammunition." (*Id.* ¶ 25.)

Moreover, undisputed evidence establishes that the AR-15 poses an "increased danger" far beyond that of a handgun—with its combination of lethality and rapid-fire capability allowing "a shooter to kill dozens of people within a matter of seconds." *Fyock*, 770 F.3d at 998; *Henry*, 688 F.3d at 640. In terms of lethality, the parties agree that a bullet "imparts kinetic energy on a target equal to one half the projectile's mass multiplied by the square of its velocity" and that the velocity of "an AR-platform rifle . . . is three times the velocity of a typical handgun." (Def.'s SOF ¶¶ 21–22.) Given handguns' lower velocity, there is no genuine dispute that a "handgun wound is typically not as injurious as the

temporal cavity typically caused from a rifle wound, and can be more easily treated by a physician." (*Id.* ¶ 18.)  And in terms of rapid-fire capability, there is no genuine dispute that the AR-15 is compatible with large-capacity magazines of up to 30 rounds.[9]  (Def.'s Ex. 61, Tucker Supp. Expert Report ¶ 15, Doc. 151-15.)[10]  It is further undisputed that AWCA-regulated features allow a shooter to quickly reload after firing all the rounds in a magazine.  (*E.g.*, Def.'s SOF ¶¶ 33, 36, 39, 44.)  As a result, a shooter with an assault rifle can fire "120 rounds semiautomatically in three minutes." (*Id.* ¶ 37.)

Moreover, the Attorney General produced evidence showing that AR-platform rifles are disproportionately used in mass shootings relative to the percentage of firearms in the United States that they represent.  There is no genuine dispute that AR-platform rifles constitute about 5% of firearms in the United States but are used in about 25% of mass shootings—*five times* the percentage of firearms in circulation that they represent.[11]  (*Id.* ¶ 83.)  Nor is there a genuine dispute that the disparity grows as the number of deaths in a mass shooting increase: While assault rifles constitute about 5% of firearms in the United States, they are used in about 50% of mass shootings with six or more deaths—*ten times* the

---

[9] At several points, Plaintiffs object—without any explanation—that "[m]agazine capacity is not at issue in this case." (*E.g.*, Def.'s SOF ¶ 11.)  Presumably, Plaintiffs are referencing the fact that their facial challenge does not include a challenge to California Penal Code § 30515(a)(2), which bans centerfire rifles with "a fixed magazine with the capacity to accept more than 10 rounds," or to § 32310(a) which bans large-capacity magazines.  But Plaintiffs *do* challenge § 30515(a), which restricts assault rifles that use detachable magazines.  As the supplemental report authored by retired Colonel Craig Tucker shows, detachable (*i.e.*, not fixed) magazines can contain up to 30 rounds and that capacity increases the weapon's danger.  (Def.'s Ex. 61, Tucker Supp. Expert Report ¶ 15.)

[10] This contention in Colonel Tucker's supplemental expert report is not meaningfully contested.  Furthermore, Plaintiffs do not make any evidentiary objections to Colonel Tucker's expertise or report.  Therefore, the Court finds it proper to rely on Colonel Tucker's expert report because he has 25 years of experience serving in the U.S. Marine Corps and has extensive experience with the use of assault weapons.  (*See* Def.'s Ex. 61, Tucker Supp. Expert Report ¶¶ 2–7.)

[11] Plaintiffs dispute this contention by stating that about 75% of mass shootings involve handguns.  (*See* Def.'s SOF ¶ 83.)  But that fact is fully consistent with the Attorney General's assertion that 25% involve AR-platform rifles and that this 25% rate is disproportionate to the 5% of firearms in circulation that AR-platform rifles represent.  Therefore, Plaintiffs' response does not create a genuine dispute of fact.

1  percentage of firearms they represent.[12]  (*Id.* ¶¶ 80, 83.)   Similarly, 80 percent of all mass

2  shootings that resulted in more than 24 deaths involved the use of assault rifles—*sixteen*

3  *times* the percentage of firearms they represent.  (Def.'s Ex. 54, Klarevas Supp. Expert

4  Report ¶ 14, Doc. 151-8.)  Indeed, over the past ten years, there have been 12.9 fatalities

5  per shooting when an assault rifle is used in a mass shooting, as opposed to 7.8 fatalities per

6  shooting where an assault rifle is not used.  (*Id.* ¶ 17.)

7       Finally, the record contains undisputed evidence that each of the challenged feature-

8  based restrictions facilitates semiautomatic assault rifles' danger and disproportionate use in

9  mass shootings.  Several of the challenged features decrease reload time or allow for

10 continued fire—allowing a shooter to inflict mass casualties:

11      - Detachable Magazine—§ 30515(a)(1): It is undisputed that "[a] rifle's

12        capability of accepting detachable magazines allows a shooter to rapidly

13        change magazines and continue firing."  (Def.'s SOF ¶ 36.)  There is no

14        genuine dispute that a detachable magazine decreases a shooter's reload time

15        by about 3–5 seconds compared to a fixed magazine.[13]  (*Id.* ¶ 33.)

16      - Pistol Grip—§ 30515(a)(1)(A): It is undisputed that a pistol grip allows a

17        shooter to reload faster.[14]  (*Id.* ¶ 40.)

18

19

20

---

21      [12] Plaintiffs dispute this contention by stating that what "[w]hat may be" an "assault weapon" in

22 "one state" may not be "in another."  (*See* Def.'s SOF ¶ 80.)  But Plaintiffs cite no evidence
   supporting their contention that assault weapon bans or assault weapon definitions differ materially,

23 such that the Attorney General cannot rely on evidence concerning the use of assault rifles in mass
   shootings.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed

24 must support the assertion by[] . . . citing to particular parts of materials in the record.").
   Therefore, Plaintiffs' response does not create a genuine dispute of fact.

25      [13] Plaintiffs dispute the Attorney General's fact regarding reloading time, but—as above—

26 Plaintiffs fail to "support the assertion by[] . . . citing to particular parts of materials in the record."
   Fed. R. Civ. P. 56(c)(1).  Therefore, Plaintiffs' response does not create a genuine dispute of fact.

27      [14] Plaintiffs cite evidence in response to the Attorney General's assertion, but they do not

28 provide a response to it.  (Def.'s SOF ¶ 40.)  Moreover, the evidence Plaintiffs cite appears
   consistent with the Attorney General's assertion that pistol grips decrease reload time.

- <u>Thumbhole Stock—§ 30515(a)(1)(B):</u> It is undisputed that a thumbhole stock "mimic[s] the effects of a pistol grip and assist[s] the shooter in rifle control during periods of rapid fire." (*Id.* ¶¶ 43–44.)
- <u>Forward Pistol Grip—§ 30515(a)(1)(F):</u> It is undisputed that a forward pistol grip "can help insulate the non-trigger hand from heat during rapid fire." (*Id.* ¶ 47.)

Other challenged features allow a shooter to evade detection before and after opening fire:

- <u>Telescoping Stock—§ 30515(a)(1)(C):</u> It is undisputed that a telescoping stock "renders [a] rifle more concealable." (*Id.* ¶ 50.)
- <u>Flash Suppressor—§ 30515(a)(1)(E):</u> It is undisputed that a flash suppressor "facilitates night combat operations by mitigating the effects of muzzle flash on [the shooter's] night vision goggles." (*Id.* ¶ 57.)
- <u>Rifle Size—§ 30515(a)(3):</u> It is undisputed that, all else equal, a rifle "under 30 inches in length is more concealable" than a longer one. (*Id.* ¶ 59.)

This undisputed evidence also highlights how assault rifles are poorly suited to lawful self-defense—the core purpose of the Second Amendment. In most jurisdictions, including California, lawful self-defense requires "a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury." *People v. Elmore*, 59 Cal. 4th 121, 133 (2014); *see also United States v. Morsette*, 622 F.3d 1200, 1201 (9th Cir. 2010) ("Force likely to cause death or great bodily harm is justified in self-defense only if a person reasonably believes that such force is necessary to prevent death or great bodily harm." (quoting Ninth Circuit model jury instruction)); Tex. Penal Code § 9.32(a) ("A person is justified in using deadly force against another[] . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary."). The requirement of a reasonable belief in an imminent threat is ongoing, meaning that an individual engaged in self-defense must alter the response if the threat dissipates. *See, e.g.*, *People v. Uriarte*, 223 Cal. App. 3d 192, 197–98 (1990) (explaining that even a husband's reasonable belief that his wife was being held in a closet and had previously been abused does not justify fatally

1   shooting the captors where shots were fired after several captors were already

2   incapacitated); *Braughton v. State*, 569 S.W.3d 592, 610–11 (Tex. Crim. App. 2018)

3   (affirming jury's rejection of self-defense where evidence showed that Defendant shot the

4   decedent "who had been hitting [Defendant's] father" but was, at the time of the shooting,

5   "slowly back[ing] up while raising his hands up").

6        Because lawful self-defense is limited in this way, the above-listed dangerous

7   propensities of assault rifles make them inappropriate for lawful self-defense.  Assault rifles

8   permit sustained rapid fire, and the AWCA-regulated features further enhance that rapid-

9   fire capability.  But rapid fire does not allow a shooter to reevaluate the circumstances and

10  determine whether fatal force is still required.  And because lawful self-defense requires

11  imminent harm, it generally occurs "up close"; at that range, it is difficult to use an assault

12  rifle.  (Def.'s Ex. 61, Tucker Supp. Expert Report ¶ 22.)  Plaintiffs do not dispute this fact,

13  but they argue that the features that permit rapid fire, like a pistol grip or thumbhole stock,

14  are "control and accuracy enhancing," meaning they improve the weapon's usefulness for

15  self-defense.  (Pls.' Opp. at 5.)  But this argument does not explain how assault rifles map

16  onto the doctrine of lawful self-defense.  The guns may be accurate, but if they shoot too

17  quickly, too powerfully, and while the alleged instigator is too far away, then they are not

18  well-suited to self-defense.

19       To summarize, undisputed evidence in the record establishes that the AR-15, the

20  prototypical semiautomatic assault rifle, is substantially similar to the M-16, is significantly

21  more lethal than a handgun, and can fire up to 120 rounds in three minutes.  Semiautomatic

22  assault rifles are disproportionately used in mass shootings, including the deadliest ones,

23  compared to the percentage of firearms they represent.  And the features that the AWCA

24  regulates facilitate semiautomatic assault rifles' use in mass shootings by either

25  contributing to the weapons' rapid-fire capability or making a mass shooter more difficult

26  to detect.  The combined effect of these dangerous characteristics also renders assault rifles

27

28

1    ill-suited to self-defense.  Based on this, there is no genuine dispute that assault rifles have

2    "uniquely dangerous propensities."[15]

3                                    b.  *Counterarguments*

4         Plaintiffs make four arguments resisting this conclusion; the Court finds none to be

5    persuasive.  First, Plaintiffs argue that *Heller*'s statement that M-16s "may be banned"

6    cannot be turned into "a dispositive test."  (Pls.' Mem. at 13–16.)  But here, the Court does

7    not use assault rifles' similarity to M-16s as a dispositive test.  Instead, the Court notes the

8    undisputed similarity as just one aspect of the factual record establishing that assault rifles

9    are dangerous and unusual.  Moreover, other courts have agreed that the notable similarity

10   between M-16s and assault rifles remains relevant post-*Bruen*.  The Seventh Circuit, for

11   example, noted: "[A]ssault weapons and high-capacity magazines are much more like

12   machineguns and military-grade weaponry than they are like the many different types of

13   firearms that are used for individual self-defense (or so the legislature was entitled to

14   conclude).  Indeed, the AR-15 is almost the same gun as the M16 machinegun."  *Bevis*, 85

15   F.4th at 1195.

16        Second, Plaintiffs argue that the Court should not rely on Louis Klarevas's expert

17   report discussing, among other things, the disproportionate use of assault rifles in mass

18   shootings because the report is irrelevant.  (Klarevas Mot., Doc. 140; Klarevas Mem., Doc.

19   140-1.)  Specifically, Plaintiffs contend that Klarevas's report is irrelevant because it "does

20   not address historical regulations at all" and, thus, "informs [no] part of the *Bruen*

21   analysis."  (Klarevas Mem. at 4–5.)  But precedent squarely establishes—and, indeed,

22   Plaintiffs elsewhere acknowledge—that the dangerous-and-unusual inquiry looks at a

---

24   [15] Plaintiffs' conclusory statements otherwise in their statement of facts are not evidence that
25   creates a genuine dispute.  (*See* Pls.' SOF ¶¶ 57–58 ("[n]one of the [banned] features is inherently
     dangerous"; "[n]one of the [banned] features becomes inherently dangerous when used in
26   conjunction with any of the other features").  Plaintiffs also argued at oral argument that some of
     the models listed in California Penal Code § 30510 are distinguishable from the AR-15, but have
27   cited no evidence in the record that would allow the Court to evaluate whether some of the
     regulated assault rifles are "less" dangerous than the AR-15.  Further, Plaintiffs mount a facial
28   challenge to all of § 30510, not an as-applied challenge targeting specific guns listed in that section.

weapon under present-day facts.  (Pls.' Mem. at 13 ("[T]he Second Amendment protects . . . weapons that are 'in common use' *today*.'") (emphasis added) (quoting *Bruen*, 597 U.S. at 32)); *see also Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam) (holding that lower court erred by conducting dangerous-and-unusual inquiry "at the time of the Second Amendment's enactment").  Therefore, Klarevas's report is relevant to the dangerous-and-unusual inquiry.

Third, Plaintiffs argue that the Court should not rely on Louis Klarevas's report because he has not, as Rule 702 and *Daubert* require, used reliable principles and methods in his analysis.  (Klarevas Mem. at 3–4.)  Professor Louis Klarevas is a security policy analyst and research professor at Columbia University; has authored a book studying high-fatality mass shootings in the United States; and has published peer-reviewed research regarding the efficacy of firearm regulations.  (Def.'s Ex. 54, Klarevas Supp. Expert Report ¶¶ 2–10.)  Plaintiffs do not explain the grounds for their *Daubert* argument in their motion to exclude Klarevas, and they omit reference to their *Daubert* argument in their reply brief.  (*See generally* Klarevas Mem.; Reply ISO Excluding Witness Testimony, Doc. 145.)  Lacking any substantive argument from Plaintiffs and finding Klarevas qualified to opine on the subject, the Court denies Plaintiffs' *Daubert* motion.

Fourth, Plaintiffs argue that the AWCA does not regulate the firearm characteristics that make a gun more dangerous and therefore, assault rifles, as they are defined by the AWCA, should not have this danger attributed to them.  (Pls.' Opp. at 5–6.)  For example, Plaintiffs argue that barrel twist, high muzzle-speed velocity, and caliber size are what affect wounding capacity and that is not what the AWCA purports to regulate.  (*Id.*)  The Court is not convinced that this distinction undermines the danger of assault rifles as the AWCA defines them.  It is the combination of power, rapidity of fire, concealability, and high magazine capacity that make assault rifles so dangerous and the AWCA attempts to target that combination of characteristics.

Finally, the Court acknowledges that the district court in *Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) reached a contrary conclusion on whether assault

weapons as defined in the AWCA are dangerous, but the Court finds *Miller*'s analysis on that issue to be unpersuasive.  *Miller* chose the wrong comparator for the inquiry by comparing "[a]n AR-15 with normal parts", which is restricted by the AWCA, to an "AR-15 with an awkward shark fin grip, an unmovable stock, and a barrel compensator," which is lawful under the AWCA.[16]  *Id.* at \*5.  But here, there are no facts in the record that compare the characteristics of an AWCA-regulated assault rifle with an AR-platform rifle that can be lawfully possessed under the AWCA.  Without a developed record or relevant case law, a court generally cannot know whether a comparator is or is not, itself, dangerous and unusual.  Additionally, the current lack of regulation of a weapon is not dispositive as to danger because a state could constitutionally regulate the weapon at a later date; after all, a "legislature must be allowed leeway to approach a perceived problem incrementally." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 (1993) (citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955)).  The better comparator is the handgun, which the Supreme Court has made clear is "the quintessential self-defense weapon" and is "indisputedly" *not* dangerous and unusual.  *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. 629).  And, as explained, with that comparator in mind, assault rifles have "propensities" that pose an "increased danger."  *Fyock*, 779 F.3d at 997–98.

### 2.     Unusual

The record also establishes that assault rifles are unusual.  The "unusual" prong asks whether a weapon is "commonly possessed."  *Id.* at 997.  The Ninth Circuit has provided little guidance, however, on how to apply this prong of the *Fyock* test.  *Fyock* noted that "sales statistics indicating that millions of [the regulated component]" were sold "does not necessarily show" that they "are commonly possessed by law-abiding citizens," but

---

[16] Though *Miller* seems to suggest that the California-legal AR-15 is just as dangerous as an AR-15 "with normal parts," it is undisputed that the typical features of an AR-15—a pistol grip, a detachable stock, and a detachable magazine—increases a shooter's ability to inflict mass casualties by increasing a shooter's rate of fire or making the shooter more difficult to detect.  Thus, even as a purely factual matter, the Court concludes that the summary judgment record compels a different result than *Miller* because the regulated features enhance a weapon's danger.

ultimately declined to "say that the district court abused its discretion" in making a factual finding that there was sufficient evidence of common possession.  *Id.* at 998.

Other Courts of Appeals have expressly noted the undeveloped nature of the inquiry into a weapon's commonality.  The Fourth Circuit listed several questions that highlight the analytical difficulties:

> How many assault weapons and large-capacity magazines must there be to consider them "in common use at the time"?  In resolving that issue, should we focus on how many assault weapons and large-capacity magazines are owned; or on how many owners there are; or on how many of the weapons and magazines are merely in circulation?  Do we count the weapons and magazines in Maryland only, or in all of the United States? . . . Must the assault weapons and large-capacity magazines be possessed for any "lawful purpose[]" or, more particularly and importantly, the "protection of one's home and family"?

*Kolbe v. Hogan*, 849 F.3d 114, 135–36 (4th Cir. 2017) (en banc) (quotation omitted).  The Seventh Circuit, for its part, noted the seeming oddity in using modern-day popularity to evaluate constitutional protections, but did not offer an alternative:

> Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal.  Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned.  A law's existence can't be the source of its own constitutional validity.

*Friedman v. City of Highland Park*, 784 F.3d 406, 509 (7th Cir. 2015); *see* Bevis, 85 F.4th at 1198 (reaffirming *Friedman* after *Bruen*).

Given the lack of clear guidance on the "unusual" prong, the parties unsurprisingly disagree over how this Court should apply it—with two main sources of disagreement. First, the parties disagree over whether the common-use inquiry must be tethered only to self-defense or may also include other lawful purposes like hunting and shooting sports. (*See* Pls.' Mem. at 22; Def.'s Mem. at 12.)  Second, and assuming that commonality must be tethered to self-defense, the parties disagree over what kind of evidence is needed to

show a weapon is in common use *for self-defense*.  Plaintiffs argue that the Court should

consider the portion of Americans who own assault rifles and those owners' reported intent

to use the weapons for self-defense.  (Pls.' Mem at 20–23.)  The Attorney General, by

contrast, argues that the number of weapons owned "is not (and cannot be) enough" and

urges the Court also to consider whether the weapons "are *actually used and suitable* for

self-defense."  (Def.'s Opp. at 12.)  The Attorney General would have the Court examine

evidence on the number of times guns are fired, on average, during self-defense scenarios

and consider whether assault rifles are well-suited to lawful self-defense, which, as

discussed, requires a shooter to use only the level of force he or she reasonably believes is

necessary.  (Def.'s Mem. at 17–19.)

As to the parties' first disagreement, the Court has already concluded that the

dangerous-and-unusual inquiry must be tethered to self-defense.  (*Supra* Part IV.A.)  As to

the second disagreement, the Court need not decide which party's version of the inquiry is

correct because, even under Plaintiffs' version that looks only at ownership rates, there is

no genuine dispute as to a material fact that assault rifles are unusual.[17]

---

[17] Though the facts of this case do not require the Court to decide what kind of evidence is necessary to show that a weapon is in common use for self-defense, the Court agrees with the Attorney General that something more than the number of weapons owned and the subjective intentions of owners is required to make such a showing.  The Court knows of no other area of constitutional law where an inquiry as to subjective intent, dependent on malleable survey results, is the only touchstone for deciding where the outer bounds of constitutional protections lie.  *See also NAGR*, 2023 WL 4975979, at *14 ("[T]o adopt Plaintiffs' proposal would mean allowing the analysis to be driven by nebulous subjective intentions such that if enough individuals filled out a survey stating that they owned high powered shotguns or niche sniper rifles for the purpose of self-defense, that would satisfy the common use test regardless of how the weapons were actually used, a result that the Supreme Court does not indicate in the slightest that it intended.").  There must be objective factors to guide the analysis under *Bruen*.  The Attorney General's proffered metrics—a weapon's suitability to self-defense and evidence of actual use—are useful and objective.  Another objective factor is comparison to weapons that the Ninth Circuit or Supreme Court have already determined are or are not protected by the Second Amendment.  A final factor worth considering would be legislative landscape and how most states treat a weapon.  This non-exhaustive list is intended to illustrate how an objective inquiry might proceed.

a. *Undisputed Evidence*

It is undisputed that there are about 24.6 million AR- and AK-platform rifles in the United States—representing just 5% of firearms in circulation.  (Def.'s SOF ¶ 64.)  It is also undisputed that 66% of individuals who own an AR- or AK-platform rifle own two or more such rifles and that such multi-rifle owners have an average of 3.1 rifles.  (*Id.* ¶ 66.)  Accounting for these multi-rifle owners, that takes the number of AR-type-rifle owners down to about 10.31 million—about 4% of the adult population.[18]  With this background, the Court turns to Plaintiffs assertion that "Americans typically choose [these] rifles … for self-defense."  (Pls.' SOF ¶ 30.)

The Attorney General disputes that fact and argues that Plaintiffs' cited evidence does not support this assertion.  (*Id.*)  As mentioned (*supra* n.1), Plaintiffs failed to file a responsive separate statement in support of its motion for summary judgment—as the District's Local Rules require.  *See* C.D. Cal. R. 56-3 (requiring a movant "who files a reply to an opposition to a motion for summary judgment or partial summary judgment [to] file a 'Response to Statement of Genuine Disputes,' which . . . [includes] citations to the supporting evidence . . . rebut[ting] the existence of a genuine dispute").  Therefore, the Court does not have the benefit of Plaintiffs' arguments regarding the validity and sufficiency of their cited evidence.  But looking at the underlying evidence, the bulk of Plaintiffs' record citations are to expert reports where the expert opines that assault rifles can be used for self-defense.  (*E.g.*, Pls.' Ex. 1, Boone Expert Report, Doc. 150-13; Pls.' Ex. 2, English Expert Report, Doc. 150-13; Pls.' Ex. 53, Hanish Expert Rebuttal Report, Doc. 150-28.)  This does not support an assertion about the *percentage* of Americans who choose these weapons for self-defense.

---

[18] The Court takes judicial notice of U.S. Census Bureau's 2020 Census results, which reports that there are about 258.3 million adults in the United States.  *See* U.S. Census Bureau, Population Under Age 18 Declined Last Decade (Aug.  2, 2021), *available at* https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html; *see also* Fed. R. Evid. 201(b)(2) (court can take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be requestioned").

1    Plaintiffs' other evidence is survey results regarding the percentage of respondents

2 who report owning an AR-style rifle for self-defense.  As an initial matter, the Attorney

3 General objects to the admissibility of this evidence.  The Attorney General notes that the

4 underlying data supporting the survey result has not been disclosed and several of the

5 surveys, such as the one published in the *Washington Post* (*see* Pls.' Ex. 51, Washington

6 Post Survey, Doc. 150-24), do not describe their survey methods.  (*See* Pls.' SOF ¶ 29.)

7    The Court agrees that survey evidence is easily manipulated and often inadmissible.

8 *See, e.g.*, *In re: Autozone, Inc.*, 2016 WL 4208200, at *17–19 (N.D. Cal. Aug. 10, 2016)

9 (excluding survey under *Daubert* because it suffered from non-response bias given its

10 "woefully low response rate," suffered from self-interest bias, asked respondents to recall

11 "very specific events that occurred" years before, and was "imprecise[ly]" targeted and

12 phrased); *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 877–79 (C.D. Cal. 2013)

13 (excluding consumer survey under *Daubert* because it used an unrepresentative sample,

14 used inapt product comparisons, asked closed-ended questions without providing

15 respondents an "I don't know" option, and failed to include any controls); *Wallace v.*

16 *Countrywide Home Loans Inc.*, 2012 WL 11896333, at *3–6 (C.D. Cal. Aug. 31, 2012)

17 (excluding survey under *Daubert* because it suffered from non-response bias, suffered from

18 self-interest bias, used ambiguous terms in questions, and elicited answers that respondents

19 later contradicted in their depositions).

20    Nevertheless, given the import of this question and because summary judgment in

21 favor of the Attorney General is appropriate even when considering this evidence, the Court

22 will assume admissibility, and consider it for purposes of this motion.  One of Plaintiffs'

23 surveys reflects that about 61.9% of respondents who "owned AR-15 style[] rifles" reported

24 doing so for home defense.  (Pls.' Ex. 49, 2021 National Firearms Survey by William

25 English at 33, Doc. 150-24.)[19]  Another survey says that 65% of owners of AR-style rifles

26 ───────────────

27    [19] Again, though the Court addresses this evidence, the inclusion of this article by William
28 English is also a clear violation of the Federal Rules of Evidence.  English was disclosed as an
     (footnote continued)

1   report that one of the main reasons they own such a rifle is for self-defense.  (*See* Pls.' Ex.

2   50, Washington Post Survey.)  Viewing the evidence in the light most favorable to

3   Plaintiffs and using the 65% figure, about 6.7 million individuals own an AR- or AK-

4   platform rifle for self-defense, with this figure amounting to about 2.59% of the United

5   States' adult population.

6        This figure is likely an over-estimate of the number of assault rifles in civilian hands

7   and the percentage of assault rifles intended for self-defense.  Not all AR-style rifles are

8   subject to the AWCA's ban.  (Def.'s Opp. at 17.)  Moreover, the base 24.6 million number

9   also includes weapons owned by law enforcement, security agencies, and retailers.  (*Id.* at

10  16.)  Nonetheless, because the Court does not know how much to discount the 24.6-million

11  figure, it assumes for purposes of summary judgment that the figure is coextensive with

12  AWCA-regulated weapons.  Therefore, the question is whether, viewing the evidence in the

13  light most favorable to Plaintiffs, 2.59% of Americans owning assault rifles for self-defense

14  renders those weapons "commonly possessed" for that purpose.

15       The only Second Amendment-specific benchmark for commonality that the Court

16  has is handguns, which *Heller* described as the "quintessential self-defense weapon."

17  *Heller*, 554 U.S. at 629.  Record evidence indicates that there are about 171 million

18  handguns in the United States, with each owner having 2.1 on average.  (Pls.' Ex. 50, 2021

19  National Firearms Survey by William English at 20–21.)  Accounting for these multiple-

20  handgun owners, about 81.43 million Americans own a handgun.  Translated into a percent

---

22  expert and produced an expert report in this action in 2018.  (*See* Pls.' Ex. 2, English Expert
    Report, Doc. 150-13.)  But rather than have English submit a supplemental report when the Court

23  reopened discovery, Plaintiffs submitted an article written by English in 2022 and downloaded
    from the Social Science Research Network ("SSRN"), a repository for *preprints* of scholarly

24  articles; Plaintiffs did not submit a version of English's article that has actually been *published*.
    (*See* Pls.' Ex. 49, 2021 National Firearms Survey by William English.)  Plaintiffs attempt to

25  introduce the article because it was relied on in a rebuttal expert report by Mark Hanish.  (*See* Pls.'
    Ex. 53, Hanish Expert Rebuttal Report ¶ 25, Doc. 150-28.)  But Hanish is a firearm industry senior

26  executive retained to provide an industry perspective on assault weapons; he claims no expertise

27  that would allow him to opine about the reliability of English's article or the veracity of the
    article's claims.  (*See id.* ¶¶ 3–8.)  For these reasons, the Court could disregard the English article

28  in its entirety.

of the adult population, that figure comes out to 31.52%. There is no evidence in the record regarding the share of handgun owners who report owning the gun for self-defense. As the "quintessential self-defense weapon," the percentage is likely higher than for assault rifles; nonetheless, the Court cautiously uses the same 65% figure that was used above. This suggests that handgun owners who intend to use the weapon in self-defense amount to about 20.49% of the adult population.

Thus, the percentage of relevant assault rifle owners is almost *eight* times less than the percentage of relevant handgun owners. The Court need not decide what the precise threshold for commonality is because, wherever that threshold lies, 2.59% certainly falls short of it. Someone would be hard-pressed to describe a presidential candidate polling below 3% as a *common* choice of Americans to be the next Commander in Chief. Similarly, if fewer than 3% of bettors wagered before the season started that a certain team would win the Super Bowl, an individual familiar with ordinary English usage would not describe that team as *commonly* chosen to take home that season's championship. The Court sees no reason to assume the Supreme Court, in *Heller* and *Bruen*, imbued "common" with any meaning other than its ordinary one. Therefore, the Court concludes as a matter of law that a weapon chosen by just 2.59% of the adult population for self-defense is not a weapon in common use for that purpose.

### b. *Counterarguments*

To resist this conclusion, Plaintiffs would have the Court focus just on absolute numbers. (*See* Pls.' Mem. at 20–21.) But in doing so, Plaintiffs overlook the "denominator question." *Murr v. Wisconsin*, 582 U.S. 383, 400 (2017). When phrased in absolute terms, a figure can seem large, but its significance can accurately be assessed only when contextualized by a denominator. *See id.* at 395 (selection of the denominator "may be outcome determinative"). Inclusion of the denominator is particularly important in this context given the size of our country, which boasts over 258.3 million adults. To return to the presidential-candidate example from above, a presidential candidate who received under

3% of the vote would still have received over 4 million votes.[20]  The latter absolute figure seems enormous; the former percentage figure shows that, in context, it is actually rather small.  Or consider a hypothetical weapon owned by about a quarter-million people in the United States; in isolation, a Court might be tempted to deem that weapon commonly possessed—a six-digit number after all, seems large.  But in context, that weapon would be owned by only about 1 in every 1,000 adult Americans.  Accordingly, the Court rejects Plaintiffs' argument that commonality can be determined on an absolute-number basis.[21]

Finally, the Court finds unpersuasive the district court's analysis in *Miller* reaching a contrary conclusion.  *Miller* states only that AWCA-regulated weapons are in common use because AR-15s "are still massively popular."  *Miller*, 2023 WL 6929336, at *37.  But it does not explain which metrics it finds dispositive or what threshold a weapon must pass to be deemed "massively popular."  Based on the analysis the Court just conducted, it disagrees that these weapons could be characterized as usual or common.

### 3. Assault Rifles Are Unprotected

Based on the foregoing analysis, there is no dispute as to a material fact that assault rifles are dangerous and unusual.  Therefore, the AWCA provisions related to assault rifles regulate weapons that are not protected by the Second Amendment.  Because assault rifles are outside the scope of the Second Amendment, the Court may end its analysis here and declare the challenged provisions of the AWCA facially constitutional as a matter of law.

---

[20] For purposes of this example, the Court takes judicial notice of the Census Bureau's estimate that about 155 million people voted in the 2020 presidential election.  *See* Census Bureau, 2020 Presidential Election Voting and Registration Tables Now Available (Apr. 29, 2021), *available at* https://www.census.gov/newsroom/press-releases/2021/2020-presidential-election-voting-and-registration-tables-now-available.html.

[21] For those who may object that this commonality analysis would threaten the Second Amendment protections for even less popular firearms, like hunting rifles that have long-been presumably protected, it is important to note that dangerous and unusual is a conjunctive test, meaning a weapon must be dangerous *and* unusual to be beyond the Second Amendment's scope.

**B.      Whether the AWCA is Consistent with History and Tradition**

The Court now shifts to an alternative analysis:  namely, having decided that assault rifles are dangerous and unusual, is the AWCA "consistent with this Nation's historical tradition" of regulating such weapons?  *Bruen*, 597 U.S. at 17.

*Bruen* tells us that the most important eras to examine are 1791 when the Second Amendment was adopted and 1868 when the Fourteenth Amendment incorporated the Bill of Rights against the states.  *See id.* at 34 ("The Second Amendment was adopted in 1791; the Fourteenth in 1868.  Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").  While elevating these two periods above the rest, *Bruen* noted that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37–38 (citing Akhil Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998); Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022)).  *Bruen* did not have the occasion to resolve that debate because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect" to the issue before the Court.  *Id.* at 38; *see also Alaniz*, 69 F. 4th at 1129 n.2 (also declining to decide).

Here, the Court is obliged to wade into those waters and, for the reasons stated below, concludes that the Reconstruction era analogues should be weighted most heavily in the analysis.  But first, to be thorough, the Court marches chronologically through the proffered historical analogues for each period identified in *Bruen*.

**1.      Conducting a Historical Analogue Inquiry**

a.  *Medieval and Early English History*

"[R]eliance on English history and custom before the founding makes some sense," given that "the Second Amendment 'codified a right inherited from our English ancestors.'" *Id.* at 39 (quoting *Heller*, 554 U.S. at 599).  However, courts must exercise caution when

1   relying on pre-Founding English history.  That is because "[t]he common law, of course,

2   developed over time." *Id.* at 35.  While some common-law practices "prevailed up to the

3   period immediately before and after the framing of the Constitution," others "had become

4   obsolete in England at the time of the adoption of the Constitution and never [were] acted

5   upon or accepted in the colonies." *Id.* at 34–35 (cleaned up).  So, "[a] long unbroken line of

6   common-law precedent . . . is far more likely to be part of our law than a short-lived" one.

7   *Id.* at 35.  Moreover, the "history between the Stuart Restoration in 1660 and the Glorious

8   Revolution in 1688 [is] particularly instructive" because royal "efforts to disarm their

9   political opponents" caused English citizens "to be jealous of their arms." *Id.* at 42–43

10  (cleaned up).

11         The Attorney General has identified four relevantly similar laws from English

12  history that have the same "how" and "why" as the AWCA.  *See Bruen*, 597 U.S. at 28–29

13  (identifying these two metrics as critical to the "relevantly similar" inquiry).  Specifically,

14  the Attorney General identifies four laws that banned possession (the same "how") of

15  dangerous and unusual weapons because of those weapons' association with offensive use,

16  as opposed to lawful self-defense (a similar "why").

17         A 1383 statute provided that "Launcegays [are] clearly put out within the said

18  Realm, as a Thing prohibited by our Lord the King, upon Pain or Forfeiture of the said

19  Launcegays . . . in whose Hands or Possession they be found."[22]  A statute passed just over

20  a decade later similarly provided that "Launcegays shall be utterly put out within the said

21  Realm."[23]  As *Bruen* explained, a launcegay was "a 10- to 12-foot-long lightweight lance."

22  597 U.S. at 41.  *Bruen* further distinguished launcegays from "smaller medieval weapons"

23  like "a knife or dagger"—*i.e.*, weapons that were then in common use for self-defense and

24  are "most analogous to modern handguns." *Id.* at 41–42.  And *Bruen* explained that

25  medieval England's regulatory focus on launcegays "ma[de] sense given that . . . lances

26

27

28     [22] [1] England (1383) at 2.
       [23] [2] England (1396) at 3.

1   were generally worn or carried only when one intended to engage in lawful combat or—as

2   most early violations of the Statute [of Northampton] show—to breach the peace." *Id.* at

3   41. Thus, these two statutes, like the AWCA, banned certain weapons (the "how") because

4   they were dangerous and unusual weapons associated with combat or unlawful use, as

5   opposed to lawful self-defense (the "why").

6        This regulatory tradition persisted into 16th- and 17th-century England. In 1541,

7   Parliament made it unlawful for an individual, subject to certain exceptions, to "keep in his

8   or their houses" any "crossbow" or "handgun."[24] The law was passed in response to

9   "shameful murders, robberies, [and] felonies" having been committed with those

10   weapons.[25] Similar to *Bruen*'s distinction of launcegays (offensive weapons used to breach

11   the peace) from smaller arms (weapons used for self-defense), the 1541 statute expressly

12   distinguished the weapons it regulated from "the good and laudable . . . long bow, which

13   always heretofore hath been the [surest] safeguard and continual defense of the Realm of

14   England."[26] A 1606 law repealed one of the exceptions to the 1541 law that had allowed

15   possession of such weapons by individuals within 12 miles of the Scottish border, making

16   the ban even more comprehensive.[27] These two laws again are relevantly similar to the

17   AWCA: They ban certain weapons (the "how") because they were at that time considered

18   dangerous and unusual, and were associated with offensive use, and violent crime in

19   particular, as opposed to lawful self-defense (the "why").

20        To be sure, *Bruen* concluded that reliance on the 1541 law could not be used to

21   support a modern-day law that banned possession or severely restricted the public carry of

22   *handguns*. *See* 597 U.S. at 44 n.10. But *Bruen* distinguished the 1541 law (and similar

23   historical restrictions on handguns) due mostly to the changing place of handguns in

24   English and American society. As *Bruen* explained, even if certain "laws prohibited the

---

[24] [3] England (1541) at 4 (spelling standardized).
[25] *Id.* (spelling standardized).
[26] *Id.* (spelling standardized).
[27] [4] England (1606) at 8.

carrying of handguns because they were considered 'dangerous and unusual weapons' in the [period the laws were passed], they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.* at 47. So, the 1541 law's treatment of handguns as "dangerous and unusual" (compared to the long bow) cannot justify regulations on handguns and other weapons *now* in common use for self-defense; but the 1541 law can support a present-day ban on weapons that are determined under present-day facts to be dangerous and unusual.[28]

### b. *Colonial America and the Founding*

The Attorney General has identified a number of laws from this time period that he argues are historical analogues. The Court concludes several are insufficiently similar because they are carry restrictions (a dissimilar "how") or because they were expressly discriminatory: five used a similar "how" but were enacted with a somewhat different "why" in mind; and only one is "relevantly similar" to the AWCA in both the "how" and the "why" (New Jersey's ban of trap or spring-loaded guns).

***Carry Restrictions.*** To begin, the Attorney General points to several laws that restricted the carry of certain weapons in a variety of manners (banning their concealed carry[29] or their carry for certain purposes or in certain contexts[30]). But the laws did not ban

---

[28] The Attorney General also cites to the English Bill of Rights and Blackstone, which limit the right to have "arms. . . as allowed by law." *See* [6] England (1689) at 13; [9] England (1765) at 42. But reliance on those sources simply begs the question, since the Court must determine what kinds of regulations are "allowed by law," *i.e.*, the Second Amendment.

[29] [5] New Jersey (1686) at 11; [19] Tennessee (1801) at 80–81 (surety required before one can "privately carry any dirk, large knife, pistol or any other dangerous weapon"); [25] Kentucky (1812) at 101; [26] Louisiana (1813) at 103–04; [30] Indiana (1820) at 115; [33] Indiana (1831) at 126.

[30] [8] Massachusetts (1750) at 26 (twelve or more persons assembling with arms); [11] New Hampshire (1771) at 46–47 (same); [12] Massachusetts (1786) at 51 (same); [13] Ohio—Territory (1788) at 59 ("breaking and entering any dwelling . . . armed with any dangerous weapon or weapons as clearly to indicate a violent intention"); [18] New Jersey (1799) at 77 ("have upon him or her [in public] any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person"); [19] Tennessee (1801) at 80–81 (surety required before one can "publicly ride or go armed to the terror of the people"); [24] Maryland (1809) at 99 ("pistol, hanger, cutlass, bludgeon or other offensive weapon, with intent feloniously to assault any person"); [28] Georgia
(footnote continued)

possession of those weapons outright.  These analogues indisputably have a similar

regulatory "why" as the AWCA: curtailing the use of certain dangerous and unusual

weapons that had grown to be associated with unlawful offensive use, instead of lawful

self-defense.  For example, New Jersey in 1686 regulated "pocket pistol[s], skeins, []

daggers, [and] dirks" because "there hath been great complaint by the inhabitants of this

Province" regarding "several persons wearing [these] or any other unusual or unlawful

weapons . . . [that] put in great fear and quarrels, and challenges made, to the great abuse of

the inhabitants."[31]  Despite a similar "why," these laws are not relevantly similar to the

AWCA because they employ a different "how."  Indeed, in *Teter*, the Ninth Circuit rejected

a defendant's attempt to analogize a ban on butterfly knives to historical laws that regulated

how certain knives could be carried—holding that the challenged ban was not analogous to

historical laws prohibiting "concealed carry," "carry by certain individuals," "carry in

certain places at certain times," "carry for certain purposes," and "dangerous conduct, such

as dueling with [the regulated knives]."  76 F.4th at 952–53 (emphasis omitted).  Though

*Teter* has been vacated, the Court finds this aspect of it persuasive and other lower courts

have agreed that carry regulations are not "relevantly similar" to possession bans under the

standard *Bruen* analysis.[32]  *See, e.g.*, *Miller*, 2023 WL 6929336, at *27 (concealed carry

laws can, under standard *Bruen* analysis, support only modern laws restricting the

concealed carry of firearms).

---

(1816) at 111 (same); [31] Maine (1821) at 118 (twelve or more persons assembling "being armed
with clubs or other dangerous weapons"); [32] Maine (1821) at 122 (surety requirement to publicly
carry "any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a
reasonable cause to fear an assault upon himself").

[31] [5] New Jersey (1686) at 10–11; *see also* [18] New Jersey (1799) at 77 (to prevent "ill
disposed persons" from "carrying their evil purposes into execution"); [26] Louisiana (1813) at 103
("Whereas assassination and attempts to commit the same[] have of late been of such frequent
occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants
of this state . . . ."); [32] Maine (1821) at 120 (for "prevention of crime").

[32] These laws, however, do still inform the Court's application of the "more nuanced approach"
that *Bruen* contemplated for cases involving "unprecedented societal concerns or dramatic
technological changes."  *Bruen*, 597 U.S. at 27.  (*Infra* part IV.C.)

***Expressly Discriminatory Laws.***  The Attorney General also includes reference to several laws that are racist on their face—limiting only Black Americans' and Native Americans' access to firearms.[33]  *Bruen* discounted laws enforced against only "black defendants who may have been targeted for selective or pretextual enforcement."  *Bruen*, 597 U.S. at 58.  Therefore, the Court declines to consider as potential analogues laws that were expressly discriminatory.  *See United States v. Griffin*, 2023 WL 8281564, at *6 (N.D. Ill. Nov. 30, 2023).  These laws do not provide probative evidence of what actions "infringe[]" on the Second Amendment right; they reflect abhorrent beliefs about who constituted "the people."

***Gunpowder Storage.***  The Attorney General also points to one law banning the possession of loaded firearms[34] and three others prohibiting the possession of gunpowder above a certain amount.[35]  The latter laws also gave the government the power to enter homes to search for gunpowder and then seize it for storage in a public magazine.  (Def.'s Ex. 52, Cornell Supp. Expert Report ¶¶ 36, 40, Doc. 151-6.)[36]  As to the first law, *Heller* forecloses reliance on it, since the Court expressed "doubt that colonial Boston authorities [where the law was in effect] would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder."  554 U.S. at 631–32.  As to the

---

[33] [7] New York (1730) at 23; [14] Virginia (1792) at 63; [15] Delaware (1797) at 67; [16] Kentucky (1798) at 71; [17] Mississippi—Territory (1799) at 73; [20] Arkansas—Territory (1804) at 84; [22] Mississippi—Territory (1804) at 90; [29] Missouri—Territory (1818) at 113.

[34] [341] Boston, Massachusetts (1783) at 1133.

[35] [342] New York, New York (1784) at 1136–38 (prohibiting possession above twenty-eight pounds, and regulating storage below that amount); [343]; [343] New York (1792) at 1141–42 (same); [344] Maine (1821) at 1144 ("[N]o person or persons shall have, keep or possess within [a town above 1500 people] any gunpowder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid.").

[36] Plaintiffs argued that portions of Saul Cornell's expert report should be excluded because they contained "his opinions on legal questions, which are not appropriate expert witness testimony."  (Cornell Mot., Doc. 138; Cornell Mem. at 4, Doc. 138-1.)  Here, the Court cites Cornell's report for a historical fact, not a legal conclusion.  Plaintiffs do not object to Cornell's ability to opine on this fact.  (*See* Cornell Mem. at 4–5.)  Further, Cornell is qualified to state this opinion because of his expertise as a chaired professor of history at Fordham University who has published articles and participated in conferences on the history of gun regulation in America.  (Def.'s Ex. 52, Cornell Supp. Expert Report ¶¶ 3, 4.)

three gunpowder laws, they each have a "how" that is similar to the AWCA: They ban possession—with one doing so outright, and two above a certain quantity.  And the three laws were motivated by a "why" that is similar to the AWCA: They were intended to prevent a danger to the public.[37]  However, the three statutes were "fire-safety laws" intended to prevent accidents, *id.* at 632, while the AWCA is intended to prevent the offensive use of dangerous and unusual weapons.  For that reason, the Court finds them insufficiently similar.

*Malfunctioning-Firearm Bans.*  The Court next considers two laws passed by Massachusetts in 1805 and 1814 that, like the AWCA, banned the manufacture and sale of certain weapons, specifically firearms that had been inspected by state officials and deemed "unfit for use" because the firearm's "barrels . . . burst . . . or in any manner fail[ed]" during the officials' testing.[38]  And like the AWCA, the laws were intended to prevent the "introduct[ion] [of firearms] into use that are unsafe and thereby [expose] the lives of the Citizens."[39]  Thus, like the AWCA, the laws banned weapons deemed dangerous and unusual.  But while the laws come close to being relevantly similar to the AWCA, they ultimately fall short because they regulated weapons that were deemed "unsafe" because of manufacturing defects—*i.e.*, the firearms did not operate as they were designed.  The AWCA, by contrast, bans the manufacture, sale, and possession of weapons that California concluded are dangerous and unusual by design.

*Trap Guns.*  Finally, the Court concludes that the Attorney General has identified one colonial or Founding-era law that is "relevantly similar" to the AWCA: New Jersey's 1771 ban on trap or spring-loaded guns.[40]  A trap gun is a "firearm that [has been]

---

[37] [342] New York, New York (1784) at 1136 ("[w]hereas the storing of gun powder . . . is dangerous"); [343] New York (1792) at 1141 (similar); [344] Maine (1821) at 1144 ("An Act for the prevention of damage by Fire").

[38] [23] Massachusetts (1805) at 94–95; *see also* [26] Massachusetts (1814) at 107–08 (elaborating on the firearm testing procedures established in the prior statute).

[39] [23] Massachusetts (1805) at 94–95; [27] Massachusetts (1814) at 107 ("An Act in addition" to the previous statute).

[40] [10] New Jersey (1771) at 32.

1  configured in a way to fire remotely (without the user operating the firearm), typically by

2  rigging the firearm to be fired by a string or wire when tripped."  (Def.'s SOF ¶ 99.)  Trap

3  guns were used "to protect personal or commercial property" (*id.* ¶ 100), but trap guns

4  "sometimes wound up hurting or killing innocents, even including the person who set the

5  trap."  (Def.'s Ex. 59, Spitzer Supp. Report ¶ 65, Doc. 151-13.)[41]  New Jersey's law

6  employed the same regulatory "how" as the AWCA: a ban on a category of weapons.  And

7  New Jersey's law adopted the ban with a similar regulatory "why" in mind: preventing the

8  unlawful use of what the New Jersey legislature had determined to be a "most dangerous"

9  kind of weapon.[42]

10                                    c.  *Antebellum*

11          Courts are instructed to be cautious when evaluating antebellum history because it

12  *both* predates the Fourteenth Amendment's incorporation of the Second Amendment

13  against the states *and* postdates the original adoption of the Second Amendment.  *See*

14  *Bruen*, 597 U.S. at 34 (noting that "[h]istorical evidence that long predates either date [1791

15  or 1868] may not illuminate the scope" of the Second Amendment right); *id.* at 35 (courts

16  "must also guard against giving postenactment history more weight than it can rightly

17  bear").

18          The Attorney General has identified five laws from the Antebellum period that are

19  "relevantly similar" to the AWCA.[43]

20

21

---

22      [41] Plaintiffs do not raise any objections to Robert Spitzer's expertise or the contents of his
    expert report.  Spitzer has been studying and writing about gun policy for over 30 years and has
23  developed expertise on the history of gun laws.  (Def.'s Ex. 59, Spitzer Supp. Report ¶ 3.)  His
    report is researched, well-cited, describes the history of firearms restrictions, and is consistent with
24  his expertise.
        [42] [10] New Jersey (1771) at 32 (spelling standardized).
25      [43] In considering the proffered laws, the Court is mindful that *Bruen* states that laws from the
26  western territories "deserve little weight."  *Id.* at 69.  That is because those laws were "short lived,"
    were "rarely subject to judicial review," often affected only "miniscule . . . populations," and were
27  perhaps "legislative improvisions which might not have been tolerated in a permanent setup."  *Id.*
    at 67–69 (citation omitted).

28

***Carry Restrictions.***  As they did in the colonial and Founding eras, states widely regulated the carry of certain dangerous and unusual weapons—focusing their regulatory efforts during the Antebellum period on "'Bowie knives,' 'Arkansas Toothpicks,' 'slung-shots,' metal knuckles, sword-canes, and other so-called 'deadly weapons.'" *Teter*, 76 F.4th at 951, *vacated for reh'g en banc*, 93 F.4th 1150.  Take, for example, the bowie knife, which "has a large, fixed blade that is sharp on one side and generally longer than nine inches," *id.* at 951 n.11, and which, "[i]n the early 19th century . . . gained notoriety as a 'fighting knife,'" *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1068 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175 (7th Cir. 2023).  After the bowie knife earned that "notoriety," states "quickly enacted laws regulating [the knives]." *Id.*  Indeed, by the Court's count and considering just the laws that regulated bowie knives *by name*, four states imposed increased punishments for the use of bowie knives in altercations or regulated the manner in which bowie knives could be carried;[44] five states prohibited their concealed carry;[45] and another state authorized a town's local government to enact a total carry prohibition.[46]  But as explained, the "how" of regulating carry is distinct from the "how" of a possession ban.

***Sale and Manufacture Prohibitions.***  That said, three states did pass laws relevantly similar to the AWCA that banned the sale and/or manufacture of certain dangerous and unusual weapons.  In 1837, Georgia adopted a law "to guard and protect the citizens of this State against the unwarrantable and too prevalent use of deadly weapons," which indicates

---

[44] [39] Mississippi (1837) at 145–46 (individual who killed someone with a bowie knife is "held chargeable with the payment of the debts" of the decedent; also unlawful to "exhibit" a bowie knife "in a rude, angry and threatening manner"); [41] Tennessee (1837) at 153 (3–15 years imprisonment for "stabbing or cutting" another person with a bowie knife; misdemeanor to "maliciously draw" bowie knife); [68] Washington—Territory (1854) at 230 ("in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any . . . bowie knife, or other dangerous weapon"); [69] California (1855) at 232 (same).

[45] [41] Tennessee (1837) at 153–54; [45] Virginia (1838) at 158; [46] Alabama (1839) at 161; [49] Alabama (1841) at 177–78; [72] Louisiana (1855) at 241.

[46] [40] Mississippi (1837) at 151 ("[T]he president and council shall have power to . . . [enact] the total inhibition of the odious and save practice of wearing . . . bowie knives . . . .").

a regulatory "why" similar to that of AWCA.[47]  And employing a similar "how," the law made it unlawful "to sell, or offer to sell . . . Bowie [knives]."[48]

Plaintiffs contend that this Georgia law is an inappropriate analogue because it "was held to be unconstitutional under the 2nd Amendment [in] *Nunn v. State*, 1 Ga. 243 (1846)."  (Pls.' Disagreements re: Def.'s Compendium ¶ 38.)  However, *Nunn* is not as sweeping as Plaintiffs make it out to be.  *Nunn*, as *Bruen* explained, held that another clause of the law was invalid to the extent it applied to the "*open*[] . . . carrying [of] a *pistol*." *Nunn*, 1 Ga. at 251 (second emphasis added); *see Bruen*, 597 U.S. at 54 (*Nunn* concerned "the State's general prohibition on the public carriage of handguns").  *Nunn* did not concern, let alone mention, the law's separate prohibition addressing the sale of weapons; nor it did reach beyond "pistols" to address dangerous-and-unusual weapons like bowie knives.  Therefore, this separate clause of the Georgia law remains a valid analogue to modern-day regulations on modern-day dangerous-and-unusual weapons.

The same year as Georgia, Tennessee enacted a similar law "to suppress the sale and use of Bowie Knives," which made it unlawful for "any merchant, peddler, jeweler, confectioner, grocery keeper, or other person . . . [to] sell or offer to sell, or . . . bring into this State, for the purpose of selling . . . any Bowie knife."[49]  About a decade later, Massachusetts made it unlawful to "manufacture . . . or sell[] any instrument or weapon of the kind usually known as [a] slung shot."[50]  Like the Georgia law, both of these are relevantly similar, having a similar "how" and "why" as the statute at issue in this case.

***Onerous Taxes.***  Moreover, one state and one territory placed onerous taxes on individuals who sold bowie knives—regulations that did not ban their sale or possession, but nonetheless imposed burdens by increasing costs.[51]  *McCulloch v. Maryland*, 17 U.S.

---

[47] [38] Georgia (1837) at 141.

[48] *Id.*

[49] [41] Tennessee (1837) at 153 (spelling standardized).

[50] [60] Massachusetts (1850) at 207.

[51] The Court does not consider in this category property-tax laws that simply taxed bowie knives in small dollar figures similar to those imposed on run-of-the-mill personal property.  *See* (footnote continued)

316, 327 (1819) (the "power to tax involves, necessarily, a power to destroy").  In 1837, Alabama passed a law taxing bowie knives with the express purpose of "suppress[ing] the use of Bowie Knives."[52]  Specifically, the Alabama law imposed "a tax of one hundred dollars" "for every [bowie knife] sold or given, or otherwise disposed of in this State" to be paid by "the person selling, giving or disposing of the same."[53]  A failure to pay the tax subjected a seller "to the pains and penalties of perjury."[54]  Similarly, in 1838, then-territory Florida passed a law that imposed a "two hundred dollar[] per annum" tax on sellers of bowie knives and a "ten dollar[] per annum" tax on anyone publicly carrying a bowie knife.[55]  A failure to pay the required taxes exposed an individual to a $200–500 fine.[56]

### d.  *Reconstruction Era*

The Attorney General identified six "relevantly similar" analogues from Reconstruction in which states (and one territory) banned certain dangerous-and-unusual weapons.  Moreover, five judicial decisions from four different states' courts provide insight into why Reconstruction-era America viewed a ban on the possession of certain weapons as consistent with the Second Amendment.

***Trap Guns.***  Most significantly, several states and one territory adopted bans on trap or spring-loaded guns during the Reconstruction Era.  Three years before the ratification of the Fourteenth Amendment, then-territory Utah enacted a trap-gun ban.[57]  A year after ratification, Minnesota enacted a trap-gun ban.[58] By 1870, a statute was on the books in New York prohibiting such "infernal machines."  (Def.'s Ex. 59, Spitzer Supp. Report, Ex.

---

[50] Mississippi (1841) at 181 ($1 property tax on bowie knives); [61] Mississippi (1850) at 210 ($0.50 property tax on bowie knives); [63] Alabama (1852) at 216 ($2 property tax on bowie knives); [67] Mississippi (1854) at 228 ($1 property tax on bowie knives); [73] Mississippi (1856) at 244 ($1 property tax on bowie knives).

[52] [36] Alabama (1837) at 135.

[53] *Id.*

[54] *Id.*

[55] [44] Florida—Territory (1838) at 156.

[56] *Id.*  Though perhaps too obvious to deserve mention, $100 and $200 in 1837 and 1838 would be sizeable taxes of several thousand dollars if converted to the worth of a dollar today.

[57] [89] Utah—Territory (1865) at 284.

[58] [101] Minnesota (1869) at 319.

B to Report at 2–3 & n.7.)  In 1872, Wisconsin enacted a ban.  (*Id.* at 3 (relying on Duke Center for Firearms Law, Repository of Historical Gun Laws).)  Minnesota reaffirmed its trap-gun ban in 1873.[59]  And Michigan enacted a ban in 1875.[60]

**Slungshots and Metallic Knuckles.**  Similarly, the year the Fourteenth Amendment was adopted, Florida banned the manufacture and sale of two other weapons considered to be dangerous and unusual: slungshots and metallic knuckles.[61]

**Judicial Decisions.**  Moreover, though the Court is not aware of any judicial decisions expressly evaluating the above prohibitions, several state-court decisions—including some the Supreme Court relied on in *Heller* and *Bruen*—provide compelling evidence that Reconstruction-era Americans viewed dangerous-and-unusual weapons as eligible to be banned.  *See Bruen*, 597 U.S. at 68–69 ("[T]he meaning of ambiguous constitutional provisions can be 'liquidated and ascertained by *a series of particular discussions and adjudications.*'" (quoting The Federalist No. 37 (James Madison))).

Consider *Andrews v. State*, 50 Tenn. 165 (1871), which was decided just three years after the ratification of the Fourteenth Amendment.  *See Heller*, 554 U.S. at 614, 629 (positively citing *Andrews*); *Bruen*, 597 U.S. at 54, 68 (same).  *Andrews* struck down "a statute that forbade openly carrying a [repeater] pistol."  *Heller*, 554 U.S. at 614.  In doing so, *Andrews* distinguished between protected arms (the repeater pistol) and several other weapons regulated by the law in question ("dirk, sword cane, Spanish stiletto, belt[,] pocket pistol," and "revolver").  *Andrews*, 50 Tenn. at 186.  The court drew that distinction by focusing on which arms were common and useful for lawful purposes: "[I]t must be held[] that the right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country."  *Id.* at 178.  The decision reiterated this limitation, holding that protected arms are those "common to the country" or are "the usual arms of the citizen of the country."  *Id.* at 179.  And in a prior

---

[59] [119] Minnesota (1873) at 380.
[60] [130] Michigan (1875) at 416.
[61] [98] Florida (1868) at 310.

decision, the Tennessee Supreme Court concluded that "[t]he Legislature . . . ha[s] a right to prohibit the . . . *keeping* [of] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defense"— a decision that *Andrews* described as having "the same general views" and "proper view of the Constitution."  *Id.* at 169, 185 (emphasis added) (quoting *Aymette v. State*, 21 Tenn. 154, 159 (1840)).

A decision issued that same year, *English v. State*, 35 Tex. 473 (1871), drew a similar distinction between commonly used weapons that are eligible for constitutional protection and those weapons that are not.  *See Heller*, 554 U.S. at 627 (citing *English* in support of its dangerous-and-unusual limitation).  Evaluating a public-carry ban on certain "deadly weapons," the court concluded:

> "A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Arms of what kind? Certainly such as are useful and proper to an armed militia.  The deadly weapons spoken of in the statute are [non-holster] pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives.  Can it be understood that these were contemplated by the framers of our bill of rights?  Most of them are the wicked devices of modern craft. . . .
>
> To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous.  No kind of travesty . . . could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.

*English*, 35 Tex. at 474, 476.  Four years later, the Texas Supreme Court refined *English*'s analysis by clarifying that protectible arms include those commonly used for either private or public self-defense: "The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open

1   and manly use in self-defense, as well as such as are proper for the defense of the State."

2   *State v. Duke*, 42 Tex. 455, 458 (1875).

3        To be sure, *Bruen* found these two Texas decisions to be unpersuasive as applied to

4   states' ability to restrict the public carry of *handguns*, but *Bruen* did not call these decisions

5   into question as applied to *contemporary* dangerous-and-unusual weapons.  *Bruen* sorted

6   *English* and *Duke* into two parts: (1) their "constitutional holding" about which arms

7   "warranted state constitutional protection"; and (2) their policy-minded conclusion that

8   even protected arms may be subject to something like a proper-cause requirement for a

9   public-carry license because such a requirement does not totally destroy the right to self-

10   defense.  *Bruen*, 597 U.S. at 64–65.  *Bruen* disapproved of the second part of these

11   decisions, describing the rationale as an "outlier." [62]  *Id.* at 65.  But *Bruen* did not call into

12   doubt the first part.  In other words, *Bruen* did not displace *Heller*'s reliance on *English*

13   when drawing the distinction between dangerous-and-unusual weapons, on the one hand,

14   and weapons in common use for self-defense, on the other.  Therefore, the parts of *English*

15   and *Duke* that reinforce that distinction and place dangerous and unusual weapons beyond

16   the protection of the Second Amendment remain probative evidence of Reconstruction-era

17   Americans' views.

18        An 1874 Georgia Supreme Court decision also suggests that Reconstruction-era

19   Americans viewed the Second Amendment as wholly inapplicable to dangerous and

20   unusual weapons.  *Hill v. State*, 53 Ga. 472 (1874).  In *Hill*, the court expressed bafflement

21   about its previous decision in *Nunn v. State*:

22          I have always been at a loss to follow the line of thought that extends the

23          guarantee to the right to carry [pocket] pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest

24          nuisances of our day.  It is in my judgment a perversion of the meaning of

25          the word arms . . . to treat it as including weapons of this character.

26       ——————————

27       [62] The Supreme Court has consistently treated arguments like this as unpersuasive.  For

28   example, *Heller* dismissed the argument that a handgun ban would be permissible "so long as the possession of other firearms (*i.e.* long guns) is allowed."  554 U.S. at 629.

1    *Id.* at 474.  Again, at first blush, *Bruen* might appear to foreclose reliance on *Hill*, since

2    *Hill* calls *Nunn* into question and *Bruen* labeled *Nunn* as "particularly instructive."  597

3    U.S. at 54.  But the two decisions concern different aspects of the Second Amendment

4    right.  *Bruen* found *Nunn* to be "particularly instructive" regarding the limits on how states

5    may regulate protected weapons like handguns: "States could *not* ban public carry

6    altogether."  *Bruen*, 597 U.S. at 53–54.  *Hill*, by contrast, quibbled with which weapons

7    *Nunn* found to be protected—believing that certain weapons are not "arms" at all and, thus,

8    outside the ambit of the state's constitutional protections.  As to the question of whether

9    those unprotected weapons may be banned altogether, the Court finds *Hill* to be probative

10   evidence of how the public viewed the Second Amendment.

11         The Arkansas Supreme Court's decision in *Fife v. State*, 31 Ark. 455 (1876) is to a

12   similar effect.  *See Bruen*, 597 U.S. at 53 n.20 (citing *Fife*).  In *Fife*, the court quoted the

13   Tennessee Supreme Court for the proposition that "[t]he Legislature . . . ha[s] the right to

14   prohibit the . . . *keeping* [of] weapons dangerous to the peace and safety of the citizens, and

15   which are not usual in civilized warfare, and would not contribute to the common defense."

16   *Fife*, 31 Ark. at 459 (emphasis added) (quoting *Aymette*, 21 Tenn. at 159).  *Fife* then

17   construed a prohibition on the public carry of pistols to apply only to pocket pistols, not

18   standard pistols "as [are] in ordinary use."  *Id.* at 461.

19         In summarizing these Reconstruction-era cases and revisiting *Bruen*'s treatment of

20   them, it is clear that *Bruen*'s dismissal of these cases was context-specific.  *Bruen* examined

21   these cases to decide whether there was history and tradition of restricting the public carry

22   of commonly used weapons; it could not find evidence to support that tradition. 597 U.S. at

23   70.  *Bruen* did not, however, cast into doubt the history and tradition of distinguishing

24   dangerous and unusual weapons and subjecting them to differential treatment.  Indeed,

25   *Heller* expressly endorses the traditional limits on dangerous and unusual weapons and

26   *Bruen* is framed as a straightforward application of *Heller*.  *See id.* at 26, 31 ("[t]he test that

27   we set forth in *Heller* and apply today"; "[h]aving made the constitutional standard

28   endorsed in Heller more explicit, we now apply that standard").  The Court concludes that

1  the Reconstruction-era case law supports a public understanding that dangerous and

2  unusual weaponry could be withheld from private citizens.  The debate back then, as now,

3  seems to have turned more on whether a specific weapon, like a pocket pistol, was properly

4  characterized as dangerous and unusual.

5  e.  *Late-Eighteenth and Early-Nineteenth Century*

6  Late-nineteenth and early-twentieth century evidence can play only a confirmatory

7  (or clarifying) role, not a contradictory one.  *See id.* at 36 ("[T]o the extent later history

8  contradicts what the text says, the text controls.")  As *Bruen* explained, "where a

9  governmental practice has been open, widespread, and unchallenged since the early days of

10  the Republic, the practice should guide our interpretation of an ambiguous constitutional

11  provision."  *Id.* (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J.,

12  concurring)).  But "liquidating indeterminacies in [the constitution] is far removed from

13  expanding or altering [it]."  *Id.* (quoting *Gamble v. United States*, 587 U.S. 678, 721 (2019)

14  (Thomas, J., concurring)).

15  The record reflects that "relevantly similar" laws proliferated in this period, with

16  dozens of laws banning the possession of dangerous and unusual weapons.

17  **Trap Guns**.  Continuing the Reconstruction-era practice of banning trap guns, over

18  ten trap-gun prohibitions were enacted in this period, with some states continuing to label

19  them rather colorfully as "infernal machines."[63]

20  **Trap Gun Regulations as a Relevant Tradition.**  Having now set forth all the trap-

21  gun bans reflected in the historical record, the Court considers Plaintiffs' blanket argument

22  that none of the trap-gun bans are "relevantly similar" to the AWCA.  Specifically,

23  Plaintiffs contend that trap-gun bans are not prohibitions on possessing a category of

24  firearm; in Plaintiffs' views, trap-gun bans are instead a regulation on "the *manner* of

25

26

27  [63] [183] Vermont (1884) at 577; [222] North Dakota (1891) at 715–16; [233] North Dakota
(1895) at 753; [252] Utah (1901) at 817–18; [262] South Dakota (1909) at 849; [264] Washington
(1909) at 853; [267] Vermont (1912) at 863; [272] New Hampshire (1915) at 882–83; [286]

28  Oregon (1925) at 940; [317] Michigan (1931) at 1035; [320] South Carolina (1931) at 1045–46.

using" firearms.  (Pls.' Opp. at 19.)  The district court in *Miller v. Bonta* also adopted this argument: "[T]rap gun laws did not prohibit possession or use of particular guns.  Trap gun laws restricted only the particular manner of using any gun."  *Miller*, 2023 WL 6929336, at *21.

This argument, however, is simply a repackaged version of the "AWCA-regulates-features-not-Arms" argument that the *Attorney General* raised at the plain-text stage.  (*See supra* Part IV.A.)  When raised by the Attorney General, Plaintiffs labelled the argument "specious," and the Court squarely rejected it.  (Pls.' Opp. at 6.)  And for the same reasons the Court now rejects it when raised by Plaintiffs as to trap-gun bans.  To the question of whether it was historically lawful to have in one's possession a gun capable of firing remotely without the user operating the firearm, the statutes provided a near-uniform answer: no.  Indeed, if trap-gun bans were a mere use restriction, then one would expect the statutes to punish individuals only when the gun was actually fired; but such a limitation is absent from the statutes.  Instead, the statutes generally provided separate punishments for having a trap gun on one's property; discharging the gun and injuring someone; and discharging the gun and killing someone.[64]  And lest there be any doubt, several laws make it clear by their text that they are possession bans: The Utah law makes it unlawful for someone to "ha[ve] any infernal machine in his possession";[65] the South Dakota law makes it unlawful for an individual to "have in possession, any trap . . . , swivel gun or set gun";[66] and the South Carolina law prohibits even "construct[ing]" a trap gun.[67]  Accordingly, the Court deems trap-gun bans to be relevantly similar to the AWCA.

**_Pocket Pistols, Slungshots, Metallic Knuckles, etc._**  Additionally, by the Court's count, states passed over twenty laws during the late-eighteenth and early-nineteenth

---

[64] *See, e.g.*, [101] Minnesota (1869) at 319–20; [119] Minnesota (1873) at 380; [264] Washington (1909) at 853.

[65] [252] Utah (1901) at 818.

[66] [262] South Dakota (1909) at 849.

[67] [320] South Carolina (1931) at 1045.

1   century banning the possession, sale, and/or manufacture of dangerous and unusual

2   weapons, including pocket pistols, slungshots, and metallic knuckles.[68]

3       ***Machine Guns.***  And the practice of banning the possession, sale, and manufacture

4   of dangerous and unusual weapons extended to a newly developed category of weapon in

5   the early twentieth century: automatic machine guns.  Indeed, when those firearms became

6   associated with offensive use, states began to regulate them—after highly publicized

7   incidents like the St. Valentine's Day massacre where the Thompson submachine gun, or

8   Tommy gun, was used by organized crime groups.  (*See* Def.'s Ex. 59, Spitzer Supp.

9   Report ¶ 10.)  By the Court's count, states passed nearly thirty laws banning the possession,

10  sale, and/or manufacture of machine guns.[69]  These state restrictions were bolstered by the

---

12      [68] [150] Tennessee (1879) at 476–77 (sale; pocket pistols); [158] Illinois (1881) at 504
13  (possession and sale; slungshots, metallic knuckles, and "other deadly weapon[s] of like
    character"); [187] New York (1885) at 588 (sale and manufacture; slungshots, billy clubs, and
14  metallic knuckles); [205] Minnesota (1888) at 665 (same); [209] Minnesota (1889) at 674 (same);
    [216] Oklahoma—Territory (1890) at 695–96 (sale and manufacture; slungshots or weapons "of
15  any similar kind"); [250] New York (1900) at 810 (sale and manufacture; slungshots, billy clubs,
    and metallic knuckles); [259] New York (1908) at 839–40 (possession; slungshots, billy clubs, and
16  metallic knuckles); [263] Washington (1909) at 852–53 (possession, sale, and manufacture;
    slungshots, billy club, and metallic knuckles); [265]–[266] New York (1911) at 856 (possession,
17  sale, and manufacture; blackjack, slungshot, billy club, sandclub, bludgeon, metallic knuckles);
    [270] Iowa (1913) at 871 (sale; dirk, dagger, stiletto, metallic knuckles, sandclub, and skull
18  cracker); [271] New York (1913) at 876–77 (possession; blackjack, slungshot, billy club, sandclub,
    sandbag, metallic knuckles, bludgeon); [274]–[275] California (1917) at 888 (possession, sale, and
19  manufacture; blackjack, slungshot, billy club, sandclub, sandbag, bludgeon, and metallic knuckles);
    [281] California (1923) at 919 (same); [285] Nevada (1925) at 937 (possession, sale, and
20  manufacture; blackjack, slungshot, billy club, sandclub, sandbag, metallic knuckles); [298]–[299]
    Michigan (1927) at 975–76 (possession, sale, manufacture; blackjack, slungshot, billy club,
21  metallic knuckles, sandclub, sandbag, and bludgeon); [301] New Jersey (1927) at  987 (sale at
    pawn shops; blackjack, slungshot, billy club, sandclub, bludgeon, metallic knuckles, dagger, dirk,
22  dangerous knife, stiletto); [307]–[308] Michigan (1929) at 1010 (possession, sale, and manufacture;
    blackjack, slungshot, billy club, metallic knuckles, sandclub, sandbag, and bludgeon); [317]
23  Michigan (1931) at 1033 (same).
        [69] [301] New Jersey (1927) at 987 (sale); [317] Michigan (1931) at 1033 (sale and
24  manufacture); [290] California (1927) at 954 (possession); [292] Indiana (1927) at 960 (same);
25  [294] Iowa (1927) at 963 (same); [298]–[299] Michigan (1927) at 975–76 (possession, sale, and
    manufacture); [300] New Jersey (1927) at 982–84 (possession and sale; ability to apply for a court-
26  issued license, with the court having "discretion" to issue it); [304] Rhode Island (1927) at 998–99
    (possession, sale, manufacture; carveout for police and military); [307]–[308] Michigan (1929) at
27      (footnote continued)

1934 National Firearms Act, one of the first federal efforts to regulate gun use, "which imposed strict regulations on the civilian acquisition and circulation of fully automatic weapons," *DSSA*, 664 F. Supp. 3d at 601, and which later developed into a federal machine gun ban in 1986.  *See* 18 U.S.C. § 922(o).

## 2.  Assessing Whether the Above-Identified Analogues Amount to a History and Tradition with which the AWCA Is Consistent

Having identified historical analogues that are "relevantly similar" to the AWCA, the Court must now determine whether those analogues constitute a history and tradition that sustains the AWCA against Plaintiffs' Second Amendment challenge.  The Court concludes that they do.  Specifically, for reasons stated below, the most probative time period from which to discern the public understanding of the Second Amendment is the

---

1010 (possession, sale, and manufacture); [309] Missouri (1929) at 1012 (sale and possession); [310] Nebraska (1929) at 1016 (possession for an unlawful purpose and sale; carveout for police and military); [311] Pennsylvania (1929) at 1018 (possession and sale; carveout for police and military); [313] Wisconsin (1929) at 1022 ( possession; carveout for police and military); [314] Delaware (1931) at 1027 (possession; carveout for police and military); [315] Illinois (1931) at 1029–30 (possession, sale, and manufacture; carveout for police, military, historic societies, and guards employed by common carriers, banks, and trust companies); [319] North Dakota (1931) at 1040–41 (possession and sale; ability to apply for a court-issued license, with the court having "discretion" to issue it); [322] Louisiana (1932) at 1054–56 30 (possession, sale, and manufacture; carveout for police, military, historic societies, and guards employed by common carriers, banks, and trust companies); [323] California (1933) at 1059–60 (possession and sale; carveout for police and military; authorized issuance of licenses upon showing of good cause); [325] Hawaii—Territory (1933) at 1068–69 (possession and sale; carveout for government, police, and military); [326] Kansas (1933) at 1072 (possession; carveout for police, military, historic societies, banks, trust companies, and other businesses "subject to unusual hazard from robbery or holdup"); [327] Minnesota (1933) at 1076–78 (possession and sale; carveout for police and military); [329] Ohio (1933) at 1085–86 (possession, subject to "discretion[ary]" permitting process and $5,000 bond; carveout for police and military); [330] Oregon (1933) at 1089–90 (possession, sale, manufacture); [333] Texas (1933) at 1097–98 (possession and sale; carveout for police, military, and scientific or historic purposes); [334] Washington (1933) at 1100 (possession, sale, and manufacture; carveout for police and military); [336] Wisconsin (1933) at 1109–10 (sale and possession; carveout for police and military); [338] New Jersey (1934) at 1119–20 (possession; carveout for police and military); [339] South Carolina (1934) at 1123–24 (possession and sale; carveout for police, military, and employees of common carriers); *cf.* [284] Vermont (1923) at 934 (prohibiting the use in hunting of "a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges"; possession "in a hunting camp shall be presumptive evidence that the possessor" violated the act).

1   ratification of the Fourteenth Amendment during Reconstruction, when states chose to

2   apply the Second Amendment to themselves.  From that time period on, there is a directly

3   relevant tradition of banning the possession of dangerous and unusual weapons.  (*Supra*

4   part IV.B.1.)  Accordingly, the Attorney General has met his burden of identifying an

5   analogous historical practice.

6           To briefly summarize the evidence that the Attorney General has amassed:

7           The Attorney General identified four "relevantly similar" laws from medieval to

8   early England, which banned possession of certain dangerous-and-unusual weapons, such

9   as the launcegay.  (*Supra* part IV.B.1.a.)  None of these analogues are from the "particularly

10   instructive" period "between the Stuart Restoration in 1660 and the Glorious Revolution in

11   1688."  *Bruen*, 597 U.S. at 42 (cleaned up).  But they do represent an "unbroken" practice

12   that prevailed for over four hundred years.  *Id.* at 35.  The Attorney General's evidence is

13   sufficient to establish a medieval and early English tradition.

14           From the colonial and Founding era, the Attorney General identified just one

15   "relevantly" similar law (the trap-gun ban) and five laws that used a similar regulatory

16   "how" as the AWCA and a similar, but not identical, regulatory "why."  Those five laws

17   include the three gunpowder laws that banned possession for fire-safety purposes and the

18   two malfunctioning-gun laws that banned possession to prevent firearms with

19   manufacturing defects from entering the market.  (*Supra* part IV.B.1.b.)  While the trap-gun

20   ban is relevantly similar to AWCA, this "lone . . . law" is insufficient to demonstrate a

21   widespread tradition during colonial and Founding-era America.  *Bruen*, 597 U.S. at 69–70;

22   *see also id.* ("we will not give disproportionate weight to a single state statute"); *id.* at 46

23   (expressing doubt "that *three* colonial regulations could suffice to show a tradition").

24           But "relevantly similar" practices gained ground in antebellum America.  From this

25   period, the Attorney General identified five laws "relevantly similar" to the AWCA: three

26   prohibitions on the manufacture or sale of dangerous and unusual weapons, and two

27   onerous taxes on the sale of such weapons.  (*Supra* part IV.B.1.c.)  Caution, however, is

28   needed.  Under *Bruen*, territorial laws like the tax imposed by Florida "deserve little

52

weight." 597 U.S. at 69.  Moreover, under *Bruen*, courts should not give antebellum historical evidence "more weight than it can rightly bear," as antebellum laws both *postdate* 1791 and *predate* 1868.  *Id.* at 35.

These "relevantly similar" laws continued into Reconstruction.  The Attorney General identified six "relevantly similar" laws from the Reconstruction era: five trap-gun bans and one prohibition on the manufacture of certain dangerous-and-unusual weapons.  Moreover, five judicial decisions from four different states' supreme courts provide insight into why Reconstruction-era Americans viewed laws banning possession of certain weapons as consistent with the Second Amendment.  (*Supra* part IV.B.1.d.)  Combined, this evidence is sufficient to demonstrate a firmly entrenched tradition during Reconstruction.  And "relevantly similar" laws only increased in the late-nineteenth and early-twentieth century, as dozens of states adopted dozens of laws banning possession of dangerous-and-unusual weapons, including trap guns and machine guns.   (*Supra* part IV.B.1.e.)

Because the Bill of Rights did not initially apply to the states, they "are bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second."  *Bruen*, 597 U.S. at 37; *see Barron v. City of Baltimore*, 32 U.S. 243, 250–251 (1833) (pre-Reconstruction Bill of Rights applies only to the federal government); *Lessee of Livingston v. Moore*, 32 U.S. 469, 551–552 (1833) (same).  But at the same time, "individual rights enumerated in the Bill of Rights and made applicable to the States through the Fourteenth Amendment have the *same scope* as against the Federal Government."  *Bruen*, 597 U.S. at 37 (emphasis added).  Given this long-established rejection of a "two-track approach" to incorporation, *McDonald*, 561 U.S. at 788, a difficult interpretive question arises: "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" or when the Bill of Rights was adopted in 1791, *Bruen*, 597 U.S. at 37.

1     *Bruen* observed that the Supreme Court had "generally assumed" 1791 was the

2     relevant date for discerning a constitutional provision's meaning but then "acknowledge[d]

3     . . . an ongoing scholarly debate" on the 1868-or-1791 question and cited two scholars who

4     argue a primary focus on 1868 is appropriate. *Bruen*, 597 U.S. at 37 (citing Akhil Amar,

5     *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998); Kurt Lash, *Re-*

6     *Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441

7     (2022)).  Ultimately, however, *Bruen* declined to address the 1868-or-1791 question

8     "because . . . the public understanding" on the issue before the Court was "the same."

9     *Bruen*, 597 U.S. at 38.  Nor has the Ninth Circuit had occasion to address it.  *See Alaniz*, 69

10    F. 4th at 1129.

11        Here, the Attorney General argues that Reconstruction-era practice should take

12    precedence over Founding-era practice if the Court were to conclude that they meaningfully

13    differ.  (*See* Def.'s Mem. at 27 (Reconstruction-era "regulations bear particular

14    importance").)  Plaintiffs appear to take the opposite position and suggest that, when

15    regulations from the two periods differ, Founding-era practice displaces Reconstruction-era

16    practice.  (See Pls.' Opp. at 22 ("[T]he State may only rely on laws enacted after 1868 when

17    they *confirm* our understanding of the text and 1791 tradition.").)

18        The Court agrees with the Attorney General and concludes that evidence shortly

19    before or after 1868 is the most probative evidence of the Second Amendment's meaning.

20    As such, a challenged statute is "consistent with this Nation's historical traditional of

21    regulating firearms" if the government has identified a practice that has been established

22    since Reconstruction—even if that practice was not widespread at the time of the Founding.

23        First, it "would be illogical" to assume that states "bound themselves to an

24    understanding of the Bill of Rights—including that of the Second Amendment—that they

25    did not share when they ratified the Fourteenth Amendment."  *NRA v. Bondi*, 61 F.4th

26    1317, 1324 (11th Cir. 2023), *vacated for reh'g en banc*, 72 F.4th 1346; *accord Maryland*

27    *Shall Issue, Inc. v. Montgomery County*, 2023 WL 4373260, at *8 (D. Md. July 6, 2023);

28    *Kipke v. Moore*, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023).  To make this point

1    more concrete: Under *Bruen*, a challenged regulation must generally have a historical

2    analogue to be constitutional.  And while there was not a widespread practice of banning

3    dangerous and unusual weapons circa 1791, there *was* such a practice circa 1868.  So, if the

4    Court were to adopt Plaintiffs' approach and hold that Reconstruction-era practice cannot

5    establish a tradition, then the Court would have to assume that states in 1868 made a

6    promise not to "infringe" on the right to "keep and bear arms" while being poised to

7    immediately breach that promise—by already having possession, manufacture, and sale

8    bans on the books or soon adopting such laws.

9           Indeed, Plaintiffs' assumption—that the states bound themselves to the Bill of Rights

10   with little consideration of the content of those rights—is difficult to square with the sea

11   change ushered in by the Fourteenth Amendment's ratification.  By incorporating the Bill

12   of Rights against the states, Section 1 of the Fourteenth Amendment "fundamentally altered

13   our country's federal system."  *McDonald*, 561 U.S. at 754.  Citizens could, for the first

14   time, challenge state action in a federal forum on the grounds that it infringed the federal

15   Constitution.  Moreover, under Section 5 of the Fourteenth Amendment, Congress could

16   enact enforcement legislation intended to ensure that states complied with their newly

17   undertaken obligation to adhere to the Bill of Rights—a muscular font of legislative power

18   that Congress invoked almost immediately to allow civil suits and criminal prosecutions

19   against state officials who violated the Constitution.  *See, e.g.*, Cass R. Sunstein, *Section

20   1983 and the Private Enforcement of Federal Law*, 49 U. Chi. L. Rev. 394, 396-400 (1982)

21   (overviewing the Civil Rights Act of 1866, the Enforcement Act of 1870, and the Ku Klux

22   Klan Act of 1871).  Given the then-novelty of incorporation, the threat of federal

23   enforcement it entailed, and the supervision of federal courts it invited, it is unreasonable to

24   assume that states in 1868 would adopt an understanding of the Constitution out of step

25   with their own practice.

26          Second, Plaintiffs' approach would create a strange discrepancy within the

27   incorporation doctrine.  Determining *whether* a provision is incorporated against the states

28   requires a careful review of Reconstruction-era history.  *See McDonald*, 561 U.S. at 770–

78; *Timbs v. Indiana*, 139 S. Ct. 682, 688–69 (2019).  But under Plaintiffs' approach, courts cannot look to Reconstruction-era history to determine the *scope* of that incorporated right if regulatory practice in that period differed from regulatory practice at the Founding.

Third, the rationales articulated by courts adopting Plaintiffs' approach are unpersuasive.  The Fifth Circuit, for example, simply concluded without further explanation: "Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791."  *United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023).  The Third Circuit, for its part, reasoned that *Bruen* "gave a strong hint" that 1791 is the focal point when *Bruen* noted that it had previously assumed a right's scope is "pegged to the public understanding . . . when the Bill of Rights was adopted in 1791."  *Lara v. Comm'r Penn. State Police*, 91 F.4th 122, 133 (3d Cir. 2024) (quoting *Bruen*, 597 U.S. at 37).  But "[j]udicial assumptions concerning . . . issues that are not contested are not holdings."  *Branham v. Montana*, 996 F.3d 959, 963 (9th Cir. 2021) (quoting *FDIC v. McSweeney*, 976 F.2d 532, 535 (9th Cir. 1992)); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The effect of the omission was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not a binding precedent on this point.").  The Supreme Court's previous assumptions likely reflect nothing more than the fact that the history in those cases did not meaningfully differ between the Founding and Reconstruction and thus the 1868-or-1791 question was not dispositive—as was the case in *Bruen* where the question was expressly reserved.  Rather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles and, as explained, the Court is persuaded that Reconstruction-era practice provides the most probative evidence of the Second Amendment's meaning.

The fact that Founding-era laws singled out dangerous and unusual weapons for differential treatment without banning the weapons is, therefore, non-dispositive.  Rather, that tradition developed, such that by the Reconstruction-era, the tradition encompassed possession bans.  This is a notable distinction from the history discussed in *Bruen*, where

1   the Supreme Court could identify only short-lived, outlier laws that resembled New York's

2   may-issue regime, suggesting that such a regime had never gained momentum as an

3   American tradition.  *See* 597 U.S. at 65, 69, 70.  Furthermore, because the Court has

4   concluded that Reconstruction-era understanding of the Second Amendment is the most

5   probative, that understanding, which clearly tolerated bans on dangerous and unusual

6   weapons, prevails in this case.  There is a history and tradition in this country of treating

7   dangerous and unusual weapons as beyond the scope of the Second Amendment.

8   **C.    The AWCA Survives Under the More Nuanced Approach**

9   Alternatively, if Reconstruction-and-onward practice cannot establish a tradition,

10   then the Court concludes that this case requires application of the "more nuanced approach"

11   contemplated by *Bruen* for "cases implicating unprecedented societal concerns or dramatic

12   technological changes."  597 U.S. at 27.  Under that approach, a challenged statute need not

13   find direct analogues in the historical record.  As applied by the Ninth Circuit, the "more

14   nuanced approach" relaxes the fit required between a challenged statute's manner of

15   burdening Second Amendment rights (the "how") and historical laws to which it is being

16   compared.  *See Alaniz*, 69 F.4th at 1129–30.  In *Alaniz*, the Ninth Circuit concluded that,

17   under the more nuanced approach, a judge-imposed sentencing enhancement for possession

18   of a dangerous weapon during commission of an offense was "relevantly similar" to certain

19   historical laws—even though, under those laws, possession was an element of the offense

20   (not a sentencing enhancement) that needed to be proven beyond a reasonable doubt (not by

21   a preponderance) to a jury of a defendant's peers (not a judge).  *See id.*

22   **1.    Unprecedented Societal Concern**

23   The record before the Court establishes that the use of assault rifles to perpetrate

24   mass shootings is an unprecedented societal concern.  Indeed, both elements of that

25   concern—mass shootings and the use of assault rifles therein—are of a recent vintage.

26   There is no genuine dispute that no known "shooting incidents involving ten or more

27   fatalities . . . occur[red] before 1949" in the United States.  (Def.'s SOF ¶ 78.)  The parties

28   agree that the AR-15, the prototypical assault rifle, did not become popular until the

1980s—following the M-16's use by the U.S. military in the Vietnam War.  (*Id.* ¶ 6.)  And there is no dispute that, as assault rifles began to be used in mass shootings, states and the federal government stepped in to ban their possession.  An assault rifle was used in a Stockton, California shooting that killed five children and left 32 others injured; that same year, California passed the AWCA, finding that "assault weapons pose[] a threat to the health, safety, and security of all citizens of this state" due to their "high rate of fire and capacity for firepower."  Cal. Penal Code § 30505(a).  And as mass shootings have become more prevalent, more and more States have enacted bans on assault weapons, with states representing a quarter of the United States' population having such a ban on the books. (Def.'s SOF ¶ 115.)

This conclusion accords with several other district court decisions evaluating similar restrictions on similar evidentiary records.  *See Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027, at *36 (D. Or. July 14, 2023) ("[M]ass shootings using [large-capacity magazines] are an unprecedented societal concern."); *DSSA*, 664 F. Supp. 3d at 599 ("assault weapons and [large-capacity magazines] implicate unprecedented societal concerns"); *Nat'l Ass'n for Gun Rights v. Lamont*, 2023 WL 4975979, at *27–29 (D. Conn. Aug 3, 2023) ("*NAGR*") ("[M]ass shootings carried out with assault weapons and [large-capacity magazines] that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history."); *Hartford v. Ferguson*, 2023 WL 3836230, at *5–6  (W.D. Wa. June 6, 2023) ("[U]nprecedented social concerns have arisen from the proliferation of [assault rifles].").  While the *Miller* district court decision declined to apply *Bruen*'s "more nuanced approach" to a challenge to the AWCA, it did so without considering whether mass shootings are an unprecedented societal concern.  *See Miller*, 2023 WL 6929336, at *19 (acknowledging Defendant's argument that "'assault weapons' represent a dramatic change in technology and the State is attempting to address a modern societal concern of mass shootings," but then analyzing only whether assault weapons are

1  "really a dramatic technological advancement").  Given that omission, the Court does not

2  find *Miller* to be persuasive on this issue.

3          Nor does the Court find Plaintiffs' counterarguments on this point to be persuasive.

4  Though Plaintiffs concede that no double-digit mass shooting occurred until the mid-

5  twentieth century and that such shootings are rapidly increasing, they argue that mass

6  shootings are not "unprecedented" because there was an 1869 shooting in which "thirteen

7  or fourteen shots were fired" and "many" were "kill[ed] and wound[ed]."  (Pls.' Opp. at

8  13.)  Even viewing the record in the light most favorable to Plaintiffs and assuming that this

9  vaguely-described incident is a mass shooting, its occurrence does not remove this case

10  from the scope of those warranting *Bruen*'s more nuanced approach.  Plaintiffs attempt a

11  sleight of hand as to *what* must be unprecedented to trigger the more nuanced approach.

12  While Plaintiffs insist that the event, here "mass shootings," must be unprecedented, *Bruen*

13  asks whether the "societal concern[]" in response to the event is unprecedented.  Indeed, in

14  fleshing out the more nuanced approach, *Bruen* contemplated its application where a

15  societal concern would not have "*preoccupied* the Founders in 1791 or the Reconstruction

16  generation in 1868"—not, as Plaintiffs would have it, where the concern would have been

17  entirely foreign to them.  *Bruen*, 597 U.S. at 27 (emphasis added).  Looking at societal

18  concern here, there may have been one previous historic mass shooting but the record lacks

19  any evidence that society was consistently concerned with mass shootings thereafter.

20  Meanwhile, the dramatic uptick in mass shootings in recent decades, including those

21  causing the deaths of many young children, has newly brought the issue front of mind for

22  many Americans.

23              **2.      Dramatic Technological Change**

24          The Court's determination that the AWCA addresses an "unprecedented societal

25  concern" is sufficient to warrant application of *Bruen*'s more nuanced approach.  *See*

26  *Bruen*, 597 U.S. at 27 ("unprecedented societal concerns *or* dramatic technological

27  changes" (emphasis added)).  However, the Court also determines that *Bruen*'s more

28  nuanced approach is appropriate here because the high-velocity, rapid fire, lightweight, and

1    concealable nature of assault rifles represents a dramatic technological change.  As

2    explained in the Court's dangerous-and-unusual analysis, assault rifles have a historically

3    unparalleled capability to inflict mass casualties.  (*Supra* part IV.A.1.)

4        Plaintiffs resist this conclusion by insisting that modern assault rifles are comparable

5    to the lever repeating rifles that, construing the record in the light most favorable to

6    Plaintiffs, were popular in the late nineteenth century.  (Pls.' Opp. at 14.)  But

7    uncontroverted evidence establishes that those rifles "required the shooter to manipulate a

8    lever in a forward-and-back motion before each shot," meaning the rate of fire was

9    significantly lower than modern-day rifles.  (Def.'s Ex. 59, Spitzer Supp. Report ¶ 34.)  It is

10   unrealistic to argue that assault rifles that can fire 120 rounds in three minutes are not a

11   dramatic technological change over a rifle that, due to the lever-pull and manual-feeding

12   requirements, could fire only about 36 rounds in that time period.  *See Or. Firearms*, 2023

13   WL 4541027, at *38–39 (finding dramatic technological change after noting that, "even the

14   most reliable multi-shot firearms of the nineteenth century—the Colt revolver, the Henry

15   rifle, and the Winchester rifle—had to be reloaded round by round, meaning that a

16   repeating firearm could only be reloaded as quickly as the shooter could insert the

17   individual rounds").

18       The Court again acknowledges that the district court in *Miller* reached a different

19   conclusion when determining whether assault rifles constituted a dramatic technological

20   change.  However, in doing so, the district court compared modern-day assault rifles with

21   nineteenth century "lever-action rifles" at an extraordinarily high level of generality.  The

22   district court found the two categories of weapons to be comparable—*i.e.*, not dramatically

23   different—because both "could be fired multiple times in succession very accurately and

24   quickly."  *Miller*, 2023 WL 6929336, at *19.  That level of generality obscures that

25   modern-day assault rifles have an effective fire rate several times over that of lever-action

26   rifles.  And it is such a high level of generality that it would mean fully automatic machine

27   guns are not a dramatic technological change over nineteenth century lever-action rifles—a

28   conclusion that directly contradicts *Heller*'s suggestion that machine guns "may be

60

1    banned." 554 U.S. at 627.  Therefore, the Court concludes that the district court's analysis

2    in *Miller* on this issue is unpersuasive.

3                          **3.       Applying the More Nuanced Approach.**

4            Laws with a regulatory "why" analogous to the AWCA date back to the Founding.

5    But, as the Court has already discussed, the laws lacked an analogous regulatory "how" and

6    the Attorney General has not identified, under the typical *Bruen* analysis, a widespread

7    practice dating back to the 1700s that encapsulates both of those metrics.  Nevertheless, in

8    applying *Bruen*'s more nuanced approach, the Court concludes that the AWCA is

9    consistent with this country's tradition of singling out dangerous and unusual weaponry for

10   differential treatment and simply escalates the regulatory method.  And notably, the

11   regulatory method of banning possession, manufacture, and sale of arms and accoutrements

12   has been employed since the Founding.  The Court concludes that the regulatory escalation

13   is warranted in light of the dramatic technological change and unprecedented societal

14   concern created by the rise of mass shootings with assault rifles.

15           The prevalence of laws with an analogous "why" dating back to the Founding is

16   evident in the record.  The colonies and early states adopted a host of laws regulating

17   dangerous and unusual weapons associated with offensive use instead of lawful self-

18   defense.  New Jersey made its "why" the most explicit, stating that "pocket pistol[s], skeins,

19   [] daggers, [and] dirks" needed to be regulated because "there hath been great complaint by

20   the inhabitants of this Province" regarding "several persons wearing [these] or any other

21   unusual or unlawful weapons . . . [that] put in great fear and quarrels, and challenges made,

22   to the great abuse of the inhabitants."[70]  Laws with an analogous "how" to the AWCA also

23   date back to the Founding.  Three Founding-era laws banned the possession of certain

24

25   _____

26       [70] [5] New Jersey (1686) at 10; *see also* [18] New Jersey (1799) at 77 (an act to prevent "ill
     disposed persons" from "carrying their evil purposes into execution"); [26] Louisiana (1813) at 103

27   ("Whereas assassination and attempts to commit the same[] have of late been of such frequent
     occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants

28   of this state . . . ."); [32] Maine (1821) at 120 (an act "for prevention of crime").

quantities of gunpowder or its possession outright, [71] while two Founding-era laws banned the sale and possession of firearms deemed "unfit for use." [72]

The more nuanced approach allows the California to regulate dangerous and unusual weapons by reaching for a well-established tool in the regulatory toolkit—even if the Founders used that tool to address slightly different regulatory concerns such as fire-safety danger created by gunpowder or the danger posed by defects in malfunctioning firearms. Doing so does not erode the historical support for the AWCA. That is because, while the AWCA's "why" is analogous to historical laws, its precise concern is novel. The threat posed by assault rifles is much more substantial than the risk posed by bowie knives. The weapons operate with a single pull of a trigger, can target victims up to 550 meters away, and can kill scores of people in minutes; no one would dispute that these capabilities outmatch those of a large knife—or, as explained, even the lever rifles developed in the nineteenth century. Because assault rifles are such powerful and dangerous departures from typical weaponry, it follows, under *Bruen*'s more nuanced approach, that the legislature would have to step up its response to protect human life effectively.

Finally, the Court finds support for its application of *Bruen*'s more nuanced approach in *Heller*'s treatment of bans on machine guns. Heller stated that it would be a "startling" if the Second Amendment rendered the federal machine gun ban unconstitutional, and it suggested that "M-16 rifles and the like[] may be banned." 554 U.S. at 624, 627. But if *Bruen*'s more nuanced approach cannot tolerate a ban on possession of semiautomatic assault rifles for lack of sufficiently similar historical laws, then *Bruen*'s more nuanced approach also could not tolerate a ban on possession of fully automatic machine guns. The Court would be hesitant to construe *Bruen* in this manner

---

[71] [342] New York City, New York (1784) at 1136–37 (prohibiting possession above twenty-eight pounds, and regulating storage below that amount); [343] New York (1792) at 1141 (same); [344] Maine (1821) at 1144 ("[N]o person or persons shall have, keep or possess within [a town above 1500 people] any gunpowder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid.").

[72] [23] Massachusetts (1805) at 94–95; [27] Massachusetts (1814) at 107–08.

1  given its express statements that it was not disturbing *Heller*.  *See Bruen*, 597 U.S. at 26, 31

2  ("[t]he test that we set forth in *Heller* and apply today"; "[h]aving made the constitutional

3  standard endorsed in *Heller* more explicit, we now apply that standard").

4  **V.      CONCLUSION**

5         The very text of the Second Amendment contemplates that the right to bear arms

6  will be subject to regulation by noting that a "well regulated Militia" is "necessary to the

7  security of a free State."  U.S. Const. amend. II.  The English Declaration of Rights, on

8  which our Bill of Rights was based, similarly accounts for the need for this regulation and

9  only guarantees "Arms for [] Defence … as allowed by Law."  *Heller*, 554 U.S. at 593

10  (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441).  For as long as the Supreme

11  Court has recognized an individual right to bear arms, it has recognized that this is *not* "a

12  right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

13  purpose."  *Id.* at 626.  Understanding that the Second Amendment has always been subject

14  to regulatory limitations and understanding that a state may use its police powers to

15  withhold dangerous and unusual weapons from private citizens, California has singled out a

16  subset of firearms for such restriction.  The AWCA is constitutional because either: (1)

17  assault rifles are dangerous and unusual and, therefore, not protected by the Second

18  Amendment at all; (2) assault rifles may be banned in accordance with this nation's

19  regulatory tradition of placing severe restrictions on dangerous and unusual weaponry,

20  including a tradition of outright possession bans that proliferated during Reconstruction

21  when states first became subject to the Second Amendment; or (3) mass shootings with

22  assault rifles pose such an unprecedented societal concern, engendered by dramatic

23  technological development, that California is constitutionally permitted to use a slightly

24  different regulatory method that is still consistent with a general tradition of limiting

25  offensive and unlawful use of dangerous and unusual weapons.

26  //

27

28

1    For the foregoing reasons, the Court GRANTS the Attorney General's motion for

2  summary judgment and DENIES Plaintiffs' motion.  Within **five (5) days** of the date of this

3  Order, the Attorney General shall file and lodge a Proposed Judgment.

4

5  DATED:  March 15, 2024

6

7  HON. JOSEPHINE L. STATON
   UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28